# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **LAURA PENDERGEST-HOLT,** | § | |
| **R. ALLEN STANFORD, GILBERT** | § | |
| **LOPEZ, JR. and MARK KUHRT,** | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. 4:09-cv-03712** |
| | § | |
| **CERTAIN UNDERWRITERS AT** | § | |
| **LLOYD'S OF LONDON and ARCH** | § | |
| **SPECIALTY INSURANCE** | § | |
| **COMPANY,** | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................. 1

II. NATURE AND STAGE OF THE PROCEEDING ......................................... 2

III. STATEMENT OF ISSUES ............................................................................... 4

IV. STANDARD OF REVIEW ............................................................................... 4

V. SUMMARY OF THE ARGUMENT ................................................................ 5

VI. EVIDENCE SUPPORTING MOTION FOR PRELIMINARY INJUNCTION ............. 8

    A.  **The Policies of Insurance:** ................................................................. 8

        1.  **The D&O Policy:** ....................................................................... 8

        2.  **The Excess Policy:** ................................................................. 11

    B.  **The Underlying Claims Made Against Plaintiffs.** ....................... 12

        1.  **The SEC Action.** ..................................................................... 12

        2.  **The Criminal Action.** ............................................................. 15

    C.  **Underwriters' Responses to Plaintiffs' Claims Under the Policies.** ............ 18

    D.  **Underwriters' Retroactive Coverage Denial.** ............................ 22

    E.  **Underwriters' Conduct Will Cause Irreparable Harm.** ............ 24

VI. ARGUMENT ................................................................................................... 27

    A.  **Jurisprudence Throughout the Country Favors Injunctive Relief in this Case.** ............ 27

    B.  **A Preliminary Injunction is Warranted in this Case** .................. 33

        1.  **There is a Substantial Likelihood that Plaintiffs Will Prevail on the Merits.** ............ 34

            a.  **The Duty to Pay Defense Costs Under the Policies and Texas Law.** ............... 34

            b.  **The Insuring Clause is Satisfied.** ................................. 39

            c.  **No Exclusions Bar All Coverage Under the Policy.** ......... 40

(1). Coverage Exists Under the "Eight Corners" Rule.....................................40

(2). Coverage Still Exists Outside the "Eight Corners" .................................44

2.  **Plaintiffs will Suffer Irreparable Injury if a Preliminary Injunction is not Issued.** .................................................................................................48

3.  **The Harm to Plaintiffs Outweighs any Harm to Underwriters.** ........................50

4.  **The Issuance of a Preliminary Injunction will not Adversely Affect the Public Interest.** .........................................................................................51

VII. CONCLUSION ..................................................................................52

## TABLE OF AUTHORITIES

**Cases**

*Associated Electric & Gas Insurance. Services, Ltd. v. Rigas*,
  382 F. Supp. 2d 685 (E.D. Pa. 2004) ..................................................................32

*Balandran v. Safeco Insurance Co.*,
  972 S.W.2d 738 (Tex. 1998) ..............................................................................47

*Basic Energy Services, Inc. v. Liberty Mutual Insurance Co.*,
  2009 WL 2998134 (W.D. Tex. Sept. 18, 2009) .............................................7, 39

*Cho v. Itco, Inc.*,
  782 F.Supp. 1183 (E.D. Tex. 1991).............................................................33, 34

*Clark v. K-Mart Corp.*,
  979 F.2d 965 (3rd Cir. 1992)...............................................................................45

*Connecticut General Life Insurance Co. v. New Images of Beverly Hills*,
  321 F.3d 878 (9th Cir. 2003)...............................................................................52

*D.R. Horton—Texas, Ltd. v. Markel International Insurance Co., Ltd.*,
  2009 WL 4728008 (Tex. Dec. 11, 2009) .............................................................38

*Federal Savings & Loan Insurance Corp. v. Dixon*,
  835 F.2d 554 (5th Cir. 1987) .................................................................................5

*Fidelity Federal Savings and Loan Association v. Felicetti*,
  830 F. Supp. 262 (E.D. Pa. 1993)........................................................................36

*Flood v. Clearone Communications, Inc.*,
  2009 WL 87006 (D. Utah 2009)................................................................. passim

*G-I Holdings, Inc. v. Reliance Insurance Co.*,
  2006 WL 776809 (D.N.J. Mar. 24, 2006) ...........................................................35

*Great American Insurance Co. v. Gross*,
  2005 WL 1048752 (E.D. Va. 2005)........................................................... passim

*Guaranty National Insurance Co. v. Vic Manufacturing. Co.*,
  143 F.3d 192 (5th Cir. 1998)...............................................................................41

*GuideOne Elite Insurance Co. v. Fielder Road Baptist Church*,
  197 S.W.3d 305 (Tex. 2006) ...............................................................................38

*In re Enron Corp. Securities, Derivative & "ERISA" Litigation*,
  391 F. Supp. 2d 541 (S.D. Tex. 2005) .............................................32, 41, 42, 45

*In re WorldCom, Inc. Securities Litigation*,
  354 F. Supp. 2d 455 (S.D.N.Y. 2005)........................................................ passim

*Julio & Sons Co. v. Travelers Casualty & Surety Co. of America*,
  591 F. Supp. 2d 651 (S.D.N.Y. 2008)............................................................37, 38

*Little v. MGIC Indemnity Corp.*,
  649 F. Supp. 1460\ (W.D. Penn. 1986), *aff'd*, 836 F.2d 789 (3rd Cir. 1987), *reh'g den.*
  (3rd Cir 1988) ............................................................................................ 32, 33, 35

*Lowy v. Travelers Property & Casualty Co.*,
  2000 WL 526702 (S.D.N.Y. May 2, 2000) ............................................................ 38

*Mary Kay Holding Corp. v. Federal Insurance Co.*,
  309 F. App'x 843 (5th Cir. 2009) ...................................................................... 37

*Mattive v. Healthsource of Savannah, Inc.*,
  893 F. Supp. 1559 (S.D. Ga. 1995) .................................................................... 45

*Mylett v. Jeane*,
  910 F.2d 296 (5th Cir. 1990) ............................................................................ 45

*National Union Fire Insurance Co. of Pittsburgh v. Brown*,
  787 F. Supp. 1424 (S.D. Fla. 1991) ............................................................... 32, 41

*National Union Fire Insurance Co. v. CBI Industries*,
  907 S.W.2d 517 (Tex. 1995) ............................................................................. 47

*National Union Insurance Co. v. Willis*,
  296 F.3d 336 (5th Cir. 2002) ....................................................................... 42, 43

*Northfield Insurance Co. v. Loving Home Care, Inc.*,
  363 F.3d 523 (5th Cir. 2004) ...................................................................... 37, 38

*PMI Mortgage Insurance Co. v. American International Specialty Lines Insurance Co.*,
  2006 WL 825266 (N.D. Cal. Mar. 29, 2006) ........................................................ 42

*Romer v. Green Point Savings Bank*,
  27 F.3d 12 (2nd Cir. 1994) .............................................................................. 46

*St. Paul Mercury Insurance Co. v. Foster*,
  268 F. Supp. 2d 1035 (C.D. Ill. 2003) ............................................................... 42

*Terrazas v. Slagle*,
  821 F. Supp. 1162 (W.D. Tex. 1993) ................................................................. 46

*U.S. v. Cronic*,
  466 U.S. 648 (1984) ................................................................................. 31, 49

*U.S. v. Gonzalez-Lopez*,
  548 U.S. 140 (2006) ...................................................................................... 49

*United Offshore Co. v. Southern Deepwater Pipeline Co.*,
  899 F.2d 405 (5th Cir. 1990) ............................................................................. 5

*University of Texas v. Camenisch*,
  451 U.S. 390 (1981) ...................................................................................... 45

*Zurich America Insurance Co. v. Nokia, Inc.*,
  268 S.W.3d 487 (Tex. 2008) ...................................................................... 7, 37, 38

**Statutes**

TEX. INS. CODE ANN. § 542.051 ............................................................................3

TEX. INS. CODE ANN. § 554.002 ..........................................................................41

U.S. CONST. amend. VI ........................................................................................31

**Rules**

FED. R. CIV. P. 43(c) ..............................................................................................5

FED. R. CIV. P. 65 ................................................................................................52

FED. R. CRIM. P. 11(d) ........................................................................................45

FED. R. CRIM. P. 11(e) ........................................................................................45

# I.
## INTRODUCTION

R. Allen Stanford, Laura Pendergest-Holt, Gilbert Lopez, Jr., and Mark Kuhrt, Plaintiffs herein, are defendants in a criminal action pending in this Court in the matter of *United States v. Robert Allen Stanford, Laura Pendergest-Holt, Gilberto Lopez, Mark Kuhrt and Leroy King*, Criminal No. H-09-342 (the "Criminal Action"), and Plaintiffs Stanford and Holt also are defendants in an action commenced by the Securities and Exchange Commission ("SEC") in the United States District Court for the Northern District of Texas, Dallas Division, in the matter of *SEC v. Stanford Int'l Bank Ltd., et al.*, Cause No. 3:09-CV-00298 (the "SEC Action"). Plaintiffs instituted this proceeding against Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Company (collectively, "Underwriters" or "Defendants") to obtain a judgment declaring that Underwriters, which issued three policies insuring the Plaintiffs, is obligated to pay for Plaintiffs' defense costs and expenses in the SEC and Criminal Actions, among other relief sought.

By this motion, Plaintiffs seek interim relief in the form of an injunction from this Court requiring Underwriters to withdraw its improper and retroactive denial of coverage and to compel Underwriters to pay all reasonable and necessary defense costs and expenses incurred in the SEC and Criminal Actions until such time as a court of competent jurisdiction concludes that Underwriters does not

have a contractual obligation to do so. Interim injunctive relief is necessary to protect Plaintiffs' constitutional rights, including the right to a speedy trial in the Criminal Action, the right to effective assistance of counsel and the right to counsel of their choice.

## II.
## NATURE AND STAGE OF THE PROCEEDING

This case arises out of the seizure of Stanford International Bank, Ltd., Stanford Capital Management, LLC, Stanford Financial Group Company and the Stanford Group Company, among other entities (collectively hereinafter "the Stanford Group"), by the SEC, and out of the criminal prosecution of Plaintiffs and others by the United States Department of Justice ("DOJ"). On February 17, 2009, the SEC commenced the SEC Action against Plaintiffs Holt and Stanford,[1] and Judge Reed O'Connor of the United States District Court for the Northern District of Texas, Dallas Division, appointed a receiver to take possession of all property and assets of the Stanford Group and of Plaintiffs Stanford and Holt.[2] The SEC later moved for leave to file a Second Amended Complaint in which it seeks to add

---

[1] A true and correct copy of the SEC's Original Complaint is attached to the contemporaneously filed Appendix at **Exhibit 1**. All further references herein to the **Appendix** will be to **"App. Exh. __."** The SEC has since filed a First Amended Complaint, which is attached hereto at **App. Exh. 2**.

[2] A true and correct copy of the Order Appointing Receiver filed in the SEC Action is attached hereto at **App. Exh. 3**.

---

Plaintiffs Kuhrt and Lopez as defendants in the SEC Action.[3] On June 18, 2009, all four Plaintiffs were indicted in the Criminal Action, which is pending before this Court.[4]

In this proceeding (the "Declaratory Judgment Action"), Plaintiffs seek a declaration requiring Underwriters to pay the Plaintiffs' defense costs incurred in connection with the SEC Action, the Criminal Action and any and all other "Claims," as those terms are defined in the D&O Policy and the "follow form" Excess Policy.[5] Plaintiffs also seek damages in the Declaratory Judgment Action for Underwriters' breaches of the insurance policies, as well as amounts due pursuant to Texas' Prompt Payment of Claims Act.[6] Finally, and most importantly

---

[3] A true and correct copy of the Motion for Leave to File Second Amended Complaint is attached hereto at **App. Exh. 4**.

[4] A true and correct copy of the Indictment is attached hereto at **App. Exh. 5**. Notably, Plaintiff Holt initially was indicted alone but, upon the filing of the aforementioned Indictment, the original indictment against Plaintiff Holt was dismissed.

[5] "D&O Policy" refers to the policy issued by Underwriters to the Stanford Group, bearing policy number 576/MNK558900 and effective August 15, 2008 to August 15, 2009. A true and correct copy of the D&O Policy is attached hereto at **App. Exh. 6**. "Excess Policy" refers to the policy issued by Underwriters to the Stanford Group, bearing policy number 576/MNA831400 and effective August 15, 2008 to August 15, 2009. A true and correct copy of the Excess Policy is attached hereto at **App. Exh. 7**. Underwriters also issued a third policy that provides, among other things, Professional Indemnity Coverage. Because the payment of defense costs is clear under both the D&O and Excess Policies, it is not necessary to address coverage under the third policy at this time.

[6] *See* TEX. INS. CODE ANN. § 542.051 *et seq.*

---

for purposes of the hearing set for December 17, 2009, Plaintiffs seek the issuance of a preliminary injunction requiring Underwriters to not only pay Plaintiffs' defenses costs and expenses that already have been incurred in the SEC Action and the Criminal Action, but also an order requiring Underwriters to continue making payment of those defense costs and expenses in both the SEC Action and the Criminal Action until such time as a court of competent jurisdiction determines that no such contractual obligation is owed.

## III.
## STATEMENT OF ISSUES

Whether Plaintiffs are entitled to a preliminary injunction requiring Underwriters to pay all reasonable and necessary defense costs and expenses (a/k/a "Costs, Charges and Expenses") incurred in the defense of the SEC and Criminal Actions until such time that a court of competent jurisdiction concludes that either a "final adjudication" or "in fact" determination has been made sufficient to negate coverage under the D&O Policy and the "follow form" Excess Policy.

## IV.
## STANDARD OF REVIEW

A preliminary injunction may be granted if the moving party proves (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not issued; (3) that [the] threatened injury to the movant outweighs any damage the injunction may do to

the opponent; and (4) that the injunction will not disserve the public interest.[7] A party is not required to prove its case in full at a preliminary injunction hearing.[8] Federal Rule of Civil Procedure 43(c) allows the Court to employ only affidavits in ruling on a motion for preliminary injunction.[9] An evidentiary hearing is not required where factual disputes are lacking.[10]

## V.
## SUMMARY OF THE ARGUMENT

By withholding the payment of defense costs and expenses, Underwriters are disrupting Plaintiffs' abilities to defend themselves in the SEC Action and in the Criminal Action. With respect to the SEC Action, Underwriters' actions effectively have left Plaintiffs with the inability to defend themselves. Further, with respect to the Criminal Action, Underwriters' actions jeopardize Plaintiffs' constitutional rights to speedy trials, to effective assistance of counsel and to counsel of their choice. Accordingly, the fact that irreparable harm will result to Plaintiffs if an injunction does not issue cannot reasonably be disputed.[11] Underwriters actually

---

[7] *United Offshore Co. v. S. Deepwater Pipeline Co.*, 899 F.2d 405, 407–08 (5th Cir. 1990).

[8] *Fed. Savings & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1987).

[9] FED. R. CIV. P. 43(c).

[10] *Dixon*, 835 F.2d at 558–59.

[11] *Flood v. ClearOne Communications, Inc.*, 2009 WL 87006 (D. Utah 2009) ("Finally, where a constitutional right is involved, irreparable injury is almost always found.").

---

stand to benefit if Plaintiffs are convicted in the Criminal Action because actual convictions could trigger the application of the very exclusions that Underwriters seek to prematurely apply to bar coverage for the Plaintiffs.

Courts throughout the country have intervened under similar circumstances and granted preliminary injunctions to prevent insurers from doing precisely what Underwriters have done in this case, finding that D&O insurers cannot withhold payment of defense costs and thereby jeopardize the defense of the underlying claims.[12] The balance of harms favors injunctive relief because while Plaintiffs' constitutional rights and ability to defend themselves are in danger, the risk for Underwriters is strictly economic. Moreover, the insurance policies issued by Underwriters contain a right of reimbursement in the event Underwriters are forced to pay amounts that are not actually due.[13] Further, public policy favors the issuance of a preliminary injunction because of the implications that Underwriters' conduct has on Plaintiffs' constitutional rights. Finally, Plaintiffs likely will prevail on the merits because Underwriters' *unilateral* and *retroactive* denial of coverage is not supported by the insurance policies or Texas law. More specifically, the terms of the D&O Policy make clear that Underwriters is obligated to pay defense

---

[12] *See In re WorldCom, Inc. Securities Litigation*, 354 F. Supp. 2d 455 (S.D.N.Y. 2005); *Great Am. Ins. Co. v. Gross*, 2005 WL 1048752 (E.D. Va. 2005).

[13] Of course, a right of *reimbursement* implies that payments actually are made. Here, Underwriters *retroactively* withdrew their consent to incur "Costs, Charges and Expenses."

costs and expenses to the Plaintiffs until a "final adjudication" against an insured triggers the fraud exclusion, or a determination "in fact" is made that an insured's conduct falls within the money laundering exclusion.[14] Moreover, even though the D&O Policy does not provide for a *duty* to defend, Texas law still requires that Underwriters' obligation to pay defense costs be governed by Texas' "eight corners" rule.[15]

In sum, Plaintiffs will show this Court the following:

- Plaintiffs will suffer irreparable harm because Plaintiffs' constitutional rights and ability to defend themselves are in jeopardy.

- Plaintiffs have no adequate remedy at law because, without this injunction, Plaintiffs' constitutional rights are in jeopardy and Plaintiffs' will not be able to mount an adequate defense to both the SEC Action or the Criminal Action.

- Plaintiffs have a substantial likelihood of success on the merits because Underwriters' contractual obligations to pay defense costs under the D&O Policy (and "follow form" Excess Policy) are clear and the extrinsic evidence on which Underwriters' relies to defeat the obligation to pay defense costs and expenses is inadmissible and, even if considered by this Court, the extrinsic evidence does not negate coverage.

---

[14] These are the two primary exclusions relied on by Underwriters in denying coverage as evidenced by the denial letters sent by Akin Gump on behalf of Underwriters.

[15] *See, e.g.*, *Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 491 (Tex. 2008). *See also Basic Energy Services, Inc. v. Liberty Mut. Ins. Co.*, 2009 WL 2998134, *6–*7 (W.D. Tex. Sept. 18, 2009) (applying Texas' "eight corners" rule to an insurer's duty to reimburse defense costs even when the policy, like the D&O policy here, disclaimed the *duty* to defend).

---

- Plaintiffs will suffer greater hardship because of the loss of their constitutional rights and the ability to defend themselves as compared to Underwriters' mere economic loss—a loss for which it can seek reimbursement should it ultimately succeed on the merits of the Declaratory Judgment Action.

- Public policy favors an injunction because of Plaintiffs' constitutional rights and their ability to defend themselves are at stake. In addition, if the injunction is not issued, it is the taxpayers that will have to bear the burden of funding the defense of the Criminal Action.

## VI.
## EVIDENCE SUPPORTING MOTION FOR PRELIMINARY INJUNCTION

**A.    The Policies of Insurance:**

1.    The D&O Policy:

Underwriters issued a Directors' and Officers' and Company Indemnity Policy, bearing policy number 576/MNK558900 and effective August 15, 2008 to August 15, 2009 to the Stanford Group (the "D&O Policy").[16] The D&O Policy pays, among other things, on behalf of the Stanford Group's Directors and Officers,[17] "Loss resulting from any Claim first made during the policy period for a Wrongful Act."[18] With respect to defense of such claims, the D&O Policy provides as follows:

---

[16] *See* **App. Exh. 6.**

[17] The D&O Policy provides, in pertinent part, that "'Director(s) and/or Officer(s)' shall mean any persons who were, now are, or shall be directors or officers of the Company." **App. Exh. 6** at App. 000161.

[18] *See* **App. Exh. 6** at App. 000159 (Insuring Clause A). "Loss" includes, among other things, "Costs, Charges and Expenses." *See* **App. Exh. 6** at App. 000161.

It shall be the duty of the Directors and Officers or the Company and not the duty of the Underwriters to defend Claims, provided that no Costs, Charges or Expenses shall be incurred without the Underwriter's prior written consent, such consent not to be unreasonably witheld [*sic*]. In the event of such consent being given, and subject to all other terms and provisions of the Policy including but not limited to Article V. of this Policy, the Underwriters shall pay Costs, Charges and Expenses no more than once every 60 days.[19]

The coverage provided under the D&O Policy is subject to a number of exclusions.

Pertinent exclusions raised by Underwriters are as follows:

The Underwriters shall not be liable to make any payment for Loss resulting from any Claim

*** 

I.      brought about or contributed to in fact by:

(a)      any dishonest, fraudulent or criminal act or omission by the Directors or Officers or the Company, or

(b)      any personal profit or advantage gained by any of the Directors and Officers or the Company to which they were not legally entitled

---

The D&O Policy provides that "Costs, Charges and Expenses" "shall mean reasonable and necessary legal fees and expenses incurred by the Directors and Officers or by the Company in defence of any Claim provided however Costs, Charges and Expenses shall not include salaries, wages, overhead or benefit expenses." **App. Exh. 6** at App. 000160–61. The D&O Policy defines "Claim," in pertinent part, as "any . . . judicial or administrative proceeding initiated against any of the Directors and Officers or the Company in which they may be subjected to a binding adjudication of liability for damages or other relief, including any appeal therefrom." **App. Exh. 6** at App. 000160. For purposes of Insuring Clause A, "'Wrongful Act' shall mean any actual or alleged error, act, omission, misstatement, misleading statement, neglect or breach of duty or negligent act by, or any other matter claimed against, the Directors and Officers whilst acting in their capacity as (1) directors or officers of the Company . . . ." **App. Exh. 6** at App. 000162.

[19] **App. Exh. 6** at App. 000169 (Article VI. B.) (emphasis added).

---

**as determined by a final adjudication**.

\*\*\*

T.   arising directly or indirectly as a result of or in connection with any act or acts (or alleged act or acts) of Money Laundering or any act or acts (or alleged act or acts) which are in breach of and/or constitute an offence or offences under any money laundering legislation (or any provisions and/or rules or regulations made by any Regulatory Body or Authority thereunder).

**Notwithstanding the foregoing Exclusion, Underwriters shall pay Costs, Charges and Expenses in the event of an alleged act or alleged acts until such time that it is determined that the alleged act or alleged acts did in fact occur**. In such event the Directors and Officers and the Company will reimburse Underwriters for such Costs, Charges and Expenses paid on their behalf.[20]

---

[20] **App. Exh. 6** at App. 000164–65, 000167 (emphasis added). The D&O Policy defines "Money Laundering" as follows:

I.   Money Laundering" means:

(i)   the concealment, or disguise, or conversion, or transfer, or removal of Criminal Property, (including concealing or disguising its nature, source, location, disposition, movement or ownership or any rights relating thereto); or

(ii)   the entering into or becoming in any way concerned in an arrangement which is known or suspected to facilitate (by whatever means) the acquisition, retention, use or control of Criminal Property by or on behalf of another person; or

(iii)   the acquisition, use or possession of Criminal Property; or

(iv)   any act which constitutes an attempt, conspiracy or incitement to commit any act or acts mentioned in the foregoing paragraphs (i), (ii) or (iii); or

(v)   any act which constitutes aiding, abetting, counselling or procuring the commission of any act or acts mentioned in the foregoing paragraphs (i), (ii) or (iii).

\*\*\*

Any Wrongful Act pertaining to any Director or Officer **shall not be imputed** to any other person for the purposes of determining the applicability of the Exclusions.[21]

The D&O Policy provides $5 million limits of liability with respect to each of two sections under the policy.

2.   The Excess Policy:

Underwriters issued the Excess Blended "Wrap" Policy bearing policy number 576/MNA831400 and effective August 15, 2008 to August 15, 2009 to the Stanford Group (the "Excess Policy"). The Excess Policy provides that "Underwriters shall indemnify or reimburse or pay on behalf of the Assured, any loss or losses first discovered and/or claim or claims first made against the Assured during the Period of Insurance" up to the Excess Policy's Limit of Liability—$45 million—and in excess of the D&O Policy's limit of liability. The Excess Policy is a "follow form" policy, meaning that it adopts the terms,

---

**App. Exh. 6** at App. 000162–63. "Criminal Property" includes "property which constitutes a benefit obtained from or as a result of or in connection with criminal conduct or represents such a benefit (in whole or part and whether directly or indirectly) which the Directors or Officers or the Company (or any person or entity acting on their behalf) knows or suspects or reasonably should have known or suspected that it constitutes or represents such a benefit." *Id.* at App. 000163.

[21] **App. Exh. 6** at App. 000168 (emphasis added).

conditions and provisions of the policies over which it sits, including the D&O Policy.[22]

**B.** **The Underlying Claims Made Against Plaintiffs.**

1. The SEC Action.

The Securities and Exchange Commission alleges that Plaintiff Stanford, chief executive officer of Stanford International Bank ("SIB"), orchestrated a fraud through the use of numerous Stanford Group entities, including Stanford International Bank, Stanford Group Company and Stanford Capital Management.[23] The SEC alleges that Plaintiff Holt, Chief Investment Officer of Stanford Group Financial, was indispensible to the fraud, misleading investors by representing that she managed SIB's multi-billion dollar portfolio and employed a team of analysts that monitored the portfolio.[24] In doing so, the SEC claims that Plaintiffs Stanford and Holt[25]—through the use of the Stanford Entities—sold approximately $8

---

[22] *See* **App. Exh. 7** at App. 000205 ("Except as otherwise provided herein this Policy is subject to the same terms, exclusions, conditions and definitions as the Policy of the Primary Insurers.").

[23] *See* SEC First Amended Complaint attached hereto at **App. Exh. 2** at App. 000027.

[24] *See* **App. Exh. 2** at App. 000027–28, 000037–38. The portfolio was separated into three "tiers" of which 80% of the portfolio fell into Tier 3. *See* **App. Exh. 2** at App. 000033.

[25] As noted previously, Plaintiffs Lopez and Kuhrt have not yet been named as defendants in the SEC Action although the SEC has sought leave to name them as defendants. *See* **App. Exh. 4**. That motion remains pending before the Northern District of Texas.

---

billion worth of certificates of deposit ("CDs"), alleging that they would provide higher returns on investment than other "standard" CDs offered.[26] SIB claimed that it earned returns on its investment of deposits between 11.5% and 16.5% from 1992 until 2006.[27] Such high returns allowed the bank to offer high interest rates on its CDs and then paid disproportionately high commissions to the Stanford Group Company for the sale of those CDs.[28] Also, the SEC contends that investment advisors for Stanford Entities sold more than $1 billion of a proprietary mutual fund wrap program by utilizing historical performance data that allegedly was false and misleading.[29]

The SEC contends that Stanford misappropriated $1.6 billion of investor money through personal loans to himself.[30] Additionally, he allegedly used investor money to fund speculative businesses that he controlled and to buy private equity and real estate.[31] The SEC further alleges that Plaintiff Stanford accomplished this purported fraud by fabricating the performance of the portfolio through a pre-determined return on investment to which accountants would

---

[26] *See* **App. Exh. 2** at App. 000028.

[27] *See id.* at App. 000032.

[28] *See id.* at App. 000032–33.

[29] *See id.* at App. 000028, 000039–42.

[30] *See id.* at App. 000028.

[31] *See id.* at App. 000028, 000036.

reverse-engineer financial statements that would show earnings not earned.[32] Plaintiff Holt allegedly aided and abetted these actions by denying any knowledge of the vast majority of SIB's assets and did not disclose that Plaintiff Stanford had misappropriated investor funds.[33] In addition, Plaintiffs Stanford and Holt allegedly signed off on Monthly and Annual Reports that included false information about the bank and the investment portfolio.[34] Further, according to the SEC, Plaintiffs Stanford and Holt also spoke to investment advisors and misrepresented the strength of the bank and the amount of its assets, lied about the existence of capital infusions into the bank and failed to tell the advisers that they had not invested customers' funds in a manner consistent with offering documents and its financial statements.[35] In addition to the other allegations, Plaintiffs Stanford and Holt allegedly also told investors that SIB had no exposure to losses from investments with Bernard Madoff even though e-mails showed that Plaintiff Holt knew in December 2008 that such losses existed.[36]

Through their actions, the SEC alleges that Plaintiffs Stanford and Holt have violated Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities

---

[32] *See id.* at App. 000028, 000034.

[33] *See id.* at App. 000034.

[34] *See id.* at App. 000035–36.

[35] *See id.* at App. 000038.

[36] *See id.* at App. 000039.

Exchange Act of 1934, and Exchange Act Rule 10b-5.[37] Additionally, they have aided and abetted such violations.[38] Moreover, the SEC contends that Plaintiff Stanford violated Sections 206(1) and (2) of the Investment Advisers Act of 1940 and that Plaintiff Holt aided and abetted those violations.[39] As a result of those violations, the SEC sought to enjoin Plaintiffs Stanford and Holt from any further violations, froze the assets of those Plaintiffs, sought an accounting detailing all assets and funds received from investors and one another, requested the appointment of a receiver, and sought disgorgement of funds and payment of civil penalties.[40]

      2.    <u>The Criminal Action.</u>

On June 18, 2009, the Indictment in the Criminal Action was entered against Plaintiffs.[41] The DOJ alleges that Plaintiffs committed and conspired to commit mail, wire and securities fraud, as well as conspired to commit money laundering, in the sale of the aforementioned CDs.[42] More specifically, the DOJ claims that Plaintiffs represented to investors that investments in SIB and the CDs offered

---

[37] *See id.* at App. 000029, 000042–44.

[38] *See id.* at App. 000029, 000043.

[39] *See id.* at App. 000029, 000045–46.

[40] *See id.* at App. 000047–48.

[41] *See* **App. Exh. 5**.

[42] *See id.* Defendants' own Motion to Dismiss [Docket No. 14] acknowledges that money laundering is only one of several claims asserted against Plaintiffs.

were safe and secure, would achieve double-digit returns and pay high interest rates.[43] In making such representations, it is alleged that the Plaintiffs sent Monthly and Annual Reports to their investors that contained false or misleading information and hired investment advisers, to whom it paid high commissions, to push the sale of the CDs.[44] In doing so, Plaintiffs purportedly inflated the strength and viability of the portfolio and SIB so that the investment advisers would support the program.[45] Allegedly, the Plaintiffs did not inform the investors that 80% of SIB's portfolio was directed and managed by Plaintiff Stanford and that a significant amount of that part of the portfolio—the "Tier III" investments—were investments in overvalued real estate and notes on Plaintiff Stanford's personal loans.[46] Through these acts, the DOJ claims that Plaintiffs conspired, along with an Antiguan regulator (Leroy King), to devise a scheme to defraud investors and, through the use of the United States Postal Service, through wire communications and through the use of securities, executed that scheme.[47] The DOJ alleges numerous false and misleading representations made to support the scheme.[48] In

---

[43] *See* **App. Exh. 5** at App. 000102.

[44] *See id.* at App. 000102–03, 000105.

[45] *See id.* at App. 000105–06.

[46] *See id.* at App. 000103–04.

[47] *See id.* at App. 000108–10.

[48] *See id.* at App. 000110–15.

addition, the DOJ details alleged overt acts, including mailings, wire transfers and securities transactions, in support of the scheme.[49]

Through those same actions, the DOJ alleges seven counts of wire fraud against Plaintiffs.[50] Additionally, the DOJ filed ten counts of mail fraud against Plaintiffs.[51] Also, the DOJ alleges a single count of conspiracy to obstruct the SEC investigation[52] and a single count of obstruction of such investigation.[53] In alleging such, the DOJ claims that Plaintiffs paid the Antiguan regulator substantial amounts of funds in order to avoid any oversight by the Antiguan government.[54] The DOJ also filed a single count against Plaintiffs for conspiracy to commit money laundering.[55]

In light of the foregoing, the DOJ filed a notice of forfeiture that, in the instance of a finding of guilt, the United States intends to forfeit all property that constitutes proceeds of the criminal offenses.[56] The forfeiture notice includes

---

[49] *See id.* at App. 000115–30.

[50] *See id.* at App. 000130–32.

[51] *See id.* at App. 000134–37.

[52] *See id.* at App. 000137–40.

[53] *See id.* at App. 000140–41.

[54] *See, e.g.*, *id.* at App. 000139–40.

[55] *See id.* at App. 000141–44.

[56] *See id.* at App. 000145.

numerous bank accounts allegedly containing such property.[57] Moreover, the DOJ seeks a money judgment against Plaintiffs for the total amount of property involved each alleged criminal offense.[58] Finally, to the extent property subject to the forfeiture cannot be obtained, the DOJ seeks forfeiture of any other property held by Plaintiffs up to the total value of the property subjected to such forfeiture.[59]

## C.    <u>Underwriters' Responses to Plaintiffs' Claims Under the Policies.</u>

Upon learning of the claims made against them, each of the Plaintiffs immediately retained attorneys who wrote to Underwriters to advise them of the claims, and to request Underwriters' agreement to pay Plaintiffs' attorneys' "Costs, Charges and Expenses" incurred in defending the SEC Action and the Criminal Action.[60] Underwriters, through its attorneys, Barry A. Chasnoff and Daniel McNeel Lane, Jr., wrote to Plaintiffs' attorneys and advised them that "[a]lthough we [Underwriters] have not yet made a final determination of coverage, Underwriters will consent to your client's request to incur Costs, Charges and

---

[57] *See id.* at App. 000145–51.

[58] *See id.* at App. 000148, 000151.

[59] *See id.* at App. 000152.

[60] The term "Cost, Charges and Expenses" will be used interchangeably with the term "defense costs and expenses" for purposes of this brief.

---

Expenses in defense of the criminal proceeding pursuant to Article VI, Section B of the D&O Policy, subject to a complete reservation of all rights."[61]

To enable criminal defendants to receive speedy trials and effective assistance of counsel, this Court requires attorneys retained to represent criminal defendants to agree that they will not withdraw prior to a guilty plea or conviction.[62] Importantly, before making such a promise and long-term commitment to this Court, Plaintiffs' criminal attorneys sought and received numerous assurances from Underwriters and their attorneys that their defense costs and expenses would be timely paid.[63] Underwriters even went so far as to send Defendants' attorneys "billing guidelines" and to instruct defense counsel on certain vendors that should be used during the defense.[64] According to Kent Schaffer ("Mr. Schaffer"), who represents Stanford in the Criminal Action, he was

---

[61] This statement was made to Plaintiff Stanford in a letter dated May 1, 2009, a true and correct copy of which is attached hereto as **App. Exh. 8**; to Plaintiff Holt in a letter dated May 1, 2009, a true and correct copy of which is attached hereto **App. Exh. 9**; and to Plaintiff Lopez in a letter dated October 30, 2009, a true and correct copy of which is attached hereto **App. Exh. 10**. Although Plaintiff Lopez's claim was initially denied by Underwriters, Underwriters ultimately reversed its denial of coverage. Notably, similar letters were sent with respect to the SEC Action. *See, e.g.*, June 1, 2009 letter to Plaintiff Holt attached hereto at **App. Exh. 11**. The parties have agreed to the authenticity of the aforementioned letters.

[62] *See* Affidavit of Kent Schaffer attached hereto at **App. Exh. 12**.

[63] *See id.*

[64] A copy of the "billing guidelines" sent by Underwriters to Mr. Schaffer is attached to his affidavit at **App. Exh. 12-A**.

---

given numerous assurances by Mr. Lane that all of his defense costs and expenses would be paid by Underwriters until Stanford either pled guilty or was convicted.[65] In fact, on October 12, 2009, one day before Mr. Schaffer agreed to represent Stanford in a "retained capacity," Mr. Lane informed Mr. Schaffer that Underwriters would be paying for Plaintiff Stanford's fees and expenses and that there was ninety-five million dollars available to pay for the legal expenses of the various defendants.[66] Mr. Lane advised Mr. Schaffer that Underwriters would be issuing a reservation of rights letter and that it meant, essentially, that if Plaintiff Stanford was convicted or entered a plea of guilty, they would no longer provide coverage.[67]

On October 13, 2009, based entirely on the assurances and promises made by Underwriters through their attorneys, Mr. Schaffer promised this Court that he would represent Plaintiff Stanford through the conclusion of the Criminal Action.[68] Identical promises and assurances were made on October 13, 2009 by Mr. Lane to Michael Sokolow ("Mr. Sokolow"), who was considering leaving his job of 22 years with the United States Public Defender's Office to join Plaintiff Stanford's

---

[65] *See* **App. Exh. 12**.

[66] *Id.*

[67] *See id.* As will be discussed, these representations made by Underwriters' attorneys are consistent with the policy language that requires a "final adjudication" or an "in fact" determination.

[68] *Id.*

defense team.[69] Although Mr. Lane assured Mr. Sokolow that Underwriters would be paying all fees and expenses through a final adjudication or guilty plea by Plaintiff Stanford, Mr. Sokolow ultimately decided to continue his work in the public defender's office.[70]

Underwriters even advised *this* Court of their promise to pay the defense costs and expenses of Plaintiffs' criminal attorneys. In their September 14, 2009 response to a motion to compel payment of fees filed in the Criminal Action, Underwriters wrote that "[i]f Judge Godbey rules that the insurance policy proceeds are not receivership assets, Underwriters presently intend to reimburse Movants' reasonable and necessary attorney's fees and costs, subject to a complete reservation of rights."[71] On October 9, 2009, United States District Judge David Godbey held that he would permit payment of defense costs and expenses by Underwriters even if the proceeds are part of the receivership estate because "the potential harm to them [directors and officers] if denied coverage is not speculative but real and immediate."[72] It is undisputed that Underwriters agreed to pay defense

---

[69] *See* Affidavit of Michael Sokolow attached hereto at **App. Exh. 13**.

[70] *Id.*

[71] A true and correct copy of Underwriters' Response is attached at **App. Exh. 14**.

[72] *See* Order dated October 9, 2009 attached hereto at **App. Exh. 15** at App. 000271, 000278.

---

costs and expenses, and that they did so with full knowledge of Plaintiffs' attorneys' reliance on their promises.

**D.    Underwriters' Retroactive Coverage Denial.**

In spite of the many promises and assurances—both written and oral—made by Underwriters that defense costs and expenses would be paid, Underwriters issued letters to Defendants in which they acknowledged payment of defense costs and expenses to counsel through August 27, 2009, but in which Underwriters *retroactively* declined to extend any coverage for "Costs, Charges, or Expenses" incurred in defending against the SEC Action and the Criminal Action after August 27, 2009.[73] The purported *retroactive* denial of coverage was made despite the fact that Underwriters had, as recently as October 30, 2009, specifically consented to defense counsel incurring "Costs, Charges and Expenses."[74] Underwriters' *retroactive* denial of coverage was based on Underwriters' *unilateral* factual conclusion that certain events that had taken place months earlier in the SEC Action and Criminal Action implicated Exclusion T of the D&O Policy (i.e., the "Money Laundering" exclusion).[75]

---

[73] Copies of the letters purporting to *retroactively* deny coverage are attached hereto at **App. Exh. 16, App. Exh. 17**, **App. Exh. 18**, and **App. Exh. 19.** Again, the parties have agreed to the authenticity of these letters.

[74] *See* **App. Exh. 10**.

[75] *See* **App. Exh. 16, App. Exh. 17, App. Exh. 18, and App. Exh. 19.**

---

The exclusion relied upon by Underwriters provides that Underwriters shall pay "Costs, Charges and Expenses" in the event of an alleged act or alleged acts until such time that it is determined that Money Laundering "in fact" occurred. The August 27, 2009 event that served as the primary basis for Underwriters' denial was James Davis' guilty plea in the Criminal Case in which he plead guilty to mail fraud, and conspiracy to commit wire, mail, and securities fraud.[76] Underwriters claims that during his allocution, Mr. Davis testified that Plaintiffs engaged in various acts meeting the definition of Money Laundering. Underwriters also claimed that its coverage denial was based on Judge O'Connor's February 17, 2009 Order in which the court held that there was good cause to believe that Defendants used improper means to obtain investor funds and assets to justify a temporary restraining order.[77] Likewise, Underwriters relied on a finding made by Judge Godbey in a preliminary injunction that Stanford engaged in fraudulent conduct, including misappropriating investor funds.[78] All of these events occurred months before Underwriters denied coverage and, in any case, cannot serve as a basis to deny its contractual obligation to pay *defense* costs and expenses to the Plaintiffs. In particular, as will be set forth in greater detail, James Davis' plea cannot be used against the Plaintiffs herein because of the clear and unambiguous

[76] *See* **App. Exh. 16, App. Exh. 17, App. Exh. 18, and App. Exh. 19.**

[77] *See* **App. Exh. 16, App. Exh. 17, App. Exh. 18, and App. Exh. 19.**

[78] *See* **App. Exh. 16, App. Exh. 17, App. Exh. 18, and App. Exh. 19.**

non-imputation clause in the D&O Policy. Moreover, the preliminary findings of Judge O'Connor and Judge Godbey—by their very nature—do not constitute either a "final adjudication" or a finding "in fact," as those terms have been interpreted by courts throughout the country.

### E.  Underwriters' Conduct Will Cause Irreparable Harm.

The charges made against Plaintiffs in the Criminal Action and in the SEC Action are very serious and defending Plaintiffs in both actions will be extremely expensive. Both cases involve millions of documents.[79] Plaintiffs' attorneys in the Criminal Action and in the SEC Action have advised that to prepare effective defenses, they will each need to hire additional attorneys, paralegals and support staff, private investigators, experts including forensic accountants, and document review firms.[80] Further, to prepare defenses for their clients, they will need to work for the next several months, and possibly years, almost exclusively on the Criminal Action and/or the SEC Action.[81] Mr. Schaffer averred that Plaintiff Stanford's defense in the Criminal Action alone could cost as much as $24 million.[82] Plaintiff Lopez's defense in the Criminal Action is estimated to cost millions of dollars[83]

---

[79] *See* **App. Exh. 12**.

[80] *Id.*

[81] *Id.*

[82] *Id.*

[83] *See* Affidavit of Jack Zimmermann attached hereto at **App. Exh. 20**.

and so will Plaintiff Kuhrt's.[84] It is expected that the amount of Ms. Holt's defense costs will be similar. None of the criminal defense attorneys can advance the expenses necessary to prepare adequate defenses for their clients and, at the same time, work without payment of their fees.[85]

Plaintiffs' attorneys in the Criminal Action and in the SEC Action already have incurred substantial defense costs and expenses based on Underwriters' and their attorneys' representations.[86] According to Mr. Schaffer, based on Underwriters' representations, he hired additional employees, including several lawyers and paralegals, and he began working seven days per week for as many as sixteen hours per day.[87] Throughout this process, he routinely spoke with Mr. Lane and was repeatedly promised that his fees and expenses would be paid. As of this date, based on Mr. Lane's representations on behalf of Underwriters, Mr. Schaffer owes over $150,000.00 in fees and expenses to the attorneys, investigators, and paralegals that have worked with him on Plaintiff Stanford's defense, as well as an additional $25,500.00 in additional out-of-pocket expenses, and he has received no income from his work defending Plaintiff Stanford.[88] Each of the attorneys

---

[84] *See* Affidavit of Richard Kuniansky attached hereto at **App. Exh. 21**.

[85] *See* **App. Exh. 12**, **App. Exh. 20**.

[86] *See* **App. Exh. 12**, **App. Exh. 20**.

[87] *See* **App. Exh. 12**.

[88] *Id.*

---

representing Plaintiffs in the Criminal Action and in the SEC Action have similar stories to tell.[89]

Plaintiffs' attorneys have advised that they will need to immediately withdraw (or attempt to withdraw) unless Underwriters honors their contractual obligations to pay for Plaintiffs' defenses.[90] At this time, the Criminal Action has not been scheduled for trial because Plaintiffs' criminal attorneys cannot estimate the length of time needed to prepare for trial, nor can they even begin significant trial preparations until they are assured that their "Costs, Charges and Expenses" will be paid as promised and as provided for in the relevant policies.[91] Plaintiffs have advised their attorneys that they wish to employ them to prepare and try the Criminal Action and the SEC Action and that they do not wish to be represented by public defenders or by any other attorneys.[92] If an injunction does not issue and Plaintiffs' attorneys are forced to withdraw, Plaintiffs' constitutional rights to speedy trials, counsel of choice, and to effective assistance of counsel will be jeopardized. Furthermore, as Judge Godbey noted in his October 9, 2009 Order, the harm to Plaintiffs if their defense costs are not paid is "real and immediate" because, without payment by Underwriters, Plaintiffs will be unable to defend

---

[89] *See* **App. Exh. 12**, **App. Exh. 20**.

[90] *See* **App. Exh. 12**, **App. Exh. 20**.

[91] *See* **App. Exh. 12**, **App. Exh. 20**.

[92] *See* **App. Exh. 12**, **App. Exh. 20**.

themselves in the SEC Action because they do not have a right to court-appointed counsel.[93] Because this Court required the criminal defense attorneys to agree that they will not withdraw prior to a guilty plea or conviction, the same "real and immediate" harm exists in the Criminal Action. And, even if this Court reconsiders and allows the criminal defense attorneys to withdraw, the Plaintiffs will be deprived of their right to select counsel and will be subject to the limited resources that the public defender's office can provide.

## VI.
## ARGUMENT

A.     <u>Jurisprudence Throughout the Country Favors Injunctive Relief in this Case.</u>

This is not a case of first impression. Courts across the country have recognized the need for the interim injunctive relief sought by Plaintiffs under the circumstances present in this case. In the matter of *In re Worldcom, Inc. Securities Litigation*, the U.S. District Court for the Southern District of New York granted a preliminary injunction and ordered Continental Casualty Company ("Continental") immediately to advance the costs of defending the former Chairman of the Board of Directors of WorldCom against claims filed in a host of lawsuits alleging SEC violations arising from the collapse of WorldCom.[94] The costs awarded included

---

[93] **App. Exh. 15** at App. 000278.

[94] *In re WorldCom, Inc. Securities Litigation*, 354 F. Supp. 2d 455 (S.D.N.Y 2005).

those costs already incurred and those that the movant continued to incur. Continental claimed that its policies were issued in reliance on WorldCom's false financial statements and were therefore properly rescinded. The court concluded that under a D&O policy with a duty to pay defense costs, like the policy in this case, the insurance company's obligation to reimburse the directors attaches as soon as the attorneys' fees are incurred.[95] To hold otherwise, held the court, would not provide insureds with protection from financial harm that insurance policies are presumed to give.[96] The court held that until the issue of rescission is adjudicated, the policy remains in effect and the duty to pay defense costs is enforceable.[97]

Most importantly, in *WorldCom*, the court held that the failure to receive defense costs when they are incurred constitutes "an immediate and direct injury" warranting a preliminary injunction because the ability to mount a successful defense requires competent and diligent representation.[98] According to the court, the impact of an adverse judgment will have ramifications beyond the money that necessarily will be involved.[99] There is the damage to reputation, the stress of litigation, and the risk of financial ruin—each of which is an intangible but very

---

[95] *Id.* at 464. Here, the D&O Policy provides for a 60-day grace period. *See* **App. Exh. 6** at App. 000169.

[96] *WorldCom*, 354 F. Supp. at 465.

[97] *Id.*

[98] *Id.* at 469.

[99] *Id.*

---

real burden.[100] As an additional basis for the court's ruling, the court noted the important role that D&O insurance plays in corporate governance in America—unless directors can rely on the protections given by D&O policies, good and competent men and women will be reluctant to serve on corporate boards.[101] Finally, the court denied Continental's request that the insured post a bond concluding that (1) the posting of a bond would undermine the very protection the insurer offered to directors when they purchased insurance, and (2) the payment of defense costs placed no undue burden on Continental as its liability was capped under its policy and the policy granted it a right of reimbursement.[102]

In *Great American Ins. Co. v. Gross*, the U.S. District Court for the Eastern District of Virginia followed *WorldCom* and granted a motion for preliminary injunction ordering Great American Insurance Company to advance defense costs to directors and officers accused of wrongful acts, who were insured by a D&O

---

[100] *Id.*

[101] *Id.*

[102] *Id.* at 470. Because with his motion for preliminary injunction, the insured in *WorldCom* merely sought a part of the relief to which he would be entitled on the merits, and because the insured was only seeking an order requiring Continental to do what it should have done earlier, the court evaluated the motion for preliminary injunction under the well-settled standard for prohibiting injunctions, as opposed to the heightened standard for mandatory injunctions requiring proof of a clear or substantial likelihood of success on the merits. The same standard was applied by the courts in *Great American Insurance Co. v. Gross*, 2005 WL 1048752, *3 (E.D. Va. May 3, 2005), and in *Flood v. ClearOne Communications, Inc.*, 2009 WL 87006, *6 (D. Utah Jan. 12, 2009).

---

policy issued by Great American, until the merits of the suit for declaratory judgment filed by Great American were resolved.[103] Great American had ceased payment of defense costs to officers and directors, who plead guilty to offenses including conspiracy to commit insurance fraud and mail fraud, in reliance on an exclusion similar to the fraud exclusion relied upon by Underwriters in its coverage denial.[104] Because the practical effect of Great American's failure to advance defense costs would be to cause the insureds' attorneys to withdraw from defending them in several civil lawsuits alleging wrongdoing, the court concluded that irreparable harm would result to the insureds if interim injunctive relief was not granted.[105] The court noted that the denial of a preliminary injunction would essentially "cripple" the insureds' defense and leave them with no ability to defend their interests in the very lawsuits filed against them.[106] Conversely, the court concluded that while Great American could be exposed to increased monetary liability if a preliminary injunction was granted, the monetary liability was agreed to by Great American when it issued the policy.[107] Further, like the policies issued by Underwriters, the policy granted Great American the right to seek

---

[103] *Gross*, 2005 WL 1048752.

[104] *Id.* at *1.

[105] *Id.* at *4.

[106] *Id.*

[107] *Id.* at 5.

---

reimbursement for the costs of defense, tipping the balance of harms decidedly in favor of the insureds.[108] Finally, like the court in *WorldCom*, the court in *Gross* did not require the insureds to post a bond.[109]

Although outside of the insurance context, a similar result was reached in *Flood v. ClearOne Communications, Inc.*[110] There, the U.S. District Court in Utah granted a preliminary injunction requiring a corporation to continue paying legal fees incurred by its officer in defending against criminal charges in accordance with an indemnification agreement. The officer's attorneys represented to the court that they could not continue representing their client without the immediate payment of fees. The court concluded that irreparable injury would result if a preliminary injunction did not issue because the corporation's failure to fund the defense threatened the officer's constitutional rights to effective assistance of counsel and to a speedy trial.[111] While the threat of injury to the corporate officer involved the loss of constitutional rights, the threat of injury to the corporation was economic, tipping the balance of harms in favor of interim injunctive relief.[112]

---

[108] *Id.*

[109] *Id.* at 6.

[110] *Flood*, 2009 WL 87006.

[111] *Id.* at *6. *See also U.S. v. Cronic*, 466 U.S. 648, 656 (1984); U.S. CONST. amend. VI.

[112] *Flood*, 2009 WL 87006, at *6.

---

Indeed, numerous courts—including the Southern District of Texas—have held that a D&O insurer must pay defense costs as incurred until such time that there is a final adjudication or "in fact" determination that would defeat coverage.[113] Because D&O insurers like Underwriters actually stand to gain from convictions that could trigger policy exclusions, they cannot be allowed to "pull the plug" on the insured's defense and thereby disrupt trial preparations.[114] If D&O policies allow absolute discretion to insurers to withhold payment whenever charges of intentional dishonesty are leveled against directors and officers, then

---

[113] *See, e.g.*, *In re Enron Corp. Securities, Derivative & "ERISA" Litigation*, 391 F. Supp. 2d 541, 574–75 (S.D. Tex. 2005) (noting that "[t]he majority of courts have concluded that the insurer must pay the defense costs as incurred" and concluding that the majority view represents the "better rule"); *Associated Electric & Gas Ins. Servs., Ltd. v. Rigas*, 382 F. Supp. 2d 685 (E.D. Pa. 2004). In *Rigas*, the Court noted public policy factors in support of its ruling requiring the advancement of defense costs:

> Presumption of Innocence. As noted above, three of the movants are Defendants in lengthy federal criminal prosecution. Until and unless they are found guilty, they are presumed innocent and must enjoy the constitutionally-based prerogatives of any citizen who stands merely accused, but not convicted, of a crime. Similarly, although all five movants are defendants in numerous civil cases and, if found liable, would probably face judgments of many millions of dollars, at this moment they have not been found liable to anyone for anything.

*Rigas*, 382 F. Supp. 2d at 700.

[114] *Nat'l Union Fire Ins. Co. of Pittsburgh v. Brown*, 787 F. Supp. 1424 (S.D. Fla. 1991).

insurers will be able to withhold payment in virtually every case.[115] That would leave directors and officers in an extremely vulnerable position as any allegations of dishonesty, no matter how groundless, could bring financial ruin upon a director or officer.[116] Underwriters, by virtue of the fact that they specifically used "final adjudication" and "in fact" language for the exclusions at issue, recognized this fact and, thus, the D&O policy clearly expresses an intent to pay for defense costs and expenses in situations such as the instant case. In violation of the clear policy language, Underwriters now attempts to act as judge and jury and convict its own insureds so as to avoid having to pay for their defense.

## B.    A Preliminary Injunction is Warranted in this Case

The evidence attached to this brief overwhelmingly supports the issuance by this Court of a preliminary injunction requiring Underwriters to pay all "Costs, Charges and Expenses" already incurred, and those incurred in the future until such time as a court of competent jurisdiction concludes that either a "final adjudication" or "in fact" determination has been made sufficient to negate coverage under the D&O Policy and the "follow form" Excess Policy.

---

[115] *Little v. MGIC Indem. Corp.*, 649 F. Supp. 1460, 1468–69 (W.D. Penn. 1986), *aff'd*, 836 F.2d 789 (3rd Cir. 1987), *reh'g den.* (3rd Cir 1988). This case was cited with approval by Judge Melinda Harmon in the *Enron* case. *See Enron*, 391 F. Supp. 2d at 574 (discussing *Little*).

[116] *Little*, 649 F. Supp. at 1468–69

1.     **There is a Substantial Likelihood that Plaintiffs Will Prevail on the Merits.**

The likelihood of success need not be one of absolute certainty for a preliminary injunction to issue.[117] It is enough that the movant has raised questions going to the merits so serious, substantial, and doubtful as to make them fair ground for litigation, and thus for more deliberate investigation.[118] Further, when the other factors are strong, showing of some likelihood of success on the merits will justify an injunction.[119]

a.     **The Duty to Pay Defense Costs Under the Policies and Texas Law.**

At the outset, it is important to note that while Underwriters do not have a *duty* to defend under the terms of the D&O Policy,[120] Underwriters are obligated to contemporaneously *advance* defense costs and expenses under the terms of the D&O Policy.[121] More specifically, the D&O Policy states:

> It shall be the duty of the Directors and Officers or the Company and not the duty of the Underwriters to defend Claims, *provided that* no Costs, Charges or Expenses shall be incurred without the

---

[117] *Cho v. Itco, Inc.*, 782 F.Supp. 1183, 1185 (E.D. Tex. 1991).

[118] *Id.*

[119] *Id.*

[120] *See* **App. Exh. 6** at App. 000169.

[121] Because of the standard associated with obtaining a preliminary injunction—that the movant need only establish a substantial likelihood of success on the merits—Plaintiffs do not present the entire universe of case law on the coverage issues involved herein.

Underwriter's prior written consent, such consent *not to be unreasonably witheld* [*sic*]. In the event of such consent being given, and subject to all other terms and provisions of the Policy including but not limited to Article V. of this Policy, the *Underwriters shall pay* Costs, Charges and Expenses no more than once every 60 days.[122]

Importantly, because of the obligation to pay "once every 60 days," it is clear the obligation is one that arises contemporaneously with the incurrence of defense costs and expenses.[123] In *Little*, the Third Circuit Court of Appeals addressed a similar provision that was coupled with an "option" clause, enabling the insurer to "at its option and upon request, advance . . . expenses" subject to reimbursement.[124] Because of the existence of the "option" clause, the court found that the policy was

---

[122] *See* **App. Exh. 6** at App. 000169 (emphasis added). In this regard, Underwriters' duty may not be stated as clearly as found in some other policies. *See, e.g., In re WorldCom, Inc. Securities Litigation*, 354 F. Supp. 2d 455, 459 (S.D.N.Y. 2005) ("NOTICE: . . . THE INSURER MUST ADVANCE DEFENSE COSTS PAYMENTS PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM."). Nevertheless, the obligation to pay defense costs remains the same. *Cf. G-I Holdings, Inc. v. Reliance Ins. Co.*, 2006 WL 776809 (D.N.J. Mar. 24, 2006) (finding that an insurer was obligated to advance defense costs because it agreed to pay Loss, including defense costs, "which the Directors and Officers shall become *legally obligated to pay* as a result of a Claim") (emphasis added). The above-quoted provision clearly provides for the contemporaneous payment of defense costs and expenses—albeit on a 60-day cycle. Whether this is considered an "advancement" or "reimbursement" of defense costs and expenses is of no consequence. And, as noted previously, the Excess Policy follows form to the D&O Policy. *See* **App. Exh. 7** at App. 000205.

[123] *See G-I Holdings*, 2006 WL 776809, at *2 (finding that the insurer's duty to pay those defenses costs "arises contemporaneously with the director['s] or officer's obligation to pay those costs"); *Little*, 836 F.2d at 793 (finding same).

[124] *Little*, 836 F.2d at 793.

---

ambiguous and construed it in favor of the insured.[125] The lack of an "option" clause in the instant D&O Policy, however, makes the requirement of advancement or reimbursement of defense costs and expenses even more clear. Moreover, even if the Plaintiffs do not have the ability to repay Underwriters should coverage ultimately not exist, the insurer still must advance defense costs.[126]

Here, the Plaintiffs requested and obtained consent to incur "Costs, Charges and Expenses" from Underwriters.[127] After incurring those fees, though, Underwriters attempted to retroactively deny coverage, withdrew its consent to incur additional "Costs, Charges and Expenses" and refused to pay "Costs, Charges and Expenses" already incurred. That attempt is in error because, in doing so, Underwriters relied on extrinsic evidence to defeat its obligations under the policies in contravention of Texas law. And, even if Underwriters could rely on such extrinsic evidence, a contractual obligation to pay "Costs, Charges and Expenses" still would exist.

To be clear, at issue here is Underwriters' obligation to advance and/or reimburse "Costs, Charges and Expenses"—that is, *defense* costs and not

---

[125] *Id.*

[126] *See Fidelity Fed. Savings and Loan Ass'n v. Felicetti,* 830 F. Supp. 262, 267 (E.D. Pa. 1993) (interpreting *Little* to require the advancement of corporate director's defense costs, despite his inability to repay).

[127] *See, e.g.*, **App. Exh. 8**, **App. Exh. 9** and **App. Exh. 10**.

indemnity payments.[128]  Accordingly, this issue is governed by Texas' "eight corners" rule.[129]  Underwriters, however, would have this Court believe that Texas' "eight corners" rule somehow does not apply to the issue.  Instead, Underwriters argues that it can rely on extrinsic evidence—that is: (1) the guilty plea by James Davis along with his allocution; (2) findings made by Judge O'Connor in response to the SEC's request for emergency relief; and (3) findings made by Judge Godbey in connection with the entering of a preliminary injunction.  To the contrary, Texas law is clear that an insurer's obligation to pay defense costs is governed by the "eight corners" rule and the Supreme Court of Texas never has recognized any exception to that rule.[130]  In fact, the Supreme Court of Texas recently said that the "analysis of the duty to defend has been strictly circumscribed by the eight-corners

---

[128] While the Policies clearly treat "Costs, Charges and Expenses" as "Loss," it is clear that the policies treat "Costs, Charges and Expenses" differently than any other category of "Loss." For example, nowhere in the Policies do the Underwriters subject themselves to advance payment of any other "Loss" pending a trial on the merits.

[129] *See Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 491 (Tex. 2008); *Julio & Sons Co. v. Travelers Cas. & Surety Co. of Am.*, 591 F. Supp. 2d 651, 659 (S.D.N.Y. 2008) (applying Texas law and ruling that "eight corners" rule applies in the context of D&O policy).

[130] *Nokia*, 268 S.W.3d at 497–98; *see also Mary Kay Holding Corp. v. Federal Ins. Co.*, 309 F. App'x 843, 848 (5th Cir. 2009) ("While appreciating the arguments for a limited 'coverage' exception to the 'eight-corners rule,' we recognize that Texas has yet to adopt such an exception.") (citing *Nokia*, 268 S.W.3d at 497); *Northfield Ins. Co. v. Loving Home Care, Inc.*, 363 F.3d 523, 531 (5th Cir. 2004) (making an *Erie* guess that Texas would not allow extrinsic evidence and, in doing so, refused to admit extrinsic evidence of a criminal conviction in determining the duty to defend).

---

doctrine."[131] Further, Texas law does not permit a ruling on the duty to indemnify when a defense obligation exists and the underlying claims remain pending.[132]

Texas precedent establishes that the same "eight corners" analysis applies to an insurer's contractual obligation to advance/reimburse defense costs as applies to a traditional "duty to defend."[133] In *Julio & Sons*, for example, the federal district court noted that it could find no decisions by Texas courts concerning a different standard for the duty to advance defense costs under a D&O policy.[134] Accordingly, because the reasons for applying the "eight corners" rule to the duty to defend "appear to apply equally to the duty to advance described in the Policy," the court applied that rule to determine whether an insurer had a duty to advance defense costs to its insured.[135] Similarly, the Western District of Texas recently found that an insurer's duty to contemporaneously reimburse defense costs under a

---

[131] *See D.R. Horton—Texas, Ltd. v. Markel Int'l Ins. Co., Ltd.*, 2009 WL 4728008 (Tex. Dec. 11, 2009).

[132] *Northfield*, 363 F.3d at 537 (holding that it would have been error to rule on the duty to indemnify while the underlying litigation was still pending).

[133] *See Julio & Sons*, 591 F. Supp. 2d at 659.

[134] *Id.*

[135] *Id.* (citing *Lowy v. Travelers Prop. & Cas. Co.*, 2000 WL 526702, at *2 n.1 (S.D.N.Y. May 2, 2000); *GuideOne Elite Ins. Co. v. Fielder Road Baptist Church*, 197 S.W.3d 305, 309 (Tex. 2006)). The *Julio & Sons* court reviewed extrinsic evidence in reaching its decision. It did so, however, before the Supreme Court of Texas reiterated that it has never recognized an exception to the "eight corners" rule. *See, e.g., Nokia*, 268 S.W.3d at 497–98. The fact that Texas has never recognized any exception was recently reaffirmed by the Supreme Court of Texas. *See D.R. Horton*, 2009 WL 4728008 at *3.

---

commercial general liability policy also is governed by Texas' "eight corners" rule even though the insurer had no "duty" to defend.[136] Contrary to the evidence relied on by Underwriters, Texas law demonstrates that the contractual obligation to pay defense costs—either by reimbursement or advancement—is governed by Texas' "eight corners" rule. Consequently, Underwriters' reliance on James Davis' plea and allocution, Judge O'Connor's findings in connection with the appointment of a receiver and Judge Godbey's findings in connection with a preliminary injunction, is misplaced and contrary to well-established Texas law.

### b.    The Insuring Clause is Satisfied.

No dispute exists among the parties that the allegations against the Plaintiffs in the SEC Action and Criminal Action are sufficient to satisfy the insuring clause of the D&O Policy.[137] More specifically, the Plaintiffs all qualify as "Directors and Officers" because they are directors and officers of an insured company.[138] Moreover, the allegations raised in the SEC Action and the Criminal Action constitute a "Claim" because those lawsuits are "judicial or administrative proceeding[s] initiated against any of the Assureds in which they may be subjected to a binding adjudication of liability for damages or other relief, including any

---

[136] *See Basic Energy Services, Inc. v. Liberty Mut. Ins. Co.*, 2009 WL 2998134 (W.D. Tex. Sept. 18, 2009).

[137] Again, because the Excess Policy "follows form," so long as the D&O Policy provides coverage, the Excess Policy will as well.

[138] *See* **App. Exh. 6** at App. 000161.

---

appeal therefrom."[139] And such Claims are for "Wrongful Acts" because they allege "actual or alleged error[s], act[s], omission[s], misstatement[s], misleading statement[s], neglect or breach of duty or negligent act[s] by, or any other matter claimed against, the Directors and Officers whilst acting in their capacity as . . . directors or officers of the Company."[140]

### c. No Exclusions Bar All Coverage Under the Policy.

The crux of Underwriters' November 16, 2009 denial of coverage was the application of the "Money Laundering" exclusion in the D&O Policy. In particular, Underwriters' claimed that James Davis' guilty plea of August 27, 2009, his accompanying allocution, Judge O'Connor's February 17, 2009 Order in which the Court found good cause to believe that improper means were used to obtain investor funds and assets justifying a temporary restraining order against Plaintiffs and the Honorable David Godbey's "findings of fact" in a preliminary injunction all can be used to "determine" that "money laundering" "in fact" occurred.[141] Underwriters are wrong.

### (1). Coverage Exists Under the "Eight Corners" Rule

Underwriters never has denied that the *allegations* in the SEC Action and the Criminal Action are sufficient to trigger coverage under the policies. In fact,

---

[139] *Id.* at App. 000160.

[140] *Id.* at App. 000162.

[141] *See* **App. Exh. 16, App. Exh. 17, App. Exh. 18,** and **App. Exh. 19.**

---

Underwriters agreed to pay defense costs and expenses for the Plaintiffs for several months under those allegations. Underwriters did so because any potential basis for a denial of coverage, as recognized by Underwriters, likely stems from either the "Fraud" exclusion or the "Money Laundering" exclusion.[142]

The "Fraud" exclusion contains clear language requiring Underwriters to pay defense costs to the insureds until a "final adjudication" against such insureds is reached and the determination is made that fraud "in fact" occurred. Courts in Texas, and across the country, have recognized that such "final adjudication" language means just that—a final adjudication.[143] "In addition, the 'final adjudication' requirement of these exclusions implies that where the insured is not found guilty, there is coverage for his costs and expenses in defending himself in a criminal action where the loss arises out of a wrongful act committed in his

---

[142] An insurer that relies on policy exclusions or other affirmative defenses to defeat its obligations under the policy has the burden to prove that one or more of the exclusions defeat coverage. *See Guar. Nat'l Ins. Co. v. Vic Mfg. Co.,* 143 F.3d 192, 193 (5th Cir. 1998); *see also* TEX. INS. CODE ANN. § 554.002 ("The insurer has the burden of proof as to any avoidance or affirmative defense . . . ."). Here, no doubt exists that Underwriters must carry the burden of proving that one or more exclusions negate coverage.

[143] *In re Enron Corporation Securities*, 391 F. Supp. 2d 541, 572 (S.D. Tex. 2005) (holding that "final adjudication" means that there must be a "final adjudication" by a judge finding the insureds committed or attempted acts of dishonesty and fraud to preclude coverage). *Id.* at 572 (citing *Nat'l Union Fire Ins. Co. v. Brown*, 787 F. Supp 1424, 1429 (S.D. Fla. 1991), *aff'd*, 963 F.2d 385 (11th Cir. 1992)).

capacity as an officer or director . . . ."[144] And, Underwriters seemingly agree with this understanding of such "final adjudication" language, as it does not appear that they are relying on the "Fraud" exclusion to deny coverage.[145]

Likewise, the "Money Laundering" exclusion also does not serve as an escape hatch for Underwriters under the "eight corners" rule because that exclusion requires a "determination . . . in fact" that "money laundering" occurred. As Underwriters has recognized, "mere allegations" are not enough to establish an "in fact" finding.[146] Rather, "in fact" requires some "objectively verifiable" information.[147]

Although not directly on point, in *National Union Insurance Co. v. Willis*,[148] the court addressed the meaning of "in fact" in an exclusion in a directors and officers insurance policy. There, the insured did not tender a claim to his carrier when a suit was filed against him for, among other things, fraud, fraud in the

---

[144] *Id.* at 572–73.

[145] *See* **App. Exh. 16, App. Exh. 17, App. Exh. 18,** and **App. Exh. 19.**

[146] *See* Underwriters' Proposed Order attached hereto at **App. Exh. 22**.

[147] *See PMI Mortgage Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 2006 WL 825266 (N.D. Cal. Mar. 29, 2006) (noting that in light of the fact that the "in fact" language is not included in every exclusion "in fact" must mean something more than "mere allegations"); *St. Paul Mercury Ins. Co. v. Foster*, 268 F. Supp. 2d 1035 (C.D. Ill. 2003) (finding that St. Paul's position that mere allegations of illegal profit can trigger an "illegal profit" exclusion "untenable" because that would render "in fact" superfluous"; thus, determination of the application of the exclusion had to await resolution of the underlying litigation).

[148] 296 F.3d 336 (5th Cir. 2002).

inducement and statutory fraud in a stock transaction because of an exclusion in his policy for claims "arising out of, based upon, or attributable to the committing *in fact* of any criminal or deliberate fraudulent act."[149] Upon receipt of the Fourth Amended Petition against him, however, Willis did notify his carrier of the claim when the plaintiffs added a claim for negligent misrepresentation. The carrier, however, denied coverage because of late notice, arguing that Willis should have provided notice in 1998—not 2000—when he was first notified of circumstances that could reasonably be expected to give rise to a claim.[150] In support of its position, the insurer argued that the express language of the policy was clear that "only a finding that the insured *actually committed* the alleged criminal or deliberate fraudulent act will make the exclusion applicable."[151] Accordingly, the insured was required to give notice because the potential for a covered claim existed. The Court agreed, finding that "[w]hether a director or officer ultimately is found to have committed a wrongful act based on the legal theory of tortious conduct, be it intentional or negligent, is irrelevant for requiring notification under the claims-made policy in this case."[152] The same language must have the same meaning here.

---

[149] *Id.* at 338 (emphasis added).

[150] *Id.*

[151] *Id.* at 341 (emphasis added).

[152] *Id.* at 343.

---

Simply put, under Texas' "eight corners" rule, Underwriters are limited to the allegations as put forth in the SEC Action and the Criminal Action as compared to the policy language. Therefore, at this point, Underwriters cannot deny coverage under either the "Fraud" or the "Money Laundering" exclusions contained in the D&O Policy because there has been no "final adjudication" or "in fact" determination with respect to any of the Plaintiffs.

### (2).   Coverage Still Exists Outside the "Eight Corners"

Even if this Court disagrees and finds that Underwriters' contractual obligation to pay defense costs and expenses is not governed by the "eight corners" rule, the Plaintiffs still likely will prevail on the merits because the evidence submitted does not defeat all coverage under the D&O Policy. Notably, Underwriters contend only that the "Money Laundering" exclusion is triggered by Mr. Davis' guilty plea, his accompanying allocution, Judge O'Connor's findings justifying a temporary restraining order and Judge Godbey's preliminary injunction order. Under the plain terms of the insurance policy and Texas law, however, those purported "facts" cannot defeat coverage.

While Mr. Davis pleaded guilty, his guilt *cannot* be imputed to other insureds because the insurance policies strictly prohibit such imputation.[153] In particular, within the "Exclusions" section, the D&O Policy specifically provides

---

[153] *See* **App. Exh. 6** at App. 000168.

that "[a]ny Wrongful Act pertaining to any Director or Officer shall not be imputed to any other person for the purposes of determining the applicability of the Exclusions."[154] Moreover, Davis' allocution, in which he accused other insureds of committing the same acts for which he had pleaded guilty, is not "fact" under Texas or Federal law.[155] Finally, Underwriters' attempt to use Judge O'Connor's findings in a *temporary* restraining order, which was a response to the SEC's request for *emergency* relief and was issued the *same day* the SEC's complaint was filed, and Judge Godbey's "findings of fact" in issuing a preliminary injunction in the SEC Action also fails. Both sets of "findings" are preliminary in nature and cannot be used as a basis for triggering an "in fact" exclusion. As one court has noted, "[d]ue to the limited nature of the proceedings resulting in the issuance of a preliminary injunction, any findings of fact and conclusions of law made at this preliminary stage are of no binding effect at the trial on the merits."[156] This is even

---

[154] *Id.*

[155] *See generally* FED. R. CRIM. P. 11(d) & (e) (explaining the process for withdrawing a guilty plea and the finality of a guilty plea). *See also In re Enron Corp. Securities, Derivative and "ERISA" Litigation*, 391 F. Supp. 541, 575 (S.D. Tex. 2005) (relying on former FED. R. CRIM. P. 32(d), which now is FED. R. CRIM. P. 11(e), and also on numerous U.S. Supreme Court cases holding that a guilty plea is not a fact until sentencing because it can be withdrawn at any time for any reason).

[156] *Mattive v. Healthsource of Savannah, Inc.*, 893 F. Supp. 1559, 1563 (S.D. Ga. 1995) (citing *Clark v. K-Mart Corp.*, 979 F.2d 965, 969 (3rd Cir. 1992) (citing *University of Texas v. Camenisch*, 451 U.S. 390, 394–95 (1981))). *See also Mylett v. Jeane*, 910 F.2d 296, 299 (5th Cir. 1990) (noting that findings of fact in a

more so for a temporary restraining order where findings of fact and conclusions of law generally are not required because such orders are issued in haste and under emergency conditions in order to forestall irreparable harm.[157] Accordingly, Underwriters cannot use those "findings" in order to defeat coverage here and, therefore, the Plaintiffs are substantially likely to prevail on the merits.

Underwriters do not appear to rely on the "Fraud" exclusion in the D&O Policy to defeat coverage. This follows from the fact that the "Fraud" exclusion requires a "final adjudication."[158] Nevertheless, the "Fraud" exclusion illustrates exactly why Underwriters' recent denial of coverage is wrong. As Underwriters recognizes, the Plaintiffs have been accused of mail fraud, wire fraud, securities fraud, conspiracy to commit such frauds, conspiracy to obstruct an SEC investigation, obstruction of an SEC investigation *and* conspiracy to commit money laundering. In other words, there are many more allegations than those attributed to money laundering. The remaining allegations—those pertaining to fraud in particular—clearly require a "final adjudication" *before* Underwriters can pull its contractual obligation to pay for defense costs and expenses.

---

preliminary injunction are not binding at a trial on the merits); *Terrazas v. Slagle*, 821 F. Supp. 1162, 1169 (W.D. Tex. 1993) (same). In addition, the orders issued by Judge O'Connor and Judge Godbey do not even apply to all of the Plaintiffs. *See* Temporary Restraining Order attached hereto at **App. Exh. 23**; Preliminary Injunction attached hereto at **App. Exh. 24**.

[157] *See Romer v. Green Point Sav. Bank*, 27 F.3d 12, 16 (2nd Cir. 1994).

[158] *See* **App. Exh. 6** at App. 00164–65.

---

Undoubtedly, Underwriters will argue—as it has previously when it denied coverage—that the "Money Laundering" exclusion is broad, encompassing more than just money laundering *per se*. Although the exclusion may be broadly written, Underwriters' contention has a fatal flaw—if the "Money Laundering" exclusion is so broad that it encompasses even allegations of fraud, then the "Money Laundering" exclusion swallows up the "Fraud" exclusion in its entirety. And, in that event, the insureds' right to "Costs, Charges and Expenses" until "final adjudication" vanishes as well. Such a construction violates well-settled contract interpretation principles that an exclusion should not be interpreted so as to render other parts of the policy, including other exclusions, mere surplusage.[159] Accordingly, it is clear that, under the plain language of the D&O Policy, Plaintiffs can show a substantial likelihood of success on the merits. In the alternative, the "in fact" language in the "Money Laundering" exclusion is ambiguous and should be construed in favor of Plaintiffs.[160]

---

[159] *Balandran v. Safeco Ins. Co.*, 972 S.W.2d 738, 740 (Tex. 1998) (applying general rules of contract interpretation to insurance policy interpretation); *Nat'l Union Fire Ins. Co. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995) (noting that a policy must be read such that all provisions have meaning and the interpretation of one provision cannot render another inoperative).

[160] *See Balandran*, 972 S.W.2d at 741 ("Where an ambiguity involves an exclusionary provision of an insurance policy, we 'must adopt the construction . . . urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent.'" (citations omitted)).

**2.   Plaintiffs will Suffer Irreparable Injury if a Preliminary Injunction is not Issued.**

Irreparable harm is found when, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied.[161] Where a constitutional right is involved, irreparable injury almost always is found.[162] It is settled that the failure to receive defense costs and expenses when they are incurred constitutes an immediate and direct injury.[163] Judge Godbey, in fact, held as such in the SEC Action:

> [T]he directors and officers, many of whom deny any knowledge of fraudulent activities, relied on the existence of coverage. They expected D&O proceeds would afford them a defense were they to be accused of wrongdoing in the course of duty. The potential harm to them if denied coverage is not speculative but real and immediate: they may be unable to defend themselves in civil actions in which they do not have a right to court-appointed counsel.[164]

It is impossible to predict or to quantify the impact on a litigant of a failure to have adequate representation.[165] The defense attorneys cannot prepare effective

---

[161] *In re WorldCom, Inc. Securities Litigation*, 354 F. Supp. 2d 455, 469 (S.D.N.Y. 2005).

[162] *Flood v. ClearOne Communications, Inc.*, 2009 WL 87006, *6 (D. Utah 2009).

[163] *WorldCom*, 354 F. Supp. 2d at 469.

[164] *See* **App. Exh. 15**.

[165] *WorldCom*, 354 F.Supp.2d at 469.

defenses without substantial funds in light of the serious and complex charges made against Plaintiffs.[166] The attorneys have indicated that they cannot afford to advance the defense costs necessary to prepare for trials in the Criminal Action and in the SEC Action and that they will withdraw from representation (or attempt to do so) unless they are paid.[167] That, of course, would leave Plaintiffs without their attorneys of choice.[168] This issue has constitutional implications in the Criminal Action, but also has drastic effects in the SEC Action because—as Judge Godbey recognized—Plaintiffs do not have a right to court-appointed counsel in the SEC Action.[169]

Plaintiffs require and have a constitutional right to effective representation.[170] Further, an element of the Sixth Amendment right to counsel is the right of a defendant who does not require appointed counsel to choose who will represent him.[171] Because the Receiver appointed in the SEC Action has either seized or requested seizure of all assets belonging to Plaintiffs, the only funds available to enable Plaintiffs to hire attorneys of their choosing are those that are contractually provided by the insurance policy. Underwriters' conduct threatens to

---

[166] *See* **App. Exh. 12**, **App. Exh. 20**.

[167] *See* **App. Exh. 12**, **App. Exh. 20**.

[168] *See* **App. Exh. 12**, **App. Exh. 20**.

[169] *See* **App. Exh. 15**.

[170] *U.S. v. Cronic,* 466 U.S. 648, 656 (1984).

[171] *U.S. v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006).

deprive Plaintiffs of their right to choose the attorneys who will represent them in the Criminal Action and the SEC Action. Additionally, until it is determined whether Plaintiffs' attorneys in the Criminal Action are going to be paid, the Criminal Action cannot be scheduled for trial.[172] Consequently, Plaintiffs' right to a speedy trial is in jeopardy because of Underwriters' conduct. The fact that Plaintiffs will suffer irreparable harm if an injunction does not issue cannot reasonably be disputed.

### 3.  The Harm to Plaintiffs Outweighs any Harm to Underwriters.

While Plaintiffs' constitutional rights and the ability to defend themselves are in jeopardy due to Underwriters' conduct, the only harm that will result to Underwriters from the issuance of a preliminary injunction is monetary. Indeed, the preliminary injunction will not significantly alter the contractual obligations and rights of either party because the policies grant Underwriters a right of reimbursement.[173] In the event that Underwriters ultimately prevail, Plaintiffs will be required to reimburse Underwriters for any amounts improperly advanced.[174] Since simple economic loss is an insufficient basis for an injunction to issue, and the loss of constitutional rights easily supports the issuance of an injunction, any

---

[172] *See* **App. Exh. 12**, **App. Exh. 20**.

[173] *See Flood*, 2009 WL 87006 at *6; *Great Am. Ins. Co. v. Gross*, 2005 WL 1048752, *4 (E.D. Va. 2005). *See also Enron* 391 F. Supp. 2d at 575 (recognizing that the D&O policy had a right of reimbursement).

[174] *Flood*, 2009 WL 87006 at *6.

---

economic loss to Underwriters cannot change the fact that the balance of harms analysis strongly favors the issuance of a preliminary injunction.[175]

### 4. The Issuance of a Preliminary Injunction will not Adversely Affect the Public Interest.

The public interest favors a speedy resolution of criminal cases.[176] The public interest also favors protection of a criminal defendants' constitutional rights.[177] Further, it is in the public's interest to see parties abide by their contractual obligations.[178]

Public interest will not adversely be affected by the issuance of interim injunctive relief in this case. Indeed, in similar cases, numerous courts have found that injunctive relief serves the public's interest.[179] Moreover, if the injunction is not issued, it is the public that will be adversely affected as it will be the taxpayers that will have to bear the financial costs associated with defending the Criminal Action.

### C. A Bond of Zero Dollars is Appropriate in this Case.

Pursuant to Federal Rule of Civil Procedure 65, "[n]o . . . preliminary injunction shall issue except upon giving of security by the applicant, in such sum

---

[175] *Id.*

[176] *Flood*, 2009 WL 87006 at *7.

[177] *Id.*

[178] *Gross*, 2005 WL 1048752 at *6.

[179] *Id.*

as the court deems proper."[180] It is in the discretion of the district court to decide that, under the circumstances, no security is required.[181] A bond amount may be zero if there is no evidence the party will suffer damages from the injunction.[182] The posting of a bond by Plaintiffs would undermine the very protection that Underwriters promised in the policies.[183] Additionally, because the policies require Plaintiffs to reimburse any amounts paid if it is ultimately determined that they are not entitled to the payments, the payment of defense costs by Underwriters places no undue burden on them and no bond should be required. As a practical matter, Stanford's and Holt's assets are frozen and the SEC has sought the same relief against Kuhrt and Lopez. Accordingly, none of the Plaintiffs possess the financial ability to post a bond and, therefore, the bond amount should be set at zero.

## VII.
## CONCLUSION

A simple but rather basic notion in our system of justice is that a defendant is presumed innocent until proven guilty. An insured under a D&O policy shares this basic right as the exclusions sought to be enforced by Underwriters require a "final adjudication" or an "in fact" determination. Neither a "final adjudication"

---

[180] FED. R. CIV. P. 65.

[181] *WorldCom*, 354 F. Supp. 2d at 470.

[182] *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills,* 321 F.3d 878, 882 (9th Cir. 2003).

[183] *Id.*

---

nor an "in fact" determination has been made in connection with the Plaintiffs. Yet, despite this fact, Underwriters unilaterally have acted as both the judge and jury by concluding that *their* insureds are guilty and thus not entitled to the contractual protections afforded by the policies—including the right to have their defense funded by the very policies purchased to provide such protection. The D&O Policy does not confer Underwriters with the right to act as judge and jury and a preliminary injunction should issue to prevent Underwriters' unconscionable and bad faith conduct.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that their Motion for Preliminary Injunction be GRANTED, and that Underwriters at Lloyd's of London and Arch Specialty Insurance Company be ordered to pay all reasonably and necessary "Costs, Charges and Expenses" incurred in defending Plaintiffs in the SEC Action and in the Criminal Action until a court of competent jurisdiction concludes that either a "final adjudication" or "in fact" determination has been made sufficient to negate coverage under the D&O Policy and the "follow form" Excess Policy.

Respectfully submitted,

By:    /s/ Lee H. Shidlofsky
     Lee H. Shidlofsky
     State Bar No. 24002937
     Federal Bar No. 22026
     E-mail: lee@vsfirm.com

     Alan M. Cohen
     State Bar No. 24057671
     Federal Bar No. 925044
     E-mail: alan@vsfirm.com

     Douglas P. Skelley
     State Bar No. 24056335
     Federal Bar No. 903934
     E-mail: doug@vsfirm.com

     VISSER SHIDLOFSKY LLP
     7200 N.Mopac Expy.,Suite 430
     Austin, Texas 78731
     Phone: (512) 795-0600
     Fax: (866) 232-8710
     **ATTORNEYS FOR PLAINTIFFS
     LAURA PENDERGEST-HOLT, R.
     ALLEN STANFORD, and
     GILBERT LOPEZ**

     **- and –**

By:   /s/ Gregg Anderson
          Gregg Anderson
          State Bar No. 011186200
          Federal Bar No. 9032
          TERRY BRYANT, PLLC
          8584 Katy Freeway, Suite 100
          Houston, Texas 77024
          Phone: (713) 973-8888
          Fax: (713) 973-1188
          E-mail:gregg@terrybryant.com
          **ATTORNEYS FOR PLAINTIFF**
          **MARK KUHRT**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 14th day of December, 2009, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to each counsel of record. To the extent any such counsel is not registered for such electronic delivery, the foregoing document will be served in accordance with the Federal Rules of Civil Procedure.

          /s/ Lee H. Shidlofsky
          Lee H. Shidlofsky