IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LAURA PENDERGEST-HOLT, R. ALLEN STANFORD, GILBERTO LOPEZ, JR. and MARK KUHRT, *Plaintiffs,* | §<br>§<br>§<br>§<br>§ | |
| vs. | §<br>§ | CIVIL ACTION NO. 4:09-cv-03712<br>(J. Hittner) |
| CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON and ARCH SPECIALTY INSURANCE COMPANY, *Defendants.* | §<br>§<br>§<br>§<br>§<br>§ | |

## DEFENDANTS' PROPOSED ORDER

Pending before the Court is Plaintiffs' Motion for Preliminary Injunction.

Having considered the Motion, the Court determines that it should be **DENIED**.

Accordingly, the Court enters the following findings of fact and conclusions of

law.  Any finding of fact that should be construed as a conclusion of law is hereby

adopted as such.  Any conclusion of law that should be construed as a finding of

fact is hereby adopted as such.

## *FINDINGS OF FACT*

### A.   The SEC Action.

On February 17, 2009, the Securities and Exchange Commission ("SEC")

sued Allen Stanford, James Davis, Laura Pendergest-Holt, and three Stanford

companies in the United States District Court for the Northern District of Texas,

Dallas Division alleging that those individuals had orchestrated a multi-billion dollar ponzi scheme through a program that sold more than $8 billion in sham certificates of deposit ("CDs") to investors.[1]  On January 5, 2010, the Northern District granted the SEC's request to amend its complaint to name Mark Kuhrt and Gilberto Lopez as additional defendants.[2]

The day the SEC brought suit, U.S. District Judge Reed O'Connor signed an order appointing a receiver to manage the affairs of the companies named in the SEC Action and ordered the seizure of assets in the possession of those entities and individuals.[3]  Judge O'Connor found appointment of a receiver "necessary and appropriate in order to prevent waste and dissipation of the assets of Defendants to the detriment of the investors."[4]  This Order (the "Receivership Order") was amended on March 12, 2009, by U.S. District Judge David Godbey.[5]  The Receivership Order empowers the Receiver to marshal and manage the Receivership Estate.[6]  Judge Godbey has asserted his court's exclusive jurisdiction

---

[1] Compl., *SEC v. Stanford Int'l Bank, Ltd.*, No. 3:09-cv-298-N (N.D. Tex. Feb. 17, 2009) (the "SEC Action").

[2] Order, *SEC Action* (N.D. Tex. Jan. 5, 2010).

[3] Dec. 17, 2009, Def.'s Hr'g Exh. (hereinafter "DHEX") 15, Order Granting Mot. for Order Appointing Receiver, *SEC Action* (N.D. Tex. Feb. 17, 2009).

[4] *Id.* at 1.

[5] DHEX 19, Am. Order Appointing Receiver, *SEC Action* (N.D. Tex. Mar. 12, 2009) (hereinafter "Receivership Order" refers to the February 17, 2009 Order Appointing Receiver, as amended on March 12, 2009).

[6] The "Receivership Estate" consists of "Receivership Assets" and "Receivership Records."  Receivership Order ¶ 2.  "Receivership Assets" are defined as the "assets, monies, securities, properties, real and personal, tangible and intangible, of whatever kind and

over the policy proceeds with regard to any claim other than those before this Court.[7]

The Receivership Order compels the Receiver to take "all acts necessary to conserve, hold, manage, and preserve the value of the Receivership Estate, in order to prevent any irreparable loss, damage, and injury to the Estate."[8]  To effectuate the Northern District's mandate, the Receiver sued various individuals seeking to recoup assets traceable to the SEC Action defendants' fraudulent conduct.[9]  The Receiver presented a detailed financial analysis, executed by forensic accountant Karyl Van Tassel, describing the roles the various Stanford entities played in the fraud alleged by the SEC, with specific focus on the sale and redemption of Stanford International Bank ("SIB") CDs, the source of income of the Stanford entities, and cash tracing of those funds.[10]  That analysis determined that proceeds from the sales of new SIB CDs were not invested as it represented, but were instead used to make CD interest and redemption payments to existing investors, as

---

description, wherever located, and the legally recognized privileges (with regard to the entities), of the Defendants and all entities they own or control." *Id.* ¶ 1.

[7] Order, *SEC Action* (N.D. Tex. Dec. 16, 2009).

[8] *Id.* ¶¶ 5(g), 8.

[9] *Janvey v. Alguiere*, 3:09-cv-0724-N (N.D. Tex. Apr. 20, 2009) (hereinafter "Relief Defendant Suit").

[10] DHEX 23, Decl. of Karyl Van Tassel ¶ 4, App. in Support of Receiver's Mot. for Order Freezing Assets Held in the Names of Certain Relief Def.'s and for Summ. J. and Br. in Support Thereof, *Relief Defendant Suit* (N.D. Tex. July 28, 2009).

3

well as to pay commissions and bonuses and make loans to Stanford financial advisors.[11]

## B.    The Criminal Action.

On June 18, 2009, a federal grand jury in Houston, Texas, returned a twenty-one count indictment against Stanford, Holt, Lopez, and Kuhrt on charges of conspiracy to commit mail, wire, and securities fraud; wire fraud; mail fraud; conspiracy to obstruct an SEC investigation; obstruction of an SEC investigation; and conspiracy to commit money laundering.[12]   Trial for these individuals is set to begin in January 2011.

James Davis, the former Chief Financial Officer of Stanford Financial Group and SIB, was separately charged with mail fraud; conspiracy to violate the mail, wire, and securities fraud laws; and conspiracy to obstruct a proceeding before the SEC.[13]

On August 27, 2009, Davis pleaded guilty to all of these charges.  Before this Court accepted Davis' plea and pursuant to Federal Rule of Criminal Procedure 11, this Court stated it needed to "make a determination that there's a

---

[11] *Id.*

[12] DHEX 26, Indictment, *United States v. Stanford*, Crim. No. H-09-342 (S.D. Tex. June 18, 2009) (the "Criminal Action").

[13] Information, *United States v. Davis*, Crim. No. H-09-cv-335 (S.D. Tex. June 18, 2009).

factual basis for [Davis'] plea."[14]  During his allocution, Davis signed a sworn plea agreement and stated under oath in open court that he, together with each of the Plaintiffs, had engaged in various acts in furtherance of a ponzi scheme.[15]  These acts included the creation of falsified financial statements, bribery, concealment of billions of dollars of fraudulent personal loans to Allen Stanford, and the execution of bogus real estate transactions designed to artificially inflate the value of SIB's assets.[16]

## C.  The D&O Policy.

Directors and officers' policies generally insure risks from claims arising from mismanagement of a corporate entity.[17]  Underwriters issued a D&O Policy to Stanford Financial Group Company and Stanford Group Company and certain of their affiliates.[18]  As early as February 25, 2009, Stanford, Holt, Kuhrt, and Lopez ("Plaintiffs") sought coverage from Underwriters for defense costs relating to the

---

[14] Tr. of Aug. 17, 2009 Rearraignment before the Honorable David Hittner at 15:13-15, Crim. No. 09-335, *United States v. Davis* (S.D. Tex. Aug. 17, 2009).

[15] *Id.* at 15:13-22:13.

[16] DHEX 24,  Plea Agreement, *United States v. Davis* (S.D. Tex. Aug. 27, 2009); App. of Notice of Filing, *SEC Action* (N.D. Tex. Sept. 28, 2009) (a transcript of Davis' entry of guilty plea was filed in the SEC Action).

[17] Tom Baker & Sean J. Griffith, *The Missing Monitor in Corporate Governance, The Directors and Officers Liability Insurer*, 95 Geo. L. J. 1795, 1801 (2007).

[18] DHEX 1, D&O Policy, Schedule, Item A.  In addition to the Directors and Officers' Liability and Company Indemnity Policy (No. 576/MNK558900), Underwriters also issued a Financial Institutions and Professional Indemnity Policy (No. 576/MNA851300) and an Excess Blended "Wrap" Policy (No. 576/MNA831400).

SEC and Criminal Actions.[19]  In response, Underwriters issued a complete

reservation of rights for each claim noticed and agreed to pay defense costs to

Stanford, Holt, and Lopez.[20]  In those reservation of rights letters, Underwriters

expressly reserved their right to deny coverage to Plaintiffs at any time based on a

number of the policies' terms, conditions, or exclusions, including Exclusion I (for

dishonest, fraudulent, or criminal acts) and Exclusion T (money laundering) in the

D&O Policy.

The fraud and money laundering exclusions differ in scope and with respect

to when they may be invoked.  The fraud exclusion bars coverage for loss resulting

from any claim for fraudulent, dishonest, or criminal acts.[21]  This exclusion does

not operate until there is a "final adjudication" that the insured in fact engaged in

fraudulent conduct.

The money laundering exclusion, on the other hand, bars coverage for loss

resulting from any claim for acts or *alleged* acts that constitute Money Laundering,

a broadly defined term in the D&O Policy, the gravamen of which relates to the

acquisition and disposition of other people's property by criminal means.  Unlike

---

[19] *See* DHEX 4-5, May 1, 2009 and June 1, 2009, Reservation of Rights letters issued to Stanford; DHEX 7-8, May 1, 2009 and June 1, 2009, Reservation of Rights letters issued to Holt; DHEX 10, Reservation of Rights letter issued to Lopez.

[20] Underwriters never agreed to advance defense costs to Mark Kuhrt.

[21] DHEX 1, D&O Policy, Art. IV, cl. I.

the fraud exclusion, the money laundering exclusion precludes coverage for even *allegations* of the excluded acts.[22]

The money laundering exclusion does contain a limited exception to its otherwise broad scope.  The exception provides that Underwriters must pay legal costs to defend alleged acts of money laundering (as defined by the D&O Policy) until, but only until, the time it is determined that Money Laundering in fact occurred.[23]  The exception does not require a court to make an "adjudication" of any kind, much less a "final adjudication."

**D.**     **The Coverage Dispute.**

Underwriters determined that sufficient information existed to establish that the claims against Plaintiffs in the SEC Action and the Criminal Action constituted Money Laundering as defined by the Policy and on November 16, 2009 communicated their determination to deny coverage as to the loss asserted by Plaintiffs.  In their denial letter, Underwriters explained that in the months since the SEC filed its initial charges evidence had developed that lead Underwriters to conclude that Money Laundering, as defined by the D&O Policy, had in fact occurred.

---

[22] DHEX 1, D&O Policy, Art. IV, cl. T.

[23] *Id.*

Plaintiffs filed this lawsuit on November 17, 2009. Plaintiffs' suit seeks damages and a declaration that their claims are covered under the Policies.[24] Plaintiffs also seek a preliminary injunction forcing Underwriters to pay fees, expenses, and costs incurred in defense of the charges brought in the SEC Action and in the Criminal Action until the Court makes a final ruling on the merits of the coverage dispute.

### *PRELIMINARY INJUNCTION STANDARD*

A preliminary injunction shall be granted only if a movant shows (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is denied, (3) that the threatened injury outweighs any damage that the injunction might cause the non-movant, and (4) that the injunction will not disserve the public interest. *Winter v. Nat'l Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008). An injunction is as an extraordinary remedy that shall not be granted unless the movant has "clearly carried the burden of persuasion on all four requirements." *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 195-96 (5th Cir. 2003). Thus, if Plaintiffs fail to carry their burden on even one of the four requirements, this Court cannot issue a preliminary injunction. *Id.* at 203.

---

[24] This lawsuit was originally docketed in the Honorable Gary Miller's court but was transferred "[b]y agreement between the Judges" to this Court. Plaintiff's Motion to Transfer Proceedings Based on Related Case [Docket No. 4]; Notice of Transfer [Docket No. 5].

Moreover, a mandatory injunction like the one Plaintiffs seek here—as compared to an injunction seeking merely to maintain the status quo—"should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party." *Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971) (quoting *Miami Beach Fed. Sav. & Loan Ass'n v. Callander*, 256 F.2d 410, 415 (5th Cir. 1958)).[25]

## *CONCLUSIONS OF LAW*

This Court denies Plaintiffs' Motion[26] with respect to the Criminal Action, because Plaintiffs cannot carry their burden on each of the four prerequisites for a preliminary injunction.[27]

---

[25] Plaintiffs are seeking a mandatory injunction because they are asking this Court to force Underwriters to pay their defense costs. *Mercedes-Benz U.S. Int'l, Inc. v. Cobasys*, 605 F. Supp. 2d 1189, 1196 (N.D. Ala. 2009) (when a preliminary injunction "goes beyond the status quo and seeks to force one party to act, it becomes a mandatory or affirmative injunction and the burden placed on the moving party is increased").

[26] Plaintiffs seek a declaration of coverage under the D&O, PI, and Excess Policies. However, Plaintiffs' preliminary injunction Motion pertains only to the D&O and Excess Policies.  Second Am. Compl. ¶ 42 [Docket 12].  Nevertheless, the Court finds that Plaintiffs' claims relating to the Criminal Action and SEC Action are excluded under the PI Policy by the government claims exclusion. *See* PI Policy, Art. III, cl. K.

[27] Even if Plaintiffs could carry their burden, this Court could not order any relief under the Excess Policy.  Underwriting Syndicate 623 underwrote a portion of the primary layer of the D&O Policy.  Syndicate 623 is not a party to this lawsuit, as Plaintiffs voluntarily dismissed this party in open court and without objection on December 17, 2009. *See* Prelim. Inj. Hr'g Tr. at 31:7-17.  Each Underwriter to the D&O Policy is bound "severally and not jointly, each for his own part and not one for another."  D&O Policy Cover Page.  This means that each Underwriter is liable only for their Syndicate's proportion of any loss.

Moreover, unless and until Syndicate 623 exhausts its share of the primary limit under the D&O Policy along with all other insurers obligated on that layer, the primary D&O Policy is not exhausted, and the excess policy and those insurers subscribed to it have no obligation to pay as a matter of law.  LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE 3D, § 254:39 (2005) ("[A]n insured procuring true 'excess' insurance which is to become effective only in the event other insurance proves inadequate to cover the full amount of the loss has the burden of proving

As to the SEC Action, this Court declines to rule on Underwriters'
obligations to pay the Plaintiffs' civil defense costs.  Judge Godbey presides over
the SEC Action and can better assess whether Underwriters are obligated to pay
Defendants' legal fees in connection with that suit.  Moreover, Judge Godbey has
previously asserted jurisdiction over the Policies.  This Court will not interfere
with that jurisdiction beyond addressing the limited issue of payment of defense
costs in the Criminal Action.  However, as discussed below, Underwriters'
coverage defenses apply equally to the claims arising from the SEC Action.
Therefore, even if this Court were to rule on Plaintiffs' claims arising from the
SEC Action, the Court would likewise deny those claims.

A.    **Plaintiffs Cannot Establish a Substantial Likelihood of Success on the
       Merits.**

This Court finds that Plaintiffs' Motion fails to establish a substantial
likelihood of success on the merits.  *Lake Charles*, 328 F.3d at 203 ("[T]he absence
of likelihood of success on the merits is sufficient to make the district court's grant

---

the exhaustion of such other insurance as a condition precedent to recover on the 'excess'
policy."); DHEX 3, Excess Policy, cl. 1 ("Liability to pay under this Policy shall not attach
unless and until the Underwriters of the Underlying Policy(ies) shall have paid or have admitted
liability or have been held liable to pay, the full amount of their indemnity inclusive of costs and
expenses).

Although Plaintiffs point out that the "Service of Suit" clause in the D&O Policy
purports to bind all of the Underwriters to any *final decision* regarding the D&O Policy, a
preliminary injunction order is not a final decision. *See, e.g., Amerispec, Inc. v. Metro
Inspection Servs., Inc.*, No. CIV.A.3:01-CV-0946, 2001 WL 770999, at *6 (N.D. Tex. July 3,
2001) (explaining that a preliminary injunction ruling is "not a final decision—which can only
be reached after full consideration of the merits").  Thus, a preliminary injunction requiring
those Underwriters that are parties to this action to pay from the D&O Policy will not bind
Syndicate 623.

of a preliminary injunction improvident as a matter of law."). Plaintiffs' claims are

excluded by the D&O Policy's money laundering exclusion (Exclusion T), and the

conditions under which the limited exception to this exclusion arise have not been

satisfied.[28] Further, the doctrines of waiver and estoppel cannot expand the scope

of Plaintiffs' insurance coverage.

> ### 1. The Money Laundering Exclusion Applies to Unambiguously Exclude Plaintiffs' Loss.
>
> #### (a) The D&O Policy broadly excludes alleged acts of Money Laundering as defined by the D&O Policy.

Exclusion T excludes Underwriters' liability for Plaintiffs' loss from the

Criminal Action and SEC Action. Any analysis of the terms and conditions of an

insurer's obligations begins with the plain language of the pertinent insurance

contract. Here, the D&O Policy broadly excludes loss resulting from any Claim

> [a]rising directly or indirectly as a result of or in connection with any act or acts *(or alleged act or acts)* of Money Laundering or any act or acts *(or alleged act or acts)* which are in breach of and/or constitute an offence or offences under any money laundering legislation (or any provisions and/or rules or regulations made by any Regulatory Body or Authority thereunder).[29]

The Policy provides the following exception to the exclusion:

> Notwithstanding the foregoing Exclusion, Underwriters shall pay
> Costs, Charges and Expenses in the event of an alleged act or alleged

---

[28] This Court cannot order relief under the Excess Policy because Syndicate 623 is not a party to this lawsuit. *See* note 27, *supra.* However, even if the Excess Policy were triggered, that policy follows the terms and conditions of the D&O Policy, which plainly exclude Plaintiffs' claims. DHEX 3, Excess Policy, cl. 7.

[29] DHEX 1, D&O Policy, Art. IV, cl. T (emphasis added).

acts *until such time that it is determined that the alleged act or alleged acts did in fact occur*.  In such event, the Directors and Officers and the Company will reimburse Underwriters for such Costs, Charges and Expenses paid on their behalf.[30]

The exclusion's application turns on the definitions of Money Laundering, Criminal Property, and Criminal Conduct.  The D&O Policy broadly defines Money Laundering as

> (i)    the concealment, or disguise, or conversion, or transfer, or removal of Criminal Property, (including concealing or disguising its nature, source, location, disposition, movement or ownership or any rights relating thereto); or
>
> (ii)   the entering into or becoming in any way concerned in an arrangement which is known or suspected to facilitate (by whatever means) the acquisition, retention, use or control of Criminal Property by or on behalf of another person; or
>
> (iii)  the acquisition, use or possession of Criminal Property; or
>
> (iv)   any act which constitutes an attempt, conspiracy or incitement to commit any act or acts mentioned in the foregoing paragraphs (i), (ii) or (iii); or
>
> (v)    any act which constitutes aiding, abetting, counselling or procuring the commission of any act or acts mentioned in the foregoing paragraphs (i), (ii) or (iii).[31]

The D&O Policy defines Criminal Property as

> property which constitutes a benefit obtained from or as a result of or in connection with criminal conduct or represents such a benefit (in

---

[30] *Id.* (emphasis added).  This Policy term is clearly an exception to the money laundering exclusion.  Any other interpretation would require this Court to read out of the Policy the phrase "Notwithstanding the foregoing Exclusion …"

[31] DHEX 1, D&O Policy, Art. III, cl. I.

whole or part and whether directly or indirectly) which the Directors or Officers or the Company (or any person or entity acting on their behalf) knows or suspects or reasonably should have known or suspected that it constitutes or represents such a benefit.[32]

The D&O Policy defines Criminal Conduct to mean "conduct which constitutes (*or would constitute*) an offense in any part of the world."[33] Each factual and legal allegation against Plaintiffs by the United States or the SEC arises out of, directly or indirectly, as a result of, or in connection with *alleged acts* of Money Laundering or *alleged acts* of offenses under money laundering legislation.

(b)     The Criminal Action alleges acts of Money Laundering as defined by the D&O Policy.

The Criminal Action for which the Plaintiffs seek defense cost payment alleges that the Plaintiffs created and concealed a massive ponzi scheme. Counts One through Eighteen of the criminal indictment allege that Plaintiffs conspired and schemed to:

> solicit and obtain billions of dollars of investors' funds through false pretenses, all in order to obtain substantial economic benefit for themselves and others through the payment of fees, wages, bonuses, and other monies, and unauthorized diversions, misuse, and misappropriation of funds.[34]

The indictment charges Plaintiffs with conspiracy to commit money laundering and, in furtherance of that conspiracy, alleges they converted millions of dollars in

---

[32] DHEX 1, D&O Policy, Art. III, cl. J.

[33] DHEX 1, D&O Policy, Art. III, cl. K (emphasis added).

[34] DHEX 26, Indictment, Count One ¶ 35, Counts Two Through Eight ¶ 4, Counts Nine Through Eighteen ¶ 4, *United States v. Stanford*, Crim. No. 09-342 (S.D. Tex. June 18, 2009).

fraudulently obtained investors' funds.[35]  The United States also alleges Stanford and Holt conspired to obstruct and did obstruct the SEC's investigation into Stanford Financial's operations in order to conceal the ongoing fraud and to continue receiving economic benefits from this fraud.[36]  The indictment further alleges that Stanford made secret corrupt payments to bank regulator Leroy King[37] and that Holt made misleading statements to the SEC to conceal the true operations and financial condition of SIB.[38]  The indictment also alleges that each Plaintiff was involved in the scheme, which each Plaintiff knew facilitated the acquisition or retention of Criminal Property.[39]  The allegations also reflect a conspiracy to engage in acts of Money Laundering as well as conduct intended to aid and abet the Money Laundering scheme.[40]  Finally, the indictment alleges that Plaintiffs violated money laundering legislation.[41]

---

[35] DHEX 26, Indictment, Count One ¶ 35, Counts Two Through Eight ¶ 4, Counts Nine Through Eighteen ¶ 4, *United States v. Stanford.*

[36] DHEX 26, Indictment, Count Nineteen ¶ 3, Count Twenty ¶ 2, *United States v. Stanford.*

[37] DHEX 26, Indictment, Count Twenty-One ¶ 4, *United States v. Stanford.*

[38] DHEX 26, Indictment, Count One ¶¶ 101-04, *United States v. Stanford.*

[39] DHEX 1, D&O Policy, Art. III, cl. I(ii) (defining Money Laundering to include "the entering into or becoming in any way concerned in an arrangement which is known or suspected to facilitate (by whatever means) the acquisition, retention, use or control of Criminal Property by or on behalf of another person."). The D&O Policy further defines Money Laundering to include "the acquisition, use or possession of Criminal Property."  D&O Policy, Art. III, cl. I(iii).

[40] The Policy further defines Money Laundering to include "any act which constitutes … conspiracy … to commit any act or acts mentioned in the foregoing paragraphs (i), (ii), or (iii)."  D&O Policy, Art. III, cl. I(iv).

[41] DHEX 26, Indictment, Count Twenty-One ¶ 2, *United States v. Stanford.*

The Government's entire case turns upon allegations that the Plaintiffs acquired, concealed, transferred, and misappropriated fraudulently obtained investor funds for their own economic benefit.  These allegations fall squarely within the reach of the money laundering exclusion, which excludes allegations of "the concealment, or disguise, or conversion, or transfer, or removal of Criminal Property, (including concealing or disguising its nature, source … or any rights relating thereto)."[42]  This is the precise conduct excluded by the D&O Policy.[43]  There are no allegations made by the Government that create any potential for a covered loss.[44]

        (c)    <u>The SEC Action alleges acts of Money Laundering as defined by the D&O Policy.</u>

The SEC alleges that Stanford and Davis, acting in concert with Plaintiffs, created "a massive Ponzi scheme" and "misappropriated billions of dollars of

---

[42] DHEX 1, D&O Policy, Art. III, cl. I(i).

[43] *See* DHEX 1, D&O Policy, Art. III, cl. I.

[44] Plaintiffs' claims arising from the Criminal Action and the SEC Action are excluded as *allegations of Money Laundering*.  Plaintiffs are mistaken that this reading of the money laundering exclusion "swallows up the 'Fraud' exclusion in its entirety."  Pltfs. Br. at 47.  The D&O Policy defines Money Laundering and fraud differently, and many claims could fall within the fraud exclusion but not within the money laundering exclusion.  For instance, claims against a director based on a publicly-held company's alleged reckless failure to disclose material information—e.g., where the company operates an otherwise legitimate business but is alleged to have overstated earnings in public filings—could fall within the fraud exclusion, but generally would not fall within the money laundering exclusion.  In that scenario, the D&O Policy would require payment of defense costs unless and until a "final adjudication" of fraud was entered against the director.  The fact that both exclusions might apply to claims arising from the same conduct in a given case—as is the case here—does not mean that one exclusion has been "read out" of the policy.

investor funds."[45]  The SEC contends that Holt, Kuhrt, and Lopez facilitated this scheme.  Holt allegedly misrepresented her management of SIB's investment portfolio to investors and gave false testimony to the SEC.[46]  Kuhrt and Lopez allegedly knew of and tracked over $1.6 billion in fraudulent "loans" to Stanford[47] and falsified financial statements to conceal the misappropriation of investors' funds.[48]

Plaintiffs' losses relating to the SEC Action are excluded as arising from alleged acts of Money Laundering, as defined in the D&O Policy.  The SEC alleges Stanford converted and transferred criminal property; masterminded a scheme to defraud investors; and acquired and used the investors' money.  This money was criminal property because it was "obtained from or as a result of or in connection with criminal conduct."[49]  Further, Holt's, Kuhrt's, and Lopez's conduct constitutes Money Laundering because the SEC alleges that they concealed or disguised the investor funds; that they were active participants in Stanford's scheme; that they conspired to further this scheme; and that they aided and abetted this massive fraud.  Thus, Plaintiffs' claims arising from the SEC

---

[45] DHEX 16, First Am. Compl. ¶ 1, *SEC Action* (Feb. 27, 2009); Second Amended Complaint ¶ 1, *SEC Action*.

[46] DHEX 16, First Am. Compl. ¶¶ 2, 38-39, *SEC Action*.

[47] DHEX 20, Second Amended Complaint ¶ 42, *SEC Action*.

[48] *Id.* ¶ 4.

[49] DHEX 1, D&O Policy, Art. III, cl. J.

Action are excluded because they arise directly or indirectly as a result of or in connection with alleged acts of Money Laundering.

Indeed, Plaintiffs implicitly concede that the money laundering exclusion applies to their claims because they seek to recover *defense costs* under the *exception* to the money laundering exclusion, arguing that a "determination" has not yet been made that Money Laundering "in fact" occurred.

## 2. The Exception to the Money Laundering Exclusion Does Not Apply.

Underwriters have carried their burden of showing that an exclusion applies to Plaintiffs' claimed loss. Once the insurer shows that an exclusion applies, the burden shifts to the insured to show that an exception to the exclusion brings the claim within coverage. *Schneider v. Employees Ret. Sys. of Tex.*, 2009 WL 884817 at *2 (Tex.App.—Austin Apr. 3, 2009) ("Once the insurer proves the applicability of an exclusion, the burden then shifts back to the insured to demonstrate that she has coverage under an exception to the exclusion."); *Underwriters at Lloyd's of London v. Gilbert Tex. Const., L.P.*, 245 S.W.3d 29, 33 (Tex.App.—Dallas 2007, no pet.) (same); *Telepak v. United Servs. Auto. Ass'n.*, 887 S.W.2d 506, 507-08 (Tex.App.—San Antonio 1994, writ denied) (determining that insured carries burden to establish exception to exclusion because exception to exclusion creates coverage).

In evaluating coverage under the exception to the money laundering exclusion, Plaintiffs argue Underwriters should not have considered any evidence beyond the D&O Policy, the SEC complaint, and the indictment to determine Underwriters' duty to pay defense costs because that obligation is governed by the eight-corners rule. Plaintiffs argued at the hearing that only a Court may make the determination that Money Laundering has, in fact, occurred. Finally, Plaintiffs argue that the evidence relied upon is insufficient to support any such determination. As each of these arguments are without merit, Plaintiffs cannot meet their burden to prove coverage under the exception to the exclusion.

> (a)   <u>Underwriters may evaluate extrinsic evidence in making coverage determinations.</u>

Plaintiffs contend that the "eight-corners" or "complaint-allegation" rule precludes Underwriters from considering extrinsic evidence when evaluating their obligation to pay Costs, Charges and Expenses under the D&O Policy. This rule generally requires a liability insurer to evaluate its duty to defend the insured by comparing only factual allegations made within the four corners of the underlying complaint against the provisions within the four corners of the policy, without regard to the truth or falsity of the allegations. *GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 307 (Tex. 2006).

The terms of the D&O Policy preclude application of the eight-corners rule in this case. It is well-settled under Texas law that the terms of an insurance

contract govern the parties' rights and obligations. *Carlton v. Trinity Universal Ins. Co.*, 32 S.W.3d 454 (Tex.App.—Houston [14th Dist.] 2000, pet. denied). Moreover, a court's primary concern in construing an insurance policy must be to give effect to the parties' intent as expressed in the policy. *See Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998). The plain terms of this D&O Policy expressly authorize Underwriters to look beyond the eight corners of the complaint and the D&O Policy when assessing defense cost obligations. Specifically, the exception to the money laundering exclusion provides that Underwriters will pay defense costs only "until such time that it is determined that the alleged act or acts [of Money Laundering] did in fact occur." That determination necessarily requires consideration of extrinsic evidence. Indeed, it would violate fundamental principles of contract construction to preclude consideration of extrinsic evidence under the "eight-corners rule" where, as here, resort to extrinsic evidence is expressly contemplated within the "four corners" of the D&O Policy.

Moreover, applying the eight-corners rule would limit the scope of the money laundering exclusion in a manner inconsistent with the parties' agreement. When an insurer's defense obligations are evaluated under the eight-corners rule, those obligations are unaffected by facts ascertained before suit, developed in trial, or by the ultimate outcome of the case. *Chapman v. Nat'l Union Fire Ins. Co. of*

*Pittsburgh*, 171 S.W.3d 222 (Tex.App.—Houston [1st Dist.] 2005), reh'g overruled, (Feb. 16, 2005). Here, the Parties agreed that Underwriters would not cease payment of defense costs based on "mere allegations." However, the contract language reflects an agreement that the determination that Money Laundering "in fact" occurred—which terminates Underwriters defense cost obligations—does not require a "final adjudication."[50] Because Underwriters can base their determination on less than a final adjudication, but more than mere allegations, the Policy permits Underwriters to look to extrinsic evidence. Thus, application of the eight-corners rule contradicts the language and intent of the contract, and applying it would nullify portions of the Parties' agreement.

Further, the eight-corners rule does not apply because the D&O Policy does not provide Plaintiffs an unqualified defense irrespective of the allegations against them, as is the case when an insurer contractually agrees to defend its insureds. Indeed, this D&O Policy is not a "duty to defend" policy, and Plaintiffs concede this fact.[51] The duty to defend cannot be otherwise implied.[52] The Texas Supreme

---

[50] The Parties concede that the phrase determined in fact must mean something more than pure allegations. *See* Plf.'s Br. in Support of Mot. for Prelim. Inj. at 42 & n.147 [Docket No. 22]; Underwriters' Response in Opposition to Plf.'s Request for a Prelim. Inj. at 23 [Docket No. 31]; *see also PMI Mort. Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, No. C-02-1774-PJH, 2006 WL 825266 (N.D. Cal. Mar. 29, 2006), discussed *infra*.

[51] Plf.'s Br. in Support of Mot. for Prelim. Inj. at 34 [Docket No. 22].

[52] Not only does the D&O Policy explicitly disclaim the duty to defend, but it does not in any way operate as a duty to defend policy. The D&O Policy does not vest Underwriters with the right to select Plaintiffs' counsel, control Plaintiffs' defense, or settle Plaintiffs' claims as is typical in a duty to defend policy. *See* D&O Policy, Art. VI, cl. B; *Rx.com Inc. v. Hartford Fire Ins. Co.*, 426 F. Supp. 2d 546, 559 (S.D. Tex. 2006) ("Rx.com incorrectly asserts that under

Court has only applied the eight-corners analysis in duty to defend cases where policy language provides that the insurer affords the insured an unqualified defense:

> As the Texas Supreme Court explained, the policy language that is missing from the Evanston policy [that the insurer would defend even groundless, false, or fraudulent suits brought against the insured seeking damages] is "assumed to exist under the eight-corners rule." . . . Because [the] policy does not contain that language, the "eight corners or complaint allegation rule" is not applicable to this case.

*B. Hall Contracting Inc. v. Evanston Ins. Co.*, 447 F. Supp. 2d 634, 645 (N.D. Tex. 2006), *vacated on other grounds*, 273 F. App'x 310 (5th Cir. 2008) (quoting *GuideOne*, 197 S.W.3d at 310).  It is this unqualified promise to defend claims, regardless of the facts developed before or during trial, that makes extrinsic evidence meaningless and the eight-corners rule applicable.  Without this unqualified promise to defend or pay defense costs, the eight-corners rule does not apply.

Plaintiffs urge this Court to consider two other federal district court opinions that have applied the eight-corners rule to determine an insurer's defense cost

---

Texas law, an insured may choose its own counsel at the insurer's expense any time the insurer agrees to defend subject to a reservation of right.  An insurer's 'right to defend' a lawsuit encompasses 'the authority to select the attorney will defend that claim and to make other decisions that would normally be vested in the insured as the named party in the case." (quoting *N. County Mut. Ins. Co. v. Davalos*, 140 S.W.3d 685, 688 (Tex. 2004))).  The duty to defend cannot be created by operation of law.  *N. County Mut. Ins. Co. v. Davalos*, 140 S.W.3d 685, 688 (Tex. 2004) ("Whether an insurer has the right or duty to conduct its insured's defense is a matter of contract."); *Daca, Inc. v. Commonwealth Land Title Ins. Co.*, 822 S.W.2d 360, 364 (Tex.App.—Houston [1st Dist.] 1992, writ denied) ("If there is no contract to defend, there is no duty to defend."); *Westchester Fire Ins. Co. v. Rhoades*, 405 S.W.2d 812, 815 (Tex.App.—Austin 1966, writ ref. n.r.e.).

payment obligations outside of the context of an express duty to defend policy.[53] However, neither of these courts even considered whether it was appropriate to apply an eight-corners analysis where, as here, the explicit terms of the contract permit an insurer to look beyond the eight corners.  Nor did these courts considered whether the eight-corners rule is appropriate where the applicable policy does not provide the insured with an unqualified defense.

This Court must apply Texas law as articulated by the Texas Supreme Court.[54]  In this case, Texas law is clear that the terms of an insurance contract must govern the parties' rights and obligations.  The terms of the D&O Policy plainly permit Underwriters to look beyond the eight-corners of the complaint and the D&O Policy in assessing their defense cost obligations.  Moreover, the terms of the D&O Policy do not provide Plaintiffs with an unqualified promise that Underwriters will pay their defense costs.  Therefore, this Court declines to apply the eight corners rule to this coverage dispute.

      (b)    The Policy terms reflect an agreement between the Parties that Underwriters may make the "determination".

This D&O Policy requires Underwriters to pay Costs, Charges and Expenses to defend allegations of Money Laundering as defined in the Policy until it is

---

[53] *See Basic Energy Servs., Inc. v. Liberty Mut. Ins. Co.*, No. MO-08-CV-78, 2009 WL 2998134 * 4 (W.D. Tex. Sept. 18, 2009); *Julio & Sons Co. v. Travelers Cas. & Surety Co. of America*, 591 F. Supp. 2d 651, 659 (S.D.N.Y. 2008).

[54] *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 163 n.17 (5th Cir. 2006).

determined that such Money Laundering in fact occurred.  Underwriters contend
this Policy exception language allows them to make this determination.  The
Plaintiffs disagree.  The Plaintiffs, however, fail to explain who makes the
determination for purposes of this exception, although they imply it is for the Court
to make.

The Court agrees with Underwriters and finds that this exception authorizes
them to determine whether Money Laundering in fact occurred for purposes of this
exception.  Insurers routinely make such determinations.  Indeed, insurers are
expected and even required to make "coverage determinations" all the time.  *See,
e.g. Pegram v. Herdrich*, 530 U.S. 211, 219 ("[R]isk-bearing organizations ... like
traditional insurers, will in some fashion make coverage determinations,
scrutinizing requested services against the contractual provisions to make sure that
a request ... falls within the scope of covered circumstances."); *Owatonna Clinic-
Mayo Health Sys. v. The Med. Protective Co. of Fort Wayne, Indiana*, No. Civ. 08-
417DSJJJK, 2009 WL 2215002 at *4 (D. Minn. July 22, 2009).  ("[A]dequate
notice of an incident within the policy period permits an insurer to investigate
potential claims [and] make an initial coverage determination ..."); *Cincinnati Ins.
Cos. v. Collier Landholdings, LLC*, 614 F.Supp.2d 960, 963 n.1 (W.D. Ark. 2009)
("Under some circumstances, the insurer must consider certain easily ascertainable
facts when making its coverage determination."); *Country Life Ins. Co. v. St. Paul*

*Surplus Lines Ins. Co.*, No. 03-1224, 2005 WL 3690565 at *7 (C.D. Ill. 2005)

("[A]n insurer cannot delegate its obligation to make a coverage determination,

*which is after all its business*, to an attorney and then claim 'work product

privilege.'") (emphasis added).  Indeed, Underwriters' reservation of rights letters

to the Plaintiffs specifically advised them that Underwriters would make a

"coverage determination" upon investigation of their claims.[55]

In order to establish a claim for defense costs under the exception to the

money laundering exclusion, it is *Plaintiffs'* burden to prove there has been no

determination that alleged acts of Money Laundering in fact occurred.  However,

Plaintiffs cannot meet their burden to show a likelihood of success in proving the

applicability of this contractual exception, because it is indisputable that

Underwriters have already made the determination that Money Laundering in fact

occurred.  On November 16, 2009, Underwriters sent a denial letter to each

Plaintiff indicating that Underwriters had determined that the money laundering

exclusion precludes coverage for Plaintiffs' claims, including defense costs, under

the D&O Policy.

Plaintiffs' argument that a court—as opposed to Underwriters—must make

the determination that Money Laundering "in fact" occurred violates established

---

[55] *See* DHEX 4-5, May 1, 2009 and June 1, 2009, Reservation of Rights letters issued to Stanford; DHEX 7-8, May 1, 2009 and June 1, 2009, Reservation of Rights letters issued to Holt; DHEX 10, Reservation of Rights letter issued to Lopez.

principles of contract interpretation.[56]   Undefined contract terms must be given

their plain meaning.  *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d

20, 23 (Tex. 2008).  "[E]ach part of the contract should be given effect," and "no

one phrase, sentence, or section of a contract should be isolated from its setting and

considered apart from the other provisions."  *Forbau v. Aetna Life Ins. Co.*, 876

S.W.2d 132, 133-34 (Tex. 1994) (quoting *Guardian Trust Co. v. Bauereisen*, 121

S.W.2d 579, 583 (Tex. 1938)).  Moreover, "courts cannot read into a contract that

which is not there."  *Sw. E&T Suppliers, Inc. v. Am. Enka Corp.*, 463 F.2d 1165,

1166 (5th Cir. 1972) (applying Texas law).

The money laundering exclusion of the D&O Policy and its exception are

written in simple and direct language that makes clear the parties did not intend

that a court must make the determination that Money Laundering in fact occurred.

Specifically, the exception to the exclusion requires Underwriters to continue to

pay defense costs only until it is "determined" that money laundering "did in fact

occur."  This Court does not construe the "determination" referenced in the

exception as requiring a "***judicial*** determination," because such a construction

would require this Court to read a term into the contract that is not there.  *See Enka

Corp.*, 463 F.2d at 1166.

---

[56] Pltfs. Br. at 42-43 [Docket No. 22].

Furthermore, when the parties intend for a court decision to serve as a prerequisite to the application of an exclusion, they used plain language to express that intent.  In the fraud exclusion, the parties intended to require an "adjudication," which is undeniably a judicial function, and used language expressly requiring as much.  The exception to the money laundering exclusion, however, uses the term "determined"—reflecting an insurer's routine practice of making coverage determinations.

      (c)    <u>Underwriters may determine that Money Laundering as defined by the D&O Policy in fact occurred based on evidence beyond mere allegations, but based on less than a judicial determination or final adjudication.</u>

This Court has found no reported case in which a court construes precisely the same language as found in the D&O Policy at issue here—that is, where one exclusion requires a "final adjudication" to become operative, while a separate exclusion requires only that conduct excluded from coverage be "determined" to have "in fact occurred."  However, the Northern District of California recently examined similar language in an analogous context.  In *PMI Mortgage Insurance Co. v. American International Specialty Lines Insurance Co.*, the court interpreted the meaning of an "in fact" requirement in a professional liability policy's personal profit exclusion.  No. C-02-1774-PJH, 2006 WL 825266 (N.D. Cal. Mar. 29, 2006).  The exclusion barred claims "arising out of, based upon or attributable to . . . the gaining in fact of any profit or advantage to which an Insured was not legally

entitled." *Id.* at *3. The insured argued the "in fact" language necessitated a final adjudication or jury verdict prior to its operation. *Id.* The insurer disagreed, citing cases requiring only that the underlying complaint contain allegations of an unlawful profit or advantage gained to trigger the exclusion. *Id.* at *4. The policy contained the "in fact" phrase in the personal profit exclusion, but also contained the phrase "judicially determined" in a subrogation clause. *Id.* at *3, 5. Applying the same contract rules applicable under Texas law, the court found that the plain meaning of the "in fact" requirement "refers to something which is put forward as 'objectively real' or which can be 'objectively verified.'" *Id.* at *5. The court held that the exclusion's "in fact" requirement ***did not*** require a judicial determination or final adjudication. *Id.* at *7. The court explained that because the policy contained the phrase "in fact" and "judicially determined" in different places, the "in fact" requirement must mean something other than a final adjudication or judicial determination. *Id.* at *7.[57] The court noted that if the parties wanted the phrase "in fact" to require a judicial determination, "the policy would have

---

[57] Some courts have held that "in fact" requires a final adjudication. However, those cases are not instructive because those policies, unlike the instant policy, did not otherwise include a separate provision requiring a final adjudication or a judicial determination. *See, e.g.*, *St. Paul Mercury Ins. Co. v. Foster*, 268 F. Supp. 2d 1035, 1045 (C.D. Ill. 2003); *Am. Chem. Soc. v. Leadscope, Inc.*, No. 04AP-305, 2005 WL 1220746, at *11 (Ohio Ct. App. May 24, 2005); *see also Va. Mason Med. Ctr. v. Executive Risk Indem. Inc.*, No. C07-0636, 2007 WL 3473683, at *5 (W.D. Wash. Nov. 14, 2007). Other courts have reached the opposite conclusion and found that mere allegations can be sufficient to meet an "in fact" standard. *See Brown & LaCounte, LLP v. Westport Ins. Corp.*, 307 F.3d 660, 663 (7th Cir. 2002) (holding that the complaint's allegations may be sufficient for the "in fact" requirement); *Westport Ins. Corp. v. Hanft & Knight, P.C.*, 523 F. Supp. 2d 444, 455-56 (M.D. Pa. 2007) (same).

included the same term in both provisions." *Id.* Thus, the court held "that the term

'in fact' . . . should be read to require *either* a final adjudication, including a

judicial adjudication, *or* at a minimum, at least some evidentiary proof." *Id.*

The contract principles supporting the Northern District of California's

decision in *PMI* also apply under Texas law. *See Forbau*, 876 S.W.2d at 133-34.

Just as in *PMI*, the "in fact" phrase in the D&O Policy cannot require a "final

adjudication" without rendering superfluous the fraud exclusion's requirement that

fraud must be "determined by a final adjudication." Thus, the Court concludes that

the phrase "determined in fact" requires some evidentiary proof beyond the

allegations before Underwriters can make a determination that Money Laundering

in fact occurred, but it does not require a judicial determination or a final

adjudication.

At the preliminary injunction hearing, Plaintiffs suggested that the phrase

"determined in fact" in the exception to the money laundering exclusion is

somehow ambiguous, and therefore, must be construed against Underwriters.

However, ambiguity arises only if the words of a contract are susceptible to at least

two different but reasonable interpretations. *DeWitt County Elec. Coop., Inc. v.

Parks*, 1 S.W.3d 96, 100 (Tex. 1999). Plaintiffs did not identify what they contend

to be two reasonable but different interpretations of "determined in fact," and this

Court finds that the phrase is not susceptible of two reasonable interpretations that

would be in conflict.  Specifically, the occurrence of a "determination" cannot require a court decision, even an interlocutory one, because that would be an "adjudication."  Where the Policy requires an adjudication, the parties use that specific language.  The exception to the money laundering exclusion does not expressly identify who will make the determination, but it does not require a court to make the determination.  Insurers can and do make determinations all the time; it is not unreasonable to construe the exception to mean the insurer will pay defense costs until it "determines in fact" that Money Laundering occurred.  The insurer bears the risk of an incorrect determination that may be actionable in contract, in tort, or by statutory remedy.  Therefore, the Court finds the term "determined in fact" as used in the exception to the money laundering exclusion is not ambiguous.

When, as here, a contract is unambiguous, this Court looks to the plain meaning of the words to ascertain the mutual intent of the parties to the contract. *Id.* at 578.  Had the Parties intended the determination contemplated in the exception be made only by a court, the Parties would have phrased that exception as they did the fraud exclusion.  Instead, the exception requires only that a "determination" be made.  Accordingly, this Court finds that the exception unambiguously permits Underwriters to make the determination that Money Laundering "in fact" occurred.

Finally, Plaintiffs have suggested that this construction of the D&O Policy, based on the clear language of the money laundering exclusion and its exception, would leave the insurer answerable only to itself once it makes a coverage determination. However, an insurer that makes the incorrect coverage determination, or that makes a coverage determination that does not have a reasonable basis, may be liable in contract and tort liability for its error, as well as subject to various statutory remedies. *See e.g., Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 340 (Tex. 1995) (noting that a breach of the duty of good faith and fair dealing is established when there is an absence of a reasonable basis for denying benefits under an insurance policy). Had the insured parties in this case felt such recourse to judicial remedies was an inadequate protection against the insurer's potential error in judgment, they should have insisted on the same protection they received in the fraud exclusion—that is, a right to defense costs until a final adjudication that money laundering occurred. But that is not a right the insured parties secured in the D&O Policy, and it is not this Court's role to secure a more advantageous arrangement for them than the D&O Policy's terms provide.[58]

---

[58] Courts construe a contract as it is made, and are not authorized to make a new contract for the parties. *Westchester Fire Ins. Co. v. Rhodes*, 405 S.W.2d 812, 815 (Tex.App.—Austin 1966, writ ref. n.r.e.).

(d)   Underwriters' determination that Money Laundering "in fact"
      occurred is based on substantial evidence.

The exception to the money laundering exclusion requires payment of

defense costs until there is evidence sufficient for Underwriters' determination that

Money Laundering (as defined in the D&O Policy) in fact occurred.  Underwriters

provided that evidence, which Plaintiffs chose not to rebut.  Underwriters

submitted the following evidence upon which they based their determination that

Money Laundering in fact occurred:

- Findings in the SEC Action, based upon affidavits and evidence
  submitted to the Court, that there was "good cause to believe that
  Defendants used improper means to obtain investor funds and
  assets."[59]

- Entry of a temporary restraining order and appointment of a Receiver
  in the SEC Action.[60]

- Entry of preliminary injunctions in the SEC Action against Allen
  Stanford and James Davis, based upon evidence submitted at a
  hearing, which resulted in findings that:

    (1)   "Stanford engaged in fraudulent conduct, including
          misappropriating investor funds;"[61]

    (2)   Stanford obtained his assets through fraudulent
          activities;[62] and

---

[59] DHEX 13, Temp. Restraining Order, Order Freezing Assets, Order Requiring an
Accounting, Order Requiring Preservation of Documents, and Order Authorizing Expedited
Discovery ¶ 6, *SEC Action* (Feb. 17, 2009).

[60] *Id.*

[61] DHEX 17, Prelim. Inj. and Other Equitable Relief as to R. Allen Stanford ¶ 11, *SEC
Action* (Mar. 12, 2009).  The Court entered a similar order as to James M. Davis.

[62] *Id.* ¶ 12 ("Stanford's assets, *including proceeds obtained through fraudulent activities*,
are in imminent jeopardy of dissipation or loss.") (emphasis added).

    (3)    "In selling the CD, the defendants in this action, including Defendant Stanford, made . ... representations that were materially false and misleading. . . . [S]ignificant portions of the bank's portfolio were misappropriated by Stanford [sic] used by him to acquire private equity and real estate."[63].

- The sworn declaration of Karyl Van Tassel that, although SIB's financial statements reflected assets valued at $8.3 billion, the combined asset value of all Stanford companies was less than $1 billion. [64]

- Van Tassel's conclusion that the proceeds from the sales of new SIB CDs were used to make CD interest and redemption payments to existing investors, as well as to pay commissions, pay bonuses, and make loans to Stanford financial advisors[65]—the classic definition of a ponzi scheme.

In addition to this already substantial evidence, Davis executed a sworn plea agreement and testified at his rearraignment on August 27, 2009 before this Court. After being charged by information,[66] Davis waived indictment and entered a guilty plea.[67]  Pursuant to Federal Rule of Criminal Procedure 11, in order to accept Davis' plea, this Court made a "determination that there's a factual basis for

---

[63] *Id.* ¶ 16.

[64] DHEX 23, Decl. of Karyl Van Tassel ¶ 13.  In her investigation, Karyl Van Tassel and her team, hired by the Receiver, reviewed the Stanford companies' accounting and other business records, conducted numerous interviews, analyzed files from third-party financial institutions, and reviewed data from clearing brokers.  *Id.* ¶¶ 5-6.

[65] *Id.* ¶ 24.

[66] Information, *United States v. Davis*, Crim. No. H-09-335, S.D. Tex. (S.D. Tex. June 18, 2009).

[67] DHEX 25, App. to Notice of Filing at 21-22, *SEC Action* (N.D. Tex. Sept. 28, 2009) (hereinafter "Davis Plea Transcript") (A transcript of the Davis plea colloquy was filed by the Receiver in the *SEC Action*).

[Davis'] plea."[68]  *See United States v. Rivas*, 85 F.3d 193, 194 (5th Cir. 1996)

("The District Court's acceptance of a guilty plea is considered a factual finding

that there is an adequate basis for the plea."); *United States v. Davila*, 698 F.2d

715, 717 (5th Cir. 1983) ("[Federal Rule of Criminal Procedure] 11 requires that a

court may not entertain a plea of guilty without determining that the plea is made

with an understanding of the nature of the charge and unless it satisfied that there is

a factual basis for the plea.  The inquiry as to the factual basis must be 'precise

enough and sufficiently specific' to determine that the defendant's conduct was

'within the ambit of that defined as criminal.'").  During the allocution, Davis

testified under oath to the facts supporting his conviction on the felony charges

against him.  Davis also signed a sworn plea agreement that provides a detailed

account of the criminal acts that he and Plaintiffs committed, including bribery,

concealment of fraudulent personal loans to Allen Stanford, and the execution of

bogus real estate transactions.[69]

    The sworn plea agreement states that the Plaintiffs created a "massive Ponzi

scheme whereby CD redemptions ultimately could only be accomplished with new

---

[68] Tr. of Aug. 17, 2009 Rearraignment Before the Honorable David Hittner at 15:13-15, Crim. No. 09-335, *USA v. Davis* (S.D. Tex. Aug. 17, 2009).

[69] Contrary to Plaintiffs' assertion, Underwriters have not "imputed" Davis' wrongful conduct to Plaintiffs.  Underwriters did not deny coverage and cease reimbursing Plaintiffs' defense costs based on Davis' own admission of guilt.  Rather, Davis' sworn testimony and sworn plea agreement provide evidence that each of the Plaintiffs in fact engaged in the alleged acts of Money Laundering.[69]  This evidence, together with the other evidence described above, supports Underwriters' determination that Money Laundering in fact occurred.

infusions of investor funds."[70]  Davis swore that he, Stanford, and Holt

misrepresented the extent of Holt's control over SIB's portfolio.[71]  Davis also

swore that he, Stanford, Lopez, and Kuhrt created false financial statements "upon

which CD investors routinely relied in making their investment decisions," and

that SIB's financial statements concealed over $2 billion dollars in unsecured

personal loans to Allen Stanford.[72]

All of these items—including Davis' sworn allocution and sworn plea

agreement, the Van Tassel declaration, and the evidence supporting the

Receivership Order—were admitted into evidence at the preliminary injunction

hearing before this Court.  This Court finds that the D&O Policy permits

Underwriters to consider these items in making a determination as to whether

Money Laundering, as defined in the Policy, in fact occurred.  The Court further

finds that Underwriters appropriately considered this evidence in determining that

Plaintiffs engaged in Criminal Conduct,[73] which allowed Plaintiffs to obtain

Criminal Property[74]—a benefit derived from or as a result of or in connection with

Criminal Conduct.  The Court concludes that Underwriters properly relied on this

---

[70] DHEX 24, Plea Agreement ¶ 17(n), *United States v. Davis*, Crim. No. 09-335 (S.D. Tex. Aug. 27, 2009) (hereinafter "Davis Plea").

[71] DHEX 24, *Davis Plea* ¶ 17(f)-(g).

[72] DHEX 24, *Davis Plea* ¶ 17(n).

[73] DHEX 1, D&O Policy, Art. III, cl. K.

[74] DHEX 1, D&O Policy, Art. III, cl. J.

evidence to determine that Plaintiffs' acts of concealment, disguise, conversion, transfer, or removal of Criminal Property constitute Money Laundering.  Thus, this Court will not disturb Underwriters' determination that Money Laundering "in fact" occurred.  Plaintiffs cannot therefore prove a substantial likelihood of success on the merits of the coverage dispute.

      (e)    <u>Even if the exception to the money laundering exclusion requires a judicial determination, this Court could make that determination based the evidence before it, including Plaintiffs' invocation of the Fifth Amendment.</u>

If Plaintiffs are correct that the "determination" required under the exception to money laundering exclusion must be made by a court rather than the insurer, then this Court would be the appropriate forum to make that determination.  However, Plaintiffs have not offered a scintilla of evidence to show that Money Laundering did not in fact occur, and there is no basis for this Court to find that they are likely to prevail on the merits of their claims at a trial of this matter.

Plaintiffs' case for a preliminary injunction is further undermined by their unanimous decision not to testify at the hearing they requested, in the civil action which they filed, but rather to invoke their constitutional privilege against self-incrimination.[75]  In response, counsel for Underwriters made an offer of proof as to

---

[75] Tr. at 38:18-19; 41:1-5; 41:11-14; 41:18-19; 41:21-22.  Plaintiffs also objected that such evidence was not relevant.  However, because the eight-corners rule does not apply, Plaintiffs' testimony was relevant to the issue of whether Money Laundering in fact occurred.

what questions counsel would have asked Plaintiffs if given the opportunity.[76]  The

offer of proof establishes that Underwriters would have asked each Plaintiff

questions related to the allegations in the criminal indictment and the SEC

complaints, including whether Plaintiffs misappropriated investor funds and

participated in a ponzi scheme.[77]

In a criminal proceeding, the invocation of that privilege would have no

evidentiary effect, but the same is not true in a civil proceeding.  Plaintiffs'

invocation of the Fifth Amendment privilege in this matter leads this Court, as

finder of fact, to draw an inference that Plaintiffs would have admitted to engaging

in acts of Money Laundering.  *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)

("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil

actions when they refuse to testify in response to probative evidence offered

against them."); *Hinojosa v. Butler*, 547 F.3d 285, 291 (5th Cir. 2008) (quoting

*Farace v. Indep. Fire Ins. Co.*, 699 F.2d 204, 210 (5th Cir. 1983)) ("[W]hile a

person may refuse to testify during civil proceedings on the ground that his

testimony may incriminate him[,] his refusal to testify may be used against him in

a civil proceeding."); *In re Moore*, 153 S.W.3d 527, 534 (Tex. App.—Tyler 2004,

no pet.) ("Refusal to answer questions by asserting the [Fifth Amendment]

---

[76] Tr. at 45:24-49:1; *see also* DHEX. 29.

[77] Tr. at 43:18-44:16; 46:6-47:17; 48:2-15; *see also* DHEX 29.

privilege is relevant evidence from which the finder of fact in a civil action may draw whatever inference is reasonable under the circumstances.").

Given Underwriters' significant probative evidence and Plaintiffs' subsequent invocations of the Fifth Amendment, this Court concludes that Plaintiffs are unlikely to prevail on the merits of their claims against Underwriters. If the exception to the money laundering exclusion requires a judicial determination, the undisputed evidence coupled with Plaintiffs' invocation of their Fifth Amendment privilege against self-incrimination render Plaintiffs vulnerable to a motion for summary judgment by Underwriters.  Therefore, even if the exception to the money laundering exclusion did required a judicial determination—contrary to the D&O Policy language—this Court would have to conclude, if anything, that Underwriters are likely to prove that Money Laundering in fact occurred and to prevail on their defense under the money laundering exclusion.

Accordingly, Plaintiffs cannot carry their burden to prove a substantial likelihood of success on the merits.

### 3.     Plaintiffs Cannot Expand Coverage Through Waiver or Estoppel.

Although Plaintiffs' claims are excluded under the terms of the D&O Policy, Plaintiffs argue that it would be unfair to let Underwriters discontinue paying their defense costs when Underwriters paid some of those costs in the past, and when

Plaintiffs' counsel claim to have had an understanding with Underwriters' counsel that those costs would continue to be paid in the future.[78]  In essence, Plaintiffs are asking this Court to force Underwriters to continue paying their legal costs under the doctrines of waiver and estoppel, although they do not cite either doctrine. Plaintiffs' efforts are unavailing.

Under well-established Texas law, the scope of insurance coverage cannot be expanded through waiver or estoppel.  The doctrines of waiver and estoppel cannot be used to create coverage where none exists under the terms of the policy itself.  *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 780 (Tex. 2008).[79] To do so would be to create terms and liabilities under a contract that were never intended or bargained for by the parties.  *Id.* at 779.  There are no exceptions to this rule that can be used to force an insurer to assume a risk not covered by the policy. *Id.* at 782.  Moreover, if the insurer agrees to pay defense costs under a reservation of rights, then the insurer may still deny coverage or assert any policy defenses at a later time, and the scope of coverage remains unaltered by any prior agreement to provide a defense.  *American Eagle Ins. Co. v. Nettleton*, 932 S.W.2d 169, 172-74 (Tex. App.–El Paso 1996, writ denied).

---

[78] Both parties' have differing accounts of conversations between counsel for Underwriters and counsel for Plaintiffs.  However, these accounts are wholly irrelevant to the issue of whether Underwriters owe a duty to pay defense costs under the D&O Policy.

[79] Plaintiffs certainly put on no proof of Underwriters' intentional relinquishment of a known right sufficient to support a waiver claim.

Underwriters' earlier payment of defense costs, subject to a complete reservation of rights, does not change this analysis.[80]  Any defense paid for by an insurer under a reservation of rights preserves the right of the insurer later to deny coverage and assert any possible coverage defenses.  ALLAN D. WINDT, 1 INS. CLAIMS AND DISPUTES 5th § 2:17.  Plaintiffs' suggestion that they were surprised that Underwriters, after reserving their rights, concluded that they were no longer obliged to pay defense costs is baseless.[81]  But Underwriters' reservation of rights put Plaintiffs on notice that there might be a dispute over coverage.  *See Valley Forge Ins. Co. v. Shah*, No. H-05-3056, 2009 WL 291080, at *12 (S.D. Tex. Jan. 30, 2009).  Plaintiffs cannot credibly maintain that their counsel agreed to represent them believing there was no coverage dispute.  Accordingly, this Court rejects Plaintiffs' contention that the D&O Policy covers their claims because of alleged representations of Underwriters' counsel and Underwriters' prior payment of defense costs.

---

[80] Underwriters never agreed to advance defense costs to Mark Kuhrt.

[81] *See* DHEX 27.  Tr. of Nov. 17, 2009 Hearing at 46:9-19, *United States v. Stanford* (S.D. Tex. Nov. 17, 2009).  During the November 17, 2009 hearing in the Criminal Action, in which criminal counsel for all Plaintiffs appeared, this Court asked Holt's counsel "[W]hen can you exercise a reservation of rights?  Is it always after the fact or when something else comes up to their attention that they might say, 'Now we're not going to continue paying'?"  Holt's counsel responded "I'm sure that — my understanding, again, is once something comes to their attention, they can exercise that reservation of rights."  This Court asked "Mid-trial or whatever?"  Holt's counsel responded "I'm sure they could … The law allows them to do that, I'm sure."

6427134

**B.**     **Plaintiffs Fail to Carry Their Burden on Irreparable Harm, Balancing of the Equities, or the Public Interest.**

Plaintiffs' inability to establish a substantial likelihood of success on the merits of the coverage dispute alone is enough to preclude this Court from granting Plaintiffs' motion for preliminary injunction. *Lake Charles,* 328 F.3d at 203 (Because "the absence of likelihood of success on the merits is [alone] sufficient to make the district court's grant of a preliminary injunction improvident as a matter of law, we need not address the three remaining prongs of the test for granting preliminary injunctions."). Nevertheless, this Court also finds that Plaintiffs have failed to establish the remaining requirements of the preliminary injunction standard.

Plaintiffs contend that they will be irreparably harmed if Underwriters are not forced to pay their legal fees because they will be unable to retain the attorneys of their choice and will thus be deprived of their constitutional rights to counsel of their choice, a speedy trial, and effective assistance of counsel. However, Plaintiffs' constitutional arguments are baseless. First, Plaintiffs have no constitutional rights to counsel of their choice, a speedy trial, or effective assistance of counsel in the SEC Action. Second, with respect to the Criminal Action, there is no constitutional right to have an ***insurance company*** pay for the counsel of one's choice, even if obtaining such proceeds would facilitate a speedy trial or ensure choice of counsel. At most, Plaintiffs have a (disputed) contractual

right to have Underwriters pay their legal fees.  Thus, even assuming that

Plaintiffs' constitutional rights were violated, Underwriters cannot be liable for that

violation because Underwriters are not state actors and the decisions of a private

insurance company do not constitute state action.  *Blum v. Yaretsky*, 457 U.S. 991,

1004 (1982).

Further, Plaintiffs' arguments on the equities depend on their right to and

reliance on coverage under the D&O Policy.  As this Court has explained,

however, Plaintiffs have not established that they are entitled to the coverage they

seek based on the plain terms of the insurance contract.  Should this Court

nevertheless issue a preliminary injunction requiring Underwriters to fund

Plaintiffs' defense, Underwriters' rights would be severely impacted as they are

unlikely ever to be able to recoup defense costs that may reach as high as $100

million.[82]

Finally, Plaintiffs have not established that a preliminary injunction is in the

public interest.  The public has a significant interest in this Court holding parties to

the benefits and bargains of insurance contracts.  *See Interox Am. v. PPG Indus.,

Inc.*, 736 F.2d 194, 203 (5th Cir. 1984) (noting that the public interest prong is best

served "by enforcing contract terms as they were intended by the parties").  As

explained above, the D&O Policy plainly permits Underwriters to cease payment

---

[82] *See* Aff. of Kent A. Schaffer at 4 (stating that Allen Stanford's defense alone will cost approximately $24 million).

of Plaintiffs' defense costs.  Moreover, requiring Underwriters to pay Plaintiffs'

defense costs for excluded claims will likely exhaust the Policies' limits, and

Underwriters will be unable to pay for legitimate, non-excluded claims.[83]

Having considered Plaintiffs' Motion, the Court determines that the Motion

should be DENIED.

SIGNED at Houston, Texas, on this _____ day of January, 2010.


_____
DAVID HITTNER
UNITED STATES DISTRICT JUDGE


_____

[83] Although Stanford investors are not insureds under the Policies, to the extent an
investor has a claim against a former Stanford employee that is covered by the Policies, the
investor's claims could potentially be paid by the proceeds of the Policies.