IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

JAN 2 6 2010

Clerk of Court

| | |
|---|---|
| LAURA PENDERGEST-HOLT,<br>R. ALLEN STANDFORD,<br>GILBERTO LOPEZ, JR., *and*<br>MARK KUHRT,<br><br>      Plaintiffs,<br><br>v.<br><br>CERTAIN UNDERWRITERS AT<br>LLOYD'S OF LONDON AND<br>ARCH SPECIALTY INSURANCE<br>COMPANYS,<br><br>      Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§     Civil Action No. H-09-3712 |

## ORDER

Pending before the Court is Plaintiffs' Request for Emergency Preliminary Injunction and Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint. Having considered the motions, submissions, and oral argument presented at a hearing on December 17, 2009, the Court determines the motion to dismiss should be denied and the application for preliminary injunction should be granted.

## BACKGROUND

On February 17, 2009, the United States Securities and Exchange Commission ("SEC") initiated a civil action ("SEC Action") in the United States District Court for

the Northern District of Texas against Robert Allen Stanford ("Stanford"), Chairman of the Board of Directors of Stanford International Bank, Ltd. ("SIBL"); Laura Pendergest-Holt ("Holt"), Chief Investment Officer of Stanford Financial Group ("SFG"); James Davis ("Davis"), Chief Financial Officer of SIBL and SFG; and three Stanford entities—SIBL, Stanford Group Company ("SGC"), and Stanford Capital Management ("SCM") (collectively "Stanford Entities"). *See Sec. & Exch. Comm'n v. Stanford Int'l Bank, Ltd., et al.*, No. 3:09-CV-298 (N.D. Tex. filed Feb. 17, 2009). On January 4, 2009, the Northern District Court granted the SEC's request to add Mark Kuhrt ("Kuhrt"), Global Controller for Stanford Financial Group Global Management, and Gilberto Lopez ("Lopez"), Chief Accounting Officer of SFG, as additional defendants in the SEC Action.  The SEC alleges Stanford, Holt, Davis, Kuhrt, and Lopez—plaintiffs in this civil case, and, therefore, hereinafter referred to as "Plaintiffs"—through their positions in the Stanford Entities, orchestrated a multi-billion dollar ponzi scheme in which they, *inter alia*, conspired to deceive investors and sold sham certificates of deposits ("CDs").

On the same day, the Northern District Court appointed a receiver ("Receiver") and seized all assets in the possession of the individuals and entities named in the SEC Action. *See Sec. & Exch. Comm'n v. Stanford Int'l Bank, Ltd., et al.*, No. 3:09-CV-298 (N.D. Tex. Feb. 17, 2009) (order appointing receiver).  The order compels

the Receiver to take "all acts necessary to conserve, hold, manage, and preserve the value of the Receivership Estate, in order to prevent any irreparable loss, damage, and injury to the Estate." *Id.* Consequently, since February 17, 2009, all the assets of the SEC Action defendants and the related Stanford Entities have been frozen.

Shortly after the commencement of the SEC Action, Plaintiffs made claims against a directors and officers insurance policy ("D&O Policy") and an associated "follow form" excess policy ("Excess Policy") (collectively, "Policies") issued by Defendants Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Company ("Underwriters") to SFG and SGC and certain other Stanford affiliated companies. Through their claims against the Policies, Plaintiffs sought to secure payment of their attorneys' fees and costs associated with defending themselves against the charges levied against them in the SEC Action.

On February 26, 2009, the United States of America ("Government") charged Holt with obstruction of an agency of the United States, namely the SEC. Holt subsequently filed additional notices of claims to Underwriters under the Policies on February 27, 2009 and March 4, 2009, identifying the criminal charges against her and seeking defense costs pursuant to the Policies.

On May 1, 2009, and again on June 1, 2009, Underwriters, through its retained counsel, issued a complete reservation of rights for each claim noticed and agreed to

3

pay defense costs to Stanford and Holt.  In those reservation-of-rights letters, Underwriters stated, "Although we [Underwriters] have not yet made a final determination of coverage, Underwriters will consent to your client's request to incur Costs, Charges and Expenses in defense of the criminal proceeding pursuant to Article VI, Section B of the D&O Policy, subject to a complete reservation of all rights."

On June 18, 2009, a federal grand jury in the Southern District of Texas, returned a twenty-one count indictment against each of the Plaintiffs and Leroy King (collectively, "Criminal Defendants") in *United States of America v. Robert Allen Stanford, Laura Pendergest-Holt, Gilberto Lopez, Mark Kuhrt and Leroy King*, Criminal Action No. H-09-342 (S.D. Tex. filed June 18, 2009) (the "Criminal Action").[1]  That case is currently pending in this Court, and the trial is set to commence in January 2011.  The indictment alleges the Criminal Defendants, in controlling the Stanford Entities, conspired to commit and did commit mail fraud and wire fraud, conspired to commit securities fraud and money laundering, and conspired to obstruct and did obstruct an SEC investigation.

Also on June 18, 2009, the Government separately charged Davis by

---

[1] Leroy King, an Antiguan regulator, remains a fugitive.  The Government dismissed the previous February 26, 2009 indictment against Holt.

information with mail fraud, conspiracy to commit mail, wire and securities fraud, and conspiracy to obstruct an SEC investigation. *See United States v. James M. Davis*, Criminal Action No. H-09-335 (S.D. Tex. filed June 18, 2009). Davis reached a plea agreement with the Government and pleaded guilty to all three charges in the information on August 27, 2009. He is currently awaiting sentencing. As part of his plea agreement, and during his allocution at his re-arraignment, Davis made a variety of statements implicating Plaintiffs in a wide range of alleged illegal activity.

On August 24, 2009, the Criminal Defendants moved the Court, in the Criminal Action, to exercise ancillary jurisdiction and order Underwriters to pay defense fees under the Policies. On September 14, 2009—eighteen days after Davis pleaded guilty—Underwriters responded to the Criminal Defendants' motion and represented to the Court that "[i]f Judge Godbey rules that the insurance policy proceeds are not receivership assets, Underwriters presently intend to reimburse Movants' reasonable and necessary attorneys' fees and costs, subject to a complete reservation of rights."

On October 9, 2009, United States District Judge for the Northern District of Texas, The Honorable David Godbey, upon a request for clarification by Holt, issued an order stating that payment of defense costs and expenses by Underwriters under the Policies, even if those proceeds were properly considered assets of the receivership estate, is permissible because "the potential harm to [the directors and

officers] if denied coverage is not speculative but real and immediate." *See Sec. & Exch. Comm'n v. Stanford Int'l Bank, Ltd., et al.*, No. 3:09-CV-298 (N.D. Tex. Oct. 9, 2009) (order clarifying status of insurance proceeds). Subsequently, on October 30, 2009, Underwriters issued to Lopez a reservation-of-rights letter similar to its May 1, 2009 and June 1, 2009 letters to Stanford and Holt in which Underwriters agreed to incur costs subject to it rights under the Policies.

On November 16, 2009, Underwriters issued denial letters to each of the Plaintiffs acknowledging payments to Plaintiffs' criminal defense counsel through August 27, 2009—the very date upon which Davis pleaded guilty to the criminal charges alleged against him—but retroactively declining to extend coverage for costs, charges, or expenses incurred in defending against the SEC Action and the Criminal Action after that date. Although Underwriters acknowledge having paid some policy proceeds to some of the Plaintiffs' criminal defense attorneys, the amount of those payments and to whom exactly the payments were made is not clear entirely. Nevertheless, Underwriters since has refused to pay any claims made by the Plaintiffs against the Policies.[2]

On November 17, 2009, Plaintiffs filed this declaratory judgment action against Underwriters. Plaintiffs seek an order from this Court directing Underwriters to pay

---

[2] Underwriters asserts it never agreed to advance defense costs to Kuhrt.

Plaintiffs' defense costs in the underlying Criminal Action and the SEC Action pending a final adjudication in those cases.  Plaintiffs contend that Underwriters' retroactive denial of coverage is contrary to the terms of the Policies and to Texas law and thus amounts to a breach of the Policies.

On December 17, 2009, the Court held an oral hearing on Plaintiffs' application for preliminary injunction.  All parties were present and represented by counsel.  The Court heard argument and admitted evidence.[3]  Specifically, Plaintiffs seek an order from this Court requiring Underwriters to withdraw its retroactive

---

[3] In support of their application for preliminary injunction, Plaintiffs offered and the Court admitted for the purposes of the preliminary injunction, affidavits from Plaintiffs' criminal defense attorneys purporting to demonstrate, *inter alia*, that Plaintiffs face irreparable harm if injunctive relief is denied.  Underwriters object to the Court's consideration of these affidavits.  However, it is clear the Court may rely on affidavit testimony in issuing a preliminary injunction.  *See Fed. Sav. & Loans Ins. Corp. v. Dixon*, 835 F.2d 554, 558–59 (5th Cir. 1997).

Moreover, Underwriters object to Plaintiffs' reliance upon these affidavits to support a theory of coverage by waiver or coverage by estoppel, and Underwriters invest a significant amount of its briefing to the Court on these issues.  However, Plaintiffs concede they are not pursuing any claim of coverage based on waiver or estoppel, and the Court concludes the law is clear that, with limited exceptions not applicable here, "waiver and estoppel can not create a new and different contract with respect to risks covered by the policy."  *Great Am. Res. Ins. Co. v. Mitchell*, 335 S.W.2d 707, 708 (Tex. Civ. App.—San Antonio 1960, writ ref'd).  *See also, e.g., Sharp v. State Farm Fire & Cas. Ins. Co.*, 115 F.3d 1258, 1263 n.3 (5th Cir. 1997); *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008); *Am. Eagle Ins. Co. v. Nettleton*, 932 S.W.2d 169, 173–74 (Tex. App.—El Paso 1996, writ denied) (discussing limited exceptions); *Minn. Mut. Life Ins. Co. v. Morse*, 487 S.W.2d 317, 320 (Tex. 1972); *Boyd v. Travelers Ins. Co.*, 421 S.W.2d 929, 931 (Tex. Civ. App.—Houston [14th] 1967, writ ref'd n.r.e.) (citing *Washington Nat'l Ins. Co. v. Craddock*, 130 Tex. 251, 109 S.W.2d 165, 166–67 (1937)).

denial of coverage and compelling Underwriters to pay all reasonable and necessary defense costs and expenses incurred in the SEC Action and Criminal Action until such time as the Court rules on the merits in this case. Thus, the Court now must determine whether Plaintiffs have met the burden of establishing the requirements to warrant enjoining Underwriters from withdrawing payments under the Policies. In effect, the Court must determine whether it should order Underwriters to pay to Plaintiffs their attorneys' fees and costs incurred in conducting their defense in the SEC Action and the Criminal Action pending a resolution of the insurance contract dispute at issue in this case.[4]

---

[4] There exist two general types of injunctive relief: prohibitory injunctions and mandatory injunctions. *See Int'l Longshoreman's Ass'n v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 75 (1967). Most injunctions are prohibitory in nature in that they prohibit a party from continuing certain conduct. *See Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). It is settled that the issuance of a prohibitory injunction freezes the status quo and is intended to "preserve the relative positions of the parties until a trial on the merits can be held." *See Wenner v. Tex. Lottery Comm'n*, 123 F.3d 321, 326 (5th Cir. 1997) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). Generally, the status quo is defined as the "'last peaceable uncontested status' existing between the parties before the dispute developed." *See Nova Health Sys. v. Edmondson*, 460 F.3d 1295, 1298 n.5 (10th Cir. 2006) (quoting 11A WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 2948 (2d ed. 1995)).

Here, Plaintiffs seek a prohibitory injunction to prohibit Underwriters from retroactively withdrawing coverage under the Policies. Plaintiffs assert the "last peaceable status existing between the parties," was prior to August 27, 2009, the date after which Underwriters refused to continue to pay claims under the Policies and before which Underwriters was accepting and paying Plaintiffs' claims under the Policies. Thus, the Court need only address the requirements for issuing the more common, prohibitory injunction.

## STANDARD OF REVIEW

A plaintiff seeking a preliminary injunction must establish: (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury outweighs any harm that will result to the nonmovant if the injunction is granted; and (4) the injunction will not disserve the public interest. *Ridgely v. Fed. Emergency Mgmt. Agency*, 512 F.3d 727, 734 (5th Cir. 2008) (citing *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003)). A preliminary injunction is an extraordinary remedy and will be granted only if the movant "clearly carrie[s] the burden of persuasion" with respect to all four requirements. *Karaha Bodas Co.*, 335 F.3d at 363; *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989) (citing *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985)). Nevertheless, a movant "is not required to prove its case in full at a preliminary injunction hearing." *Dixon*, 835 F.2d at 558 (citing *Comenisch*, 451 U.S. at 395). Moreover, the decision whether to grant a preliminary injunction lies within the sound discretion of the district court. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982); *Allied Mktg.*, 878 F.2d at 809.

## LAW & ANALYSIS

At the outset, the Court notes this is an equity matter. *See, e.g., Romero-*

9

*Barcelo*, 456 U.S. at 311 ("It goes without saying that an injunction is an equitable remedy."). However, the burden of persuasion remains squarely on Plaintiffs as to each of the four elements required to warrant issuing a preliminary injunction. *See, e.g., Karaha Bodas Co.*, 335 F.3d at 363; *Allied Mktg.*, 878 F.2d at 809. The Court addresses each element in turn.

I.    *Substantial Likelihood of Success on the Merits*

First, Plaintiffs must demonstrate they have a substantial likelihood of succeeding on the merits. *E.g., Ridgely*, 512 F.3d at 734. That likelihood, however, need not be one of absolute certainty for a preliminary injunction to issue. *See Cho v. Itco, Inc.*, 782 F. Supp. 1183, 1185 (E.D. Tex. 1991); *Sebastian v. Tex. Dep't of Corrections*, 541 F. Supp. 970, 975 (S.D. Tex. 1982). "It is enough that the movant[s] . . . raise[] questions going to the merits so serious, substantial, and doubtful as to make them fair ground for litigation, and thus more deliberate investigation." *See Cho*, 782 F. Supp. at 1185 (citing *Sebastian*, 541 F. Supp. at 975).

Here then, Plaintiffs must demonstrate they may likely prevail on the coverage question at issue. *See, e.g., Ridgely*, 512 F.3d at 734. Plaintiffs contend Underwriters are bound by the terms of the Policies to extend defense costs in the SEC Action and the Criminal Action until policy limits are exhausted or until Plaintiffs have been found by a judicial determination to be liable or guilty in those cases. Underwriters,

however, argue that, pursuant to the terms of the Policies, the Plaintiffs' claims are

excluded because Underwriters determined Plaintiffs engaged in money laundering,

thus triggering an exclusion in the Policies that works to deny coverage of Plaintiffs'

claims. The dispute, then, essentially is an insurance contract dispute. Thus, in order

to determine whether Plaintiffs can demonstrate a substantial likelihood of success

on the merits, the Court first must analyze the Policies' provisions in dispute here.

> A.    *The Policies*

>> 1.    *The D&O Policy*

Underwriters issued to the Stanford Entities, for the benefit of their directors

and officers, a D&O Policy bearing policy number 576/MNK558900 and effective

August 15, 2008 to August 15, 2009. The D&O Policy pays, among other things, on

behalf of the Stanford Entities' directors and officers,[5] "Loss resulting from any

Claim first made during the policy period for a Wrongful Act."[6] With respect to

---

[5] The D&O Policy provides, "'Director(s) and/or Officer(s)' shall mean any persons who were, now are, or shall be directors or officers of the Company." Underwriters admit that Plaintiffs are Directors or Officers under the terms of the Policies.

[6] "Loss" includes, among other things, "Costs, Charges and Expenses." The D&O Policy provides that "Costs, Charges and Expenses" "shall mean reasonable and necessary legal fees and expenses incurred by the Directors and Officers or by the Company in defense of any Claim provided however Costs, Charges and Expenses shall not include salaries, wages, overhead or benefit expenses." The D&O Policy defines "Claim," as "any . . . judicial or administrative proceeding initiated against any of the Directors and Officers or the Company in which they may be subjected to a binding adjudication of liability for damages or other relief, including any appeal therefrom." Moreover, for purposes of

defense of such claims, the D&O Policy provides as follows:

> It shall be the duty of the Directors and Officers or the Company and not the duty of the Underwriters to defend Claims, provided that no Costs, Charges or Expenses shall be incurred without the Underwriter's prior written consent, such consent not to be unreasonably witheld [*sic*]. In the event of such consent being given, and subject to all other terms and provisions of the Policy including but not limited to Article V of this Policy, the Underwriters shall pay Costs, Charges and Expenses no more than once every 60 days.

The coverage provided under the D&O Policy is subject to a number of exclusions. The exclusions relied upon by Underwriters in declining to extend coverage here are the "Fraud Exclusion" and the "Money Laundering Exclusion," which, respectively, provide as follows:

> The Underwriters shall not be liable to make any payment for Loss resulting from any Claim
>
> <div align="center">***</div>
>
> I.   brought about or contributed to in fact by:
>
> (a) any dishonest, fraudulent or criminal act or omission by the Directors or Officers or the Company, or
>
> (b) any personal profit or advantage gained by any

---

Insuring Clause A, "'Wrongful Act' shall mean any actual or alleged error, act, omission, misstatement, misleading statement, neglect or breach of duty or negligent act by, or any other matter claimed against, the Directors and Officers whilst acting in their capacity as (1) directors or officers of the Company . . . ."

of the Directors and Officers or the Company to which they were not legally entitled

as determined by a final adjudication.

<p style="text-align:center">***</p>

T.   arising directly or indirectly as a result of or in connection with any acts (or alleged act or acts) of Money Laundering or any act or acts (or alleged act or acts) which are in breach of and/or constitute an offence or offences under any money laundering legislation (or any provisions and/or rules or regulations made by any Regulatory Body or Authority thereunder).

Notwithstanding the foregoing Exclusion, Underwriters shall pay Costs, Charges and Expenses in the event of an alleged act or alleged acts until such time that it is determined that the alleged act or alleged acts did in fact occur. In such event the Directors and Officers and the Company will reimburse Underwriters for such Costs, Charges and Expenses paid on their behalf.[7]

---

[7] The D&O Policy defines "Money Laundering" as follows:

   I.   "Money Laundering" means:
      (i) the concealment, or disguise, or conversion, or transfer, or removal of Criminal Property, (including concealing or disguising its nature, source, location, disposition, movement or ownership or any rights relating thereto); or
      (ii) the entering into or becoming in any way concerned in an arrangement which is known or suspected to facilitate (by whatever means) the acquisition, retention, use or control of Criminal Property by or on behalf of another person; or
      (iii) the acquisition, use or possession of Criminal

\*\*\*

> Any Wrongful Act pertaining to any Director or
> Officer shall not be imputed to any other person for
> the purposes of determining the applicability of the
> Exclusions.

Finally, the D&O Policy provides $5 million limits of liability with respect to each

of the two sections under the policy.

      2.    *The Excess Policy*

Underwriters also issued to the Stanford Entities, for the benefit of their

officers and directors, an Excess Policy bearing policy number 576/MNA831400 and

effective August 15, 2008 to August 15, 2009.   The Excess Policy provides,

"Underwriters shall indemnify or reimburse or pay on behalf of the Assured, any loss

or losses first discovered and/or claim or claims first made against the Assured during

---

> Property; or
> (iv) any act which constitutes an attempt, conspiracy
> or incitement to commit any act or acts mentioned
> in the foregoing paragraphs (i), (ii) or (iii); or
> (v) any act which constitutes aiding, abetting,
> counseling or procuring the commission of any
> act or acts mentioned in the foregoing paragraphs
> (i), (ii) or (iii).

Moreover, pursuant to the D&O Policy, "Criminal Property" includes "property which
constitutes a benefit obtained from or as a result of or in connection with criminal conduct
or represents such a benefit (in whole or part and whether directly or indirectly) which the
Directors or Officers or the Company (or any person or entity acting on their behalf) knows
or suspects or reasonably should have known or suspected that it constitutes or represents
such a benefit."

the Period of Insurance" up to the Excess Policy's limit of liability and in excess of the D&O Policy's limit of liability. The Excess Policy is a "follow form" policy, meaning that it adopts the terms, conditions and provisions of the policies of the D&O Policy.[8] The Excess Policy extends the policy limits above and beyond that of the D&O Policy. Although it is unclear at precisely what dollar amount the policy is limited, Underwriters contend they face a coverage exposure of nearly $100 million in this case.

### B.    *Analysis*

As an initial matter, the Court notes, and Underwriters concede, the Fraud Exclusion is not at issue here and cannot be a valid basis for Underwriter's refusal to pay defense costs at this time. This is so because the Fraud Exclusion explicitly requires a "final adjudication" that Plaintiffs committed a "fraudulent or criminal act," which Courts have found to mean a judicial determination of guilt or liability in the underlying case. *See, e.g.*, *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 391 F. Supp. 2d 541, 572–73 (S.D. Tex. 2005) (citing *Nat'l Union Fire Ins. Co. v. Brown*, 787 F. Supp. 1424, 1429 (S.D. Fla. 1991), *aff'd*, 963 F.2d 385 (11th Cir. 1992)) ("[T]here must be a 'final adjudication' by a judge finding the insureds committed or

---

[8] The Excess Policy states, "Except as otherwise provided herein this Policy is subject to the same terms, exclusions, conditions and definitions as the Policy of the Primary Insurers."

attempted acts of dishonesty and fraud to preclude coverage."). Here, of course, Plaintiffs have pleaded not guilty to the alleged criminal acts and there certainly has been no final judicial determination as to those allegations. Consequently, until a court has entered a final judgment of liability or guilt in the underlying SEC Action or Criminal Action, the Fraud Exclusion cannot be a valid basis for withdrawing defense costs at this time. *See id.* Thus, the sole basis for Underwriters' refusal to continue paying defense costs is the Money Laundering Exclusion.

Importantly, the Money Laundering Exclusion does not explicitly state that a "final adjudication" must be made. Rather, that exclusion provides that allegations of money laundering will preclude payments when "it is determined that the alleged act or alleged acts did in fact occur." Underwriters contend this "in fact" determination is Underwriters' decision to make. Underwriters aver that, here, it alone already has determined there is now sufficient information to establish the claims against Plaintiffs in the SEC Action and the Criminal Action constitute money laundering as defined by the Policies and that Plaintiffs "in fact" engaged in those activities. Moreover, Underwriters contend they explained to Plaintiffs in their November 16, 2009 coverage-denial letter that Underwriters' position is that evidence has developed in the months since the SEC filed its charges that allows Underwriters

16

to conclude money laundering, as defined by the Policies, in fact occurred.[9]

_____

[9] Underwriters submitted the following as evidence upon which they contend they based their determination that money laundering in fact occurred:

1.  Affidavits and evidence submitted to the court in the SEC Action that purport to conclude there was "good cause to believe that Defendants used improper means to obtain investor funds and assets."

2.  Entry of a temporary restraining order and appointment of a Receiver in the SEC Action.

3.  Entry of preliminary injunctions in the SEC Action against Stanford and Davis, based upon evidence submitted at a hearing, which resulted in findings by the court in the SEC Action that, *inter alia*:

    (A)  "Stanford engaged in fraudulent conduct, including misappropriating investor funds;"

    (B)  Stanford obtained his assets through fraudulent activities; and

    (C)  "In selling the CD[s], the defendants in this action, including Defendant Stanford, made representations . . . [that] were m a t e r i a l l y   f a l s e   a n d misleading . . . . [S]ignificant portions of the bank's portfolio were misappropriated by Stanford [and] used by him to acquire private equity and real estate."

*See Sec. & Exch. Comm'n v. Stanford Int'l Bank, Ltd., et al.*, No. 3:09-CV-298 (N.D. Tex. Mar. 12, 2009) (preliminary injunction order freezing assets).

4.  The sworn declaration of Karyl M. Van Tassel ("Van Tassel")—a certified public accountant and forensic litigation consultant hired by the Receiver—that, although SIBL's financial statements reflected assets valued at $8.3 billion, the combined asset value of all Stanford Entities is less than $1 billion, and the proceeds from the sales of new SIBL CDs were used to make CD interest and redemption payments to existing

17

Moreover, Underwriters contend each allegation against Plaintiffs by the SEC and the Government "arises out of, directly or indirectly, as a result of, or in connection with alleged acts of money laundering or alleged acts of offenses under money laundering legislation" within the meaning of the Money Laundering Exclusion.  Underwriters urge this concept despite the fact that only one of the twenty-one counts charged in the Criminal Action alleges money laundering or conspiracy to commit money laundering.  This is so, argue Underwriters, because their Money Laundering Exclusion is more broad than any money laundering statute and encompasses alleged illegal acts beyond those defined as money laundering in the statutes made the basis of the indictment in the Criminal Action.

Furthermore, Underwriters argue that "the Government's entire case turns upon allegations that the Plaintiffs acquired, concealed, transferred, and misappropriated fraudulently obtained investor funds for their own economic benefit."   Thus,

---

<div style="padding-left: 2em;">

investors, as well as to pay commissions, pay bonuses, and make loans to Stanford financial advisors.

5.   Davis's allocution testimony, supporting his plea on the felony charges against him, and his sworn plea agreement in which he provides a detailed account of the criminal acts that he alleges Plaintiffs committed, including bribery, concealment of fraudulent personal loans to Stanford, and the execution of bogus real estate transactions.

</div>

Plaintiffs object to all of this evidence as being: (1) irrelevant under the applicable Texas law; and (2) merely unsubstantiated allegations.

according to Underwriters, those allegations fall squarely within the reach of the Money Laundering Exclusion, which excludes allegations of "the concealment, or disguise, or conversion, or transfer, or removal of Criminal Property, (including concealing or disguising its nature, source . . . or any rights relating thereto)." Therefore, Underwriters denied coverage because, according to Underwriters, Plaintiffs' claims against the Policies arising from the charges leveled against them in the Criminal Action and the SEC Action fall outside the coverage of the Policies solely because Underwriters independently have determined that Plaintiffs did "in fact" actually engage in money laundering such that coverage is excluded under the Money Laundering Exclusion.

As an initial matter, Plaintiffs argue that Underwriters' reliance upon extraneous evidence is misguided and contrary to the applicable law.[10] Plaintiffs urge the Court to apply the "eight corners rule" as applied by Texas courts in insurance duty-to-defend disputes. *See, e.g., GuideOne Elite Ins. Co. v. Fielder Rd. Baptist*, 197 S.W.3d 305, 308 (Tex. 2006) (discussing the eight corners rule as applied in duty to defend cases). Under the eight corners rule, an insurer's duty to pay defense costs is determined by examining only the policy provisions and the claims in the underlying

---

[10]   The parties do not dispute, and the Court agrees, that Texas law applies to this dispute.

case, "without regard to the truth or falsity of those allegations." *Argonaut Sw. Ins. Co. v. Maupin*, 500 S.W.2d 633, 635 (Tex. 1973); *see also Trinity Universal Ins. Co. v. Employers Mut. Cas. Co.*, --- F.3d ---, 2010 WL 6903, at *3 (5th Cir. Jan. 4, 2010) (discussing the eight corners rule). Underwriters, however, argue the eight corners rule is inapplicable in this case because the very terms of the Policies allow Underwriters to look to extrinsic evidence of its choosing to determine if the claims fall within the terms of coverage under the Policies.

First, the parties concede this is not a duty to defend case; the Policies do not burden Underwriters with a duty to defend Plaintiffs. Indeed, the Policies specifically state, "It shall be the duty of the Directors and Officers or the Company and not the duty of the Underwriters to defend Claims . . . ." Rather, the Policies obligate Underwriters to "pay Costs, Charges and Expenses no more than once every 60 days," provided Underwriters consents to such defense costs as covered under the terms of the Policies. *See Nat'l Union Fire Ins. Co. v. Merch. Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997); *accord Warren v. Am. Nat'l Fire Ins. Co.*, 826 S.W.2d 185, 187 (Tex. App.—Ft. Worth 1992, writ denied) (noting a policy's clear language can negate an insurer's duty to defend).

Underwriters argue that because this is not a duty to defend case, the eight corners rule is inapplicable. However, other courts have concluded the eight corners

rule also applies to disputes regarding the contractual obligation to advance and reimburse defense costs and expenses in the absence of a contractual duty to defend such as here. *See Julio & Sons Co. v. Travelers Cas. & Surety Co. of Am.*, 591 F. Supp. 2d 651, 659 (S.D.N.Y. 2008) (applying Texas law and finding the eight corners rule applies to duty to advance defense costs in the context of a D&O policy); *Basic Energy Servs., Inc. v. Liberty Mut. Ins. Co.*, 655 F. Supp. 2d 666, 673–75 (W.D. Tex. 2009) (applying eight corners rule to the reimbursement of defense costs even when insurer had no duty to defend).

For instance, in *Julio & Sons*, looking to Texas substantive law, the United States District Court for the Southern District of New York noted that it found no Texas court decisions applying any standard other than the eight corners rule to disputes regarding the duty to advance defense costs under a D&O Policy. *See Julio & Sons*, 591 F. Supp. 2d at 659. Thus, because the reasons for applying the eight corners rule to the duty to defend "appear to apply equally to the duty to advance described in the Policy," the court applied that rule to determine whether an insurer had a duty to advance defense costs to its insured. *Id.* (citing *Lowy v. Travelers Prop. & Cas. Co.*, No. 99 Civ. 2727(MBM), 2000 WL 526702, at *2 n.1 (S.D.N.Y. May 2, 2000); *GuideOne Elite*, 197 S.W.3d at 309).

Similarly, the United States District Court for the Western District of Texas

21

also recently found an insurer's duty to contemporaneously reimburse defense costs governed by the eight corners rule even though the insurer had no contractual duty to defend. *See Basic Energy*, 655 F. Supp. 2d at 673 ("[A]n obligation to reimburse an insured for incurred legal expenses should be analyzed using the Eight Corners Rule."). Moreover, the *Basic Energy* court made it clear that it carefully considered whether to apply the eight corners rule or an "actual facts" analysis. *Id.* Given that the court granted the insured's motion to strike all of the extrinsic evidence the insurer sought to rely upon in disclaiming its obligation to pay defense costs, application of the eight corners rule was essential to the court's holding in that case. *Id.* at 675.

Furthermore, despite Underwriters' arguments to the contrary, the Court concludes the Supreme Court of Texas never has recognized any exception to the eight corners rule. *See Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 497–98 (Tex. 2008); *see also Mary Kay Holding Corp. v. Federal Ins. Co.*, 309 F. App'x 843, 848 (5th Cir. 2009) (citing *Nokia*, 268 S.W.3d at 497) ("While appreciating the arguments for a limited 'coverage' exception to the 'eight-corners rule,' we recognize that Texas has yet to adopt such an exception."); *Northfield Ins. Co. v. Loving Home Care, Inc.*, 363 F.3d 523, 531 (5th Cir. 2004) ("In light of the Texas appellate courts' unwavering unwillingness to apply and recent repudiations of the *Wade* type

22

exception, this Court makes its *Erie* guess that the current Texas Supreme Court

would not recognize any exception to the strict eight corners rule."). The Court is

comfortable making this conclusion given that the Supreme Court of Texas recently

reiterated that it has never recognized an exception to the eight corners rule. *See, e.g.*,

*Nokia*, 268 S.W.3d at 497–98; *see also Basic Energy*, 655 F. Supp. 2d at 674–75

("The Texas Supreme Court has never expressly recognized an exception to the Eight

Corners rule . . . .").[11]

---

[11] Although *Northfield* has been cited as recognizing a limited exception to the eight corners rule, a careful review of the opinion reveals that the United States Court of Appeals for the Fifth Circuit's discussion of a limited exception was an alternative holding and that the actual *Erie* determination made by the Fifth Circuit was that Texas would not recognize any exception. *See Northfield*, 363 F.3d at 531. This determination has proven to be correct. *See, e.g., AccuFleet, Inc. v. Hartford Fire Ins. Co.*, --- S.W.3d ---, 2009 WL 2961351, at *6 (Tex. App.—Houston [1st Dist.] Sept. 17, 2009, no pet. h.) ("We decline to create an exception to the eight corners rule under the facts of this case and consider this extrinsic evidence to determine the existence of a duty to defend. The Texas Supreme Court has not recognized such an exception to the eight-corners rule. To the contrary, in cases in which the Texas Supreme Court has been asked to acknowledge exceptions to the rule, it has declined to do so." (citing *Pine Oak Builders, Inc. v. Great Am. Lloyds Ins. Co.*, 279 S.W.3d 650, 654–55 (Tex. 2009)). In fact, the Supreme Court of Texas recently stated that the "analysis of the duty to defend has been strictly circumscribed by the eight-corners doctrine." *See D.R. Horton—Texas, Ltd. v. Markel Int'l Ins. Co., Ltd.*, --- S.W.3d ---, 2009 WL 4728008, at *3 (Tex. Dec. 11, 2009).

In *Ooida Risk Retention Group, Inc. v. Williams*, 579 F.3d 469, 475–76 (5th Cir. 2009), the Fifth Circuit seems to have recognized a limited exception to the eight corners rule. There, however, the court simply found that the scope of the eight corners rule enabled a court to consider "readily ascertainable facts relevant to coverage, that 'do not overlap with the merits of or engage the truth or falsity of any facts alleged in the underlying case,'" such as whether or not a tortfeasor is an insured. *Id.* at 476. The Fifth Circuit made clear, however, that extrinsic evidence bearing on the truth or falsity of any facts alleged in the underlying case may not be considered under the eight corners rule. *Id.* This is congruent

Thus, in the absence of Texas court decisions explicitly refusing to apply the eight corners rule in cases such as this one—in which no duty to defend exists but in which there is a duty to advance defense costs—and with no explicit direction from Texas courts to apply a different standard, the logic employed by the *Julio & Sons* and *Basic Energy* courts is persuasive. *See Julio & Sons*, 591 F. Supp. 2d at 659; *Basic Energy*, 655 F. Supp. 2d at 673 ("The Court agrees with Plaintiff that this reimbursement of defense costs obligation is most analogous to a duty to defend even when the duty to defend is explicitly disclaimed."). If a contemporaneous duty to advance or reimburse defense costs were judged on an "actual facts" basis, an insurer's contractual obligation to pay defense costs could change on a daily basis as additional "facts" are developed. Essentially, coverage that directors and officers relied upon and expected when the Policies were purchased on their behalf could be withdrawn at the insurer's whim. If, as Underwriters suggest, the Policies afford

---

with other Fifth Circuit decisions in which the court recognized that no such exception exists to the eight corners rule. *See Mary Kay Holding*, 309 F. App'x at 848; *Basic Energy Servs., LP v. Great N. Ins. Co.*, No. 08-40843, 2009 WL 3092466, at *4–6 (5th Cir. Sept. 29, 2009). Texas courts have been clear that courts may not look to extrinsic evidence when that evidence goes to the very merits of the underlying claims against the insured even when the evidence overlaps between liability and coverage. *See GuideOne Elite*, 197 S.W.3d at 310; *Pine Oak Builders*, 279 S.W.3d at 654–55. Here, no doubt exists that the extrinsic evidence Underwriters seek to introduce goes to the very heart of the Plaintiffs' liability in the SEC Action and their guilt or innocence in the Criminal Action, and thus—even if an exception to the eight corners rule exists, which the Court finds does not at this time—the proffered evidence would not fall within any purported exception and, therefore, may not be considered for purposes of determining whether defense costs are owed by Underwriters.

Underwriters absolute discretion to withhold payments whenever charges of intentional dishonesty are leveled against directors and officers, then insurers will be able to withhold payment in virtually every case at their sole discretion. *See Little v. MGIC Indem. Corp.*, 649 F. Supp. 1460, 1468–69 (W.D. Penn. 1986), *aff'd*, 836 F.2d 789 (3rd Cir. 1987), *reh'g denied* (3rd Cir. 1988); *see also Enron*, 391 F. Supp. 2d at 574 (discussing *Little*). That would leave directors and officers in an extremely vulnerable position, as any allegations of dishonesty, no matter how groundless, could bring financial ruin on a director or officer. *See Little*, 649 F. Supp. at 1468–69. Essentially, an insurer could act as judge and jury and convict its own insureds, thus avoiding any further financial responsibility for the insureds' defenses. This simply can not be the case.

The Court agrees with Plaintiffs that the eight corners rule most likely applies here. Thus, applying the eight corners rule here would render Underwriters' reliance upon Davis's plea and allocution, the Northern District Court's findings in connection with appointing the Receiver and findings in connection with issuing a preliminary injunction, and Van Tassel's declarations misplaced and contrary to established Texas law. *See, e.g.*, *Nokia*, 268 S.W.3d at 491 (explaining that, pursuant to the eight corners rule "an insurer's duty to defend is determined by the third-party plaintiff's pleadings, considered in light of the policy provisions, *without regard to the truth or*

*falsity of those allegations.*" (emphasis added)); *Argonaut Sw. Ins.*, 500 S.W.2d at

635; *Heyden Newport Chem. Corp. v. S. Gen. Ins. Co.*, 387 S.W.2d 22, 24–25 (Tex.

1965). Consequently, the Court concludes that Plaintiffs are likely to succeed on

their argument that Underwriters are contractually obligated to pay defense costs

under the Policies until a final adjudication in the underlying litigation. As such,

Underwriters obligation to advance defense costs under the Policies extends to civil

cases and criminal cases involving Plaintiffs, including the aforementioned SEC

Action and the Criminal Action. In light of this, Underwriters' determination that the

alleged illegal acts—which Underwriters argue fall within its definition of money

laundering—in which Plaintiffs are alleged to have engaged did "in fact" occur is

irrelevant to the legal issue at hand.

Next, Underwriters contend it is Plaintiffs' burden to prove there has been no

determination that alleged acts of money laundering in fact occurred. Moreover,

Underwriters argue Plaintiffs can not make such a showing because Underwriters has

determined that the alleged acts "in fact occurred" and that "Plaintiffs have not

offered a scintilla of evidence to show that money laundering did not in fact occur."

Underwriters' argument is unpersuasive.

First, it is Underwriters' burden to prove that an exclusion to coverage applies.

*See, e.g., Trinity Universal*, --- F.3d ---, 2010 WL 6903, at *3; *Fed. Mut. Ins. Co. v.*

*Grapevine Excavation, Inc.*, 197 F.3d 720, 723 (5th Cir. 1999) ([W]hen the insurer relies on the policy's exclusions, it bears the burden of proving that one or more of those exclusions apply."). Moreover, any ambiguity in the insurance policy is construed in favor of the insured, and "when the language of a policy is susceptible to more than one construction, it should be construed strictly against the insurer and liberally in favor of the insured." *Trinity Universal*, --- F.3d ---, 2010 WL 6903, at *3; *Mid-Continent Cas. Co. v. JHP Dev., Inc.*, 557 F.3d 207, 212 (5th Cir. 2009) (citing *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 666 (Tex. 1987)). It is not Plaintiffs' burden to demonstrate that money laundering did *not* in fact occur either in the underlying Criminal Action or here. Nor is it Plaintiffs' burden, as Underwriters suggest, to demonstrate that Underwriters have not made a determination that Plaintiffs did "in fact" engage in money laundering activity. It is Underwriters burden to prove that the alleged acts occurred and, considering the Court's determination of the application of the eight corners rule, Underwriters can not meet that burden at this time. Plaintiffs merely have the burden of persuasion that they have a substantial likelihood of succeeding on their argument that the Money Laundering Exclusion does not work to deny them coverage under the Policies. *See Ridgely*, 512 F.3d at 734; *Cho*, 782 F. Supp. at 1185. Plaintiffs can make this showing without proving that "money laundering did *not* in fact occur." The Court

27

is persuaded that Plaintiffs have made such a showing.

Finally, Underwriters claim that Plaintiffs' refusal to testify in support of their application for preliminary injunction is proof enough the allegations against Plaintiffs are true.   At the December 17, 2009 preliminary injunction hearing, Underwriters sought to call the Plaintiffs as witnesses.  Non surprisingly, in the face of the underlying criminal charges against them, each Plaintiff invoked the Fifth Amendment's protection against self-incrimination and declined to testify. Underwriters contend, based on Plaintiffs' refusal to testify as to the allegations of money laundering made against them in the Criminal Action, Underwriters is entitled to an inference that money laundering "did in fact" occur.   Underwriters rely on Federal Rule of Evidence 501 and Texas Rule of Evidence 513, which taken together allow a factfinder in civil cases to draw an adverse inference from a civil claimant's invocation of the Fifth Amendment.  *See, e.g.*, *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment *does not forbid* adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." (emphasis added)); *Hinojosa v. Butler*, 547 F.3d 285, 291 (5th Cir. 2008) ("[W]hile a person may refuse to testify during civil proceedings on the ground that his testimony may incriminate him[,] his refusal to testify *may* be used against him in a civil proceeding." (quoting *Farace v. Indep. Fire Ins. Co.*, 699 F.2d

28

204, 210 (5th Cir. 1983) (emphasis added))); *In re Moore*, 153 S.W.3d 527, 534 (Tex. App.—Tyler 2004, no pet.) ("Refusal to answer questions by asserting the [Fifth Amendment] privilege is relevant evidence from which the finder of fact in a civil action *may* draw whatever inference is reasonable under the circumstances." (emphasis added)).

Underwriters argument is unpersuasive. These rules, as the cases interpreting them have made clear, merely allow for a permissible inference and not a mandatory one. *See, e.g., Palmigiano*, 425 U.S. at 318; *Butler*, 547 F.3d at 291; *Farace*, 699 F.2d at 210. Underwriters are not entitled to such an inference, and given the magnitude, complexity, and nature of the charges made against the Plaintiffs in the SEC Action and the Criminal Action, the Court declines to draw such an inference here. Furthermore, because the Court has determined that an insurer's obligation to pay defense costs is likely governed by the eight corners rule, Underwriters' attempted reliance upon the testimony of the Plaintiffs, or any inferences drawn from their assertion of their Fifth Amendment rights, similarly is misplaced.

B.      *Conclusion as to Likelihood of Success on the Merits*

In sum, the Court is persuaded that the language in the Money Laundering Exclusion, which precludes coverage when "it is determined that the alleged act or alleged acts did in fact occur," may mean something less than a judicial determination

29

but also may mean much more than an insurer's own determination based on nothing more than mere allegations supplemented by the self-serving statements of an indicted co-defendant who elects to plead guilty and cooperate with the prosecution. The Court, however, need not decide at this time what level of factual determination must be made to satisfy the language of the Money Laundering Exclusion—indeed, that goes to the very heart of the merits of this case; a conclusion to be reached after "more deliberate investigation" and a full trial on the merits. *See Cho*, 782 F. Supp. at 1185; *Sebastian*, 541 F. Supp. at 975. Plaintiffs are not, at this stage of the litigation, required to prove their interpretation will prevail at trial. *In re WorldCom, Inc. Sec. Litig.*, 354 F. Supp. 2d 455, 466–67 (S.D.N.Y. 2005); *see also Cho*, 782 F. Supp. at 1185. Rather, at this time, the Court need only be persuaded that Plaintiffs have a substantial likelihood of succeeding on those merits at trial and that more deliberate investigation is required. *See e.g., Karaha Bodas Co.*, 335 F.3d at 363; *Allied Mktg.*, 878 F.2d at 809; *Cho*, 782 F. Supp. at 1185; *Sebastian*, 541 F. Supp. at 975. The Court is thus persuaded. Consequently, the Court determines Plaintiffs have met their burden of demonstrating a substantial likelihood of prevailing on the merits of their claim in this case.

## II.    *Irreparable Harm*

Second, a plaintiff seeking a preliminary injunction also must demonstrate

there is a substantial threat of irreparable injury if the injunction is not granted. *See Karaha Bodas Co.*, 335 F.3d at 363. Therefore, the Court must determine whether Plaintiffs likely will suffer irreparable injury if injunctive relief is denied.

That Plaintiffs here will suffer real, immediate, and irreparable harm if injunctive relief is denied is unmistakable and cannot be seriously disputed. Indeed, as Judge Godbey noted in the SEC Action, the harm to Plaintiffs as defendants in both the SEC Action and the Criminal Action is "real and immediate." *See SEC v. Stanford Int'l Bank Ltd., et al.*, Cause No. 3:09-CV-00298, at 8 (N.D. Tex. Oct. 9, 2009) (order clarifying status of insurance proceeds). If convicted on all charges against them in the Criminal Action, Plaintiffs each face potential punishment of up to approximately 375 years incarceration in addition to financial and reputational ruin. Without the ability to fund an adequate defense in such a complex case, Plaintiffs no doubt face irreparable harm.[12] *See WorldCom*, 354 F. Supp. 2d at 469.

Moreover, the Court has determined that Plaintiffs have a substantial likelihood of succeeding on their claim that the Policies require Underwriters to advance defense funds until a final judicial determination is made in the underlying litigation. Thus, the potential breach of that contractual duty necessarily impedes Plaintiffs'

---

[12] In the Criminal Action alone, there are an estimated seven million documents and the Government and criminal defense attorneys have initially stated that the trial will be lengthy.

constitutional right to secure counsel of their choice and seek a speedy resolution to the criminal charges against them.  Without access to the funds for which Plaintiffs duly contracted, through the Stanford Entities, and upon which they relied, the Court finds Plaintiffs will be unable to mount the defense required in such complex cases as the Criminal Action and SEC Action. *See id.*  In our system of justice, this alone is significant, irreparable harm sufficient to justify issuing a preliminary injunction.

Furthermore, Underwriters' position would essentially require Plaintiffs to prove their innocence in the underlying Criminal Action and SEC Action before they would be entitled to the funds under the policy, which of course, they need to defend themselves in those cases.  Underwriters' position is absurd because these circumstances are precisely why corporations procure D&O insurance on behalf of their directors and officers.[13]  Indeed, it would contravene the very purpose of the Policies—as well as the policy language itself—to require Plaintiffs to prove their innocence before being entitled to funds for their defense.[14]  Accordingly, the Court finds Plaintiffs have met their burden of showing they will suffer immediate and

---

[13]  The Court notes that, when asked in open court whether Underwriters—if not required to advance defense funds—would reimburse the private or appointed attorneys in the event the Plaintiffs were acquitted or otherwise vindicated, Underwriters' counsel's answer was equivocal at best.

[14]  The very terms of the Policies obligate Underwriters to pay defense costs and expenses for claims made against the insureds arising from their alleged wrongful acts.

irreparable harm if the injunction is not granted.

### III.   Balance of Harm

Third, a plaintiff seeking a preliminary injunction also must demonstrate the threatened injury outweighs any harm that will result to the nonmovant if the injunction is granted. *E.g.*, *Ridgely*, 512 F.3d at 734.   In effect, Plaintiffs must demonstrate that any injury they face outweighs the harm that may befall Underwriters if the injunction is granted. *See id.*

As the Court has explained, Plaintiffs face the prospect of going unrepresented in the underlying SEC Action and being deprived of their right to counsel of their choice in the Criminal Action.   The only harm, if any, that will result to Underwriters from the issuance of a preliminary injunction is economic.   Certainly, a harm involving basic constitutional rights outweighs purely economic consequences.   *See Flood v. ClearOne Commc'ns, Inc.*, No. 2:08-CV-631, 2009 WL 87006, at \*6–7 (D. Utah 2009) (citing *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003)).   Indeed, here, like in *Flood*, the preliminary injunction will not significantly alter the contractual obligations and rights of either party because the Policies grant Underwriters a right of reimbursement. *See id.*; *Great Am. Ins. Co. v. Gross*, No. Civ. A. 305CV159, 2005 WL 1048752, at \*4 (E.D. Va. May 3, 2005).   *See also Enron*, 391 F. Supp. 2d at 575 (recognizing that the D&O policy included a right of

reimbursement).  In the event Underwriters ultimately prevail, according to the terms of the Policies, Plaintiffs will be required to reimburse Underwriters for any amounts improperly advanced.  Thus, Underwriters face no harm.  Underwriters, however, claim that "Underwriters' rights would be severely impacted as they are unlikely ever to be able to recoup defense costs that may reach as high as $100 million."  Underwriters thus claim their contracted-for right to reimbursement is a "hollow right."  But, hollow or not, it is the right for which they contracted and cannot be ignored merely because it may well be unenforceable.  Indeed, Underwriters is entitled to that for which they bargained.

Moreover, Underwriters' liability is capped.  *See Worldcom*, 354 F. Supp. 2d at 469–70.  The economic harm that may befall Underwriters is limited to the amount of the monetary coverage limits in the Policies—again, a level of risk exposure to which Underwriters consented in issuing the Policies.  Because basic economic loss is an insufficient basis for an injunction to issue, and the loss of constitutional rights supports the issuance of an injunction, any potential economic loss to Underwriters does not outweigh the potential harm to Plaintiffs.  Therefore, the balance of harms analysis favors the issuance of a preliminary injunction.  *See Flood*, 2009 WL 87006, at *6.  The Court determines the balance of harm weighs heavily in favor of granting the preliminary injunction.

34

*IV.    Public Interest*

Finally, a plaintiff seeking a preliminary injunction also must establish that a preliminary injunction will not disserve the public interest. *E.g., Ridgely,* 512 F.3d at 734. Although this element is rarely decisive, it weighs heavily in this case.

First, the public interest favors a speedy resolution of criminal cases and the protection of a criminal defendant's constitutional rights. *See Flood,* 2009 WL 87006, at *6. Further, it is in the public's interest to see parties abide by their contractual obligations. *See Gross,* 2005 WL 1048752, at *6. The public interest will not be adversely affected by the issuance of interim injunctive relief in this case. Indeed, in similar cases, numerous courts have found that injunctive relief serves the public's interest. *See id.; WorldCom,* 354 F. Supp. 2d at 469–70; *Flood,* 2009 WL 87006, at *7. *See also Associated Elec. & Gas Ins. Servs., Ltd. v. Rigas,* 382 F. Supp. 2d 685, 701 (E.D. Pa. 2004). In *Rigas,* the United States District Court for the Eastern District of Pennsylvania, in ordering an insurer to advance defense costs pending final adjudication of a coverage dispute, aptly noted several public policy factors that supported the court's ruling, including:

> Presumption of Innocence . . . three of the movants are Defendants in a lengthy federal criminal prosecution. Until and unless they are found guilty, they are presumed innocent and must enjoy the constitutionally-based prerogatives of any citizen who stands merely accused, but

not convicted, of a crime. Similarly, although all five movants are defendants in numerous civil cases and, if found liable, would probably face judgments of many millions of dollars, at this moment they have not been found liable to anyone for anything.

<div align="center">***</div>

An insurance policy is, of course, a contract, and both parties are entitled to receive the benefit of the bargain . . . It would be possible for carriers issuing D&O policies to explicitly reserve themselves the unfettered discretion whether to advance defense costs—but that language does not appear in these policies. No doubt, as a matter of business common sense, the Carriers might be reluctant to issue a policy with such draconian power, because they might find it difficult to sell such a policy in the marketplace.

<div align="center">***</div>

Insurance carriers do not function as courts of law. If a carrier wants the unilateral right to refuse payment called for in a policy, the policy should clearly state that right. This policy does not do so.

*Rigas*, 382 F. Supp. 2d at 700–01. These factors all squarely apply to this case and weigh heavily in favor of granting injunctive relief.

Indeed, corporations purchasing directors and officers policies rely on the coverage of those policies when directors or officers of the organization are implicated in potential wrongdoing. *See, e.g.*, *WorldCom*, 354 F. Supp. 2d at 469; *accord McLean v. Int'l Harvester Co.*, 817 F.2d 1214, 1222 (5th Cir. 1987). Underwriters argue that Plaintiffs can rely on "the amount of coverage they bargained for." However, here Plaintiffs bargained for coverage against claims of money

<div align="center">36</div>

laundering until an "in fact determination" has been made that money laundering actually occurred. Regardless whether this is a "judicial determination," which Plaintiffs claim it should be, or whether it is a determination properly made by Underwriters, the Court determines it is one that must be based on something more than mere allegations and broad, self-serving statements by a co-defendant who chooses to plead guilty and cooperate with the prosecution. Indeed, the eight corners rule dictates this conclusion, and to ignore the application of the applicable, established Texas law would be to disserve the public interest.

A final public interest concern, although certainly not controlling or decisive here, is worthy of mention. If the injunctive relief is not granted, the United States taxpayers will ultimately bear the financial costs associated with defending the Criminal Action. Of course, no insurer should be ordered to pay defense costs where no coverage for such costs exists under the relevant policy simply because the burden may otherwise fall upon the taxpayer. However, where as here, coverage is in dispute and the insureds have made a showing that they are likely to succeed on the merits that they are entitled to such costs, this public interest factor is relevant. Here, the Court determines Plaintiffs have carried their burden of demonstrating that a preliminary injunction will not disserve the public interest.

In sum, the Court finds at this time, based on the evidence submitted and

testimony offered at the December 17, 2009 hearing, Plaintiffs have met their burden

of persuasion with respect to all four prerequisites of a preliminary injunction.

Consequently, a preliminary injunction should issue in this case.[15]   Having

---

[15] Although Underwriters insist that a preliminary injunction ordering it to pay defense costs is an extraordinary and unprecedented action, other courts have made the same determination in the face of similar facts.

First, in *In re Worldcom, Inc. Securities Litigation*, the United States District Court for the Southern District of New York granted a preliminary injunction and ordered Continental Casualty Company ("Continental") immediately to advance the costs of defending WorldCom's former Chairman of the Board of Directors against claims filed in a host of lawsuits alleging SEC violations arising from WorldCom's collapse.   *See WorldCom*, 354 F. Supp. 2d at 458.  The costs awarded included those costs already incurred and those the movant continued to incur.  *Id.*  Continental claimed its policies were issued in reliance on WorldCom's false financial statements and were therefore properly rescinded. *Id.*  The court concluded that under a D&O policy with a duty to pay defense costs, like the policy in this case, the insurance company's obligation to reimburse the directors attaches as soon as the attorneys' fees are incurred. *See id.* at 464.  The court further held that until the issue of rescission is adjudicated, the policy remains in effect and the duty to pay defense costs is enforceable. *See id.*

Most importantly, in *WorldCom*, the court held that the failure to receive defense costs when they are incurred constitutes "an immediate and direct injury" warranting a preliminary injunction because the ability to mount a successful defense requires competent and diligent representation. *See id.* at 469. According to the court, the impact of an adverse judgment will have ramifications beyond the money that necessarily will be involved. *See id.*  There is the damage to reputation, the stress of litigation, and the risk of financial ruin—each of which is an intangible but very real burden. *See id.*  As an additional basis for the court's ruling, the court noted the important role D&O insurance plays in corporate governance in America—unless directors can rely on the protections given by D&O policies, good and competent men and women will be reluctant to serve on corporate boards. *See id.*  Finally, the court denied Continental's request that the insured post a bond, concluding that: (1) the posting of a bond would undermine the very protection the insurer offered to directors when they purchased insurance; and (2) the payment of defense costs placed no undue burden on Continental, as its liability was capped under its policy and the policy granted it a right of reimbursement.  *Id.*

In *Great American Ins. Co. v. Gross*, the United States District Court for the Eastern District of Virginia followed *WorldCom* and granted a preliminary injunction ordering Great

determined a preliminary injunction is appropriate here, the Court must determine

what security, if any, Plaintiffs must post.

---

American Insurance Company ("Great American") to advance defense costs to directors and officers accused of wrongful acts, who were insured by a D&O policy issued by Great American, until the merits of the suit for declaratory judgment filed by Great American were resolved. *See Gross*, 2005 WL 1048752, at *5. Great American had ceased payment of defense costs to officers and directors, who pleaded guilty to offenses, including conspiracy to commit insurance fraud and mail fraud, in reliance on an exclusion similar to the Fraud Exclusion relied on by Underwriters here. *See id.* at *1. Because the practical effect of Great American's failure to advance defense costs would be to cause the insureds' attorneys to withdraw from defending them in several civil lawsuits alleging wrongdoing, the court concluded that irreparable harm would result to the insureds if interim injunctive relief was not granted. *See id.* at *4. The court noted that the denial of a preliminary injunction would essentially "cripple" the insureds' defense and leave them with no ability to defend their interests in the very lawsuits filed against them. *See id.* Conversely, the court concluded that while Great American could be exposed to increased monetary liability if a preliminary injunction was granted, the monetary liability was agreed to by Great American when it issued the policy. *See id.* at *5. Further, like the policies issued by Underwriters, the policy granted Great American the right to seek reimbursement for the costs of defense, tipping the balance of harms decidedly in favor of the insureds. *See id.* Finally, like the court in *WorldCom*, the court in *Gross* did not require the insureds to post a bond. *See id.* at *6.

Although outside the insurance context, a similar result was reached in *Flood*. *See Flood*, 2009 WL 87006, at *6–8. In that case, the United States District Court of Utah granted a preliminary injunction requiring a corporation to continue paying legal fees incurred by its officer in defending against criminal charges in accordance with an indemnification agreement. The officer's attorneys represented to the court that they could not continue representing their client without the immediate payment of fees. The court concluded that irreparable injury would result if a preliminary injunction was not granted because the corporation's failure to fund the defense threatened the officer's constitutional rights to effective assistance of counsel and to a speedy trial. *Id.* at *6 ("Finally, where a constitutional right is involved, irreparable injury is almost always found."). While the threat of injury to the corporate officer involved the loss of constitutional rights, the threat of injury to the corporation was economic, tipping the balance of harms in favor of interim injunctive relief. *See Flood*, 2009 WL 87006, at *6.

V.    *Bond*

Federal Rule of Civil Procedure 65 provides that "[n]o . . . preliminary injunction shall issue except on giving of security by the applicant, in such sum as the court deems proper." FED. R. CIV. P. 65. However, the Fifth Circuit has made clear that it is well within the discretion of the district court to decide that, under the circumstances, no security is required. *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) ("In holding that the amount of security required pursuant to Rule 65(c) 'is a matter for the discretion of the trial court,' we have ruled that the court 'may elect to require no security at all.'" (quoting *Corrigan Dispatch Co. v. Casa Guzman*, 569 F.2d 300, 303 (5th Cir. 1978))). Because the Policies require Plaintiffs to reimburse Underwriters for any amounts paid if it is ultimately determined that Plaintiffs are not entitled to those payments, the advancement of defense costs by Underwriters legally places no undue burden on them and, therefore, no bond is required.

Moreover, the posting of a bond by Plaintiffs would undermine the very protection that Underwriters promised in the policies. *See id.* Also, as a practical matter, because their assets have been frozen by the Government and none of the Plaintiffs have sufficient assets to pay their own attorneys, none of the Plaintiffs possess the financial ability to post a bond. Therefore, the Court determines the

appropriate bond amount is zero.

<div align="center">CONCLUSION</div>

For all the foregoing reasons, the Court hereby

ORDERS that Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint is DENIED.  The Court further

ORDERS that Plaintiffs' Request for Emergency Preliminary Injunction is GRANTED.  The Court further

ORDERS that Defendants Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Company are ENJOINED, RESTRAINED and PROHIBITED from withholding payment of all "Costs, Charges and Expenses" already incurred by Plaintiffs, and incurred by them in the future in *United States of America v. Robert Allen Stanford, Laura Pendergest-Holt, Gilberto Lopez, Mark Kuhrt and Leroy King*, Criminal Action No. H-09-342, pending in this Court, and in *Securities and Exchange Commission v. Stanford International Bank, Ltd., et al.*, No. 3:09-CV-298-N, pending in the United States District Court for the Northern District of Texas, Dallas Division, until a trial on the merits in this case or such other time as this Court orders that Defendants are under no contractual obligation to pay such "Costs, Charges and Expenses" or until the applicable policy limits are exhausted.  The Court further

ORDERS that Underwriters shall, within ten (10) days of the date this Order,

<div align="center">41</div>

pay all "Costs, Charges and Expenses" that have been submitted by or on behalf of Plaintiffs to Underwriters as of the date of this Order in connection with *United States v. Robert Allen Stanford, Laura Pendergest-Holt, Gilbert Lopez, Mark Kuhrt and Leroy King*, Criminal Action No. H-09-342, pending in this Court, and in connection with *Securities and Exchange Commission v. Stanford International Bank Ltd., et al.*, Cause No. 3:09-CV-00298, pending in the United States District Court for the Northern District of Texas, Dallas Division, as the payment of such "Costs, Charges and Expenses" complies with the 60-day payment cycle in the D&O Policy. The Court further

ORDERS that Plaintiffs are not required to post a bond relative to this Order.

SIGNED at Houston, Texas, on this **26** day of January, 2010.

DAVID HITTNER
United States District Judge

42