IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **LAURA PENDERGEST-HOLT,** | § | |
| **R. ALLEN STANFORD, GILBERT** | § | |
| **LOPEZ, JR. and MARK KUHRT,** | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. 4:09-cv-03712** |
| | § | |
| **CERTAIN UNDERWRITERS AT** | § | |
| **LLOYD'S OF LONDON and ARCH** | § | |
| **SPECIALTY INSURANCE** | § | |
| **COMPANY,** | § | |
| | § | |
| *Defendants*. | § | |

## MEMORANDUM OPINION AND ORDER

This insurance coverage dispute is before the Court on: (1) Plaintiffs'
Motion for Preliminary Injunction [Doc. #12] ("Plaintiffs' Motion for Preliminary
Injunction"); (2) Underwriters' Motion to Dismiss Plaintiffs' Second Amended
Complaint [Doc. #14] ("Underwriters' Motion to Dismiss"); (3) Underwriters'
Motion to Transfer Case to Northern District of Texas Judge David C. Godbey
[Doc. #24] ("Underwriters' Motion to Transfer"); and (4) Plaintiffs' Motion to
Dismiss Syndicate 623 Pursuant to FRCP 21 [Doc. #25] ("Plaintiffs' Motion to
Dismiss"). Having reviewed the parties' submissions, all pertinent matters of
record, arguments of counsel and applicable law, the Court concludes that
Plaintiffs' Motion for Preliminary Injunction [Doc. #12] and Plaintiffs' Motion to

Dismiss [Doc. #25] should be **GRANTED** and Underwriters' Motion to Dismiss [Doc. #24] and Underwriters' Motion to Transfer [Doc. #25] should be **DENIED AS MOOT**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

R. Allen Stanford, Laura Pendergest-Holt, Gilbert Lopez, Jr., and Mark Kuhrt, Plaintiffs herein, are defendants in a criminal action pending in this Court in the matter of *United States v. Robert Allen Stanford, Laura Pendergest-Holt, Gilberto Lopez, Mark Kuhrt and Leroy King*, Criminal No. H-09-342 (the "Criminal Action"). Plaintiffs Stanford and Holt also are defendants in an action commenced by the Securities and Exchange Commission ("SEC") in the United States District Court for the Northern District of Texas, Dallas Division, in the matter of *SEC v. Stanford International Bank Ltd., et al.*, Cause No. 3:09-CV-00298 (the "SEC Action"). Plaintiffs instituted this proceeding against Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Company (collectively, "Underwriters" or "Defendants") to obtain a judgment declaring that Underwriters, which issued three policies insuring the Plaintiffs, are obligated to pay for Plaintiffs' defense costs and expenses in the SEC and Criminal Actions, among other relief sought.

On December 17, 2009, after sufficient advance notice of the hearing was provided, Plaintiffs and Defendants appeared before the Court for consideration of

Plaintiffs' Motion for Preliminary Injunction.[1] With their Motion for Preliminary Injunction, Plaintiffs seek interim relief from this Court requiring Underwriters to withdraw its retroactive denial of coverage and compelling Underwriters to pay all reasonable and necessary defense costs and expenses incurred in the SEC and Criminal Actions until such time as this Court rules on the merits that no such contractual obligation is owed or until the applicable policy limits are exhausted. The Court conducted a lengthy hearing in which both parties were afforded the opportunity to present arguments and introduce evidence.[2] In reaching its rulings, the Court has carefully considered the arguments, the evidence, and the applicable law.

---

[1] The Court signed an order setting the hearing on Plaintiffs' Motion for Preliminary Injunction on December 2, 2009 [Doc. #13]. Plaintiffs were required to serve Underwriters by private process server and by certified mail. Plaintiffs have filed proof of service in accordance with this Court's order [Doc. #36]. During the same hearing on Plaintiffs' Motion for Preliminary Injunction, the Court considered the other pending motions as well [Docs. #14, #24, #25].

[2] On December 9, 2009, Underwriters filed a Motion for Continuance of Preliminary Injunction Hearing and Request for Expedited Discovery [Doc. #15]. By Order on December 10, 2009 [Doc. #16], the Court denied the motion. Given the preliminary nature of this proceeding, including the fact that the insurance coverage dispute revolves around a legal issue as to the proper contract interpretation, this Court continues to believe that no discovery was necessary and no continuance was warranted. In addition, this Court finds that both parties were given "ample opportunity to present their respective views of the legal issues involved." *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 627 (5th Cir. 1996) (internal citations omitted). In fact, although one was conducted, a court is not required to hold an evidentiary hearing before issuing an injunction. *See Federal Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558–59 (5th Cir. 1987).

## II.   **LEGAL STANDARDS**

Injunctive relief is authorized by general principles of equity.[3] Two general types of injunctive relief exist: prohibitory and mandatory.[4] Most injunctions are prohibitory in nature in that they prohibit a party from continuing certain conduct.[5] It is well settled that the issuance of a prohibitory injunction freezes the status quo, and is intended to "preserve the relative positions of the parties until a trial on the merits can be held."[6] The status quo generally is defined as the last peaceable status existing between the parties before the dispute developed.[7]

Under the standards set forth by the Fifth Circuit, movants that seek a preliminary injunction must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not issued; (3) that the threatened injury to the movant outweighs any damage the injunction may do to the opponent; and (4) that the injunction will not disserve the public interest.[8] A movant is not required to prove its case in full at

---

[3] *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S.Ct. 1837, 1840 (2006); *Wenner v. Tex. Lottery Comm'n*, 123 F.3d 321, 325 (5th Cir. 1997).

[4] *See Int'l Longshoreman's Ass'n v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 75, 88 S.Ct. 201, 207 (1967).

[5] *See Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995).

[6] *See Wenner*, 123 F.3d at 326 (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834 (1981)).

[7] *See Nova Health Sys. v. Edmondson*, 460 F.3d 1295, 1298 (10th Cir. 2006).

[8] *See United Offshore Co. v. S. Deepwater Pipeline Co.*, 899 F.2d 405, 407–08 (5th Cir. 1990); *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974). Some circuits require a party seeking a prohibitory injunction to show a risk of irreparable harm and *either* (1)

a preliminary injunction hearing.[9] FED. R. CIV. P. 43(c) allows a court to employ only affidavits in ruling on a motion for preliminary injunction.[10] The grant or denial of a preliminary injunction lies in the sound discretion of the district court.[11] Even so, a preliminary injunction is an extraordinary remedy not to be granted unless the movant clearly carries the burden of persuasion.[12]

## III.   <u>FINDINGS OF FACT</u>

This case arises out of the seizure of Stanford International Bank, Ltd., Stanford Capital Management, LLC, Stanford Financial Group Company and the Stanford Group Company, among other entities (collectively hereinafter "the Stanford Group"), by the SEC, and out of the criminal prosecution of Plaintiffs and others by the United States Department of Justice ("DOJ"). On February 17, 2009,

---

a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping in the movants' favor. *See Johnson v. Kay*, 860 F.2d 529, 540 (2nd Cir. 1988). When a preliminary injunction grants only part of the relief to which a movant would be entitled on the merits and requires a party to do what it should have done earlier, it is judged under the standard for prohibitory injunctions and not the heightened standard for mandatory injunctions. *Id.* The injunction sought by Plaintiffs in this case is prohibitory in nature because Plaintiffs seek to put the parties back into the position that they were in prior to Underwriters' retroactive denial of coverage. *See In re WorldCom, Inc. Securities Litigation*, 354 F. Supp. 2d 455, 463 (S.D.N.Y. 2005); *Great Am. Ins. Co. v. Gross*, 2005 WL 1048752, *3 (E.D. Va. May 3, 2005); *Flood v. ClearOne Commc'ns, Inc.*, 2009 WL 87006, *6 (D. Utah Jan. 12, 2009). Nevertheless, regardless of whether the injunction is prohibitory or mandatory, it does not appear that the Fifth Circuit has adopted any distinction on the standard to be applied. *See U.L. Coleman Co., Ltd. v. Bossier City-Parrish Metro. Planning Comm'n*, 2009 WL 497634 (W.D. La. Feb. 26, 2009). Accordingly, this Court will require Plaintiffs to carry the burden as to all four elements.

[9] *See Dixon*, 835 F.2d at 558.

[10] FED. R. CIV. P. 43(c).

[11] *See Callaway*, 489 F.2d at 572.

[12] *See Guy Carpenter & Co., Inc. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003).

the SEC commenced the SEC Action against Plaintiffs Holt and Stanford,[13] and Judge Reed O'Connor of the United States District Court for the Northern District of Texas, Dallas Division, appointed a receiver to take possession of all property and assets of the Stanford Group and of Plaintiffs Stanford and Holt.[14] The SEC later moved for leave to file a Second Amended Complaint in which it sought to add Plaintiffs Kuhrt and Lopez as defendants in the SEC Action.[15] On January 4, 2010, the SEC Motion for Leave was granted.[16] In the meantime, on June 18, 2009, all four Plaintiffs were indicted in the Criminal Action, which is pending before this Court.[17]

In this proceeding (the "Declaratory Judgment Action"), Plaintiffs seek a declaration requiring Underwriters to pay the Plaintiffs' defense costs and expenses incurred in connection with the SEC Action, the Criminal Action and any and all other "Claims," as those terms are defined in the D&O Policy and the

---

[13] SEC Original Complaint [Doc. #22-2] (attached as Exhibit 1 to the Appendix to Plaintiffs' Brief in Support of Motion for Preliminary Injunction ("Plaintiffs' Brief in Support") [Doc. #22]). The SEC subsequently filed a First Amended Complaint [Doc. #22-3].

[14] February 17, 2009 Order Appointing Receiver [Doc. #22-4].

[15] SEC Motion for Leave to File Amended Complaint ("SEC Motion for Leave") [Doc. #22-5].

[16] January 4, 2010 Order Granting SEC Motion for Leave [Doc. #937 (Civil Action No. 3:09-CV-298-N)]. The Second Amended Complaint adding Plaintiffs Kuhrt and Lopez did not alter the relevant allegations for purposes of determining Underwriters' contractual obligation to pay defense costs and expenses.

[17] Indictment [Doc. #22-6]. Plaintiff Holt initially was indicted alone but, on the filing of the aforementioned Indictment, the original indictment against Holt was dismissed.

"follow form" Excess Policy.[18] Plaintiffs also seek damages in the Declaratory Judgment Action for Underwriters' breaches of the insurance policies, as well as amounts due pursuant to Texas' Prompt Payment of Claims Act.[19] Finally, and most pertinent to this Memorandum Opinion and Order, Plaintiffs seek the issuance of a preliminary injunction requiring Underwriters to not only pay Plaintiffs' reasonable and necessary defense costs and expenses that already have been incurred in the SEC Action and the Criminal Action, but also an order requiring Underwriters to continue making payment of those defense costs and expenses in both the SEC Action and the Criminal Action until such time as this Court makes a determination in the Declaratory Judgment Action that no such contractual obligation is owed or until the applicable policy limits are exhausted.

---

[18] "D&O Policy" refers to the policy issued by Underwriters to the Stanford Group, bearing policy number 576/MNK558900 and effective August 15, 2008 to August 15, 2009 [Doc. #22-7]. "Excess Policy" refers to the policy issued by Underwriters to the Stanford Group, bearing policy number 576/MNA831400 and effective August 15, 2008 to August 15, 2009 [Doc. #22-8]. Underwriters also issued a third policy that provides, among other things, Professional Indemnity Coverage. The Parties agree that the third policy is not relevant to the Parties' current arguments in this proceeding for purposes of determining whether Underwriters has a contractual obligation to advance defense costs and expenses. Accordingly, for purposes of the preliminary injunction, the Court's analysis will be restricted to the D&O policy and the "follow form" Excess Policy.

[19] See TEX. INS. CODE ANN. § 542.051 et seq. See also Lamar Homes, Inc. v. Mid-Continent Cas. Co., 242 S.W.3d 1, 19 (Tex. 2007) (holding that the Prompt Payment of Claims Act applies to an insurer's denial of defense costs).

A.     **The Policies of Insurance:**

1.     **The D&O Policy**

Underwriters issued a Directors' and Officers' and Company Indemnity Policy, bearing policy number 576/MNK558900 and effective August 15, 2008 to August 15, 2009 to the Stanford Group.[20] The D&O Policy pays, among other things, on behalf of the Stanford Group's Directors and Officers,[21] "Loss resulting from any Claim first made during the policy period for a Wrongful Act."[22] With respect to defense of such claims, the D&O Policy provides as follows:

> It shall be the duty of the Directors and Officers or the Company and not the duty of the Underwriters to defend Claims, provided that no Costs, Charges or Expenses shall be incurred without the Underwriter's prior written consent, such consent not to be unreasonably witheld [*sic*]. In the event of such consent being given, and subject to all other terms and provisions of the Policy including

---

[20] D&O Policy [Doc. #22-7].

[21] The D&O Policy provides, in pertinent part, that "'Director(s) and/or Officer(s)' shall mean any persons who were, now are, or shall be directors or officers of the Company." D&O Policy [Doc. #22-7] at App. 000161.

[22] D&O Policy [Doc. #22-7] at App. 000159. "Loss" includes, among other things, "Costs, Charges and Expenses." D&O Policy [Doc. #22-7] at App. 000161. The D&O Policy provides that "Costs, Charges and Expenses" "shall mean reasonable and necessary legal fees and expenses incurred by the Directors and Officers or by the Company in defense of any Claim provided however Costs, Charges and Expenses shall not include salaries, wages, overhead or benefit expenses." D&O Policy [Doc. #22-7] at App. 000160–61. The D&O Policy defines "Claim," in pertinent part, as "any . . . judicial or administrative proceeding initiated against any of the Directors and Officers or the Company in which they may be subjected to a binding adjudication of liability for damages or other relief, including any appeal therefrom." D&O Policy [Doc. #22-7] at App. 000160. For purposes of Insuring Clause A, "'Wrongful Act' shall mean any actual or alleged error, act, omission, misstatement, misleading statement, neglect or breach of duty or negligent act by, or any other matter claimed against, the Directors and Officers whilst acting in their capacity as (1) directors or officers of the Company . . . ." D&O Policy [Doc. #22-7] at App. 000162.

but not limited to Article V. of this Policy, the Underwriters shall pay Costs, Charges and Expenses no more than once every 60 days.[23]

The coverage provided under the D&O Policy is subject to a number of exclusions.

Pertinent exclusions raised by Underwriters are as follows:

> The Underwriters shall not be liable to make any payment for Loss resulting from any Claim
>
> ***
>
> I. brought about or contributed to in fact by:
>
> > (a) any dishonest, fraudulent or criminal act or omission by the Directors or Officers or the Company, or
>
> > (b) any personal profit or advantage gained by any of the Directors and Officers or the Company to which they were not legally entitled
>
> as determined by a final adjudication.
>
> ***
>
> T. arising directly or indirectly as a result of or in connection with any act or acts (or alleged act or acts) of Money Laundering or any act or acts (or alleged act or acts) which are in breach of and/or constitute an offence or offences under any money laundering legislation (or any provisions and/or rules or regulations made by any Regulatory Body or Authority thereunder).
>
> > Notwithstanding the foregoing Exclusion, Underwriters shall pay Costs, Charges and Expenses in the event of an alleged act or alleged acts until such time that it is determined that the alleged act or alleged acts did in fact occur. In such event the Directors and Officers and the Company will reimburse

---

[23] D&O Policy [Doc. #22-7] at App. 000169.

> Underwriters for such Costs, Charges and Expenses paid on their behalf.[24]
>
> ***
>
> Any Wrongful Act pertaining to any Director or Officer shall not be imputed to any other person for the purposes of determining the applicability of the Exclusions.[25]

The D&O Policy provides $5 million limits of liability with respect to each of two sections under the policy.[26]

---

[24] D&O Policy [Doc. #22-7] at App. 000164–65, App. 000167. The D&O Policy defines "Money Laundering" as follows:

    I.   "Money Laundering" means:

        (i)   the concealment, or disguise, or conversion, or transfer, or removal of Criminal Property, (including concealing or disguising its nature, source, location, disposition, movement or ownership or any rights relating thereto); or

        (ii)  the entering into or becoming in any way concerned in an arrangement which is known or suspected to facilitate (by whatever means) the acquisition, retention, use or control of Criminal Property by or on behalf of another person; or

        (iii) the acquisition, use or possession of Criminal Property; or

        (iv) any act which constitutes an attempt, conspiracy or incitement to commit any act or acts mentioned in the foregoing paragraphs (i), (ii) or (iii); or

        (v)  any act which constitutes aiding, abetting, counseling or procuring the commission of any act or acts mentioned in the foregoing paragraphs (i), (ii) or (iii).

D&O Policy [Doc. #22-7] at App. 000162–63. "Criminal Property" includes "property which constitutes a benefit obtained from or as a result of or in connection with criminal conduct or represents such a benefit (in whole or part and whether directly or indirectly) which the Directors or Officers or the Company (or any person or entity acting on their behalf) knows or suspects or reasonably should have known or suspected that it constitutes or represents such a benefit." D&O Policy [Doc. #22-7] at App. 000163.

[25] D&O Policy [Doc. #22-7] at App. 000168. This Court need not address any other exclusions because Underwriters acknowledged during the hearing and in its briefing that the Money Laundering Exclusion and the Fraud Exclusion were the only two relevant exclusions at this stage of the proceedings. In reality, since the Fraud Exclusion has "final adjudication" language and since it is beyond dispute that no "final adjudication" has occurred in either the Criminal Action or the SEC Action, the merits of Underwriters' denial rest solely on whether Underwriters properly invoked the Money Laundering Exclusion.

[26] *See* D&O Policy [Doc. #22-7] at App. 000157.

### 2.     The Excess Policy

Underwriters issued the Excess Blended "Wrap" Policy bearing policy number 576/MNA831400 and effective August 15, 2008 to August 15, 2009 to the Stanford Group. The Excess Policy provides that "Underwriters shall indemnify or reimburse or pay on behalf of the Assured, any loss or losses first discovered and/or claim or claims first made against the Assured during the Period of Insurance" up to the Excess Policy's Limit of Liability and in excess of the D&O Policy's limit of liability. The Excess Policy is a "follow form" policy, meaning that it adopts the terms, conditions and provisions of the policies over which it sits, including the D&O Policy.[27]

### B.     <u>The Underlying Claims Made Against Plaintiffs</u>[28]

### 1.     The SEC Action

The Securities and Exchange Commission alleges that Plaintiff Stanford, Chief Executive Officer of Stanford International Bank ("SIB"), orchestrated a fraud through the use of numerous Stanford Group entities, including SIB,

---

[27] *See* Excess Policy [Doc. #22-7] at App. 000205 ("Except as otherwise provided herein this Policy is subject to the same terms, exclusions, conditions and definitions as the Policy of the Primary Insurers.").

[28] As will be discussed *infra*, while the Court must accept the allegations against the Plaintiffs as true for purposes of applying the "eight corners" rule, the Court's recitation of the allegations should not be construed as any legal determination of the validity of the allegations in either the SEC Action or the Criminal Action.

Stanford Group Company and Stanford Capital Management.[29] The SEC alleges that Plaintiff Holt, Chief Investment Officer of Stanford Group Financial, was indispensible to the fraud, misleading investors by representing that she managed SIB's multi-billion dollar portfolio and employed a team of analysts that monitored the portfolio.[30] In doing so, the SEC claims that Plaintiffs—through the use of the Stanford Entities—sold approximately $7 or $8 billion worth of certificates of deposit ("CDs"), alleging that they would provide higher returns on investment than other "standard" CDs offered.[31] SIB claimed that it earned returns on its investment of deposits between 11.5% and 16.5% from 1992 until 2006.[32] Such high returns allowed the bank to offer high interest rates on its CDs and then pay disproportionately high commissions to the Stanford Group Company for the sale of those CDs.[33] Also, the SEC contends that investment advisors for Stanford Group entities sold more than $1 billion of a proprietary mutual fund wrap

---

[29] *See* SEC First Amended Complaint [Doc. #22-3] at App. 000027; SEC Second Amended Complaint [Doc. #22-5] at App. 000065.

[30] *See* SEC First Amended Complaint [Doc. #22-3] at App. 000027–28, App. 000037–38; SEC Second Amended Complaint [Doc. #22-5] at App. 000066, App. 000081–83. The portfolio was separated into three "tiers" of which 80% of the portfolio fell into Tier 3. *See* SEC First Amended Complaint [Doc. #22-3] at App. 000033; SEC Second Amended Complaint [Doc. #22-5] at App. 000082.

[31] *See* SEC First Amended Complaint [Doc. #22-3] at App. 000028; SEC Second Amended Complaint [Doc. #22-5] at App. 000065–66.

[32] *See* SEC First Amended Complaint [Doc. #22-3] at App. 000032; SEC Second Amended Complaint [Doc. #22-5] at App. 000076.

[33] *See* SEC First Amended Complaint [Doc. #22-3] at App. 000032–33; SEC Second Amended Complaint [Doc. #22-5] at App. 000077.

program by utilizing historical performance data that allegedly was false and misleading.[34]

The SEC contends that Stanford misappropriated $1.6 billion of investor money through personal loans to himself.[35] Additionally, he allegedly used investor money to, among other things, fund speculative businesses that he controlled and to buy private equity and real estate.[36] The SEC contends that Plaintiffs Kuhrt and Lopez were aware of these "loans" to Stanford, claiming that they even tracked the "loans" in a separate spreadsheet.[37] The SEC further alleges that Plaintiff Stanford accomplished this purported fraud by fabricating the performance of the portfolio through a pre-determined return on investment to which Plaintiffs Kuhrt and Lopez would allegedly reverse-engineer financial statements that would show earnings not earned.[38] Plaintiff Holt allegedly aided and abetted these actions by denying any knowledge of the vast majority of SIB's assets and by failing to disclose that Plaintiff Stanford had misappropriated

---

[34] *See* SEC First Amended Complaint [Doc. #22-3] at App. 000028, App. 000039–42; SEC Second Amended Complaint [Doc. #22-5] at App. 000087–90.

[35] *See* SEC First Amended Complaint [Doc. #22-3] at App. 000028; SEC Second Amended Complaint [Doc. #22-5] at App. 000074.

[36] *See* SEC First Amended Complaint [Doc. #22-3] at App. 000028, App. 000036; SEC Second Amended Complaint [Doc. #22-5] at App. 000074.

[37] *See* SEC Second Amended Complaint [Doc. #22-5] at App. 000074–75.

[38] *See* SEC First Amended Complaint [Doc. #22-3] at App. 000028, App. 000034; SEC Second Amended Complaint [Doc. #22-5] at App. 000077–78.

investor funds.[39] In addition, Plaintiffs allegedly signed off on Monthly and Annual Reports that included false information about the bank and the investment portfolio.[40] Further, according to the SEC, Plaintiffs Stanford and Holt also spoke to investment advisors and misrepresented the strength of the bank and the amount of its assets, lied about the existence of capital infusions into the bank and failed to tell the advisers that they had not invested customers' funds in a manner consistent with offering documents and its financial statements.[41] With respect to the purported capital infusions, the SEC claims that Plaintiffs Kuhrt and Lopez were integral parts of the background efforts to formulate a proposal showing that the infusions had occurred.[42] In addition to the other allegations, Plaintiffs Stanford and Holt allegedly also told investors that SIB had no exposure to losses from investments with Bernard Madoff even though e-mails showed that Plaintiff Holt knew in December 2008 that such losses existed.[43]

Through their actions, the SEC alleges that Plaintiffs have violated Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act

---

[39] *See* SEC First Amended Complaint [Doc. #22-3] at App. 000034; SEC Second Amended Complaint [Doc. #22-5] at App. 000077.

[40] *See* SEC First Amended Complaint [Doc. #22-3] at App. 000035–36; SEC Second Amended Complaint [Doc. #22-5] at App. 000073–74, App. 000076–77, App. 000079.

[41] *See* SEC First Amended Complaint [Doc. #22-3] at App. 000038; SEC Second Amended Complaint [Doc. #22-5] at App. 000081–83.

[42] *See* SEC Second Amended Complaint [Doc. #22-5] at App. 000078–81.

[43] *See* SEC First Amended Complaint [Doc. #22-3] at App. 000039; SEC Second Amended Complaint [Doc. #22-5] at App. 000084.

of 1934, and Exchange Act Rule 10b-5.[44] Additionally, they allegedly have aided and abetted such violations.[45] Moreover, the SEC contends that Plaintiff Stanford violated Sections 206(1) and (2) of the Investment Advisers Act of 1940 and that Plaintiffs aided and abetted those violations.[46] As a result of those purported violations, the SEC sought to enjoin Plaintiffs from any further violations, sought disgorgement of funds and sought payment of civil penalties.[47] The SEC Action remains pending.

### 2.    The Criminal Action

On June 18, 2009, the Indictment in the Criminal Action was entered against Plaintiffs.[48] The DOJ alleges that Plaintiffs committed and conspired to commit mail, wire and securities fraud, as well as conspired to commit money laundering, in the sale of the aforementioned CDs.[49] More specifically, the DOJ claims that Plaintiffs represented to investors that investments in SIB and the CDs offered were safe and secure, would achieve double-digit returns and pay high interest

---

[44] *See* SEC First Amended Complaint [Doc. #22-3] at App. 000029, App. 000042–44; SEC Second Amended Complaint [Doc. #22-5] at App. 000067, App. 000090–93.

[45] *See* SEC First Amended Complaint [Doc. #22-3] at App. 000029, App. 000043; SEC Second Amended Complaint [Doc. #22-5] at App. 000067, App. 000091–92.

[46] *See* SEC First Amended Complaint [Doc. #22-3] at App. 000029, App. 000045–46; SEC Second Amended Complaint [Doc. #22-5] at App. 000068, App. 000093–94.

[47] *See* SEC First Amended Complaint [Doc. #22-3] at App. 000047–48; SEC Second Amended Complaint [Doc. #22-5] at App. 000095–96.

[48] *See* Indictment [Doc. #22-6].

[49] *See generally* Indictment [Doc. #22-6].

rates.[50] In making such representations, it is alleged that the Plaintiffs sent Monthly and Annual Reports to their investors that contained false or misleading information and hired investment advisers, to whom it paid high commissions, to push the sale of the CDs.[51] In doing so, Plaintiffs purportedly inflated the strength and viability of the portfolio and SIB so that the investment advisers would support the program.[52] Allegedly, the Plaintiffs did not inform the investors that 80% of SIB's portfolio was directed and managed by Plaintiff Stanford and that a significant amount of that part of the portfolio—the "Tier III" investments—were investments in overvalued real estate and notes on Plaintiff Stanford's personal loans.[53] Through these acts, the DOJ claims that Plaintiffs conspired, along with an Antiguan regulator (Leroy King), to devise a scheme to defraud investors and, through the use of the United States Postal Service, through wire communications and through the use of securities, executed that scheme.[54] The DOJ alleges numerous false and misleading representations made to support the scheme.[55] In addition, the DOJ details alleged overt acts, including mailings, wire transfers and

---

[50] *See* Indictment [Doc. #22-6] at App. 000102.

[51] *See* Indictment [Doc. #22-6] at App. 000102–03, App. 000105.

[52] *See* Indictment [Doc. #22-6] at App. 000105–06.

[53] *See* Indictment [Doc. #22-6] at App. 000103–04.

[54] *See* Indictment [Doc. #22-6] at App. 000108–10.

[55] *See* Indictment [Doc. #22-6] at App. 000110–15.

securities transactions, in support of the scheme.[56] Through those same actions, the DOJ alleges seven counts of wire fraud against Plaintiffs.[57] Additionally, the DOJ filed ten counts of mail fraud against Plaintiffs and a single count of conspiracy to commit money laundering.[58]

The DOJ also alleges a single count of conspiracy to obstruct an SEC investigation[59] and a single count of obstruction of an SEC investigation.[60] Specifically, the DOJ alleges that Plaintiffs conspired to, and did in fact influence, obstruct and impede the SEC's investigation of the Stanford Group in an effort to perpetuate and prevent detection of an ongoing fraud and to continue receiving benefits from the fraud.[61]

In light of the foregoing, the DOJ filed a notice of forfeiture that, in the instance of a finding of guilt, the United States intends to forfeit all property that constitutes proceeds of the criminal offenses.[62] The forfeiture notice includes numerous bank accounts allegedly containing such property.[63] Moreover, the DOJ seeks a money judgment against Plaintiffs for the total amount of property

---

[56] *See* Indictment [Doc. #22-6] at App. 000115–30.

[57] *See* Indictment [Doc. #22-6] at App. 000130–32.

[58] *See* Indictment [Doc. #22-6] at App. 000134–37, App. 000142-44.

[59] *See* Indictment [Doc. #22-6] at App. 000137–40.

[60] *See* Indictment [Doc. #22-6] at App. 000140–41.

[61] *See* Indictment [Doc. #22-6] at App. 000137-38.

[62] *See* Indictment [Doc. #22-6] at App. 000145.

[63] *See* Indictment [Doc. #22-6] at App. 000145–51.

involved in each alleged criminal offense.[64] Finally, to the extent property subject to the forfeiture cannot be obtained, the DOJ seeks forfeiture of any other property held by Plaintiffs up to the total value of the property subjected to such forfeiture.[65]

### C.   Underwriters' Responses to Plaintiffs' Claims under the Policies

On learning of the claims made against them, each of the Plaintiffs retained attorneys who wrote to Underwriters to advise them of the claims, and to request Underwriters' agreement to pay Plaintiffs' attorneys' "Costs, Charges and Expenses" incurred in defending the SEC Action and the Criminal Action.[66] Underwriters, through its retained counsel, wrote to Plaintiffs' attorneys and advised them that "[a]lthough we [Underwriters] have not yet made a final determination of coverage, Underwriters will consent to your client's request to incur Costs, Charges and Expenses in defense of the criminal proceeding pursuant to Article VI, Section B of the D&O Policy, subject to a complete reservation of all rights."[67]

Underwriters even advised this Court of its intent to pay the defense costs and expenses of Plaintiffs' criminal attorneys. In their September 14, 2009

---

[64] *See* Indictment [Doc. #22-6] at App. 000148, App. 000151.

[65] *See* Indictment [Doc. #22-6] at App. 000152.

[66] The Court will use "Cost, Charges and Expenses" interchangeably with "defense costs and expenses" for purposes of this Memorandum Opinion and Order.

[67] May 1, 2009 Letter to Plaintiff Stanford [Doc. #22-9]; May 1, 2009 Letter to Plaintiff Holt [Doc. #22-10]; October 30, 2009 Letter to Plaintiff Lopez [Doc. #22-11]. Similar letters were sent with respect to the SEC Action. *See, e.g.*, June 1, 2009 Letter to Plaintiff Holt [Doc. #22-12].

response to a motion to compel payment of fees filed in the Criminal Action, Underwriters wrote that "[i]f Judge Godbey rules that the insurance policy proceeds are not receivership assets, Underwriters presently intend to reimburse Movants' reasonable and necessary attorney's fees and costs, subject to a complete reservation of rights."[68] On October 9, 2009, United States District Judge David Godbey held that he would permit payment of defense costs and expenses by Underwriters even if the proceeds are part of the receivership estate because "the potential harm to them [the directors and officers] if denied coverage is not speculative but real and immediate."[69]

To safeguard the rights of criminal defendants to receive speedy trials and effective assistance of counsel, this Court requires criminal defense attorneys to agree in open court that they will represent each of their clients through a guilty plea or conviction. Plaintiffs' criminal attorneys contend that they relied on Underwriters' promises of payment when they committed to represent their clients in the Criminal Action.[70]

---

[68] Underwriters' Response to Motion to Compel Payments in Criminal Action [Doc. #22-16] at App. 000253.

[69] October 9, 2009 Order in SEC Action [Doc. #22-17] at App. 000271, App. 000278.

[70] *See* Affidavit of Kent A. Schaffer [Doc. #22-13]; Transcript from November 17, 2009 hearing in the Criminal Action [Doc. #160 (Criminal No. H-09-0342)]. Even though this Court questions the propriety of Underwriters' actions in retroactively denying coverage after repeatedly consenting to "Costs, Charges, and Expenses," this Court focused its attention on the policy language as applied to the allegations in the Criminal Action and SEC Action and did not rely on any waiver or estoppel theory in reaching its ruling. As a practical matter, although Underwriters

### D.   Underwriters' Retroactive Coverage Denial

Despite the many written assurances made by Underwriters that defense costs and expenses would be paid, on November 16, 2009, Underwriters issued letters to Defendants in which they acknowledged payment of defense costs and expenses to counsel through August 27, 2009, but Underwriters also *retroactively* declined to extend any coverage for "Costs, Charges, or Expenses" incurred in defending against the SEC Action and the Criminal Action after August 27, 2009.[71] This purported retroactive denial of coverage was made despite the fact that Underwriters had, as recently as October 30, 2009, specifically consented to defense counsel incurring "Costs, Charges and Expenses."[72]

Underwriters' retroactive denial of coverage was based on its *unilateral* factual conclusion that certain events that had taken place months earlier in the SEC Action and in the Criminal Action implicated the Money Laundering

---

spent a considerable amount of time arguing against coverage by estoppel, it does not appear that Plaintiffs relied on any such theory in supporting their claim for preliminary injunction.

[71] *See* November 16, 2009 Letter to Plaintiff Holt [Doc. #22-18]; November 16, 2009 Letter to Plaintiff Kuhrt [Doc. #22-19]; November 16, 2009 Letter to Plaintiff Stanford [Doc. #22-20]; November 16, 2009 Letter to Plaintiff Lopez [Doc. #22-21]. While the Court acknowledges that Underwriters reserved their rights to deny coverage, this Court finds no authority within the terms of the D&O Policy for a retroactive denial. Notably, while Underwriters unquestionably have a right to seek *reimbursement* under the terms of the D&O Policy, the term "reimbursement," as commonly understood, means to seek recovery of funds already paid (i.e., to *refund* or *repay* that which has been paid).

[72] *See* October 30, 2009  Letter to Plaintiff Lopez [Doc. #22-11].

Exclusion of the D&O Policy.[73] The Money Laundering Exclusion relied on by Underwriters provides that Underwriters shall pay "Costs, Charges and Expenses" in the event of an alleged act or alleged acts until such time that it is "determined" that Money Laundering "in fact" occurred.[74]

The August 27, 2009 event that served as the primary basis for Underwriters' denial was James Davis' guilty plea in the Criminal Action in which he pleaded guilty to mail fraud, and conspiracy to commit wire, mail, and securities fraud.[75] Underwriters claim that, during his allocution, Mr. Davis testified that Plaintiffs engaged in various acts meeting the definition of Money Laundering. Underwriters also claim that its coverage denial is based on Judge O'Connor's February 17, 2009 Temporary Restraining Order in which the court held that there was good cause to believe that the defendants in the SEC Action used improper means to obtain investor funds and assets to justify a temporary

---

[73] *See* November 16, 2009 Letter to Plaintiff Holt [Doc. #22-18]; November 16, 2009 Letter to Plaintiff Kuhrt [Doc. #22-19]; November 16, 2009 Letter to Plaintiff Stanford [Doc. #22-20]; November 16, 2009 Letter to Plaintiff Lopez [Doc. #22-21].

[74] D&O Policy [Doc. #22-7] at App. 000167.

[75] *See* November 16, 2009 Letter to Plaintiff Holt [Doc. #22-18]; November 16, 2009 Letter to Plaintiff Kuhrt [Doc. #22-19]; November 16, 2009 Letter to Plaintiff Stanford [Doc. #22-20]; November 16, 2009 Letter to Plaintiff Lopez [Doc. #22-21]. According to the Indictment in the Criminal Action, James Davis was the Chief Financial Officer of Stanford Financial Group, which was the parent company of SIB and other affiliated entities. *See* Indictment [Doc. #22-6] at App. 000100.

restraining order.[76] Likewise, Underwriters rely on a March 12, 2009 finding made by Judge Godbey in response to a motion for a preliminary injunction in the SEC Action that Stanford engaged in fraudulent conduct, including misappropriating investor funds.[77] All of these events occurred months before Underwriters denied coverage and, in any event, do not constitute sufficient "in fact" determinations that would cut off Underwriters' contractual obligation to advance defense costs and expenses.

### E.  Evidence of Irreparable Injury, the Balance of Harm and the Effect of Interim Relief on the Public Interest[78]

Plaintiffs claim that they will suffer irreparable harm if they are not awarded interim injunctive relief. Defendants offered no evidence that disputes the evidence offered by Plaintiffs in support of their claim of irreparable harm. Rather, Defendants only claim that if this Court incorrectly grants the interim relief sought by Plaintiffs, Underwriters are unlikely to ever be able to recover the amounts paid to fund Plaintiffs' defenses and there will be insufficient funds to pay unspecified

---

[76] *See* November 16, 2009 Letter to Plaintiff Holt [Doc. #22-18]; November 16, 2009 Letter to Plaintiff Kuhrt [Doc. #22-19]; November 16, 2009 Letter to Plaintiff Stanford [Doc. #22-20]; November 16, 2009 Letter to Plaintiff Lopez [Doc. #22-21].

[77] *See* November 16, 2009 Letter to Plaintiff Holt [Doc. #22-18]; November 16, 2009 Letter to Plaintiff Kuhrt [Doc. #22-19]; November 16, 2009 Letter to Plaintiff Stanford [Doc. #22-20]; November 16, 2009 Letter to Plaintiff Lopez [Doc. #22-21].

[78] At its heart, the issue before this Court is an insurance coverage dispute and, thus, Plaintiffs' likelihood of success on the merits is determined by the relevant policies of insurance and the underlying pleadings because, as discussed herein, Texas' "eight corners" rule governs the coverage issue. Nevertheless, discussion of extrinsic evidence is relevant to Plaintiffs' burden of proof with respect to the other three factors required for a preliminary injunction.

claims that Underwriters believe might be covered.[79] In other words, the only potential harm identified by Underwriters is strictly economic.

The charges made against Plaintiffs in the Criminal Action and in the SEC Action are very serious and defending Plaintiffs in both actions will be expensive. Both cases involve millions of documents.[80] Plaintiffs' attorneys in the Criminal Action and in the SEC Action have advised that, to prepare effective defenses, they each will need to hire additional attorneys, paralegals and support staff, private investigators, experts including forensic accountants, and document review firms.[81] Further, to prepare defenses for their clients, they will need to work for the next several months, and possibly years, almost exclusively on the Criminal Action and/or the SEC Action.[82] Defense counsel in the Criminal Action provided affidavits demonstrating that the defense of the individual defendants will cost millions of dollars.[83] Likewise, the defense costs for the SEC action will be substantial.[84] The Court is sufficiently convinced that none of the criminal defense

---

[79] *See* Underwriters' Response in Opposition to Plaintiffs' Request for Preliminary Injunction [Doc. #31] at 34.

[80] *See* Affidavit of Kent A. Schaffer [Doc. #22-13].

[81] *See, e.g.*, Affidavit of Kent A. Schaffer [Doc. #22-13].

[82] *See, e.g.*, Affidavit of Kent A. Schaffer [Doc. #22-13].

[83] *See* Affidavit of Kent A. Schaffer [Doc. #22-13]; Affidavit of Jack B. Zimmermann [Doc. #22-22]; Affidavit of Richard Kuniansky [Doc. #22-23].

[84] *See* Affidavit of Brent R. Baker [Doc. #32-1] (attached as Exhibit 1 to Plaintiffs' Supplemental Motion in Support of Preliminary Injunction [Doc. #32]).

attorneys can advance the expenses necessary to prepare adequate defenses for their clients and, at the same time, work without payment of their fees.

Plaintiffs' attorneys in the Criminal Action and in the SEC Action already have incurred substantial defense costs and expenses based on Underwriters' consent.[85] According to Mr. Schaffer, based on Underwriters' consent, he hired additional employees, including several lawyers and paralegals, and he began working seven days per week for as many as sixteen hours per day.[86] As of December 14, 2009, Mr. Schaffer owed over $150,000.00 in fees and expenses to the attorneys, investigators, and paralegals that worked with him on Plaintiff Stanford's defense, as well as an additional $25,500.00 in additional out-of-pocket expenses, and he had received no income from his work defending Plaintiff Stanford.[87] The Court has heard similar accounts from all of the attorneys representing Plaintiffs in the Criminal Action.[88]

Plaintiffs' attorneys, with the exception of Richard Kuniansky who is being paid with public funds, have advised that they will need to immediately withdraw (or attempt to withdraw) unless Underwriters honor their contractual obligations to

---

[85] *See* Affidavit of Kent A. Schaffer [Doc. #22-13]; Affidavit of Jack B. Zimmermann [Doc. #22-22].

[86] Affidavit of Kent A. Schaffer [Doc. #22-13] at App. 000241.

[87] Affidavit of Kent A. Schaffer [Doc. #22-13] at App. 000241.

[88] *See* Transcript from November 17, 2009 hearing in the Criminal Action [Doc. #160 (Criminal No. H-09-0342)].

pay for Plaintiffs' defense costs and expenses.[89] Ms. Holt's attorney in the SEC Action has advised that "in light of Ms. Holt's financial condition and the broad pretrial asset freeze imposed in the [SEC Action], Ms. Holt will be unable to defend herself in the [SEC Action] if the insurer is allowed to deny coverage, or is allowed to withhold payment of defense costs pending trial court and appellate resolution of all policy and coverage issues."[90]

The trial in the Criminal Action is scheduled to begin in January 2011. Plaintiffs' criminal attorneys have advised that they cannot begin significant trial preparations until they are assured that their "Costs, Charges and Expenses" will be paid as provided for in the relevant policies.[91] Plaintiffs have advised their attorneys that they wish to employ them to prepare and try the Criminal Action and the SEC Action and that they do not wish to be represented by public defenders or by any other attorneys.[92] Further, as Judge Godbey noted in his October 9, 2009 Order, the harm to Plaintiffs if their defense costs are not paid is "real and immediate" because, without payment by Underwriters, Plaintiffs will be unable to defend themselves in the SEC Action because they do not have a right to court-

---

[89] *See* Affidavit of Kent A. Schaffer [Doc. #22-13]; Affidavit of Jack B. Zimmermann [Doc. #22-22].

[90] Affidavit of Brent R. Baker [Doc. #32-1] at 2.

[91] *See* Affidavit of Kent A. Schaffer [Doc. #22-13]; Affidavit of Jack B. Zimmermann [Doc. #22-22].

[92] *See* Affidavit of Kent A. Schaffer [Doc. #22-13]; Affidavit of Jack B. Zimmermann [Doc. #22-22].

appointed counsel.[93] Because this Court required the criminal defense attorneys to agree that they will not withdraw prior to a guilty plea or conviction, the same "real and immediate" harm exists in the Criminal Action. Even if this Court were to allow the criminal defense attorneys to withdraw, the Plaintiffs would be deprived of their constitutional right to select counsel. Additionally, because of the seizure of assets and the financial inability to pay the amounts that will be required to mount an adequate defense, Plaintiffs' defenses in the Criminal Action would need to be funded by the taxpayers.

## IV.  CONCLUSIONS OF LAW

### A.  This Court has Jurisdiction over this Dispute

With their Motion to Dismiss Plaintiffs' Second Amended Complaint, Underwriters claim that this Court lacks jurisdiction over the dispute between the parties for two reasons: (1) because there is not complete diversity of citizenship between Plaintiffs and Defendants; and (2) because Judge Godbey of the Northern District has *exclusive* jurisdiction over this insurance coverage dispute.[94] For the reasons discussed below, Plaintiffs' Motion to Dismiss [Doc. #25] is **GRANTED** without Prejudice, and Underwriters' Motion to Dismiss [Doc. #14] and Underwriters' Motion to Transfer [Doc. #24] are **DENIED AS MOOT**.

---

[93] October 9, 2009 Order in SEC Action [Doc. #22-17] at App. 000278.

[94] *See* Underwriters' Motion to Dismiss [Doc. #14].

### 1.    Diversity of Citizenship

Underwriters' claim that a lack of complete diversity of citizenship exists is based on the fact that a single "Name" that participates in one of the Syndicates that subscribes to the D&O Policy is a Texas resident. After Underwriters alerted Plaintiffs to the fact that one of the individuals participating in Syndicate 623 is a Texas resident, Plaintiffs requested that this Court dismiss without prejudice Syndicate 623 pursuant to FED. R. CIV. P. 21.[95] On December 16, 2009, Underwriters filed a response to Plaintiffs' Motion to Dismiss in which they acknowledged that Syndicate 623 is a dispensable party to this proceeding, in which they consented to the dismissal of Syndicate 623, and in which they acknowledged that with Syndicate 623's dismissal there will be complete diversity of citizenship between the parties.[96]

FED. R. CIV. P. 21 permits the Court to retain diversity jurisdiction over a case by dropping a non-diverse party if that party is a dispensable party pursuant to FED. R. CIV. P. 19.[97] According to the Fifth Circuit, an insured is not required to sue each "Name" or Syndicate member individually to obtain a judgment against Underwriters binding as to each of its members.[98] Further, the "Service of Suit

---

[95] *See* Plaintiffs' Motion to Dismiss [Doc. #25].

[96] *See* Underwriters' Response to Plaintiffs' Motion to Dismiss [Doc. #29].

[97] *See Grupo DataFlux v. Atlas Global Group, L.P.*, 541 U.S. 567, 572 (2004).

[98] *See Corfield v. Dallas Glen Hills L.P.*, 355 F.3d 853, 859 (5th Cir. 2003).

Clause" in Underwriters' policies provides that each of the Names will be bound on an individual basis to the insured to adhere to any adverse judgment against Underwriters notwithstanding that only one Name participates in the litigation as a named party.[99] The parties agree and the Court concludes that Syndicate 623 is a dispensable party and that, with its removal, the jurisdictional defect alleged by Underwriters is cured.[100]

To the extent Underwriters contends that dismissal of Syndicate 623 prevents this Court from ordering any relief under the Excess Policy, Underwriters' contention is without merit. Underwriters' position is premised on the fact that the Excess Policy provides that liability attaches once the Underwriters of the underlying policies "have paid or admitted liability or have been held liable to pay, the full amount of their indemnity inclusive of costs and expenses."[101] That position, however, incorrectly assumes that for liability under the Excess Policy to attach, Plaintiffs must obtain judgments against every Syndicate subscribing to the D&O Policy. The Service of Suit provisions of the D&O Policy and the Excess Policy provide that "in any suit instituted against any one of them upon this contract, Underwriters will abide by the final decision of

---

[99] *See* D&O Policy [Doc. #22-7] at App. 000192.

[100] *See Grupo DataFlux*, 541 U.S. at 572; *see also Ralli-Coney, Inc. v. Gates*, 528 F.2d 572, 575 (5th Cir. 1976).

[101] *See* Underwriters' Response to Plaintiffs' Motion to Dismiss [Doc. #29].

such Court or of any Appellate Court in the event of appeal."[102] The Fifth Circuit
has held that the Syndicates subscribing to Underwriters' policies of insurance
have no independent legal identity.[103] In *Corfield*, the Fifth Circuit, addressing a
nearly identical service of suit clause as at issue here, held that a Syndicate is a
creature of administrative convenience through which individual investors, called
"Names," can subscribe to an Underwriters policy.[104] A Syndicate bears no liability
for the risk on an Underwriters policy. Rather, all liability is born by the individual
Names who belong to the various Syndicates that have subscribed to a policy.[105]
According to the Fifth Circuit, each of Underwriters' members, or "Names," are
bound on an individual basis to the insured to adhere to any adverse judgment
notwithstanding that only one Name participates in the litigation as a named
party.[106] Because Syndicates have no legal identities and are not liable for the risks
on Underwriters' policies of insurance, and because any coverage ruling this Court
makes will bind all "Names," Plaintiffs are not required to obtain judgments
against every Syndicate subscribing to the D&O Policy for liability under the

---

[102] *See* D&O Policy [Doc. #22-7] at App. 000192; Excess Policy [Doc. #22-8] at App. 000208–09.

[103] *See Corfield*, 355 F.3d at 858.

[104] *See id.*

[105] *See id.*

[106] *See id.* at 859.

Excess Policy to attach. As such, dismissal of Syndicate 623 has no bearing on this Court's authority to order relief under the Excess Policy.

## 2.    This Court has Proper Jurisdiction

In their Motion to Dismiss Plaintiffs' Second Amended Complaint, Underwriters also claim that this Court lacks jurisdiction over this coverage dispute because Judge Godbey possesses *exclusive* jurisdiction over this dispute.[107] In the SEC Action, the same contention is made in Underwriters' Motion to Transfer Case as a "Tag-Along Action."[108] By Order dated December 16, 2009 in the SEC Action, Judge Godbey held that this Court is better situated than the United States District Court for the Northern District of Texas to determine whether Underwriters are obligated to pay Plaintiffs' legal fees in the Criminal Action.[109] Although Judge Godbey held that he stands prepared to determine whether Underwriters are obligated to fund Plaintiffs' defenses in the SEC Action, Judge Godbey held that this Court is free to determine Underwriters' obligations in the SEC Action as well as the Criminal Action, if judicial economy warrants such a determination.[110] Indeed, judicial economy does warrant determination by this

---

[107] *See* Underwriters' Motion to Dismiss [Doc. #14].

[108] *See* Underwriters' Motion to Transfer Case as a "Tag-Along Action" [Doc. #27-1].

[109] *See* December 16, 2009 Order in the SEC Action [Doc. #926 (Civil Action No. 3:09-CV-298-N)].

[110] *See* December 16, 2009 Order in the SEC Action [Doc. #926 (Civil Action No. 3:09-CV-298-N)] at 3.

Court of Underwriters' obligations under the relevant policies of insurance in a single proceeding. Underwriters' obligations under the insurance policies with respect to the SEC Action and the Criminal Action are virtually the same, and severance of the claims could lead to inconsistent results. Further, the claims made with respect to the SEC Action and the Criminal Action involve common questions of law and fact. Accordingly, as there is no prohibition against the exercise by this Court of jurisdiction over this proceeding, this proceeding is properly before this Court.

### B.   The Evidence

The evidence introduced by Plaintiffs and by Defendants at the December 17, 2009 hearing demonstrates that the material facts largely are undisputed. In support of their Motion for Preliminary Injunction, Plaintiffs introduced into evidence twenty-five (25) exhibits attached to their brief and supplemental brief and Plaintiffs requested that the Court take judicial notice of all pleadings and other documents filed in the Criminal Action and in this proceeding.[111] Defendants objected to the documents introduced into evidence by Plaintiffs to the extent that the documents refer to communications between counsel that, according to Underwriters, are not relevant to the issues currently before the Court. In particular, Underwriters raised concerns that the affidavits and other

---

[111] *See* Plaintiffs' Brief in Support of Motion for Preliminary Injunction [Doc. #22]; Plaintiffs' Supplemental Brief in Support of Motion for Preliminary Injunction [Doc. #32].

correspondence would be used by this Court to conclude that coverage exists by waiver or estoppel. As previously noted, this Court's ruling is not based on any theory of waiver or estoppel. Accordingly, this Court **OVERRULES** Defendants' objections.

Defendants introduced into evidence the 28 exhibits attached to their Response in Opposition to Plaintiffs' Request for a Preliminary Injunction without objection from Plaintiffs.[112] Defendants also sought to obtain the testimony in open court of all four Plaintiffs in this proceeding concerning the veracity of the allegations made against them in the SEC Action and in the Criminal Action. Defendants claimed that the truth of the allegations made against Plaintiffs in the SEC Action and in the Criminal Action is relevant to Plaintiffs' ability to prove a substantial likelihood of success on the merits. Plaintiffs objected, claiming that their testimony is irrelevant because (1) Defendants' duty to pay defense costs and expenses is governed by the "eight corners" rule, which provides that such duty is determined by the underlying plaintiff's pleadings against the insureds considered in light of the policy provisions, without regard to the truth or falsity of those allegations;[113] (2) the testimony would not be relevant since Defendants already

---

[112] *See* Underwriters' Response in Opposition to Plaintiffs' Request for a Preliminary Injunction [Doc. #31].

[113] *See Nat'l Union Fire Ins. Co. of Pittsburgh v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997). Under the "eight corners" rule, all doubts regarding an insurer's duty to pay defense costs and expenses are resolved in favor of the duty. *See Northfield Ins. Co. v.*

denied coverage based on their unilateral determination that the claims made against Plaintiffs invoke the Money Laundering Exclusion; and (3) the Plaintiffs have a constitutional right against self-incrimination and such right affords protection against testifying in this proceeding. The Court overruled Plaintiffs' relevancy objections for purposes of the hearing; however, the Court did not require the Plaintiffs to take the stand. Defendants asked that adverse inferences be drawn from Plaintiffs' assertion of their 5th Amendment rights and Defendants filed an Offer of Proof containing the questions that they would have asked had Plaintiffs not sought the protections of the 5th Amendment.[114]

The Court is of the opinion that Plaintiffs' Motion for Preliminary Injunction can be considered based on the documentary evidence and the affidavits introduced into evidence by the parties. Accordingly, the Court sustains its ruling that the Plaintiffs need not testify in this proceeding. The potential impact of Plaintiffs' invocation of their constitutional right not to testify is addressed below.

---

*Loving Home Care, Inc.*, 363 F.3d 523, 528 (5th Cir. 2004) (citing *King v. Dallas Fire Ins. Co.*, 85 S.W.3d 185, 187 (Tex. 2002)). "Thus, the duty to defend arises only when the facts alleged in the complaint, if taken as true, would *potentially* state a cause of action falling within the terms of the policy." *Id.* (citing *Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins. Co.*, 99 F.3d 695, 701 (5th Cir. 1996) (applying Texas law)). "[I]n case of doubt as to whether or not the allegations of a complaint against the insured state a cause of action within the coverage of a liability policy sufficient to compel the insurer to defend the action, such doubt will be resolved in the insured's favor." *Id.* (quoting *Merchants Fast Motor Lines*, 939 S.W.2d at 141). "Facts ascertained before suit, developed in the process of litigation, or determined by the ultimate outcome of the suit do not affect the duty to defend." *Id.* (citation omitted). These standards for applying the "eight corners" rule were just recently re-affirmed by the Fifth Circuit. *See Trinity Universal Ins. Co. v. Employers Mut. Cas. Co.*, 2010 WL 6903 (5th Cir. Jan. 4, 2010).

[114] *See* Underwriters' Offer of Proof [Doc. #34].

### C.    <u>Plaintiffs have met their Burden of Proof and a Preliminary Injunction is Warranted in this Case</u>

The evidence introduced by Plaintiffs supports the issuance of a preliminary injunction requiring Underwriters to pay all "Costs, Charges and Expenses" already incurred, and those incurred in the future until a ruling on the merits is made in the Declaratory Judgment Action or until the applicable policy limits are exhausted.

### 1.    There is a Substantial Likelihood that Plaintiffs Will Prevail on the Merits

The likelihood of success need not be one of absolute certainty for a preliminary injunction to issue.[115] It is enough that the movants have raised questions going to the merits so serious, substantial, and doubtful as to make them fair ground for litigation, and thus for more deliberate investigation.[116] Further, when the other factors are strong, showing of some likelihood of success on the merits will justify an injunction.[117]

---

[115] *See Cho v. Itco, Inc.*, 782 F. Supp. 1183, 1185 (E.D. Tex. 1991); *Sebastian v. Tex. Dept. of Corrections*, 541 F. Supp. 970, 975 (S.D. Tex. 1982).

[116] *See Cho*, 782 F. Supp. at 1185; *Sebastian*, 541 F. Supp. at 975.

[117] *See Cho*, 782 F. Supp. at 1185.

### a.    This Coverage Dispute is Governed by Texas' "Eight Corners" Rule.

At the outset, it is important to note that, while Underwriters do not have a *duty to defend* under the terms of the D&O Policy,[118] Underwriters are obligated to contemporaneously *advance* defense costs and expenses under the terms of the D&O Policy. More specifically, the D&O Policy states:

> It shall be the duty of the Directors and Officers or the Company and not the duty of the Underwriters to defend Claims, provided that no Costs, Charges or Expenses shall be incurred without the Underwriter's [*sic*] prior written consent, such consent not to be unreasonably witheld [*sic*]. *In the event of such consent being given, and subject to all other terms and provisions of the Policy including but not limited to Article V. of this Policy, the Underwriters shall pay Costs, Charges and Expenses no more than once every 60 days.*[119]

Importantly, because of the obligation to pay "once every 60 days," it is clear the obligation is one that arises contemporaneously with the incurrence of defense costs and expenses—albeit on a 60-day payment cycle.[120] In *Little*, the Third

---

[118] *See* D&O Policy [Doc. #22-7] at App. 000169.

[119] *See* D&O Policy [Doc. #22-7] at App. 000169 (emphasis added). In this regard, Underwriters' duty may not be stated as clearly as found in some other policies. *See, e.g., In re WorldCom, Inc. Securities Litigation*, 354 F. Supp. 2d 455, 459 (S.D.N.Y. 2005) ("NOTICE: . . . THE INSURER MUST ADVANCE DEFENSE COSTS PAYMENTS PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM."). Nevertheless, the obligation to pay defense costs remains the same. *Cf. G-I Holdings, Inc. v. Reliance Ins. Co.*, 2006 WL 776809 (D.N.J. Mar. 24, 2006) (finding that an insurer was obligated to advance defense costs because it agreed to pay Loss, including defense costs, "which the Directors and Officers shall become *legally obligated to pay* as a result of a Claim") (emphasis added).

[120] *See G-I Holdings*, 2006 WL 776809, at *2 (finding that the insurer's duty to pay those defenses costs "arises contemporaneously with the director['s] or officer's obligation to pay those costs"); *Little v. MGIC Indem. Corp.*, 836 F.2d 789, 793 (3rd Cir. 1987), *reh'g den.* (3rd Cir. 1988). (finding same). And, as noted previously, the Excess Policy follows form to the D&O Policy. *See* Excess Policy [Doc. #22-8] at App. 000205.

Circuit Court of Appeals addressed a similar provision that was coupled with an "option" clause, enabling the insurer to "at its option and on request, advance . . . expenses" subject to reimbursement.[121] Because of the existence of the "option" clause, the court found that the policy was ambiguous and construed it in favor of the insured.[122] The lack of an "option" clause in the instant D&O Policy, however, makes the requirement of advancement or reimbursement of defense costs and expenses even more clear. Moreover, even if the Plaintiffs do not have the ability to repay Underwriters should coverage ultimately not exist, the insurer still must advance defense costs.[123]

Here, the Plaintiffs requested and obtained consent to incur "Costs, Charges and Expenses" from Underwriters.[124] After incurring those fees, though, Underwriters attempted to retroactively deny coverage, withdrew its consent to incur additional "Costs, Charges and Expenses" and refused to pay "Costs,

---

[121] *Little*, 836 F.2d at 793.

[122] *See id.* The logic employed by the Third Circuit was followed by Judge Melinda Harmon in *In Re Enron Corp. Securities, Derivative & "ERISA" Litigation*, 391 F. Supp. 2d 541, 573–75 (S.D. Tex. 2005) ("The majority of courts have concluded that the insurer must pay the defense costs as incurred.").

[123] *See Fidelity Fed. Sav. & Loan Ass'n v. Felicetti*, 830 F. Supp. 262, 267 (E.D. Pa. 1993) (interpreting *Little* to require the advancement of corporate director's defense costs despite his inability to repay); *Associated Elec. & Gas Ins. Servs., Ltd. v. Rigas,* 382 F. Supp. 2d 685, 697 (E.D. Pa. 2004) (requiring advancement of defense costs despite insurer's argument that it would never be able to obtain reimbursement); *Great Am. Ins. Co. v. Gross*, 2005 WL 1048752, *5 (E.D. Va. 2005) (same).

[124] *See, e.g.*, May 1, 2009 Letter to Plaintiff Stanford [Doc. #22-9]; May 1, 2009 Letter to Plaintiff Holt [Doc. #22-10]; October 30, 2009 Letter to Plaintiff Lopez [Doc. #22-11].

Charges and Expenses" already incurred. That attempt, however, was in error because, in doing so, Underwriters relied on extrinsic evidence to defeat its contractual obligations under the policies in contravention of Texas law. And, even if Underwriters could rely on such extrinsic evidence, a contractual obligation to pay "Costs, Charges and Expenses" still would exist.

To be clear, at issue here is Underwriters' obligation to advance and/or reimburse "Costs, Charges and Expenses"—that is, *defense* costs and not indemnity payments.[125] Plaintiffs contend that this issue is governed by Texas' "eight corners" rule. Underwriters, on the other hand, contend that the "eight corners" rule does not apply to the issue. Instead, Underwriters argue that they can rely on extrinsic evidence—that is: (1) the guilty plea by James Davis along with his allocution; (2) findings made by Judge O'Connor in response to the SEC's request for emergency relief; and (3) findings made by Judge Godbey in connection with the entering of a preliminary injunction.[126]

---

[125] While the Policies clearly treat "Costs, Charges and Expenses" as "Loss," it also is clear that the policies treat "Costs, Charges and Expenses" differently than any other category of "Loss." For example, nowhere in the Policies do the Underwriters subject themselves to advance payment of any other "Loss" pending a trial on the merits. *Cf.* D&O Policy [Doc. #22-7] at App. 000169 (requiring payment of defense costs and expenses on a 60-day cycle).

[126] In Underwriters' Response to Plaintiffs' Motion for Preliminary Injunction [Doc. #31], Underwriters also rely on the Declaration of Karyl Van Tassel attached to Appendix in Support of Receiver's Motion for Order Freezing Assets Held in the Name of Certain Relief Defendants and for Summary Judgment and Brief in Support Thereof filed in the SEC Action [Doc. #31-8]. And, although not referenced in their Response, at the hearing Underwriters also relied on the Declaration of James R. Scarazzo, which also was filed in the SEC Action [Doc. #142-9 ((Civil Action No. 3:09-CV-298-N)]. Both declarations were made by individuals hired by the Receiver

Although this Court recognizes that the D&O Policy does not provide for a duty to defend, other courts have concluded that the "eight corners" analysis should apply to a contractual obligation to advance and/or reimburse defense costs and expenses in the absence of a contractual duty to defend.[127] In *Julio & Sons*, for example, the federal district court noted that it could find no decisions by Texas courts concerning a different standard for the duty to advance defense costs under a D&O policy.[128] Accordingly, because the reasons for applying the "eight corners" rule to the duty to defend "appear to apply equally to the duty to advance described in the Policy," the court applied that rule to determine whether an insurer had a duty to advance defense costs to its insured.[129] Similarly, the Western District of Texas recently found that an insurer's duty to contemporaneously reimburse defense costs also is governed by Texas' "eight corners" rule even though the

---

and they were filed by the Receiver in the SEC Action in support of the claims made against the Defendants therein.

[127] *See Julio & Sons Co. v. Travelers Cas. & Surety Co. of Am.*, 591 F. Supp. 2d 651, 659 (S.D.N.Y. 2008) (applying Texas law and finding that the "eight corners" rule applies in the context of a D&O policy); *Basic Energy Servs., Inc. v. Liberty Mut. Ins. Co.*, 2009 WL 2998134 (W.D. Tex. Sept. 18, 2009) (applying "eight corners" rule to the advancement of defense costs even when insurer had no duty to defend).

[128] *See Julio & Sons*, 591 F. Supp. 2d at 659.

[129] *Id.* (citing *Lowy v. Travelers Prop. & Cas. Co.*, 2000 WL 526702, at *2 n.1 (S.D.N.Y. May 2, 2000); *GuideOne Elite Ins. Co. v. Fielder Road Baptist Church*, 197 S.W.3d 305, 309 (Tex. 2006)). The *Julio & Sons* court reviewed extrinsic evidence in reaching its decision. It did so, however, before the Supreme Court of Texas reiterated that it has never recognized an exception to the "eight corners" rule. *See, e.g.*, *Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 497–98 (Tex. 2008).

insurer had no "duty" to defend.[130] In addition, the *Basic Energy* court correctly recognized that the Supreme Court of Texas has not recognized any exception to the "eight corners" rule.[131]

Even though the cases cited by Plaintiffs supporting application of the "eight corners" rule to a duty to advance or reimburse defense costs and expenses are not binding on this Court, the logic employed by those courts that have applied the "eight corners" rule is persuasive. If a contemporaneous duty to advance or reimburse defense costs were judged on an "actual facts" basis, an insurer's contractual obligation to pay defense costs could change on a daily basis as additional facts are developed. This Court, therefore, concludes that the contractual obligation to pay defense costs contained within the D&O policy is governed by the "eight corners" rule. In addition, despite Underwriters' arguments to the contrary, this Court concludes that the Supreme Court of Texas never has

---

[130] *See Basic Energy Servs.*, 2009 WL 2998134 at *6 ("To wait until the conclusion of the underlying state lawsuit, as would be required if the Court were to use the 'actual facts,' could potentially delay reimbursement or could completely nullify any such obligation if the insured were not adjudicated responsible for the underlying occurrence."). During the hearing, Underwriters attempted to dismiss *Basic Energy* as having been decided without a true analysis of the "eight corners" issue. To the contrary, it is clear from the opinion that the court carefully considered whether to apply the "eight corners" standard or the "actual facts" analysis and the issue was essential to the holding given that the court granted the insured's motion to strike all of the extrinsic evidence that the insurer sought to rely on in disclaiming its obligation to pay defense costs. *Id.* at *8.

[131] *Id.* at *7–*8.

recognized any exception to that rule.[132] In fact, the Supreme Court of Texas recently said that the "analysis of the duty to defend has been strictly circumscribed by the eight-corners doctrine."[133]

For this reason, Underwriters' reliance on James Davis' plea and allocution, Judge O'Connor's findings in connection with the appointment of a receiver, Judge Godbey's findings in connection with a preliminary injunction, and the declarations of James R. Scarazzo and Karyl Van Tassel is misplaced and contrary to Texas law.[134] Further, because an insurer's obligation to pay defense costs is

---

[132] *See Nokia*, 268 S.W.3d at 497–98. *See also Mary Kay Holding Corp. v. Federal Ins. Co.*, 309 F. App'x 843, 848 (5th Cir. 2009) ("While appreciating the arguments for a limited 'coverage' exception to the 'eight-corners rule,' we recognize that Texas has yet to adopt such an exception.") (citing *Nokia*, 268 S.W.3d at 497); *Northfield Ins. Co. v. Loving Home Care, Inc.*, 363 F.3d 523, 531 (5th Cir. 2004) (making an *Erie* guess that Texas would *not* allow extrinsic evidence and, in doing so, refusing to admit extrinsic evidence of a criminal conviction in determining the duty to defend). While *Northfield* has been cited as recognizing a limited exception to the "eight corners" rule, a careful review of the opinion reveals that the Fifth Circuit's discussion of a limited exception was an alternative holding and that the actual *Erie* guess made by the Fifth Circuit was that Texas would not recognize any exception. *See Northfield*, 363 F.3d at 531. The Fifth Circuit's *Erie* guess has proven to be correct. *See, e.g., AccuFleet, Inc. v. Hartford Fire Ins. Co.*, 2009 WL 2961351 (Tex. App.—Houston [1st Dist.] Sept. 17, 2009, no pet. h.) ("We decline to create an exception to the eight corners rule under the facts of this case and consider this extrinsic evidence to determine the existence of a duty to defend. The Texas Supreme Court has not recognized such an exception to the eight-corners rule. To the contrary, in cases in which the Texas Supreme Court has been asked to acknowledge exceptions to the rule, it has declined to do so.").

[133] *See D.R. Horton—Texas, Ltd. v. Markel Int'l Ins. Co., Ltd.*, 2009 WL 4728008 (Tex. Dec. 11, 2009).

[134] Underwriters rely on the decision in *Ooida Risk Retention Group, Inc. v. Williams*, 579 F.3d 469, 475–76 (5th Cir. 2009), for the proposition that a limited exception to the "eight corners" rule exists. Although *Ooida* does recognize a limited exception to the "eight corners" rule to enable a Court to consider "readily ascertainable facts relevant to coverage," such as whether or not a tortfeasor is an insured, the Fifth Circuit made clear in *Ooida* that extrinsic evidence bearing on the truth or falsity of any facts alleged in the underlying case cannot be considered. Other panels of the Fifth Circuit have recognized that no such exception exists. *See Mary Kay*

governed by the "eight corners" rule, Underwriters' attempted reliance on the testimony of the Plaintiffs, or rather, on inferences drawn from their assertion of their 5th Amendment rights, similarly is misplaced and contrary to Texas law.

At the December 17, 2009 hearing, Underwriters tendered an Offer of Proof containing the questions that they would have asked each Plaintiff had they been required to testify.[135] Underwriters claim that under TEX. R. OF EVID. 513(c), the Court should draw inferences of guilt from Plaintiffs' assertions of their privileges against self-incrimination and that those inferences preclude Plaintiffs from proving their likelihood of success on the merits.[136] Just like James Davis' plea and allocution, any inferences to be drawn from Plaintiffs' assertions of their 5th Amendment rights are extrinsic evidence beyond the "eight corners" of the

---

*Holding Corp. v. F.I.C.,* 309 F. App'x 843, 848 (5th Cir. 2009); *Basic Energy Servs., LP v. Great Northern Ins. Co.,* 2009 WL 3092455 (5th Cir. Sept. 29, 2009). Recently, Judge Rosenthal of the Southern District recognized that some confusion exists among the courts. *See Pennzoil-Quaker State Co. v. Am. Int'l Specialty Lines Ins. Co.,* 2009 WL 2905823 (S.D. Tex. Sept. 4, 2009). While this Court likewise acknowledges some confusion on the issue, Texas courts have been clear that extrinsic evidence *cannot* be used when it touches on the merits of the underlying claims against the insured or even when the evidence overlaps between liability and coverage. *See GuideOne Elite Ins. Co. v. Fielder Road Baptist Church,* 197 S.W.3d 305, 310 (Tex. 2006); *Pine Oak Builders, Inc. v. Great Am. Lloyds Ins. Co.,* 279 S.W.3d 650, 654–55 (Tex. 2009). Here, no doubt exists that the extrinsic evidence sought to be introduced by Underwriters goes to the very merits of the Plaintiffs' liability in both the SEC Action and the Criminal Action and thus—even if an exception to the "eight corners" rule exists—the proffered evidence would not fall within any purported exception and, therefore, cannot be considered for purposes of determining whether defense costs are owed by Underwriters.

[135] *See* Underwriters' Offer of Proof [Doc. #34].

[136] FED. R. OF EVID. 501 provides that, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness shall be determined in accordance with State law.

relevant policy and the underlying complaints.[137] Accordingly, Plaintiffs' refusal to testify is not relevant to their likelihood of success on the merits, which is wholly dependent on the contents of the relevant policies of insurance and on the underlying allegations made against Plaintiffs in the SEC Action and in the Criminal Action. Indeed, it is settled that evidence bearing on the liability of the insureds for the claims made against them is extrinsic evidence that is irrelevant and inadmissible insofar as the insurer's obligation to pay defense costs and expenses is concerned.[138] Simply put, the truth or falsity of the allegations made against Plaintiffs in the SEC Action and the Criminal Action has no bearing on Underwriters' obligations to contractually pay defense costs and expenses.

Moreover, it would contravene the very purpose of the D&O Policy—as well as the policy language itself[139]—to require Plaintiffs to prove their innocence before being entitled to defenses under the policy. Plaintiffs have denied the allegations made against them in the Criminal Action and in the SEC Action. The D&O Policy cannot be interpreted so as to provide Underwriters, who agreed to pay defense costs and expenses, the right to cross-examine their own insureds prior

---

[137] *See Northfield*, 363 F.3d at 532 (applying the "eight corners" rule and affirming Judge Gilmore's refusal to consider evidence of a criminal conviction). If a criminal conviction is inadmissible extrinsic evidence under the "eight corners" rule, the "eight corners" rule certainly precludes consideration of a mere inference.

[138] *See GuideOne*, 197 S.W.3d at 308; *Pine Oak Builders*, 279 S.W.3d at 653.

[139] Underwriters are obligated under the D&O Policy to pay defense costs and expenses for Claims made against the insureds arising from their alleged Wrongful Acts. *See* D&O Policy [Doc. #22-7] at App. 000159.

to the conclusion of the underlying cases in which they deny any wrongdoing. Because the truth or falsity of the allegations made against Plaintiffs is irrelevant to Underwriters' contractual duty to advance defense costs, and because the Court sustains Plaintiffs' objection with respect to any testimony from the insureds, the Court need not consider any inferences arising from Plaintiffs' assertions of their 5th Amendment rights. But, even if this Court were to consider the "inference" as set forth by TEX. R. OF EVID. 513(c), this Court holds that an "inference" does not equate to an "in fact" determination as required to negate the contractual obligation to advance defense costs and expenses.[140]

### b.  Coverage Exists Under the "Eight Corners" Rule

Although counsel for Underwriters appeared to equivocate at the hearing, the actions of Underwriters demonstrate a recognition that the *allegations* in the SEC Action and the Criminal Action are sufficient to trigger a potential for coverage under the policies. In fact, Underwriters agreed to pay defense costs and expenses for the Plaintiffs for several months based on the allegations in the SEC

---

[140] *See Blake v. Dorado*, 211 S.W.3d 429, 433–34 (Tex. App.—El Paso 2006, no pet.) (holding that a claim of privilege is not a substitute for relevant evidence—without more, the negative inference that the trial court can draw from a claim of privilege cannot rise beyond "mere suspicion"). In the criminal context, the United States Supreme Court has distinguished permissive inferences, which allow, but do not require the trier of fact to credit or reject inferences and which do not shift the burden of proof to the defendant, from mandatory presumptions, which instruct the trier of fact that he or they *must* find the elemental fact upon proof of the basic fact, at least unless the defendant has come forward with some evidence to rebut the presumed connection between the two facts. *See Virginia v. Black*, 538 U.S. 343, 397, 123 S.Ct. 1536, 1567 (2003). Even if inferences can be drawn in this case from Plaintiffs' assertions of their 5th Amendment rights, such inferences fall short of "in fact" determinations.

Action and the Criminal Action. Moreover, in denying coverage and the payment of "Cost, Charges and Expenses," Underwriters exclusively relied on extrinsic evidence and have not set forth any credible argument that the *allegations*, in and of themselves, defeat the contractual obligation to pay defense costs and expenses.[141]

Having concluded that the "eight corners" rule applies, and although it does not appear to be in dispute, this Court notes that the allegations against the Plaintiffs in the SEC Action and Criminal Action are sufficient to satisfy the insuring clause of the D&O Policy.[142] More specifically, the Plaintiffs all qualify as "Directors and Officers" because they are directors and officers of an insured company.[143] Moreover, the allegations raised in the SEC Action and the Criminal Action constitute a "Claim" because those lawsuits are "judicial or administrative proceeding[s] initiated against any of the Assureds in which they may be subjected to a binding adjudication of liability for damages or other relief, including any appeal therefrom."[144] Further such Claims are for "Wrongful Acts" because they allege "actual or alleged error[s], act[s], omission[s], misstatement[s], misleading

---

[141] *See* November 16, 2009 Letter to Plaintiff Holt [Doc. #22-18]; November 16, 2009 Letter to Plaintiff Kuhrt [Doc. #22-19]; November 16, 2009 Letter to Plaintiff Stanford [Doc. #22-20]; November 16, 2009 Letter to Plaintiff Lopez [Doc. #22-21].

[142] Again, because the Excess Policy "follows form," the Excess Policy is subject to the same terms and conditions as the D&O Policy.

[143] *See* D&O Policy [Doc. #22-7] at App. 000161.

[144] D&O Policy [Doc. #22-7] at App. 000160.

statement[s], neglect or breach of duty or negligent act[s] by, or any other matter claimed against, the Directors and Officers whilst acting in their capacity as . . . directors or officers of the Company."[145]

Because the insuring agreement is satisfied, this Court now will focus on the exclusions.[146] The crux of Underwriters' November 16, 2009 denial of coverage was the application of the Money Laundering Exclusion in the D&O Policy. In particular, Underwriters claimed that James Davis' guilty plea of August 27, 2009, his accompanying allocution, Judge O'Connor's February 17, 2009 Order in which the Court found good cause to believe that improper means were used to obtain investor funds and assets justifying a temporary restraining order against Plaintiffs and the Honorable David Godbey's "findings of fact" in a preliminary injunction all can be used to "determine" that Money Laundering did "in fact" occur.[147] Underwriters are wrong.

Although Underwriters cite to the Fraud Exclusion, it does not appear that Underwriters contend that the Fraud Exclusion negates its contractual obligation to

---

[145] D&O Policy [Doc. #22-7] at App. 000162.

[146] An insurer that relies on policy exclusions or other affirmative defenses to defeat its obligations under the policy has the burden to prove that one or more of the exclusions defeat coverage. *See Guar. Nat'l Ins. Co. v. Vic Mfg. Co.,* 143 F.3d 192, 193 (5th Cir. 1998). *See also* TEX. INS. CODE ANN. § 554.002 ("The insurer has the burden of proof as to any avoidance or affirmative defense . . . .").

[147] *See* November 16, 2009 Letter to Plaintiff Holt [Doc. #22-18]; November 16, 2009 Letter to Plaintiff Kuhrt [Doc. #22-19]; November 16, 2009 Letter to Plaintiff Stanford [Doc. #22-20]; November 16, 2009 Letter to Plaintiff Lopez [Doc. #22-21].

pay defense costs and expenses.[148] The Fraud Exclusion, in contrast to the Money Laundering Exclusion, contains language requiring Underwriters to pay defense costs and expenses to the insureds until a "final adjudication" against such insureds is reached and the determination is made that fraud "in fact" occurred. Courts in Texas, and across the country, have recognized that such "final adjudication" language means just that—a final adjudication.[149] "In addition, the 'final adjudication' requirement of these exclusions implies that where the insured is not found guilty, there is coverage for his costs and expenses in defending himself in a criminal action where the loss arises out of a wrongful act committed in his capacity as an officer or director . . . ."[150]

Although the Money Laundering Exclusion does not contain "final adjudication" language, it does not serve as an escape hatch for Underwriters under the "eight corners" rule because it still requires a "determination . . . in fact" that "Money Laundering" occurred. As Underwriters have recognized, "mere

---

[148] *See* November 16, 2009 Letter to Plaintiff Holt [Doc. #22-18]; November 16, 2009 Letter to Plaintiff Kuhrt [Doc. #22-19]; November 16, 2009 Letter to Plaintiff Stanford [Doc. #22-20]; November 16, 2009 Letter to Plaintiff Lopez [Doc. #22-21].

[149] *See In re Enron Corp. Securities, Derivative & "ERISA" Litigation*, 391 F. Supp. 2d 541, 572 (S.D. Tex. 2005) (holding that "final adjudication" means that there must be a "final adjudication" by a judge finding the insureds committed or attempted acts of dishonesty and fraud to preclude coverage) (citing *Nat'l Union Fire Ins. Co. v. Brown*, 787 F. Supp 1424, 1429 (S.D. Fla. 1991), *aff'd*, 963 F.2d 385 (11th Cir. 1992)).

[150] *Id.* at 572–73.

allegations" are not enough to establish an "in fact" determination.[151] Rather, at the very least, an "in fact" determination requires some "objectively verifiable" information.[152] Even so, and as will be discussed, the language of the Money Laundering Exclusion begs the question as to "who" gets to make the "in fact" determination.

Prior to reaching that issue, however, the Court notes that the Fifth Circuit has addressed the scope of an "in fact" exclusion in the context of a D&O policy.[153] In *Willis*, the insured did not tender a claim to his carrier when a suit was filed against him for, among other things, fraud, fraud in the inducement and statutory fraud in a stock transaction because of an exclusion in his policy for claims "arising out of, based on, or attributable to the committing *in fact* of any

---

[151] *See* Underwriters' Proposed Order in Criminal Action [Doc. #22-24] at App. 000345.

[152] *See PMI Mortgage Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 2006 WL 825266 (N.D. Cal. Mar. 29, 2006) (noting that in light of the fact that the "in fact" language is not included in every exclusion, "in fact" must mean something more than "mere allegations"); *St. Paul Mercury Ins. Co. v. Foster*, 268 F. Supp. 2d 1035 (C.D. Ill. 2003) (finding that St. Paul's position that mere allegations of illegal profit can trigger an "illegal profit" exclusion "untenable" because that would render "in fact" "superfluous"; thus, determination of the application of the exclusion had to await resolution of the underlying litigation); *Federal Ins. Co. v. Cintas Corp.*, 2006 WL 1476206, *6–*7 (S.D. Ohio 2006) (finding that an exclusion precluding coverage in the event the insured gained personal profit, "in fact", did not preclude coverage because it had not been determined in the underlying action, or in the declaratory judgment action that the insured obtained personal profit and that any such profit was illegal); *Am. Chem. Soc'y v. Leadscope*, 2005 WL 1220746, *11 (Ohio Ct. App. May 24, 2005) (finding that the language "in fact" requires a final determination that an act of conversion took place resulting in profit or an advantage); *Chicago Ins. Co. v. Capwill*, 2009 WL 3063351, *6–*8 (N.D. Ohio Sept. 21, 2009) (finding that exclusion for claims "arising out of the insured gaining, in fact, any personal profit or advantage" requires a final adjudication).

[153] *See Nat'l Union Ins. Co. v. Willis*, 296 F.3d 336 (5th Cir. 2002).

criminal or deliberate fraudulent act."[154] On receipt of the Fourth Amended Petition against him, however, Willis did notify his carrier of the claim when the plaintiffs added a claim for negligent misrepresentation. The carrier, however, denied coverage because of late notice, arguing that Willis should have provided notice in 1998—not 2000—when he was first notified of circumstances that could reasonably be expected to give rise to a claim.[155] In support of its position that late notice barred coverage, the insurer argued that the express language of the policy was clear that "only a finding that the insured *actually committed* the alleged criminal or deliberate fraudulent act will make the exclusion applicable."[156] Accordingly, the insured was required to give notice because the potential for a covered claim existed. The Court agreed, finding that "[w]hether a director or officer ultimately is found to have committed a wrongful act based on the legal theory of tortious conduct, be it intentional or negligent, is irrelevant for requiring notification under the claims-made policy in this case."[157] The same language should have the same meaning here.

The Fraud Exclusion illustrates exactly why Underwriters' denial of coverage at this stage of the proceedings is wrong. As Underwriters recognize, the

---

[154] *Id.* at 338 (emphasis added).

[155] *See id.*

[156] *Id.* at 341 (emphasis added).

[157] *Id.* at 343.

Plaintiffs have been accused of mail fraud, wire fraud, securities fraud, conspiracy to commit such frauds, conspiracy to obstruct an SEC investigation, obstruction of an SEC investigation *and* conspiracy to commit money laundering. In other words, there are many more allegations than those attributed to money laundering as that term is defined in the D&O Policy. The remaining allegations—those pertaining to fraud in particular—clearly require a "final adjudication" *before* Underwriters can withdraw from its contractual obligation to pay for defense costs and expenses.

Underwriters argue that the Money Laundering Exclusion is broad, encompassing more than just money laundering *per se*. Although the exclusion may be broadly written, Underwriters' contention has a fatal flaw—if the Money Laundering Exclusion is so broad that it encompasses even allegations of fraud, then the Money Laundering Exclusion completely envelops and "swallows up" the Fraud Exclusion in its entirety. And, in that event, the insureds' right to "Costs, Charges and Expenses" until "final adjudication" vanishes as well. Such a construction violates well-settled contract interpretation principles that an exclusion should not be interpreted so as to render other parts of the policy, including other exclusions, mere surplusage.[158]

---

[158] *See Balandran v. Safeco Ins. Co.*, 972 S.W.2d 738, 740 (Tex. 1998) (applying general rules of contract interpretation to an insurance policy); *Nat'l Union Fire Ins. Co. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995) (noting that a policy must be read such that all provisions have meaning and the interpretation of one provision cannot render another inoperative).

Insurance contracts are subject to the same rules of construction as other contracts.[159] Courts should read all parts of the contract together to give meaning to every sentence, clause, and word to avoid rendering any portion inoperative.[160] If a contract is subject to two or more reasonable interpretations, it is ambiguous.[161] Where an ambiguity involves an exclusionary provision of an insurance policy, courts must adopt the construction urged by the insured as long as that construction is not unreasonable, *even* if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent.[162] Whether an insurance policy contains an ambiguity is a matter of law for the court to decide.[163]

As stated above, in their denials of coverage, Underwriters relied on the Money Laundering Exclusion of the D&O Policy.[164] Underwriters admit that the Fraud Exclusion does not preclude coverage because fraud has not been judicially "determined by a final adjudication."[165] Underwriters, however, contend that the Money Laundering Exclusion applied once *Underwriters* "determined that the

---

[159] *See Balandran,* 972 S.W.2d at 740.

[160] *See id.*

[161] *See id.*

[162] *See id.*; *Trinity Universal Ins. Co. v. Employers Mut. Cas. Co.*, 2010 WL 6903 (5th Cir. Jan. 4, 2010).

[163] *See CBI Indus.*, 907 S.W.2d at 521.

[164] *See* November 16, 2009 Letter to Plaintiff Holt [Doc. #22-18]; November 16, 2009 Letter to Plaintiff Kuhrt [Doc. #22-19]; November 16, 2009 Letter to Plaintiff Stanford [Doc. #22-20]; and November 16, 2009 Letter to Plaintiff Lopez [Doc. #22-21].

[165] *See* Underwriters' Response in Opposition to Plaintiffs' Request for Preliminary Injunction [Doc. #31] at 23.

alleged act or alleged acts did in fact occur."[166] The D&O Policy does not define the terms "final adjudication," "in fact," or "determined."

Underwriters interpret the "determined . . . in fact" language as granting *them* the unilateral right to deny coverage once *they* "determine" that Money Laundering "in fact" occurred.[167] If Underwriters intended to be the party entitled to determine that Money Laundering "in fact" occurred, they could have reserved that right for themselves by inserting the words "by Underwriters" after the word "determined," as they did throughout the policy when they reserved certain determinations or rights for themselves.[168] By failing to identify the party entitled to make the "in fact" determination, Underwriters drafted an exclusion that is capable of multiple interpretations.

That is not to say that the "determined . . . in fact" language has no meaning or that it cannot be distinguished from the "final adjudication" language. By way of example only, the Money Laundering Exclusion for a specific Officer or Director could be triggered by a guilty plea by that particular accused Officer or Director. Likewise, by way of further example, an adverse jury verdict before entry

---

[166] Underwriters' Response in Opposition to Plaintiffs' Request for Preliminary Injunction [Doc. #31] at 23.

[167] Underwriters' Response in Opposition to Plaintiffs' Request for Preliminary Injunction [Doc. #31] at 23.

[168] *See, e.g.*, D&O Policy [Doc. #22-7] at App. 000169 ("No Costs, Charges or Expenses shall be incurred without the Underwriter's prior written consent . . . ."). There are many instances throughout the D&O Policy where Underwriters explicitly reserved for itself certain rights and obligations by using the words "We" or "Underwriters."

of a final judgment could conceivably be an "in fact" determination even if it were not considered a "final adjudication."[169] An "in fact" determination also could be interpreted to apply to the entry of a judgment even before that judgment becomes final. All of these interpretations satisfy the "objectively verifiable" requirement of *PMI Mortgage Ins. Co.*, the case relied on by Underwriters, and also distinguish the language from a requirement of a "final adjudication."[170] In fact, it is Underwriters' interpretation that does not require an "objectively verifiable" determination because, according to Underwriters, the policy grants it the right to make a unilateral, subjective determination of its insured's guilt.[171]

---

[169] *See Alexander Mfg., Inc. v. Illinois Union Ins. Co.*, 2009 WL 3335883, *11 (D. Or. Oct. 15, 2009) ("The plain meanings of judgment and adjudication encompass both a decision that a judge renders in the course of a case as well as the final outcome in a case"); *In re Enron Corp. Securities, Derivative & "ERISA" Litigation*, 391 F. Supp. 2d 541, 573 (S.D. Tex. 2005) ("[A] criminal adjudication is not final until a sentence is imposed on the defendant.").

[170] *See PMI Mortgage Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 2006 WL 825266 (N.D. Cal. Mar. 29, 2006) (applying California law). The Court notes that, in *PMI*, the court was interpreting language different than what is in the D&O policy before this Court. More specifically, the issue in *PMI* concerned the distinction between "in fact" and "judicially determined." *Id.* at *7. Accordingly, unlike here, the policy made a distinction between "who" gets to make the coverage determination. It also is worth noting that California courts do not apply the "eight corners" rule that is followed by Texas courts. *See, e.g., Harbison v. Am. Motorists Ins. Co.*, 636 F. Supp. 2d 1030, 1031 (E.D. Cal. 2009) (citing *Waller v. Truck Ins. Exch.*, 900 P.2d 619 (Cal. 1995)).

[171] Underwriters contend that the advancement of defense costs provision following the Money Laundering Exclusion is an "exception" to an exclusion and, thus, Plaintiffs bear the burden of proof. This contention is without merit. The advancement of defense costs provision is not an "exception" to the Money Laundering Exclusion, but rather sets forth what needs to occur *before* Underwriters can refuse to advance defense costs and expenses. If this Court were to consider the advancement of defense costs provision as an exception to an exclusion, it would impermissibly shift the burden of proof with respect to the Money Laundering Exclusion to the Plaintiffs. Moreover, at least under Underwriters' interpretation of the Money Laundering Exclusion, it would put the Plaintiffs in the illogical position of having to prove that *Underwriters* has not made an "in fact" determination. Here again, even if the Court were to rule otherwise as to the

This Court concludes that Plaintiffs have set forth several reasonable interpretations of the Money Laundering Exclusion and, as such, the Court must adopt one of the interpretations urged by Plaintiffs. To the contrary, the Court is not convinced that Defendants have set forth a reasonable interpretation of the Money Laundering Exclusion and, in particular, the Court is not convinced that the D&O Policy can be interpreted to allow Underwriters to make the "in fact" determination. Such an interpretation, in fact, seemingly would eviscerate the specific language that requires Underwriters to continue paying defense costs and expenses even in the face of allegations that otherwise would trigger the exclusion. And, even if this Court were to conclude that Underwriters' interpretation also is reasonable, this Court still would be required to find in favor of Plaintiffs.

The Court need not determine at this stage whether the Money Laundering Exclusion is ambiguous. Rather, for now, it is sufficient that this Court has concluded that Plaintiffs have set forth a reasonable interpretation of the Money Laundering Exclusion and, in doing so, have satisfied their burden of proving a substantial likelihood of success on the merits.

---

burden of proof, this Court concludes that the result would be the same because Underwriters' interpretation that *they* are the ones that get to make the "in fact" determination is not proper or, at the very least, the interpretation of the exclusion is subject to multiple reasonable interpretations.

### c.   Coverage Would Exist Even if this Court Considered the Extrinsic Evidence

Although this Court has concluded that the "eight corners" rule applies and that no exception to the "eight corners" rule exists—at least with respect to the evidence proffered by Underwriters—this Court has taken the further step of analyzing whether Plaintiffs would likely prevail on the merits if the extrinsic evidence is considered. After doing so, this Court concludes that the extrinsic evidence proffered by Underwriters does not defeat the contractual obligation to advance defense costs and expenses because such evidence does not rise to the level of either an "in fact" determination or a "final adjudication."

Notably, Underwriters contend only that the Money Laundering Exclusion is triggered by Mr. Davis' guilty plea, his accompanying allocution, Judge O'Connor's findings justifying a temporary restraining order and Judge Godbey's preliminary injunction order. Under the plain terms of the insurance policy and Texas law, however, those purported "facts" cannot defeat coverage.[172]

While Mr. Davis pleaded guilty, his guilt *cannot* be imputed to other insureds because the insurance policies strictly prohibit such imputation.[173] In particular, within the "Exclusions" section, the D&O Policy specifically provides

---

[172] Although neither the Declaration of James R. Scarazzo [Doc. #142-9 ((Civil Action No. 3:09-CV-298-N)] nor the Declaration of Karyl Van Tassel [Doc. #31-8] were discussed in the letters from Underwriters denying coverage, the statements contained in the declarations similarly are not "facts," but, rather, mere allegations by individuals hired by the Receiver.

[173] *See* D&O Policy [Doc. #22-7] at App. 000168.

54

that "[a]ny Wrongful Act pertaining to any Director or Officer shall not be imputed to any other person for the purposes of determining the applicability of the Exclusions."[174] Moreover, Davis' allocution, in which he accused other insureds of committing the same acts for which he had pleaded guilty, is not "fact" under Texas or federal law.[175] Finally, Underwriters' attempt to use Judge O'Connor's findings in an ex parte *temporary* restraining order—which was a response to the SEC's request for *emergency* relief and was issued the *same day* the SEC's complaint was filed—and Judge Godbey's "findings of fact" in issuing a preliminary injunction in the SEC Action also fails. Both sets of "findings" are preliminary in nature and cannot be used as a basis for triggering an "in fact" exclusion. As one court has noted, "[d]ue to the limited nature of the proceedings resulting in the issuance of a preliminary injunction, any findings of fact and conclusions of law made at this preliminary stage are of no binding effect at the trial on the merits."[176] This is even more so for a temporary restraining order where

---

[174] D&O Policy [Doc. #22-7] at App. 000168.

[175] *See generally* FED. R. CRIM. P. 11(d) & (e) (explaining the process for withdrawing a guilty plea and the finality of a guilty plea). *See also Enron*, 391 F. Supp. at 575 (relying on former FED. R. CRIM. P. 32(d), which now is FED. R. CRIM. P. 11(e), and also on numerous U.S. Supreme Court cases holding that a guilty plea is not a fact until sentencing because it can be withdrawn).

[176] *See Mattive v. Healthsource of Savannah, Inc.*, 893 F. Supp. 1559, 1563 (S.D. Ga. 1995) (citing *Clark v. K-Mart Corp.*, 979 F.2d 965, 969 (3rd Cir. 1992) (citing *University of Texas v. Camenisch*, 451 U.S. 390, 394–95 (1981))). *See also Mylett v. Jeane*, 910 F.2d 296, 299 (5th Cir. 1990) (noting that findings of fact in a preliminary injunction are not binding at a trial on the merits); *Terrazas v. Slagle*, 821 F. Supp. 1162, 1169 (W.D. Tex. 1993) (same). In addition, the orders issued by Judge O'Connor and Judge Godbey do not even apply to all of the Plaintiffs.

findings of fact and conclusions of law generally are not required because such orders are issued in haste and under emergency conditions in order to forestall irreparable harm.[177] Accordingly, even if an exception to the "eight corners" rule applied, Underwriters cannot use those "findings" in order to defeat their contractual obligation to pay defense costs and expenses. For that reason, the consideration of such extrinsic evidence does nothing to alter this Court's conclusion that the Plaintiffs have satisfied their burden of demonstrating that they are substantially likely to prevail on the merits.

## 2. Plaintiffs will Suffer Irreparable Injury if a Preliminary Injunction is not Issued

Defendants introduced no evidence to dispute Plaintiffs' evidence of the irreparable injuries that they will sustain if they are not awarded interim injunctive relief. Irreparable harm is found when, but for the grant of equitable relief, there is a substantial chance that on final resolution of the action the parties cannot be returned to the positions they previously occupied.[178] Where a constitutional right is involved, irreparable injury almost always is found as a matter of law.[179] It is settled that the failure to receive defense costs and expenses when they are incurred

---

*See* Temporary Restraining Order in SEC Action [Doc. #22-25]; Preliminary Injunction in SEC Action [Doc. #22-26].

[177] *See Romer v. Green Point Sav. Bank*, 27 F.3d 12, 16 (2nd Cir. 1994).

[178] *In re WorldCom, Inc. Securities Litigation*, 354 F. Supp. 2d 455, 469 (S.D.N.Y. 2005).

[179] *Flood v. ClearOne Commc'ns, Inc.*, 2009 WL 87006, *6 (D. Utah 2009).

constitutes an immediate and direct injury.[180] Judge Godbey, in fact, held as such in the SEC Action:

> [T]he directors and officers, many of whom deny any knowledge of fraudulent activities, relied on the existence of coverage. They expected D&O proceeds would afford them a defense were they to be accused of wrongdoing in the course of duty. The potential harm to them if denied coverage is not speculative but real and immediate: they may be unable to defend themselves in civil actions in which they do not have a right to court-appointed counsel.[181]

It is impossible to predict or to quantify the impact on a litigant of a failure to have adequate representation.[182] The Court is convinced that the Plaintiffs' defense attorneys, most of whom operate small firms, cannot prepare effective defenses without substantial funds in light of the serious and complex charges made against Plaintiffs.[183] The attorneys have indicated that they cannot afford to advance the defense costs necessary to prepare for trials in the Criminal Action and in the SEC Action and that they will withdraw from representation (or attempt to do so) unless they are paid.[184] That, of course, would leave Plaintiffs without their

---

[180] *WorldCom*, 354 F. Supp. 2d at 469.

[181] October 9, 2009 Order in SEC Action [Doc. #22-17] at App. 000278.

[182] *WorldCom*, 354 F. upp. d at 469.

[183] *See* Affidavit of Kent A. Schaffer [Doc. #22-13]; Affidavit of Jack B. Zimmermann [Doc. #22-22].

[184] *See* Affidavit of Kent A. Schaffer [Doc. #22-13]; Affidavit of Jack B. Zimmermann [Doc. #22-22].

selection of counsel.[185] This issue has constitutional implications in the Criminal Action, but also has drastic effects in the SEC Action because—as Judge Godbey recognized—Plaintiffs do not have a right to court-appointed counsel in the SEC Action.[186]

Plaintiffs require and have a constitutional right to effective representation.[187] Further, an element of the Sixth Amendment right to counsel is the right of a defendant who does not require appointed counsel to choose who will represent him.[188] Because the Receiver appointed in the SEC Action has either seized or requested seizure of all assets belonging to certain Plaintiffs, the only sufficient funds available to enable those Plaintiffs to hire attorneys of their choosing are those provided by the policies issued by Underwriters. Underwriters' conduct in unilaterally acting as judge and jury threatens to deprive Plaintiffs of their right to choose the attorneys who will represent them in the Criminal Action and the SEC Action. Additionally, until it is determined whether Plaintiffs' attorneys are going to be paid, Plaintiffs' attorneys have advised that they cannot

---

[185] *See* Affidavit of Kent A. Schaffer [Doc. #22-13]; Affidavit of Jack B. Zimmermann [Doc. #22-22].

[186] *See* October 9, 2009 Order in SEC Action [Doc. #22-17].

[187] *U.S. v. Cronic*, 466 U.S. 648, 656 (1984).

[188] *U.S. v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). In issuing a preliminary injunction, the court in *Flood* specifically held that "the Sixth Amendment does comprehend 'the right to select and be represented by one's preferred attorney.'" *Flood*, 2009 WL 87006, at *6 n.1 (citing *Wheat v. U.S.*, 486 U.S. 153, 159, 108 S.Ct. 1692 (1988)).

resume trial preparations.[189] The fact that Plaintiffs will suffer irreparable harm if an injunction does not issue is indisputable.

### 3.   The Harm to Plaintiffs Outweighs any Harm to Underwriters

While Plaintiffs' constitutional rights and the ability to defend themselves are in jeopardy due to Underwriters' conduct, the only harm that will result to Underwriters from the issuance of a preliminary injunction is economic. Indeed, the preliminary injunction will not significantly alter the contractual obligations and rights of either party because the policies grant Underwriters a right of reimbursement.[190] In the event that Underwriters ultimately prevail, according to the terms of the D&O policy, Plaintiffs will be required to reimburse Underwriters for any amounts improperly advanced. Because simple economic loss is an insufficient basis for an injunction to issue, and the loss of constitutional rights supports the issuance of an injunction, any economic loss to Underwriters cannot change the fact that the balance of harms analysis strongly favors the issuance of a preliminary injunction.[191]

---

[189] *See* Affidavit of Kent A. Schaffer [Doc. #22-13]; Affidavit of Jack B. Zimmermann [Doc. #22-22].

[190] *See Flood*, 2009 WL 87006 at *6; *Great Am. Ins. Co. v. Gross*, 2005 WL 1048752, *4 (E.D. Va. 2005). *See also In re Enron Corp. Securities, Derivative & "ERISA" Litigation*, 391 F. Supp. 2d, 541, 575 (S.D. Tex. 2005) (recognizing that the D&O policy included a right of reimbursement).

[191] *See Flood*, 2009 WL 87006 at *6.

### 4. The Issuance of a Preliminary Injunction will not Adversely Affect the Public Interest

The public interest favors a speedy resolution of criminal cases.[192] The public interest also favors protection of a criminal defendant's constitutional rights.[193] Further, it is in the public's interest to see parties abide by their contractual obligations.[194] Underwriters have not and cannot refute these findings.

The public interest will not adversely be affected by the issuance of interim injunctive relief in this case. Indeed, in similar cases, numerous courts have found that injunctive relief serves the public's interest.[195] Moreover, if the injunction is not issued, it is the public that will be adversely affected as it will be the taxpayers that will be required to bear the financial costs associated with defending the Criminal Action.

### D. Jurisprudence Throughout the Country Favors Injunctive Relief in this Case

This is not a case of first impression. Courts across the country have recognized the need for the interim injunctive relief sought by Plaintiffs under circumstances similar to those found in this case. In the matter of *In re Worldcom, Inc. Securities Litigation*, the United States District Court for the Southern District

---

[192] *See id.* at *7.

[193] *See id.*

[194] *See Gross*, 2005 WL 1048752 at *6.

[195] *See id.*; *In re WorldCom, Inc. Securities Litigation*, 354 F. Supp. 2d 455, 469–70 (S.D.N.Y. 2005); *Flood*, 2009 WL 87006 at *7.

of New York granted a preliminary injunction and ordered Continental Casualty Company ("Continental") immediately to advance the costs of defending the former Chairman of the Board of Directors of WorldCom against claims filed in a host of lawsuits alleging SEC violations arising from the collapse of WorldCom.[196] The costs awarded included those costs already incurred and those that the movant continued to incur. Continental claimed that its policies were issued in reliance on WorldCom's false financial statements and were therefore properly rescinded. The court concluded that under a D&O policy with a duty to pay defense costs, like the policy in this case, the insurance company's obligation to reimburse the directors attaches as soon as the attorneys' fees are incurred.[197] To hold otherwise, held the court, would not provide insureds with protection from financial harm that insurance policies are presumed to give.[198] The court held that until the issue of rescission is adjudicated, the policy remains in effect and the duty to pay defense costs is enforceable.[199]

Most importantly, in *WorldCom*, the court held that the failure to receive defense costs when they are incurred constitutes "an immediate and direct injury" warranting a preliminary injunction because the ability to mount a successful

---

[196] *See WorldCom*, 354 F. Supp. 2d 455.

[197] *See id.* at 464. Here, the D&O Policy provides for a 60-day grace period. *See* D&O Policy [Doc. #22-7] at App. 000169.

[198] *See WorldCom*, 354 F. Supp. at 465.

[199] *See id.*

defense requires competent and diligent representation.[200] According to the court, the impact of an adverse judgment will have ramifications beyond the money that necessarily will be involved.[201] There is the damage to reputation, the stress of litigation, and the risk of financial ruin—each of which is an intangible but very real burden.[202] As an additional basis for the court's ruling, the court noted the important role that D&O insurance plays in corporate governance in America— unless directors can rely on the protections given by D&O policies, good and competent men and women will be reluctant to serve on corporate boards.[203] Finally, the court denied Continental's request that the insured post a bond, concluding that (1) the posting of a bond would undermine the very protection the insurer offered to directors when they purchased insurance, and (2) the payment of defense costs placed no undue burden on Continental, as its liability was capped under its policy and the policy granted it a right of reimbursement.

In *Great American Ins. Co. v. Gross*, the United States District Court for the Eastern District of Virginia followed *WorldCom* and granted a motion for preliminary injunction ordering Great American Insurance Company to advance defense costs to directors and officers accused of wrongful acts, who were insured

---

[200] *See id.* at 469.

[201] *See id.*

[202] *See id.*

[203] *See id.*

by a D&O policy issued by Great American, until the merits of the suit for declaratory judgment filed by Great American were resolved.[204] Great American had ceased payment of defense costs to officers and directors, who pleaded guilty to offenses, including conspiracy to commit insurance fraud and mail fraud, in reliance on an exclusion similar to the Fraud Exclusion relied on by Underwriters in its coverage denial.[205] Because the practical effect of Great American's failure to advance defense costs would be to cause the insureds' attorneys to withdraw from defending them in several civil lawsuits alleging wrongdoing, the court concluded that irreparable harm would result to the insureds if interim injunctive relief was not granted.[206] The court noted that the denial of a preliminary injunction would essentially "cripple" the insureds' defense and leave them with no ability to defend their interests in the very lawsuits filed against them.[207] Conversely, the court concluded that while Great American could be exposed to increased monetary liability if a preliminary injunction was granted, the monetary liability was agreed to by Great American when it issued the policy.[208] Further, like the policies issued by Underwriters, the policy granted Great American the right to seek reimbursement for the costs of defense, tipping the balance of harms decidedly in

---

[204] *See Gross*, 2005 WL 1048752.

[205] *See id.* at *1.

[206] *See id.* at *4.

[207] *See id.*

[208] *See id.* at *5.

favor of the insureds.[209] Finally, like the court in *WorldCom*, the court in *Gross* did not require the insureds to post a bond.[210]

Although outside the insurance context, a similar result was reached in *Flood*.[211] In that case, the United States District Court of Utah granted a preliminary injunction requiring a corporation to continue paying legal fees incurred by its officer in defending against criminal charges in accordance with an indemnification agreement. The officer's attorneys represented to the court that they could not continue representing their client without the immediate payment of fees. The court concluded that irreparable injury would result if a preliminary injunction did not issue because the corporation's failure to fund the defense threatened the officer's constitutional rights to effective assistance of counsel and to a speedy trial.[212] While the threat of injury to the corporate officer involved the loss of constitutional rights, the threat of injury to the corporation was economic, tipping the balance of harms in favor of interim injunctive relief.[213]

Indeed, numerous courts—including the Southern District of Texas—have held that a D&O insurer must pay defense costs as incurred until such time that

---

[209] *See id.*

[210] *See id.* at *6.

[211] *See Flood v. ClearOne Commc'ns, Inc.*, 2009 WL 87006 (D. Utah Jan. 12, 2009).

[212] *Id.* at *6 ("Finally, where a constitutional right is involved, irreparable injury is almost always found."). *See also U.S. v. Cronic*, 466 U.S. 648, 656 (1984); U.S. CONST. amend. VI.

[213] *See Flood*, 2009 WL 87006, at *6.

there is a final adjudication or "in fact" determination that would defeat coverage.[214] Because D&O insurers like Underwriters actually stand to gain from convictions that could trigger policy exclusions, they cannot be allowed to "pull the plug" on the insured's defense and thereby disrupt trial preparations.[215] If D&O policies allow absolute discretion to insurers to withhold payment whenever charges of intentional dishonesty are leveled against directors and officers, then insurers will be able to withhold payment in virtually every case.[216] That would leave directors and officers in an extremely vulnerable position, as any allegations of dishonesty, no matter how groundless, could bring financial ruin on a director or officer.[217] Underwriters, by virtue of the fact that they specifically used "final

---

[214] *See, e.g., In re Enron Corp. Securities, Derivative & "ERISA" Litigation*, 391 F. Supp. 2d 541, 574–75 (S.D. Tex. 2005) (noting that "[t]he majority of courts have concluded that the insurer must pay the defense costs as incurred" and concluding that the majority view represents the "better rule"); *Associated Elec. & Gas Ins. Servs., Ltd. v. Rigas*, 382 F. Supp. 2d 685 (E.D. Pa. 2004). In *Rigas*, the Court noted public policy factors in support of its ruling requiring the advancement of defense costs:

> Presumption of Innocence. As noted above, three of the movants are Defendants in lengthy federal criminal prosecution. Until and unless they are found guilty, they are presumed innocent and must enjoy the constitutionally-based prerogatives of any citizen who stands merely accused, but not convicted, of a crime. Similarly, although all five movants are defendants in numerous civil cases and, if found liable, would probably face judgments of many millions of dollars, at this moment they have not been found liable to anyone for anything.

*Rigas*, 382 F. Supp. 2d at 700.

[215] *See Nat'l Union Fire Ins. Co. of Pittsburgh v. Brown*, 787 F. Supp. 1424 (S.D. Fla. 1991).

[216] *See Little v. MGIC Indem. Corp.*, 649 F. Supp. 1460, 1468–69 (W.D. Penn. 1986), *aff'd*, 836 F.2d 789 (3rd Cir. 1987), *reh'g den.* (3rd Cir. 1988). This case was cited with approval by Judge Melinda Harmon in the *Enron* case. *See Enron*, 391 F. Supp. 2d at 574 (discussing *Little*).

[217] *See Little*, 649 F. Supp. at 1468–69

adjudication" and "in fact" language for the exclusions at issue, recognized this fact and, thus, the D&O policy clearly expresses an intent to pay for defense costs and expenses in situations such as the instant case. In violation of the clear policy language, Underwriters now attempt to act as judge and jury and convict their own insureds so as to avoid any further financial responsibility for their defenses.

### E.    A Bond of Zero Dollars is Appropriate in this Case

Pursuant to FED. R. CIV. P. 65, "[n]o . . . preliminary injunction shall issue except on giving of security by the applicant, in such sum as the court deems proper."[218] It is in the discretion of the district court to decide that, under the circumstances, no security is required.[219] A bond amount may be zero if there is no evidence the enjoined party will suffer damages from the injunction.[220] Moreover, the posting of a bond by Plaintiffs would undermine the very protection that Underwriters promised in the policies.[221] Additionally, because the policies require Plaintiffs to reimburse any amounts paid if it is ultimately determined that they are not entitled to the payments, the payment of defense costs by Underwriters places no undue burden on them and, therefore, no bond is required. As a practical matter, Stanford's and Holt's assets are frozen and none of the Plaintiffs have sufficient

---

[218] FED. R. CIV. P. 65.

[219] See In re WorldCom, Inc. Securities Litigation, 354 F. Supp. 2d 455, 470 (S.D.N.Y. 2005).

[220] See Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills, 321 F.3d 878, 882 (9th Cir. 2003).

[221] See id.

assets to pay their own attorneys. Accordingly, none of the Plaintiffs possess the financial ability to post a bond and, therefore, the bond amount set by the Court is zero.

## IV.   **CONCLUSION AND ORDER**

A fundamental and rudimentary principle in our system of justice is that a defendant is presumed innocent until proven guilty. An insured under a D&O policy shares this basic right when the exclusions sought to be enforced by Underwriters require a "final adjudication" or an "in fact" determination. Neither a "final adjudication" nor an "in fact" determination within the meaning of the D&O Policy has been made in connection with the Plaintiffs. Yet, despite this fact, Underwriters unilaterally have acted as both the judge and jury by concluding that their insureds are guilty as charged and thus not entitled to the contractual protections afforded by the policies—including the right to have their defense costs and expenses funded by the very policies purchased to provide such protection. The D&O Policy at issue in the instant case does not confer Underwriters with the unilateral right to act as judge and jury and a preliminary injunction should issue to place the parties back in the position that they were in prior to Underwriters' retroactive denial of coverage.

Consistent with the above findings of fact and conclusions of law:

**IT IS ORDERED** that Plaintiffs' Motion to Dismiss Syndicate 623 Pursuant to FRCP 21 [Doc. #25] is **GRANTED WITHOUT PREJUDICE** and **IT IS ORDERED** that Underwriters' Motion to Dismiss Plaintiffs' Second Amended Complaint [Doc. #14] and Underwriters' Motion to Transfer Case to Northern District of Texas Judge David C. Godbey [Doc. #24] are **DENIED AS MOOT**; and

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Preliminary Injunction [Doc. #12] is **GRANTED**, and accordingly, Defendants are **ENJOINED, RESTRAINED AND PROHIBITED** from withholding payment of reasonable and necessary "Costs, Charges and Expenses" already incurred by Plaintiffs, and incurred by them in the future in Criminal No. H-09-342, *United States v. Robert Allen Stanford, Laura Pendergest-Holt, Gilbert Lopez, Mark Kuhrt and Leroy King*, pending in this Court, and in Cause No. 3:09-CV-00298, *SEC v. Stanford Int'l Bank Ltd., et al.*, pending in the United States District Court for the Northern District of Texas, Dallas Division, until such time as this Court orders that Defendants are under no contractual obligation to pay such "Costs, Charges and Expenses" or until the applicable policy limits are exhausted; and

**IT IS FURTHER ORDERED** that Underwriters shall, within ten (10) business days of this Order, pay all reasonable and necessary "Costs, Charges and Expenses" that have been submitted by or on behalf of Plaintiffs to Underwriters as

of the date of this Order in connection with Criminal No. H-09-342, *United States v. Robert Allen Stanford, Laura Pendergest-Holt, Gilbert Lopez, Mark Kuhrt and Leroy King*, pending in this Court, and in connection with Cause No. 3:09-CV-00298, *SEC v. Stanford Int'l Bank Ltd., et al.*, pending in the United States District Court for the Northern District of Texas, Dallas Division, as the payment of such "Costs, Charges and Expenses" complies with the 60-day payment cycle in the D&O Policy; and

**IT IS FURTHER ORDERED** that Plaintiffs shall post a bond in the amount of $0.00 pursuant to Federal Rule of Civil Procedure 65 because there is no evidence that Defendants will suffer damages as a result of the issuance of this preliminary injunction.

SIGNED at Houston, Texas, on this __ day of January, 2010.


                                         _____

                                                 DAVID HITTNER

                                                 UNITED STATES DISTRICT JUDGE