IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LAURA PENDERGEST-HOLT, | § | |
| R. ALLEN STANFORD, GILBERTO | § | |
| LOPEZ, JR. and MARK KUHRT, | § | |
| *Plaintiffs,* | § | CIVIL   ACTION   NO.: |
| | § | 4:09-cv-03712 |
| vs. | § | |
| | § | |
| CERTAIN UNDERWRITERS AT | § | |
| LLOYD'S OF LONDON and ARCH | § | |
| SPECIALTY INSURANCE | § | |
| COMPANY, | § | |
| *Defendants.* | § | |

## MOTION TO DISQUALIFY AKIN GUMP STRAUSS HAUER & FELD

TO THE HONORABLE JUDGE OF THIS COURT:

COMES NOW, PLAINTIFF R. ALLEN STANFORD (hereinafter "Stanford"), who files this Motion to Disqualify Akin Gump Strauss Hauer & Feld, L.L.P. (hereinafter "Akin Gump"). The conflict between Stanford and Akin Gump was only recently realized by Stanford and is respectfully raised before this Court quickly and for a swift resolution, as to mitigate any argument that disqualification would be prejudicial to Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Company in this coverage matter and we respectfully show the Court as follows:

## I.   CHOICE OF LAW FOR DISQUALIFICATION

The Fifth Circuit holds that a district court is obliged to take measures against unethical conduct occurring in connection with any proceeding before it. The Fifth

Circuit remains, "sensitive to preventing conflicts of interest."[1] "A motion to disqualify counsel is the proper method for a party-litigant to bring the issues of conflict of interest or breach of ethical duties to the attention of the court."[2] "Motions to disqualify are substantive motions affecting the rights of the parties and are determined by applying standards developed under *federal law*."[3]

When considering a motion to disqualify, this Court should first look to "the local rules promulgated by the local court itself."[4] The Local Rules of the Southern District of Texas provide that "the minimum standard of practice shall be the Texas Disciplinary Rules of Professional Conduct," and that violations of the Texas Rules "shall be grounds for disciplinary action, but the court is not limited by that code."[5] Therefore, the Texas Rules "are not the sole authority governing a motion to disqualify."[6]

A "[d]istrict [c]ourt is obliged to take measures against unethical conduct occurring in connection with any proceeding before it."[7] Furthermore, the Fifth Circuit drew from federal common law precedent[8] to hold that a single inquiry into whether past

---

[1] *Matter of Consolidated Bankshares, Inc*., 785 F.2d 1249, 1256 (5th Cir. 1986).
[2] *Musicus v. Westinghouse Elec. Corp.,* 621 F.2d 742, 744 (5th Cir. 1980).
[3] *Dresser*, No. 92-2199, slip op. at 6976; *see also In Re Snyder,* 472 U.S. 634, 105 S. Ct. 2874, 2881, 86 L. Ed. 2d 504 n.6 (1985); *In Re  Finkelstein,* 901 F.2d 1560, 1564 (11th Cir. 1991); *United States v. Miller,* 624 F.2d 1198, 1200 (3d Cir. 1980); *Cord v. Smith,* 338 F.2d 516, 524 (9th Cir. 1964); *Ayus v. Total Renal Care, Inc.*, 48 F. Supp. 2d 714, 716-17 (S.D. Tex. 1999).
[4] *FDIC v. U.S. Fire Ins. Co*., 50 F.3d 1304, 1312 (5th Cir. 1995).
[5] S.D. TEX. LOCAL R. APP. A, R. 1(A) & 1(B).
[6] *In re American Airlines*, 972 F.2d 605, 610 (5th Cir. 1992).
[7] *Id*.
[8] *American*, 972 F.2d at 617.

and present representations are substantially related provides the best means to protect the integrity of a particular matter and the duty of loyalty owed by an attorney to his client.[9]

Because Akin Gump represented Stanford in the previous matters that are alleged to be actions of money laundering vis-a-vis the D & O Policy Money Laundering Exclusion, the issue is whether these prior representations are substantially related to the existing issue in this cause. Under the substantial relationship test, a party seeking to disqualify opposing counsel must establish two elements: 1) an actual attorney-client relationship between the moving party and the attorney he seeks to disqualify and 2) a substantial relationship between the subject matter of the former and present representations.[10]

## II. AKIN GUMP AND ALLEN STANFORD AND RELATED ENTITIES HAVE AN ACTUAL ATTORNEY-CLIENT RELATIONSHIP AND AKIN GUMP'S CURRENT REPRESENTATION OF CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON AND ARCH SPECIALTY INSURANCE COMPANY AT A MINIMUM RAISES A REASONABLE PROBABILITY THAT WOULD INVOLVE A VIOLATION OF CONFIDENTIAL CLIENT INFORMATION[11]

---

[9] *American*, 972 F.2d at 619.

[10] *Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1569 (5th Cir. 1989).

[11] TEX. DISCIPLINARY R. PROF'L CONDUCT 1.09, re-printed in TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A, Art. 10, § 9 (Vernon 2005).

Texas Rule 1.09 states:

(a) Without prior consent, a lawyer who personally has formerly represented a client in a matter shall not thereafter represent another person in a matter adverse to the former client:

(1) in which such other person questions the validity of the lawyer's services or work product for the former client;

(2) if the representation in reasonable probability will involve a violation of Rule 1.05 [dealing with confidential client information]; or

(3) if it is the same or a substantially related matter.

Over the past decade, from approximately 2000[12] to early 2009, there have been substantial dealings between Stanford, Stanford Companies, and Akin Gump in an attorney-client capacity.[13] Although Stanford dealings were not with the directly named attorneys who represent Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Company, the personal conflicts of one attorney are imputed to all other members of a firm.[14] Two irrebuttable presumptions exist that first, "confidential information has been given to the attorney actually doing work for the client," and second, "confidences obtained by an individual lawyer will be shared with the other members of his firm."[15] Additionally, "in the Fifth Circuit, liability for disqualification extends to former employees of the attorney who established the attorney-client relationship."[16]

---

(b) Except to the extent authorized by Rule 1.10, when lawyers are or have become members of or associated with a firm, none of them shall knowingly represent a client if any one of them practicing alone would be prohibited from doing so by paragraph (a).

(c) When the association of a lawyer with a firm has terminated, the lawyers who were then associated with that lawyer shall not knowingly represent a client if the lawyer whose association with that firm has terminated would be prohibited from doing so by paragraph (a)(1) or if the representation in reasonable probability will involve a violation of Rule 1.05.

[12] There are documents detailing that Rick Rubin represented Stanford prior to October 2000. *See* email between Carol Roston and Mauricio Alvarado, submitted herewith as Exhibit "A"

[13] *See* Letter to Judge Atlas, Dkt. No. 131, filed June 2, 2010, submitted herewith as Exhibit "B".

[14] TEX. DISCIPLINARY R. PROF'L CONDUCT 1.09 (b), re-printed in TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A, Art. 10, § 9 (Vernon 2005).

[15] *American.,* 972 F.2d at  614 & n.1; *Kraft, Inc. v. Alton Box Board Co. (In re Corrugated Container Antitrust Litigation),* 659 F.2d 1341, 1346 (5th Cir. 1981); *Nat'l Med. Enters., Inc. v. Godbey*, 924 S.W.2d 123, 129-31 (Tex. 1996).

[16] *American Can Co. v. Citrus Feed Co*., 436 F.2d 1125, 1129 (5th Cir. 1971).

a. **TONY NUNES**

Barry Chasnoff, Neel Lane, and Manuel Mungia are members of the firm of Akin Gump.   Michael Anthony "Tony" Nunes was a partner at Akin Gump from approximately 2004-2010. Mr. Nunes served as counsel and a friend to Stanford from the 1980's when Mr. Nunes was with Baker Botts, until after the civil complaint on February 17, 2009, when he was with Akin Gump.[17] Mr. Nunes represented Stanford in matters that are substantially related to the issues in this case.

From 1985 to 1987, Mr. Nunes represented Stanford and his father, James Stanford, in organizing and structuring Guardian International Bank Limited (now Stanford International Bank "SIB") on the island of Montserrat.[18] Under a program developed and advised by Tony Nunes, the Bank provided depositors with certificates of deposits.[19] Mr. Nunes organized the Bank, prepared its bylaws, and qualified the Bank to do business under the banking regulations of the United States Federal Government, and under the regulations of the State of Texas.[20] Mr. Nunes was intimately involved with the formation and organization of the Bank.  Both James and Allen Stanford, "discussed with Mr. Nunes on more than one occasion, [their] family business' history, [their] business opportunities in Venezuela, Curaco, Aruba, the Netherland Antilles, and other Caribbean

---

[17]  *See* Emails: re Tony Nunes and photo, submitted herewith as Exhibit "C"; *See* Affidavits of James Allen Stanford, submitted herewith as Exhibit "D": *See* Affidavit of Robert Allen Stanford, submitted herewith as Exhibit "E"
[18]  *See* Baker Botts Billing, submitted herewith as Exhibit "F"; *See* Exhibit "D", Affidavits of James Allen Stanford.; *See* Exhibit "E", Affidavit of Robert Allen Stanford.
[19]*See* Exhibit "D", Affidavits of James Allen Stanford.
[20]*See* Memorandum of Association and Articles of Association, submitted herewith as Exhibit "G"; *See* Exhibit "D", Affidavits of James Allen Stanford.

locations stemming from oil refinery closings, ways to benefit from currency exchange laws of these countries, what our business strategy was with regard to moneys deposited with GIBL, [their] arrangements with other banks located in the United States and other jurisdictions…and many other private confidential details."[21] The Banks purpose was to not only carry on the business of banking, but also "to issue and deposit securities by way of collateral for the performance of any obligation of the Bank or other companies to which the Bank might make loans, or in which the Bank might have investments."[22] Mr. Nunes was part and parcel in establishing, developing, and advising SIB's certificate of deposit program, that Akin Gump is now asserting was one source of money laundering.[23]

In the course of representing Stanford, Mr. Nunes obtained, secured, created, and utilized confidential information that sits at the heart of the issues that Akin Gump is now trying to allege is evidence of money laundering.[24] Mr. Nunes' attorney-client relationship with Stanford and James Allen Stanford did not end with establishing Guardian Bank.[25] Mr. Nunes maintained communication with Stanford and gave him advice throughout the years.[26] Mr. Nunes was a partner at Akin Gump when the conflict

---

[21] *See* Exhibit "D", Affidavits of James Allen Stanford 6/27/10 at 2.
[22] *See* Exhibit "F", Baker Botts Billing; *See* Exhibit "D", Affidavits of James Allen Stanford.
[23] *See id.*
[24] *See* Exhibit "D", Affidavits of James Allen Stanford; *See* Exhibit "E", Affidavit of Robert Allen Stanford.
[25] *See* Exhibit "C", Emails: re Tony Nunes and photo; *See* Exhibit "D", Affidavits of James Allen Stanford; *See* Exhibit "E", Affidavit of Robert Allen Stanford.
[26] *See* Exhibit "C", Emails: re Tony Nunes and photo; *See* Exhibit "D", Affidavits of James Allen Stanford; *See* Exhibit "E", Affidavit of Robert Allen Stanford.

arose between Stanford and Akin Gump for this coverage case. Stanford has never consented to the disclosure of information related to the formation of SIB, nor does he waive his right now.

### b. **AST, BLUE SKY, TWS, ASL, SVCH, INTERWAVE, ROLL-UP**

Roger Cepeda, Joseph Tiano, Rick Rubin, Victoria Baylin, Christine Samsel, Teri Jacoby, and Jason Tankel were members of Akin Gump and served as counsel to Stanford from at least October 2000 to September 2002. Fadi Samman and Erica McGrady are currently partners at Akin Gump and served as counsel to Stanford from at least October 2000 to September 2002. All these attorneys from Akin Gump collectively represented Stanford and developed an attorney-client relationship for work performed regarding multi-million dollar, Tier 3 investments, which are the very class of assets alleged to have been the source of money laundering.

These attorneys were involved with the transactions not limited to: American Samoa Telecom LLC (hereinafter "AST"), Blue Sky Communications (hereinafter "Blue Sky"), Telecom Wireless Solutions (hereinafter "TWS"), American Samoan Licensing (hereinafter "ASL"), Stanford Venture Capital Holdings (hereinafter "SVCH"), InterWave Communications (hereinafter "InterWave"), David Laiser Nortel (hereinafter "Nortel"), and Telecom Wireless Solutions International (hereinafter "TWSI"). AST is a limited liability company organized under the laws of the State of Georgia. AST is 95% owned by Blue Sky. Blue Sky is a corporation organized under the laws of the State of Delaware. Blue Sky is owned by TWS, SVCH, InterWave, and David Lasier. ASL is a corporation organized under the laws of American Samoa and owned by AST. TWS is a

Delaware corporation majority owned by SVCH. SVCH is wholly owned by Mr. Stanford. AST Telecom is solely owned by SVCH.[27]  The limited documents available to Stanford from Akin Gump attorneys show a number of significant and complex corporate transactions.[28] Akin Gump was intimately involved in the structuring and documentation of a roll-up or consolidation of these entities on behalf of Stanford.  The evidence demonstrates that Akin Gump provided legal advice and work product for many critical and foundational documents for the transaction in representation of Stanford, many of which involved the rights, obligations and transfer of monies and financial instruments to effectuate the transaction over a span of approximately four years.

In early 1998 to beyond 2002, Akin Gump, represented Stanford through TWS regarding proposed transactions between TWS, Stanford, Gelber Securities Inc., and Blue Sky; as well as an AST roll-up and consolidation with Blue Sky.[29] In April 2001, Akin Gump, through Erica McGrady, drafted an Investor Rights Agreement containing voting rights, registration rights and tag-along rights to Mauricio Alvarado, Danny Bogar, and Osvaldo Pi of Stanford.[30]

Akin Gump, through various former and current attorneys, advised and structured at least the following transactions: an Exchange Agreement between Stanford Financial Group (hereinafter "SFG") and Laiser, an Exchange Agreement between SFG and TWS,

---

[27] *See* LLC Operating Agreement and Asset Purchase Agreement, submitted herewith as Exhibit "H"; *See* Exhibit "D", Affidavits of James Allen Stanford.

[28] *See* Affidavit of Dr. Ken Lehrer, submitted herewith as Exhibit "I".

[29] *See* Letter re: AST Board of Managers Meeting of January 11, 2001, submitted herewith as Exhibit "J"; *See* Exhibit "E", Affidavit of Robert Allen Stanford.

[30] *See* Email re: Stanford/TWS Investor Rights Agreement, submitted herewith as Exhibit "K".

an Assignment and Assumption Agreement between SFG and TWS, a Lost Note Affidavit from Stanford International Bank (hereinafter "SIB"), an Exchange Agreement between SIB and TWS, an Exchange Agreement between SIB and TWS, a Lost Note Affidavit from SIB, a First Amendment to Amended & Restated Stockholder Rights Agreement, Certificate of Designation of Series A Non-Voting Preferred Stock of TWS, and a letter agreement regarding legal fees.[31] Akin Gump attorneys were intimately involved with the drafting and execution of contracts and other financial instruments.[32] Former Akin Gump attorney Jason Tankel drafted affidavits for a lost AST promissory note and a lost TWS promissory note and warrant.[33]

Akin Gump, through Richard Rubin and Roger Cepeda, executed the "ClearShot deal".[34] The "ClearShot deal" involved sale of the West Virginia licenses to Leap Wireless International, Inc.[35]

Former Akin Gump attorney Roger Cepeda drafted board of director's resolutions for SFG and SIB, the very documents that govern the policies and agenda of corporations.[36] Furthermore, Akin Gump attorneys drafted a letter to Daivid Laiser, the

---

[31] *See* Email re: Stanford/TWS Restructuring Agreement and Draft First Amendment to Amend and Restated Stockholder Rights Agreement, submitted herewith as Exhibit "L".

[32] *See* Exhibit "L", Email re: Stanford/TWS Restructuring Agreement stating, "any signature pages, questions, or changes be handled through [Mr. Cepeda](for Stanford)."

[33] *See* Email re: Affidavits for the lost promissory notes, submitted herewith as Exhibit "M".

[34] *See* Email re: The "ClearShot deal", submitted herewith as Exhibit "N".

[35] *See* Email re: Stanford/TWS Reviewing Private Placement Memorandum, submitted herewith as Exhibit "O".

[36] *See* Email re: Resolutions for SFG and SIB, submitted herewith as Exhibit "P"; *See* Exhibit "D", Affidavits of James Allen Stanford.

TWS Chairman and CEO, purportedly from James Davis, SFG's CFO.[37] Akin Gump worked intimately with James Davis. James Davis approved the transfer of all investments and loans from Stanford Companies, and Akin Gump executed the investment loans in venture companies.[38] At the end of 2001, former Akin Gump attorney Roger Cepeda drafted stock purchase agreements to transfer TWS stock from SIB and Bank of Antigua to SVCH.[39]

In January 2002, there Rick Rubin drafted an explanation of a tax assistance loan while stating that Akin Gump represents SFG.[40] Akin Gump attorneys also worked on the "Stanford and GO, LLC loan documents for TWS and TWSI" deal that involved a revised Line of Credit Agreement, SFG Note, another Note, four Warrants, and a General Security Agreement.[41]

Akin Gump attorneys handled much of the entire the AST transaction. This transaction is where Stanford Companies bought Nortel position in their $9MM debt for $825K, and Akin Gump created a new limited liability company to hold the assets.[42] Akin Gump was also involved with a FCC license transfer and a Stanford Company was acting as a creditor until the assets were transferred to the new entity.[43] As late as September 2, 2002, Akin Gump attorneys drafted a limited liability company operating agreement for AST Telecom (the very document that governs the rights of members and

---

[37] *See* Letter re: Short Term Notes, submitted herewith as Exhibit "Q".

[38] *See* Email re: Transfer of Assets to SVCH, submitted herewith as Exhibit "R".

[39] *See* Email re: Transfer of TWS stock to SVCH, submitted herewith as Exhibit "S".

[40] *See* Letter re: Laiser Tax Loan Request, submitted herewith as Exhibit "T".

[41] *See* Email re: Stanford and GO LLC documents, submitted herewith as Exhibit "U".

[42] *See* Email re: AST and Nortel, submitted herewith as Exhibit "V".

[43] *See* Exhibit "V", Email re: AST and Nortel.

the limited liability company), and a request to the FCC to allow ASL to transfer control from AST to AST Telecom.[44] Akin Gump also represented Stanford's SFG Company by filing the "Eagle Design" and "Stanford Financial Group" trademark.[45] Akin Gump also represented SFG related to a merger and acquisition of OPM Auction Company. [46] Stanford has never consented to the disclosure of information related to this deal, nor does he waive his right now.[47]

### c.  **CARIBBEAN SUN**

John Tang was an attorney at Akin Gump and Lester Hewitt is currently a partner at Akin Gump. Both served as counsel to Stanford in 2003.  Both attorneys while at Akin Gump represented Stanford and developed an attorney-client relationship while executing, at the very least, trademark applications for the Caribbean Sun deal, again an asset Tier 3 class alleged to have been the source for money laundering.[48]

Caribbean Sun Airlines, Inc., is an affiliated company of SFG, and classified as a Tier 3 investment. Both companies are wholly owned by Mr. Allen Stanford.[49] On February 11, 2003, former Akin Gump attorney John Tang filed two applications for

---

[44] *See* Exhibit "H", LLC Operating Agreement and Asset Purchase Agreement; *See* Exhibit "D", Affidavits of James Allen Stanford.

[45] *See* Exhibit "D", Affidavits of James Allen Stanford; *See* Exhibit "E", Affidavit of Robert Allen Stanford.

[46] *See* Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Company's Emergency Motion for Reconsideration of Order or, Alternatively, Motion for Protective Order, Dkt, No. 144, filed June 13, 2010.

[47] *Tekni-Plex, Inc. v. Meyner & Landis*, 89 N.Y.2d 123, 132 (1996) (stating that the power to assert or waive the attorney-client privilege belongs to the management of the corporations to be exercised by its officers and directors.)

[48] *See* Exhibit "E", Affidavit of Robert Allen Stanford

[49] *See* Email re: Caribbean Sun Ownership, submitted herewith as Exhibit "W".

trademarks for Caribbean Sun.[50]  There is not much information regarding Akin Gump's

involvement with Caribbean Sun other than filing of the trademarks. Stanford has never

consented to the disclosure of information related to this deal, nor does he waive his right

now.

### d. 20/20 CRICKET MATCH AND CUBA

The Stanford 20/20 Cricket Tournament was the brainchild of Stanford to make

cricket an international sport while maintaining a business model to make money, similar

to professional sports in the US, through holding an annual Twenty20 competition

involving seventeen Caribbean countries complete with television broadcasts and social

events held at night.[51] "Stanford had Texas-sized dreams of turning cricket into a world

sport, particularly the new quick-fire, fan-friendly, short form known as Twenty20."[52]

The competition was an enormous personal financial transaction and deal for Stanford,

"who invested over US$100 million into the extravagant showpiece between 2006 and

2008.[53] "With the popularity of Twenty20 Stanford [was] set to make a fortune out of

cricket."[54]

> "With unprecedented sums of money available as prize money, players
> adopted a more professional approach to the game. Stanford even
> sponsored some professional teams whose players were paid well just to
> play cricket. Professional cricket did not exist in any other form in the

---

[50] *See* Emails re: Caribbean Sun Trademark Applications, submitted herewith as Exhibit "X".

[51] *See* Media on Cricket Tournament, submitted herewith as Exhibit "Y"; *See* Exhibit "E", Affidavit of Robert Allen Stanford.

[52] *See* Exhibit "Y", Media on Cricket Tournament.

[53] *See* Exhibit "Y", Media on Cricket Tournament; *See* Exhibit "E", Affidavit of Robert Allen Stanford.

[54] *See* Exhibit "Y", Media on Cricket Tournament.

Caribbean. Stanford's 20/20 initiative certainly provided a more disciplined approach-particularly with the Stanford Superstars team...Stanford-although he invested more than received in kind- demonstrated that cricket could be run by a business model. He invested heavily in advertising and structuring the Stanford 20/20 organization. The organization of the tournaments was very business-like and efficient- unlike what normally transpires under the auspices of the WICB."[55]

The Stanford 20/20 Cricket tournament was not only for show, but an invested that was anticipated to bring a large rate of return. "Over a five-year business model [Stanford] foresaw Cricket in the 20/20 format becoming a multi-million dollar, extremely valuable business and marketing tool for the Stanford companies globally."[56]

Stanford originally wanted Cuba to participate in the Stanford 20/20 tournament but, "[t]he United States embargo against Cuba means that organizations[sic] and American citizens such as Allen Stanford have to make application to, and receive special permission from the US Government to conduct any type of activity with Cuba. Stanford's application was denied but…he plan[ned] to ask the US government to reconsider for future tournaments."[57] Cuba's involvement was necessary to make this competition a true Caribbean wide cricket tournament, and the large public interest in the competition would draw would give a good rate of return. "In fact, a five million dollar contract per year was negotiated with Cable and Wireless, one of a number of sponsors who expressed a keen desire to become a part of the Stanford 20/20 program."[58]

---

[55] *See* Exhibit "Y", Media on Cricket Tournament.
[56] *See* Exhibit "E", Affidavit of Robert Allen Stanford.
[57] *See* Exhibit "Y", Media on Cricket Tournament; *See* Exhibit "E", Affidavit of Robert Allen Stanford.
[58] *See* Exhibit "E", Affidavit of Robert Allen Stanford.

Wynn Segall and Tatman Savio are Akin Gump attorneys who served as counsel to Stanford from 2007-2008.  Both attorneys from Akin Gump represented Stanford and developed an attorney-client relationship while executing negotiations and licensing transactions to run Stanford's 20/20 Cricket Tournament and obtain the Office of Foreign Assets Control (hereinafter "OFAC") licensing permission to manage the participation of a Cuban Cricket Team. [59]

In a memo from November 16, 2007, the Treasury Department through the OFAC denied the request of Stanford 20/20 to have Cuba participate in the tournament.[60] Wynn Segall was the Akin Gump attorney named as a good authority with the OFAC based on work accomplished with Cuba and the Major League Baseball and Player's Associations to secure Cuba's participation in the World Baseball Classic.[61]

Stanford retained Mr. Segall and Akin Gump with a retainer agreement on November 27, 2007.[62] Mr. Segall's retainer was $25,000 and wire transferred on November 30, 2007 to Akin Gump's Washington, D.C. office.[63]

Through emails and phone calls, there were times where Mr. Segall and Stanford talked to one another directly in an attorney-client capacity.[64] On January 7, 2008, Stanford 20/20 sent a letter to the OFAC and directed any concerns to their counsel Akin

---

[59] *See* Exhibit "E", Affidavit of Robert Allen Stanford; *See* Declaration of Andrea Stoelker, Exhibit "AT".

[60] *See* Memo re: Cuba's participation in Stanford 20/20 Tournament, submitted herewith as Exhibit "Z"; *See* Exhibit "E", Affidavit of Robert Allen Stanford.

[61] *See* Exhibit "U", Memo re: Cuba's participation in Stanford 20/20 Tournament

[62] *See* Retainer Agreement, submitted herewith as Exhibit "AA".

[63] *See* Wire Transfer and Statement, submitted herewith as Exhibit "AB".

[64] *See* Email re: Conversation with Stanford for Cuba Letter, submitted herewith as Exhibit "AC".

Gump.  Mr. Segall also sent Stanford 20/20's application to OFAC the same day.[65] Based on the January 7, 2008 application, Mr. Segall obtained a license from the Department of the Treasury from the OFAC Regulations.[66] This license was an authorization to manage the participation of a Cuban cricket team in the 2008 Stanford Cricket Tournament held in Antigua and Barbuda from approximately January 25- February 24, 2008.[67] Stanford has never consented to the disclosure of information related to the 20/20 Cricket Match and OFAC licensing for Cuba, nor does he waive his right now.

e. **BROKER SOLICITING STANFORD EMPLOYEES POST SEC COMPLAINT**

Orrin Harrison, Mary O'Connor, Scott Banard, Michael Simons, Michael Wilson, and Barry Greenberg are members of Akin Gump.  These attorneys planned and solicited their services directly to Stanford representatives and brokers regarding their representation of brokers and their qualifications to obtain defense costs under the D & O policy.[68]

This unofficial deal to represent Stanford brokers resulted in release of confidential information regarding Stanford businesses and the D & O policy while an

---

[65] *See* Letter re: Request in Consideration of Change in Facts and Circumstances for Expedited Review for OFAC and Cuba with Accompanying Application, submitted herewith as Exhibit "AD".

[66] *See* Stanford 20/20 OFAC License Provided to Akin Gump Attorney Wynn Segall and Accompanying Email, submitted herewith as Exhibit "AE".

[67] *See* Exhibit "AD", Letter re: Request in Consideration of Change in Facts and Circumstances for Expedited Review for OFAC and Cuba.

[68] *See* Emails re: Stanford and Broker Solicitation of Services, submitted herewith as Exhibit "AF".

attorney-client relationship was established. The sequence of events to solicit representation began with Orrin Harrison offering his services to Lou Schaufele, the Managing Director of Stanford Group Company in Dallas, TX.[69] Orrin Harrison offered to help some brokers who worked for Stanford.  Orrin Harrison and Mary O'Connor held a conference call for whoever wanted to dial on Feb. 25, 2009, a week following the SEC civil complaint.[70]  There is no way to detail what information Akin Gump received regarding Stanford Companies, but the conversation focused on securing funds for the representation of the brokers through the D & O policy, the same policy that Akin Gump now represents Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Company in preserving. The Akin Gump attorneys offered the following services to the brokers after the telephone conference call as detailed in an email:

- Gather names of brokers who want to be represented by Akin Gump for a conflict check.
- Attend the hearing in early March 2009 but not file an appearance.
- Akin Gump's job would be to serve as document gathering and an information arm for brokers.
- They were already taking action to terminate existing relationships with other associates and law firms elsewhere.
- Charge a lump sum around $2500 per broker. If there is an appearance before the SEC they would be charged in addition to the flat $2500 per person.
- They were currently determining D & O coverage availability in case they have to make an appearance before the SEC. [71]

Although the capacities of Scott Banard, Michael Simons, Michael Wilson, and Barry Greenberg were not detailed from information immediately available, they were addressed in the email from Mr. Harrison to Mr. Schaufele.[72]

---

[69] *See* Exhibit "AF", Emails re: Stanford and Broker Solicitation of Services.
[70] *See* Exhibit "AF", Emails re: Stanford and Broker Solicitation of Services.
[71] *See* Email re: Akin Representation of Brokers, submitted herewith as Exhibit "AG".

**f.  THERE   WAS   AND   IS   AN   ATTORNEY-CLIENT RELATIONSHIP  BETWEEN  AKIN  GUMP  AND  STANFORD AND STANFORD COMPANIES.**

The constrained paper trail available shows that there was a continuing pattern of representation over the span of a decade as well as substantial sums of payment from Stanford Companies to Akin Gump.[73] Although the limited electronic records only date back to 2000, Akin Gump represented Stanford and Stanford Companies even earlier.[74]

Akin Gump's continuous representation of Stanford Companies involved dealing with Stanford, the sole shareholder of Stanford Group Company and one of two shareholders for SFG[75] with privity. Both Akin Gump and Stanford along with Stanford Entities, and parties manifested intent, over many financial transactions, to create an attorney-client relationship. "Stanford's relationship with Akin Gump was extensive, long-term, and with a number of the firm's high-level attorneys, leading him to reasonably conclude that Akin Gump was his personal law firm and the law firm of his closely held companies."[76]

Akin Gump attorneys executed financial and structuring transactions in the very least to the formation of Stanford Companies, roll-up acquisitions of billion dollar

---

[72] *See* Exhibit "AG", Email re: Akin Representation of Brokers.

[73] All documents were pulled from OrangeLegal/iCONECT database. Attempts to have former Stanford employees help explain general details of various transactions were immediately rebuffed. Many former employees who worked with Stanford and Akin Gump stated via their attorneys that Akin Gump is paying their defense costs and they did not want to cut-off or anger their money lifeline.

[74]*See* Exhibit "A", Email Between Carol Roston and Mauricio Alvarado.

[75] *See* Application for Certificate of Authority and Articles of Incorporation for Stanford Company Parent Companies, submitted herewith as Exhibit "AH".

[76] *See* Affidavit of Seth Hopkins at 7-8, submitted herewith as Exhibit "AI"

investments, debt and equity capital infusion executions, trademark applications for Stanford Companies, and licensing representation in front of governmental international regulatory agencies. Akin Gump attorneys, "who undertook the preparation and finalization of the documentation for the various transactions and investments had solid knowledge, understanding and involvement of the various transactions AND knew who their clients were, namely a blend or combination of R. Allen Stanford (an individual) and corporate entities of the Stanford Financial Group."[77]

### i. AKIN GUMP OBTAINED CONFIDENTIAL INFORMATION DURING THEIR REPRESENTATION OF STANFORD AND STANFORD COMPANIES

Akin Gump represented Stanford and Stanford Companies in a capacity that granted a unique insight and access to confidential information related to the formation, development, execution, and investment portfolio of Stanford Companies through confidential communications. What information comprises a confidential communication is very broad.

> "The classic example provided in legal ethics classes is one in which a client hires a law firm to create a corporation. During the course of conversation, the client mentions that he has an illegitimate child. It would seem at first blush that this information, offered in casual conversation, is not 'relating to the representation of a client,' since the client hired the firm only to create a corporation. However, the client believes that everything he tells his lawyers is confidential, and it is possible that the existence of the illegitimate child might be the subject of litigation down the line—in the client's divorce, paternity suit, probate, or any number of legal permutations that may not be readily apparent. Therefore, even this seemingly irrelevant fact, which appears to have nothing to do with the representation, is considered to have been learned during the scope of the representation and should be regarded as confidential. Given the broad scope of what is

---

[77] *See* Exhibit "I", Affidavit of Dr. Ken Lehrer at 4.

considered confidential, the extensive information that was likely provided to Akin Gump during years of representing Stanford and his entities in complex business transactions creates a strong likelihood that Akin Gump possesses confidential and relevant information related to the ultimate issues of fact in a case focusing on the propriety of Stanford's business decisions."[78]

Not restricted to exchanging of fact during the confidential communications, Akin Gump attorneys exchanged confidences of substantial significance that is at the heart of money laundering issue now before this Court.[79] The information obtained throughout the course of Akin Gump's representation of Stanford and Stanford entities was very detailed, in depth, and related to the issues that Akin Gump must prove for their current clients. To execute the varied and vast services that Akin Gump performed for Stanford and Stanford entities, there is no doubt that Akin Gump received confidential information related to the running of all the Stanford entities. Akin Gump attorneys are not ones to rest on their laurels, as stated by Dr. Ken Lehrer:

> "Note is further made of the fact that these individuals are encouraged to interact to produce to the highest level of performance for the client via the data listed on the website of Akin Gump itself. Said website data denotes – 'Our team (emphasis added) of litigators, dealmakers, and policy lawyers and advisors collaborate with a single goal …'

---

[78] *See* Exhibit "AI", Affidavit of Seth Hopkins at 11.

[79] *See* Exhibit "AI", Affidavit of Seth Hopkins at 10-11 stating "Rule 1.05 establishes that confidential information is much broader than the attorney-client privilege, and it includes nearly all information learned by an attorney in the course of his representation of the client. *See also Davis v. Stansbury,* 824 S.W.2d 278 (Tex.App. Houston [1st Dist.] 1992) (confidential information includes both privileged and unprivileged client information). Legal ethics scholars typically consider three elements to determine what information is regarded as confidential—(1) all information; (2) relating to the representation of a client; (3) regardless of the source. *See* Deborah Orlik, *Ethics for the Legal Professional*, p. 79-80 (6th ed. 2008). The first and third elements—"all information" and "regardless of the source" speak for themselves."

and the website goes on to add -

'The mission of Akin Gump - the reason this firm exists - is to advise our clients as they choose the road on which they will embark and to assist them in negotiating the turns and obstacles between them and their goals.'

In addition to the legal contents of the documentation that in and of themselves exhibits a solid understanding of the transactions the underlying primary ingredients and knowledge of the parties (more than one) they are representing, from an Economic and Financial point of view the documentation also reflects a solid grasp and understanding of the various transactions.   This is evidenced by the fact that the Stanford Group of Companies is comprised of over 65 entities of varying legal structures and formations.

Since most of the transactions are extremely complex, in order for them to be viable enterprises and fit into the economic / financial structure of the overall enterprise, those preparing the documentation would have to clearly know (as suggested by the website as quoted above) and understand the essential reasons and components of each transaction or otherwise those preparing the documentation would be creating ventures that are either "useless", doomed to failure or conflicting with others in the overall organizational structure.   Thus, via careful analysis of the documentation, ventures such as those in the Stanford Files consist of a solid blending of legal, corporate and economic ingredients, all of which in order to be viable and contributory <u>have to be known</u> to and / or reviewed by the legal sector."[80]

## ii.   <u>AKIN GUMP REPRESENTED A BLEND OF STANFORD COMPANIES AND STANFORD PERSONALLY</u>

"Although corporate counsel does not ordinarily become counsel for the shareholders and directors, in a closely-held corporation consisting of only two shareholders, 'it is indeed reasonable for each shareholder to believe that the corporate

---

[80] *See* Exhibit "I", Affidavit of Dr. Ken Lehrer at 6-7.

counsel is in effect his own individual attorney." [81] Case law dictates that there are a number of factors that can be considered when deciding if an attorney represents the shareholders and directors of a closely-held corporation such as: "(1) 'whether the attorney ever represented the shareholder in individual matters'; (2) 'whether the attorneys' services were billed to and paid by the corporation'; (3) 'whether the shareholders treat the corporation as a corporation or as a partnership'; and (4) 'whether the shareholder could reasonably have believed that the attorney was acting as his individual attorney rather than as the corporation's attorney.'"[82]

Likewise, the American Bar Association Committee on Ethics and Professional Responsibility has similar, yet discernible, factors when determining whether an attorney-client relationship has been formed between a partnership's attorney and an individual partner:

> "Whether such a relationship has been created almost always will depend on an analysis of the specific facts involved. The analysis may include such factors as whether the lawyer affirmatively assumed a duty of representation to the individual partner, whether the partner was separately represented by other counsel when the partnership was created or in connection with its affairs, whether the lawyer had represented an individual partner before undertaking to represent the partnership, and whether there was evidence of reliance by the individual partner on the lawyer as his or her separate counsel, or of the partner's expectation of personal representation."[83]

---

[81] *United States v. Edwards*, 39 F. Supp. 2d 716, 732 (M.D. La. 1999), citing, *Rosman v. Shapiro*, 653 F. Supp. 1441, 1445 (S.D.N.Y. 1987) (counsel for a closely-held corporation consisting of two fifty-percent shareholders represented both the corporate entity and the individual shareholders as well).

[82] *Edwards*, 39 F. Supp. 2d at 732; citing, *Sackley v. Southeast Energy Group, Ltd.*, 1987 U.S. Dist. LEXIS 10279, 1987 WL 12950 (N.D.Ill. 1987).

[83] Amer. Bar Ass'n Comm. on Eth. & Prof. Resp. Inf. Op. 91-361 ("Opinion 91-361") at 6 (1991).

Although the Option 91-361 test is aimed at representation in the context of a partnership, the opinion states that "[t]here is no logical reason to distinguish partnerships from corporations or other legal entities in determining the client a lawyer represents."[84]

1. **TONY NUNES REPRESENTED STANFORD PERSONALLY IN THE PAST**

Mr. Nunes previously represented Stanford personally before there was any bank, any corporations, or any entities. Although Mr. Nunes was with Baker Botts at the time, he moved to Akin Gump and continued to be in constant communication with Mr. Stanford.[85]

2. **BILLING RECORDS FROM AKIN GUMP WERE ADDRESSED TO STANFORD AND PAID FROM STANFORD'S ACCOUNTS**

The very nature of the relationship with Akin Gump was an express contractual relationship evident with an attorney-client retainer agreement to be signed by an agent for Stanford and wire transfer on behalf of "R. Allen Stanford" for the 20/20 Cricket match and licensing questions with OFAC.[86]  Early drafts of the retainer agreement first were addressed to "Sir R. Allen Stanford" on behalf of SFG, then changed to "Sir. R. Allen Stanford" on behalf of 20/20 Stanford Cricket.[87] Although a retainer agreement for

---

[84] *Id*. at 3.11; *Hopper v. Frank*, 16 F.3d 92, 96 (5th Cir. 1994) (applying Opinion 91-361 factors to corporate attorney and shareholder).
[85] *See* Exhibit, "E", Affidavit of Robert Allen Stanford,
[86] *See Mellon Sev. Co. v. Touche Ross*, 17 S.W.2d 432, 437 (Tex. App.—Houston 2000); *Perez v. Kirk & Carrigan*, 822 S.W.2d 261, 265 (Tex. App.—Corpus Christi 1991); *See* Exhibit "AA", Retainer Agreement; *See* Exhibit "AB", Wire Transfer and Statement; *See* Past Draft Retainer Agreement, submitted herewith as Exhibit "AJ".
[87] *See* Exhibit "AJ", Past Draft Retainer Agreement.

every transaction has yet to be located between Stanford or Stanford Companies and Akin Gump, this does not mean that a retainer agreement does not exist nor is an attorney-client relationship demonstrated solely with a retainer agreement.  The billing statements from Akin Gump were to "Sir R. Allen Stanford" and not just to SFG or SVCH.[88]

Per the usual course of business, based on the very limited information available[89], teleconference calls, and emails delineating intent along with statements that Akin Gump represents Stanford Companies, an attorney-client relationship was formed for the Stanford Companies through Stanford and Akin Gump for other transactions as well.[90]

In totality, documents show that Stanford "as an individual was the 99.0+% owner of Stanford Financial and Stanford Group Holdings.  As such, when a transaction was being undertaken or structured, it is extremely easy for the funds and / or position of R. Allen Stanford (an individual) and the funds and / or position of one or more of the Stanford Group of Companies to be or become comingled and or intertwined."[91] Even more, because "there were no independent shareholders to report to or account for, it is highly unlikely that at all times, without any doubt or confusion that the law firm of Akin

---

[88] *See, e.g., Nat'l Med. Enters., Inc. v. Godbey*, 924 S.W.2d at 147; *See* Billing re: Internal Compliance, submitted herewith as Exhibit "AK"; *See* Exhibit "AA", Retainer Agreement.

[89] Mr. Chasnoff made a reference that roughly 700,000 emails were in Akin Gump's system, but we have not seen any of those emails.

[90] *See Parker v. Carnahan*, 772 S.W.2d 151, 156 (Tex. App.—Texarkana 1989) (stating that the hallmark of an attorney-client relationship is the manifestation of an intention to create such a relationship); *Kirk & Carrigan*, 822 S.W.2d at 265 (stating that courts have found an attorney-client relationship even where the attorney had no intention of forming such relationship).

[91] *See* Exhibit "I", Affidavit of Dr. Ken Lehrer at 8.

Gump knew exactly whom they were representing and the exact source of the Stanford funds.   In addition, in a situation where one individual is a super majority major shareholder, the concept of 'piercing the veil' often prevails in regard to significant transactions."[92]

This essentially means that, "funds from Stanford Financial can also belong to R. Allen Stanford and funds of R. Allen Stanford could be part of Stanford Financial.  This dual combining and comingling of funds is also evidenced by legal representation.  This based upon the fact that there were NO other law firms, NONE denoted as representing any other Stanford personal or private entities and thus Akin Gump supplied and fulfilled the dual representational role for both R. Allen Stanford and the Stanford Group of Companies."[93]

### 3.  STANFORD CORPORATIONS WERE CLOSELY HELD AND NOT PUBLICLY REGISTERED

Stanford treated each Stanford entity as a corporation, but he was the sole shareholder for many of the companies or was a shareholder with a small private group of individuals.

Furthermore, the "Stanford Group of Companies, is a privately held organization without ANY public shareholders to whom to report on an ongoing basis or publicly registered or traded debt instruments or investors (such as a pension fund or other public funding source)…Akin Gump and others who worked for the Stanford Family knew and acknowledged by their output and more specifically in their billing records that they were

---

[92] *See* Exhibit "I", Affidavit of Dr. Ken Lehrer at 8.
[93] *See* Exhibit "I", Affidavit of Dr. Ken Lehrer at 8.

at all times working for a combined blend or mixture of both the person of R. Allen Stanford and his Father James Stanford and the Stanford Group of companies."[94]

Additionally, "if the Stanford Group of Companies were semi public or fully public reporting organizations, such representation might not have been possible. However, via the very private and non reporting nature of these varied organizations and enterprises, Akin Gump via their own professional required due diligence analysis was well aware of the comingling and combinations that were undertaken by the Stanford Family on an ongoing basis."[95]

As evident, all Stanford Companies were closely held corporations and incorporated for very specific reasons.[96] A person does not accumulate 65 separate corporations if each was incorporated for broad nonspecific reasons. For instance, Stanford 20/20, LLC was incorporated for the sole reason to produce an international Cricket Tournament in Antigua and nothing else.[97]

Per the usual course of business, teleconference calls and emails delineating intent along with statements that Akin Gump represents Stanford Companies, an attorney-client relationship was formed for the Stanford Companies through Stanford and Akin Gump for other transactions as well.[98]

---

[94] *See* Exhibit "I", Affidavit of Dr. Ken Lehrer at 9.
[95] *See* Exhibit "I", Affidavit of Dr. Ken Lehrer at 9-10.
[96] *Rosman*, 653 F. Supp. at 1445.
[97] *See* Stanford 20/20 Organizational Chart, submitted herewith as Exhibit "AL"; *See* Exhibit "E", Affidavit of Robert Allen Stanford.
[98] *See Parker v. Carnahan*, 772 S.W.2d 151, 156 (Tex. App.—Texarkana 1989) (stating that the hallmark of an attorney-client relationship is the manifestation of an intention to create such a relationship); *Kirk & Carrigan*, 822 S.W.2d at 265 (stating that courts have

In totality, documents show that Stanford "as an individual was the 99.0+% owner of Stanford Financial and Stanford Group Holdings.  As such, when a transaction was being undertaken or structured, it is extremely easy for the funds and / or position of R. Allen Stanford (an individual) and the funds and / or position of one or more of the Stanford Group of Companies to be or become comingled and or intertwined."[99] Even more, because "there were no independent shareholders to report to or account for, it is highly unlikely that at all times, without any doubt or confusion that the law firm of Akin Gump knew exactly whom they were representing and the exact source of the Stanford funds.  In addition, in a situation where one individual is a super majority major shareholder, the concept of 'piercing the veil' often prevails in regard to significant transactions."[100]

This essentially means that, "funds from Stanford Financial can also belong to R. Allen Stanford and funds of R. Allen Stanford could be part of Stanford Financial.  This dual combining and comingling of funds is also evidenced by legal representation.  This based upon the fact that there were NO other law firms, NONE denoted as representing any other Stanford personal or private entities and thus Akin Gump supplied and fulfilled the dual representational role for both R. Allen Stanford and the Stanford Group of Companies."[101]

---

found an attorney-client relationship even where the attorney had no intention of forming such relationship).

[99] *See* Exhibit "I", Affidavit of Dr. Ken Lehrer at 8.

[100] *See* Exhibit "I", Affidavit of Dr. Ken Lehrer at 8.

[101] *See* Exhibit "I", Affidavit of Dr. Ken Lehrer at 8.

### 4. **STANFORD REASONABLY BELIEVED THAT AKIN GUMP ATTORNEYS WERE ACTING ON HIS PERSONAL BEHALF**

Stanford believed that Akin Gump was working for him personally and not his corporation explicitly because Stanford Companies had their own in-house counsel attorneys, including Yolanda Suarez and Mauricio Alvarado, to represent the respective Stanford Corporation.[102] Stanford believed that the role of the Akin Gump attorneys were to help Stanford personally when Stanford Companies needed additional and complex legal advice.[103]

For instance, in for Stanford 20/20 the OFAC denied Stanford's request to provide support for Cuba's participation in the tournament. Additionally, Stanford was told that he would also subject himself to investigation and liability with the U.S. State Department if the 20/20 Cricket and OFAC licensing did not resolve itself smoothly and if he violated the restrictions regarding sending money to Cuba.[104] Mr. Stanford personally spoke with attorneys Wynn Segall and Tatman Savio on more than one occasion to discuss "strategy and approach" related to the execution of licensing with the

---

[102] *See* Exhibit "E", Affidavit of Robert Allen Stanford; *See* Exhibit "AT", Declaration of Andrea Stoelker.

[103] *In re Legal Econometrics, Inc.*, 191 B.R. 331, 346-47 (Bankr. N.D. Tex. 1995), aff'd in relevant part sub nom. *Vaughn v. Akin, Gump, Hauer & Feld, L.L.P.*, No. 3-95-CV-0457-R, 1997 WL 560617 (N.D. Tex. Aug. 29, 1997) (where corporation's lawyers had performed various services on shareholder's behalf and had communicated with him directly without contacting his other attorneys for period of almost two years, attorney-client relationship between corporation's lawyers and shareholder existed); *See* Exhibit "E", Affidavit of Robert Allen Stanford; *See* Exhibit "AT", Declaration of Andrea Stoelker.

[104] *See* Exhibit "Z", Memo re: Cuba's participation in Stanford 20/20 Tournament; *See* Exhibit "E", Affidavit of Robert Allen Stanford.

OFAC and Cuba.[105] Stanford believed that Akin Gump were his personal attorneys working with Yolanda Suarez the attorney for Stanford 20/20.[106]

Stanford's personal relationship with Mr. Nunes further muddies the water between representing the person in combination with, or instead of, the company. "Even after the start of the Securities and Exchange Commission investigation of Mr. Stanford, he had a good faith basis for believing that Akin Gump still represented him. In particular, and according to Stanford's affidavit, on February 17, 2009, Tony Nunes, an Akin Gump partner, had a lengthy telephone conference with Stanford and sent him a follow-up email regarding the investigation, stating, "I'm in your corner. Hang in there. Tony." Stanford testified via affidavit, "This all led me to believe that Tony Nunes and Akin Gump would look out for me throughout the SEC matter." Mr. Stanford confirmed this with me at our July 1, 2010 conference and further stated that during the February 17, 2009 telephone conference, Mr. Nunes was emotional about the SEC investigation, reminded Stanford that he had "been there from the beginning" advising him in his business transactions, invited him to his home in Houston to discuss a legal strategy, and suggested that he and his firm would do, '[w]hatever it is you need us to do.' When viewed in the context of Rule 1.02 (b), Mr. Nunes' email alone (and certainly his telephone conversation) could reasonably have led Stanford to believe that Akin Gump was continuing to represent him and seems to foreclose on the possibility that only

---

[105] *See* Exhibit "AK", Billing re: Internal Compliance.
[106] *See* Exhibit "AT", Declaration of Andrea Stoelker.

months later it would be representing Stanford's entities' former insurers or attempting to represent Stanford's entities' former employees in a lawsuit against him."[107]

Perhaps best summed up in Stanford's own words,

"[i]t is my personal and true belief that Akin Gump has been representing not only several of my companies over at least the past ten years but has also been representing me personally throughout the same duration.  I have relied on Akin Gump's legal advice and services in order to expertly structure complicated transactions that have helped build and grow my companies' investment portfolios.  I have relied on the expertise and advice of Akin Gump in order to bring our business model of Cuba's participation in the Stanford 20/20 Caribbean Cricket Tournament to fruition.  I have relied on Tony Nunes, an attorney who was with Akin Gump from May of 2004 to April of 2010, to help me create SIBL in Antigua.  Having stated the foregoing facts throughout this affidavit, I find it completely unreasonable to argue that Akin Gump never represented me in an individual capacity."[108]

### iii.  <u>AKIN GUMP DID NOT CLEARLY DEFINE THE SCOPE OF THEIR REPRESENTATION</u>

"Under Rule 1.02 (b), if Akin Gump wished to place specific limits on the scope of its representation, it should have clearly defined those limits, communicated those limits to Mr. Stanford, and receive Mr. Stanford's consent after consultation. *See also, In re Cypresswood Land Partners I,* 410 B.R. 247 (Bankr. S.D. Tex. 2009) (where there is doubt as to whether an attorney-client relationship has been terminated, the attorney should clarify the attorney-client relationship, "preferably in writing so that client will not mistakenly suppose the lawyer is looking after the client's affairs when the attorney has failed to do so.") Otherwise, based upon Mr. Stanford's lengthy and diverse history with Akin Gump, he could reasonably believe that he could rely upon Akin Gump to represent

---

[107] *See* Exhibit "AI", Affidavit of Seth Hopkins at 8-9.
[108] *See* Exhibit "E", Affidavit of Robert Allen Stanford.

him for his general legal needs and could communicate freely with the firm about all confidential legal matters, both corporate and personal. The Stanfords' [sic] testimony indicates that no such limits were ever made by Akin Gump."[109]

Akin Gump cannot use their representation of Stanford Companies as a sword and a shield to argue that they did not represent Stanford personally, yet also argue and use those multiple Stanford Company transactions, which Akin Gump has a confidential insight to and worked directly on, to show that Stanford personally committed money laundering.[110]

### iv. AKIN GUMP IS NOT ACTING IN THE BEST INTERESTS OF THEIR FORMER CLIENT NOR THEIR CURRENT CLIENT

It is unclear whether Akin Gump has discussed their prior representation of Stanford and Stanford Companies with their current client, Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Company, but Stanford has not waived his attorney-client relationship or confidential information with Akin Gump, personally or on behalf of Stanford Companies. Above all, the client is the person who has the ability to waive attorney-client confidentiality.

Additionally, even if Stanford was not represented individually, Akin Gump's representation of Certain Underwriters at Lloyd's of London and Arch Specialty

---

[109] *See* Exhibit "AI", Affidavit of Seth Hopkins at 8.

[110] *United States v. Edwards*, 39 F. Supp. 2d at 724 (stating that 'this duty of confidentiality is broader than the evidentiary attorney-client privilege and applies not only to matters communicated to the attorney in confidence by the client, but to all information relating to the representation, whatever its source.'); See*, e.g., United States v. James*, 708 F.2d 40 (2d Cir. 1983); *Dworkin v. General Motors Corp.*, 906 F. Supp. 273 (E.D.Pa. 1995).

Insurance Company is adverse to their former clients, SFG, SIB, and SVCH. To adequately advocate for Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Company in this case, Akin Gump must prove that SFG, SIB, and SVCH were not legally run and not adequately regulated.[111]

Incidentally, Akin Gump definitely represented Stanford companies throughout the years, availing themselves to confidential information related to the running of the major Stanford entities. Furthermore, Lloyd's of London performed scheduled reviews and audits into how Stanford entities were run when issuing and renewing the D & O policy. Lloyd's of London representatives were in contact with James Davis regarding the structural soundness of the Stanford entities.[112] Ironically, Akin Gump and Lloyd's of London have now teamed up to argue that the D & O policy is invalid due to questionable Stanford entity operations that both Akin Gump and Lloyd's of London had intimate knowledge of for years.[113]

"[W]hen a firm represents a client adverse to its former client in a related case, there is not only a conflict for the former client, whose confidential information may now be used against him, but there may be a conflict for the new client, since the firm may have some residual loyalty to its former client. This does a disservice not only to the

---

[111] *See Anonymous v. Anonymous*, 262 A.D.2d 216 (N.Y. App. Div. 1st Dep't 1999) (stating that representation of a litigant could be "materially adverse" to a non-party in the litigation, including a former client,); *See also Franklin v. Callum*, 782 A.2d 884 (N.H. 2001) (stating that a law firm is disqualified for taking position adverse to the interest of current client who was not a party to the litigation).

[112] *See* Photo of James Davis and Lloyd's of London representatives, submitted herewith as Exhibit "AM"; *See* Exhibit "E", Affidavit of Robert Allen Stanford.

[113] *See* Exhibit "E", Affidavit of Robert Allen Stanford.

clients, but to the integrity and public perception of the profession."[114] Akin Gump cannot represent Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Company by attacking the validity of their own firm's prior work when they were Stanford's and Stanford Companies' representative counsel.[115]

"Akin Gump from the size and nature of their billing records appeared delighted to be in this ongoing dual representation position, a position most law firm [sic] only hope for and would seek to obtain in order for them to more easily sustain and increase their ongoing incomes.  As Stanford grew on a linear basis, the ability of Akin Gump to profit from their due [sic] representations grew on a geometric basis."[116]

Based on documents and billing records reviewed, Dr. Ken Lehrer, "based upon his personal and long standing (40 years) working knowledge of deals and ventures, background and education easily and fully concludes that the law firm of Akin Gump was at all time working for and representing an intermingled and / or comingled combination of R. Allen Stanford, an individual, and the Stanford Group of companies."[117]

III.   **A SUBSTANTIAL RELATIONSHIP EXISTS BETWEEN THE SUBJECT MATTER OF AKIN GUMP'S PREVIOUS INVOLVEMENT REPRESENTING STANFORD AND AKIN GUMP'S CURRENT INVOLVEMENT REPRESENTING CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON AND ARCH SPECIALTY INSURANCE COMPANY**

---

[114] See Exhibit "AI", Affidavit of Seth Hopkins at 14.
[115] *In re Basco*, 221 S.W.3d 637 (Tex. 2007); *In re Mitcham*, 133 S.W.3d 274, 276 (Tex. 2004); TEX. DISCIPLINARY R. PROF'L CONDUCT 1.09 (a).
[116] *See* Exhibit "I", Affidavit of Dr. Ken Lehrer at 10.
[117] *See* Exhibit "I", Affidavit of Dr. Ken Lehrer at 8.

Akin Gump may argue that they are not disqualified because they never represented Stanford or Stanford Companies in an insurance case. This potential argument is unfounded. Under the substantially related test, advice received from Akin Gump does not need to be relevant in the evidentiary sense to be substantially related, "[i]t need only be *akin* to the present action in a way reasonable persons would understand as important to the issues involved."[118]

It is imperative that the Court looks at the underlying issues of this case to see how Akin Gump's previous representation of Stanford and Stanford Companies is akin to the present action and issue. For Mr. Stanford the critical issue in this case requires Akin Gump, on behalf of Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Company, to prove money laundering occurred and further prove that Stanford personally committed money laundering. This case has expanded beyond the realm of simply comparing an insurance case to another insurance case, and there is more than just a reasonable probability that the highly confidential information Akin Gump acquired during its representation of Stanford can be used against Stanford and Stanford Companies. "Stanford objects to his former attorneys representing these new clients in an adverse proceeding, particularly since Akin Gump advised and assisted Stanford with transactions which are related to these claims."[119]

Defendants' Responses to Plaintiffs' Second Set of Interrogatories and Requests for Production from June 8, 2010, gives insight to broad theories Akin Gump plans to

---

[118] *In re Corrugated Container Antitrust Litigation*, 659 F.2d at 1346 (emphasis added).
[119] *See* Exhibit "AI", Affidavit of Seth Hopkins at 6.

execute for this case, and as such, is a simple way to show this Court how Akin Gump's previous representation of Stanford and Stanford Companies is substantially related to the present action.

Akin Gump is now asserting that Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Company do not have to pay under the D & O Policy because Stanford allegedly fraudulently obtained, or assisted in fraudulently obtaining, billions in investor funds.  The investor funds are the alleged criminal property.  The alleged criminal conduct is committing securities fraud, bribery, wire fraud, mail fraud, conspiracy to obstruct an SEC investigation, and obstruction of an SEC investigation.

Akin Gump alleges Stanford committed securities fraud by carrying out and facilitating a multi-billion dollar Ponzi Scheme. Furthermore, Akin Gump alleges that Stanford misappropriated at least $1.6 billion of the investor funds through bogus personal loans and an undetermined amount of investor funds through speculative and unprofitable investments in the businesses he controlled.

Akin Gump's past representation of Stanford is substantially related to the allegation of securities fraud. Akin Gump was involved in structuring, advising, documenting, regulatory matters, and executing key financial and strategic transactions on behalf of Stanford with AST, AST Telecom, ASL, BLUE SKY, CLEARSHOT, TWS, SVCH, SIB, SFG, CARIBBEAN SKY, and the Stanford 20/20 Cricket deals to name a few.  Almost all of the entity transactions that Akin Gump oversaw as Stanford's counsel were investments, mostly Tier 3, in businesses he controlled.  Akin Gump was the firm used for the investment portfolio for SIB and offered legal advice in connection with

investments made by SFG.[120] Akin Gump will have to prove securities fraud by showing investor funds were invested through bogus investments and unprofitable investments, when ironically; Akin Gump was the law firm overseeing many of these transactions.

### i. PROVING THAT STANFORD WAS MISAPPROPRIATING FUNDS IS SUBSTANTIALLY RELATED TO AKIN GUMP'S PREVIOUS REPRESENTATION OF STANFORD

Per Akin Gump's allegations that Stanford Companies were "misappropriating" funds and funding unprofitable investments in businesses Stanford controlled, Akin Gump was the firm used to transfer the funds, make investments, and drafted the notes and other financial documents for the Tier 3 investments, not limited to:

- proposed transactions between TWS, Stanford, Gelber Securities Inc., and Blue Sky as well as an AST roll-out with Blue Sky,[121]
- an Investor Rights Agreement containing voting rights, registration rights and tag-along rights,[122]
- an Exchange Agreement between Stanford Financial Group ("SFG") and Laiser,[123]
- multiple Exchange Agreement between SFG and TWS,[124]
- an Assignment and Assumption Agreement between SFG and TWS,[125]
- a Lost Note Affidavit from Stanford International Bank,[126]

---

[120] *See* Henry Failing SFG Document Request Excerpt, submitted herewith as Exhibit "AN"; *See also* Stanford Eagle Magazine Excerpt Displaying Portfolio of Companies, submitted herewith as Exhibit "AO".

[121] *See* Exhibit "J", Letter re: AST Board of Managers Meeting of January 11, 2001.

[122] *See* Exhibit "K", Email re: Stanford/TWS Investor Rights Agreement.

[123] *See* Exhibit "L", Email re: Stanford/TWS Restructuring Agreement and Draft First Amendment to Amend and Restated Stockholder Rights Agreement.

[124] *See* Exhibit "L", Email re: Stanford/TWS Restructuring Agreement and Draft First Amendment to Amend and Restated Stockholder Rights Agreement.

[125] *See* Exhibit "L", Email re: Stanford/TWS Restructuring Agreement and Draft First Amendment to Amend and Restated Stockholder Rights Agreement.

[126] *See* Exhibit "L", Email re: Stanford/TWS Restructuring Agreement and Draft First Amendment to Amend and Restated Stockholder Rights Agreement.

- a First Amendment to Amended & Restated Stockholder Rights Agreement,[127]
- a Certificate of Designation of Series A Non-Voting Preferred Stock of TWS,[128]
- a letter agreement regarding legal fees,[129]
- affidavits for a lost AST promissory note and a lost TWS promissory note,[130]
- warrants,[131]
- executed the "ClearShot deal",[132]
- drafted board resolutions for SFG and SIB,[133]
- drafted a letter to Daivid Laiser, the TWS Chairman and CEO, purportedly from James Davis,[134]
- executed investment loans in venture companies,[135]
- drafted stock purchase agreements to transfer TWS stock from SIB and Bank of Antigua to SVCH,[136]
- explanation of a tax assistance loan while they represent SFG,[137]
- executed "Stanford and GO LLC loan documents for TWS and TWSI",[138]
- a revised Line of Credit Agreement,[139]
- SFG Notes,[140]
- a General Security Agreement,[141]
- executed the "AST transaction" involving Nortel,[142]
- creation of a new LLC to hold the assets,[143]

---

[127] *See* Exhibit "L", Email re: Stanford/TWS Restructuring Agreement and Draft First Amendment to Amend and Restated Stockholder Rights Agreement.

[128] *See* Exhibit "L", Email re: Stanford/TWS Restructuring Agreement and Draft First Amendment to Amend and Restated Stockholder Rights Agreement.

[129] *See* Exhibit "L", Email re: Stanford/TWS Restructuring Agreement and Draft First Amendment to Amend and Restated Stockholder Rights Agreement.

[130] *See* Exhibit "M", Email re: Affidavits for the lost promissory notes.

[131] *See* Exhibit "M", Email re: Affidavits for the lost promissory notes.

[132] *See* Exhibit "N", Email re: The "ClearShot deal".

[133] *See* Exhibit "P", Email re: Resolutions for SFG and SIB.

[134] *See* Exhibit "Q", Letter re: Short Term Notes.

[135] *See* Exhibit "R", Email re: Transfer of Assets to SVCH.

[136] *See* Exhibit "S", Email re: Transfer of TWS stock to SVCH.

[137] *See* Exhibit "T", Letter re: Laiser Tax Loan Request.

[138] *See* Exhibit "U", Email re: Stanford and GO LLC documents.

[139] *See* Exhibit "U", Email re: Stanford and GO LLC documents.

[140] *See* Exhibit "U", Email re: Stanford and GO LLC documents.

[141] *See* Exhibit "U", Email re: Stanford and GO LLC documents.

[142] *See* Exhibit "V", Email re: AST and Nortel.

[143] *See* Exhibit "V", Email re: AST and Nortel.

- a FCC license transfer and a Stanford Company was acting as a creditor until the assets were transferred to the new entity,[144]
- a LLC Operating Agreement for AST Telecom, a request to the FCC to allow ASL to transfer control from AST to AST Telecom, and[145]
- trademark applications,[146]

"An overall review of the files and documentation further reveals the Attorneys and Law Firms, such as Akin Gump (from their billing records) who prepared and worked on the documentation had to have a clear understanding and perception of the business transactions and their relationship and representation (dual or joint) of R. Allen Stanford and the Stanford Group of Companies."[147]

<h3 style="text-align:center"><ins>ii. PROVING THAT STANFORD FABRICATED FINANCIAL PERFORMANCE IS SUBSTANTIALLY RELATED TO AKIN GUMP'S PREVIOUS REPRESENTATION OF STANFORD</ins></h3>

Akin Gump also alleges that Stanford fabricated financial performance and Stanford provided other employees predetermined numbers. Substantially related to the issues at hand, Akin Gump held themselves out as representing SFG as outside counsel. If there were evidence of routine changing or fabrication of numbers, it would be unreasonable to assert that Akin Gump had no knowledge of the behavior when they were counsel for SFG and involved in many complex investment transactions.[148]

Additionally noted:

---

[144] *See* Exhibit "V", Email re: AST and Nortel.
[145] *See* Exhibit "H" LLC Operating Agreement and Asset Purchase Agreement; *See* Exhibit "D", Affidavits of James Allen Stanford.
[146] *See* Exhibit "X", Emails re: Caribbean Sun Trademark Applications.
[147] *See* Exhibit "I", Affidavit of Dr. Ken Lehrer at 4.
[148] See Exhibit "T", Letter re: Laiser Tax Loan Request.

"in many of these instances, the Attorneys and law firms interacted with each other and a significant number of firms such as – Fleischman & Walsh; Donelan, Cleary, Wood and Maser, various offices of Akin Gump and various legal divisions and entities of the United States Federal Government. In order for such interaction amongst attorneys to have any meaning and viability, the corresponding Attorneys have to understand the basics of the transactions and be able to respond and reply in a meaningful manner, thus clearly revealing their knowledge, structuring and representation of different clients in the various transactions.  Several of these Attorney replies also include analysis of associated Court opinions, thus further supporting and evidencing their knowledge of the transactions, varied representations and the underlying ingredients."[149]

Akin Gump is privy to distinct private knowledge and confidences made during their representation of Stanford and Stanford Companies that sits at the heart of their allegation of fabricating financial performance.

"Since the Stanford Group of companies operated over a vast spectrum of areas, many of the Administrative Agencies (also referred to as the "Alphabet Boys")…were involved in or had to pass judgment on the applications of the various corporate ventures, enterprises and individuals (such as R. Allen Stanford himself) involved in and with the Stanford Group of companies.  In order for these various and varied ventures to obtain an agency's 'seal of approval' (as when necessary) the party creating the document, namely in one or more instances the attorneys at Akin Gump needed to be fully informed of the enterprise, and it members (which often included R. Allen Stanford as an individual) and its structure when submitting an application to a specific Administrative agency or such application(s) would have been rejected or denied."[150]

### iii.  <u>PROVING THAT STANFORD ENGAGED IN BRIBERY AND CONSPIRACY TO OBSTRUCT AN SEC INVESTIGATION IS SUBSTANTIALLY RELATED TO AKIN GUMP'S PREVIOUS REPRESENTATION OF STANFORD</u>

---

[149] *See* Exhibit "I", Affidavit of Dr. Ken Lehrer at 4, 5.
[150] *See* Exhibit "I"; Affidavit of Dr. Ken Lehrer.

Furthermore, Akin Gump says Stanford engaged in acts of bribery by paying thousands of dollars to Leroy King, an Antiguan regulator responsible for supervising SIB. Substantially related to the issues at hand, Akin Gump performed routine services for SIB not limited to Mr. Nunes establishing the bank and certificate of deposit program used by SIB, and Mr. Cepeda drafting the board resolutions that govern SIB.[151] Not to beat a dead horse, but again, transactions of this nature require Akin Gump attorneys to understand the detailed running of SIB, and to adequately execute the transactions that Akin Gump performed requires a deep knowledge of the flow of money and investments.[152]

Akin Gump alleges that all Plaintiffs conspired to obstruct an SEC investigation by bribing Leroy King to misrepresent the extent of his oversight of SIB. In addition, Akin Gump alleges that all Plaintiffs participated in meetings for the purpose of preparing Ms. Holt's testimony before the SEC. Akin Gump alleged that in those meetings to prepare Ms. Holt, Stanford admitted he had misappropriated investor funds. Akin Gump further alleges that the Stanford Company Portfolio comprised of undisclosed personal loans to Stanford and undisclosed private equity and real estate deals.

Akin Gump attorneys helped draft lost note affidavits, execute notes, and debt instruments for Stanford Companies.[153] Substantially related to the issues at hand, James Davis approved the transfer of all investments and Akin Gump executed loans and debt

---

[151] *See* Exhibit "D", Affidavits of James Allen Stanford.
[152] See Exhibit "P", Email re: Resolutions for SFG and SIB.
[153] *See* Exhibit "M", Email re: Affidavits for the lost promissory notes.

instruments from Stanford Companies to venture companies.[154] Akin Gump has systematically performed services for Stanford Companies that are at the heart of the "money laundering" conduct they are alleging.

### iv. PROVING THAT STANFORD THROUGH SIB CONCEALED PERSONAL LOANS IS SUBSTANTIALLY RELATED TO AKIN GUMP'S PREVIOUS REPRESENTATION OF STANFORD

Akin Gump alleges that SIB concealed personal loans to Stanford. Substantially related to the issues at hand, Akin Gump performed services for Stanford related to loans, investment, Stanford's direction of money, and Mr. Davis' direction of money. Akin Gump was also aware how loans related to Stanford were executed and performed the paperwork to document and execute those transactions.[155]

### v. PROVING THAT STANFORD ENGAGED IN MAIL AND WIRE FRAUD IS SUBSTANTIALLY RELATED TO AKIN GUMP'S PREVIOUS REPRESENTATION OF STANFORD

Another allegation is that Stanford Companies engaged in acts of mail and wire fraud to facilitate Stanford scheme and obtain investor funds. Stanford through Stanford Companies allegedly committed mail fraud using the USPS to deliver documents to obtain investor funds. Additionally, Stanford through Stanford Companies allegedly

---

[154]*See* Exhibit "R", Email re: Transfer of Assets to SVCH.
[155]*See* Exhibit "O", Email re: Stanford and $GO_x$ LLC documents stating "It was brought to my attention that Stanford will make the loan facility available through its subsidiary Stanford Venture Capital Holdings, Inc. (Delaware Corporation with Houston, TX offices) and not through Stanford Financial Group Company. I will work with Andrew to make certain that this is properly reflected throughout the loan documents. This change should not have a material effect upon the business terms of the transaction."—signed Roger Cepeda Akin Gump attorney.

committed wire fraud by using wire communications and conducted wire transactions to facilitate their fraudulent scheme.

There are numerous records showing that on several occasions Stanford Companies FedEx'd documents related to Tier 3 investment business acquisitions to Akin Gump.[156] Conversely, Akin Gump shipped documents to Stanford and Stanford Companies containing documents to grow Stanford's alleged "multi-billion dollar Ponzi scheme".[157] Furthermore, Stanford and Stanford Companies routinely wire-transferred money to Akin Gump to pay for legal services related to execution of Tier 3 investments to facilitate the alleged "sham capital infusions from Stanford to SIB."[158] No doubt similar courier and financial wire services were used by Akin Gump to send documents to other parties related to the very transactions that Akin Gump represented and advised Stanford, the same transactions that are now alleged to be acts of money laundering under Akin Gump advice.

### vi. PROVING THAT STANFORD LAUNDERED MONEY THROUGH COMPANIES HE HELD AN INTEREST IN IS SUBSTANTIALLY RELATED TO AKIN GUMP'S PREVIOUS REPRESENTATION OF STANFORD

Akin Gump on behalf of their client, Certain Underwriters at Lloyd's of London and Arch Specialty Insurance, contend that Stanford laundered money through companies that he held an interest.  The receiver and the Government allege that Stanford violated the SEC through a fraudulent scheme using companies that Akin Gump represented and

---

[156] *See* Shipping Document, submitted herewith as Exhibit "AP".

[157] *See id.*

[158] *See* Wire Transfer Documents, submitted herewith as Exhibit "AQ"; *See* Exhibit "AB", Wire Transfer and Statement.

advised Stanford.   Akin Gump advised Stanford to move money into investments structured identical to those companies and financial dealings Akin Gump documented, structured, and executed while representing Stanford and Stanford Companies.

As stated previously, representation of a former client "need only be *akin* to the present action in a way reasonable persons would understand as important to the issues involved."[159]   In totality of the circumstances, a reasonable person can understand why Akin Gump must be disqualified from this case.   Mr. Nunes' established SIB and the certificate of deposit program in 1985, and although he was with Baker Botts at the time, his knowledge of establishing SIB and the certificate of deposit program was imputed to Akin Gump when Mr. Nunes became a partner in 2004.   The ongoing relationship with former Akin Gump attorney, Mr. Nunes, and Akin Gump, and their position now arguing that Stanford and Stanford Companies committed money laundering via SIB is enough to disqualify Akin Gump for the confidential knowledge imputed to both. However, Akin Gump's continued representation of Stanford and Stanford Companies did not stop with Mr. Nunes knowledge imputed throughout the firm; as Akin Gump continuously executed multimillion dollar transactions and capital infusions in varying capacities for the past decade.   Nearly all of the transactions, for which there is information, that Akin Gump represented Stanford and Stanford Companies as counsel, relate to financial transactions, notes, loans, licensing, and business acquisitions of Tier 3 investments.

IV.   **PRECEDENT DEMANDS THAT AKIN GUMP IS DISQUALIFIED FROM THE ABOVE STYLED CASE BECAUSE OF AN ADVICE OF COUNSEL DEFENSE AND A SUBSTANTIAL RELATIONSHIP**

---

[159] *In re Corrugated Container Antitrust Litigation*, 659 F.2d at 1346 (emphasis added).

**EXISTS BETWEEN STANFORD, STANFORD COMPANIES, AND AKIN GUMP.**

Stanford is entitled to raise an "advice of counsel" defense. Evidence to support an "advice of counsel" defense may include producing privileged documents and calling lawyers at witnesses. Accordingly, when an "advice of counsel" defense is asserted, courts have not hesitated to disqualify counsel based on the potential that counsel may be a witness.[160]

Disqualifying a lawyer from participating in a case where he may be a witness is appropriate as "[f]ederal courts have an independent interest in ensuring that trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them."[161] Courts are cautious in acting not only in situations "where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses."[162] Such action is not only appropriate but also necessary here.

Akin Gump's complex and detailed legal recommendations to Stanford and Stanford entities place the firm and firm employees in a position to be called as witnesses

---

[160] *See United States v. Locascio,* 6 F.3d 924, 934-35 (2nd Cir. 1993) (affirming disqualification of counsel due to potential that counsel would be unsworn witness based on first-hand knowledge of some evidence); *United States v. Merlino,* 349 F.3d 144, 150-51 (3d Cir. 2003) (potential for counsel to be subject to disciplinary sanctions and witness at trial warranted disqualification); *U.S. v. DeFazio,* 899 F.2d 626, 631 (7th Cir. 1990) (disqualification claim not examined with "the advantage of hindsight"; failure to call counsel as a witness at trial is "unimportant" to upholding disqualification).

[161] *Wheat v. U.S.*, 486 U.S. 153 (1988); *see U.S. v. Reeves*, 892 F.2d 1223, 1227 (5th Cir. 1990).

[162] *Id.* at 163.

in this case. Although none of the attorneys representing Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Company have previously represented Stanford, the knowledge of the more than one dozen Akin Gump attorneys is imputed throughout the entire firm.[163]

As described, Akin Gump provided Stanford with legal advice related to banking, Stanford Company investment portfolios, formation of investment companies, and much more. Stanford could use Akin Gump's previous advice as part of his defense, which may include introducing Akin Gump's documents as evidence and calling its attorneys as witnesses. Thus, Akin Gump can have no role in this case as an adversary to Stanford or Stanford Companies. Indeed, Akin Gump's continued involvement not only impedes Stanford's constitutional right to a fair trial but it subjects itself to possible action.[164]

V. **ANY ASSERTION OF ERECTING A CHINESE WALL IS NOT SUFFICIENT FOR THE COMPLEX CONVOLUTED ISSUES BEFORE THE COURT THAT ARE DEEPLY INTERTWINED WITH AKIN GUMP'S PREVIOUS REPRESENTATION OF STANFORD AND STANFORD COMPANIES**

Akin Gump may allege that a "Chinese Wall" is established within the firm to avoid cross-contamination of confidential information. Mr. Nunes was an attorney with Akin Gump until April 2010, well after Akin Gump began representing Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Company and after the

---

[163] TEX. DISCIPLINARY R. PROF'L CONDUCT 1.09 (b), re-printed in TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A, Art. 10, § 9 (Vernon 2005).
[164] In addition to possibly serving as a witness in this case, Akin Gump itself may be subject to state bar disciplinary action, a malpractice lawsuit, and possible prosecution for crimes such as fraud or theft of honest services for having breached its fiduciary duty to Stanford and Stanford Companies.

question of money laundering arose in this case. "When a tainted lawyer moves to a new firm, that firm may no longer work on the case."[165] Akin Gump "is not allowed to wall off the tainted member or certain parts of the litigation"[166] This implies that, aside from the more than one dozen Akin Gump attorneys who worked for Stanford and Stanford Companies in varying capacities, once Mr. Nunes joined Akin Gump they could not build an effective "Chinese Wall" around him when representing a client against Stanford and Stanford Companies in a substantially related matter. That is not to allude that Mr. Nunes provided any documented work officially through Akin Gump for Stanford, but to convey how seriously Courts like to minimize conflict and that a "Chinese Wall" is usually not practical.

"In practice, it is not uncommon for firms to establish 'Chinese Walls' to restrict access to files and information and to prevent members of the firm working on a case from communicating about the case with firm members who may have conflicts or may be in possession of confidential information about adverse parties. However, these screening procedures are normally created when an individual or small number of employees from one firm are employed by a new firm, thus creating an inadvertent conflict. It is uncommon for a firm which represented one client to terminate

---

[165]*In re George,* 28 S.W.3d 511, 523 (Tex. 2000); Tex. Disciplinary R. Prof'l Conduct 1.09(b).
[166]*In re George,* 28 S.W.3d 511, 523 (Tex. 2000), citing Henderson v. Floyd, 891 S.W.2d 252, 253-54 (Tex.1995).

representation with that client, begin representing an adverse client, and then attempt to isolate the attorneys and staff who worked with the first client."[167]

The sheer number of Akin Gump attorneys involved in varying capacities for Stanford and Stanford Companies and the size and scope of the financial and structured transactions that Akin Gump attorneys executed on behalf of Stanford prevent an effective "Chinese Wall" from being erect.

## VI.   AKIN GUMP'S CONTINUED REPRESENTATION OF CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON AND ARCH SPECIALTY INSURANCE COMPANY GOES AGAINST PUBLIC POLICY RATTLING THE PUBLIC'S TRUST IN THE LEGAL SYSTEM

The Fifth Circuit mandates that "a lawyer who has given advice in a substantially related matter must be disqualified, whether or not he has gained confidences."[168] Additionally, when two matters are substantially related, it is *irrebuttably presumed* that confidential information was exchanged during the former period of representation.  The Fifth Circuit has stated that:

> "[t]he court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation. It will not inquire into their nature or extent. Only in this manner can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule relating to privileged communications be maintained."[169]

According to Rule 1.09(c), Akin Gump will "continue to be disqualified even after the attorney who previously represented the adverse client departs 'if the representation in

---

[167] *See* Exhibit "AI", Affidavit of Seth Hopkins at 16.

[168] *See e.g., American,* 972 F.2d 619; *In re Corrugated Container Antitrust Litigation*, 659 F.2d 1341 (5th Cir. 1980).

[169] *See American*, 972 F.2d at 618, citing *T.C. Theater Corp. v. Warner Bros. Pictures, Inc.*, 113 F. Supp. 265, 268-69 (S.D. N.Y. 1953).

reasonable probability will involve a violation of Rule 1.05'."[170] Rule 1.05 provides exceptions to the general duty of confidentiality, one "allows an attorney to reveal confidential information, "[t]o the extent revelation reasonably appears necessary to rectify the consequences of a client's criminal or fraudulent act in the commission of which the lawyer's services had been used." Presumably, Akin Gump may argue that Mr. Stanford used its services to engage in activity which it must now rectify. However, whether Mr. Stanford engaged in criminal or fraudulent activity is an ultimate issue being decided in this case. Furthermore, this rule contemplates that a lawyer may be called as a witness in subsequent litigation in which he may be asked to testify as to his client's actions. It does not contemplate that the lawyer might use this confidential information to take on a new case against his former client."[171]

Additionally, "a requirement that the irrebuttable presumption continues to apply after the disqualified attorney leaves the firm serves to uphold the integrity of the legal profession."[172] Although not immediately discernible how long Mr. Chasnoff and Mr. Mungia have been with Akin Gump, Mr. Lane has been an attorney with Akin Gump since October 1992.[173] Many of the attorneys from Akin Gump who represented Stanford and Stanford Companies from 2000 to 2010 are still attorneys at Akin Gump's Houston, Dallas, Austin, and Washington D.C., offices. Imputation of knowledge is applied

---

[170] *See TXU U.S. Holdings Co. d/b/a/ Tu Electric*, 110 S.W.3d 62, 65 (Tex. App--Waco 2002), citing TEX. DISCIPLINARY R. PROF'L CONDUCT 1.09(c)
[171] *See* Exhibit "AI", Affidavit of Seth Hopkins at 12-13.
[172] *TXU U.S. Holdings Co.*, 110 S.W.3d at 66.
[173] *See* Linkedin Profile for Daniel McNeel Lane, submitted herewith as Exhibit "AR";

throughout the firm and to the attorneys who represent Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Company in this case.[174]

Additionally, the Fifth Circuit's substantial relationship test is not solely concerned with the adverse use of confidential information or the appearance of impropriety; it is also concerned with the law firm's duty of loyalty.  As a matter of public policy, "if courts protect only a client's disclosures to his attorney, and fail to safeguard the attorney-client relationship itself – a relationship which must be one of trust and reliance – they can only undermine the public's confidence in the legal system as a means for adjudicating disputes."[175]  An attorney's obligation to not "misuse information acquired in the course of representation serves to vindicate the trust and reliance that clients place in their attorneys."[176]  Furthermore, "a client would feel wronged if an opponent prevailed against him with the aid of an attorney who formerly represented the clients . . . this would undermine public confidence in the legal system as a means for adjudicating disputes."[177]  "The purpose of having conflict of interest rules is to assure that clients are protected from attorneys and firms with divided loyalties, whether obvious or subtle. The public is entitled to the assurance that their attorneys are providing them with zealous representation which is not influenced by conflicts or other interests,

---

[174] TEX. DISCIPLINARY R. PROF'L CONDUCT 1.09 (b), re-printed in TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A, Art. 10, § 9 (Vernon 2005); *American., 972 F.2d at 614 & n.1*; *Kraft, Inc. v. Alton Box Board Co. (In re Corrugated Container Antitrust Litigation),* 659 F.2d at 1346*; American Can Co. v. Citrus Feed Co*., 436 F.2d at 1129.
[175] *American*, 972 F.2d at 618 (citing *E.F. Hutton & Co. v. Brown*, 305 F. Supp. 371, 395 (S.D. Tex. 1969)).
[176] *Brennan's Inc. v. Brennans' Restaurants, Inc.,* 590 F.2d 168 (5th Cir. 1979).
[177] *Id.*

pecuniary or otherwise. As legal ethics evolves, the profession is becoming increasingly sensitive to conflicts as subtle as a lawyer's small, often passive investments."[178]

For Akin Gump to continue to represent Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Company in this case would perturb and outrage the public's trust and confidence in the legal system. Stanford is hesitant that Akin Gump attorneys would not use his own confidences and their intimate knowledge of SFG and SIB against him in this cause to benefit Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Company, as Stanford feels that there is a lack of loyalty to Akin Gump's clients and former clients.[179] In this case, Stanford is now facing an outrageous situation where Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Company stands to gain, based on decades of knowledge Akin Gump obtained while previously representing Stanford and Stanford Companies.

Akin Gump is now asserting that Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Company do not have to pay Stanford under the D & O Policy because of a broad definition of money laundering, which inherently relates to the very transactions that Akin Gump represented Stanford. Akin Gump cannot continue to represent Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Company while maintaining intimate and closely-held knowledge of the financial

---

[178] *See* exhibit "AI", Affidavit of Seth Hopkins at 14.

[179] A transcript between Mr. Kent Schaffer and Akin Gump attorney Mr. Daniel McNeel Lane was uncovered in the boxes of discovery sent to Stanford's lead criminal defense counsel's office. In the transcript, Mr. Lane encourages Mr. Schaffer to drum-up bad press and file a lawsuit against his own current client, Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Company, submitted herewith as Exhibit "AS".

dealings of Stanford and Stanford Companies. Akin Gump cannot continue to represent their clients in this case and assert that the transactions they themselves executed voided their current client's obligation to pay for Stanford's defense.

The documents provided to Stanford, "clearly denotes that over a prolonged period of time it was the Akin Gump Law firm who advised, prepared and documented many of the major transactions undertaken by both R. Allen Stanford and the Stanford Group of Companies.  If this was not the case, than the Stanford parties who compensated the Akin Gump law firm were clearly paying for services and talents not provided.  As noted in the Watergate proceedings - 'follow the money'."[180]

Expedited consideration of this motion is necessary because this is an expedited proceeding and numerous approaching deadlines. Stanford respectfully requests expedited consideration of this motion to enable him to adequately prepare for the Hearing set to start August 24, 2010.  If an expedited hearing will assist the Court in ruling on the motions, Stanford respectfully request an expedited hearing.[181] The Court may benefit by hearing the client's testimony. Additionally, Stanford respectfully requests the opportunity to file a reply by a date set by the Court.

---

[180] See Exhibit IX", Affidavit of Dr. Ken Lehrer at 7.

[181] When the facts underlying the motion are contested, however, a hearing typically will be held. *See In re Estate of Myers*, 130 P.3d 1023, 1027 (Colo. 2006); 22 Law. Man. Prof. Conduct 131 (stating that although no mechanical hearing requirement applies, "justification for this extreme remedy will often require particularized factual findings"); *Cody v. Cody*, 889 A.2d 733 (Vt. 2005); 21 Law. Man. Prof. Conduct 522 (Vt. 2005) (stating trial court should not disqualify lawyer on basis of alleged former-client conflict without holding evidentiary hearing, if lawyer denies that he ever represented complaining party).

WHEREFORE, Stanford requests an order barring Barry Chasnoff, Neel Lane, Manuel Mungia, and all members of the firm of Akin Gump from representing Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Company against Stanford, in all further proceedings in this cause, and directing that no work product generated by Akin Gump attorneys in connection with representing Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Company in this cause before issuance of the order may be made available to Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Company or Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Company's new counsel.

Respectfully submitted,

___/s/ Robert S. Bennett___
Robert S. Bennett
Texas Bar No. 02150500
Fed Bar No. 465
515 Louisiana St. Ste 200
Houston, TX 77002
713.225.6000
( FAX)713.225.6001

ATTORNEY FOR PLAINTIFF/MOVANT

## CERTIFICATE OF SERVICE

I certify compliance with the Court's Procedures. On July 02, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered parties.

___/s/ Robert S. Bennett___
July 02, 2010                                                  Robert S. Bennett

## <u>CERTIFICATE OF CONFERENCE</u>

I HEREBY CERTIFY that I have complied or attempted to comply with the local meet and confer requirement. In discussions and exchanges with Akin Gump, I have been warned not to file this motion. I have also complied with the Court's twenty-four ("24") hour rule.

 /s/ Robert S. Bennett

Robert S. Bennett

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LAURA PENDERGEST-HOLT, | § | |
| R. ALLEN STANFORD, GILBERTO | § | |
| LOPEZ, JR. and MARK KUHURT | § | |
| *Plaintiffs*, | § | CIVIL ACTION NO.: 4:09-cv-03712 |
| | § | |
| vs. | § | |
| | § | |
| CERTAIN UNDERWRITERS AT | § | |
| LLOYD'S OF LONDON and ARCH | § | |
| SPECIALTY INSURANCE | § | |
| COMPANY, | § | |
| *Defendants* | § | |

## <u>ORDER</u>

Upon consideration of the Plaintiff's Motion to Disqualify Akin, Gump, Strauss, Hauer & Feld, the responses and replies thereto, the evidence submitted by all parties, and the arguments of counsel, the Court is of the opinion that Mr. Stanford's Motion to Disqualify Akin, Gump, Strauss, Hauer & Feld is GRANTED in its entirety.

**SIGNED** at Houston, Texas, this _____ day of _____, **2010**.

_____
Nancy Atlas
United States District Judge