IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION<br>Plaintiff, | §<br>§<br>§<br>§ | |
| | § | CIV. ACTION NO.3-09CV0298-N |
| v. | §<br>§<br>§ | |
| STANFORD INTERNATIONAL BANK, LTD., ET AL.,<br>Defendants. | §<br>§<br>§ | |

### AFFIDAVIT OF JAMES ALLEN STANFORD

| | |
|---|---|
| STATE OF TEXAS | §<br>§ |
| COUNTY OF LIMESTONE | § |

Before me, the undersigned notary, on this day personally appeared James Allen Stanford, who being by me first duly sworn did depose and say:

1. "My name is James Allen Stanford. I am over the age of 21 years, am under no legal disability, and am fully competent to make this affidavit. The matters appearing herein are true and correct of my own personal knowledge.

2. My son, Robert "Allen" Stanford, and I first retained the Houston law firm of Baker & Botts in 1985-1987 to perform legal services and to provide legal advice in connection with the formation of a foreign bank in the Caribbean. The bank was originally organized under the laws of Monserrat, West Indies. Allen Stanford and I were the sole principals.

3. Allen and I met with a Baker & Botts attorney named Tony Nunes beginning in October of 1985, in connection with the formation and organization of the bank. Baker & Botts charged us an up front fee of $10,000 (which was paid by Allen), and billed us hourly thereafter. The hourly bills were paid by Stanford Financial Group, Inc., an investment and real estate company.

4. The bank, which later became known as Stanford International Bank, was originally called Guardian International Bank Limited (GIBL). The lawyers at Baker & Botts represented the bank, Allen Stanford, and me in connection with the formation of the bank. The Memorandum of Association & Articles of Association were drafted by Mr. Nunes and others working with him at Baker & Botts on or about November 22, 1985. Pursuant to the terms of the Memorandum & Articles, I, James Stanford, and my son, Allen Stanford, were the initial shareholders and officers of GIBL.


EXHIBIT D

5. As is reflected in Baker & Botts' own internal memoranda, the purpose of GIBL from the beginning was to aggregate the savings of individuals in certificates of deposit issued by the bank, and ultimately deposited in banks, obligations, and instruments located in the United States, as well as investing in real estate. Allen and I had many substantive discussions with Mr. Nunes about how to structure the bank and our strategy for investing.

6. As described in detail in Mr. Nunes' notes, Allen, in my presence, discussed with Mr. Nunes on more than one occasion, our family business' history, our business opportunities in Venezuela, Curacao, Aruba, the Netherlands Antilles, and other Caribbean locations stemming from oil refinery closings, ways to benefit from currency exchange laws of these countries, what our business strategy was with regard to monies deposited with GIBL, our arrangements with other banks located in the United States and other jurisdictions, how much profit we predicted we would make and under what terms, and what Baker & Botts' role was to be, and many other private, confidential details.

7. As reflected in section 3(29) of the Memorandum and Articles of Association of the bank, one of the objectives was to cause the bank issue and deposit securities by way of collateral for the performance of any obligation of the Bank or other companies to which the Bank might make loans, or in which the Bank might have investments. Furthermore, section 3(32) authorizes the GIBL to enter into any partnership or union of interest with any person or company that GIBL believes would be beneficial. This provision was specifically reviewed by and with our counsel, Baker Botts, and we relied upon the advice of Baker Botts with regard to the legality of such arrangements under the securities laws and the regulations of the United States and other jurisdictions in which the Bank might be operating.

8. Mr. Nunes appeared with Allen Stanford at the High Court of Justice for the Colony of Montserrat before the Resistrar to finalize and approve the formation of GIBL. Mr. Nunes also appeared with Allen Stanford before the Federal regulatory authorities in Washington, D.C. and the State of Texas regulatory authorities in Austin, Texas to insure compliance with Federal and State regulations. Over the years, Mr. Nunes has advised and counseled Allen Stanford, GIBL (now called Stanford International Bank Limited) Stanford Financial Group, Inc., and me as well as other Stanford entities regarding maintaining SIBL's status as an independent entity and about the adviseability and legality of interrelatedness or business dealings between SIB, SFG, and other the companies Allen Stanford, or we owned.

9. Baker Botts was intimately involved in all aspects of the organization of the bank, the utilization of funds, and the relationships between the Bank, Stanford Financial Group, and other related, but independent, companies."

4

06/14/2009   04:56    9033898118                                                         PAGE   03

Further affiant sayeth not.

_____
James Stanford

SWORN TO AND SUBSCRIBED BEFORE ME, the undersigned authority this _____ day of _____, 2009.

_____
Notary Public, State of Texas



5

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LAURA PENDERGEST-HOLT, R. ALLEN STANFORD, GILBERT LOPEZ, JR. and MARK KUHRT, | § § § § | |
| *Plaintiffs,* | § § | |
| V. | § § | CIV. ACTION NO. 4:09-cv-03712 |
| CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON and ARCH SPECIALTY INSURANCE COMPANY, | § § § § § § | |
| *Defendants.* | § | |

### AFFIDAVIT OF JAMES ALLEN STANFORD

| | |
|---|---|
| THE STATE OF TEXAS | § § |
| THE COUNTY OF LIMESTONE | § |

Before me, the undersigned notary, on this day personally appeared James Allen Stanford, who being by me first duly sworn did depose and say:

1. "My name is James Allen Stanford. I am over the age of 21 years, am under no legal disability, and am fully competent to make this affidavit. The matters appearing herein are true and correct of my own personal knowledge.

2. My son, Robert "Allen" Stanford, and I first retained the Houston law firm of Baker & Botts in 1985-1987 to perform legal services and to provide legal advice in connection with the formation of a foreign bank in the Caribbean. The bank was originally organized under the laws of Montserrat, West Indies. Allen Stanford and I were the sole principals.

3. Allen and I met with a Baker & Botts attorney named Tony Nunes beginning in October of 1985, in connection with the formation and organization of the bank. Baker & Botts charged us an up front fee of $10,000 (which was paid by Allen), and billed us hourly thereafter. The hourly bills were paid for by Stanford Financial Group, Inc., an investment and real estate company.

4.  The bank, which later became known as Stanford International Bank, Ltd. was originally called Guardian International Bank Limited (GIBL). The lawyers at Baker & Botts represented the bank, Allen Stanford, and me in connection with the formation of the bank. The Memorandum and Association & Articles of Association were drafted by Mr. Nunes and others working with him at Baker & Botts during October and through on or about November 22, 1985. Pursuant to the terms of the Memorandum and Articles, I, James Stanford, and my son, Allen Stanford, were the initial shareholders and officers of GIBL.

5.  As is reflected in Baker & Botts' own internal memoranda, the purpose of GIBL from the beginning was to aggregate the savings of individuals in certificates of deposit issued by the bank, and ultimately deposited in banks, obligations and instruments located in the United States, as well as investing in real estate. Allen and I had many substantive discussions with Mr. Nunes about how to structure the bank and our strategy for investing.

6.  As described in detail in Mr. Nunes' notes, Allen, in my presence, discussed with Mr. Nunes on more than one occasion, our family business' history, our business opportunities in Venezuela, Curacao, Aruba, the Netherlands Antilles, and other Caribbean locations stemming from oil refinery closings, ways to benefit from currency exchange laws of these countries, what our business strategy was with regard to monies deposited with GIBL, our arrangements with other banks located in the United States and other jurisdictions, how much profit we predicted we would make and under what terms, and what Baker & Botts' role was to be, and many other private, confidential details.

7.  As reflected in section 3(29) of the Memorandum and Articles of Association of the bank, one of the objectives was to cause the bank to issue and deposit securities by way of collateral for the performance of any obligation of the Bank or other companies to which the Bank might make loans, or in which the Bank might have investments. Furthermore, section 3(32) authorizes GIBL to enter into any partnership or union of interest with any person or company that GIBL believes would be beneficial. This provision was specifically reviewed by and with our counsel, Baker Botts, and we relied upon the advice of Baker Botts with regard to the legality of such arrangements under the securities laws and the regulations of the United States and other jurisdictions in which the bank might be operating.

8.  Mr. Nunes appeared with Allen Stanford at the High Court of Justice for the Colony of Montserrat before the Registrar to finalize and approve the formation of GIBL. Mr. Nunes also appeared with Allen Stanford before the Federal regulatory authorities in Washington, D.C. and the state of Texas regulatory authorities in Austin, Texas to insure compliance with Federal and State regulations. Over the years, Mr. Nunes has advised and counseled Allen Stanford, GIBL (now called Stanford International Bank Limited), Stanford Financial Group, Inc., and me as well as other Stanford entities regarding maintaining SIBL's status as an independent entity and about the adviseability and legality of interrelatedness or business dealings between SIB, SFG, and other companies

Allen Stanford, or we owned. From May 2004 to April 2010, Mr. Nunes was with Akin Gump.

9. I have served on the board of directors of SIBL and SFG throughout the entire existence of those companies until their closure on February 17, 2009.

10. R. Allen Stanford and I, as sole shareholders of SIBL and SFG, relied on Akin Gump in an individual capacity and as personal counsel for financial legal advice and services concerning the structuring and execution of mergers and acquisitions of companies to increase the investment portfolios of SIBL and SFG and its affiliates.

11. Akin Gump represented Allen Stanford, SFG and SIBL in a complicated "roll up" restructuring agreement with Telecom Wireless Solutions, Inc., American Samoa Telecom, LLC, Gelber Securities, Inc., and Blue Sky Communications, Inc. in which shares of stock were exchanged.

12. Akin Gump represented Allen Stanford and Stanford companies in an asset purchase agreement transaction that ultimately allowed Allen Stanford to acquire American Samoa Telecom, LLC through his wholly owned AST Telecom, LLC. Akin Gump handled the applications and request to the FCC to allow AST to transfer control of AST to AST Telecom, assuring the FCC that AST Telecom, its parent company Stanford Capital Venture Holdings and its ultimate owner, R. Allen Stanford, were qualified to control a Commission license. Furthermore, Akin Gump drafted the limited liability company operating agreement for AST Telecom, LLC.

13. In reference to paragraphs 10 through 12, Akin Gump not only helped put together these deals, but also facilitated the transfer of funds and drafting of notes and other financial documents necessary for these "Tier Three" investments of SIBL.

14. Akin Gump represented Allen Stanford in acquiring a license from the Department of the Treasury from the OFAC Regulations. This license authorized the management and participation of a Cuban cricket team in the 2008 Stanford 20/20 Cricket Tournament in Antigua.

16. Akin Gump represented Allen Stanford in the trademark registration of Caribbean Sun Airlines, Inc., a Tier Three investment of SIBL, both wholly owned by Allen Stanford at the date of the transaction.

17. Akin Gump was involved in the drafting of board resolutions for SIBL.

18. Akin Gump has represented Allen Stanford and Stanford entities in renewing trademarks for Stanford entities.

19. It is my belief that Akin Gump was intimately involved in all aspects of the organization of SIBL, the utilization and transfer of funds, and the relationship between SIBL, SFG, and other related, but independent, Stanford companies. As I remember,

Akin Gump had intimate knowledge of or was directly involved in all of the business activities of the Stanford Group of Companies."

Further affiant sayeth not.

*James Allen Stanford*
_____
James Stanford

SWORN TO AND SUBSCRIBED BEFORE ME, the undersigned authority this 27 day of June, 2010.

[Notary Seal: CHARLOTTE J. BERRY, Notary Public, State of Texas, Comm. Exp. 08-04-12]

*Charlotte J. Berry*
_____
Notary Public, State of Texas