IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LAURA PENDERGEST-HOLT, R. ALLEN STANFORD, GILBERT LOPEZ, JR. and MARK KUHRT, | § § § § | |
| *Plaintiffs,* | § § | |
| V. | § § | CIV. ACTION NO. 4:09-cv-03712 |
| CERTAIN UNDERWRITERS AT LLOYDS OF LONDON and ARCH SPECIALTY INSURANCE COMPANY, | § § § § § § | |
| *Defendants.* | § | |

AFFIDAVIT OF ROBERT ALLEN STANFORD

| | |
|---|---|
| THE STATE OF TEXAS | § § |
| THE COUNTY OF HARRIS | § |

Before me, the undersigned notary, on this day personally appeared Robert Allen Stanford, who being by me first duly sworn did depose and say:

1. "My name is Robert Allen Stanford. I am over the age of 21 years, am under no legal disability, and am fully competent to make this affidavit. The matters appearing herein are true and correct of my own personal knowledge.

2. In October of 1985, I retained Baker & Botts attorney Tony Nunes in connection with the formation of Guardian International Bank, Ltd. in Montserrat, which was later moved to St. John's, Antigua and renamed Stanford International Bank, Ltd. My father, James Allen Stanford, and I spoke with Tony Nunes regarding our intent to create an off-shore bank for the purpose of aggregating the savings of depositors into certificates of deposit which in turn would be reinvested in U.S and non-U.S. banks, real estate, and limited partnerships. Tony Nunes and other Baker & Botts attorneys helped draft the Memorandum of Association & Articles of Association for Guardian International Bank, Ltd., and were therefore knowledgeable of the purposes and objectives for which the bank was being created and of both the United States and foreign securities laws and



regulations that would control those purposes and objectives of the bank. According to the Memorandum of Association & Articles of Association, my father, James Allen Stanford, and I were the sole shareholders of Guardian International Bank, Ltd.

3.  Tony Nunes was with Akin Gump from May of 2004 to April of 2010. During his time at Akin Gump, Mr. Nunes has sent me emails requesting my opinion regarding the Houston office of Greenberg Taurig, has sent me emails regarding catching up and buying me lunch the next time I was in Houston, and has invited Mauricio Alvarado, general counsel for Stanford Financial Group, to attend an open house at the offices of Akin Gump and then subsequently sent a letter apologizing for not being able to attend the open house himself. The day after the SEC civil action was filed on February 17, 2009, I talked at length with Tony Nunes over the phone as to what advice he could give me in dealing with the SEC matter. Furthermore, Tony Nunes contacted me via email on February 20, 2009, stating "I'm in your corner. Hang in there. Tony". This all lead me to believe that Tony Nunes and Akin Gump would look out for me throughout the SEC matter.

4.  Stanford companies were staffed with their own in-house attorneys, who represented the respective companies. However, I relied on Akin Gump as outside counsel to personally help me when I needed additional and complex legal advice regarding Stanford companies' investment opportunities. I relied on Akin Gump as a key financial and investment advisor to structure and execute several investments which increased the investment portfolios of Stanford Financial Group (SFG) and Stanford International Bank, Ltd. (SIBL), and Stanford Venture Capital Holdings, Inc. (SVCH), closely-held companies with no shareholders except for me and my father, James Allen Stanford.

5.  Akin Gump represented me and my companies in an asset purchase agreement in July of 2002 by and among Stanford Venture Capital Holdings, Inc., and AST Telecom, LLC on the one hand, and Blue Sky Communications, Inc., Communication International Corporation, and American Samoa Telecom, LLC on the other. In this transaction, Akin Gump helped me gain, through my wholly-owned SVCH and its subsidiary, AST Telecom, LLC, acquisition of American Samoa Telecom, LLC and its subsidiary, American Samoa License, Inc., and control of its commission licenses issued by the FCC.

6.  Akin Gump represented me and my companies in several restructuring and exchange agreements involving such Stanford companies as SIBL, SFG, and SVCH and several telecommunications companies including American Samoa Telecom, LLC, Blue Sky Communications, Inc., and Telecom Wireless Solutions, Inc. This representation took place from at least January of 2001 through May or June of 2003. Through these various and complex rollup transactions, Akin Gump helped me consolidate more control of the telecommunications industry in Stanford companies, thus expanding the investment portfolios of SVCH, SFG, and SIBL. As I remember, all wire transfers involved in these transactions were completed by Akin Gump.

7. Akin Gump has represented me and my companies in the registration and renewals of trademarks, particularly for Caribbean Sun Airlines, Inc., which was part of the tier three investment portfolio of SIBL. Akin Gump has also performed trademark registration and renewal services for SFG. I remember this representation taking place from at least as early as January of 2002 through August of 2006.

8. Akin Gump represented me personally in obtaining a license from the Office of Foreign Assets Control to allow for the participation of a Cuban Cricket team to compete in the 2008 Stanford 20/20 Cricket Tournament in Antigua.

9. I first introduced the Stanford 20/20 Caribbean Cricket Tournament (Stanford 20/20) to the West Indies region in 2006. Before starting the Stanford 20/20 tournament, what had once been a passionate enthusiasm for the game of Cricket throughout the region had devolved into a waning interest in the sport due to many unsuccessful years of the West Indies Cricket team. I saw the introduction of the tournament and the shorter, more exciting Twenty20 version of the game to the region to be the catalyst for the revival of what had once been a favorite pastime throughout the Caribbean. The $1,000,000 cash prize to the winner of the tournament sparked new excitement amongst fans and brought a higher standard of professionalism to the sport. Because I was so passionate in my belief that Stanford 20/20 could revive the game of Cricket in the West Indies and thus, unify and bond Cricket fans throughout the region, and could be developed into a much larger business model as Cricket is the second most popular spectator sport behind soccer, I ran Stanford 20/20 as a business and invested millions into its advertising and organization and the event reached a global television audience of over one billion people. Over a five-year business model we foresaw Cricket in the 20/20 format becoming a multi-million dollar, extremely valuable business and marketing tool for the Stanford companies globally.

10. On August 1, 2007, I wrote a letter to Mr. Adam Szubin, director of the Office of Foreign Assets Control (OFAC), regarding my desire to have Cuba participate in the January 2008 Stanford 20/20 Caribbean Cricket Tournament (Stanford 20/20). In that letter, I described my enthusiasm for the game of cricket and how that enthusiasm for the sport was shared throughout the Caribbean. It was my desire to create a tournament in which the participation of the several island nations and territories throughout the Caribbean basin would take place that would help further unify and strengthen the region. I expressed my wishes to provide a competitive environment in which up-and-coming athletes from all around the region could display their talents and further develop their careers. Cricket athletes in Cuba were in need of an aggressive program to compete in and I believed that their participation in Stanford 20/20 would not only help display and further develop their collective and individual talents, but benefit the region as well by making Stanford 20/20 a true Caribbean-wide event and an extremely entertaining television venue unlike any sport in the world. In fact, a five million dollar contract per year was negotiated with Cable and Wireless, one of a number of sponsors who expressed a keen desire to become a part of the Stanford 20/20 program.

11. In the August 1, 2007 letter to Mr. Adam Szubin, I expressed my total willingness to work with OFAC in order to obtain the approval for Cuba's participation in the Stanford 20/20 tournament. In the letter, I was candid about the fact that members of the board of directors of Stanford 20/20, LLC would travel to Cuba to assist the Cuban Cricket team in preparation for the tournament. I stated that Stanford 20/20 would be responsible for the travel, uniform and equipment costs incurred by all participating teams, including the Cuban team. I also disclosed that cash prizes would be awarded to the first and second place teams, as well as to the "man of the match" and for the "play of the match" in each game. Finally, I stated in the letter my understanding of restrictions upon cash payments to Cuban nationals and that any prizes awarded to the Cuban team or any Cuban athlete would be in-kind in lieu of cash.

12. I received a response to my August 1, 2007 letter from the associate director of OFAC, John Smith, in a letter dated October 31, 2007 stating that based upon consultation with the U.S. Department of State, it was against foreign policy to license any of the transactions described in the previous paragraph. Specifically, Mr. Smith informed me that under the Cuban Assets Control regulation, administered by OFAC, all dealings in property in which Cuba or Cuban nationals had an interest were prohibited unless authorized under current licensing policy. The same was true with regard to all Cuba travel-related transactions. It was determined by OFAC that licensing the proposed transactions would have been inconsistent with the then-current U.S. foreign policy and thus, my application for a license that would have helped secure Cuba's participation in Stanford 20/20 was denied.

13. OFAC's decision to deny my application for a license to have Cuba participate in the Stanford 20/20 tournament was not well received by the West Indies Cricket Board (WICB), the governing body for Cricket in the Americas, located in St. John's, Antigua. The president of the WICB, Dr. Julian Hunte, wrote Mr. Adam Szubin a letter dated November 19, 2007 that urged OFAC to reconsider its decision denying Cuba's participation in Stanford 20/20. Dr. Julian Hunte stressed that the tournament and the desire for Cuba's participation in the tournament contained no overt or covert political agenda and that Stanford 20/20 was only about promoting the game of Cricket, a way of life throughout the Caribbean region.

14. On November 19, 2007, I approved the use of attorney Wynn Segall of Akin Gump to assist me in obtaining a license from OFAC to allow the participation of Cuba in Stanford 20/20 just in time for the January 2008 tournament. Mr. Segall appeared to be one of the leading experts on OFAC and economic sanctions and controls and was the obvious choice for assisting me in getting OFAC to reconsider its denial of my August 1, 2007 letter and application. Mr. Segall's representation of me in this matter was especially important because he told me that if the licensing was not properly executed, I would be personally liable for any financial dealings with Cuba which were highly restricted by OFAC. On November 27, 2007, Mr. Segall wrote an engagement letter addressed to me confirming his representation of me and Stanford 20/20, LLC in obtaining proper licensing from OFAC. On that same day Mr. Segall, myself, and others held a teleconference to discuss our strategy and approach in the OFAC matter. The

$25,000 retainer for Mr. Segall's legal services was wire transferred to Akin Gump on November 30, 2007.

15.  On January 25, 2008, I received an email through Yolanda Suarez from Wynn Segall stating that he had obtained the license for Cuba's participation in the Stanford 20/20 tournament from OFAC. After I had received word that he was successful in obtaining the license, Mr. Segall continued to provide services concerning license interpretation and guidance from OFAC, and $1008 for these services was wire transferred to Akin Gump on March 28, 2008.

16.  Stanford 20/20 was a business and personal passion and several pictures and videos of my involvement with the tournament can be seen throughout the internet. There is even a Wikipedia entry and numerous articles on Stanford 20/20 that describe the tournament and its positive regional effect throughout the West Indies.

17.  After the SEC filed its civil complaint against me in February of 2009, several attorneys at Akin Gump solicited various brokers of Stanford companies offering their services in representing the brokers throughout the pending SEC investigations. These attorneys stated in emails that they were taking steps to secure funds under the D&O policy to pay for the defense of those brokers who wished to be represented by Akin Gump. The irony to me is that Akin Gump now represents Certain Underwriters at Lloyds of London in refusing to disburse reasonable and necessary funds for my defense under the D&O policy. I would think that an attorney-client relationship between Akin Gump and the Stanford brokers was established through these communications, especially considering the likelihood that confidential information regarding Stanford companies and the D&O policy was released during these communications.

18.  Before issuing the D&O policy, Lloyds of London exercised due diligence into the financial strength of Stanford companies as well as into my own personal financial health. Stanford companies and Lloyds have done business together throughout the years and the closeness of that business relationship can be illustrated in a photograph of Jim Davis, Chief Financial Officer of Stanford Financial Group, and David Rowland, Chairman of Lloyds of London. The photograph was taken in 1993 in Houston where Mr. Davis met with Mr. Rowland and others to offer consultation regarding administrative changes within Lloyds of London that would enhance customer service and benefits. I believe it is highly probable that information concerning the business relationship between Stanford entities and Lloyds of London has been shared between Lloyds and Akin Gump.

19.  It is my personal and true belief that Akin Gump has been representing not only several of my companies over at least the past ten years but has also been representing me personally throughout the same duration. I have relied on Akin Gump's legal advice and services in order to expertly structure complicated transactions that have helped build and grow my companies' investment portfolios. I have relied on the expertise and advice of Akin Gump in order to bring our business model of Cuba's participation in the Stanford 20/20 Caribbean Cricket Tournament to fruition. I have relied on Tony Nunes, an

attorney who was with Akin Gump from May of 2004 to April of 2010, to help me create SIBL in Antigua. Having stated the foregoing facts throughout this affidavit, I find it completely unreasonable to argue that Akin Gump never represented me in an individual capacity."

Further affiant sayeth not.

*R Allen Stanford*
Robert Allen Stanford

SWORN TO AND SUBSCRIBED BEFORE ME, the undersigned authority this 2ND day of July 2010.

*D. Hefele*
Notary Public, State of Texas

THOMAS P. HEFELE
My Commission Expires
May 14, 2014