# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| LAURA PENDERGEST-HOLT, *et al.*, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-3712 |
| | § | |
| CERTAIN UNDERWRITERS AT | § | |
| LLOYD'S OF LONDON AND ARCH | § | |
| SPECIALTY INSURANCE CO., | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

This insurance dispute comes before the Court on the motion of Plaintiff R. Allen Stanford to disqualify Defendants' counsel Akin, Gump, Strauss, Hauer & Feld ("Akin Gump") [Doc. # 166] ("Motion").  Defendants, Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Company (collectively, "Underwriters"), filed a Response under seal [Doc. # 179] with attachments [Docs. # 180-# 192].  Stanford has replied with argument and other materials filed under seal [Doc. # 194] ("Reply").  After carefully considering the parties' submissions, applicable legal authorities, and all pertinent matters of record, the Court **denies** Stanford's Motion.[1]

---

[1]     Stanford has submitted affidavits of two experts in support of his Motion.  *See*
(continued...)

## I.   <u>BACKGROUND</u>

On February 17, 2009, the Securities and Exchange Commission ("SEC") filed suit against three companies founded by Stanford, and three individual defendants, including Stanford himself.[2]  *See Sec. & Exch. Comm'n v. Stanford Int'l Bank, Ltd., et al.,* No. 3:09-CV-298 (N.D. Tex. filed Feb. 17, 2009) ("SEC Litigation").  The SEC alleges that Stanford and the other individual defendants orchestrated a massive ponzi scheme through the sale of sham certificates of deposit to investors.  Several months later, on June 18, 2009, the United States brought a parallel criminal action against Plaintiffs in this action, Stanford, Laura Pendergest-Holt, Gilberto Lopez, Jr., and Mark Kuhrt.  *See United States v. Stanford, et al.*, No. 4:09-CR-0342 (S.D. Tex. filed Jun. 18, 2009) ("Criminal Litigation").

Following institution of the SEC and Criminal Litigation, all Plaintiffs sought coverage for their defense costs under several related directors' and officers' insurance policies (collectively, the "Policy") issued by Underwriters.  In letters dated May 1,

---

[1]     (...continued)
Affidavit of Dr. Kenneth Eugene Lehrer, Exh. I to Motion [Doc. # 166-9]; Affidavit of Seth Hopkins in Support of Motion to Disqualify, Exh. AI to Motion [Doc. # 166-35]; The Court does not rely on these witnesses' opinions.  Underwriters' Motions to Strike the experts are therefore **denied as moot.**

[2]     The SEC also sued Stanford executives Laura Pendergest-Holt and James Davis.  The SEC subsequently amended the complaint to add Gilbert Lopez, Jr. and Mark Kuhrt as defendants.

2009 and June 1, 2009, Underwriters, through its counsel, Akin Gump, agreed to pay

defense costs to Stanford subject to a complete reservation of rights under the Policy.[3]

Both letters were sent on Akin Gump letterhead and were signed by Underwriters'

counsel in this case, Barry Chasnoff and Daniel McNeel Lane, Jr.[4]  Each letter began

with the statement: "As you know from previous communications, we represent the

Underwriters who issued certain insurance policies to Stanford Financial Group

Company and its affiliated entities ("Stanford") . . . ."[5]  Both letters further stated that:

> As we have advised, we are currently evaluating each of the cases
> against Stanford and/or any of its officers, directors, or employees as
> quickly as possible in order to make a determination of coverage and to
> assess the extent, if any of Underwriters' obligations.  Due to the size
> and complexity of this matter, Underwriters are not yet in a position to
> make a final determination of coverage with respect to your client.
> Therefore, at this time, Underwriters simply reserve all rights under any
> potentially applicable policy . . . subject to further investigation.

> Although we have not yet made a final determination of coverage,
> Underwriters will consent to your client's request to incur reasonable
> [defense costs] in defense of [civil and criminal proceedings] pursuant
> to [the Policy], subject to a complete reservation of all rights.[6]

---

[3]    *See* May 1, 2009 Reservation of Rights Letter [Doc. # 31-11] ("May 2009 Letter");
June 1, 2009 Reservation of Rights Letter [Doc. # 31-12] ("June 2009 Letter").

[4]    These Letters were addressed to Stanford's counsel, as required for a represented
party.

[5]    May 2009 Letter, at 1; June 2009 Letter, at 1.

[6]    May 2009 Letter, at 2; June 2009 Letter, at 2.  The May Letter consented to defense
costs for any "criminal proceeding," while the June 2009 Letter only consented to
(continued...)

Of significance to the Motion, both letters expressly noted that the Policy excludes

coverage for fraudulent conduct and for acts of money laundering as that term is

defined under the Policy ("Money Laundering").[7]

On November 16, 2010, Akin Gump, on behalf of Underwriters, sent a letter

to Stanford through his counsel denying coverage under the Policy pursuant to the

Money Laundering exclusion.[8]

The Money Laundering exclusion bars coverage for loss (including defense

costs) resulting from any claim "arising directly or indirectly as a result of or in

---

[6]     (...continued)
       such costs for the "various civil proceedings."

[7]     For example, the May 2009 Letter stated that the Policy excludes "any Loss resulting
       from any claim arising 'as a result of or in connection with any act or acts (or alleged
       act or acts) of Money Laundering.'"  May 2009 Letter, at 2-3.  The May 2009 Letter
       also noted that the Policy

              excludes Loss resulting from any Claim brought about or contributed
              to in fact by: (a) any dishonest, fraudulent or criminal act or omission
              by the Directors or Officers of the Company, or (b) any personal profit
              or advantage gained by any of the Directors and officers or the
              Company to which they were not legally entitled.

       *Id.* at 3.  The June 2009 Letter contained similar language.  *See* June 2009 Letter, at
       3-4.

[8]     Denial Letter [Doc. # 22-20], at 2 ("Because all of your client's Claims arise directly
       or indirectly as a result of or in connection with his acts of Money Laundering
       Underwriters hereby deny all of your client's Claims of Loss, including defense costs
       and indemnification, under [the Policy].").

connection with any act or acts (or alleged act or acts)" of Money Laundering . . . ."[9]

"Money Laundering" is defined broadly under the Policy.[10]  At its most basic Money

Laundering reduces to the use or possession of Criminal Property, a term which is also

defined broadly under the Policy to include:

> [P]roperty which constitutes a benefit obtained from or as a result of or
> in connection with criminal conduct or represents such a benefit (in
> whole or part and whether directly or indirectly) which the Directors or
> Officers or the Company (or any person or entity acting on their behalf)

---

[9]     Policy [Doc. # 22-7], at Art. IV, cl. T; *Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, 600 F.3d 562, 567 (5th Cir. 2010)

[10]    *See* Policy, at Art. III, cl. I; *See also Pendergest-Holt,* 600 F.3d at 567.  The Policy defines Money Laundering as:

> (i)  the concealment, or disguise, or conversion, or transfer, or removal of Criminal Property, (including concealing or disguising its nature, source, location, disposition, movement or ownership or any rights relating thereto); or
>
> (ii)  the entering into or becoming in any way concerned in an arrangement which is known or suspected to facilitate (by whatever means) the acquisition, retention, use or control of Criminal Property by or on behalf of another person; or
>
> (iii)  the acquisition, use or possession of Criminal Property; or
>
> (iv)  any act which constitutes an attempt, conspiracy or incitement to commit any act or acts mentioned in the foregoing paragraphs (I), (ii) or (iii); or
>
> (v)  any act which constitutes aiding, abetting, counselling or procuring the commission of any act or acts mentioned in the foregoing paragraphs (i), (ii) or (iii).

Policy, at Art. III, cl. I; *Pendergest-Holt*, 600 F.3d at 567.

knows or suspects or reasonably should have known or suspected that it constitutes or represents such a benefit.[11]

On November 17, 2009, Pendergest-Holt, whose claims for coverage were also denied under the Money Laundering exclusion, filed the instant declaratory judgment action seeking coverage for her defense costs under the Policy. Three days later, Stanford joined the suit seeking the same coverage.[12]

On January 26, 2010, the District Court, Judge Hittner presiding, entered a preliminary injunction prohibiting Underwriters from "withholding payment" for defense costs "already incurred" by Plaintiffs and to be "incurred by them in the future . . . until a trial on the merits in this case or such other time as this Court orders." *Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, 681 F. Supp.2d 816, 836 (S.D. Tex. 2010), *aff'd in part, rev'd in part, and modified by* 600 F.3d 562 (5th Cir. 2010). Judge Hittner's decision to grant the preliminary injunction was premised on his holding that the Texas insurance doctrine known as the "eight corners rule" was likely applicable to the Policy, and that Plaintiffs were "likely to succeed on their argument that Underwriters are contractually obligated to pay defense costs" under

---

[11]    Policy, at Art. III, cl. J; *Pendergest-Holt*, 600 F.3d at 567.

[12]    *See* First Amended Complaint, ¶ 2 [Doc. # 11].

that rule.[13]  *Id.* at 829.  In so holding, Judge Hittner rejected Underwriters' arguments that the eight corners rule was inapplicable to the Policy and that extrinsic evidence should be considered to determine whether the Money Laundering exclusion applied. *Id.* at 826, 829.

Underwriters filed an interlocutory and expedited appeal of Judge Hittner's decision.  The Fifth Circuit disagreed with the District Court's reasoning, but affirmed the preliminary injunction and remanded the case for further expedited proceedings on the coverage question.  *Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, 600 F.3d 562, 576 (5th Cir. 2010).  Specifically, the Fifth Circuit disagreed with Judge Hittner's conclusion that there must be a traditional "duty to defend" decision under the eight corners rule prior to a decision on indemnity obligations under the Policy with regard to the Money Laundering exclusion.  The Court of Appeals held instead, relying on the Policy language, that the Policy created a contractual obligation for the carriers to reimburse the insureds for their respective corporate-related litigation defense costs unless there was an "in fact" "determination"

---

[13]     "Under the eight corners rule, an insurer's duty to pay defense costs is determined by examining only the policy provisions and the claims in the underlying case, 'without regard to the truth or falsity of those allegations.'"  *Id.* at 826 (citing *Argonaut Sw. Ins. Co. v. Maupin*, 500 S.W.2d 633, 635 (Tex. 1973)).

that Money Laundering (as defined in the Policy) had occurred.[14]  This determination,

according to the Court of Appeals, permits the use of extrinsic evidence:

> The underwriters are entitled to a decision in a separate coverage action,
> for their bargain sought to mitigate the risk of advancing substantial fees
> on behalf of policyholders should it be found that the insureds did in fact
> commit Money Laundering as defined in the policy.  By the bargain,
> they are not compelled to remain aboard an aircraft that has lost its
> wings.

*Id.* at 574-75.  The court concluded its opinion by stating:  "Given the effect the

determination in this case may have on the executives' ability to secure criminal and

civil counsel of their choosing, we are confident that the district court assigned this

action on remand will be one able to proceed as expeditiously as is feasible under the

circumstances."  *Id.* at 576.

On remand, the case was assigned to this Court, which announced that the "in

fact" determination of whether Money Laundering occurred would be made at a trial

in the context of a non-jury preliminary injunction hearing ("Trial").  The Trial is

scheduled to begin on August 24, 2010.  In light of the unique circumstances of this

case, and the Fifth Circuit's instructions, this Court has ruled that there will be no

continuances of this setting.  Underwriters have reported they have paid more than

---

[14]     Specifically, the Court of Appeals held that "[t]he underwriters are enjoined from
refusing to advance defense costs as provided for in the D&O Policy unless and until
a court determine[s] that the alleged act or alleged acts [of Money Laundering] did in
fact occur."  *Id.* at 576 (internal quotation marks omitted, brackets in the original).

$1,000,000 per month in criminal and civil litigation defense costs for the four Plaintiffs collectively.  The monies are paid out of a joint fund that was purchased to cover numerous insureds under the Policy.[15]

On June 3, 2010, Stanford purportedly acting *pro se* filed a nine-page letter raising various issues.[16]  Among them was that Akin Gump had allegedly represented Stanford entities and Stanford himself in the past.  At a hearing on June 3, 2010, the Court struck the letter from the record without prejudice due to extensive extraneous matters that were not pertinent, unfairly inflammatory, or moot.[17]  At the June 3 hearing, Robert Bennett, Esq., then Stanford's putative criminal counsel, made his first appearance in this coverage case.  The Court informed Bennett that Stanford could file any motion to disqualify he deemed necessary after conferring with the Akin Gump lawyers working on this case in an effort to narrow or resolve the dispute.[18]

---

[15]     *See, e.g.*, Emergency Motion to Vacate Preliminary Injunction [Doc. # 61], at 2.

[16]     *See* Letter Re: Prison Confinement, Attorney Payment, Insurance Fraud, and Other Issues [Doc. # 131] ("Stanford's June 2010 Letter").  This letter did not expressly seek disqualification of Akin Gump.  At the June 3rd hearing, Robert Bennett, now Stanford's counsel in both the Criminal Litigation and the instant case, admitted to ghost-writing large parts of the letter.

[17]     *See* June 3, 2010 Hearing Minutes and Order [Doc. # 136].

[18]     *Id.*

Because no motion was forthcoming, on June 10, 2010, the Court imposed a schedule for the filing of any motion to disqualify.[19]  On July 2, 2010, Stanford filed the instant Motion.  The Court, having fully considered the parties' arguments, briefing, evidence and pertinent legal authorities, denies the requested disqualification. Stanford's extended delay in seeking disqualification of Akin Gump waives any conflict that might conceivably exist.

## II.   LEGAL STANDARDS

### A.   Disqualification

A motion to disqualify counsel is a substantive motion which courts analyze under federal law standards.  *In re Dresser Indus., Inc.*, 972 F.2d 540, 543 (5th Cir. 1992).  "When considering motions to disqualify, courts should first look to the local rules promulgated by the local court itself." *In re ProEducation Intern., Inc.*, 587 F.3d 296, 299 (5th Cir. 2009).  "The Local Rules of the Southern District of Texas provide that 'the minimum standard of practice shall be the Texas Disciplinary Rules of Professional Conduct' (Texas Rules), and that violations of the Texas Rules 'shall be grounds for disciplinary action, but the court is not limited by that code.'" *Id.* (citing S.D. TEX. LOCAL R. App. A, R. 1A & 1B). "The Fifth Circuit has recognized the ABA

---

[19]    *See* June 10, 2010 Hearing Minutes and Order [Doc. # 140].   This schedule was later modified to accommodate the production of attorney-client files sought by Stanford. *See* June 15, 2010 Hearing Minutes and Order [Doc. # 152].

Model Rules of Professional Conduct ([ABA] Model Rules) as the national standards to consider in reviewing motions to disqualify." *Id.* The Court therefore looks to both the Texas Rules and the ABA Model Rules in resolving the disqualification issue. *See id.*; *In re Am. Airlines*, 972 F.2d 605, 610 (5th Cir. 1992).

"The Fifth Circuit's approach to ethical issues has remained 'sensitive to preventing conflicts of interest.'" *In re ProEducation Intern.,* 587 F.3d at 299 (quoting *In re Am. Airlines,* 972 F.2d at 611). "Under this approach, a '[d]istrict [c]ourt is obliged to take measures against unethical conduct occurring in connection with any proceeding before it.'" *Id.* at 299-300 (quoting *In re Am. Airlines,* 972 F.2d at 611). "Because of the severity of disqualification, [a court does] not apply disqualification rules 'mechanically,' but [considers] '[a]ll of the facts particular to [the] case . . . in the context of the relevant ethical criteria and with meticulous deference to the litigant's rights.'" *Id.* at 300 (citing *F.D.I.C. v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1313-14 (5th Cir. 1995)). The sanction of disqualification "must not be imposed cavalierly." *Id.* (citing *U.S. Fire Ins.*, 50 F.3d at 1316).

Stanford seeks to disqualify Akin Gump under Texas Rule 1.09 on the basis of the firm's former representation of Stanford related entities and, Stanford alleges, Stanford personally.[20] Because Texas Rule 1.09 does not differ significantly from its

---

[20]      Texas Rule 1.09 provides:

(continued...)

ABA counterpart,[21] the Court's analysis centers on the Texas Rule.  *See In re Am. Airlines*, 972 F.2d at 610; *M-I LLC v. Stelly*, 2010 WL 2196281, at *2 (S.D. Tex. May 26, 2010).

---

[20] (...continued)

  (a) Without prior consent, a lawyer who personally has formerly represented a client in a matter shall not thereafter represent another person in a matter adverse to the former client:

    (1) in which such other person questions the validity of the lawyer's services or work product for the former client;

    (2) if the representation in reasonable probability will involve a violation of Rule 1.05 [governing the use of a client's confidential information]; or

    (3) if it is the same or a substantially related matter.

  (b) Except to the extent authorized by Rule 1.10, when lawyers are or have become members of or associated with a firm, none of them shall knowingly represent a client if any one of them practicing alone would be prohibited from doing so by paragraph (a).

  (c) When the association of a lawyer with a firm has terminated, the lawyers who were then associated with that lawyer shall not knowingly represent a client if the lawyer whose association with that firm has terminated would be prohibited from doing so by paragraph (a)(1) or if the representation in reasonable probability will involve a violation of Rule 1.05.

  TEX. DISCIPLINARY R. PROF'L CONDUCT 1.09, reprinted in TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A, Art. 10, § 9.

[21] *See* MODEL RULES OF PROF'L CONDUCT R. 1.9 (2009).

To disqualify opposing counsel under the "substantial relationship" test delineated under Texas Rule 1.09(a)(3), the moving party "must establish two elements: 1) an actual attorney-client relationship between the moving party and the attorney he seeks to disqualify, and 2) a substantial relationship between the subject matter of the former and present representations." *In re Am. Airlines*, 972 F.2d at 610. A former client may also disqualify counsel under Texas Rule 1.09 by showing that "his former attorney possessed relevant confidential information in the manner contemplated by Rule 1.09(a)(2)." *Id.*

### B.   Waiver

"It is well settled that a former client who is entitled to object to an attorney representing an opposing party on the ground of conflict of interest but who knowingly refrains from asserting it promptly is deemed to have waived that right." *Trust Corp. of Montana v. Piper Aircraft Corp.*, 701 F.2d 85, 87-88 (9th Cir. 1983) (citing *Central Milk Producers Co-op v. Sentry Food Stores*, 573 F.2d 988, 999 (8th Cir. 1978); *see Redd v. Shell Oil Co.*, 518 F.2d 311, 315 (10th Cir. 1975) ("lawyer conflict of interest problems ought to be brought up long before the date of trial in an atmosphere which does not cast a shadow over the trial itself")); *see also In re Corrugated Container Antitrust Litigation*, 659 F.2d 1341, 1348-49 (5th Cir. 1981)[22]

---

[22]   The *In re Corrugated Container* court also stated that "a client may not by delay or
(continued...)

(a client may, in some circumstances, waive an objection regarding a violation of

ABA Model Code of Professional Responsibility Canon 4 ("A lawyer should preserve

the confidences and secrets of a client") and Canon 5 ("A lawyer should exercise

independent judgment on behalf of a client")); *Cox v. American Cast Iron Pipe Co.*,

847 F.2d 725, 729 (11th Cir. 1988) ("A failure to make a timely objection [to a

violation of Canon 4] may also result in a waiver."); *Atasi Corp. v. Seagate Tech.*, 847

F.2d 826, 832 (Fed. Cir. 1988) (a finding of waiver is appropriate "when a motion to

disqualify is used in an abusive manner as part of litigation tactics").

   "A motion to disqualify should be made with reasonable promptness after a

party discovers the facts which lead to the motion." *Cox*, 847 F.2d at 729 (quoting

---

[22]   (...continued)
     any other action, remove from the court the responsibility of weighing the likelihood
     of public suspicion of the legal profession when Canon 9 ['A lawyer should avoid
     even the appearance of professional impropriety'] is involved." *In re Corrugated
     Container*, 659 F.2d at 1348.  The Fifth Circuit has subsequently noted, however, that
     Canon 9's appearance of impropriety language has been omitted from the Texas and
     Model Rules pertaining both to former client conflicts and lawyers as witnesses. *See
     In re Am. Airlines*, 972 F.2d at 616-19 (former client conflicts); *F.D.I.C. v. U.S. Fire
     Ins. Co.*, 50 F.3d 1304, 1315-16 (1995) (lawyer as witness rule); *see also Vinewood
     Capital, LLC*, 2010 WL 1172947 at *7-*8 (noting *In re Corrugated Container's*
     statement that a conflict under Canon 9 cannot be waived, but holding that a former
     client conflict based on the substantial relationship test can be waived by delay).  In
     any event, though Stanford makes passing reference to the "appearance of
     impropriety" in his Reply brief, he does not expressly move to disqualify Akin Gump
     under Canon 9. *See* Reply, at 14.  Moreover, given the circumstances of this case, and
     Stanford's delay in filing the instant Motion, disqualifying Akin Gump at this point
     in the proceedings would "raise more public suspicion of than it would quell."  *See
     In re Corrugated Container*, 659 F.2d at 1349.

*Jackson v. J.C. Penney Co.*, 521 F. Supp. 1032, 1034-35 (N.D. Ga. 1981).  "A litigant may not delay filing a motion to disqualify in order to use the motion later as a tool to deprive his opponent of counsel of his choice after substantial preparation of the case has been completed."  *Id.*   Numerous federal courts have found that a party waives an objection to a former client conflict "where the delay in moving for disqualification is for an extended period of time, or where it is done on the eve of trial."  *Abney v. Wal-Mart*, 984 F. Supp. 526, 530 (E.D. Tex. 2007) (waiver found when the plaintiff waited one year after learning of potential conflict before filing motion to disqualify and motion was filed one month before trial; disqualification would have worked "too great an injustice on the Defendant"); *see Cox*, 847 F.2d at 730-31 (waiver when moving party's attorney's did not object to merger of law firms that potentially gave rise to conflict, waited eighteen months after merger before filing motion to disqualify thirty-two days before trial); *Trust Corp. of Montana*, 701 F.2d 85 at 87-88 (waiver found when motion to disqualify filed two and a half years after notice of potential conflict and motion filed thirty-three days before trial); *Vinewood Capital, LLC v. Dar Al-Maal Al-Islami Trust*, 2010 WL 1172947, at *8 (N.D. Tex. Mar. 25, 2010) (waiver appropriate when moving party waited almost four years to assert conflict, did not attempt to explain the delay, and both sides had engaged in delay tactics that "hindered the resolution of the case"); *Microsoft Corp. v.*

*Commonwealth Scientific and Indus.,* 2007 WL 4376104, at *9 (E.D. Tex. Dec.13,

2007) (waiver appropriate when movant waited two years to file motion to disqualify

after it knew or should have known about conflict, and even waited six months after

movant claims that conflict arose); *see also Central Milk Producers*, 573 F.2d at 992

(movant waived right to object to opposing law firm's retention of two former

government attorneys who had worked on a similar case; movant specifically

approved screening procedures for those attorneys and waited more than two years to

raise the issue); *cf. Atasi Corp.*, 847 F.2d at 832 (waiver not appropriate when moving

party filed motion approximately six months after learning of conflict during which

time the proceedings and discovery were stayed and movant sought disqualification

on the same day the non-movant moved to reopen the case); *City of El Paso v. Salas-

Porras Soule*, 6 F.Supp.2d 616, 621-22 (W.D. Tex. 1998) (motion to disqualify held

to be timely filed when movants raised issue when they "presumably" first became

aware of conflict and filed motion approximately six months later during the early

stages of the proceeding); *Islander East Rental Prog'm v. Ferguson,* 917 F.Supp. 504,

508 (S.D. Tex. 1996) (no waiver when motion to disqualify filed a mere four months

after initiation of the action).

Although motions to disqualify are substantive motions decided under federal

law, *see In re Dresser Indus.*, 972 F.2d at 543, it is noted that federal cases are

consistent with Texas courts, which hold that "a party who fails to file a motion to disqualify opposing counsel in a timely manner waives the complaint." *Vaughn v. Walther*, 875 S.W.2d 690, 690 (Tex. 1994) (finding that the right to file a motion to disqualify was waived when the movant waited six and a half months after becoming aware of the conflict to file the motion and did so on the day of the final hearing) (citing, *e.g.*, *Spears v. Fourth Court of Appeals*, 797 S.W.2d 654, 656 (Tex. 1990) ("[C]ourts must adhere to an exacting standard when considering motions to disqualify counsel so as to discourage their use as a dilatory trial tactic.")); *see also HECI Exploration Co. v. Clajon Gas Co.,* 843 S.W.2d 622, 628-29 (Tex.App.—Austin 1992, writ denied) (right to seek disqualification waived when moving party waited approximately eleven months after learning of conflict, and two months after opponent filed motion for summary judgment, to file motion to disqualify); *Praise Tabernacle Outreach & Family Worship Ctr. v. Restoration Fin. Group, Inc.*, 2008 WL 2884601, at *11 (Tex.App.–Houston [14th Dist.] 2008, no pet.) (waiver when moving party did not seek disqualification for nearly a year after being aware of the potential conflict and did so the week of trial).

## III.   ANALYSIS

### A.   Merits

Before proceeding to the waiver analysis, the Court addresses aspects of the merits of Stanford's Motion for Disqualification of Akin Gump.

## 1. Alleged Representation of Stanford Individually

To prevail under Texas Rule 1.09, Stanford must demonstrate that Akin Gump represented him personally, *i.e.*, that Stanford is a former client of the firm. *See* TEX. DISCIPLINARY R. PROF'L CONDUCT 1.09(a); *In re Am. Airlines*, 972 F.2d at 615. Stanford points to several transactions involving third-party telecommunication companies (America Samoa Telecom, LLC, OPM Auction Company, Blue Sky Communications, Inc., and Telecom Wireless Solutions, Inc.) as prior legal projects allegedly requiring Akin Gump's disqualification.[23]   Akin Gump counters that it represented Stanford Financial Group on these transactions, not Stanford personally.[24] Stanford, who has the burden of proof, provides no persuasive evidence to the contrary.

In attempting to show that Akin Gump represented him in his individual capacity, Stanford relies heavily on his relationship with Michael ("Tony") Nunes, an attorney who was engaged by Stanford's father, James Stanford, to perform work related to the formation of a bank in the 1980's while Nunes was at Baker Botts.[25]

---

[23]    *See* Motion, at 7-11.

[24]    Declaration of Fadi G. Samman, App. 2-A to Response [Doc. # 181], ¶¶ 4, 8.

[25]    *See* Motion, 5-7.  Stanford also alleges that Nunes also represented him individually during the 1980's Baker Botts representation.  Indeed, as discussed below, Stanford filed a motion to disqualify Baker Botts as counsel for the Receiver in the SEC Litigation on this basis.  *See* Brief in Support of Defendants' Motion to Disqualify
(continued...)

Nunes moved to Akin Gump in 2004.    Stanford asserts that he maintained communication with Nunes "throughout the years."[26] Specifically, Stanford states that he telephoned Nunes in February 2009, shortly after the SEC Litigation was filed, while Nunes was at Akin Gump, and sought Nunes' "advice" on that matter.  Stanford also points to an informal comment by Nunes ("I'm in your corner.  Hang in there. Tony") in a one-line, supportive email sent several days later from his Akin Gump email account .[27]  Stanford asserts that these communications led him "to believe that Tony Nunes and Akin Gump would look out for me throughout the SEC matter."[28] This self-serving contention and its skeletal factual foundation do not create an attorney-client relationship.   To the contrary, Akin Gump has no record it ever represented Stanford personally.[29]  It also is undisputed that Stanford never sought

---

[25]    (...continued)
Baker Botts in the SEC Litigation, App. 1-A to Response [Doc. # 180], at 5-20 of 31. However, after Baker Botts asserted it has no record that it represented anyone other than James Stanford, and submitted its client file to the court for inspection, Stanford withdrew his motion to disqualify Baker Botts.

[26]    Motion, at 6.

[27]    Nunes Email to Stanford, Exh. C. to Motion [Doc. # 166-3] ("Nunes Email"); *see also* Affidavit of Robert Allen Stanford. Exh. E to Motion [Doc. # 166-5] ("Stanford Affidavit"), ¶ 3.

[28]    Stanford Affidavit, ¶ 3.

[29]    Chasnoff Declaration, ¶ 5.

Akin Gump's representation in the SEC or Criminal Litigation.[30]   Further, Nunes

avers that he never represented Stanford personally at Akin Gump and that Stanford

never indicated to him that he, Stanford, believed either Akin Gump or Nunes was

representing him individually.[31]

Stanford also argues that he had a "reasonable basis" for believing that Akin

Gump represented him personally, rather than just representing Stanford-related

corporate entities, at some earlier points in time.  However, even if Stanford cites the

correct legal standard, which is highly questionable,[32] Stanford fails to proffer any

probative communications or other reliable evidence supporting his purported belief

---

[30]   *See* Declaration of Barry A. Chasnoff, App. 12-B to Response [Doc. # 192] ("Chasnoff Declaration"), ¶ 4.

[31]   Declaration of Michael A. Nunes, App. 12-A to Response [Doc. # 192] ("Nunes Declaration"), ¶ 6.

[32]   Underwriters dispute that this is the correct legal standard.  Stanford relies on *United States v. Edwards*, 39 F.Supp.2d 716, 732 (M.D. La. 1999), for the proposition that though an attorney for a corporation generally represents the entity and not its shareholders or directors, in a closely-held corporation consisting of two shareholders, "it is indeed reasonable for each shareholder to believe that the corporate counsel is in effect his own individual attorney." *Id.* (quoting *Rosman v. Shapiro*, 653 F.Supp. 1441, 1445 (S.D.N.Y.1987)).  However, Underwriters correctly note that subsequent to *Rosman*, the legal lynch pin of the *Edwards* ruling, the Second Circuit rejected a "reasonable belief" standard.  *See United States v. Int'l Bhd. of Teamsters*, 119 F.3d 210, 217 (2d Cir.1997); *see also MacKenzie-Childs LLC v. MacKenzie-Childs*, 262 F.R.D. 241, 253 (W.D.N.Y. 2009) (rejecting *Rosman* in light of *Int'l Bhd. of Teamsters*).  Underwriters contend that Stanford bears the burden of proving that he sought legal advice from Akin Gump and made clear that he was seeking such advice in his individual capacity.  *See Mackenzie-Childs*, 262 F.R.D. at 253, cited in Response, at 17.

that Akin Gump gave him legal advice in his individual capacity or otherwise provided him with a reasonable basis for believing that the firm represented him individually.[33] Further, on this record, there is no basis to allow Stanford to pierce the corporate veil of his own corporate entities, even if such tactic were legally permissible, which it is not. *See Sims v. Western Waste Industries,* 918 S.W.2d 682, 658 (Tex.App.—Beaumont 1996, writ denied) ("[W]here an individual 'deliberately chose to operate his business as a corporation, . . . it would be inequitable now to allow him' to disregard the corporate fiction and pierce the corporate veil for his benefit." (quoting *Adams v. Big Three Indus., Inc.*, 549 S.W.2d 411, 413

---

[33]    Stanford also relies on two conversations he had with Wynn Segall, a partner at Akin Gump, as part of a representation to procure Cuba's participation in an international cricket tournament. *See* Motion, 12-15. Stanford's reliance on these conversations to establish a personal attorney-client relationship is unavailing. The documentary evidence of record demonstrates that Akin Gump was retained by Stanford 20/20 LLC ("20/20"), the entity that was invoiced for the representation and paid the retainer fee. *See* Retainer Agreement, App. 3-A to Response [Doc. # 182], at 6-7 of 30; Invoice and Wire Statement, Exh. AB to Motion [Doc. # 166-28]. While Segall acknowledges that he spoke with Stanford by telephone on two occasions, Segall also explains that he was not retained to represent Stanford individually and that Stanford never indicated that he was relying on Segall or Akin Gump for personal representation. Declaration of Wayne Segall, App. 3-A to Response [Doc. # 182], ¶¶ 7, 11. It also is undisputed that Stanford was not the primary contact for Akin Gump with regard to this representation; the firm was instructed to deal with Yolanda Suarez on this matter. In contrast to the two conversations Segall had with Stanford, the retained Akin Gump lawyers on the 20/20 deal communicated with Suarez approximately 30 times. *Id.*, ¶¶ 6, 10. In any event, even if Stanford could establish that Akin Gump represented him personally with regard to this matter, the firm's work on a cricket tournament is not shown to have been substantially related to the instant Money Laundering inquiry. Nor has Stanford shown that the work provided Akin Gump with confidential information relevant here.

(Tex.Civ.App.—Beaumont 1977, writ ref'd n.r.e.))).  Stanford has not demonstrated that he personally had an actual attorney-client relationship with Akin Gump.

## 2.    Relationship to Prior Representations

Another aspect necessary for disqualification under Texas Rule 1.09, the provision on which Stanford primarily relies in the Motion, is whether there is a substantial relationship between the current matter and Akin Gump's prior representations, or whether Akin Gump possesses confidential information from those representations that is relevant here.  *See* TEX. DISCIPLINARY R. PROF'L CONDUCT 1.09(a)(3); *id* 1.09(a)(2); *In re Am. Airlines*, 972 F.2d at 610.  Stanford has the burden to demonstrate that Underwriters' counsel should be disqualified.  *In re Am. Airlines*, 972 F.2d at 614.  While it does not appear that Stanford has presented the necessary detailed probative evidence or argument that the work by Akin Gump was "substantially related" to the issues in the instant case, or that Akin Gump possesses relevant confidential information gleaned from its attorney's work on the earlier representations, *see id.* at 615, the Court declines to definitively determine this issue given the record and time available.[34]

---

[34]    It is noted, however, that several of the referenced matters were clearly ministerial in nature, such as the creation of lost note affidavits, and would not support disqualification.  Other projects, such as the filing of trademark applications, appear to be completely unrelated to the allegations and proof necessary to resolve the coverage issue centered on whether Plaintiffs engaged in Money Laundering as
(continued...)

The Court now turns to another dispositive issue: Has Stanford, under the circumstances presented, waived objection to Akin Gump's representation of Underwriters in this matter through inordinate delay in raising the alleged conflict?

## B.     Waiver

---

[34]     (...continued)
defined under the Policy.  *See* Motion, at 35-37.  Notably, as to the remaining work performed by Akin Gump on which Stanford relies, the Motion and proffered evidence fail to make clear how these matters relate to issues presented to this Court.

Stanford also asserts in passing that Akin Gump should be disqualified because he is entitled to an "advice of counsel" defense, and he may call Akin Gump attorneys as witnesses at the Trial.  These contentions are unsupported by the law or the record.  *See* Motion, at 43-44.  Stanford does not identify any particular ethical rule under which he bases this ground for disqualification.  To the extent he intends to rely on Texas Rule 3.08, he misses the mark.  Texas Rule 3.08 provides that a "[a] lawyer shall not accept or continue employment as an advocate before a tribunal in a contemplated or pending adjudicatory proceeding if the lawyer knows or believes that the lawyer is or may be a witness. . ."  TEX. DISCIPLINARY R. PROF'L CONDUCT 3.08. Stanford fails to identify with specificity either the attorneys he intends to call or the subject matter of the putative testimony.  *See generally In re Bahn*, 13 S.W.3d 865, 872-73 (Tex.App.—Fort Worth 2000, orig. proceeding) (party seeking disqualification must demonstrate actual prejudice to itself from opposing counsel serving in dual roles of lawyer and witness and must present evidence that the testimony is necessary and goes to an essential element of the non-movant's case); *see also F.D.I.C. v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1313-14 (5th Cir. 1995) ("Where an attorney's testimony may prejudice only his own [current] client, the opposing party should have no say in whether or not the attorney participates in the litigation as both advocate and witness.").  Further, it is undisputed that none of the Akin Gump attorneys representing Underwriters has ever represented him or any Stanford related entity.  *See Anderson Producing Inc. v. Koch Oil Co.*, 929 S.W.2d 416, 424 (Tex. 1996) ("Even in those situations in which a testifying lawyer is disqualified, however, another lawyer in the testifying lawyer's firm may act as an advocate, provided the [testifying attorney's current] client's informed consent is obtained.") (quoting TEX. DISCIPLINARY R. PROF'L CONDUCT 3.08, cmt. 8 (internal quotation marks and brackets omitted)).

In the instant case, Stanford and his lawyers received the reservation of rights letter in early May 2009.  This letter made obvious Akin Gump's representation of Underwriters and disclosed that Underwriters were potentially adverse to Stanford. An insurer's reservation of rights "serves as notice to the insured of the potential conflict of interest" between the insurer and the insured.  *Rhodes v. Chicago Ins. Co.*, 719 F.2d 116, 121 n.6 (5th Cir. 1983); *see also State Farm Lloyds v. C.M.W.*, 53 S.W.3d 877, 886 (Tex.App.—Dallas 2001, pet. denied) (because insurer provided a defense subject to a reservation of rights, a conflict of interest existed between the insurer and insured).  The May 2009 Letter was on Akin Gump letterhead and signed by Akin Gump attorneys.  This May 2009 Letter expressly stated that Akin Gump would be "evaluating" whether the Money Laundering exclusion applied to bar Stanford's claim for defense costs under the Policy.

Despite the fact that the SEC and a federal grand jury charged Stanford with, among other things, knowing violations of various federal securities laws, fraud and conspiracy to commit money laundering, providing ample notice that the Policy's broad Money Laundering exclusion was in serious issue, Stanford did not raise the issue of Akin Gump's former representation until he filed his June 2010 Letter — thirteen months after receipt of Underwriters' reservation of rights.  Stanford filed the Motion on July 2, 2010 — fourteen months after being given notice of the alleged

conflict and only seven weeks before commencement of the August 24 Trial setting at which the Court must make an expedited "in fact" determination whether the Money Laundering exclusion in the Policy applies.[35] *Pendergest-Holt*, 600 F.3d at 576.  Underwriters through Akin Gump have been engaging in expedited discovery concerning complex transactions and millions of documents.  This case is proceeding on an exceptionally compressed schedule.  Disqualifying Underwriters' counsel at this late date would inevitably necessitate a long delay in the Trial in order to allow new counsel to be retained and prepare.  A delay of this nature would result in severe and unfair prejudice to Akin Gump's current clients, Underwriters, who are under a court order (entered over strenuous nonfrivolous objection) to continue to pay extraordinarily large legal fees for Stanford's and others' criminal and SEC enforcement action defense.  The Court finds Stanford's disqualification Motion is primarily strategic rather than substantive.  If the Money Laundering exclusion applies, Stanford loses access to insurance funds to compensate the criminal defense counsel of his choosing.

Stanford argues that he did not wait an unreasonable amount of time to file the Motion.  First, Stanford contends that because of the "sprawling scale of documents at issue" in the Criminal Litigation, he did not realize this conflict until early June

---

[35]    Indeed, it is unclear whether Stanford would have filed the Motion by this date but for the Court's imposition of a deadline.

2010, at which time he promptly raised it.[36]   Stanford also asserts that he did not earlier recall the alleged conflict due to the "stress and shock of imprisonment."[37]

The Court is unpersuaded.  Stanford's contentions stand in stark contrast to the gravamen of his Motion, namely, his allegation that "[o]ver the past decade, from approximately 2000 to early 2009, there have been substantial dealings between Stanford, Stanford Companies, and Akin Gump in an attorney-client capacity."[38] Indeed, if Akin Gump in fact represented Stanford "over the past decade" personally as an individual or indirectly though corporate entities through which Akin Gump received genuinely confidential information relevant to this case, contentions on which no clear, probative evidence has been presented, then Stanford would have been aware of this fact and should have sought disqualification long ago.

Stanford's arguments that he only recently recalled his relationship with Akin Gump are further belied by other aspects of this Motion.  A central ground Stanford proffers for disqualification of Akin Gump is that Tony Nunes allegedly represented him and his father on a matter he claimed was substantially related to the instant case

---

[36]   Reply, at 16.

[37]   Stanford's June 2010 Letter [Doc. # 166-2], at 3.

[38]   Motion, at 4 (internal footnote omitted).  Stanford's argument that he only recently recalled Akin Gump's representation is further undermined by his statement that it is his "personal and true belief that Akin Gump has been representing not only several of my companies over at least the past ten years but has also been representing me personally throughout the same duration."  Stanford Affidavit, ¶ 19.

while Nunes was an associate at Baker Botts in the 1980's.[39]  Stanford complains that

Nunes then went to Akin Gump from 2004 until April 2010.[40]  In June 2009, based on

Nunes' work with Baker Botts, Stanford moved to disqualify that firm from

representing the Receiver in the SEC Litigation.[41]  Inconsistently, Stanford did not

raise concerns about Nunes' work while at Akin Gump – despite his then recent phone

and email communications with Nunes[42] and the two reservation of rights letters that

Akin Gump had sent by that time, until June 2010.  Stanford thus asks the Court to

excuse the delay in bringing the Motion against Akin Gump in this case even though

he was capable in June 2009 of recalling and complaining of work that Nunes

---

[39]     *See* Motion, at 5-6.

[40]     Stanford Affidavit, ¶ 3.  In addition to arguing that Nunes' alleged conflict should be
imputed to Akin Gump, Stanford, as noted, contends that Nunes maintained
communication with Stanford and allegedly gave him advice throughout the years.
Motion, at 6.  Yet, there is no dispute that Nunes, who is no longer with Akin
Gump,"never opened or worked on any matters as legal counsel for Allen Stanford
or the Stanford corporate entities" while at Akin Gump.  Nunes Declaration, ¶ 5.

[41]     *See* Brief in Support of Defendants' Motion to Disqualify Baker Botts in the SEC
Litigation, App. 1-A to Response [Doc. # 180], at 5-20 of 31.  Though Stanford's
Motion to Disqualify Baker Botts did not refer to any attorney by name, a comparison
of the facts alleged in that motion and the instant motion makes clear that Stanford
was referring to Nunes.  Further, the Receiver's response to Stanford's motion
establishes that Nunes was the only Baker Botts lawyer to work on the referenced
matter.  *See* Receiver's Brief in Opposition to Motion to Disqualify, App. 1-B to
Response [Doc. # 180], at 21-28 of 31.  As noted, following the Receiver's
opposition, Stanford withdrew his motion to disqualify Baker Botts in the SEC
Litigation.

[42]     *See* Stanford Affidavit, ¶ 3.

performed in the 1980's in another litigation.  In this context, Stanford's contention that he failed to recognize until June 2010 the alleged conflict with Akin Gump is rejected.

Another of Stanford's arguments that he has not waived his right to object to Akin Gump's representation of Underwriters is that the alleged conflict did not become apparent until March 30, 2010, when the Fifth Circuit remanded this case for a determination of whether Plaintiffs engaged in Money Laundering.[43]  Stanford argues that prior to this date, "the insurer was at least endeavoring to provide some coverage, so the conflict of interest had [not] fully ripened."[44]  This contention is without merit.  As noted above, a reservation of rights put the insured on notice of a possible conflict with the insurer.  *See Rhodes v. Chicago Ins. Co.*, 719 F.2d 116, 121 n.6 (5th Cir. 1983); *see also State Farm Lloyds v. C.M.W.*, 53 S.W.3d 877, 886 (Tex.App.—Dallas 2001, pet. denied).  Factually, Stanford was expressly informed that Underwriters were in an adverse position to him and that Akin Gump was Underwriters' legal representative for that purpose.  May 2009 is when the adversity between Akin Gump and Stanford became apparent.

---

[43]     Reply, at 17.

[44]     *Id.*

Furthermore, it was inescapable by November 2009, when Underwriters, through Akin Gump, formally denied coverage for Stanford's defense costs under the Money Laundering exclusion, that Akin Gump was adverse to his interests and Stanford knew it.   Stanford, several days later, joined this lawsuit against Underwriters, who at all times have  been represented by Akin Gump.  Stanford's contention that the conflict of interest had not "fully ripened" until March 30, 2010, is not supported by the record.  The Court holds that any conflict that may exist between Akin Gump and Stanford became apparent when Underwriters first reserved its rights through Akin Gump in May 2009.  Alternatively, the conflict was patent by November 2009.  Under the circumstances of this case, Stanford's delay in filing a motion to disqualify until July 2010 establishes waiver of his rights to object to Akin Gump's representation of Underwriters in this matter.

## IV.   CONCLUSION

The Court is "sensitive to preventing conflicts of interest."  *In re ProEducation Intern.,* 587 F.3d at 299-300.  Stanford, however, has failed to satisfy his burden to demonstrate he personally was a former client of Akin Gump and has also waived any alleged conflict that may have existed.  It is therefore

**ORDERED** that Stanford's Motion to Disqualify [Doc. # 166] is **DENIED**. It is further

ORDERED that Underwriters' Motion to Strike Expert Affidavits of Kenneth

Lehrer and Seth Hopkins [Doc. # 178] is **DENIED as MOOT.**

SIGNED at Houston, Texas, this **30**th day of **July, 2010**.

Nancy F. Atlas
United States District Judge