UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LAURA PENDERGEST-HOLT, | ) | CASE NO:  4:09-CV-3712 |
| | ) | |
| Plaintiff, | ) | CIVIL |
| | ) | |
| vs. | ) | Houston, Texas |
| | ) | |
| CERTAIN UNDERWRITERS | ) | Tuesday, August 24, 2010 |
| AT LLOYD'S OF LONDON, | ) | ( 9:18 a.m. to  1:29 p.m.) |
| | ) | ( 2:30 p.m. to  6:16 p.m.) |
| Defendant. | ) | |

#117 - INJUNCTION HEARING;
#193 - MISCELLANEOUS

BEFORE THE HONORABLE NANCY F. ATLAS,
UNITED STATES DISTRICT JUDGE


Appearances:            See Next Page

Court Reporter:         Paula Crawford, FTR

Case Manager:           Shelia Ashabranner

Transcriber:            Exceptional Reporting Services, Inc.
                        14493 S. Padre Island Drive
                        Suite A-400
                        Corpus Christi, TX 78418
                        361-949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>**APPEARANCES FOR:**</u>


Certain Underwriters at          DANIEL MCNEEL LANE, JR., ESQ.
Lloyds of London, et al.:        BARRY A. CHASNOFF, ESQ.
                                 MANUEL MUNGIA, ESQ.
                                 BRANDON DANFORTH, ESQ.
                                 MATTHEW PEPPING, ESQ.
                                 MCLEAN PENA, ESQ.
                                 Akin Gump et al.
                                 Suite 1500
                                 San Antonio, Texas 78205


Mark Kuhrt, et al.:              LEE H. SHIDLOFSKY, ESQ.
                                 ALAN M. COHEN, ESQ.
                                 Visser Shidlofsky
                                 7200 N. Mopac Expwy., Suite 430
                                 Austin, Texas 78731


Mark Kuhrt:                      RICHARD KUNIANSKY, ESQ.
                                 Kuniansky & Associates
                                 440 Louisiana, Suite 200
                                 Houston, Texas 77002

                                 - And -

                                 RICHARD BRAMER, ESQ.


Gilbert Lopez, Jr.:              JACK B. ZIMMERMANN, ESQ.
                                 Zimmermann Lavine, et al.
                                 770 S. Post Oak Lane, Suite 620
                                 Houston, Texas 77056

                                 COLE RAMEY, ESQ.
                                 Crouch & Ramey
                                 3600 Fountain Place
                                 1445 Ross Avenue
                                 Dallas, Texas 75202


R. Allen Stanford:               ROBERT STEPHEN BENNETT, ESQ.
                                 Bennett Law Firm
                                 515 Louisiana, Suite 200
                                 Houston, Texas 77002

                                 - And -

                                 OLNEY WALLIS, ESQ.
                                 KIRK KENNEDY, ESQ.

<u>INDEX</u>

| <u>DEFENDANTS' WITNESSES</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|
| ROBERT CONTE | | | | |
|   BY MR. LANE | 158/180 | | -- | |
|   BY MR. KUNIANSKY | | 190 | | -- |
|   BY MR. ZIMMERMANN | | 194 | | -- |
|   BY MR. BENNETT | | 202 | | -- |
| WALLACE LEE DEHAY, JR. | | | | |
|   BY MR. LANE | 211 | | -- | |
|   BY MR. KUNIANSKY | | 219 | | -- |
|   BY MR. ZIMMERMANN | | 221 | | -- |
|   BY MR. KENNEDY | | 221 | | -- |
| DWAYNE MARK TIDWELL | | | | |
|   BY MR. LANE | 237 | | 324 | |
|   BY MR. KUNIANSKY | | 278 | | -- |
|   BY MR. KENNEDY | | 295 | | -- |

| <u>DEFENDANTS' EXHIBITS</u> | <u>RECEIVED</u> |
|---|---|
| 39 | 160 |
| 33 | 167 |
| 36 | 183 |
| 52 | 250 |
| 224 | 252 |

4

1        **Houston, Texas; Tuesday, August 24, 2010; 9:18 a.m.**

2                        **(Call to Order)**

3            **THE MARSHAL:**  All rise.

4            **THE CLERK:**  Hear ye, hear ye, hear ye.  United States

5   District Court for the Southern District of Texas; the

6   Honorable Nancy F. Atlas presiding, is now in session.  God

7   save these United States and this Honorable Court.

8            **THE COURT:**  Please be seated.  This is the case of

9   *Laura Pendergest-Holt, Mark Kuhrt and Gilbert Lopez against --*

10  well, *and Allen Stafford against Certain Underwriters at*

11  *Lloyd's.*

12           Will counsel state their appearances, please?

13           **MR. BENNETT:**  Bob Bennett for Mr. Stanford, your

14  Honor.

15           **MR. WALLIS:**  Olney Wallis for Mr. Stanford, your

16  Honor.

17           **MR. KENNEDY:**  Kirk Kennedy, Allen Stanford.

18           **MR. ZIMMERMANN:**  Good morning, your Honor.  Jack

19  Zimmermann and Cole Ramey for Mr. Lopez.  This is Mr. Ramey

20  from Dallas.

21           **THE COURT:**  Okay.

22           **MR. ZIMMERMANN:**  The Court had permitted him to

23  appear as part of the criminal defense team to --

24           **THE COURT:**  Okay.

25           **MR. ZIMMERMANN:**  -- handle witnesses.

1        **MR. SHIDLOFSKY:**  Lee Shidlofsky and Alan Cohen for

2 Mr. Lopez and Mr. Kuhrt.

3        **MR. KUNIANSKY:**  Good morning, your Honor.  Richard

4 Kuniansky on behalf of Mark Kuhrt, and I have Richard Bramer,

5 my assistant, seated next to me.

6        **THE COURT:**  Okay.  Where's Mr. Kuhrt?

7        **MR. KUNIANSKY:**  Mr. Kuhrt is present.

8        **THE COURT:**  Are we not going to have the clients

9 sitting with the lawyers?

10        **MR. KUNIANSKY:**  We didn't have enough chairs, your

11 Honor.

12        **MR. ZIMMERMANN:**  We're out of space, Judge.  They're

13 both here.  Mr. Lopez is also here.

14    **(Whispers and voices heard)**

15        **THE COURT:**  We have chairs in the jury room if you

16 need them.  I know it's tight.  This is one of the benefits of

17 this courtroom, but I do think it would be important.

18        **MR. KUNIANSKY:**  I would like to have him up here,

19 then, if we can make space.

20        **THE COURT:**  Okay.

21        **MR. CHASNOFF:**  Your Honor, Barry Chasnoff for

22 Underwriters.  Neel Lane is with me, as well a number of

23 lawyers from the firm who won't be asking questions but, for

24 the record, Manuel Mungia, McLean Pena, Brandon Danford and

25 Matt Pepping.

1          **THE COURT:**  You have another person at the table?

2          **MR. CHASNOFF:**  And this is who we believe to be the

3   world's best paralegal, Lisa Lightner.

4          **THE COURT:**  Okay.

5          **MR. CHASNOFF:**  And if I might introduce to the Court,

6   our client is also here, Mr. Paul Sewell who is with -- stand

7   up, Paul -- with the lead underwriter, and he will be

8   testifying.

9          **THE COURT:**  Okay, fine.  Let's get two more chairs

10  from the jury room.  Would you help us, please?

11         **MR. UNIDENTIFIED:**  Yes, ma'am.

12     **(Whispers / Chairs being moved)**

13         **THE COURT:**  All right, it's going to take some doing.

14  If the -- the podium's going to need to be moved a little bit.

15  It's in an odd place.  It's fine with me, frankly, but is that

16  where you're going to want it for the opening statements?  Is

17  that the idea?

18         **MR. CHASNOFF:**  Yes, ma'am.  I didn't want to put my

19  back to the counsel.  And the reporter said she would be able

20  to pick me up if I stood right here.

21         **THE COURT:**  Fine, okay.  If you just keep your voice

22  up, it would be great.  We have a lot of microphones.  The

23  courtroom is new.  Like anybody who was here before, they

24  noticed how pretty it is, but it is not perfect and so we do

25  need everyone to keep their voices up.  We're recording this.

1    It is -- we do not have daily -- daily copy.

2         **(Voices and whispers as chairs are being moved)**

3         **THE COURT:**  Okay, as soon as we get the chair

4    situation worked out -- we might have another bookcase or two

5    we can rustle up, if that would help, especially at this middle

6    table.  Okay.  Are those chairs adequate?

7         (**No audible response**)

8         **THE COURT:**  All right, good.  Paula, you gave me a

9    seating chart but I don't know where it is.

10        **(Court confers with Court Recorder)**

11        Okay.  Okay.  All right, well, we may work on it a

12   little bit.

13        Today is the beginning of the hearing on

14   Underwriters' coverage issues.  The Court has issued, I don't

15   know, two dozen opinions in this case in writing.  Some of them

16   have been on the fly.  I got the impression that the parties

17   wanted a couple of preliminary matters ruled on as early as

18   possible, so last night I issued what I've called a preliminary

19   memorandum and order on Davis and Van Tassel matters, and that

20   is an order giving my reasoning for admission of the Davis plea

21   agreement and transcript of the re-arraignment allocution.

22        I also have ruled that the -- that two Van Tassel

23   declarations with exhibits can be received again in a somewhat

24   limited way.  The ruling is in writing so I'm not going to

25   repeat it.  I just want to be sure you have it.  It wasn't

1    issued till 10:00 o'clock last night because I was in court all

2    day yesterday; did the best I could.  I know we're all

3    operating under very tight time constraints, so I'd like to

4    extend my congratulations to all parties and counsel for

5    bearing with us on this tight schedule.

6           This is a civil case.  It is a preliminary injunction

7    hearing.  It is very important to all parties.  I recognize

8    that it is a decision that you all want promptly and with as

9    much reasoning as possible.  But I also want you to appreciate

10   that there is -- that this is a matter that needs careful

11   consideration.  I know you all have worked hard and intend to

12   introduce a lot of evidence.

13          I have not reviewed the exhibits that you've

14   submitted, except in limited part; for instance, when I was

15   hunting for Van Tassel's declarations.  I couldn't possibly

16   rule on whether they were admissible unless I could find some

17   of them.  There were two attached to motion papers, and I

18   decided that those must be exemplars, and so I used those.  For

19   the record, I will tell you that I'm aware of other ones but

20   I'm not sure what they're being offered for.  And so, until I

21   know something more specific, I can't decide whether any others

22   should be admissible or not.

23          The rulings I made yesterday are preliminary, in that

24   once I have seen and heard other evidence, and once I've got

25   specific proffers on specific portions of these transcripts,

1    declarations or plea agreement, then I will be able to say yea

2    or nay it's in or it isn't.  So, you read the law that I cited.

3    Limine motions are sometimes favored, but sometimes not.

4    They're difficult to do in a vacuum.

5           So, I will tell you also for the purposes of your

6    information and preparation, I have read virtually everything

7    that has been submitted.  There are a couple of things I

8    haven't quite finished, but I have made a sincere effort to

9    keep up with you.

10          As you can see, there's one of me, and I have one law

11   clerk working on this case; so I'll just be frank, one.  So

12   there are two of us, and I'm a decision maker.  And you look

13   around the room and you can see how many there are of you, and

14   for every person in this room I'll bet there are a couple, if

15   not more, back in the office.  So I respect that you have to

16   gather the information, but I hope you will understand that I

17   also am trying to appreciate what's going on and understand it.

18          I'm going to be trying to simplify this case, because

19   I don't think that we need 70 pages of findings of fact and

20   conclusions of law, even though each of the groups of parties

21   or each party has submitted that.  I'm happy to get the

22   information because I've learned from it.  But on the other

23   hand, I don't know that it's as complicated as you guys are

24   presenting.  So, that was intended not as a criticism but as a

25   theme, which is that I'm going to be trying to simplify and

1    figure out what's really important and focus in on that.  That

2    will be true with respect to the questioning of witnesses and

3    other things.

4            Now, I have given us three days, and I've given you

5    some indication that if we really need it we can have a fourth

6    day, most of a day.  But I have sincere hopes that we can get

7    this done within that time limit.  I've given you hours.  We

8    have a time clock in that the recording keeps track of who

9    talks when.  I am not going to be doing it to the minute.

10   There will be rounding, I promise you that.  That's the good

11   news, because I will round in your favor.

12           But it is important that you understand that the goal

13   here is to focus, and for you to understand, again, that I am

14   an educated listener; I'm not starting from square one.  And I

15   have no compunction about asking questions.  So you'll know

16   when I'm confused, at least I hope you will.  If I know I'm

17   confused, you'll know.

18           We do have some more preliminary matters, and here's

19   what I was thinking we could do.  First of all, we do have the

20   Stanford issues regarding counsel, which I'm going to hold off

21   on, because I don't want to do that in open court.  And I see

22   that there are plenty of people sitting at the table who look

23   like they know what they're doing.  And I know Mr. Wallis from

24   his reputation.  And I know Mr. Bennett.  And so I've read

25   other things.  So I'm thinking that we're okay for now.

1          With respect to objections to exhibits, it's a bench

2    trial; and it's a preliminary injunction hearing; and I will

3    take it as it comes.  I am not going to do objections -- when I

4    looked at the objections, I think it was the Plaintiffs had

5    objections to virtually every defense exhibit, and the hearsay

6    and authenticity.  And so, I mean, I'm just going to take it as

7    it comes.

8          With respect to the experts that I've not yet ruled

9    on, everybody's got a couple of experts, one or two anyway; and

10   my inclination on them is as follows:  The two primary experts,

11   Berenblut and --

12          **MR. LANE:**  Westheimer?

13          **THE COURT:**  Yes, Westheimer, thank you.  I was

14   drawing a blank.  They are what they are.  They purport to have

15   reviewed a wide variety of documents, but have not done the

16   extensive review that Van Tassel and FTI have done.  My view

17   about it is, I've read their reports.  I'm not thinking there's

18   a whole lot of value in there.  But I think for ease of

19   everything, I'm going to just say put them on the stand and

20   I'll have the Daubert Hearing at the same time that I have the

21   substantive hearing; and I will decide what, if anything, they

22   can testify to in the way of opinions.

23          I have already ruled that Mr. Westheimer can testify

24   to factual matters and to the extent that he is the repository

25   of admissions, as the Underwriters call it, of Mr. Kuhrt and

12

1   Mr. Lopez.  And again, I've read his whole report, actually

2   more than once, to try in advance to figure out what to do with

3   him.  And truthfully, I'm not sure what opinions I will receive

4   of his.  When he says that conduct was (quote) "appropriate," I

5   don't know what that means.  So, to me, that's not a valuable

6   opinion, but I do think that I would like to hear him testify

7   because maybe he can elucidate for me what it is he's trying to

8   tell me that's relevant here.

9           This is not the criminal trial.  The issue, I think,

10  Plaintiffs have fairly characterized is in, in some substantial

11  part, what the Plaintiffs knew when with respect to their

12  appreciation of misconduct or inappropriate conduct, illegal

13  conduct that the Underwriters are charging and that has been

14  described in the papers.  So Westheimer cannot testify to

15  knowledge.  Period.

16          And so I'm not sure, frankly, what Westheimer is

17  going to offer in the way of opinions that I think are valuable

18  but we'll find out as we go through; and I will just simply

19  consider the opinions as we go and decide whether I think that

20  they are of -- methodologically sound and reliable and whether,

21  frankly, they are within his expertise.  I simply could not

22  tell from the report or the motion to strike.

23          The issue with respect to Berenblut is somewhat the

24  same.  He's accused of basically being a tagalong to Van

25  Tassel.  That is not completely wrong.  But Berenblut may have

1    some value.  I can't tell exactly what.  So I am going to

2    determine what, if anything, he can add when I find out what

3    questions people want to ask him.  So I'm not striking him as

4    an expert at this time.  I think he can testify, and I will

5    decide whether anything he has to say meets the Daubert

6    criteria and is admissible.

7          With respect to Mr. Stanford's experts, they're in a

8    little bit of a different category.  And I'm honestly not sure

9    what the expert, Lehrer, has to offer.  I see that he's

10   testified many times, according to the defense -- or the

11   Underwriters, 1600 times.  The data he relied on is secondary

12   information in some respects, but he -- and then other -- in

13   other respects, it's information I cannot assess.

14         But he has relied on, according to his own report,

15   things like the indictment; the reported investigations of the

16   SEC; the plea agreement of Davis; the 10-K of FTI; that is, the

17   employer of Van Tassel; the Court of Appeals decision in this

18   case; a disclosure statement from 1998 and then amended through

19   November 7 -- November '07.

20         Then the other expert reports:  Berenblut, Compton,

21   Westheimer; some article about Ponzi schemes; attorney notes of

22   the Stanford Group Company, which, frankly, I'm sort of afraid

23   to even ask about because I'm concerned about the attorney-

24   client privilege.  But that's the full extent of the

25   description:  (quote) "various corporate organizational charts

1 of Stanford Financial Group and affiliates of subsidiaries"; an

2 order from the District Court -- I guess that's Judge Hittner's

3 order -- Declaration of Nigel Hamilton-Smith; supplemental

4 declaration of the same person; various affidavits of Carol Van

5 Tassel; federal income tax audits of Allen and Susan Stanford

6 for 2000, 2001 and '2; every -- an arraignment hearing of the

7 Plaintiffs other than Stanford; the insurance policies

8 involved; the Orange Database, various search/research

9 undertakings, undisclosed, undescribed, undefined;

10 Underwriters' Designation of Expert List; some case from New

11 York, the Ralph Cioffi (phonetic) case from 2008 -- completely

12 unrelated; and then personal meetings and interviews with Allen

13 Stanford.

14   His opinions include the following, and I have no

15 idea why this is relevant.  The information on which he relies,

16 however, to me is undefined and, frankly, either the same as

17 the people he's criticizing but in far smaller quantity or is

18 irrelevant.  But anyway, the conclusions he's offering are

19 things such as -- and I quote from page 10 now.

20   "Based upon the documentation provided, (quote)

21   'There was clearly no mention of forced labor, or any

22   complaints to suitable authorities in regard to

23   unlawful conduct by Mr. Stanford or his organizations

24   in regard to appropriate employment of individuals to

25   fulfill the labor requirements of his

1          organizations.'" (closed quote)

2          And he also says that the data denotes that the

3  people were (quote) "adequately compensated and totally free to

4  terminate their relationship." (closed quote)

5          The next opinion in the section called Land is:

6          "Based on the documentation, there was (quote)

7          'clearly no mention of land rustling or other forms

8          of obtaining land via force or inappropriate

9          methods.'" (closed quote)

10         And he then says that there's legal documentation

11  denoting the acquisitions of the land by acceptable methods;

12  meaning, I guess, it was paid for.  And then (quote)

13         "Hence, it is more than reasonable and equitable to

14         conclude that land or real estate component of the

15         production factors were appropriately obtained from

16         those who furnished or sold their land to the

17         Stanford group of companies at their own discretion."

18         (closed quote)

19         So I think that means that those -- the property was

20  not stolen.  I'm not sure what the relevance of this is but

21  nobody is accusing Mr. Stanford of forced labor or stealing

22  real estate.

23         In terms of the capital, he says there's an --

24  (quote) "appropriate agglomeration," A-G-G-L-O-M-E-R-A-T-I-O-N,

25  "of funds," (closed quote) from which the organization

16

1    operates.

2            Oh, okay, and then page 11, (quote)

3            "There was clearly no mention of robbery or assault

4            by Mr. Stanford or any members of his organization in

5            order to obtain appropriate and necessary funds with

6            which to operate organizations or earn a reasonable

7            rate of return for shareholders and employees."

8            (closed quote)

9            I don't know that anybody's accused Mr. Sanford of

10   assault, but the robbery piece usually means that you are

11   taking things by force.  I don't think that's in this case, to

12   the extent that this kind -- this opinion says there's an

13   adequate or reasonable rate of return for shareholders, that

14   was Mr. Stanford.  That's not an issue in this case.  And

15   employees don't get a reasonable rate of return so I don't

16   understand that part of the quote.

17           And then page 11, this is a sort of teeing up the

18   rest of the report.  It says, "If" -- and I'm quoting again,

19           "If said capital was attracted and obtained by

20           generally accepted and approved methods, then Certain

21           Underwriters at Lloyd's of London or and Arch

22           Specialty Insurance are obligated to supply adequate

23           funding for Mr. Stanford and others in their legal

24           defense against allegations brought by the United

25           States of America."  (closed quote)

1          There's no explanation of that conclusion.  I don't

2   understand the reasoning in it.  And to the extent that that is

3   the punch line of this report, the report lacks reliability; it

4   is not methodologically sound.  And, frankly, I don't know what

5   the conclusion even means.  So to the extent that these are the

6   kinds of conclusions that Mr. Lehrer is offering, he and the

7   report are inadmissible as completely wanting under the Daubert

8   standards.

9          The report does go on and talks about attainment of

10  funding, and then there's an accusation section and a response.

11  I will -- and I have read the report in detail, and I will

12  consider it.  But I view this report to be, basically, an ipse

13  dixit report and set of opinions.  Under Fifth Circuit law,

14  experts are not allowed to just give opinions based on their

15  say-so.  And so I find Mr. Lehrer's report to be not

16  satisfactory and will not meet the standards of admissibility

17  under the Fifth Circuit and the Supreme Court of the United

18  States.  So that report will not be received.

19         For Mr. Stanford's edification, I have, again, read

20  this report and simply don't see anything of value in it.  He

21  does, Mr. Lehrer, criticize Mr. Berenblut time and again with

22  the accusation sections.  Those are criticisms that are made

23  elsewhere, so Mr. Lehrer's report is completely cumulative to

24  the extent that he is unimpressed with Berenblut and

25  Berenblut's methodology.  Those weaknesses I've already noted,

18

1    and we will talk about that as the time comes when

2    Mr. Berenblut testifies.

3              There's a second report from Mr. Stanford's team, and

4    this is the expert report of Christopher Bebel.  I will treat

5    Mr. Bebel in the same fashion as the Westheimer and the

6    Berenblut expert matters.

7              Mr. Bebel is a securities lawyer, and so his

8    experience and his expertise, to me, are of questionable

9    relevance.  But maybe he can explain better what it is that

10   he's aiming for.  To the extent that Mr. Bebel believes that

11   there is direct evidence of anybody's state of mind, and he

12   criticizes -- to the extent that he believes that there is a

13   need for direct evidence, the premise is -- is off.

14             There is no need for direct evidence of criminal

15   conduct or criminal intent; circumstantial evidence is

16   sufficient.  And we all understand that this case needs to be

17   measured on a preponderance of the evidence standard.  Direct

18   and circumstantial evidence are admissible, and I will be using

19   them.

20             To the extent Mr. Bebel has an opinion in here that

21   is of any relevance, it can be argued; and I will determine its

22   weight and importance and relevance at the time, similar to the

23   way I'm doing the other experts.  To the extent that there's a

24   state of mind requirement, though, such as on page 10 of the

25   report, the -- that is irrelevant, and I -- that's not the

1    province of an expert.

2              So, Mr. Lehrer is stricken; Mr. Bebel is treated like

3    Mr. Westheimer and Mr. Berenblut.  Those are the rulings on the

4    other limine matters for the experts.  I think that catches me

5    up with you all.

6              Is there any other ruling that you are aware of or

7    needing?  I guess I have one more.  That is, the Underwriters'

8    request regarding inferences from the Fifth Amendment plea of

9    -- by Plaintiffs.  I'm just going to hold on that.  It's not

10   necessary right now, and I'd rather not get into it until after

11   I've heard the evidence.  So I will wait.

12             I'll note, for the record -- I should have done this

13   earlier -- Ms. Holt, Pendergest-Holt, is not here.  My

14   understanding is that she has reached a settlement with the

15   Underwriters; is that correct?

16             **MR. CHASNOFF:**  That's correct, your Honor.

17             **MR. KUNIANSKY:**  It is, your Honor.

18             **THE COURT:**  Okay, so I've noted that.  I have some

19   confusion with respect to exhibits.  I know the parties have

20   delivered binders to me, and we have tried to check them

21   against the lists.  We are unsure that we have all of them.

22   But it may have to do with the Holt withdrawal from this

23   hearing, or it may have to do with the fact I don't have them.

24   So I will deal with that as you see fit.  If you want to tell

25   me what you think you've delivered, I can check.

1          **MR. SHIDLOFSKY:**  Your Honor, we did not deliver the

2    Holt exhibits yesterday, which were several notebooks on

3    Plaintiffs.

4          **THE COURT:**  Like 1 through 100 and something?

5          **MR. SHIDLOFSKY:**  I believe so.

6          **THE COURT:**  That's what I was hoping.

7          **MR. SHIDLOFSKY:**  Yes.  So what you got yesterday from

8    us were Kuhrt's exhibits, Lopez exhibits; and then there was

9    some joint exhibits that were going to be Holt, Kuhrt and Lopez

10   exhibits.

11         **THE COURT:**  Okay.  Then I think I'm okay.

12         **MR. SHIDLOFSKY:**  I think you have all of the ones we

13   (indiscernible).

14         **THE COURT:**  Okay.  I have no books that say one for

15   -- it says Kuhrt Exhibits 1 through -- no, I'm sorry, 146

16   through 151?

17         **MR. SHIDLOFSKY:**  Correct.  And there's a CD in there

18   with an audio recording as 151.

19         **THE COURT:**  Okay, I haven't opened it; 152, 168 seem

20   to be joint exhibits --

21         **MR. SHIDLOFSKY:**  That's correct.

22         **THE COURT:**  -- if they do say Holt, but they're also

23   the other two --

24         **MR. SHIDLOFSKY:**  That's correct, your Honor.

25         **THE COURT:**  -- so you quoted me.  So I'll cover up

1   Holt.  And then we have Lopez, 127 to 145?

2           **MR. SHIDLOFSKY:**  That's correct, your Honor.

3           **THE COURT:**  And then we have some more Underwriters.

4   Okay, fine.  That explains that one.

5           Mr. Stanford, do you have any -- Mr. Bennett, any

6   exhibits?

7           **MR. BENNETT:**  We do, your Honor; and the binders are

8   here in front.  We brought them this morning.

9           **THE COURT:**  Okay.

10          **MR. BENNETT:**  We're still adding to them, and so

11  that's the reason for the delay.

12          **THE COURT:**  All right.  Well, in the course of the

13  hearing, if you intend for me to look at exhibits, I would need

14  them up here.  We do have an Elmo and I have a screen; and, you

15  know, you all see the screens on your tables.  We can use them.

16  And so it's not an emergency, but eventually I need copies of

17  the exhibits that are received.

18          **MR. BENNETT:**  We also have them loaded on the laptop,

19  your Honor.  We can do it that way too.

20          **THE COURT:**  I will not have -- I mechanically cannot

21  look at them that way here, but maybe for later I can take

22  that.  That would be good.

23          **MR. BENNETT:**  One other point, your Honor.  I

24  understand we'll be moving into opening statements.

25          **THE COURT:**  Yes.

1          **MR. BENNETT:**  And with permission of the Court and to

2     simplify and maybe even shorten, I would like to reserve my

3     opening statement till the time of our evidence.

4          **THE COURT:**  No.  No, this is a civil case.  And I --

5     I know that is appropriate in criminal cases, but this is a

6     civil case.  I need to know where you're going.

7          **MR. BENNETT:**  Okay.

8          **THE COURT:**  And I have read the proposed findings, so

9     I have some feel but I really do want -- because the proposed

10    findings are enormous, and they are -- frankly, it would be

11    very helpful to me to get some sort of a feel for where you're

12    going.  It doesn't have to be fabulous, it just needs to be

13    informative.  I just need a little roadmap.

14         **MR. LANE:**  Your Honor, just on the exhibits, I wanted

15    to note one thing.

16         **THE COURT:**  Yeah.

17         **MR. LANE:**  We, on Sunday, got together with lawyers

18    for Kuhrt, Lopez and Holt to discuss objections and discussion

19    among the exhibits.  We don't have all of the exhibits from

20    Mr. Stanford.  And although invited, counsel --

21         **THE COURT:**  No, because they're adding to --

22         **MR. LANE:**  -- counsel for Mr. Stanford did not attend

23    the meeting.  So we didn't really get an opportunity to discuss

24    objections to the exhibits.  We don't even have some of the

25    exhibits.  So…

1          **THE COURT:**  They -- from them, you mean?

2          **MR. LANE:**  Yes, from them.  So --

3          **THE COURT:**  All right.

4          **MR. LANE:**  -- we've provided -- the Plaintiffs

5   provided us their exhibits; we provided them our exhibits and

6   so forth.

7          **THE COURT:**  Right.

8          **MR. LANE:**  And there was just a disconnect in one

9   part of the counsel relationships.

10          **THE COURT:**  Okay.  Well, you know, we're just going

11   to do this the old-fashioned way.  You've got gray hair,

12   Mr. Chasnoff, you know what I mean.

13      **(Laughter)**

14          **MR. CHASNOFF:**  Well, that's now officially on the

15   record.

16      **(Laughter)**

17          **THE COURT:**  You know, I have to say it's like

18   wrinkles and gray hair, you know.  In our business, I think it

19   helps, you know.  It adds credibility, one might say.

20          **MR. CHASNOFF:**  I just wanted to say, to make sure, we

21   provided Exhibits 1 through 224; and I believe the Court has

22   all of our Underwriters' exhibits.

23          **THE COURT:**  Okay.  I have Underwriters' exhibits up

24   through 224; is that what you said?

25          **MR. CHASNOFF:**  Yes, your Honor.

1          **THE COURT**:  Yeah.  Okay, the Plaintiffs are going to

2    go first.  These opening statements, in my mind, are designed

3    for you to tell me what you're going to try to show me, you

4    know, just at 10,000 feet.  And I am interested -- frankly, I

5    have idea what your witnesses are going to say, and you don't

6    have to tell me in any detail.  But I have -- I haven't read

7    all your documents either because they're not in evidence.  But

8    I've read the findings and those kinds of things.  But I'm

9    interested in knowing what you think the witnesses are going to

10   sort of add to the mix, if you know and -- but again, not too

11   detailed.  Just give me a feel because I don't want to spend a

12   lot of time on it.

13         One thing, also, I think I need to tell you.  I don't

14   remember if I've said this.  It is my practice to require pre-

15   marking of exhibits.  But my practice also is that there is no

16   data dump into the record.  There -- I think I told you this on

17   a telephone call, but if not, here it is.  You need to offer

18   the exhibits by number so that both I and the record know

19   what's coming in.  The fact that you have numbered a paper and

20   identified it as an exhibit, does not get it into evidence.

21         This is how I've done trials since day one.  It's how

22   we used to do trials.  It's -- the pre-marking is a convenience

23   so we don't have to stand there and do the stickers and figure

24   out what it is, and do the objections, or all this surprise.

25   But it is important that you appreciate -- I mean, I'll take

1    groups if you'll define for me what they are.

2            But, for instance, if somebody is going to offer the

3    Stanford Financial Group disclosure statements; that is, their

4    promotional materials, I want to know what exhibits those are,

5    what numbers.  Okay?  And I will tell you that I'm very

6    interested in those.  So, anyway, that's the kind of thing --

7    you have to offer them.  I'll work with you; it won't be too

8    difficult.

9            **MR. SHIDLOFSKY:**  Your Honor, obviously we'll do

10   opening statements any way the Court likes.  It was our

11   expectations; and since the Court's already ruled that

12   Underwriters has the burden of proof --

13           **THE COURT:**  Uh-huh.

14           **MR. SHIDLOFSKY:**  -- they'd be leading off --

15           **THE COURT:**  That's fine.

16           **MR. SHIDLOFSKY:**  -- on opening statements.

17           **THE COURT:**  I just thought you might want to go

18   first.

19           **MR. SHIDLOFSKY:**  Well, I mean --

20           **THE COURT:**  Who knows?

21           **MR. SHIDLOFSKY:**  -- not to burden my team, but --

22           **THE COURT:**  Okay.

23           **MR. CHASNOFF:**  And one clarification I'd like to get

24   on exhibits.  We read carefully the Court's rulings on the Van

25   Tassel materials and the Davis materials, and how parts of

1    those are -- preliminary ruling -- are admissible, and parts

2    are not.  It would be our preference, if it works for the

3    Court, when we offer them to not try to redact and --

4             **THE COURT:**  Oh, no, you don't have to redact.

5             **MR. CHASNOFF:**  Okay.

6             **THE COURT:**  No.  It's just that, I mean, you all know

7    I've read them already.

8             **MR. CHASNOFF:**  Yeah.

9             **THE COURT:**  But the point is that I view the rulings

10   as appellate issues.  And so, at some point, I'm going to be

11   able to say I relied on Van Tassel for the following things.

12   And I relied on Davis' allocution or plea agreement or whatever

13   for the following things.  But big picture, I'm letting that be

14   part of the play of this trial.  And it is indefinite at the

15   moment.

16       **(Pause / Counsel confer)**

17            **THE COURT:**  Do the parties mind if we still call this

18   case Pendergest-Holt or Holt or -- I don't know how Mr. Cogdell

19   feels -- or she feels.

20            **MR. COGDELL:**  I probably don't have standing since I

21   don't even have a tie, but I don't care what you call it.

22            **THE COURT:**  You don't, I noticed.

23       **(Laughter)**

24            **MR. COGDELL:**  I didn't expect to be this far forward.

25   I apologize to the Court.

1          **THE COURT:**  You forgot how small the courtroom is.

2          **MR. COGDELL:**  But however you want to refer to it, I

3     don't have a problem with it.

4          **THE COURT:**  Okay.  Well, that's what's in the

5     caption.

6          **MR. COGDELL:**  Yes.

7          **THE COURT:**  So for the time being, we'll just keep it

8     that way.  You ready?

9          **MR. CHASNOFF:**  Yes, your Honor.  And I -- oh, one

10    request, your Honor.  If -- Mr. Berenblut is here in the

11    courtroom.  I would like, during my opening, for him to be able

12    to see a screen.  Would it be permissible for him to sit up in

13    the jury box so he can see a screen?

14         **THE COURT:**  Sure.  Any of the experts who want to sit

15    in the screen -- sit in the jury box, you can do that.  I just

16    have to make sure my system is working.  Are you seeing

17    anything?  Has anyone turned anything on?

18         **MR. CHASNOFF:**  Yeah, we --

19         **THE COURT:**  How are you operating?

20         **MR. CHASNOFF:**  It is switched to us now, and we have

21    slides, the -- on point.

22         **THE COURT:**  Okay, yes, attorney one back.  You want

23    to turn it on and see if we have --

24    **(Whispers and voices heard)**

25         **THE COURT:**  Okay, I don't.  Let's see.  Okay.

1          Does Mr. Bebel -- is he here?  Does he want to sit in

2    the jury box too?

3          **MR. KENNEDY:**  Your Honor, Kirk Kennedy.  Mr. Bebel is

4    on his way, but we can proceed in his absence.

5          **THE COURT:**  All right.  And okay, that's

6    Mr. Westheimer?

7          **MR. WESTHEIMER:**  I'm Alan Westheimer.

8          **THE COURT:**  And Mr. --

9          **MR. UNIDENTIFIED:**  Berenblut.

10          **MR. UNIDENTIFIED:**  Berenblut.

11          **THE COURT:**  -- Berenblut.  Okay.  All right, does

12    that help you?  You have your own personal little screens?

13          **MR. UNIDENTIFIED:**  Yes, ma'am, like an airplane.

14          **THE COURT:**  Yeah, there you go.  All right.

15          **MR. ZIMMERMANN:**  May it please the Court?  Your

16    Honor, other than the experts, we don't know who the witnesses

17    may be; we would like to invoke the rule prior to opening

18    statements.

19          **THE COURT:**  Okay.  Has anybody been informed that

20    they're going to be a witness in this case for any party?

21          **MR. UNIDENTIFIED:**  Yes.

22       **(Voices and whispers heard)**

23          **MR. CHASNOFF:**  You have --

24          **THE COURT:**  If you have, you need to step outside.

25    It doesn't matter whether you were officially subpoenaed or you

1    were just invited to come, you need to step outside.  That's

2    what invoking the rule means.

3          **(Voices and whispers heard)**

4              **MR. CHASNOFF:**  Your Honor?

5              **THE COURT:**  Uh-huh.

6              **MR. CHASNOFF:**  Mr. Sewell -- we anticipate Mr. Sewell

7    testifying.  He is, however, a party representative, so may he

8    stay and --

9          **(Voices and whispers heard)**

10             **THE COURT:**  Yes.  Yes, party representatives may

11   stay.  Do you want somebody sitting at your table too?  I can

12   get you another chair too.

13             **MR. CHASNOFF:**  Actually, this is fine.  Mr. Sewell's

14   fine.  That is close enough.

15             **THE COURT:**  Okay.  You may proceed.

16             **MR. CHASNOFF:**  Thank you, your Honor.  And the court

17   reporter will let me know if my voice drops.  Throw something

18   at me.

19             In December of 2008, Stanford International Bank,

20   which I'll call SIB, in documents that were prepared and

21   approved by these Plaintiffs, represented to investors and

22   regulators that the bank had more than $8.1 billion in total

23   assets.  Two months later, the SEC initiated proceedings in the

24   Northern District of Texas against Mr. Stanford, Mr. Davis,

25   Ms. Holt, and later added Mr. Lopez and Mr. Kuhrt, alleging the

1    massive Ponzi scheme that you're aware of.

2           After reviewing the sworn submissions of the SEC,

3    Judge O'Connor froze the assets; found good cause to believe

4    that the various Stanford entities which Mr. Stanford

5    controlled were part of a massive fraud; and so he appointed a

6    receiver, as you are aware.  And one of the chief

7    responsibilities of the receiver was to marshal this supposed

8    8.1 billion in assets; and we will be showing you their filings

9    and materials in which they claimed to have that $8.1 billion.

10          The receiver's job, in part, was to pull together

11   those assets.  Today, is spite of Herculean efforts, as Ms. Van

12   -- Ms. Van Tassel has reported, the receiver has recovered less

13   than $1 billion of those assets.  This case is in part the

14   story of what happened to those missing billions of dollars.

15          What -- the James Davis plea makes it clear that the

16   disappearance of that money was a crime.  The evidence we will

17   present and what we will demonstrate will show the roles of

18   each of the Plaintiffs individually played in the theft,

19   overstatement of value and money laundering of that massive

20   amount of money.  And we are cognizant of the Court's direction

21   that the evidence must point to each Plaintiff individually.

22          The Plaintiffs were part of the upper management.  Of

23   course, Mr. Stanford was the upper management, the sole

24   shareholder of something called the Stanford Financial Group,

25   which was a global network of affiliated companies.  One of the

 1   defenses that has been raised is that -- what -- certain of the

 2   Plaintiffs worked for different companies; and, therefore, we

 3   weren't responsible for what Stanford International Bank did.

 4         But what is before you as Exhibit 41, which was one

 5   of their statements -- disclosures.  And as it says, Stanford

 6   International Bank is a member of the Stanford Financial Group,

 7   a global network of affiliated companies; although independent,

 8   each company works in cooperation with other Stanford

 9   affiliates to provide coordinated wealth-management programs

10   for nearly 40,000 investors on six continents.  So the --

11         **THE COURT:**  What year brochure is this, and did it

12   change over time?  I've seen this brochure somewhere?

13         **MR. CHASNOFF:**  Yes, I -- my --

14         **THE COURT:**  Let me just tell you that you cite to a

15   2008 version, but I think I've seen -- we've pulled -- I guess

16   I should make this disclosure.  We either were supplied by you

17   or we pulled off the Northern District of Texas website, a

18   publically filed document, which was a Van Tassel report, from

19   May of 2010, which had the 2008 brochure.  But you have

20   supplied us, I think, with the '7.  We did not notice any

21   differences.

22         **MR. CHASNOFF:**  As far as I know, this representation,

23   over the years -- and we will put in and identify the exhibits

24   -- did not change.

25         **THE COURT:**  Okay.  And you can tell the date -- for

1    your people -- towards the very back, they have dates on there

2    that --

3           **MR. CHASNOFF:**  Okay.  And Ms. Grayland (phonetic) --

4    if you don't mind, I'll go on and then she'll --

5           **THE COURT:**  Please.  And you don't need to -- I just

6    am sort of lodging the question.

7           **MR. CHASNOFF:**  Okay.  Okay.  So, what the evidence

8    will show is that even though individual Plaintiffs may have

9    been on the payroll of a different entity, they were doing work

10   for Stanford International Bank.

11          Now -- and what the evidence is going to show is that

12   the fraud was centered -- the money was raised through CDs.

13   And all of this -- we put up this which is Exhibit 36.  This is

14   a consistent statement, but they had CDs that paid a higher

15   rate of return.  A constant way of bringing money in was to say

16   we pay more money on a CD, one or two percent, than any of our

17   other competitors.

18          The CDs were marketed in two ways.  First, through

19   false misleading annual statements, financial statements,

20   marketing materials and disclosure statements, which we will

21   put into evidence.  Which the evidence will show each of the

22   Plaintiffs participated in the preparation of, or in many

23   cases, in the case of Mr. Stanford, he signed.

24          Second, through financial advisors.  Mr. Stanford and

25   others trained them to disseminate false information which they

1    didn't know was false, and -- as far as we are able to tell --

2    but false information concerning what the bank was and its

3    portfolio through those annual reports.

4         Now, it's important to focus on and understand how

5    they -- what they said that was false.  And so back to Exhibit

6    41, which I think Ms. Grayland's looking up.

7         **MS. UNIDENTIFIED:**  2003.

8         **MR. CHASNOFF:**  What's that?

9         **MS. UNIDENTIFIED:**  It's a 2003.

10        **MR. CHASNOFF:**  Exhibit 41, which we showed, is a 2003

11   brochure; and it continued through the years.  And among the

12   things -- I call it a brochure.  Is that an annual statement?

13   It's one of the marketing brochures.  And this was a, also out

14   of Exhibit 41, one of their classis statements that really

15   summarizes what they were telling people.

16        "Liquidity:  We focus on maintaining the highest

17            degree of liquidity as a protective factor for

18            depositors.  The bank's assets are invested in a

19            well-diversified portfolio of highly-marketable

20            securities, issued by stable governments, strong

21            multinational companies, and major international

22            banks."

23        And as you will see, the evidence will show what was

24   presented was all of these marketable -- highly-marketable

25   assets were supposedly managed by Ms. Holt -- and I understand

1    she's out, but her role in integral here -- and a global

2    network of money managers that she supposedly supervised on a

3    daily basis.  Both the description of what their assets were

4    invested in and what Ms. Holt's role was were false.

5            In fact, more than 80 percent of the bank's assets

6    were not in the kind of deposits that are described in the

7    brochure.  Rather, they were -- and they were not monitored by

8    Holt, they were separated out and consisted of unsecured

9    personal loans to Mr. Stanford and investments in companies a

10   hundred percent owned by Mr. Stanford.  Those companies were

11   not securities at all.  Certainly the loans weren't because

12   they were unsecured personal loans, and they weren't -- these

13   other companies weren't securities, much less liquid and highly

14   marketable.

15           And as I indicated before, what SIB did was to lure

16   purchasers of CDs by offering these higher interest rates.  And

17   what they said, we can pay higher interest rates because we

18   have -- we're smarter than everybody else and we manage these

19   conservative assets in a way that other people haven't figured

20   out.

21           And this is a compendium of what they say.  And if

22   you look through the annual reports, the dates at the top are

23   what's pulled from different annual reports, which will be in

24   evidence; and they show their assets growing astronomically,

25   the customer deposits growing, their profits growing, and

1    shareholders' equity growing, supposedly by -- the deposits and

2    assets grew by $5 billion during this time.

3          And they also talked about how their portfolio

4    yielded double -- double-digit growth.  This is Exhibit 52

5    which we'll offer into evidence.

6          **THE COURT:**  What was the prior exhibit?

7          **MR. CHASNOFF:**  The number, your Honor, was -- this is

8    a demonstrative chart that's a compilation.  We can mark it

9    later and make it an exhibit.  But it is pulled from documents

10   which will be in evidence and we will team mark that.

11         And for the Court's information, and the team's

12   information, we should mark on this chart, which each

13   exhibit --

14         **MR. LANE:**  It was in our findings of fact.

15         **MR. CHASNOFF:**  And this chart was also in our

16   findings of fact.

17         **THE COURT:**  Right.

18         **MR. CHASNOFF:**  Okay.

19         **THE COURT:**  But I wondered where it was from.

20         **MR. CHASNOFF:**  Okay.

21         **THE COURT:**  It says "data from" -- okay, anyway you

22   get the point.

23         **MR. CHASNOFF:**  Yeah, and we will tract that for you.

24         All right, the report -- so they put this information

25   out.  We'll be able to demonstrate, in part with

36

1    Mr. Berenblut's assistance -- and I do believe that when you

2    see what we're going to have him focus on, you will find him

3    useful, your Honor.

4            **THE COURT:**  Yeah.  I mean, he could serve as an

5    accountant.

6            **MR. CHASNOFF:**  And, your Honor, we -- what you'll

7    find is that we ask him -- he had a different task than Ms. Van

8    Tassel.  And you'll -- I think you'll see that it melds

9    together and provides useful information too.

10           **THE COURT:**  But -- that's fine.  I mean, he pointed

11   out that he wasn't aware he was going to have to write a

12   report.  Nobody was.  Somehow something I wrote, did or said

13   indicated that I wanted reports, which I did.  So thank you all

14   for scurrying around.  But that's part of why I don't feel

15   comfortable striking those experts.

16           **MR. CHASNOFF:**  If they --

17           **THE COURT:**  Go ahead.

18           **MR. CHASNOFF:**  I'm sorry.  In any case, we'll show

19   the false representations, we're going to show that people

20   relied upon.  One of the witnesses, we anticipate our first

21   witness, will be Dr. Robert Conte, C-O-N-T-E, who will testify

22   that he relied on the representation he received in the annual

23   reports; marketing brochures; and from his financial advisors

24   about the liquidity and security of the investments.  And he

25   relied upon that in deciding not only to make his initial

1    investment, but when CDs matured, to roll over his investments.

2         The Court's also going to hear testimony from

3    Stanford investor Kelly Dehay.  Mr. Dehay was here and he's one

4    of those who left when the rule was invoked, who will testify

5    that he viewed these representations as important; and that he

6    invested based upon these representations.

7         Unfortunately for Mr. Dehay and Dr. Conte and

8    thousands of other investors, the composition, strength,

9    stability and liquidity of the portfolio was nothing like what

10   they led investors to believe.

11        I've briefly mentioned, and you've seen from the

12   papers, that the portfolio was divided into three tiers.  Tier

13   one was cash and cash equivalents.  Tier two was investments

14   with outside portfolio managers, and tier three was what they

15   called other assets.  In there were $1.7 billion worth of

16   unsecured loans to Mr. Stanford, among other things, and was

17   directed, managed and monitored exclusively by Mr. Stanford and

18   Mr. Davis, not by Ms. Holt and her global team of advisors, as

19   was represented to investors and the regulators.

20        Stanford routinely misappropriated those tier-three

21   assets for his own personal use through these undisclosed

22   personal loans and related-party transactions.  The loans, we

23   will show you, were supposed to have been disclosed SIB's

24   financial statements to Antigua regulators.

25        Antigua, also, we will demonstrate, had a limitation

```
1    that no loans to shareholders amounted to more than five

2    percent of assets.  The loans to Mr. Stanford far exceeded the

3    five percent and were not disclosed.

4              THE COURT:  Say that part again.

5              MR. CHASNOFF:  The Antiguan regulations --

6              THE COURT:  Right.

7              MR. CHASNOFF:  -- allowed loans to shareholders of no

8    more than five percent of assets.  His loans -- well, if you

9    talk about stated assets, it's -- I'm doing this in my head --

10   20 percent.  Of real assets, it was far more than that because

11   they didn't have the assets they said they had.  Talking about

12   the loans, they -- what did they represent to investors about

13   loans?  This is Exhibit 33, and it's from the 2005 annual

14   statement as you can see in the upper left, but it's -- this is

15   another that is consistent throughout.

16             Stanford International Bank does not expose its

17   clients to the risk associated with commercial loans.  The

18   bank's only form of lending is done on a cash-secured basis

19   solely to existing clients.  Loans and advances to clients are

20   permitted up to 80 percent of deposits, et cetera.  That

21   deposit serves as a guarantee to the loan; and, therefore, no

22   addition provision is needed to support a potential loss.  The

23   antithesis of unsecured loans being made, and we will show you

24   the promissory notes; and we'll show you the books and records

25   where these were done.  And Ms. Van Tassel, in her reports,
```

1    traced those loans out.

2           Now, Mr. Kuhrt and Mr. Lopez, they were responsible

3    for the preparation of the financial reports that concealed the

4    loans.  And the way they concealed them on the books was to

5    call them (quote) "financial assets at fair value."

6           Just as problematic for investors as Stanford's

7    misappropriation of funds, was the fact that the purported

8    investment returns were completely fictitious.  They were made

9    up.  This is a -- Exhibit 52, we've looked at this before, a

10   supposed 10-year investment portfolio returns.  This would have

11   been in 2005 because it tracks it through 2004.  One of the

12   interesting little things, they got lazy one year; and when

13   they made up the numbers, the box around -- they -- these are

14   percentages, so this is what, to a thousand, then you go to

15   15.71 percent.  Supposedly in two years it was precisely the

16   same on this huge portfolio.

17          Mr. Berenblut, who's a certified fraud examiner, will

18   explain to the Court that this investment return could not have

19   been generated even by a legitimate portfolio in the real

20   world, much less the sort of bizarre portfolio which you'll

21   hear about.

22          What the evidence is going to show is that the

23   investment returns were simply made up and supported by

24   falsified financial statements prepared by Mr. Kuhrt and Lopez.

25   And I'm going to go through and explain this.  And this is one

1  of the things Mr. Berenblut's going to because you have to

2  track through the accounting to show how they were doing this.

3  And we're going to ask Mr. Berenblut to --

4        **THE COURT:**  And has he done that himself, personally?

5        **MR. CHASNOFF:**  Yes.

6        **THE COURT:**  Based on the basic -- based on the

7  primary documents?

8        **MR. CHASNOFF:**  Yes, ma'am.

9        **THE COURT:**  Okay.

10        **MR. CHASNOFF:**  Yes, ma'am.  And so we will be looking

11  at spreadsheets and accounting records and then track how

12  numbers moved through.

13        **THE COURT:**  Okay.

14        **MR. CHASNOFF:**  So, to give you an overview of it,

15  though, what would happen is, they would make up a revenue

16  number -- and I'll talk about this more in a minute -- that

17  would -- to drive the return that was being sought.  And then

18  they would report the supposed -- the made-up revenue number to

19  investors and to regulators.

20        **THE COURT:**  The papers say something to the effect

21  that Kuhrt and Lopez were using either projections or budgeted

22  numbers to prepare a red book for Davis.  Do you know anything

23  about that?

24        **MR. CHASNOFF:**  Yes, ma'am.  And I'm going to do this

25  without looking at my notes, because it's later in my notes,

1   but I'll explain --

2            **THE COURT:**  Okay.  I can't help myself.

3            **MR. CHASNOFF:**  -- to your Honor how it's done.

4            What would happen is that Mr. Davis and Mr. Stanford

5   would decide what they wanted to show to the outside world as

6   the returns.  Well, to get your returns, you need to look at

7   your investment portfolio and what it returns, what its

8   revenues were, minus your expenses.  Expenses are set.  But

9   there are all sorts fees and so forth.  So if you're going to

10  have a certain ROI, return on investment, you have to figure

11  what numbers you need; and you need it for two reasons.  You

12  need that return both to make their projection and to get the

13  revenue number, the investment return they wanted to show the

14  investors.  But, two, the Antiguan regulations required them to

15  have 105 percent capital.  They have to have a five percent

16  capital cushion.

17           And you'll see -- and I'm actually going to show you

18  some of these as we go through, and you'll see more of them in

19  the evidence -- where they would work backwards to get the

20  numbers they needed to do that.  And what was ultimate -- and

21  just to give you a big picture and then I'll come back, -- this

22  -- we'll show you this happened through the years, and there

23  started being a bigger and bigger hole in the numbers.

24           And then when the regulatory authorities started

25  coming in and it started collapsing, they compounded it by

1    creating more lies; making up assets; changing the books to

2    make it look as if there were hard assets there.  So I want to

3    -- that's the broad scheme.

4         Now, I'd like to talk about what each of the three

5    Plaintiffs' role was in this.  Mr. Stanford.  As you know, the

6    sole shareholder of Stanford International Bank and the driving

7    force behind the scheme.  He kept secret the fact that he was

8    -- had this separate portfolio that he and Damon (phonetic) --

9    Davis were running.  He kept secret the fact that -- of these

10   personal loans.  He participated in meetings with financial

11   advisors where they were told -- made -- told false things to

12   go off and repeat to their investors so that got passed on to

13   them.  Part of what this lie was the management by Laura Holt

14   of the Holt Portfolio which didn't happen.  She ultimately

15   admitted that, by the time it all came crashing down, she was

16   managing something like five percent of the portfolio.

17        It had gone from ten percent to five percent because

18   as CD redemptions started coming in, they started having to

19   liquidate hers to try to pay these redemptions.  He was

20   involved with Davis and -- Mr. Stanford was, in falsifying the

21   financial statements, because they together would come up with

22   the return they wanted to show.  And then he would have

23   meetings with big investors and make direct misrepresentations

24   to them.

25        Mr. Stanford also signed the annual reports and the

1  so-called report of management in the annual reports that went

2  out to investors and regulators.  In it, he said he assumed

3  responsibility for the (quote) "preparation, integrity and

4  objectivity of the financial statements of the bank."  But as

5  we've said, and as the evidence is going to show, they were

6  completely false.

7          Mr. Kuhrt and Mr. Lopez.  I'm going to talk about

8  them together because Mr. Lopez was Mr. Kuhrt's supervisor; and

9  as the evidence is going to show, Mr. Kuhrt would work with

10  Mr. Lopez.  Mr. Kuhrt would do some of the day-to-day number

11  crunching, getting approval by Mr. Lopez; it would go up to

12  Davis, he would approve the false numbers; and it would go from

13  there.

14          And one of the interesting pieces of evidence you

15  will hear is that, in connection with retaining Mr. Westheimer

16  as their expert, they have this issue, I guess, that they

17  weren't going to testify so they had Mr. -- they told

18  Mr. Westheimer, and then Mr. Westheimer says his -- his job, I

19  guess, was to repeat their story without them having to

20  testify.  But in the course of that, we got what we view as

21  some pretty important admissions from them; and that's why we

22  wanted to call Mr. Westheimer, and we'll call Mr. Westheimer as

23  a fact witness.

24          Part of what you'll learn is that Mr. Lopez was

25  responsible for -- and I'll quote -- "overall supervision of

44

1    the accounting reports and budgetary processes" (end of quote)

2    for the Stanford entities.  He was also, as I said, a direct

3    supervisor of Mr. Kuhrt.  And Mr. Kuhrt worked --

4        THE COURT:  Would you repeat what you just said about

5    Lopez?  What is his responsibility?  This is what he -- this is

6    what's in Westheimer's report?

7        MR. LANE:  It's in his notes and --

8        MR. CHASNOFF:  In his notes, yes.

9        MR. LANE:  -- in his testimony.

10       MR. CHASNOFF:  And we'll show documents that

11   (quote) --

12       THE COURT:  I didn't read the notes.

13       MR. CHASNOFF:  -- "overall supervision of the

14   accounting reports and budgeting processes" (end of quote) to

15   the Stanford entities.

16       THE COURT:  For the Stanford entities?

17       MR. CHASNOFF:  Yes, ma'am.

18       So, Mr. Kuhrt would put together the initial drafts

19   of the annual report numbers and --

20       THE COURT:  Kuhrt or Lopez?

21       MR. CHASNOFF:  Mr. Kuhrt would.  Then it would go to

22   Mr. Lopez, his boss, and then to Mr. Davis; and they would

23   create and compile the financial statements for the annual

24   reports and would prepare SIB's reports -- and I'm going to use

25   a new term here -- to the Antiguan Financial Services

1    Regulatory Commission, which I'm going to call the FSRC, which

2    was the Antiguan regulatory authority responsible for this --

3    overseeing this bank.

4         What the evidence is going to show is each of these

5    documents went first from Mr. Kuhrt to Mr. Lopez; and in them,

6    they misstated the true composition of the assets.  There are

7    admissions that they knew it was wrong, that the numbers were

8    wrong, but they have an excuse which I'll talk about in a

9    moment, a claim excuse.

10        Many of these assets, by the way, part -- we'll talk

11   about the hole that got created -- part of the hole that kept

12   getting created in their numbers was a lot of these other

13   Stanford business entities that they were pumping money into,

14   just owned by Mr. Stanford that weren't marketable securities,

15   were money losers.  And so they'd have to take more money out

16   to try to keep these other things going, from cricket teams to

17   a variety of other stuff.

18        All right, so, if you -- we better take points in

19   time.  One point in time is June 30th, 2008.  The internal

20   records show that by June 30th, 2008, Mr. Stanford had

21   misappropriated at least 1.7 billion in personal loans and

22   another 1.8 billion in related-party transactions.  Mr. Kuhrt

23   and Mr. Lopez kept track of those personal loans and related-

24   party transactions in a spreadsheet that Mr. Kuhrt created

25   called -- and it's Exhibit 56.  I know it's a little hard to

1  read, but --

2          **THE COURT:**  Can you zoom?  Probably not.  Okay, for

3  the future, if they're little things like that, and you have a

4  small -- you have a hardcopy, we can put it on the Elmo and we

5  can zoom in.

6          **MR. CHASNOFF:**  Okay.

7          **THE COURT:**  So just print the ones that are hard to

8  read.

9          **MR. CHASNOFF:**  Okay.  We'll do that.

10          In any case, it's called Shareholder Funding

11  Assumption of Debt and Notes Payable.  It's Exhibit 56 in our

12  exhibits.  Part of what you'll learn from Mr. Westheimer's

13  notes and his testimony is that Kuhrt and Lopez knew that these

14  related-party transactions were not disclosed in the financial

15  statements; the annual reports; or the FSRC reports.  And they

16  knew that that was a violation of international financial

17  reporting statements.  They knew that, and of the laws of

18  Antigua, the United States, Texas.  They admitted this to

19  Mr. Westheimer.

20          They kept track of these loans at least as far back

21  as 2005.  They knew -- they admit they knew that they were

22  supposed to be disclosed, but what they say is well we told

23  Mr. Davis that these should be disclosed.  Now we don't have

24  any evidence that they said that, but that's what they say

25  through Mr. Westheimer, and claims that this absolves them --

1    their claim is this absolves them of liability.  But they never

2    recorded the falsity of the statements nor have I seen an

3    explanation as to why, after they admittedly knew at least as

4    far back as 2005 that the numbers were false, they stayed with

5    the Stanford entities another four years, continuing to

6    generate the false reports which were given to regulators and

7    to investors.

8              The fact is Mr. Kuhrt and Mr. Lopez helped

9    Mr. Stanford conceal the unsecured personal loans because then

10   what they would do with these numbers each year that they knew

11   were false would characterize them on the financial statements,

12   as I said, as financial assets at fair value.  This wasn't the

13   only thing that Mr. Kuhrt and Mr. Lopez were doing to help.

14             This is where we get to the false numbers.  They

15   helped to bring in the false numbers on the investment returns.

16   So they're reporting false information to investors and

17   regulators to cover the problems, but they're also helping to

18   bring in more money by helping prepare the financial reports

19   that are distributed with false numbers.

20             And it's probably obvious, but just to state it, the

21   way this worked, CDs with the higher return, what they would

22   say to investors is we can give you higher return because we

23   have this investment portfolio.  We're making a ton of money;

24   we want -- we're taking your money from the CDs and putting

25   them into these safe investments.  They're liquid.  You'll hear

1    terms like T1, T2, we can liquidate in one day or two days the

2    portfolio and get you your money.  Meanwhile, we're making a

3    ton of money, because we're so smart; and we -- we'll pay you a

4    higher return.  So it was important to -- how high they -- of a

5    return they needed.

6            Now, I already talked to you out of turn a little bit

7    about how they were coming up with these budgeted numbers

8    which, essentially, part of their excuse is well these were

9    just budgeted numbers.  When Mr. Berenblut helps us walk

10   through the numbers -- a budget is a goal.  What they would do

11   after the end of the year is gave that a revenue results number

12   that they needed to show -- I mean, a -- or rather, a return

13   number, and then they would budget what revenue we had to have

14   to get the return you want.

15           **THE COURT:**  For the past year?

16           **MR. CHASNOFF:**  For the past year.  And you'll see in

17   some specific emails where, in at least one instance, where we

18   have the emails they went through this process.  They had a

19   computer program they eventually developed so they would go

20   through and figure out -- okay, you tell us what investment

21   return; and we'll tell you how much revenue you had, where they

22   figured it all out.

23           And then there's an email that Mr. Kuhrt and

24   Mr. Lopez are involved in where they say oops, we just realized

25   we had another $1.6 million in expense.  Okay, here's the

1    increased revenue we need -- and you'll see it on the

2    spreadsheet.  The next day, the revenue goes up for the past

3    month by exactly the amount of the expense so the return stays

4    the same.  And then those documents, we'll trace them through

5    to show that those falsified numbers ended up in the annual

6    reports and the disclosure statements.

7            And, you know, we'll show that -- I understand your

8    ruling, I think I do, on Mr. Davis, that he conspired.  I think

9    it's our job to show with whom he conspired and if these folks

10   are some of those that he conspired with, and we will show

11   through the documents that that conspiracy with Mr. Davis on

12   those numbers took place involving Mr. Kuhrt, Mr. Lopez and

13   Mr. Stanford.

14           And --

15      **(Counsel confer)**

16           Okay.  This is an example of -- this is Exhibit 148

17   in our documents where -- and it's -- where there's a man named

18   Mr. --

19           **MR. LANE:**  Persuad.

20           **MR. CHASNOFF:**  -- Persuad who sends an email to

21   Mr. Kuhrt and says we need to make 19 million profits for

22   December for 44 million for 2007 -- and you notice this is

23   January of 2008 -- to be at five percent equity of the capital.

24   That's the five percent requirement.  Yes, let's make it --

25   yes, 19 million would take us, Mr. Kuhrt says, to 5.05 percent

50

1   for a slight cushion, and then --

2           **MR. LANE:**  That's Persuad.

3           **MR. CHASNOFF:**  What's that?

4           **MR. LANE:**  That's Persuad.

5           **MR. CHASNOFF:**  Persuad.  Okay, Mr. Persuad says to

6   Mr. Kuhrt -- and you'll see that the numbers that show up are

7   the ones they need for the slight cushion.

8           All right, and there are many more documents, and

9   we'll track them through with the witness and with the actual

10  documents.

11          The scheme went on for a number of years.  But what

12  happened was that the gap -- and the reason Ms. Van Tassel's

13  been able to find -- and the receiver have been able to find so

14  little, is that the gap is created by a compounded problem.

15  One is, they're reporting on their books and records they're

16  making these huge returns which they weren't making.  In fact,

17  they were losing money.  And so -- and each year as you

18  compound that return that you're not getting, the number gets

19  higher of what you supposedly have.  At the same time, they're

20  draining money out the back door for loans and investments and

21  losing propositions, so you get this ever-widening gap in the

22  amount of money you have and the amount of money you're

23  reporting to make.

24          The problem came to a head -- a combination of things

25  -- 2007, Mr. Tidwell, who's a financial advisor and who will be

1  here to testify; and I'll talk about him more in a moment --

2  became concerned about what was going on and he went to the

3  SEC.

4          **THE COURT:**  In 2007?

5          **MR. CHASNOFF:**  Yes --

6          **MR. LANE:**  He left in 2007 --

7          **MR. CHASNOFF:**  Yeah.

8          **MR. LANE:**  **-- a**s of December, yeah.

9          **MR. CHASNOFF:**  I think it was like December of 2007,

10  and then very shortly thereafter went to the SEC.  And as I

11  said, Mr. Tidwell is -- was one of the gentlemen who stood up

12  and got out.  He was here; he will be one of our witnesses.

13          And then the other thing that happened is financial

14  crisis comes along, and so people start redeeming more CDs

15  because they need their money; and the flow of investor funds

16  goes down.

17          **THE COURT:**  Didn't the Stanford Financial Group or

18  some company within it have an issue with the SEC in 2006?

19          **MR. CHASNOFF:**  They --

20          **MR. ZIMMERMANN:**  Excuse me, your Honor.  I think I

21  recognize a witness that may not have been here when the rule

22  was invoked.

23          **THE COURT:**  Oh, okay.  If there are any witnesses

24  that have -- or people who have been notified that they are

25  likely to be called as witnesses, you need to step out of the

1    room.  You cannot be in here.  Is there anybody of that nature?

2        **(Voices and whispers heard)**

3            **MR. CHASNOFF:**  That's Dr. Conte's attorney, not

4    Dr. Conte.

5            **THE COURT:**  Okay, fair enough.  Thank you for telling

6    us.

7            **MR. CHASNOFF:**  I couldn't figure out who he was

8    talking about.  I'm sorry.

9            **THE COURT:**  Okay, I had asked what the SEC --

10            **MR. CHASNOFF:**  In 2007.

11            **THE COURT:**  Okay, you can answer it later.

12            **MR. CHASNOFF:**  It was actually in 2005 --

13            **THE COURT:**  Five.

14            **MR. CHASNOFF:**  -- that the SEC first did some

15    looking.  And they have continued, and then with Mr. Tidwell's

16    assistance --

17            **THE COURT:**  Yes, I understand.

18            **MR. CHASNOFF:**  So, they're short of funds.  People

19    are redeeming.  But also, although, obviously, press reports

20    are hearsay, but what happened was the reports in the press,

21    and what you'll see is investors started getting nervous, and

22    so more money starts coming out.  And they -- they want to do -

23    - it's like in math, there's some -- something -- quantum

24    physics there's a grand overall solution.  I can't remember

25    what the term is.

1          **MR. LANE:**  Unified theory.

2          **MR. CHASNOFF:**  Unified theory.  They wanted to come

3   up -- thank you, Mr. Lane.

4          They wanted to come up with a unified approach to

5   solving all their problems.  And now by 2008, they have a

6   number of problems.  He wants to invest -- inspire --

7          **THE COURT:**  Well, it was also the economic crisis --

8   I mean, it was overall.

9          **MR. CHASNOFF:**  Yes.  Yes.  And so they want to

10  inspire investor confidence to stop the outflow and maybe get

11  more inflow.  So Mr. Stanford announces -- and we'll show that

12  he's making two capital infusions of his own money, supposedly,

13  in the bank, totaling $741 million.

14         Second, they decided -- and you'll see this evidence

15  -- that they were going to create and account, a capital

16  account, Mr. Stanford, in the bank.  When I say "they," it

17  included these Plaintiffs, the accounting folks.  And that was

18  going to be 759 million.  So, all of a sudden he's going to put

19  in all this capital, and they discover another capital account

20  there with some millions.  And so all of a sudden their capital

21  goes up.

22         Second, he wanted at the same time to wipe out his

23  $1.7 billion of personal loans on the books because regulators

24  are starting to look.

25         And third, not only did he want to eliminate those

1    transactions and pay for the capital, he wanted something that

2    would make it look like he already had -- or pay for his

3    supposed confusion.  He wanted to replace it, the personal

4    loans, with a supposed hard asset.

5    So what happened was -- and the evidence will show that

6    Stanford, Davis, Kuhrt and Lopez conspired to develop a

7    transaction that was going to -- the unified theory.  It was

8    going to solve all of this.  And this is Exhibit 61, and this

9    is an email from Mr. Kuhrt to Mr. Lopez on December 23rd, 2008.

10   "Attached is the revised approach to the real estate deal."

11          **MR. LANE:**  This is to Davis.

12          **MR. CHASNOFF:**  I'm sorry.

13          **MS. UNIDENTIFIED:**  Kuhrt to Davis.

14          **MR. LANE:**  Kuhrt to Davis.

15          **MR. CHASNOFF:**  I'm sorry.  It's Kuhrt to Mr. Davis.

16   I not only have gray hair, I have bifocals.  Sometimes it

17   affects that.

18          "The revised approach to the real estate deal, GL --

19   that's Mr. Lopez, Gil Lopez -- will send you the password to

20   open the file.  I've discussed this with him.  You can call me

21   to discuss when time permits.  Please call my cell."

22          And then -- all right -- you see at virtually the

23   same time Mr. Lopez sends an email to Mr. Davis with one word

24   on it, Pelican.

25          And one of the things this sort of obscure email --

1    and you will see that Mr. Lopez at times was -- tried to be

2    clever, because he would have this obscure email that doesn't

3    say anything but Pelican -- what you're going to see from the

4    evidence is the word Pelican does indeed -- we have the

5    original file -- open the scheme up.

6              **THE COURT:**  You mean in the computer?

7              **MR. CHASNOFF:**  In the computer, yes.

8              **MR. LANE:**  That's the password.

9              **MR. CHASNOFF:**  It's a password to open it up.

10             **THE COURT:**  All right.

11             **MR. CHASNOFF:**  I'll -- so the transaction -- and I

12   want to describe briefly -- and once again, this is going to be

13   something that Mr. Berenblut helps us show how it was supposed

14   to work by taking us through -- was an elaborate related-party

15   transaction which was designed to convert a $63 1/2 million

16   purchase of real estate into more than $3 billion on the

17   balance sheet.

18             So in roughly June of 2008, SIB signs agreements to

19   acquire two holding companies, Cukfield, C-U-K-F-I-E-L-D,

20   Investments, which own Pelican Island; and, therefore, the

21   Pelican password; and Crayford, Limited, that owned real estate

22   in Antigua for a combined $63.5 million.

23             In this next exhibit -- there we go -- once again,

24   real evidence.  This is Exhibit 63, is the secret Pelican

25   diagram.  What's clear, as you track through all these related-

1  party transactions, is you start off with Stanford

2  International Bank owning it.  And after you go through all

3  these transactions, Stanford International Bank owns it again.

4  But in the process, and you see the numbers in there, they buy

5  and sell to each other and pump the value up; and it's much

6  like the scheme in -- what was the banker in --

7          **MR. LANE:**  Oh, Keating (phonetic) and (indiscernible)

8          **(Voices overlap)**

9          **MR. CHASNOFF:**  It's much like a Keating deal.  It's

10  the same deal.  Now -- so this is what Kuhrt and Lopez

11  distribute to Davis.  The ultimate value was going to be

12  something like 3.174 billion in assets.  But even a bogus set

13  of land flips requires the lawyers to get involved and prepare

14  the papers.  And one of the things you'll see is that by the

15  time they got to doing the papers, they had some shell

16  companies.  The shell companies had been used for other things,

17  and so they didn't actually get the papers done but they needed

18  the hole filled.  And so on June 30th, 2008, they put the

19  higher number on the books as if the transactions have taken

20  place.  So they've got this bogus numbers.  They don't even

21  have the internal flips done to put on the books.  Mr. Kuhrt

22  puts it on the books.

23          And adding to this whole farce was the fact that one

24  of the underlying acquisitions, the one of Cukfield, didn't

25  even close until at least 30 days after June 30th.  So now

 1  they've got on their books a vastly-inflated value for an asset

 2  they don't own.

 3          Looking back at it, Mr. Kuhrt and Mr. Lopez clearly

 4  realized this is hard to complain in the current context so

 5  what they now say through their expert is that we told

 6  Mr. Davis we needed to have a -- an appraisal and legal advice

 7  before we could put the new number on the books.  But they're

 8  the -- but Mr. Kuhrt and Mr. Lopez put it on the books even

 9  though there was no appraisal and no opinion from a lawyer that

10  it was appropriate.

11          And you'll see the email where Mr. Kuhrt, working

12  under Mr. Lopez, also advised a member of SIB's accounting team

13  to put the $741 million supposed capital infusion from

14  Mr. Stanford, which didn't take place, on the books.

15          And then, this is in the height of all the problems,

16  we get this 2008 -- December 2008, what's called a monthly

17  report.  This is the only one they ever put out.  Mr. Stanford

18  puts it out.  And sure enough it says, you know, although our

19  earnings are down.  It talks about contribution of 541 million

20  on November 28th, 2008.  Never happened.  And the rest of the

21  statements aren't correct in here either.  But this is

22  distributed to shareholders.

23          Mr. Lane cleverly passed me a note to say there was

24  another monthly report.  I said this was the only one.

25          **MR. LANE:**  No, no, no.

1          **MR. CHASNOFF:**  Okay.

2          **THE COURT:**  It was all over the papers.  There was

3   only one.

4          **MR. LANE:**  There's only one.

5          **MR. CHASNOFF:**  Only one, okay.

6          **THE COURT:**  We know there's only one.

7          **MR. CHASNOFF:**  Mr. Lane, you can go sit in the back

8   of the room now.

9          **THE COURT:**  At least I don't - but you -- you said it

10  a lot of time.

11         **MR. CHASNOFF:**  And do not pass me any more notes.

12         All right, so we've got that monthly report.  Now, in

13  spite of this, it didn't work.  The scheme's over.  The house

14  of cards is coming down.  So SEC wants to take depositions.  So

15  -- I told you about the press reporting it.  In February of

16  2009, Mr. Stanford issued a Dear Client letter where he

17  repeated the lies about --

18         **THE COURT:**  When was that?

19         **MR. CHASNOFF:**  February 11th, 2009.

20         **THE COURT:**  This was right before the end?

21         **MR. CHASNOFF:**  Right before the end, yes.  Then we

22  get, late 2008 or early 2009, the SEC requests documents from

23  SIB.  So then Mr. Stanford, Mr. Davis, and another name,

24  Mr. Juan Rodriguez-Tolentino, who was SIB's president; and then

25  SIB's outside counsel who was at Proskauer (phonetic), a

1    gentleman named Thomas Sjoblom -- and all of these people have,

2    in our pretrial order, are people who have taken the Fifth,

3    including Mr. Sjoblom -- decided that Holt and Rodriguez would

4    be the ones to testify before the SEC.

5            So in late January of 2009, this is Exhibit 76,

6    Mr. Sjoblom, the -- Sjoblom, the Proskauer lawyer, advised

7    this.  It's talking about what they're going to have to do.

8            "We're going to have to provide positive proof that

9            investor funds are invested as and where we say they

10           are.  We need to account for the full amount stated

11           in the financial statements related to the CDs. E.g.,

12           if we say there's 8.2 billion attributed to the CDs,

13           we have to account for the full 8.2 billion.  We will

14           need to address all three tiers, not just tier one

15           and two.  Who are the money portfolio managers?

16           Where are they located?"

17           And then that same email goes on:  "Juan," that's

18   Mr. Rodriguez, and "Laura," that's Ms. Holt,

19           "If you would like to discuss any of these, please do

20           not hesitate to contact me."

21           **THE COURT:**  What exhibit?

22           **MR. CHASNOFF:**  This is the same exhibit, your Honor,

23   76.  This is just the second page of it.

24           "I know this is not a pleasant task and highly

25           unfair; however, Tidwell and others have thrown down

1          the gauntlet.  So we need to rise to the occasion.  I

2          know we can and must.  Our livelihood depends on it."

3          Mr. Tidwell will be -- as I said, will be here to

4  testify.  He was -- he will testify he was a financial advisor

5  and left in late 2007; went to the SEC.  He -- among his

6  testimony will be that he was fed by Mr. Stanford false

7  information which he then, not knowing it was false, passed on

8  to his customers, his clients, to get them to invest money.

9  And also that he relied on the materials that we -- that -- the

10  numbers that went into the disclosure statements, the annual

11  reports and so forth, and passed those on to his investors, and

12  that they relied upon them to decide and make the investments.

13          So, Mr. Stanford, Mr. Kuhrt and Mr. Lopez knew they

14  were going to have to account.  As you saw from the email from

15  Mr. Sjoblom, they were going to have to account for the full

16  8.2 billion.  So you'll see a list where they start compiling

17  everything they've got to try to come up with this number.  And

18  what becomes clear is not even the $3 billion bogus transaction

19  was enough to make up the number.  They were still short.

20          So Mr. Berenblut, another thing he will do, is take

21  you through one of the things they did.  You will see that they

22  had some investments in some securities and some companies.

23  And so all of a sudden they show up on their books with the

24  supposed value of their -- of Stanford's partial investment,

25  partial ownership in them, exceeding the total market cap of

1   those companies.  I don't have any exact numbers.  So they

2   would say our investment in that company is worth $350 million,

3   when in fact, the market capital in the company was 180

4   million.  And so they used that also to pump up the numbers.

5   And once again, that was Mr. Kurt and Lopez involved in that

6   process.

7           The process goes on and then about February 3rd,

8   2009, Mr. Holt (sic); Mr. Stanford; Mr. Davis; Mr. Sjoblom, the

9   outside counsel; Mr. Rodriguez, -- their general counsel was a

10  man named Mauricio Avarado -- all these people, once again,

11  taking the Fifth Amendment.

12          Their chief operating officer, a woman named Lena

13  Stinson -- I call that to your attention because I'm going to

14  show you an email from her in a second -- and their -- and the

15  president of SGC, Dave Bogar, all gathered in Miami to prepare

16  Ms. Holt and Mr. Rodriguez for their SEC testimony.

17          First thing that happens in that meeting is that

18  Ms. Holt disclosed to the group, well I don't really manage all

19  the assets, I only manager tier three.  And at that point,

20  there's 350 --

21          **MS. UNIDENTIFIED:**  Tier two.

22          **MR. CHASNOFF:**  I mean tier two, I'm sorry.  Thank

23  you.  Tier two, and that's only 350 million, less than five

24  percent of the assets.

25          Mr. Davis then reveals to the group his pie chart and

1    -- on this one, I would apologize, it's -- this is the best

2    copy we've been able to come up with.  And this pie chart shows

3    their investments.

4         One of the interesting things you'll see is they --

5    their earlier drafts of this, when they're working with it; and

6    there's a big chunk of it that had next to it "amount needed,"

7    which was the hole they needed to fill.  But you'll see on here

8    they show private equity real estate on that lower left-hand

9    corner, 50 percent of their assets.  Notes receivable, and the

10   only notes receivable on the right-hand side are to

11   Mr. Stanford, 29.4 percent.

12        Of course, remember the first exhibit I showed where

13   they supposedly had -- their assets were liquid, highly

14   marketable securities.  This is what they have.  And that 50

15   percent, if you look at tier three, is 6.3 billion of the 50

16   percent; it comes out to about that 3.1 created number.

17        Well, as I said, one of the people there was

18   Mr. Mauricio Avarado, the former general counsel, and the --

19   that same day Mr. Avarado sends an email to Lena Stinson, who I

20   mentioned; and I'll show you an email from her in a second.  He

21   says,

22   "As you know, the two holding companies that ultimately own

23   Pelican and Guyana Island Properties were acquired directly by

24   Stanford International Bank last year for consideration of 17.5

25   and 68 million."

1          He's off a little bit on his numbers.

2          "Thus while I'm not an accountant or a finance

3          person, unless you were referring to other real

4          estate holdings of which of that I do not know" --

5          And Mr. Avarado is very senior, --

6          "I don't understand how it's possible that some

7          acquisitions be considered capital contributions or

8          be valued over $2 billion when they were acquired to

9          start with by -- as IBL for a much lower

10         consideration."

11         Obviously, right to the point we will be making as

12   well.  Then looking at Exhibit 83 -- oh, this is to

13   Lena Stinson, another --

14      **(Counsel confer)**

15         **MR. CHASNOFF:**  The part we've pulled out is an email.

16   It's -- you can't see -- you'll see it on the actual exhibit.

17   The language I've got here is on this chain of emails, and it's

18   what Ms. Stinson said to Mr. Stanford.  But she talks about,

19         "As you know, I was first made aware of the issues

20         regarding the accuracy of the -- SIBL financial

21         statements, disclosure document, as well as the

22         liquidity issue of Stanford International Bank at the

23         meeting last week in Miami."

24         And that's the one that I just told you about.

25         "Over the past week, I have expressed to you and

1          counsel for the company concerns and suggestions for

2          actions I believe the company, Stanford Group Company

3          and Stanford International Bank should take."

4      And then she goes through a series of actions,

5  disclosing to the SEC that the financial statements must be

6  revised to reflect the related-party transaction and disclosure

7  document.  That SIBL should contact its regulator and disclose

8  its need to revise.  Number three,

9          "The current SIBL financial statement should not be

10         used and should be immediately removed from offices

11         worldwide.  The deposits recently received as of

12         February 6th, 2009, approximately five million,

13         should be returned; and SIBL should immediately stop

14         acquiring deposits worldwide until the financial

15         statements have been revised."

16     And then you see in the last sentence,

17          "If, Allen," --

18          And that's Mr. Stanford.

19     -- "if this does not happen, I will have no choice

20         but to tender my resignation and report to the SEC

21         the issues I believe exist."

22     We have another note that relates to that leak.  Now,

23  Mr. Sjoblom -- these -- there are attorneys' notes, your Honor;

24  and you mentioned this earlier, concerns about attorneys'

25  notes.  The owner of the privilege for this is the receiver.

1    The receiver --

2            **THE COURT:**  I just said note.  I didn't know which

3    notes that fellow had looked at, and there was no way to know.

4            **MR. CHASNOFF:**  Okay.  And the receiver has not

5    expressed a concern about the privilege; in fact, has made the

6    documents available.  So --

7            **THE COURT:**  Okay.

8            **MR. CHASNOFF:**  -- if there was a privilege that he

9    owned, he's now waived it.

10           **THE COURT:**  I was referring to it in Mr. Lehrer's

11   report because it was undefined.  But I appreciate the

12   explanation.  So the receiver has basically waived the

13   privilege?

14           **MR. CHASNOFF:**  Yes, your Honor.  Now, there is a

15   better document than this Exhibit 194, but we got a late

16   objection to Mr. Sjoblom's -- a letter he wrote that explains

17   this even more fully, and we didn't want to put it up --

18           **THE COURT:**  Until --

19           **MR. CHASNOFF:**  -- till that was out there.  And some

20   of the -- and I will say, some of the Plaintiffs haven't

21   objected to even that.  Just one of them did, and so we have

22   this interesting situation where it at least should be

23   admissible.

24           **THE COURT:**  Well I'll rule..

25           **MR. CHASNOFF:**  Okay.  But this is Mr. Sjoblom.

1           "I called Mauricio," --

2           And that's Avarado, the general counsel.

3           -- "to report what I knew about the false bank

4           financial statements.  I told him I had an obligation

5           to report this information to him as CLO, to

6           discharge my obligations to the company.  Mauricio

7           asked me how the external auditors missed this.  I

8           explained, as Jim Davis had told me, that the

9           auditors only saw the papers given to them which

10          would not reveal the computer model used to run the

11          numbers."

12          The computer model we're talking about here is when

13  Mr. Kuhrt and Lopez had to reverse engineer; they developed

14  this computer program where they got -- okay, here's how much

15  return they want to show, well how do we generate the numbers.

16  And this is his explanation of that.

17          So, in spite of -- by the way, in spite of all these

18  warnings and alarms from other people, Ms. Holt went ahead and

19  gave her testimony to the SEC; and shortly thereafter the SEC

20  accused her of falsely testifying.  One week later -- and that

21  was one week later, and the SEC brought several charges against

22  Mr. Stanford, Ms. Holt, and later added Mr. Lopez and

23  Mr. Kuhrt.  And then there were filings for obstruction of

24  justice against Mr. Stanford and Ms. Holt.  And that brings us

25  to where we are.

1          Now, I know that the Court is familiar with the

2    policy and you've talked about it.  There are a few things in

3    the policy that we would like the Court to have in mind, and so

4    I want to take a moment just to point those out.

5          **THE COURT:**  Okay.

6          **MR. CHASNOFF:**  One preliminary point, in some of the

7    papers at times, we've had a reference to the -- what I'll call

8    the old saw, that an insurance policy is construed if there's

9    an ambiguity against the insurance company.  You will hear that

10   that's not always the case.  You will hear testimony that what

11   happens in the London market where this -- the Lloyd's market,

12   is that in order to obtain insurance, someone wishing to

13   purchase the insurance has to hire someone who is a London

14   broker.  That London broker is a representative and agent of

15   the insured, not the insurer.  And that's what happened here.

16          And in this case, what you will see is that the

17   London broker, the agent of the insured, came with a draft

18   policy form.  So it was the agent of the insured who drafted

19   the policy.  And, in fact, we will show a document.  I believe

20   -- if memory serves, it's Exhibit 219, which has that on the

21   cover.  There's a form that says -- I'm not sure of the exact

22   words -- drafted by Willis.  Willis is the name of the broker.

23          And Mr. Sewell is here to testify that he's reviewed

24   the file.  There's nothing -- and at times, these policies get

25   negotiated.  The broker comes; they talk about particular

1    provisions.  But in this case, what was proposed for the 2008

2    policy on the money laundering was what was proposed by Willis.

3              Now, he was asked in his deposition back in history,

4    was it possible that there were negotiations about this term.

5              **THE COURT:**  Was this a -- was there a policy

6    previously that had this clause in it?

7              **MR. CHASNOFF:**  Yes, your Honor.  The three previous

8    years they had been insured, it's had the same language.  What

9    Mr. -- what's not in the underlying policy is whether five

10   years before or 10 years before, there had been negotiations

11   about -- among various insurers and brokers about this money

12   laundering.

13             All we're saying is that what was proposed for the

14   2008 policy was a form that Willis proposed.  They could have

15   asked to modify on behalf of the insured, the money-laundering

16   language.  They didn't do that.

17             **THE COURT:**  But you don't know how that language got

18   in there in the first place?

19             **MR. CHASNOFF:**  Well --

20             **THE COURT:**  Was that language prior to the three

21   years earlier?  In other words --

22             **MR. CHASNOFF:**  Well, they didn't --

23             **THE COURT:**  -- it was longstanding?

24             **MR. CHASNOFF:**  I'm sorry.  They didn't insure them

25   prior to three years earlier.  They may have existed in the

1    world out there in other policies.  But the underwriting file

2    we have only goes back a couple years because that's when they

3    started insuring the Stanford entities.

4              **THE COURT:**  Okay.  But the question, then, is:  what

5    was the source of the language of this money-laundering

6    provision in the first year?  Who drafted it?

7              **MR. CHASNOFF:**  It was in a Willis form.

8              **THE COURT:**  It was?

9              **MR. CHASNOFF:**  Yes.

10             **THE COURT:**  So Willis -- to your knowledge, Willis

11   brought that language to the Lloyd's people the first time the

12   language was used --

13             **MR. CHASNOFF:**  That is my --

14             **THE COURT:**  -- by Lloyds?

15             **MR. CHASNOFF:**  Yeah.  Well --

16             **THE COURT:**  But the first time it was used by Lloyd's

17   was Stanford?

18             **MR. CHASNOFF:**  Was Stanford, right.  When that

19   language was first used -- it could be 30 years old; it could

20   be five years old.  I don't have witnesses, but there's

21   probably someone over in the London market who would know that

22   because they remember when this stuff came up.  All I can tell

23   you is that this policy that they proposed is what they

24   proposed for the 2008 year, and it had the language in it.

25   And --

1          **THE COURT:**  Okay.  All I can say is it's turning out

2     not to be such a bargain.

3          **(Laughter)**

4          **MR. CHASNOFF:**  Thank you, your Honor.

5          **THE COURT:**  This language is -- you know, I'll bet

6     they wish they hadn't entered into it.

7          **MR. CHASNOFF:**  I will call to your attention this

8     issue of how you construe it.  This is called a manuscript

9     policy, as I'm sure you've run across sometimes.

10         **THE COURT:**  No, I have not.

11         **MR. CHASNOFF:**  Oh, it's a manuscript in the sense

12    that it can be negotiated.  It's not a -- it's not contract of

13    adhesion that a consumer gets from an insurance company, take

14    it or leave it.

15         **THE COURT:**  Well, I'll let you put evidence on.

16    That's evidentiary to me.  I have no idea.

17         **MR. CHASNOFF:**  Okay, right.

18         **THE COURT:**  I have no idea.  I have no idea.

19         **MR. CHASNOFF:**  And I'll just point out that Judge

20    Fitzwater in the Northern District has very recently, within

21    the last six weeks, looked at precisely this issue of how you

22    construe them when it's a manuscript policy.

23         **THE COURT:**  Oh.

24         **MR. CHASNOFF:**  I wanted his opinion on that, and I

25    wouldn't be putting on a witness if that opinion weren't

1  (indiscernible).  So…  He came out and he said that it does not

2  get construed against the insurer (indiscernible)

3      **(Voices overlap)**

4      **THE COURT:**  I'd like a witness anyway.  I would like

5  a witness anyway; it can be brief.

6      **MR. CHASNOFF:**  Oh, oh; yes, yes.  We will need a

7  witness to establish the facts of how this was negotiated.  And

8  I will tell you, although they -- in their papers now on file,

9  they haven't argued ambiguity.  I've asked the question:  do I

10  need to do this, and are they going to raise ambiguity.  And

11  what they've said -- and I respect it -- is "we don't know; we

12  may."  And so for that, I'm going to put the witness on.  But

13  right now, they have not argued ambiguity.

14      **THE COURT:**  No.

15      **MR. CHASNOFF:**  So it may be that we don't need it,

16  but I'm going to put it on to protect my record.

17      **THE COURT:**  Well, they may not argue it, but I may be

18  interested anyway down the road.  So…

19      **MR. CHASNOFF:**  Okay.  Thank you, your Honor.

20      All right.  So talking about the actual policy, there

21  are two claims under the policy.  If you'll look at the

22  language, it's not -- a claim is defined in terms of related

23  actions.  So in the -- although there are separate particulars

24  in the SEC complaint and in the criminal complaint, you'll see

25  that the definition of a claim is the whole thing.  So there

1    are only two claims, the whole related allegations.  And we can

2    -- we will show you that as we look at the particular policy.

3            **THE COURT**:  When you say "there are only two claims"

4    in the policy, what do you mean?  There were only two --

5            **MR. CHASNOFF**:  That they've only made -- these

6    Plaintiffs have made --

7            **THE COURT**:  They've made two claims.

8            **MR. CHASNOFF**:  -- two claims against us.  And part of

9    the evidence you will get from Mr. Sewell when he testifies is

10   that we have over 200 other claimants that we are -- that we've

11   paid in addition to the over $15 million we've paid to these

12   folks.  We've paid three or $4 million to other folks making

13   other claims, and continue to pay people.  And we have claims

14   which are in dispute.  But if they -- if the receiver, for

15   example, is correct in his claims for coverage, that would

16   exhaust the rest of the policy.  Those claims are significantly

17   large.  So there are other claimants --

18           **THE COURT**:  What's the receiver claiming?

19           **MR. CHASNOFF**:  Financial advisers like Mr. Tidwell

20   and others have been sued by their people --

21           **THE COURT**:  Their customers.

22           **MR. CHASNOFF**:  -- their customers.  And those

23   financial advisers have turned to this company for indemnity.

24   And the company, i.e., the receiver, is seeking coverage under

25   the policy for those indemnity claims.

73

1          **THE COURT:**  For the cost of defense, or for actual

2   indemnity --

3          **MR. CHASNOFF:**  Right.

4          **THE COURT:**  -- to the customers --

5          **MR. CHASNOFF:**  Indemnity to the customers.

6          **THE COURT:**  -- for money lost.

7          **MR. CHASNOFF:**  Yeah.  So, ultimately --

8          **THE COURT:**  Okay.  That's what I thought.

9          **MR. CHASNOFF:**  -- the ultimate recipients of that

10  money would be customers with money lost if they are correct

11  and we are incorrect on coverage on those issues.

12         **THE COURT:**  Okay.

13         **MR. CHASNOFF:**  All right.  So, as the Court knows --

14  and I'm going to be very brief on this because your opinions

15  have already reflected an understanding that there's a broad

16  definition of money laundering.  And that the key to money

17  laundering is what constitutes criminal property.  And I know

18  that in at least one opinion or yours, and it may be two,

19  you've reflected understanding of that.

20         So what I want to go to, and what I want to focus on,

21  is the definition of criminal property, because we haven't

22  talked about this before.  But as criminal property is defined

23  -- I don't have an exhibit number on this, but I know the

24  policy's in evidence.  It's at least 219 in the stack --

25         **THE COURT:**  It's all right.  That's fine, go ahead.

1          **MR. CHASNOFF:**  Criminal property exists in two

2     circumstances.  One, it's property which constitutes the

3     benefit obtained from or as a result in connection with

4     criminal conduct or represents such a benefit, in whole or in

5     part, whether directly or indirectly, which the directors are

6     officers or any person or entity acting on the behalf knows or

7     suspects or reasonably should known or suspected that it

8     constitutes such a benefit.

9          A couple of points about this.  So -- and there's

10    another or that I don't underlined up here, which I should.

11    The first or up there, it's a benefit obtained of or as a

12    result or in connection with criminal conduct so that the

13    insured engaged in criminal conduct, or it represents a benefit

14    like that, which the director or officer knew or should have

15    suspected was criminal property.

16          So as this definition of criminal property reads,

17    it's not even necessary that the proposed insured obtained the

18    benefit as a result or in connection with criminal conduct, but

19    that they knew or suspected or should have known or should have

20    suspected that the property that they were dealing with was

21    such a benefit; that is, one obtained through criminal conduct.

22    I adopt parts of that for the Court; in fact, closely before.

23    But I -- I am -- I believe that is how it reads.

24          Now, we firmly believe that the evidence is going to

25    show that, first of all, the investor funds are criminal

1   property because they were obtained by the misrepresentations,

2   which we will go through; and that each of these Plaintiffs

3   engaged in acts which constituted criminal conduct.

4          **THE COURT:**  You say the investor funds constitute

5   criminal property, right?

6          **MR. CHASNOFF:**  Yes, your Honor.  Because they were

7   obtained through misrepresentation and fraud.  And Antiguan,

8   U.S. and Texas law -- of course, the definition of criminal

9   conduct is an offense anywhere in the world.  And then there

10  was -- also it's criminal property because of the

11  misrepresentations to the regulators about it.

12         Now, talking more specifically about Kuhrt or Lopez

13  and what they told Mr. Westheimer, even if their conduct did

14  not arise to criminal conduct -- which we believe that the

15  evidence it does -- they say that they told Mr. Davis you can't

16  report those numbers that those numbers are wrong, the faked

17  numbers, but Mr. Davis kept reporting them so that was okay.

18  And also they say, we told Mr. Davis you can't pump up the real

19  estate without an appraisal and so forth.  At the very least,

20  they should have known, or should have suspected that it was

21  criminal property.  And that's why I point that out.

22         Now, I know you've received reams of paper.  You're

23  going to hear some interesting excuses from the Plaintiffs

24  about what they did.  Frankly, many of them -- and not even

25  just the ones that talk about land-rustling -- don't pass the

1    red face test.  But in the end, what you're going to see is the

2    evidence is overwhelming that these Plaintiffs engaged in money

3    laundering; and that there's no coverage under this policy.

4            Thank you.

5            **THE COURT:**  You're saying Kuhrt and Lopez either knew

6    or should have known, or suspected or should have suspected,

7    that there was -- that the money from the CDs was being

8    acquired through fraud, basically?

9            **MR. CHASNOFF:**  Yes, at the least.  Now, we also

10   believe that what they did constitutes a criminal violation so

11   they meet the first half of the definition because they were

12   cooking the books.  But even if it doesn't meet the first half,

13   it sure meets the second half.

14           **THE COURT:**  I understand.

15           **MR. CHASNOFF:**  Thank you, your Honor.

16           **THE COURT:**  Okay, who wants to go next?

17           **MR. ZIMMERMANN:**  When are you going to give the court

18   reporter a break, Judge?  We've been going for about two hours.

19           **THE COURT:**  Yeah, that's basically right.  Okay,

20   we'll have a break now.  Let's -- 15 minutes.  You're excused

21   15 minutes.

22           **THE MARSHAL:**  All rise.

23           **THE COURT:**  Could I see counsel up here please, just

24   one from each team?  We'll do it over here.

25           **(Court confers with counsel off the record)**

77

1          **(Recess taken from 11:11 a.m. to 11:40 a.m.**

2               **THE COURT:**  Please be seated.

3               **MR. CHASNOFF:**  Your Honor, may we approach for side

4     bar?

5               **THE COURT:**  Sure.

6          **(Court confers with Court Recorder)**

7          **(Begin bench conference at 11:41 a.m.)**

8               **MR. CHASNOFF:**  Your Honor, as counsel, I'm asking you

9     something that you have absolute power to do (indiscernible).

10    One of the witnesses we subpoenaed was Dr. Conte who is here.

11    He is represented by counsel, Mr. Levine (phonetic).

12              Mr. Levine --

13              **MR. UNIDENTIFIED:**  Not our Levine, a different

14    Levine.

15              **MR. CHASNOFF:**  Not -- a different Levine.

16    Mr. Levine --

17              **THE COURT:**  (Indiscernible).

18              **MR. CHASNOFF:**  -- says Dr. Conte doesn't want to be

19    in the newspaper, et cetera, or if you're talking to him, he's

20    asked if the Court can do something about keeping Dr. Conte's

21    name out of the newspapers.  I reminded him of the First

22    Amendment, but --

23              **THE COURT:**  They're open, public trials.

24              **MR. CHASNOFF:**  And so I represented to him, since I

25    had subpoenaed his client, that I would bring that to your

1    attention, you know.  And he asked me to pass on that he would

2    -- Mr. Levine would like to have an opportunity to speak with

3    the Court about that.

4              THE COURT:  Okay.  Let's just have him up here.

5              MR. CHASNOFF:  You want to do that now?

6              THE COURT:  Uh-huh.  Are you going to call him?  If I

7    were you, I'd call him sooner rather than later.

8              MR. CHASNOFF:  Yeah.  He's our first witness.

9              THE COURT:  Okay.

10             MR. CHASNOFF:  I'll ask Mr. Levine, if that's okay.

11             THE COURT:  No, not you, Mr. Kunian -- you're welcome

12   to come, but --

13             MR. UNIDENTIFIED:  No, that's all right.

14             THE COURT:  Hello.  You want to state your name for

15   me?

16             MR. LABONE:  What's that?

17             THE COURT:  Your name?

18             MR. LABONE:  Alan Labone (phonetic).  And --

19             THE COURT:  We know each other, right?

20             MR. LABONE:  We know each other.

21             THE COURT:  Okay.

22             MR. LABONE:  I'm anxious to talk about your boys,

23   but --

24             THE COURT:  Not on the record, thanks.

25             MR. LABONE:  No.  Dr. Conte was accosted by some

1    reporters yearning some notoriety --

2             THE COURT:  Well --

3             MR. LABONE:  -- in a good sense.

4             THE COURT:  -- hopefully not notoriety but means.

5             MR. LABONE:  In a good sense.

6             THE COURT:  Uh-huh.

7             MR. LABONE:  He's well known.  And he's -- he doesn't

8    want his name in the paper.  If there's anything that you could

9    do to encourage Woody (phonetic) -- whatever her name is from

10   The Chronicle.

11            THE COURT:  You know, I'm embarrassed to tell you, I

12   don't even know who that person -- Woody.

13            MR. LABONE:  You do know or don't?

14            THE COURT:  Don't.

15            MR. UNIDENTIFIED:  I think it's Mary --

16            MR. LABONE:  I'm sorry?

17        (Several voices overlapping)

18            THE COURT:  No, Mary Flood left.  She's at some

19   computer or online thing.

20            MR. UNIDENTIFIED:  I think you're right.

21            THE COURT:  I mean, obviously, you understand I can't

22   kick people out of the courtroom.  That's out of the question.

23            MR. LABONE:  I do.

24            THE COURT:  And I --

25            MR. CHASNOFF:  Is there anything we can do?

1          **THE COURT:**  There really isn't.  Because what am I

2   going to do, say to this reporter in open court or at the side

3   bar, please don't publish this guy's name?  I mean that in and

4   of itself will be a story.

5          **MR. CHASNOFF:**  Uh-huh.

6          **THE COURT:**  So I'm sympathetic, but the sooner he

7   gets on and off, the faster people are going to forget it

8   because this is going to go on for a few days, so there's going

9   to be a lot of other more interesting stuff.  So -- at least I

10  assume so.

11      **(Laughter)**

12          **THE COURT:**  The accounting not --

13          **MR. UNIDENTIFIED:**  Yeah, wait till you get to the

14  next opening statement.

15          **THE COURT:**  -- the accounting notwithstanding.

16          **MR. UNIDENTIFIED:**  Well, maybe not my opening.  But…

17          **THE COURT:**  Well, anyway --

18          **MR. LABONE:**  Well, I don't know what else to do.

19          **THE COURT:**  Yeah.  Point out the reporter to me, if

20  you can just describe what he or she is wearing.  I don't know

21  the reporter, but I would like to know who that is.  Just maybe

22  if I had an opportunity to -- you know, low key try to

23  (indiscernible).

24          **MR. LABONE:**  Pink scarf over there.

25          **THE COURT:**  Oh, yeah; okay, she's (indiscernible).

1          **MR. UNIDENTIFIED:**  (indiscernible)

2          **THE COURT:**  Well, the answer is I can't close the

3   courtroom.  I can't.

4      **(Voices and whispers overlapping)**

5          **MR. LABONE:**  Oh, I understand.

6          **THE COURT:**  I have no power to do what he's asking.

7   You tell him you asked, and I declined.

8          **MR. LABONE:**  Thank you.

9          **THE COURT:**  And I will say I understand.  You can

10  also tell your client I hate for my name to be in the

11  newspapers.  I understand his concern very well.  I really

12  dislike it.  I mean, notwithstanding my job, I pray that my

13  case will get reported and my name won't be.  So I do

14  understand the concerns.

15         All right, do we have any -- any other issues while

16  we're up here?

17         **MR. CHASNOFF:**  Not that I'm aware of, your Honor.

18         **THE COURT:**  Okay.

19         **MR. ZIMMERMANN:**  Well, we did do what the Court

20  asked.  We went in the jury room, and we did not resolve it.

21         **THE COURT:**  That's fair enough.

22     **(End bench conference at 11:44 a.m.)**

23         **THE COURT:**  Okay.  Opening statements from

24  Mr. Shidlofsky?

25         **MR. SHIDLOFSKY:**  Your Honor, I'm going to be brief.

1    And I don't have as much gray hair as Mr. Chasnoff.  Although I

2    will say that the case has probably aged me in the last few

3    months.

4        **(Laughter)**

5            And let me explain real quick for the Court's sake

6    because I know the Court probably has lots of questions what

7    the respective roles will be.  There's a lot of lawyers here.

8    While I was lead counsel for the preliminary injunctions and at

9    the Fifth Circuit and while I remain lead counsel for the

10   remaining Plaintiffs, given the nature of this case, I'm going

11   to defer to the individual teams for specific questions as to

12   Kuhrt and as to Lopez.

13           **THE COURT:**  Okay.

14           **MR. SHIDLOFSKY:**  And I'm here to talk about -- a

15   little bit about the policy and the framework.  We provided the

16   Court already with briefing and our findings of facts and

17   conclusions of law about the money-laundering exclusion.  I've

18   compared the two, what was turned in by Underwriters and what

19   was turned in by us, and there doesn't seem to be a whole bunch

20   of disagreement about what has to be shown and who has the

21   burden to show it.  This Court's already ruled that they have

22   the burden.

23           There is certainly a difference of opinion as to

24   whether they can show their burden of proof in the facts.  And

25   again, I would defer to the individual teams.  Where there

1    seems to be an element of disagreement with the policy language

2    is that, it appears that it's Underwriters' position that it's

3    enough for this Court to just conclude that a Ponzi scheme

4    existed or that there was this massive fraud and not whether --

5    not that -- or that they just -- that certain people knew or

6    should have known.  And we don't think that's a fair reading.

7         And the Court must conclude or believe that each of

8    the Plaintiffs intentionally engaged in certain acts in

9    furtherance of the Ponzi scheme or mass fraud.  And I'm not

10   saying there is a Ponzi scheme or massive fraud.  I'm saying,

11   if the Court ultimately concludes that, then the Court must

12   also conclude that each Plaintiff did acts in furtherance of

13   that.

14        **THE COURT:**  Well, are you saying that -- once you've

15   shown there's criminal property, there has to be some

16   connection between the individual defendant and the money

17   laundering aspect of it.

18        **MR. SHIDLOFSKY:**  Exactly.

19        **THE COURT:**  I don't think anybody disagrees.

20        **MR. SHIDLOFSKY:**  Well, the highlight of the criminal

21   property definition and the part about the knew or should have

22   known.  And they said see here, we only have to show knew or

23   should have known and we have criminal property.  And that is

24   in the criminal property definition, but that's just the

25   criminal property definition.

1          When you then go to the money-laundering definition,

2     it uses words as concealment, disguise, conversion, the

3     entering into or becoming part of an arrangement that

4     facilitates, conspiracy, aiding or abetting.  So there is a

5     intent requirement built into this money-laundering definition.

6     So it is not enough for them just to say there's a Ponzi

7     scheme; there's a massive fraud; and the Plaintiffs have

8     committed it.  They must show for each one of these Plaintiffs

9     that they fall into one of the four prongs of the money-

10    laundering definition.

11          **THE COURT:**  I agree.  And I don't see that to be any

12    disagreement anywhere.

13          **MR. SHIDLOFSKY:**  Okay.  That being said, I'll move to

14    one other point, and then I'll pass on the team.

15          There was some talk about what Mr. Sewell is going to

16    testify, Mr. Sewell being from Underwriters, about this being a

17    negotiated policy.  It's really only important -- it's only an

18    issue if the Court finds that it's ambiguous, the policy's

19    ambiguous.

20          Mr. Sewell did give his deposition.  I expect him to

21    testify here.  He -- not as an expert, as a fact witness.  He

22    said yesterday that he's on the claims side not on the

23    underwriter's side.  He has no personal knowledge of the

24    specific underwriting of this policy.  He can testify generally

25    how it works in the London marketplace.  But I don't think he's

1    going to be able to tell you that they had no role in the

2    drafting of the money-laundering exclusion.

3              **THE COURT:**  Okay.

4         **MR. SHIDLOFSKY:**  And I don't think there's evidence

5    of that fact.  Again, going back -- one more point on the

6    concealment, disguise, conversion and those things.  The key,

7    again, to each I think was probably best summed up by their

8    expert report, Mr. Berenblut, in a deposition where he said who

9    put what where, I don't know.

10             **THE COURT:**  Uh-huh.

11        **MR. SHIDLOFSKY:**  And in my mind, from the coverage

12   perspective, that's a fatal flaw in their case.  If they can't

13   show who put what where, then they can't meet their definition

14   of money laundering under this policy.

15             **THE COURT:**  No.  You're right, if they can't.  But

16   the thing that I took from yours and Stanford's briefing that I

17   think needs to be clarified is there is not a need for direct

18   evidence.  There does not need to be a statement by someone

19   that Joe Schmo (phonetic) knew this was false when he gave it

20   to me.  Okay?

21        My point back for everybody's consumption is

22   circumstantial evidence of knowledge is typically involved in

23   trials of these kinds of issues, criminal and civil.  So, yes,

24   you're right.  But that's not the whole answer to my challenge.

25             **MR. SHIDLOFSKY:**  All right.  And that may be

1   accurate --

2           **THE COURT:**  And I don't mean to argue with you.  It's

3   just that you're raising good points, so I think we should just

4   get on the record the focus.

5           **MR. SHIDLOFSKY:**  Right, and just a five-second -- I

6   mean, I don't dispute what the Court's said about

7   circumstantial knowledge versus direct knowledge, but it still

8   has to be in the form of concealment, disguise, conspiracy.

9           **THE COURT:**  Sure.  Yeah, but it's evidence I'm

10  talking about.

11          **MR. SHIDLOFSKY:**  Right, correct.  And with that, I

12  will pass it onto either Mr. Zimmermann or Mr. Kuniansky.

13          **THE COURT:**  Okay.

14          **MR. KUNIANSKY:**  Good morning, your Honor.

15          **THE COURT:**  Good morning.

16          **MR. KUNIANSKY:**  I represent Mark Kuhrt.

17          Prior to getting into what I expect the evidence to

18  show about Mark Kuhrt, I wanted to make a few general

19  observations about this case and what I think your Honor's

20  going to find unique about it.

21          There are going to be no witnesses that testify about

22  Mark Kuhrt in any way, shape or form.  Basically, the

23  Underwriters are going to throw a whole bunch of documents out

24  on the table and say this shows fraud.  And they've got an

25  expert who's going to put his spin on the documents.  We've got

1    the same documents, and we have an expert who has a different

2    spin on the documents.  But there will be no evidence at all

3    from any witness' mouth that has anything whatsoever to do

4    about Mark Kuhrt.

5            I want to tell you a little bit about Mark Kuhrt.  He

6    obtained a finance degree from the University of Texas in 1994.

7    And then he moved to Birmingham, Alabama where he worked at a

8    trucking company as an accountant for three years.  Moved back

9    to Houston which is his hometown; that was 1997.  He was about

10   25 years old at the time, and a headhunter put him in touch

11   with one of the Stanford entities where he got hired at age 25.

12   He was not a CPA then; he's not a CPA now; he's never been a

13   CPA.  He doesn't have an accounting degree; his degree was in

14   finance.

15           Now, according to what I understand the allegations

16   to be -- well, let me go back one bit.

17           When he first got hired, he got hired as something

18   called a fixed-asset manager.  And --

19           **THE COURT:**  Okay.  Let me ask you a question.

20           **MR. KUNIANSKY:**  Yes.

21           **THE COURT:**  I'm actually interested in what you're

22   saying, but is there going to be evidence for this that's

23   admissible?

24           **MR. KUNIANSKY:**  Well --

25           **THE COURT:**  What are we using for evidence?

1      **MR. KUNIANSKY:**  -- this is what was relayed to

2 Mr. Westheimer, and it's to the extent your Honor considers

3 what was relayed to Mr. Westheimer.  It's my understanding that

4 the Underwriters are using what was relayed to him as a fact

5 witness.  So it seems like I should also be able to relay what

6 was relayed to Mr. Westheimer as a fact witness.  I don't see

7 how we can have it one way but not the other.

8      **THE COURT:**  Well the reason that I ruled that he

9 could be a fact witness is because the predicate was that there

10 would be -- he would be offered for admissions against

11 interest.  I need a rule of evidence that helps me get through

12 the information that is not against Mr. Kuhrt's either penal or

13 some financial or other interest.  In other words, gets us over

14 the hearsay problem.

15      **MR. KUNIANSKY:**  It would be that experts are

16 typically allowed --

17      **THE COURT:**  No, no.  He's not an expert for this.  My

18 ruling was clear.  I've not decided about the expert stuff.

19 The ruling I made was he would need -- he -- Westheimer would

20 be allowed to testify to admissions by Kuhrt and Lopez because

21 that's an exception to the hearsay rule, or it's really not

22 even hearsay.

23      The limits on that are significant; that is, the

24 limits on what Kuhrt or Westheimer can testify to are very

25 significant because if it's exculpatory or background even, it

1    fits within the hearsay rules.  And I cannot have it unless

2    there's some exception that I'm asking for.

3           **MR. KUNIANSKY:**  Well, the only exception I would be

4    aware of would be what experts are allowed to rely on.  And

5    I'm --

6           **THE COURT:**  But I'm not hearing Mr. Westheimer as an

7    expert in the context in which I'm discussing now.

8           **MR. KUNIANSKY:**  But I think Mr. Westheimer has to

9    know the different positions that Mark Kuhrt held and the

10   different responsibilities that he had with whatever entity it

11   was to be able to draw opinions on what duties or not he should

12   have had.

13          **THE COURT:**  I'm not going to let Mr. Westheimer

14   testify about what Mr. Kuhrt knew or didn't know.

15          **MR. KUNIANSKY:**  I'm not asking him to testify about

16   what Mr. Kuhrt knew or didn't know.

17          **THE COURT:**  Okay.

18          **MR. KUNIANSKY:**  What I'm saying is that he needs to

19   know what positions Mr. Kuhrt held and with which entities in

20   order to know what duties and responsibilities he had, not what

21   was in Mr. Kuhrt's mind.  I'm not --

22          **THE COURT:**  Well, I interrupted you -- I interrupted

23   you because you were talking about how Mr. Kuhrt through -- got

24   to Stanford entities through a headhunter.  And you started to

25   get into he doesn't have a CPA and all of that, none of which

1  is a big deal.  But I did not anticipate letting Mr. Westheimer

2  testify to what duties Mr. Kuhrt had unless it was part of the

3  factual -- it's inculpatory or he was going to use it in

4  connection with an expert opinion that related to something

5  pretty solid.  And so far, all he's told us is that Mr. Kuhrt's

6  behavior was (quote) "appropriate."  That's not admissible.  I

7  am not going to hear him on that.

8           I am going to hear him on, did he look at financial

9  documents, and tell me what they say from the company.  That's

10  primary evidence and he's an accountant and he can tell me that

11  -- or forensic, whatever he is.  And he can tell me what his

12  digging on primary evidence shows.  But the vast majority of

13  opinions that he tried to give, I am not going to admit.

14           And so here's what I'm going to do for you now.  I'm

15  going to let you tell me what Mr. Kuhrt's duties were because,

16  frankly, I'll probably get that anyway, and I am interested.

17  But you cannot open and rely on Westheimer's materials at this

18  time unless they are inculpatory of your client.  And I just

19  want to warn you of that because you will be telling me they're

20  inculpatory by using the arguments -- or using the -- using

21  them in an opening statement or at least the inference will be

22  there.  You won't be admitting it, but the inference will be

23  there.

24           And if you open that door, you may wind up opening it

25  for opinions which I will allow from the opponents which could

1    hurt your client.  I'm trying to cabin these experts who I call

2    second -- to some extent they're second-generation or second-

3    level experts because to the extent they're relying on other

4    people, that is -- I'm not really interested in an expert to

5    rely on Van Tassel or other stuff.  I'm interested in these

6    experts to the extent they've done work themselves.  It's the

7    criticism that each side has made of the opposing expert.  And

8    I'm not -- I'm interested in getting their fresh and different

9    and new opinions based on their own personal reviews of primary

10   materials.  That's what I'm primarily interested in.

11            I respect that experts can review inadmissible

12   evidence, and so we all know that everybody's read Van Tassel's

13   reports and Davis' plea agreement, which is one of the reasons

14   I'm letting it in because it's stupid not to.  In some fashion,

15   it should be in the record because everybody here has read

16   them.  But the whole point is that I'm -- right now, all I've

17   allowed from Westheimer is inculpatory admissions or admissions

18   against interest.  They don't have to be criminally

19   inculpatory, of course.  So I'm just warning you, be careful.

20   Okay.  Next, he -- you're telling me his duties.

21            **MR. KUNIANSKY:**  Okay.

22            **THE COURT:**  I would like to know his titles.

23            **MR. KUNIANSKY:**  Originally --

24            **THE COURT:**  That's objectively verifiable.

25            **MR. KUNIANSKY:**  **-- h**e's hired by a leasing entity of

1    Stanford as a fixed-asset manager, which I call a glorified

2    inventory clerk.  Basically, account desk, computers to find

3    out worldwide where all the assets are and to organize into

4    some kind of fashion.

5         **THE COURT**:  It's fixed assets so that means really

6    real estate as opposed to --

7         **MR. KUNIANSKY**:  I don't believe it was real estate

8    but it may have been.  I'm not sure, your Honor, but I know

9    that it dealt with things like desks, computers, equipment,

10   things of that nature.  And it was to organize everything and

11   have some computerized system of being able to keep track with

12   all of the assets of this far-flung organization.

13        Now, as I understand it, according to that time, at

14   that period of time when he's hired at age 25 as this glorified

15   inventory clerk, allegedly a Ponzi scheme has been going on for

16   10 years, a multi-billion dollar Ponzi scheme.

17        Your Honor is not going to hear one piece of evidence

18   during this trial, circumstantially or direct, that anybody

19   ever told Mark Kuhrt that there was a Ponzi scheme going on.

20   You're not going to hear any evidence that Mark Kuhrt was aware

21   there was a Ponzi scheme going on.  And you're not going to

22   hear any evidence Mark Kuhrt participated in a Ponzi scheme.

23        Now, eventually he worked his way up into accounting

24   positions with one of the Stanford entities, and it was

25   something called SFGC or Stanford Financial Group Company.  And

1    basically what that entity did was provide administrative

2    services to many other Stanford entities.  And they would

3    provide human resources; they would provide IT; they would

4    provide some minimal level of accounting services; there was

5    legal services, et cetera; all different kinds of

6    administrative services to these different affiliated entities.

7            Now, there are three main allegations against

8    Mr. Kuhrt.  And I want to go over the three allegations, and

9    then I'm going to go over how these entities were set up to

10   explain how these allegations fit into the Stanford group of

11   companies.  But the three allegations that have been made are

12   something that the Underwriters refer to as reverse engineering

13   on the revenue of the investments of Stanford International

14   Bank Limited, which is the bank in Antigua that issues the CDs.

15   That's one of the allegations.

16           The second allegation is that Mark Kuhrt was involved

17   in not properly disclosing a shareholder loan that Allen

18   Stanford had in the amount of $1.7 billion as a related-party

19   transaction on the annual reports of Stanford International

20   Bank Limited.

21           And the third and final allegation against him is

22   that it is alleged that he artificially inflated the value of

23   some real estate, that's typically called the Island Club, some

24   island property that Allen Stanford acquired in Antigua; and

25   that he artificially inflated that value from 63 1/2 million to

94

1    $3.2 billion to inflate the assets of Stanford International

2    Bank Limited.

3            And I'm going to address each one of those

4    allegations one by one and submit to your Honor there's not

5    going to be any evidence that Mark Kuhrt knowingly engaged in

6    any of those activities nor will any witnesses come in here and

7    say that he did.

8            Now, the first thing I'd like to do is I've got a

9    chart on a PowerPoint display, Relationship of Relevant

10   Entities.  Could we pull that up, Mr. Bramer?

11           **THE COURT:**  Are you going to get -- give me the

12   titles that he held and which companies?  I interrupted you and

13   I apologize.

14           **MR. KUNIANSKY:**  Yes.  He started out as fixed-asset

15   manager for I think it was Stanford Leasing Company or

16   something very similar to that.  And that was in 1997.  And in

17   2000, he was promoted to be an accounting manager at SFGC,

18   which is Stanford Financial Group Company.  And I'm not sure of

19   the exact year but it was either 2004 or 2005 that he was

20   promoted to Assistant Controller at Stanford Financial Group

21   Company.  And then in August of 2007, there was an initiative

22   of Stanford for tax reasons to try to locate some of their

23   administrative operations in the U.S. Virgin Islands.  Economic

24   Development Corporation they called it, and they got certain

25   tax benefits for that.  And at that time, there was a new

1    entity formed that sort of took over as SFGC, and that was

2    called SFGGM, which was --

3            **THE COURT:**  In St. Croix.

4            **MR. KUNIANSKY:**  -- in St. Croix, Stanford Financial

5    Group Global Management.  And at that point in time, his title

6    became something called Global Controller.

7            Now, Mr. Bramer, could you pull up the first -- have

8    we got to switch it over?

9            **THE COURT:**  Oh, sorry.  Okay.  Are you sitting in the

10   back?  Is it back?

11           **MR. UNIDENTIFIED:**  Yeah, it's back.

12           **THE COURT:**  Does that work?

13      **(Counsel confer)**

14           **MR. KUNIANSKY:**  Now, what I wanted to do was just

15   give a little understanding of the relevant entities for

16   purposes of this trial.  I understand there may be -- I've seen

17   in reports various numbers of Stanford-related entities.  I

18   think maybe even as high as 150 or something in either Van

19   Tassel, Berenblut report, or whatever.  But 99 percent of that

20   is not relevant for this proceeding.

21           Up on the top right-hand corner, there's Stanford

22   Group Company; and that was a company that was involved in

23   marketing financial instruments.  And they called the people of

24   marketing financial advisors or FAs, basically a glorified word

25   for a stockbroker.

1              **THE COURT:**  Am I supposed to be seeing this on here?

2              **MR. KUNIANSKY:**  I'm hoping your Honor does.  It's

3    coming up over on here.

4              **THE COURT:**  Well, I have something on screen, but

5    what are you --

6              **MR. KUNIANSKY:**  It says --

7              **THE COURT:**  What are you --

8              **MR. KUNIANSKY:**  -- Relationship of Relevant Entities.

9    And on the top right it says some -- SGC.

10             **THE COURT:**  Got it.

11             **MR. KUNIANSKY:**  Okay.  That stands for Stanford Group

12   Company.  And that was the arm that marketed or sold these

13   various investments.  They had stockbrokers working out of

14   there, at least when the building was still around; and it was

15   that brown brick building right across the street from the

16   Galleria.  At least that was one of them.  And the stockbrokers

17   sold various financial instruments to their clients.  Stocks,

18   bonds, everything.  As far as the stocks, bonds, et cetera, I

19   don't think there's been any allegation made by anybody that

20   there was anything illegitimate about those.  But everything

21   relates to the certificates of deposit that were sold.

22             Now, these certificates of deposit were issued by a

23   bank out of Antigua, Stanford International Bank Limited, which

24   I have right below, SIBL.  And by the way, I don't have it

25   below because it's a parent subsidiary.  I'm just showing

1  different entities here.  And the -- well, you'll see the name

2  pop up on some of the documents.  The president of that

3  organization was Juan Rodriguez-Tolentino, and the head

4  accountant who you will see on some of the emails was Banu

5  Persuad.

6        Now, I've got this box, 50-plus Stanford-affiliated

7  entities.  There are numerous other Stanford-affiliated

8  entities that don't fit directly into this case.  If you go

9  below, you've got SFGC, Stanford Financial Group Company, and

10  that is the organization that I told you provided

11  administrative services to various of the Stanford-related

12  entities.

13        And in August of 2007, a new entity was created in

14  St. Croix that basically was slated to take over that entity as

15  part of this global initiative, and that was Stanford Financial

16  Group Global Management.

17        Now, Mr. Kuhrt was one of several accountants that

18  worked for Stanford Financial Group Company; and later when he

19  was transferred over to St. Croix in August of 2007, Stanford

20  Financial Group -- or Global Group Management.

21        Now, one of the important points that I want to make

22  out, and then I'll go back to the various allegations, is that

23  Mr. Kuhrt was not an employee, not an officer, director,

24  shareholder or employee of Stanford International Bank Limited,

25  that deals with issuing the CDs; nor was he a officer,

1    director, employee, shareholder of Stanford Group Company that

2    was the arm that sold various financial instruments including

3    these CDs.

4              THE COURT:  Can I ask you a question?

5              MR. KUNIANSKY:  Yes.

6              THE COURT:  On SFGGM, that's the St. Croix company,

7    you say he was there from August '07 to February '08.  Do you

8    mean '09?

9              MR. KUNIANSKY:  It may be.  Whenever everything shut

10   down.

11             THE COURT:  '09.

12             MR. KUNIANSKY:  '09.

13             THE COURT:  And when you say he was one of several

14   accountants, his name was -- you told me -- Global Controller,

15   right?

16             MR. KUNIANSKY:  Right.

17             THE COURT:  And he was -- prior to that, he was

18   Controller of Stanford Group -- Stanford Financial Corp.,

19   right?

20             MR. KUNIANSKY:  Right.

21             THE COURT:  He was Controller, right?

22             MR. KUNIANSKY:  Right.  He had an accounting

23   department.

24             THE COURT:  Okay, so he was not -- just -- I'm just

25   trying to understand your facts here.  He was not one of a

1    bunch of accountants, he was the top dog?

2           **MR. KUNIANSKY:**  No, he was not the top dog.  Above

3    him would have been Mr. Lopez.  And above Mr. Lopez, as Chief

4    Financial Officer, would have been James Davis.

5           **THE COURT:**  Right, okay.

6           **MR. KUNIANSKY:**  And, of course, above James Davis was

7    Stanford.

8           **THE COURT:**  Okay, thank you.  Davis -- but Davis had

9    titles in different companies?

10          **MR. KUNIANSKY:**  And I probably ought to get a little

11   more accurate.  I'm not sure when he transferred over to SFGGM,

12   whether Mr. Lopez was still technically above him or not.

13          **THE COURT:**  Well, I don't know --

14          **MR. KUNIANSKY:**  But --

15          **THE COURT:**  -- I don't think Mr. Lopez transferred.

16          **MR. KUNIANSKY:**  No.  I know he didn't.  He stayed in

17   Houston.

18          **THE COURT:**  But I think the functions remained the

19   same.  I mean --

20          **MR. KUNIANSKY:**  Right.

21          **THE COURT:**  -- from the papers it appears that it was

22   a title --

23          **MR. KUNIANSKY:**  Correct.

24          **THE COURT:**  -- I mean it was a paper transfer.  They

25   were just -- and he moved.

1          **MR. KUNIANSKY:**  There's nothing that really changed

2   from SFGC to SFGGM, other than it was part of this tax

3   initiative and a formation of a new organization.

4          **THE COURT:**  Okay.

5          **MR. KUNIANSKY:**  Basically, everything continued on

6   pretty much as it had been in the past.

7          **THE COURT:**  Okay.

8          **MR. KUNIANSKY:**  Now, I want to go to the three

9   different allegations that are involved in this case.

10          And if we could pull up, Mr. Bramer, the reporting

11   revenue on investment from SIBL.

12          And this is what --

13          **THE COURT:**  Ben (phonetic), turn that thing around so

14   he can see it, if you don't mind, please.

15          **MR. KUNIANSKY:**  Your Honor, I'm okay right here.

16   Mr. Chasnoff is helping me out.

17          **THE COURT:**  Oh, I didn't see that.  Okay, fine.

18   Sorry.  I'm with you, reporting revenue.

19          **MR. KUNIANSKY:**  And this is what has been referred to

20   by both the prosecution and the Underwriters as so-called

21   (quote) "reverse engineering" (closed quote).  The first thing

22   that I want to point out is that only one person, and perhaps

23   two, ever had the investments of SIBL; and that was James Davis

24   and presumably Stanford.

25          This was a very closely-guarded secret.  It was

1   referred to as the (quote) "secret family recipe" (closed

2   quote) like the 11 herbs and spices of Kentucky Fried Chicken,

3   like the formula to Coca Cola.  There will not be one piece of

4   evidence during this trial that anybody other than James Davis,

5   and perhaps Allen Stanford, had this portfolio of investments

6   and what the investments were earning.  It was alleged to be

7   proprietary.  That is, if this secret got out of how they were

8   managing their investments to earn this high rate of return,

9   that anybody could do it so that it was this closely-guarded

10  secret by James Davis.

11          Now, one of Kuhrt's responsibilities was with

12  numerous of these affiliated entities of Stanford.  And by the

13  way, each of these had their own accounting department; every

14  one of these affiliated entities, including Stanford

15  International Bank Limited, had their own accounting

16  department.  But they would submit financials onto the entity

17  that Kuhrt worked for, this SFGC; and one of his jobs would be

18  to compile these in something that was called red books.  And

19  those would be forwarded on to Davis and Stanford.

20          But what happened is Davis was routinely late in

21  providing the revenue on the investments to Stanford

22  International Bank Limited.  And this may seem somewhat odd but

23  Stanford International Bank Limited didn't know their own

24  investments.  The president of Stanford International Bank

25  Limited didn't know the investments.

1          **THE COURT:**  It does seem very odd.

2          **MR. KUNIANSKY:**  The accountant -- the head accountant

3   didn't know their own investments.  And what they were told is

4   this is the secret family recipe.  So as a -- they would be

5   late in being able to put together these red books because they

6   wouldn't have the revenue numbers from Stanford International

7   Bank Limited because the head accountant over there, Banu

8   Persuad, wouldn't be able to provide them.  And he couldn't

9   provide them because he hadn't got the information from Davis.

10  He didn't know it himself because it was the secret family

11  recipe.

12          So what happened is Stanford International Bank, like

13  most companies, had a budget.  A budget was prepared on a

14  annual basis.  I think just about every company prepares a

15  budget.  So there was a remedy devised to deal with this

16  tardiness to the best --

17          **THE COURT:**  Was the budget -- what was the budget

18  supposed to do, if you know?

19          **MR. KUNIANSKY:**  Well, initially, the budget was just

20  a budget.  It wasn't supposed to do anything.  It was just --

21          **THE COURT:**  It was supposed to be --

22          **MR. KUNIANSKY:**  -- projections of what we think we're

23  going to be making, and how much new money is going to be

24  coming in, and what our expenses are going to be.

25          **THE COURT:**  Right.

1      **MR. KUNIANSKY:**  But at some point, it does change.

2  And I think that's what your Honor gets -- is getting at.

3      **THE COURT:**  Well, no; I was more basic, actually.  I

4  don't know how we're getting this into evidence but okay,

5  whatever.

6      **MR. CHASNOFF:**  Your Honor?

7      **THE COURT:**  I'm interested.

8      **MR. CHASNOFF:**  There are a number of things which

9  have been said which I believe have -- this secret family

10 recipe and stuff like that.  I don't know who's going to

11 testify to that, so I just --

12     **THE COURT:**  Well, let --

13     **MR. CHASNOFF:**  -- I want to object.

14     **THE COURT:**  -- let me see counsel at the side bar on

15 this.

16     **(Begin bench conference at 12:17 p.m.)**

17     **THE COURT:**  This is on the record.

18     **MR. BENNETT:**  On the record?

19     **THE COURT:**  On the record.  This whole case seems

20 like, from the preliminary material I've got, for instance the

21 proposed language, I've heard all this before.  It's

22 interesting, frankly, and I'm getting a little more detail,

23 which I'm curious, you know.  But in terms of admissibility,

24 I'm not sure which way this is going to cut.  And I just feel

25 compelled, on a equity basis, to tell you that I'm going to let

1    you do whatever you all want.

2         But there's a serious double-edged sword right here,

3    very serious double-edged sword, because so much of the money

4    came and so much of the investments and all that of the

5    Stanford International Bank came from an absolutely undisclosed

6    source.  And if you think -- I know that you think that helps

7    you because Mr. Kuhrt is saying I didn't know what comprised

8    that 80 percent of the numbers we were putting in the financial

9    statements, you know, for our assets or whatever or the

10   revenues or whatever it turns out.

11        But it really cuts both ways because he had a very

12   high title.  And the issue that I have to deal with is should

13   he have suspected there was real serious funny business going

14   on because nobody would tell him anything, and he was yet

15   expected to give budgets and projections; and then -- and the

16   non-quarterly reporting months they have sometimes didn't

17   change.  And then the reporting months they changed some.  But

18   then there are these couple of emails that they've been -- the

19   Underwriters and, frankly, the prosecutor's going to wave

20   around.

21        So, I don't know which way I'm going to come out but

22   there's serious issue of whether somebody with the title Global

23   Controller, or whatever he is, and Head Controller for the bank

24   should have accepted the nondisclosure, period.  And from a

25   criminal standpoint, you're into maybe willful blindness,

1    deliberately **--** let's go with deliberate and get what's --

2        **(Voices overlap)**

3            **MR. KUNIANSKY:**  (indiscernible) ignorance.

4            **THE COURT:**  -- ignorance.

5            **MR. KUNIANSKY:**  Yeah.

6            **THE COURT:**  But the whole point is, I'm not in the

7    criminal case, particularly.

8            **MR. UNIDENTIFIED:**  I know that.

9            **THE COURT:**  I'm in the civil case.  And the standard

10   for money laundering is reasonably should have suspected that

11   there was criminal activity going on.  That's overstating it --

12   not overstating but over-generalizing.  But I don't mind trying

13   this case -- frankly, I'm probably going to try it either way;

14   what's the difference to me; I'm ready to go.  It's very

15   interesting.  But I think -- I'm just wondering why this helps

16   you.

17           And I wanted to give you that feedback because I'm

18   not -- I have not decided this case.  I am dying to see the

19   evidence, and I appreciate -- I actually have already read and

20   looked at the footnotes, not the evidence but the footnotes for

21   the Underwriters' findings.  And you're right.  There's nothing

22   there that, you know, details about Kuhrt or even Lopez.  I

23   mean, we had some emails back and forth; and I haven't read the

24   emails so I don't know which way it'll show.

25           But it's a hard argument that a guy with that title

1    shouldn't have been looking and asking more questions.  And,

2    frankly, engaged -- you know, as close as he was about trying

3    to do projections that would meet certain requirements.  So,

4    you go forth.  But if you go into all of this, I'm going to let

5    their expert -- I mean, that means I will have let Westheimer

6    talk, and it means I will let their expert go farther.  And I

7    thought I would give you a feel because I consider this a

8    serious double-edged sword in the civil context in which I'm

9    sitting.  Okay?

10        **MR. KUNIANSKY:**  And it's not time to argue the case,

11   obviously.

12        **THE COURT:**  No.

13        **MR. KUNIANSKY:**  But my position regarding the titles,

14   it was just that.  He was basically a glorified numbers

15   cruncher.

16        **THE COURT:**  But you don't have any evidence of that

17   except Westheimer talking inculpatory.  And I may not -- I mean

18   exculpatory.

19        **(Voices overlap)**

20        **MR. KUNIANSKY:**  (indiscernible)  They have no

21   evidence otherwise.  They have the burden of proof.  There's

22   nothing else said that they can disprove.

23        **THE COURT:**  I don't know because I haven't seen the

24   evidence yet, so good for you.

25        **MR. KUNIANSKY:**  Yes.

1        **THE** COURT:  But all I'm saying is I've made my point.

2   Thanks.

3        **(Counsel thank the Court)**

4        **(End bench conference at 12:22 p.m.)**

5        **THE COURT:**  So you're -- oh, I'm sorry.

6        **MR. KUNIANSKY:**  I think we're back to -- on this

7   about the budget.  And I talked about a budget being done every

8   year.  The budget was just that.

9        Davis is late in providing numbers that only Davis

10  has.  And as a result, a procedure is implemented to do -- use

11  the budgeted number simply as a projection, nothing other than

12  a projection, and then to be forwarded on to Davis to true up.

13  And that they were always forwarded on to Davis to be trued up.

14  And they were only submitted to Stanford International Bank

15  after having been submitted to Davis for his approval.

16        And then after all that, there are independent,

17  outside auditors who audited the books and records of SIBL; and

18  those are the numbers that get into the annual reports, the

19  numbers out of the auditors' reports.

20        In short, Mark Kuhrt at no time reverse engineered or

21  came up with numbers to meet any goals.  He didn't have the

22  information.  He did the best he could do with projections and

23  forwarding them to Davis for Davis' approval.

24        **THE COURT:**  Did -- is there -- oh, forget it.  Sorry.

25        **MR. KUNIANSKY:**  The next area that I wanted to go to

1   was shareholder loans.  And we'll let the battle of the experts

2   decide this issue.  And I'm not sure it makes a difference to

3   Mark Kuhrt.  But it is our understanding that there was a total

4   of 1.7 billion, approximately, in shareholder loans and not the

5   1.7 plus the 1.8 that Mr. Chasnoff referred to in his opening

6   statement.

7          **THE COURT:**  Well, one, Mr. Chasnoff --

8          **MR. KUNIANSKY:**  Either way, I'll let the --

9          **THE COURT:**  -- Mr. Chasnoff referred to it as

10  shareholder loans for 1.7 or something, and then related -- and

11  related-party transactions, which since Stanford apparently

12  controlled all of these entities.

13         **MR. KUNIANSKY:**  Okay, yeah.

14         **THE COURT:**  So he's made that distinction.

15         **MR. KUNIANSKY:**  Right.  And I'll tell your Honor the

16  way I understand it, and then we'll let the accountants talk

17  about it but I'm not really sure it's a distinction with a real

18  meaning to, you know, my client.

19         But in any event, as I understand it, I think what

20  the evidence is actually going to show is that there were

21  numerous Stanford-affiliated entities that borrowed money from

22  Stanford International Bank Limited.  And that at some point in

23  time -- and I doubt there'll be evidence of this -- and once

24  again, it doesn't matter from our end what their reasons are,

25  but I understand there were apparent tax reasons and what

1    happened is that Stanford assumed the debt of the loans to

2    these various entities.  And at that point, they became (quote)

3    "shareholder loans" (closed quote).  So we're not talking

4    about, you know, 1.7 to the entities then another 1.7 to

5    Stanford; we're talking about the same $1.7 billion.

6         Now, the Underwriters claim that Kuhrt has made a

7    damning admission.  That he admitted that he knew about these

8    shareholder loans and that they were not properly disclosed as

9    a related-party transaction.  There is no question but that he

10   did know about these shareholder loans.  He is working for the

11   administrative company and not SIBL.  He advises his boss,

12   several layers up, James Davis, that these need to be disclosed

13   as a related-party transaction in a footnote.  And that

14   recommendation is apparently declined by Mr. Davis.

15        The outside auditors review all of this, and they

16   sign off on the financial statement without the footnote that

17   it's a related-party interest.  And Stanford and Davis signed

18   this annual return, and Kuhrt did not.  I submit a couple of

19   things that, first of all, Kuhrt did what he was supposed to

20   do.  He properly advised what he understood the footnote should

21   say relating to this.  And then the CFO of the organization, as

22   well as the independent auditors, approve it without that.  I

23   submit that he didn't do anything wrong, nor he didn't suspect

24   any wrongdoing, nor does that have anything to do with him

25   suspecting any kind of Ponzi scheme.

1          The final allegation relates to something that's been

2    called the Island Club, and I don't think there's going to be

3    any dispute that Stanford wanted to develop some island

4    property off the coast of Antigua for this incredible resort

5    for the ultra wealthy.  And then he acquired 1,587 acres land

6    in doing this, and apparently the purchase price was

7    approximately $63 1/2 million.

8          Davis comes to Kuhrt and wants him to come up with

9    various accounting scenarios to have this property transferred

10   to Stanford where it was supposedly originally supposed to be

11   in Stanford's name, and then back into Stanford International

12   Bank.  And to -- under International Accounting Standards, to

13   mark the value of the property to market;  that is, under GAP,

14   we use historical-cost basis.  Whatever a property costs is

15   what it's accounted for on the books.  But under the

16   International Accounting Standards and mark to market, you mark

17   it at its fair value.

18          **MR. CHASNOFF:**  Your Honor, I -- maybe there was a

19   piece of evidence I've missed, or testimony, but there is no

20   evidence of the mark-to-market recommendation.

21          **THE COURT:**  Okay.  Well I haven't read it either.

22   This is opening statements not evidence, that's for sure.

23          **MR. KUNIANSKY:**  And Davis provides Kuhrt with a $2

24   million-an-acre figure, and I believe there's some handwritten

25   notes on this that'll be in evidence;  and that is a sale of a

1    property known as Jumby Bay.  Jumby Bay was some nearby island

2    resort in Antigua where the property -- six acres of land had

3    sold for approximately $12 million or $2 million an acre.

4           So, Kuhrt applies this $2 million an acre times that

5    acreage, arriving at a value of 3.174 billion, but --

6           **THE COURT:**  Does he do any analysis of whether the

7    properties are comparable?

8           **MR. KUNIANSKY:**  No, your Honor.  He's not a real

9    estate appraiser.  He doesn't purport --

10           **THE COURT:**  Does he ask for any analysis --

11           **MR. KUNIANSKY:**  Yes, he asked for an appraisal.  He

12    absolutely asked for an appraisal and was told one would be

13    forthcoming; and that this deal would never come through unless

14    an appraisal and legal approved it, which never happened.

15           And by the way, this deal never occurred.  It's been

16    referenced --

17           **THE COURT:**  It's -- the issue is not whether it

18    occurred.  The issue -- although Stanford has a witness that's

19    going to say they built a dock or something, but -- or a

20    marina.  But the whole point is, the issue in this case is

21    whether it was reported at a fair value.

22           **MR. KUNIANSKY:**  Okay.

23           **THE COURT:**  Not whether or not --

24           **MR. KUNIANSKY:**  You're absolute --

25           **THE COURT:**  -- they actually built the thing.

1          **MR. KUNIANSKY:**  You're --

2          **THE COURT:**  And the question is the timing between

3    the purchase at 63 million, which we all know didn't actually

4    close as to one of them until after it was reported, but the

5    point is $63 million purchase, or contracts to purchase, versus

6    $3.174 billion valuation sometime later.  And my question to

7    you is, if you know, what was the time gap or the difference in

8    time between the purchase at 65 -- or 63 1/2 million versus the

9    reporting of a value at three billion.

10          **MR. KUNIANSKY:**  It was never reported at that value,

11   and that's the point I'm making.

12          **THE COURT:**  Okay.

13          **MR. KUNIANSKY:**  Never.  And now, Mr. Chasnoff -- and

14   I'm sure he did it in the best of faith -- but he indicated to

15   the Court that there was a exhibit that shows that this thing

16   was booked at this --

17          **THE COURT:**  Okay.

18          **MR. KUNIANSKY:**  -- in the internal records.  And I

19   guess what he's missed is the document he is relying upon --

20   and the metadata will show this -- was actually prepared by

21   James Davis in February of 2009.  And then he uses that to

22   represent what the assets were back June 30th, 2008.

23          In other words, James Davis is apparently trying to

24   come up with ways to fill a hole that only he knows about when

25   this investigation starts and things look like they're going to

1   crumble.  And so he comes up with some charts that we know

2   nothing about.  We haven't seen these.  He's coming up with his

3   own internal figures trying to show how we have $8.1 billion in

4   assets or how Stanford International Bank Limited has $8.1

5   billion in assets.  And he comes up putting this property in

6   there at the $3.1 billion.  That's not a record -- internal

7   record of anybody.  That is James Davis' own calculation that

8   we never saw.

9           THE COURT:  Well, wasn't that record given -- well,

10  you may not be the person to ask.  Forget it.  But I thought it

11  was given to somebody.

12          MR. KUNIANSKY:  No, I don't think it was given to

13  anyone.  I think it was just something that --

14          THE COURT:  The regulators.

15          MR. KUNIANSKY:  No, this was not given to the

16  regulators.

17          THE COURT:  Okay.

18          MR. KUNIANSKY:  Absolutely not given to the

19  regulators.

20          THE COURT:  Okay.  That's what I'm trying to figure

21  out, what's the story there.  But okay, we'll find out later.

22          MR. KUNIANSKY:  The story is it was absolutely never

23  booked.

24          THE COURT:  All right.

25          MR. KUNIANSKY:  This transaction never took place.

1    It was never booked.  And to the point that Mr. Chasnoff

2    represents, if any, to this Court that it was booked, he's

3    simply incorrect.  It didn't happen; end of story.

4             **THE COURT:**  But Davis did something with the number.

5             **MR. KUNIANSKY:**  I think this was something Davis was

6    preparing to probably try and pull the wool over the SEC.  But

7    nothing was done with these numbers.

8             **THE COURT:**  Okay, thank you.

9             **MR. KUNIANSKY:**  These are not the records of SIBL or

10   any other entity.  This is Davis' own -- an admitted liar,

11   cheat -- thief and cheat trying to come up with a way to boost

12   the value of the assets of Stanford International Bank by a

13   bunch of hocus pocus.

14            **THE COURT:**  Okay.

15            **MR. KUNIANSKY:**  And I think that also fits into the,

16   apparently -- and Mr. Chasnoff said something about Kuhrt and

17   Lopez inflated the values of certain stock to come up with this

18   number.  They didn't inflate the values of anything.  This is a

19   listing -- and I think if we could put it up, I think it was --

20   Mr. Bramer, can you pull that up?

21            And this is actually -- it started out as a --

22            **THE COURT:**  What are you looking at?  Do you want it

23   -- for the record?

24            **MR. KUNIANSKY:**  Well, it started out Underwriters'

25   Number 68.  We're actually going to be renaming it, I think, to

1    our Exhibit --

2              **MR. UNIDENTIFIED:**  Three hundred.

3              **MR. KUNIANSKY:**  -- 300.  Which, because the

4    Underwriters' exhibit fails for some reason to include the

5    second page of the exhibit --

6              **THE COURT:**  Oh, okay.

7              **MR. KUNIANSKY:**  -- so we've just included both pages

8    of it.  And I tell you --

9              Mr. Bramer, could you first just kind of show the

10   whole document?  And then we'll pull out the part that we're

11   referring to.

12        **(Pause / whispers)**

13             Judge, I think we're having a little of computer

14   problem here, but --

15             **THE COURT:**  I can read it the way it is, if you want.

16             **MR. KUNIANSKY:**  But here -- the point I wanted to

17   make, this is the bottom of the document.  The top portion of

18   it lays out a bunch of stocks that I presume Stanford

19   International Bank purportedly holds in their portfolio.

20   Whether they do or not, we have no clue.  Apparently, I think

21   these are some of the stocks that Mr. Berenblut must have

22   looked up.  And apparently some of these values are phony

23   because they exceed the entire capitalization of the company.

24   And --

25             **THE COURT:**  Right.  I don't know, but that list of

1    stocks is actually -- it's been reported -- I don't know if

2    it's true but it's been reported to be the list of private

3    equity investments, not stock necessarily --

4              **MR. KUNIANSKY:**  Oh, okay, yeah.

5              **THE COURT:**  -- but possibly.

6              **MR. KUNIANSKY:**  Private equity stock, whatever --

7    whatever these are.  My point -- a couple of points to make,

8    though.  I think the statement was made in opening by

9    Mr. Chasnoff that Kuhrt and Lopez falsified these numbers to

10   come up with whatever number we -- we didn't falsify anything.

11   We didn't come up with any of these numbers.  And there won't

12   be any evidence that we came up with any of these numbers.  If

13   these numbers are wrong, you know, blame it on the thief, Jim

14   Davis.  But don't put his dirty laundry on us.

15             And then the point I wanted to make down at the

16   bottom, dealing with the fact that they're using this to claim

17   that the $3.1 billion got booked.  And if you go to adding up

18   all these real estate properties, it comes to the $3.1 billion,

19   which matches the $2 million-an-acre, et cetera.  This record

20   never got -- it didn't get booked anywhere.  And there won't be

21   any evidence it got booked anywhere.  This was something

22   created long after the fact by James Davis.  And the metadata

23   will show that, that he's trying to reflect back eight months

24   earlier what he claims were the assets at the time.  And the

25   ridiculous part about is apparently he doesn't think very long

1    and hard about it because he's reporting some island property

2    that hasn't even been purchased yet.  Okay?  But don't put that

3    dirty laundry on us.  We had nothing to do with that.

4         Basically, all Mark Kuhrt did was, per request, come

5    up with a accounting scenario based upon what he understood to

6    be, you know, the data.  But nothing was booked.  Nothing was

7    done.  And he was going to require an appraisal before anything

8    was done.

9         Now, I wanted to go over some miscellaneous matters

10   regarding intent because I think intent does fit into this.

11   Because one of the definitions is, you know, whether or not a

12   crime was committed in addition to the suspected -- but Mark

13   Kuhrt was a salaried employee, earning a salary commensurate

14   with, if not lower, than what would be expected with somebody

15   with his duties.

16        And the Underwriters can try all they want, and they

17   can have, you know, their 400 lawyers looking through 10

18   million documents, and what they will not find --

19        **THE COURT:**  Is there a document that tells what his

20   salary was?

21        **MR. KUNIANSKY:**  Well --

22        **THE COURT:**  Is there a document, yes or no?

23        **MR. KUNIANSKY:**  -- yes and no.  I have submitted some

24   tax records.

25        **(Laughter)**

1          **THE COURT:**  I said "yes or no."

2          **MR. KUNIANSKY:**  Okay.  There is but I doubt it will

3    come in.  I submitted his tax returns to your Honor.  Your

4    Honor has them, okay?  They are objecting on authenticity.  And

5    for obvious reasons, I don't know that I'm going to call

6    someone to the stand to authenticate them.

7          **THE COURT:**  All right.

8          **MR. KUNIANSKY:**  But in any event --

9          **THE COURT:**  Well, I might receive them anyway if

10   they're signed, but --

11         **MR. KUNIANSKY:**  Well here's the point that I'm

12   making.  There will not be any evidence that any monies at all

13   went to Mark Kuhrt.  So it's somewhat interesting to have this

14   multibillion dollar Ponzi scheme where allegedly out of $8.1

15   billion, the receivers only come up with one billion or

16   something, so seven billion has supposedly gone somewhere; and

17   you won't see and there won't be produced to you one piece of

18   evidence that one dime of that went to Mark Kuhrt other than a

19   normal salary.

20         Finally, I'm going to play a tape.  It's 10 minutes.

21   What happens when the -- when this thing starts breaking and

22   the receiver comes in and everything's shut down is there was a

23   staff accountant that worked for Mark Kuhrt that actually did a

24   lot of the numbers crunching on these revenue entries.  And the

25   FBI approached him and apparently put the fear of God into him

1   and told him, I guess, he was in a lot of trouble and he better

2   make some calls; and he makes a tape-recorded call to Mark

3   Kuhrt.

4           Calls Mark Kuhrt up late at night.  It's very obvious

5   from the tape Kuhrt's not expecting the call.  And for 10

6   minutes, he does everything he can do to try to get Mark Kuhrt

7   to make some kind of incriminating statement.  And Mark Kuhrt

8   repeatedly tells him over and over again, tell the truth.  He

9   asked Mark Kuhrt what should I do if the FBI questions me.

10  Tell them the truth.  And then he starts asking questions:

11  what about this; what about that?  And Mark goes "Look, Rolando

12  (phonetic), if you have any questions at all, you should go to

13  the FBI and the SEC and address any concerns that you have."

14  And I submit to you that those are not the actions of somebody

15  that knowingly engaged in any type of criminal activity.

16          I think at the conclusion of this case, what you're

17  really going to have is not any evidence or hardly anything.

18  You're going to have a bunch of documents that are thrown at

19  you.  They are no smoking-gun documents.  They're just going to

20  be a whole bunch of emails and other documents with each side

21  putting its spin on them; to which I say Underwriters have the

22  burden of proof, and they will not meet that burden.

23          **THE COURT:**  Thank you.  You may proceed.

24          **MR. ZIMMERMANN:**  May it please the Court.  If you

25  have read, as you said you have, and I know you have, all the

1    several feet of paper that's been submitted to you, you've got

2    to be very tired now.  I'm going to attempt --

3           **THE COURT:**  No more tired than you all.

4           **MR. ZIMMERMANN:**  -- not to put you sleep.

5           **THE COURT:**  You've much worse.

6           **MR. ZIMMERMANN:**  I agree.

7           **THE COURT:**  So don't worry about that.

8           **MR. ZIMMERMANN:**  So I hope to take just maybe 15 or

9    20 minutes or so of your time and try to not repeat what has

10   been said by Mr. Kuniansky because much of it would apply to

11   Mr. Lopez.  But I do want to point out some things specific to

12   Mr. Lopez, with the Court's permission.  In other words, things

13   -- you said try to give you a couple of points that you should

14   be looking for.  And that's what I would like to do, so

15   emphasize some points I ask you to look for.

16          First of all, I think very important -- it's been

17   said before, but I can't emphasize it enough, that this is

18   supposed to be an individualized decision regarding whether Gil

19   Lopez is subject to that exclusion.  And I note that in the

20   lengthy opening statement of the insurance lawyer, that he used

21   the term "they" perhaps a couple of dozen times.  I lost track.

22   He can't be making "they" claims.  They've got to prove against

23   Gil Lopez and not "they," whoever "they" is.

24          Second, the non-imputation clause of the policy --

25   and I'm certainly not an expert in the policy, but I do think I

1    can look through there and see the things that I think are very

2    important if I were in your position.  And one is that non-

3    imputation clause.  In other words, you can find as the fact

4    finder, that the exclusion applies to maybe Mr. Davis,

5    Mr. Stanford and Ms. Holt, some others, but that non-imputation

6    clause is in there to protect Gil Lopez from the spillover

7    effect if you're finding that in somebody else.

8           I do want to perhaps chime in here on the legal

9    discussions you were having with some of the other counsel with

10   regard to Mr. Westheimer's potential testimony as a fact

11   witness.  Maybe I'm just -- don't remember the rules of

12   evidence that well but I thought I did know that -- if he takes

13   the stand as a fact witness and speaks about what Mr. Lopez

14   told him and what his notes reflect, to me that's a statement.

15   And they're offering it as a statement against penal interest.

16   So there's not a question that there will be a statement.

17          And Rule 106 of the Federal Rules of Evidence, the

18   rule of option and completeness, allows if one party's

19   statement comes in, and if -- in all fairness to put it into

20   context -- the balance of it should be allowed to be put in.

21   So that's what we're relying on.  If he, frankly,

22   mischaracterizes badly -- the insurance lawyer mischaracterizes

23   badly what Mr. Westheimer said that he gathered in his

24   investigation by interviewing Gil Lopez.

25          I think when you find out what really was said, you

1    will see that it's not an admission.  For example, he says that

2    Gil Lopez and Mark Kuhrt admitted that they knew the numbers

3    were false.  There is no such statement.  That statement was

4    never made, and it never was reported.

5            And I think we've been together enough, you know I'm

6    always kind to the other opposing counsel; and I don't want to

7    vary from that.  But let me just say this, I really do suggest

8    that the insurance lawyer mischaracterized the evidence,

9    particularly about the Westheimer interview.  And I would

10   expect that if I mischaracterized the evidence in opening

11   statement, you would hold that against me.  So I hope that if

12   you find that the insurance lawyer, the insurance company

13   lawyer, mischaracterized evidence, you'll hold that against the

14   insurance company in the same way you'd hold it against me if I

15   mischaracterized it.

16           **THE COURT:**  To tell you the truth, I view this

17   opening statement stuff as orientation of the evidence that

18   they believe will -- orientation about what the evidence will

19   show.  And I'm not going to hold these opening statements

20   against anybody.

21           **MR. ZIMMERMANN:**  All right.  Leaving aside who you

22   hold it against, or nobody, please be alert, if you will --

23           **THE COURT:**  That I appreciate.

24           **MR. ZIMMERMANN:**  -- to the facts that many statements

25   mischaracterized -- in many statements made by the insurance

1    company lawyer misstate the evidence.

2            **THE COURT:**  Well, I'll be watching carefully, I

3    promise.

4            **MR. ZIMMERMANN:**  Good.  And I'll leave the subject

5    with this because you asked what other exception to the hearsay

6    rule would allow the balance of that conversation to come in.

7    And I would think state of mind exception was made for this

8    type of thing.  We're talking about why'd you do this; what was

9    your state of mind.  You might just want to file that aside

10   that I would like you to consider the state of mind exception,

11   as well as Rule 106.

12           Now, there's been a lot of discussion about whether

13   you have to find criminal intent or not.  I think that the

14   final resolution was is that they have to at least suspect that

15   there was some criminal conduct going on.  And the Court's made

16   it clear that it can -- like in any trial, you can consider

17   direct and circumstantial evidence of that.  But I suggest to

18   you that when you look at the evidence and hear the actual

19   witnesses that testify and look at the actual documents, you're

20   going to find that that burden of persuasion -- and I call it

21   the burden of persuasion -- that's on the insurance company

22   will not be met, not by the evidence.  And I'd like to

23   summarize some key points of what I think if we tried to look

24   at it from a higher level and not down in the weeds.

25           One is that the focus of the case -- my suggestion,

1    focus of the case, this all revolves around the sale of the

2    CDs.  That's what's got this thing started, is the sale of the

3    CDs.  We can get off on rabbit trails about other things like

4    that, cricket club and all that kind of stuff, but it's the

5    sale of the CDs that's at the heart of this case.

6           Secondly, I'd like the Court to try to make a note of

7    how many times you hear that Gil Lopez had any contact with

8    investors because he had zero contact with investors.  He sold

9    no CDs.  He wasn't responsible at all for the marketing

10   materials.  The insurance company lawyer emphasized brochures

11   that the investors relied on and made it seem like when he used

12   the word "they" that somehow Gil Lopez had something to do with

13   the construction of the those marketing brochures.  There'd be

14   zero evidence that Mark Kuhrt or Gil Lopez had anything to do

15   with the preparation of those marketing materials.

16          The annual reports are going to be emphasized and

17   have been already in opening statement.  I would just like the

18   Court to -- I request that the Court look for evidence that Gil

19   Lopez had any responsibility at all about the accuracy of those

20   annual statements.  There will be no evidence that he was

21   responsible for the accuracy of annual reports.

22          And if you look in the annual reports themselves,

23   it's very clear in there, near the back of the book, that the

24   accuracy of the numbers and the statements in the annual report

25   is the responsibility of the board of directors.  And it states

1    in there -- and then it says management -- SIBL -- I'm talking

2    the SIBL annual reports.  And then if you look in the very last

3    page or two where it lists the bank management, you will not

4    see Gil Lopez's name there.  He had nothing to do -- he was not

5    a member of the board of directors.  He was not an officer of

6    SIBL.

7              What was he?  He was the -- he had the title of the

8    Chief Accounting Officer of the Houston company called Stanford

9    Financial Group Company.  It was a services company that

10   provided services to all the entities in the Stanford Financial

11   Group affiliates.

12             By the way, there's a misnomer multiple times in the

13   papers that I saw referring to SFG, Stanford Financial Group,

14   as if there was an entity called Stanford Financial Group.

15             **THE COURT:**  No, we all know there wasn't.

16             **MR. ZIMMERMANN:**  Okay.

17             **THE COURT:**  But there was -- but they definitely

18   promoted themselves as a business of -- an integrated business

19   that was called the Stanford Financial Group.  Yeah, Stanford

20   Financial Group.  That's what was all over their marketing

21   brochures.  And they use it in other places.

22             **MR. ZIMMERMANN:**  For the --

23             **THE COURT:**  But there was no legal entity, and that's

24   your point.

25             **MR. ZIMMERMANN:**  Right.  Well, actually, my point --

1    my point is, in addition to that, is that you have to look --

2    you don't have to do anything but I'm asking you to concentrate

3    on what Gil Lopez's responsibilities were.  Who was he employed

4    by; what was he responsible for?  He was the Chief Accounting

5    Officer of what they called "the company," Stanford Financial

6    Group Company.

7            He was -- he had no responsibility for the accounting

8    of SIBL.  He had been with the company since 1997, and James

9    Davis had -- knew him and then would -- and then when they were

10   together, and -- because you're going to say why did he have

11   any responsibility for gathering all these together.

12           Because one of his jobs was to, on a monthly basis,

13   take all of those companies that we've talked about, all these

14   affiliate companies, and under the Stanford umbrella -- each of

15   -- each company of which had its own accounting department --

16   and compile all of those monthly financial reports into this

17   red book and get it up to Davis and Stanford on a monthly

18   basis.  That was his responsibility as the service company

19   Chief Accounting Officer.  And that's how that came about.  And

20   Mr. Kuniansky has already gone into it with you, and I'll defer

21   to that and come back slightly later.

22           Another thing I'd request that you look at, Judge, is

23   -- you know from having presided over this case for the last 20

24   years, it seems -- I think it's more like a couple of months --

25   that there are millions of documents in this database.  And

1    when you look at the evidence that the insurance company

2    lawyers are going to represent to you, you're going to be able

3    to count on the fingers of your hands how many emails are

4    authored by Gil Lopez.  And when you do see those few emails,

5    you're going to see that most of them are forwarding an email

6    from someone else to someone else.  And that he only responds a

7    very few times with words like print or the word Pelican or

8    that even a couple of them don't even have anything to do with

9    anything at issue in this case, like a foreign bank, a

10   Venezuelan bank, or something from another entity that has --

11   it's not in play in this case.

12          You have ruled -- I'm not sure if it was last night

13   or this morning, but I just found out about it this morning --

14   you ruled that much of the Van Tassel report will come in.  Her

15   conclusions as to the open issue will not come in.  But as I

16   read your report, and I hope I'm not misreading it, the

17   investigative work that she did you're going to consider.  So,

18   I'd like you to make a little checklist and see how many times

19   she finds Gil Lopez did anything wrong.  Zero.

20          It's reported that the receiver paid her company

21   upwards of $13 million for her work.  And there's not one

22   finding of wrongdoing by Gil Lopez in any of her reports.

23          **THE COURT:**  I didn't know it was that high.

24          **MR. ZIMMERMANN:**  I think that -- I think it's been --

25   I think it's -- the way I've come to that conclusion is

1    probably not in evidence here, but it dealt with the issue

2    about whether she could testify or not.  And, you know, Judge

3    Godbey in Dallas told me that they paid half of the fee, and

4    that's how --

5            **THE COURT:**  Well, yeah, but it's half of the fee used

6    for certain -- generated for certain tasks.  But anyway --

7            **MR. ZIMMERMANN:**  Anyway --

8            **THE COURT:**  -- none of us know.

9            **MR. ZIMMERMANN:**  -- it's millions of dollars,

10   millions of dollars.

11           **THE COURT:**  Yeah, clearly.

12           **MR. ZIMMERMANN:**  Okay.  My point was she didn't find

13   any fault --

14           **THE COURT:**  Yeah.  I got it.

15           **MR. ZIMMERMANN:**  -- by Mr. Lopez, no matter what it

16   cost to find that.  I guess my idea about the millions is,

17   number one, how it shocked me.  I'm in the wrong profession.

18   And number two, that if you really did spend that much money,

19   it must have been a very thorough investigation; and it still

20   didn't find any wrongdoing by Mr. Lopez.

21           I read, also with interest, your ruling; and I hope

22   I'm not misstating it with regard to Mr. Davis' plea and his

23   government-written statement of factual basis and the

24   allocution.  And I understand that --

25           **THE COURT:**  Which he agreed to.

1          **MR. ZIMMERMANN:**  Yes.  That the Court will -- that he

2    signed -- that the Court will consider the inculpatory

3    statements as to Mr. Davis but not as to any other party.  I'm

4    not sure that I read that exactly right.

5          **THE COURT:**  Yeah, I -- yeah, it's ambiguous.  I admit

6    it.

7          **MR. ZIMMERMANN:**  No, I think it's clear, Judge, that

8    you're not going to consider it for anybody else except Davis,

9    which is --

10          **THE COURT:**  Well, I want to see what the evidence

11    shows.

12          **MR. ZIMMERMANN:**  Well, just in case, I just want the

13    Court to remember that -- what the Supreme Court has said, the

14    U.S. Supreme Court has said, about the reliability of a witness

15    who's --

16          **THE COURT:**  I'm very familiar with that.

17          **MR. ZIMMERMANN:**  Right, I knew you would be.  And so

18    -- well, I'd probably agree with some of the more colorful

19    descriptions by Mr. Kuniansky.  I would at least agree with --

20    know we agree that he is the classic bought witness and traded

21    his testimony for the leniency he's going to be shown by the

22    government.

23          And so to the extent that it even applies, we would

24    say that his -- you have made it real clear from the beginning

25    that you're going to apply reliability standard as to what

1    evidence you will consider, applying the rules of evidence.

2    But nonetheless, as I understand it, your focus is on the

3    reliability of the evidence.  And I would just reemphasize that

4    James Davis' reliability has got to be at the low range as it

5    deals with -- when he's trying to inculpate other people.

6              **THE COURT:**  Yeah, well, I will be alert to that.

7              **MR. ZIMMERMANN:**  Sure.  And -- and then --

8              **THE COURT:**  I'm not commenting on his reliability.

9    I'm just simply saying I'm alert to the typical --

10             **MR. ZIMMERMANN:**  Right.

11             **THE COURT:**  -- concerns that one has --

12             **MR. ZIMMERMANN:**  And that's all I can ask --

13             **THE COURT:**  -- regarding cooperating witnesses.

14             **MR. ZIMMERMANN:**  -- and that's all I can ask you to

15   do.  And then I leave you with the points to look at before I

16   move into the three areas of concern by the insurance company

17   is that -- if you look at -- there'll be no evidence

18   introduced, zero, that Gil Lopez had any economic gain or

19   consideration beyond his ordinary, normal state of compensation

20   with SFGC, S -- Stanford Financial Group Company.

21             And you would think that somebody who has been

22   branded by the insurance company lawyer this morning as an

23   equal participant in this multibillion dollar Ponzi scheme

24   wouldn't have subjected himself to the potential exposure if

25   his reward wasn't considerably above what his normal salary

1    would be for someone working --

2            **THE COURT:**  Is there evidence what his salary was?

3            **MR. ZIMMERMANN:**  I don't think that that became an

4    issue.  I don't think there's going to be any evidence of that.

5    What I'm saying is I don't think that the -- excuse me -- that

6    the insurance company is going to introduce any evidence that

7    there was any economic gain --

8            **THE COURT:**  Other than his salary?

9            **MR. ZIMMERMANN:**  -- other than his standard bonus

10   salary compensation.

11           **THE COURT:**  Right, right.  But to me the devil's in

12   the detail about that.  That's true for Mr. Kuhrt and anyone

13   else.  I mean, if the -- just by way of example, if the salary

14   is $2 million for what they were doing, it's one thing.  If the

15   salary was 200,000 or 20,000, it's another thing.  And -- or if

16   there are bonuses paid based on performance, I mean I'm

17   thinking about the Enron situation.  You know, one of the most

18   inculpatory things was the bonus structure for certain of those

19   people.

20           **MR. ZIMMERMANN:**  We may ask for leave of the Court to

21   supplement the exhibit list.  But I -- I'll tell you how I

22   viewed this.  This is my fault and not Mr. Lopez's.  I believe

23   these lawyers have the burden of persuasion.  And if they had

24   thought that they're -- or had any evidence whatsoever that

25   there was something like an extraordinary salary or an

1    extraordinary bonus, they would be required to bring it to you.

2    And all I'm telling you is you aren't going to see it anything

3    like that.

4            **THE COURT:**  Okay.

5            **MR. ZIMMERMANN:**  If you want to know what it actually

6    was, I'll get you the number.

7            **THE COURT:**  Well, fine.  I don't know.  I mean, I'll

8    just wait and see what all the evidence turns out to be.  Thank

9    you.

10           **MR. ZIMMERMANN:**  Now, let's move to the revenue

11   projections.  Here is -- here's what I'd like to ask the Court

12   -- there's about five things I'd like you to -- I'm not going

13   to go into great detail because I think Mr. Kuniansky went --

14   both lawyers that have spoken and gone into it.

15           The points that I think are most important to

16   emphasize from Mr. Gil Lopez's point of view is: only

17   Mr. Stanford and Mr. Davis knew the content of the investment

18   portfolio.  And that was conceded in opening statement by the

19   insurance company lawyer this morning.  I mean, that's just not

20   in dispute.  And I know it may seem odd.  And it did seem odd

21   to us when we got the case, why these people didn't know but

22   they didn't; and that's conceded.  And they get that from

23   Mr. Davis's statement as well as other sources of information.

24           Second is that Mr. Lopez relied entirely on Mr. Davis

25   as the Chief Financial Officer and as an accountant to provide

1   accurate investment revenue numbers.  Now, why do I think

2   that's important to ask you to look for that?  Because the

3   insurance company lawyers have suggested that somehow Gil Lopez

4   knew the numbers were false.  He actually said that to you in

5   opening statements this morning.  He said "they knew the

6   numbers were false, and yet they reported them."

7          They did not know the numbers were false.  There's no

8   evidence they knew the numbers were false.  It's just the

9   opposite.  He -- Mr. Davis was the Chief Financial Officer, not

10  only at SIBL, but of SFGC, all of them.  He was the Chief

11  Financial Officer for just about every entity.

12          **THE COURT:**  Davis.

13          **MR. ZIMMERMANN:**  Davis.  And he was a cofounder and a

14  -- and the college roommate of Mr. Stanford.  And there's just

15  no evidence that it would be something that Mr. Lopez should

16  not rely on him to be providing accurate numbers.

17          And the idea of the compilation of the red books, I

18  think that's been gone into.  I'm not going to go into a lot of

19  detail.  But if you will look, you will see that there are

20  emails in there; and there are going to be exhibits where

21  you're going to see that, based on this budget projection

22  influenced by past historical trends, that in order to expedite

23  getting back the SIBL reports so they could go into the red

24  book, that Mr. Kuhrt, sometimes directly, sometimes

25  through somebody that worked for Mr. Kuhrt, sometimes through

1  Mr. Lopez, would send this projected approval revenue number up

2  to Mr. Davis, and he would true it up and send it back.

3          And you will see documents where he makes changes;

4  where Davis says this is okay or change this or change that,

5  add this, subtract that.  And you'll see it had -- and it was

6  done by -- sometimes by fax.  You'll see faxes in there with

7  writing on it; they're sometimes by email; sometimes by phone

8  which there's not a record of other than when Mr. Westheimer

9  asked these questions; and we don't know whether you're going

10  to consider that or not but I don't know whether you are so in

11  the opening statement, I want you to -- if you decide you do

12  think it's either under 106 or state of mind exception, that

13  the true ups came email, fax, in person and sometimes on the

14  telephone.

15          And so to Gil Lopez, he was doing what he was

16  supposed to be doing.  Davis was truing these numbers up.  He

17  accepted that as being true.  And that's the number that then

18  went to Banu Persaud.  And then SIBL accounting department

19  would put theirs together, send it in; and it would go up in

20  the red book with all the other entities.

21          And moving to the loan shareholder, the second issue,

22  the lawyer for the insurance company tried to make the

23  undisputed fact that the loan shareholder numbers were tracked

24  into some badge of criminality.  It's just the opposite.

25  Mr. Lopez and Mr. Kuhrt tracked to the dollar what the loan to

1    shareholder was.  And they traced it through.  And there were

2    -- it's in both post findings of facts from both parties, I

3    think, that there were promissory notes at some period of time.

4    It varied over time.  Promissory notes signed by Mr. Stanford.

5    There were notes that were serviced, the newer ones that

6    weren't.  Then there were -- then there was this switchover to

7    the affiliates and so forth.

8            But the point is this, is that that loan to

9    shareholder was tracked.  Is that a badge of fraud?  Is that an

10   indication of fraud?  They're going to keep track of a fraud?

11   Why would someone who knowingly would do that would keep track

12   of the fraud and leave this trail?  I think it cuts the other

13   way.

14           Also, the evidence is going to show that Mr. Lopez

15   was not responsible for the SIBL accounting or annual reports.

16   The insurance company lawyer this morning made it look like Gil

17   Lopez was the only guy that was responsible for the SIBL annual

18   reports that may have gone out to the financial advisors who

19   may have given them to the investors.  He wasn't responsible

20   for that.  And we've talked about that.  He didn't sign them.

21   They were signed only by Mr. Stanford.

22           And then it's uncontested, I think, that Gil Lopez,

23   on more than one occasion, told Mr. Davis that when they were

24   switching in 2005 to the International Financial Reporting

25   Standards that his loans, these related-party transactions,

1    required a footnote.  Undisputed that he told him that, I

2    think, and also undisputed that they didn't appear.  We're not

3    contesting that.

4         But -- and this is where I think the expert testimony

5    is important and helpful to the Court -- what was the -- what's

6    the duty of an accountant who's not a CPA, who's not working

7    for a publically-traded company, a privately-held company, what

8    is his responsibility when he informs his superior, who is an

9    accountant himself, and who's a Chief Financial Officer, that

10   an entry needs to be footnoted; and that superior says "I'm not

11   going to do it," and actually takes a footnote out of a draft

12   and actually removes it?  What's he supposed to do, report that

13   to the SEC?  Why?  That's an accounting standard.

14        And as this Court well knows -- I think you've

15   instructed in cases that I've been on here -- that the

16   violation of an accounting standard, like any other civil

17   matter or regulation, is not a crime.  It's not a crime in and

18   of itself.  And so it's not like they're observing a crime

19   being committed; and ,therefore, Mr. Lopez would resign or go

20   to the FBI or the SEC.  It was an accounting principle.

21        There are a lot of accounting principles that are

22   perhaps not followed the way they're supposed to.  And if an

23   accountant who's aware of it reports that up the chain, what

24   else is he required to do?  And I think that the expert will

25   say -- and I think that that's an explanation for what

1    Mr. Westheimer meant when he lodged the expert opinion that,

2    given these facts that I've just given to you, that it was

3    appropriate for what he did.  In other words, he can't -- he is

4    supposed to report it.  He's supposed to tell his boss.

5            It's like, you know, if your -- I don't want to

6    get --

7            **THE COURT:**  Well, okay.  This is -- we're at --

8    you're shifting over into --

9            **MR. ZIMMERMANN:**  Argument.

10           **THE COURT:**  -- closing argument.

11           **MR. ZIMMERMANN:**  There we go.  Okay.

12           **THE COURT:**  It's not easy to be in a civil case.

13           **MR. ZIMMERMANN:**  It's terrible.

14      **(Laughter)**

15           Also, let me just ask you to remember that the

16   insurance company lawyer this morning in his opening statement

17   said that the violation of that accounting standard violated

18   the laws of Texas and the federal laws.  Violating an

19   accounting standard is not a violation of federal law or state

20   law.

21           **THE COURT:**  Okay.

22           **MR. ZIMMERMANN:**  And Mr. Lopez also had some degree

23   of comfort, if you will, that the external auditors who did not

24   work for any Stanford Financial Group affiliate would be

25   checking the footnotes and the necessity for footnotes.

1          **THE COURT:**  Did Mr. Lopez ever meet with the

2    auditors?

3          **MR. ZIMMERMANN:**  Did he ever meet with the auditors?

4          **THE COURT:**  Meet an auditor, do any -- see a physical

5    person from the auditors?

6          **MR. ZIMMERMANN:**  Yes.  Yes, they would come in --

7    well, sometimes Mr. Lopez would be involved and --

8          **THE COURT:**  Are you sure?

9          **MR. ZIMMERMANN:**  He didn't meet with the -- he didn't

10   meet with the actual auditors.  He knew when Hewlitt (phonetic)

11   was coming in to audit SIBL.  I'm not sure what your question

12   is.  Did he actually sit down and meet with them?

13         **THE COURT:**  Well, yeah.  But let's -- I'll just leave

14   the question hanging.

15         **MR. ZIMMERMANN:**  And then with regard to the -- and

16   also, before I leave that external auditor issue, not only did

17   he have a right to rely on the external auditor to verify the

18   requirements for footnoting, he also had, I think -- would be

19   entitled to rely on them to verify the accuracy of those

20   recorded revenue numbers.  That's what an external auditor is

21   supposed to do.  They're supposed to go in and look at the bank

22   -- look at the bank statements, if they're recording interest;

23   look at the stock statements that the company would have

24   gotten.  And he had a right to rely on it when they said that

25   those statements were accurate.

1          **THE COURT:**  Okay.

2          **MR. ZIMMERMANN:**  Now, with this two Islands Club, it

3    seems that there is some -- this parting of the ways with

4    regard to what the facts are, and I will rely on the documents

5    with regard to whether this was ever booked.  The two of --

6    Island --

7          **THE COURT:**  I agree with that.  Let's move on because

8    it does seem like nobody really knows, and I want to see the

9    documents.

10         **MR. ZIMMERMANN:**  Okay.  Well --

11         **THE COURT:**  I mean, that is, not nobody knows.  It's

12   that I don't know that that would be appropriate for us to be

13   guessing here.

14         **MR. ZIMMERMANN:**  Okay.  Well, let me just -- as what

15   -- as an opening statement, can I tell you what the evidence --

16   I expect the evidence to show?

17         **THE COURT:**  Yeah.

18         **MR. ZIMMERMANN:**  Is that it was unconsummated.

19         **THE COURT:**  Well we all know that.

20         **MR. ZIMMERMANN:**  Well it didn't sound like it did,

21   because Mr. -- well the insurance company lawyer said this

22   morning that it was booked back in June of 2008.

23         **THE COURT:**  Booking is different from consummated.

24   That's the whole issue.  That's the whole issue.

25         **MR. ZIMMERMANN:**  Okay.  Well our position is -- and

1    we believe the evidence will show it was neither consummated

2    nor was it booked.

3           **THE COURT:**  Okay, there you go.  And I got that from

4    Mr. Kuniansky, so I'm on the -- I'm on the program.  I

5    understand now.

6           **MR. ZIMMERMANN:**  And I just would like to point out

7    also, in addition, that Mr. Kuhrt telling Mr. Davis that an

8    appraisal and legal work was needed, so did Mr. Lopez, on

9    different occasions told Mr. Davis that he needed an appraisal

10   and that legal documents need to be drafted.

11          And the last thing on that, Judge, is this:  the two

12   Island Club unconsummated transaction never went to any

13   investors.  There's going to be zero evidence that that ever

14   left the internal workings of a planning session.  It did not

15   go into any report that went to the investors.

16          First of all, they didn't even start working on this

17   hypothetical scenario, Mr. Kuhrt, until December/January; and

18   then this place closed down in February.  So there wouldn't

19   have been any report that it could have gone out in.  It didn't

20   go out.  But I just wanted to make sure that -- because, as we

21   know, reliance and so forth by investors is an important

22   factor, and they couldn't have relied on it because it never

23   went out.

24          That's my brief opening statement.

25          **THE COURT:**  Thank you.

1          **MR. ZIMMERMANN:**  Thank you.

2          **THE COURT:**  Okay.  Mr. Bennett, the good news for you

3    is that I've heard from all these other people; and you can

4    keep yours nice and short if you prefer.

5          **MR. BENNETT:**  I do, your Honor.

6          **THE COURT:**  But I would like one.

7          For witness purposes, I don't have my calendar open,

8    but we will take a lunch break after this and start up with

9    witnesses as soon as we get back from lunch.  We will have a

10   one-hour -- I'd like to have a 45-minute lunch break.  Can you

11   live with that?  Nobody ever accused me of getting people fat

12   during my trials.

13         **MR. CHASNOFF:**  May I ask you something?  Your Honor,

14   is there someplace we'll be able to grab something that

15   quickly?

16         **THE COURT:**  Well, since you have all these people, I

17   suggest that you go out and buy a bunch of -- this is not a

18   joke -- I suggest you go out before 2:00 o'clock, because

19   everything closes in the tunnel at 2:00; and you probably might

20   prefer to get something better than what they serve in the

21   cafeteria.  But that cafeteria is open until 2:00 also.  And

22   the cafeteria food is fine; it's very plain.  They have

23   delicious popcorn.

24       **(Laughter)**

25         Delicious popcorn.  Very salty.  Anyway, the whole

1    point is that I would suggest you send out one of your number

2    and buy sandwiches.

3          The other thing is, I did not tell you, but there are

4    attorney prep rooms on this floor.  And if you ask in chambers,

5    we can give you keys to rooms so you each can have your own

6    room.  I only have one technically assigned to me.  But if

7    there are no other trials going on on this floor, then I have

8    access to, I think, three.  I think there are a total of three.

9    So that's a place where you can eat your food, which is why I

10   didn't think of it.

11         The criminal lawyers know all about the rules of the

12   road on the food, so take it from them; they are very

13   experienced.

14         Okay, Mr. Bennett,

15         **MR. BENNETT:**  Thank you, your Honor.  I'm in a little

16   different position for a number of reasons than any of the

17   other attorneys who've come before the Court.  Obviously, my

18   client -- and I'm just going to be on this very, very briefly

19   -- is still in jail, still doesn't have any access to the

20   internet, still has the problems of trying to do discovery.

21         And I bring that up only, your Honor, for this

22   reason, to say that I've been on the case for 68 days; and in

23   four months, we have to go to trial in the criminal case.  And

24   that puts a little bit of a different burden and a little bit

25   different responsibility on my shoulders, which I welcome.

1          Because of all the people in this room, of every

2    person sitting here, there's only one person that has created

3    an international, financial institution of the integrity of

4    Stanford Company, Stanford International Bank.  And I am proud

5    to say that, and I'll continue to say that.  And I think once

6    we get through all the evidence, you will see that there wasn't

7    a Ponzi scheme.  There wasn't any type of fraud committed.  And

8    there was not any misrepresentation.

9          And it's also interesting -- the Court makes a brief

10   -- a statement or alluded to the fact about the financial

11   situation in 2007 leading up to 2008.  And of all the

12   institutions we're going to hear about, the Stanford

13   International Bank took no federal loans.  It took -- there was

14   no one that bailed out.  And they had entities that they could

15   have applied for federal loans, and they didn't do that.

16         Now, that's important, seeing what a horrible

17   situation we have.  They went without a government bailout.

18   The United States was in $80 billion negative.  And during that

19   same period though, your Honor, the evidence will show because

20   from Van Tassels' report that over $2 billion was paid out in

21   early redemptions by Stanford International Bank when people

22   wanted to be paid.

23         In fact, not one investor -- up until the time that

24   this government, which is sitting back here listening to all

25   the words we're saying -- which we realize.  This government,

1    before they came in and took over the bank, nobody lost any

2    money.  And those would be the facts that we intend to prove

3    here.

4           Now, more importantly than even that, though, is the

5    fact that this was a -- an entity that had clients in 136

6    different countries; six continents; had offices in Houston,

7    New York, Boston.  We can go on and on.  We'll show that at the

8    time we put on our evidence.

9           In 2006, Stanford's North American Regional

10   Institutional Sales and Trading Company had values of 13.3

11   billion, and it grew to 19 billion in 2007; and its projection

12   to be over 25 billion in 2008.  And that's important, your

13   Honor, because this was an ongoing, honest, highly regulated,

14   highly regulated industry that Stanford International Bank and

15   its entities were part of.

16          Now, the importance of the witnesses that we're going

17   to bring to the Court include a woman by the name of Giselle

18   James (phonetic).  And Mrs. James is a lady in Antigua, and she

19   grew up on the island; and on the island, knew of the high

20   regards that Stanford and Stanford companies held; knew about

21   his involvement in cricket; knew about his involvement in

22   banking; knew about his philanthropic activities.  And it was

23   her dream to go to work for Stanford someday when she finishes

24   her education.

25          In fact, she fulfilled that dream and started in the

1     Human Relations Department with Stanford.  And then after that,

2     she was promoted to be one of the chief promoters of the Island

3     Club that we've heard about.  And we'll -- if the Court allows

4     into evidence, we'll show you how that entity was developed;

5     how that was a dream of Mr. Stanford to make an exclusive,

6     ecological village of people that would come together,

7     certainly have wonderful things, but also be one of the main

8     resources of income and productivity for the country of

9     Antigua.

10          Now, we've heard that this may have been pie in the

11    sky, but that's not correct.  Because we're going to show you

12    photos identified by Giselle James of the things that were

13    built and in place.  And also that she understood what -- how

14    the financing, at least initially, was put together or how much

15    it cost to be a member and that type of thing.  So I think it's

16    going to be very important for the Court to understand the

17    value of the real estate, and how that went forward.  So it

18    wasn't just something that was dreamed up.

19          In addition to that information, your Honor, we'll

20    also call Mr. Bebel, who, if the Court allows him to testify,

21    will talk about the importance of SEC regulations and the

22    importance of what Stanford entities did; how highly regulated

23    they were; and how the regulatory agencies, time and time

24    again, gave them a clean bill of health.

25          There were questions about whether even the CD was a

1    security.  I'm not going to get into all that, but that was a

2    question at one time.  But it was actually a security.  And

3    so --

4              **THE COURT:**  Are you taking a position on that now?

5              **MR. BENNETT:**  I think I'll let Mr. Bebel explain that

6    to the Court, if the Court would allow him.

7              **THE COURT:**  Okay.  But you --

8              **MR. BENNETT:**  There certainly is testimony, and

9    there's certainly evidence, and there's certainly documents.

10   In fact, we've heard something about Mr. Sjoblom; and he, in

11   numerous statements, said this -- and he had a history of

12   working for the SEC -- he said that this was not a security.

13             **THE COURT:**  Right.  That's the position I thought you

14   were taking.

15             **MR. BENNETT:**  Well, I will let our expert go into

16   that, your Honor.  I don't see it as a security.  I think it's

17   -- I think that there shouldn't have been regulation.  And

18   certainly our position is the SEC jumped the gun because of

19   Bernard Madoff and came in and got this.  And I think that's --

20   was --

21             **THE COURT:**  Right, but that's -- that's not --

22             **MR. BENNETT:**  That's not evidence, I understand that,

23   Judge.

24             **THE COURT:**  No, I understand that.  But that's not --

25   for my purposes here, it doesn't need to be a CD.  I don't care

1    one way or another because there are a variety of predicate

2    crimes that the Underwriters are relying on for the money

3    laundering.  And I want you to know that I understand and

4    foresaw the question of whether or not this was a CD as being a

5    big one for you in other settings.  Therefore, I am not

6    interested in the Underwriters relying on the securities aspect

7    because it introduces a host of issues that I don't need to

8    deal with.

9            **MR. BENNETT:**  We just want a little hint of what

10   might happen in January, your Honor.  Just laying it out a

11   little bit.

12           **THE COURT:**  Okay.  But I'm telling you the word

13   securities does not need to come up because I don't care.

14   We've got mail -- they're arguing about mail fraud and wire

15   fraud and some other predicate issues, crimes that don't have

16   anything to do with securities.  So, I just thought I'd lay it

17   out there.  I am not going to worry about whether this is

18   security and don't care what you guys argue in another setting.

19   I don't want to bring that in and complicate our lives

20   unnecessarily here.

21           **MR. BENNETT:**  I understand, your Honor.  I

22   understand.

23           Let me also talk just a minute about our witnesses.

24   I've talked about Giselle James.  Mr. Bebel has an incredible

25   history with the SEC, and I think the Court found him very

1    interesting in what he says in his points in his report and his

2    background.

3          The Court has ruled on a Dr. Lehrer.  I think that as

4    to the issue of real estate valuation, if some -- something --

5    evidence comes in, we at least ask the Court to keep an open

6    mind that maybe he'd be accepted by the Court in rebuttal, but

7    we'll wait and see how that develops.

8          **THE COURT:**  Well, you guys go second.  So in terms of

9    rebuttal, I don't know.  But you want to use him in your case

10   is what I'm hearing.  I'll go back and look at his report for

11   that purpose.  Okay, because I didn't.  He has many claimed

12   expertises.  And I didn't focus specifically on that although I

13   thought what he wrote in the beginning of that report was not

14   worthy.  So I'll go back and read it.  And if you want to make

15   a separate proffer sometime before he testifies as to exactly

16   what his opinion will be, I will entertain that.

17         **MR. BENNETT:**  Well he's the only one that can really,

18   with credentials, to talk about the value of real estate.  And

19   so I'll bring that up at the proper time.

20         **THE COURT:**  Yeah.

21         **MR. BENNETT:**  And as the evidence develops, no one

22   knows exactly what's going to happen, so maybe that will also

23   be part of this.

24         **THE COURT:**  That's fine.  That's fine.

25         **MR. BENNETT:**  Okay.

1          **THE COURT:**  But I'm just going to tell you, you need

2   to give not only me -- less important me -- but you need to

3   give the rest of the crew, all the parties, notice of what

4   Lehrer's opinion or opinions would be and the basis for those

5   opinions.  It doesn't have to be a big, long report but it does

6   need to lay out in summary fashion where we can tie it in to

7   the evidence a little bit what opinions he's going to offer so

8   we can measure against doubt.  But, okay, that's just a

9   practice tip for -- thanks, you can proceed.

10          **MR. BENNETT:**  Thank you, your Honor.  And we'll take

11   that to heart and follow those directions, obviously.

12          **THE COURT:**  Thanks.

13          **MR. BENNETT:**  Your Honor, just as to what the

14   evidence will show, though, for Mr. Stanford is the following.

15   And part of it we've already heard because all the emails, all

16   the actions, all the accounting, you heard that there were

17   things sent to Mr. Davis.  You heard that Mr. Davis sent things

18   down.

19          For instance, you heard a statement about these red

20   books were prepared.  There will not be one witness that comes

21   and testifies about the red books being sent to and received by

22   Mr. Stanford.  No one will take the stand and say "Yes, we

23   sent that to him, and he received it."  There's no information

24   whatsoever about that.  That's important because all of this --

25   and I think as the evidence develops we'll show this

1    combination of the Chief Financial Officer and Chief Investment

2    Officer of Holt and Davis were in tandem throughout this whole

3    thing.

4             And they were the ones that made the decisions on

5    financing, on disclosure, on representations.  And we'll show

6    that by emails; and we'll show that by charts; and we'll show

7    that by -- for instance, the testimony of Ms. Holt when she

8    testified in front of the SEC and what she said in front of the

9    SEC is very important about her relationship to Mr. Davis, how

10   information was exchanged with Mr. Stanford, my client

11   completely out of the loop, completely out of the loop.

12            And so I think that's going to be very important for

13   the keep -- Court to keep an open mind to see how all this

14   information flowed up to Laura Holt and then to Mr. Davis.  In

15   fact, in one -- there's one piece of evidence that we'll show,

16   which is a request at the time all this was kind of falling

17   apart, a financial advisor asked for specific information for

18   one of his clients.  That went to Laura Holt; she sent two

19   different emails to Mr. Davis saying explain all this to me.

20   So I think that's going to be very important as to that

21   relationship and how that road went -- was traveled by those

22   two together.  The hour's late, your Honor.

23            There are other things I want to bring out but I

24   think I'm going to leave it like that, and I know the Court

25   will keep an open mind as to the evidence that's presented by

1    the insurance company.  And then when we put on our evidence to

2    show that Mr. Stanford was not in charge of a Ponzi scheme; he

3    did not commit fraud; he did not make false statements.  He ran

4    a legitimate business.  And he was seen as a very, very fine

5    businessman.  And we'll conclude with that.

6            **THE COURT:**  Okay.  Yes, sir?

7            **MR. CHASNOFF:**  With the Court's permission, I would

8    like to be excused for this afternoon and work with witnesses.

9            **THE COURT:**  Sure.

10           **MR. CHASNOFF:**  So I'm not going to be here.

11           **THE COURT:**  You people can come and go, as long as

12   there's one lawyer in the room.  I think I may have written

13   this in some order, but it's one lawyer per witness per party.

14   Okay?  That's all I'm asking.  Other than that, we are going to

15   proceed ahead.  The lawyers can excuse themselves whenever they

16   want; I don't care.  If you want to go do other things, that's

17   fine.  I just need one lawyer per party in the courtroom at all

18   times.  With that, I feel it's sufficient, and we will proceed

19   with the testimony or argument.  Okay?

20           All right, it is now 1:26.  Why don't you come back

21   here at 2:15.  Okay?  Thank you all very much.

22           **MR. BENNETT:**  May we approach, your Honor?

23           **THE COURT:**  Yes.

24           **THE MARSHAL:**  All rise.

25           **(Begin bench conference at 1:26 p.m.)**

1          MR. BENNETT:  I'll ask for us to have --

2          THE COURT:  The conference with you?

3          MR. BENNETT:  Yes.  Is that possible?

4          THE COURT:  Yes, it is.  But just with the Stanford

5    people, right?

6          MR. BENNETT:  That's correct, your Honor.

7          THE COURT:  Okay.  Is that agreeable --

8          MR. UNIDENTIFIED:  Yes, your Honor.

9          THE COURT:  Does anyone -- this is on the record.

10   We're just at the side bar.  The Stanford people need a

11   conference with me about their attorney representation and some

12   stuff like that.  Is there any objection to me meeting with

13   them?  We will not be discussing the substance of the case, I

14   can promise that.

15         MR. CHASNOFF:  Nothing; no objection from

16   Underwriters, your Honor.

17         MR. ZIMMERMANN:  Does that meeting have anything to

18   do with any of the other co-Plaintiffs?

19         THE COURT:  No, no, it does not.

20         MR. ZIMMERMANN:  Okay.

21         THE COURT:  Any objection.

22         MR. ZIMMERMANN:  None.

23         THE COURT:  And Mr. Shidlofsky?

24         MR. SHIDLOFSKY:  No.

25         THE COURT:  Okay.  Thank you all.

1          **(End bench conference at 1:27 p.m.)**

2          **(Voices and laughter heard in the courtroom)**

3               **THE COURT:**  Why don't we go into the jury room?

4               **MR. BENNETT:**  That's fine.  Whatever the Court --

5               **THE COURT:**  The jury room is --

6               **MR. BENNETT:**  Is Mr. Stanford going to be brought in

7     there?

8               **THE COURT:**  Yes.  It's big enough.  We can all be in

9     there.  You want him in there, right?

10              **MR. BENNETT:**  Yes, I do.

11              **THE COURT:**  Marshal?

12         **(Voices and laughter heard in the courtroom)**

13              **THE MARSHAL:**  Yes, ma'am.

14              **THE COURT:**  Can we take Mr. Stanford into the -- can

15    we take Mr. Stanford into the jury room with us?  I want to go

16    in there and meet with him and his lawyers.

17              **THE MARSHAL:**  Just as long -- if I can be in there

18    with him?

19              **THE COURT:**  Yeah, you're going to have to be -- oh,

20    wait.  Counsel, counsel, counsel?

21              **THE MARSHAL:**  That's the only thing --

22              **THE COURT:**  Yeah, yeah.  The one thing --

23              **MR. UNIDENTIFIED:**  All of us?

24              **THE COURT:**  No.  Thank you, though.  We need the

25    marshals in there.  The marshal can be sworn to secrecy, but

1   the marshals have to be in there.

2           **MR. BENNETT:**  Sure, that's fine by us, your Honor.

3           **THE COURT:**  Okay, I just wanted to let you know.

4           **MR. BENNETT:**  He looks like a trustworthy guy.

5       **(Laughter)**

6           **THE COURT:**  I'm sure he is.  Okay, but if the --

7   Marshals, you are not -- not, not -- this is on the record.

8   You are not allowed to discuss what you hear with anyone,

9   anyone.  You are going to be in with me, with the attorneys;

10  it's of the highest confidentiality.

11      **(Voices heard in the courtroom)**

12          **THE MARSHAL:**  Yes, ma'am.

13          **THE COURT:**  Even your bosses, no one; and if you have

14  some need to talk about it, you have to talk to me first.

15          **THE MARSHAL:**  Yes, your Honor.

16          **THE COURT:**  Okay, thank you very much.

17          **THE MARSHAL:**  Are we doing this right now, your

18  Honor?

19          **THE COURT:**  Yes.  Thank you.

20      **(Recess taken from 1:29 p.m. to 2:30 p.m.)**

21          **THE COURT:**  Please be seated.  Okay.  Well, our ranks

22  have been thinned out, but are you ready to go?

23          **MR. LANE:**  On the other side, your Honor.

24          **THE COURT:**  Uh-huh.

25          **MR. LANE:**  Your Honor, underwriters calls Dr. Robert

1    Conte.

2           **THE COURT:**  Okay.

3           **MR. KENNEDY:**  Your Honor, Christopher Bebel, witness

4    for Allen Stanford -- expert witness -- is here and I'd ask

5    permission that he be permitted to sit in the jury box with the

6    other experts?

7           **THE COURT:**  Sure.  Mr. Bebel?  Okay.  You may join

8    the other experts in the jury box.

9           **MR. KENNEDY:**  Thank you, your Honor.

10          **THE COURT:**   There's an irony to this.

11          **MR. SHIDLOFSKY:**  -- for a second sidebar?

12          **THE COURT:**  Okay.

13      **(Begin sidebar conference at 2:31 p.m.)**

14          **MR. SHIDLOFSKY:**  This is completely non-substantive.

15   We want to borrow our books back for a second and get some

16   copies made.  It's --

17          **THE COURT:**  Which ones?

18          **MR. SHIDLOFSKY:**  It's the Lopez exhibits.  And there

19   should be joint exhibits.

20          **THE COURT:**  That's here.

21          **MR. SHIDLOFSKY:**  Yes.

22          **THE COURT:**  Okay.  While we're at the sidebar, I did

23   talk to the Stanford crew at the lunch hour and at some point

24   in the middle of the afternoon I'm going to want to put on the

25   record a summary of the conversation we had, which was about

1    attorney matters.  It also came up about the possibility of

2    negotiations with underwriters.  And so, at some point, maybe

3    you and the Stanford people can fill me in in time to get --

4              **MR. LANE:**  Sure, your Honor.

5              **THE COURT:**  Okay?  It's not a rush at all.

6              **MR. LANE:**  Yes.

7              **THE COURT:**  I want to hear evidence and all that.

8    So, it's just one of those things that I'm warning it's going

9    to come up at some point.

10             **MR. LANE:**  I'll be glad to tell you the status of

11   discussions.

12             **THE COURT:**  And so -- but not now, maybe late in the

13   day.

14             **MR. LANE:**  Yeah, sure.  I'll wait 'til then.

15             **THE COURT:**  Okay

16             **MR. SHIDLOFSKY:**  I'll give this back to the Court

17   very shortly.

18             **THE COURT:**  No problem.  Thank you.

19             **MR. ZIMMERMANN:**  Did you want to do the announcement

20   on the record before we start the evidence?

21             **THE COURT:**  No.

22       **(End sidebar conference at 2:33 p.m.)**

23             Okay.  Dr. or Mr. Conte?

24             Are you going to want a computer on exhibits?

25             **MR. LANE:**  So that I could see it?

1          **THE COURT:**   If you do, let me know, would you,

2     because I have to manage it from up here.

3          **MR. LANE:**  Well, I have -- I can see anything here,

4     but what I'm going to do is I'm going to hand the Court and

5     opposing counsel -- and do it the old fashioned way -- a binder

6     with three documents in it, which I'm going to use with the

7     next two witnesses.  And I'll direct you to the page.  We'll

8     put it on the screen, too.

9          **THE COURT:**  Are you in front or in back, because

10    right now when I asked you, I had the table 2 on.  So, I need

11    to set it.  Are you planning to use --

12          **MR. LANE:**  Give this to the judge.

13          **THE COURT:**  Thank you.  Are you planning to use

14    computers?

15          **MR. LANE:**  Well, we'll probably call it up on the

16    screen, but I'm giving you a hard copy.

17          **THE COURT:**  I appreciate that.  That's no problem.

18    It's just that if you're going to call it up on the screen, I

19    need to have it set correctly.  I think I've got it.  It's the

20    back computer -- back box there.

21          **MR. LANE:**  Sure.

22          **MR. BENNETT:**  Your Honor, is there another copy of

23    the documents?  Do we not have another copy?

24          **MR. LANE:**  Sorry.

25          **THE COURT:**  You should have one for each --

Conte - Direct / By Mr. Lane                    158

1              **MR. LANE:**  Party.

2              **THE COURT:**  Party, exactly.  Okay.

3              Would you raise your right hand, please?

4               **ROBERT CONTE, DEFENDANTS' WITNESS, SWORN**

5              All right.  Would you state and spell your whole name

6    for the record?

7              **THE WITNESS:**  My name is Robert Conte.  It's

8    R-O-B-E-R-T.

9              **THE COURT:**  You know what?  Say that again.

10   Robert --

11             **THE WITNESS:**  My name is Robert Conte.

12   C-O-N-T-E; first name Robert, R-O-B-E-R-T.

13             **THE COURT:**  Thank you.  You may proceed.

14                        **DIRECT EXAMINATION**

15   BY MR. LANE:

16   Q    Dr. Conte, can you tell me a little bit about your

17   background, please?

18   A    I'm a physician and I was in practice here for a number of

19   years.  And over the last 20 years I've had a company called

20   Corporate Health Care Management, which gives medical director

21   services to corporations.

22   Q    And what was your specialty medically?

23   A    It was internal medicine, pulmonary disease.

24   Q    And what does your company do as of now?

25   A    What we do is actually employers hire me to do everything

1   from determining the policies and procedures on how they hire

2   people; get them back to work; how they comply with OSHA law;

3   wellness programs; recommendation on benefits coverage and this

4   type of thing.

5   Q    Could you please tell the Court -- tell Judge Atlas -- how

6   you came to learn of a company called Stanford Financial?

7   A    I originally had an advisor over at Prudential and

8   Prudential was bought, I believe, by Wachovia.  This is

9   probably back in the early 2000s and my advisor went over to

10  Stanford.  And so, I followed the advisor from Prudential.

11  Q    And when the advisor went over to Stanford, did you meet

12  with the advisor?

13  A    I did.

14  Q    And did the advisor discuss with you Stanford Investments?

15  A    He did.

16  Q    And what did the advisor -- did the advisor make a

17  recommendation?

18  A    We made a number of recommendations, one of which was the

19  CDs in Stanford.

20  Q    And what did he tell you about the CDs?

21  A    Well, my understanding that the CDs were invested in

22  liquid assets and that the portfolio was mainly revolved around

23  currency plays and that it was totally -- there was a totally

24  ability to liquidate it in 48 hours.  So, they didn't feel

25  there was a lot of risk to it.

Conte - Direct / By Mr. Lane                    160

1   Q    Did he discuss with you the rates that the CDs were

2   paying?

3   A    He did.

4   Q    And what did he discuss with you about that?

5   A    The rates were above market and that was the reason that I

6   looked at them.  And I looked because he said it was a liquid

7   portfolio and that there were mainly currency plays around the

8   wealth that allowed them to get that type of return.

9   Q    When did you first invest in a Stanford CD?

10  A    I may be mistaken, but I think it was around 2003.  It may

11  have been 2003 -- I think it was maybe 2003; between 2003 and

12  2005.

13  Q    And I'm not going to ask you the amount that you invested,

14  but how did you -- you entered into the contract with Stanford

15  and purchased the CDs?

16  A    I did.  Un-huh.

17  Q    Did you receive what was called a disclosure statement?

18  A    I believe so.

19  Q    I'm going to ask you to look at what's been marked as

20  Exhibit 39 in your binder in front of you, the document binder.

21       And your Honor, I believe there's no objection to 39.

22  I would offer 39 into evidence.

23       **THE COURT:**  Okay.  No objections?  It's received.

24       **(Defendants' Exhibit Number 39 was received in evidence)**

25  //

1   **BY MR. LANE:**

2   Q    Is that the disclosure statement you received, Doctor?

3   A    Well, I believe it is.  I mean, obviously it's been a long

4   time, but this looks like the one that I received.

5   Q    At the time you made your investment, did you review this

6   disclosure statement?

7   A    I did.

8   Q    Did you look at it carefully?

9   A    As carefully as I could, sure.  Uh-huh.

10  Q    I want to ask you -- I want to direct your attention to a

11  few pages in this document.  On page one of the disclosure

12  statement and it's entitled "securities investment statement"

13  and it's at 804.  And it states in the second paragraph:

14            "By signing the subscription agreement, you are

15            acknowledging the receipt as well as careful review

16            and understanding of this disclosure statement, the

17            subscription agreement, the investor questionnaire,

18            any additional account documents that may be required

19            and their respective terms and conditions."

20            Did you, in fact, carefully review the disclosure

21  statement?

22  A    Well, I read through it.  I reviewed it, like I said, as

23  close as I could review it.  I don't recall back then, but yes,

24  I did review it.

25  Q    And it states in the next paragraph:

1              "In making an investment decision, investors must

2              rely on their own examination of the issue and the

3              terms of the offering, including the merits and risks

4              involved."

5              Let me ask you, did the Stanford representative also

6    give you an annual statement of the company?

7    A    He did.

8    Q    Let me ask you about a few more questions here about the

9    disclosure statement.  Let me ask you to turn to page --

10             **THE COURT:**  What was your last question?

11             **MR. LANE:**  Did the representative -- the Stanford rep

12   -- give you an annual report?

13             **THE COURT:**  Okay.  Thank you.

14             **MR. ZIMMERMANN:**  Excuse me.  That's not what I heard.

15   I head did he give him a financial statement and I think that's

16   what prompted the question.

17             **MR. LANE:**  Financial statement did I say?  My

18   apology.  If I misspoke --

19             **THE WITNESS:**  I think it was an annual statement,

20   wasn't it?  That was what I understood is an annual statement.

21   **BY MR. LANE:**

22   Q    Let me direct your attention to page 10 of the disclosure

23   statement that's also 813 or 1925813.  And you see this entry,

24   or this page that begins, "Stanford International Bank

25   Limited"?

1   A    Yes.

2   Q    Do you see where it says:

3            "Our primary business is to provide banking services

4            and to issue certificates of deposit.  The funds

5            deposited with us are primarily invested in foreign

6            and U.S. investment grade bonds and securities and

7            Euro dollar and foreign currency deposits.  The

8            following date issues are an historical portfolio

9            investments by specific categories of investment and

10           the approximate percentage of funds invested for

11           2003, 2004, 2005 and 2006."

12           Do you see where I'm reading?

13  A    Yes.  Uh-huh.

14  Q    Do you see it has a number of columns for '06 -- year

15  ending '06, '05, '04 and '03?  Do you see those?

16  A    Yes.

17  Q    Did you discuss this particular aspect of the Stanford

18  International Bank underlying investments with your Stanford

19  rep?

20  A    I did.

21  Q    And what do you recall him telling you about that?

22  A    Well, again, we said that they had a number of mechanisms

23  they used to generate a significant amount of return and,

24  again, that was certainly something that drew my attention

25  along with the liquidity issue in case the market did turn or

Conte - Direct / By Mr. Lane                          164

1   something happened, they said they could liquidate it very

2   quickly.

3   Q    On the next page of that document, the top of it says:

4              "The following data shows our historical ten-year

5              operating profits.  The same data is illustrated in

6              the graph below."

7              Do you recall reviewing the reported operating

8   profits?

9   A    Yes.  I was interested in that.

10  Q    And why were you interested?

11  A    Well, because it had such a significant profit.

12  Q    On page 12, the next page, second paragraph, this reads:

13             "While we do not generally provide unsecured credit

14             facilities, we do provide loans to customers" --

15             **MR. ZIMMERMANN:**  Excuse me, counsel.

16             Your Honor, that's not a question.  I'm going to

17  object to the form of these questions.  He's reading from a

18  document that he can ask --

19             **THE COURT:**  Okay.  Rephrase.

20  **BY MR. LANE:**

21  Q    Well, may I ask you to read the second paragraph?

22  A         "While we do not generally provide unsecured credit

23             facilities, we do provide loans to customers, often

24             secured by the customers' deposits at Stanford

25             International Bank; usually in an amount greater than

1          the amount of the loan.

2          "We also issue letters of credit on behalf of our

3          customers to support debt obligations to finance the

4          shipment of goods.  Customers' deposits typically

5          secure letters of credit with Stanford International

6          Bank in an amount equal to or greater than the

7          letters of credit issued."

8   Q    Do you remember at that point discussing any possibilities

9   of loans by Stanford International Bank?

10  A    Well, I asked them if there was any significant loans out

11  there, because I did not understand that that was a lot of the,

12  you know, bank's revenue coming from loans.

13  Q    Do you see the bottom -- the bottom line -- or the last

14  paragraph on that page?  It has a reference to the total assets

15  of Stanford International Bank, Limited?

16  A    Yes.

17  Q    And was this amount of total assets meaningful to you in

18  connection with your purchase of the Stanford CDs?

19  A    Yes, it was.  It was substantial and it looked like they

20  had a lot of deposits.

21  Q    I want you to turn to page 14, which is a listing of the

22  Board of Directors.  You see at the top there, "Sir Allen

23  Stanford, Chairman, Director"?

24  A    Yes.

25  Q    Did you have any discussion with the rep -- the Stanford

1  rep -- about Allen Stanford himself or about his philosophy or

2  approach?

3  A    No, just I knew that -- in fact, my only discussion about

4  him was that if I thought he had made initially his money in

5  insurance and real estate, and that was about all the

6  discussion that took place.

7  Q    Let me ask you to turn to page 16 of the disclosure you

8  received when you invested.  Do you see the paragraph that

9  begins -- or is denoted "Investment philosophy and portfolio

10  diversification"?

11  A    I do.

12  Q    Do you recall reading this in your disclosure?

13  A    I recall reading most of this.  I can't say anything other

14  than that.

15  Q    Now, you see where it states, "Our investment philosophy

16  is to seek capital preservation of a consistent annual flow of

17  revenues."  Do you recall discussing that philosophy with the

18  registered rep?

19  A    Yes, I did, because the whole issue to me was that was the

20  most protected part of my portfolio, I thought, because it had

21  that type of revenue and that type of profit.  So, I looked at

22  it as a more conservative approach in the portfolio, actually.

23  Q    And it states:

24            "We seek to obtain this global diversification of

25            asset classes, economic sectors, issuers, currencies

1          in geographic areas."

2          Do you recall that -- discussing that subject with

3    your representative?

4    A    Yeah, I did, because that was what he felt was the reason

5    for the returns.

6    Q    Let me ask you to turn to Exhibit 33.  Is this an annual

7    report that you received and reviewed?

8    A    It looks like one of the annual reports that I received,

9    yes.

10         **MR. LANE:**  Your Honor, we offer Exhibit 33.

11         **THE COURT:**  Hearing no objections, it's received.

12         **(Defendants' Exhibit Number 33 was received in evidence)**

13   **BY MR. LANE:**

14   Q    Now, I apologize that this is a Xerox copy.  Did the copy

15   you received, was it glossy and easy to read?

16   A    Yes.  It was.

17   Q    Did you subsequently, after your initial investment with

18   Stanford, make a second investment?

19   A    I did.

20   Q    How much longer after your initial investment did you

21   invest?

22   A    Probably about a year.

23   Q    Was that your last investment?

24   A    I don't think so.  I think I've made like two or three in

25   a row.

1    Q    Would you receive an annual report every year?

2    A    I would.

3    Q    Did you review it when you received it?

4    A    I did.

5    Q    And why did you review it?  What was the reason?

6    A    Well, I was looking to make sure there were no change in

7    the philosophy that had been explained to me.

8    Q    Let's take a look at this report.  I'd ask you to direct

9    your attention to page -- it's page 9 of this report.  It's 205

10   is the next page.  Do you see the financial highlights page?

11   A    Yes.

12   Q    You see it shows a year -- over a year -- growth in the

13   total assets?

14   A    Yes.

15   Q    From 2.2 billion to 3.086 billion to four point -- and I

16   apologize; this is not the best copy -- 4.059?  Okay.  Did the

17   growth in the total assets as reflected in the financial

18   highlights, was that meaningful to you as an investor in

19   Stanford Financial?

20   A    Yes, it was.

21   Q    Did that in any way lead to you make those further

22   investments in Stanford Financial?

23   A    Yes, it was one of the things in the report that, you

24   know, I felt it was appropriate to do so.

25   Q    I want you to turn to page 19.  It's 215 of the report.

Conte - Direct / By Mr. Lane                                   169

1    See that entry that says, "Our risk management strategy"?

2    A    Yes.

3    Q          "SID employees an investment strategy with the goal

4               of minimizing systematic and unsystematic risk while

5               maintaining more than adequate liquidity, portfolio

6               efficiency, operational flexibility, and absolute

7               yields as opposed to index benchmark yields.  Our

8               return on investment expectations are realistic and

9               based on as much knowledge of information as we can

10              obtain on a first hand basis.  In many instances,

11              this simply means rolling up our sleeves to do the

12              hard work necessary in order to make sound investment

13              decisions."

14              Was this statement consistent with what your rep told

15   you when you visited with him about the Stanford investment?

16   A    That was.

17   Q    Let me ask you to turn to page 26 of the report.  This is

18   actually very difficult to read because of the way it's imaged.

19   It's chairman's letter; do you see that?

20   A    Yes.

21   Q    And let me ask you to turn the page.  At the bottom, do

22   you see who signed the chairman's letter?

23   A    Yes.

24   Q    Did you read it at the time?

25   A    I did.  Uh-huh.

Conte - Direct / By Mr. Lane                              170

1   Q    When you see under "financial performance," are you able -

2   - I don't know on this copy if you can read it, because of the

3   way that it's copied.

4            THE COURT:  Can you zoom in?

5            MR. LANE:  Let me see if we can zoom in.

6            THE COURT:   Which paragraph?

7            MR. LANE:   The paragraph beginning "financial

8   performance 2005."

9            THE COURT:  Oh, I see one that says "The bank" --

10           MR. LANE:  Yes.

11           THE COURT:  And then one, "The total," something; and

12  then, "Interest"; and then, "Our cash balance."

13           MR. LANE:  Let me see if -- if I can -- maybe I can

14  read --

15           THE COURT:  I think she just hasn't blown up the

16  right section.

17           MR. LANE:  It is on mine.  Let me see.  Maybe I can -

18  - what I'll do is --

19           THE COURT:  Oh, I see it.  Okay.  Top.  There you go.

20  BY MR. LANE:

21  Q    Okay.  If I may, I'll just -- let me -- is your monitor

22  on?

23           THE COURT:  Is his on?

24           THE WITNESS:  No.

25           THE COURT:  Press the button -- the screen on the far

EXCEPTIONAL REPORTING SERVICES, INC

Conte - Direct / By Mr. Lane                      171

1    right.

2              **THE WITNESS:**  It's not turning on I don't think.

3    Looks like it's trying to.  Maybe I've got to hold it down.

4              **THE COURT:**  You know what?  Somebody dig under there

5    and wiggle the wires, because I think it's just not plugged in

6    right.  You know how they always tell you, "You checked?  It's

7    plugged in?"

8              **THE WITNESS:**  Looks like it's in, but I can't tell.

9              **MR. LANE:**  Maybe I'll -- with the Court's permission,

10   I'll read this if you can try and follow it and tell me if I've

11   got it correctly?

12             **THE COURT:**  Sorry.  We'll get a new one.

13   **BY MR. LANE:**

14   Q    I believe in the first paragraph under financial

15   performance in the chairman's letter, it says:

16             "The bank achieved strong growth in assets and

17             deposits in 2005.  Assets totaled $41 billion, up

18             31.5 percent over 2004."

19        **(Attorneys confer)**

20             Four point one billion?  I'm sorry.  "Assets totaled"

21   -- now I really am at the limits of my sight.

22             "Assets totaled $4.1 billion, up 31.5 percent over

23             2004.  This represents an increase of nearly one

24             billion dollars over the previous year.  Deposits

25             increased 33.1 percent to $3.8 billion in 2005.  The

1              bank's operating profit was $35.9 million, slightly

2              down from the 2004 record profit of $36.2 million."

3         As best you can tell, did I read that correctly?

4    A    As far as I could tell, yes.

5    Q    And was that meaningful information to you as an investor?

6    A    Yeah, it showed a growth in a profitable bank.

7    Q    It goes on to say:

8              "Total revenues for the year were $431.7 million, an

9              increase of 30.1 percent over the previous year.

10             Investment income for the year was $339.2 million, or

11             78.6 percent of total revenue; and $61.9 million, or

12             22.3 percent greater than 2004.

13             "Interest income of $86.3 million represented

14             approximately 20 percent of total revenue, an

15             increase from $56.8 million in 2004."

16        Do you recall reading that portion of the letter?

17   A    Yes, I recall reading all of the statements that

18   referenced growth and profit.

19   Q    It goes on to state:

20             "Interest paid to depositors for 2005 was $220.8

21             million, 36.6 percent greater than the $161.7 million

22             paid in 2004.  Referral fees increased by 37.8

23             percent to $87.8 million and management fees

24             increased to $74.5 million, or 25.4 percent over the

25             prior year."

Conte - Direct / By Mr. Lane                    173

1          **THE COURT:**  Can you tell me what page you're on?

2          **MR. LANE:**  It's page 27 of the 2005 annual report --

3   the annual report for 2005, obviously released in 2006.  And

4   it's page 27 and it's under financial performance in the letter

5   from the chairman.

6          And then, the last paragraph states:

7          "Our cash balance has increased to $257.5 million, or

8          29.6 percent over last year, and represented 6.8

9          percent of client deposits.  Financial assets at fair

10         value increased $906.7 million, to $3.8 billion, a

11         31.9 percent increase from 2004.

12         "As of 31 December 2005, shareholders' equity

13         increased to $282.5 million, up 14.6 percent from

14         $246.5 million on 31 December 2004."

15         What did this enormous amount of financial

16  information mean to you when you read it; when you received

17  this from Stanford?

18  A    Well, it showed growth and profitability in the bank, so I

19  thought it was worth the investment.

20  Q    In the two pages after this letter signed by the chairman,

21  there's a balance sheet at page 29.  Do you see it states those

22  figures again for the total liabilities and shareholder equity

23  of $4.059 million.  Do you see that?

24  A    Which page are you on, 28?

25  Q    Two pages after the letter.  It's page 29.

Conte - Direct / By Mr. Lane                            174

1   A    At 29, okay.  Yes.

2   Q    Was this part of the materials that you reviewed in the

3   annual statement?

4   A    The balance sheet was, yes.

5   Q    I want to ask you to turn to page 35 of this same annual

6   report.  It's 231.

7        Maybe if you could pull up loans and advances for

8   clients at the bottom.

9        You see there's a paragraph that says "loans and

10  advances to clients"?

11  A    Yes.

12  Q    And the second -- well, it states:

13        "Stanford International Bank does not expose its

14        clients to the risks associated with commercial

15        loans.  The bank's only form of lending is done on a

16        cash secured basis, solely to existing clients.

17        Loans and advances to clients are permitted up to 80

18        percent of deposits maintained by the client at the

19        bank.  The deposits serve as guarantee to the loan

20        and, therefore, no additional provision is needed to

21        support a potential loan loss."

22        There was similar language in the disclosure

23  statement.  Is that correct?

24        **THE COURT:**  I'm sorry to be so thick, but where are

25  you reading now?

1          **MR. LANE:**  This is page 35.

2          **THE COURT:**  Oh, 35.  I misheard you.  Sorry.

3          **MR. LANE:**  This is the bottom.  It is paragraph 2.9

4    entitled "loans and advances to clients."

5          **THE COURT:**  Got it.  That's fine.  Thank you.

6          **THE WITNESS:**  I'm sorry.  Would you repeat the

7    question?

8    **BY MR. LANE:**

9    Q    This was consistent with what you'd been told in the

10   disclosure statement when you initially invested?

11   A    Yes.  When I initially invested, that was one of the

12   reasons.

13   Q    Let me ask you to go to page 37 and you see page 37 --

14   it's 233 -- and it's under "financial risk management."

15   There's a section "strategy using financial instruments."  Do

16   you see that?

17   A    I do.

18   Q    Do you see the first paragraph under that states:

19          "As a banking company, the strategy of the bank is to

20          efficiency manage assets and liabilities.  In this

21          process, assets primary consist of securities and, to

22          a lesser degree, clients' credits and are matched in

23          premium and timing.  The bank's assets are invested

24          in a well-balanced global portfolio of marketable

25          financial instruments; namely, U.S. and international

1          securities and fiduciary placements."

2          Was that consistent, also, with what you'd been told

3   when you invested the first time?

4   A    It was.

5   Q    And was this a statement that led you to continue to

6   invest?

7   A    It's one of the statements, yes.

8   Q    It states:

9          "The bank's investment portfolio maintains a stable

10         and well-balanced structure due to high proportion of

11         fixed income investments and a diversified investment

12         advisory network, resulting in an optimum

13         diversification process.  There is a policy of

14         maintaining sufficient liquidity, thus protecting the

15         longer termed investments with significant returns."

16         That reference to the policy of maintaining

17   liquidity, was that also consistent with what you'd been told?

18   A    It was.

19   Q    You see below, the paragraph 3.4 "market risks"?

20   A    I see it.

21   Q    It states:

22         "Capital preservation and steady annual flow of

23         revenues is a specific objective of the portfolio.

24         This objective is met by the investment methodology

25         that pursues minimization of risk, both

Conte - Direct / By Mr. Lane                    177

1           systematically and unsystematically, liquidity,

2           marketability, portfolio efficiency, highest return,

3           minimum risk, operational flexibility and absolute --

4           as opposed to index linked -- yields on investment

5           risk.

6           "Risk is monitored and managed on a day to day basis

7           and a major component of this management is to remain

8           widely diversified on an international scale.  This

9           objective is met through diversification and asset

10          classes; debt, equity, cash, hard assets; economic

11          sectors, health, financials, energy, et cetera;

12          insurers, parent, governments, multi-nationals,

13          commercial banks, et cetera; currencies," and then in

14          parens, "U.S. dollars, Swiss franc, Japanese yen,

15          euros and other currencies; and geographical areas,"

16          and then in parens, "United States, Switzerland,

17          England, France, Austria, Australia, Asia Pacific

18          rim, et cetera.

19          "Furthermore, the bank's investment policy

20          specifically limits at seven percent to eight percent

21          on the downside for equity holdings and monitors

22          historical statistical information for diversified

23          investments, such as funds for exposure to risk."

24          Did you read that when you received the annual

25    report?

1   A    Yes.

2   Q    Did that lead you to make further investments in Stanford

3   CDs?

4   A    Yes, in addition to the other ones, yes.

5   Q    Were any representations made to you in the initial sale

6   with respect to how quickly the portfolio -- the bank's

7   portfolio -- could be liquidated?

8   A    I was told that it could be liquidated in 48 hours.

9            MR. ZIMMERMANN:  Excuse me.  Your Honor, I have two

10  objections, if I may.  Number one, relevancy as to Gil Lopez.

11           THE COURT:  Okay.

12           MR. LANE:  I'd love to --

13           THE COURT:  You know there are three plaintiffs here.

14  So --

15           MR. ZIMMERMANN:  And can I have a running objection

16  so I don't have to keep doing it?

17           THE COURT:  Yes.

18           MR. ZIMMERMANN:  But I do want to point out to the

19  Court that the last set of questions --

20           THE COURT:  Uh-huh.

21           MR. ZIMMERMANN:  -- where the lawyer's been

22  testifying?  I shouldn't say questions.  My second objection

23  was that the lawyer is testifying.

24           THE COURT:  Form.  Okay.  Form of question.

25           MR. ZIMMERMANN:  Form of question and the relevancy

 1  to Gil Lopez, talking about representations made by financial

 2  advisors.

 3          **MR. LANE:**  Your Honor, I would be delighted to

 4  respond.

 5          **THE COURT:**  Okay.  You don't have to.

 6          I'm allowing this because it's the first witness and

 7  I want this material in the annual statements or the brochures

 8  or whatever to be explained to me; not beating a dead horse

 9  over time, but I'm interested.  And so, the form of the

10  question, it's overruled.  I'll allowing this reading to go on.

11          Second, with respect to Gil Lopez, this evidence is

12  admissible as to everyone; whether it's relevant to him or is

13  material, time will tell.

14          Hi, do you have another screen?  Okay.  We're going

15  to just take a brief break.  If you don't mind stepping down,

16  Doctor.

17          **THE WITNESS:**  No problem.

18          **THE COURT:**  We're going to try to replace the

19  monitor.  You can go around.  I think it would be easier.

20          You all can chat among yourselves if you want.

21      **(A recess was taken from 3:05 p.m. to 3:08 p.m. to repair**

22  **computer monitor)**

23          **THE COURT:**  All right.  We're back on the record.

24  We've solved the monitor problem.  There was a second on/off

25  switch, for the record.  Try to redo it to redeem my own

Conte - Direct / By Mr. Lane                          180

1   (indiscernible).

2           **THE WITNESS:**  It was in the back somewhere.

3           **THE COURT:**  It's behind the screen.

4           **THE WITNESS:**  It's got two on/off switches.

5           **MR. LANE:**  It's a double secret power switch.

6           **THE COURT:**  Okay.

7                   **DIRECT EXAMINATION (RESUMED)**

8   **BY MR. LANE:**

9   Q    Dr. Conte, I believe I had asked you about the liquidity.

10  I think when last we broke I believe I was asking you about the

11  liquidity.  Is that correct?

12          **THE COURT:**  Yes.

13  **BY MR. LANE:**

14  Q    Of the account?  Okay.  Did your Stanford financial

15  representative initially discuss with you the level of the risk

16  associated with this investment?

17  A    Yes, he did.

18  Q    And what did he tell you about that?

19  A    Well, he said it was extremely low risk because of the

20  type of portfolio and because of the ability to, you know, to

21  turn it over in 48 hours if need be.

22  Q    Did the 2005 annual report that we've been going over

23  continue to create that impression for you?

24  A    It did.

25  Q    Let me ask you to go to page 55 -- and it's 251.  See this

1   "report of management"?

2   A    I have it.

3   Q    And who is that signed by?

4   A    R. Allen Stanford and James Davis.

5   Q    And it states in the first paragraph:

6           "The management of Stanford International Bank is

7           responsible for the preparation, integrity and

8           objectivity of the financial statements of the bank.

9           The financial statements and notes have been prepared

10          by the bank in accordance with the international

11          financial reporting standards and, in the judgment of

12          management, present fairly and consistently the

13          bank's financial position and the results of

14          operations.

15          "The financial statements and other financial

16          information in this annual report include amounts

17          that are based on management's best estimates and

18          judgment and give due consideration to materiality."

19          Dr. Conte, did you take some comfort that management

20   affirmed the integrity and objectivity of the financial

21   statements?

22   A    I did.  And I think it was independent audits, too, so

23   yes, I did.

24   Q    And it goes on to state:

25          "The bank maintains a system of internal accounting

1              controls to provide reasonable assurance that assets

2              are safeguarded and that transactions are executed in

3              accordance with management's authorization and

4              recorded properly to permit the preparation of

5              financial statements in accordance with international

6              financial reporting standards."

7              Now, do you see that paragraph?

8    A    Yes.

9    Q    Did that representation that the bank maintained a system

10   of internal accounting controls give you comfort?

11   A    It did.

12   Q    Now, this 2005 report issued in 2006, you invested

13   subsequent to receiving this annual report, didn't you?

14   A    I did.

15   Q    Had you in this annual report been told that there were

16   substantial loans to the chairman Allen Stanford in the amount

17   of hundreds of millions -- or perhaps over a billion dollars,

18   would that have affected your willingness to continue to invest

19   in Stanford?

20   A    Substantially, yes.

21   Q    What would you have done?

22   A    I wouldn't have invested in it.  I'd probably have taken

23   the CDs out.

24   Q    Had this annual report disclosed that instead of being

25   invested in highly liquid securities and currencies and so

Conte - Direct / By Mr. Lane                          183

1   forth -- the things that I described to you -- rather the

2   bank's investments were in related companies and ventures of

3   various kinds that were ill liquid?  Would that have affected

4   your willingness to remain a Stanford investor?

5   A    Yeah, I would not have remained an investor.

6   Q    Let me ask you to turn to Exhibit 36.  This is the 2006

7   annual report.

8           Your Honor, I'd offer Exhibit 36.

9           THE COURT:  I'm receiving it.

10          (Defendants' Exhibit Number 36 was received in evidence)

11  BY MR. LANE:

12  Q    Now, I'm not going to be so tedious as to read every one

13  of these representations.  I wanted the Court to have the

14  benefit of --

15          THE COURT:  Thank you.  If you want to just cite us

16  to the pages, just so I can flip through or something; you

17  don't have to read them.

18          MR. LANE:  Your Honor, I'll ask about some similar

19  language and there's new language in this particular one.

20  BY MR. LANE:

21  Q    Do you recall receiving this annual report?

22  A    I recall receiving all the annual reports, this one

23  included, yes.

24  Q    Let me ask you to turn your attention to page -- I'm going

25  to refer you to the Bates number at the very bottom, beginning

1   with the "B," because I can't see the page (indiscernible) the

2   one ending in 016; so, it's 16 in Bates numbers.

3           **THE COURT:**  There are numerous numbers on there.

4           **THE WITNESS:**  Yeah.

5           **MR. LANE:**  Okay.

6           **THE COURT:**  Are you referring to the dark ones?

7           **MR. LANE:**  There's a longer one that's --

8           **THE WITNESS:**  The one at the very bottom?

9           **MR. LANE:**  The very bottom.

10          **THE COURT:**  Oh, that's the one you're referring to at

11  the very bottom?

12          **MR. LANE:**  Yes, 16.

13          **THE WITNESS:**  Okay.  I have it.

14  **BY MR. LANE:**

15  Q    Do you see that's the chairman's letter?

16  A    Yes.

17  Q    And who is that signed by on the next page?

18  A    R. Allen Stanford.

19  Q    On the first page, on page 16 -- that is, of the

20  chairman's letter -- I'm not going to read to you the language

21  in there, but when you received this report, did you see that

22  the assets -- the total assets of the bank -- had grown to more

23  than $5 billion -- $5.3 billion -- up from the $4 billion

24  approximately the previous year?

25  A    I can see the page.  Where are you on the page?

Conte - Direct / By Mr. Lane                    185

1   Q    Well, it's in that language that says, "The bank continues

2   to have solid growth in assets and deposits."

3   A    Oh, yes, I see where you're talking about and that's

4   correct, yeah.

5   Q    Then it says, "Total assets at year end were $5.3 billion,

6   up 31.5 percent in one year."

7   A    Yes.  I see it and I did read that, yes.

8   Q    And do you recall at the time seeing that information?

9   A    Yeah, I recall at the time the chairman's letter showing

10  continued growth and profitability, yes.

11  Q    And did that provide you comfort as an investor in

12  Stanford?

13  A    It did.

14  Q    I'm just going to ask you to go to page 20 on that bottom

15  number.  Do you see the balance sheet?

16  A    I do.

17  Q    And this reflects the total assets for '05 and '06.  Do

18  you see that?

19  A    I do.

20  Q    And again, that reflects the number, the $5.3 billion from

21  $4.059 billion.

22  A    That's correct.

23  Q    And did you actually look over this balance sheet; look

24  over these financials when you received the annual report?

25  A    Yes.  I always did.

1    Q    Let me ask you to go to page 23.  Do you see "notes to

2    financial statement"?

3    A    Yes.

4    Q    Can you see under "accounting policies note 2," it says,

5    "2.1 basis of presentation"?

6    A    I see it.

7    Q    And you see underneath there at paragraph beginning, "The

8    bank is adopting the following IFRS"?  Do you see that?

9    A    Yes.

10   Q    And this is different from the previous annual reports.

11   I'm going to read it.

12            "The bank is adopting the following IFRS, which are

13            relevant to its operations.  All other standards do

14            not currently apply to the bank's operations."

15            And then, it has a list of IAS numbered principles.

16   Do you see those?

17   A    I do.

18   Q    Do you see IAS 24 "related party disclosures"?

19   A    I do.

20   Q    Now, did you read the notes -- these notes to the

21   financials -- when you received the annual report?

22   A    Yes, I usually read the notes because they tend to be more

23   -- just as important or more so than some of the other things.

24   Q    Let me ask you to go to page 25 and I can see the numbers

25   on 27 Bates stamp.  And it says "loans and advances to

1  clients."  Is this once again the provisions --?

2  A    I'm sorry.  What page are you on?

3  Q    It's 25 of the report.

4  A    Okay.

5  Q    Bates stamp number 27.  At the bottom it has "loans and

6  advances to clients."

7  A    It's 27 at the bottom?

8  Q    Yeah.

9  A    Okay.  I can't see anything at the top.  Okay.  Yes, I do

10  see.

11  Q    And that's a similar assurance about the lack of loans?

12  A    That's correct.

13  Q    That the debtor's described?  And do you recall seeing

14  that again?

15  A    Yes.

16  Q    Let me ask you to go to page 27 and that's at the bottom

17  it's Bates number 29, but it was 27, and it's "strategy in

18  using financial instruments."

19  A    Where are you now?  What's the bottom number?

20  Q    It's note 3.  The page is 27.  The bottom Bates number is

21  29.

22  A    I don't have page numbers on mine.  Just the bottom

23  number.

24  Q    Okay.

25  A    Okay, 29, okay.  I have it.

1  Q    And this is a little bit different.  It states -- in the

2  second paragraph of 3.1:

3            "Strategy in using financial instruments.  The bank's

4            investment portfolio maintains a stable and well-

5            balanced structure due to a high proportion of fixed

6            income investments and a diversified investment

7            advisory network, resulting in an optimum

8            diversification process.

9            "There is a policy of maintaining sufficient

10           liquidity, thus protecting longer term investments

11           with significant returns."

12           Was that meaningful -- that representation meaningful

13  to you?

14  A    It was.

15  Q    And let me ask you to go to page 48 at the bottom, Bates

16  number.  Do you see this "report of management"?

17  A    I do.

18  Q    And it's the same in substance as the "report of

19  management" in the prior year's annual report.  Is that

20  correct?

21  A    Pretty much so, yes.

22  Q    Now, I want to ask you.  You recall I read you a note

23  about the IFRS and IAS 24?  Do you recall that --

24  A    Yes.

25  Q    -- list of information?  The statement that the bank was

1   following that IAS?  At this point in time, when you received

2   this annual report in 2007, had you been made aware that there

3   were substantial loans to Allen Stanford?

4   A    I was not aware of that, no.

5   Q    Were you ever made aware -- well, were you made aware at

6   the time you received this or did you know that the investments

7   of Stanford Financial or Stanford International Bank, Limited

8   were not as represented in the annual report?

9   A    I was not made aware -- repeat the question again?

10  Q    Well, let me ask you this.  When did you -- was there a

11  point when you became concerned about your investment in

12  Stanford International Bank, Limited?

13  A    Yeah.  I happened to be in the building when the SEC

14  walked in to shut them down.  So, I became very concerned at

15  that time.

16  Q    What was the reason you were in the building at that time?

17  A    I was in the building because I was talking to them and,

18  actually, it was about this and saying, "Should we not take

19  some money out of the CDs and put it into something else?"  And

20  I was coming down the elevator when they wouldn't let me exit

21  the building and I finally convinced them I was not an

22  employee.  I was an investor.  I was in the parking lot.  I was

23  very concerned, obviously.

24  Q    And what did you do as a result of being at Stanford at

25  the time they shut down the bank?

1  A    Well, I tried to call back.  They advised, obviously, they

2  had all the employees that they had sequestered somewhere and,

3  I guess, telling them what they were doing.  Unfortunately, I

4  was standing at the elevator when they read off their --

5  whatever the charges were (indiscernible) and I guess that's

6  why they thought I was an employee.  They wouldn't let me out

7  for a while.

8           But no, I mean, once they did that and, obviously, I

9  tried to call the advisor back, but obviously at that time

10 there was no way to get in touch with them.

11 Q    Were you ever able to withdraw the investment that you

12 made at Stanford?

13 A    No.  I had one CD that I did cash in a year or two earlier

14 and bought an annuity or something with, but no, the rest of

15 them I left there, yeah.

16          **MR. LANE:**  At this time, your Honor, I pass the

17 witness.  Thank you.

18          **THE WITNESS:**  Okay.

19                          **CROSS EXAMINATION**

20 **BY MR. KUNIANSKY:**

21 Q    Good afternoon, Dr. Conte.

22 A    Good afternoon.

23 Q    My name is Richard Kuniansky.  We met briefly at your

24 deposition.  Do you recall that?

25 A    Yes, sir, we did.

Conte - Cross / By Mr. Kuniansky                    191

1  Q    And Mark Kuhrt wasn't present.

2            Mark, would you stand up, please?

3            That's Mark Kuhrt who I represent.  Have you ever

4  seen that gentleman before in your life?

5  A    I have not.

6  Q    Okay.  He has made no representations to you of any type,

7  correct?

8  A    He did not.

9  Q    And all these different things that were read off that you

10 relied upon, you do not know whether he wrote any of those or

11 even if he did have something to do with some of him, where he

12 got his information from, correct?

13 A    I'm not aware of that, yeah.

14 Q    You don't know whether or not he was misled in the same

15 way that you were misled, do you?

16 A    I have no idea.

17 Q    Now, one of the reasons that you bought the CD -- I guess

18 the reason a lot of people did -- is a combination of a high

19 rate of return and a purported low degree of risk, correct?

20 A    That's correct.

21 Q    In investing, those are normally mutually exclusive; I

22 mean, the higher the rate of return the greater the risk.

23 Isn't that the way it normally works?

24 A    That's the way it's supposed to work, I guess, yeah.

25 Q    Okay.  And you are an extremely well-educated man.  Would

1    you agree with that?

2    A     In medicine, that's correct, yes.

3    Q     Not necessarily finance, huh?

4    A     No.

5    Q     And you've -- and I'm not going to ask you what you made,

6    but you've been a successful both doctor and businessman, as

7    what many people would call a high income earner.  Is that

8    correct?

9    A     Yes, but as using my profession.

10   Q     Excuse me?

11   A     Using my profession, that's correct.  You said a

12   businessman.

13   Q     Well, you're really more than just a physician, though.

14   Haven't you established some kind of business type of practice

15   that --

16   A     Yes.

17   Q     -- is related to the medical industry?

18   A     Yes.  The business of medicine is what I do.  That's

19   correct.  Based on my credentials, yes.

20   Q     And we can all look back in hindsight and think that

21   something was pretty foolish, correct?

22   A     That's correct.

23   Q     And if you look back on this, you would think that that

24   was maybe pretty foolish of me to invest in this, correct?

25   A     Based on the representations at the time, I didn't think

Conte - Cross / By Mr. Kuniansky                     193

1    it was.

2    Q    Now, one of the things that you relied upon was the fact

3    that there was an independent audit, correct?

4    A    That's correct.

5    Q    That gave you some degree of comfort that all those things

6    that you were looking at had supposedly been audited by an

7    independent auditor, correct?

8    A    Correct.

9    Q    And you understand an auditor's not somebody that just

10   takes the numbers and goes with them, that they're supposed to

11   look behind the numbers and make sure that the numbers are, in

12   fact, true, correct?

13   A    That's my understanding.

14   Q    Now, when you went to Stanford -- by the way, I take it

15   the Stanford you went to was the brown brick building right

16   across -- Westheimer across from the Galleria.  Is that right?

17   A    That's correct.

18   Q    And that's where your financial advisor was, correct?

19   A    That's correct.

20   Q    And you went there, I guess, with the idea of you were

21   going to think about taking some money out of your CDs at the

22   time, correct?

23   A    Well, I visited him a number of times.  That's one

24   occasion, that's correct, yes.

25   Q    You were thinking about redeeming some of your CDs at that

1   time?

2   A    That's correct, yeah.

3   Q    And did he talk you out of it or what?

4   A    No, he felt it was, you know, we could diversify some

5   things and I said I'd like to take some out of there and

6   diversify a little bit further since the amount that was

7   getting in the CDs was higher than I wanted in CDs.

8   Q    So, he was actually going to do that for you but didn't

9   have the opportunity because everything broke at that time?

10  A    That's correct, yes.

11  Q    Okay.  And you were actually there and they wouldn't let

12  you out of the building for a while.  Is that right?

13  A    That's correct.

14  Q    You didn't like being wrongfully accused, did you?

15  A    (Witness laughing)

16       **(Pause)**

17                    **CROSS EXAMINATION**

18  **BY MR. ZIMMERMANN:**

19  Q    Doctor, we met at the deposition; do you recall that?

20  A    Yes, sir.  We did.

21  Q    I don't want to spend a lot of time with you, but you

22  don't know Gil Lopez, do you?

23  A    I do not.

24  Q    Do you see him in the courtroom?

25  A    I do not.  I know there's a gentleman sitting next to you,

1    but no, I don't know if that's Mr. Lopez or not.

2    Q    Your medical training (indiscernible).

3    A    It's kind of hard.  He's a big man.  Kind of hard not to

4    see him.

5    Q    But you don't know him?

6    A    No, I do not.

7    Q    He never made any representations to you that dealt with

8    the investments?

9    A    He did not.

10   Q    You never saw anything that you relied on that was signed

11   by him?

12   A    I did not.

13   Q    You never received any mail or anything from him, either,

14   did you?

15   A    Not that I'm aware of.

16   Q    Let me cover just a couple of things and you have a little

17   notebook there with three exhibits.  Let's look at 33 first.

18   Actually, at page 32 of that document at the top.  Do you see

19   "notes to the financial statements"?

20   A    Yes, sir.

21   Q    And right under note 1, the last line, it says, "These

22   financial statements have been approved for issue by the board

23   of directors on 28 April 2006."

24   A    That's correct.

25   Q    And that says the board of directors, correct?

Conte - Cross / By Mr. Zimmermann                      196

1   A    Yes, sir.

2   Q    All right.  Would you then, in that same document, turn to

3   page 56?  Do you see that, sir?

4   A    Yes, sir.

5   Q    Do you see in the left hand column, it says "board of

6   directors"?

7   A    I do.

8   Q    Do you see Gil Lopez' name there?

9   A    I do not.

10  Q    If you'll just flip from page 56 to the previous page, 55.

11  A    I have it, yes, sir.

12  Q    And you see where it says "report of management"?

13  A    I see it.

14  Q    In that first line, it says, "Management of Stanford

15  International Bank is responsible for the preparation and

16  integrity and objectivity of the financial statements of the

17  bank."  Does yours say that?

18  A    Yes, sir.

19  Q    If you'll flip, then, to page 56 and look at the middle

20  column.  It says "bank's manager."

21  A    Yes, sir.

22  Q    Do you see that?

23  A    I do.

24  Q    Do you see Gil Lopez' name in that column?

25  A    I do not.

1   Q    Do you see an accounting manager's name listed there?

2   A    I do.

3   Q    And what's that name?

4   A    It looks like it's Banupi (phonetic) Persaud,

5   P-E-R-S-A-U-D.

6   Q    All right.  And do you see -- my copy's a little hard to

7   read, but do you see that first name up there that says

8   president?

9   A    Yes.  I believe it's the president.  It's the first name

10  under the bank's manager?

11  Q    Okay.

12  A    Okay.

13  Q    Mr. Rodriguez?

14  A    Yes.

15  Q    And would you go back to the previous page, 55, and look

16  at the left hand column, the last paragraph where it says:

17           "The bank's independent accountants were engaged to

18           perform an examination of the financial statements

19           and this examination provides an objective outside

20           review of management's responsibility to report

21           operating results and financial conditions."

22           That was important to you, right?

23  A    Yes, sir.

24  Q    And I think we just established that you relied -- I think

25  you told Mr. Kuniansky that you relied on outside auditors --

1   A     Independent auditors, yes, sir.

2   Q     Independent auditors?

3   A     Yes, sir.

4   Q     And that was important to you, right?

5   A     Yes, sir.

6   Q     Okay.  If you'll then flip to Exhibit 36 and go to page

7   45.  This time the page numbers are at the bottom.

8             **THE COURT:**  You using the same Bates numbers?

9             **MR. ZIMMERMANN:** Actually, I wasn't using Bates

10  numbers, because these were clear.

11            **THE WITNESS:**  You were looking at the bottom -- the

12  last number at the bottom of the page?

13  **BY MR. ZIMMERMANN:**

14  Q     Well, I can.  If you want to use that, look at 046.

15  A     Oh, okay.  Yes, sir.  I have it.

16  Q     Okay.  And I don't want to repeat all that, but would look

17  under "report of management"?  It makes it clear that the

18  management of Stanford International Bank is responsible for

19  the financial statements of the bank, correct?

20  A     Yes, sir.

21  Q     We just went through that.

22  A     That is correct.

23  Q     And if you flip to the next page, which is 47 on the Bates

24  number, and there's a statement there about the auditor's

25  report and it's signed by who?  Can you tell?

1   A    It's signed -- well, I can't tell the actual -- I can't

2   tell.  Reading that at the signature part, it says CASU

3   Company, Limited is the accountant.

4   Q    And that's not a Houston outfit, is it?

5   A    It is not.  It says St. Johns Antigua.

6   Q    Did that bring you some comfort that it was an outside

7   auditor reviewing these matters?

8   A    It was an independent auditor; that's correct.

9   Q    Let's look at -- if you flip the page, we have once again

10  under "report of management" who's responsible for the

11  financial statements and its accuracy, same as we did in the

12  previous --

13  A    Correct.

14  Q    Signed by the same people?

15  A    That's correct.

16  Q    Did Gil Lopez sign that?

17  A    No.

18          THE COURT:  I think it's just a repeat of the same

19  page.

20          THE WITNESS:  No, sir.

21          MR. ZIMMERMANN:  I'm sorry, Judge?

22          THE COURT:  It's the same page -- duplicated twice.

23          MR. ZIMMERMANN:  I'm looking at page 48, Judge.

24          THE COURT:  I know.  I'm just telling you it's the

25  same as 46.  Okay.  Doesn't matter.  Go ahead.

Conte - Cross / By Mr. Zimmermann                    200

1          **MR. ZIMMERMANN:**  You know, it is --

2          **THE COURT:**  It's in here twice.

3          **MR. ZIMMERMANN:**  -- but I didn't check -- but it's

4     got a different Bates number.  You're right.  It is twice.

5     **BY MR. ZIMMERMANN.**

6     Q    And if you look at page 49, same questions about Gil Lopez

7     not on the board of directors, not in the bank's management,

8     correct?

9     A    That's correct.

10    Q    And those auditors that you said looked like they signed

11    it?  They're listed as the auditors there, too, correct?  In

12    the third column?

13    A    Yes, they are.

14    Q    All right.  Let's go to Exhibit 39, the last one in your

15    document, and flip to Bates -- page 817.  Let me know when you

16    got there.

17    A    Yes, sir.  I have it.

18    Q    All right.  You see the board of directors?

19    A    I do.

20    Q    And if you would look on that page and tell me if you see

21    Gil Lopez' name?

22    A    I do not.

23    Q    Go to the next page, 818.  Is that the management?

24    A    I see it.

25    Q    Do you see Gil Lopez' name under management?

1  A    I do not.

2  Q    And then, if you'll go to the last page I'd like for you

3  to look at is 820.

4  A    I have it.

5  Q    All right.  Now, if I understood your testimony correctly

6  -- just to sum it up -- you were in contact only with the

7  financial advisor?

8  A    That's correct.

9  Q    Okay.  And did you know what company he worked for?  Did

10 you know that was --

11 A    My understanding was that he was with Stanford Group.

12 Q    Did you -- they had a lot of alphabet soup kind of stuff.

13 It was hard to keep track of -- did you ever know it was SGC or

14 not?

15 A    No, I'm sorry.

16 Q    Let me look at my notes real quickly.  I may not have any

17 more for you.

18         Can I have just a moment with counsel, your Honor?

19         We'll pass the witness, Judge.  Thank you very much.

20         **THE WITNESS:**  Thank you.

21         **MR. BENNETT:**  Your Honor, may I just stand here?

22         **THE COURT:**  Sure.  No problem.

23 //

24 //

25 //

**CROSS EXAMINATION**

**BY MR. BENNETT:**

Q    Doctor, Bob Bennett.  We met before, didn't we, at your deposition?

A    Yes, sir.  We did.

Q    And who was your financial advisor?

A    Gentlemen named John Fry and Lou Perry -- Louis Perry.

Q    And you've filed a lawsuit against them, haven't you?

A    Yes, sir, I have.

Q    Okay.  Now, the first time you invested, how much did you invest?

A    Probably about $100,000.

Q    Okay.  And as I understand it, you were talking -- that you withdrew that, the first investment, one time?

A    No, I did not.  I made subsequent investments and then withdrew some later on.

Q    Okay.  How much did you overall invest with Stanford?

        MR. LANE:  Your Honor, objection, relevance.

        THE WITNESS:  Is that something, Judge, I need to --?

        MR. BENNETT:  Well, I think it's important, your Honor, because I think some of it was withdrawn and some of it was moved and we need to know what service was rendered.

        THE COURT:  Wait, wait.  What's the question again?

        MR. BENNETT:  How much did he invest with Stanford.

        THE COURT:  Total?

1          **MR. BENNETT:**  Total.

2          **THE COURT:**  Well, why don't you ask him -- okay.

3   I'll allow that.  You have to answer.

4          **THE WITNESS:**  Yeah, the investments I made with

5   Stanford were not all in the CDs.  And I did subsequent close

6   to a million dollars, of which only a portion of that was in

7   CDs.

8   **BY MR. BENNETT:**

9   Q    Okay.  Now, can you just tell me the classifications of

10  what else was invested?  Was it in coins?  Was it in cash?

11  A    No.  It was in equities; General Motors, companies like

12  that, conservative investments.

13  Q    So, part of the investment was with the brokerage firm and

14  part of it was with the bank -- the CDs.  Is that correct?

15  A    That's correct.

16  Q    Okay.  And prior to the SEC coming in and meeting you in

17  the elevator, you never lost a penny with any Stanford entity;

18  isn't that correct?

19  A    That's correct.

20  Q    You got good service with Stanford, didn't you?

21  A    Yes.

22  Q    Now, do you know that for 26 years when Stanford was

23  going, before the government took them over, not one customer

24  lost a penny at Stanford.  Did you know that?

25  A    No, I'm not aware of that.

1    Q    Well, when you were talking to your investment advisor,

2    did he tell you this long history of successful investing?

3    Wasn't that important to you?

4    A    Yes, it was, but, I mean, we didn't go into detail on it.

5    But yes, he did mention that.

6    Q    Well, you went into all the detail about all of these

7    notes and things, he didn't tell you about the long history of

8    very successful investing they had before the government came

9    in?

10   A    Mr. Bennett, I don't remember having a discussion with him

11   about Mr. Stanford or Stanford's groups or history.  I really

12   don't.

13   Q    Okay.  Well, I understand that.  I'll withdraw it.  Of

14   course, you never met Mr. Stanford, my client sitting next to

15   me, did you?

16   A    I did not.

17   Q    And he personally never made any representations to you,

18   did he?

19   A    No, he did not.

20   Q    He never personally -- not talking about the financial

21   statements -- never personally sent you any letters,

22   correspondence, anything like that?

23   A    No.

24   Q    And there's a dining room there at Stanford Financial

25   Group, or the Stanford Financial Building on Westheimer.

Conte - Cross / By Mr. Bennett                               205

1   Remember that?

2   A    Yes.

3   Q    And you ate there, didn't you?

4   A    I did.

5   Q    And you were treated very nicely when you were there,

6   weren't you?

7   A    Yes, I was.

8   Q    And then, subsequently, you lost how much with the CD

9   program?

10  A    Out of my investment, probably around -- somewhere around

11  -- $300,000.

12  Q    Okay.

13  A    Somewhere around that.

14  Q    Did you know that 98 percent of U.S. investors have all

15  gotten their money back?

16            THE COURT:  No, no, no.

17  BY MR. BENNETT:

18  Q    You are here at the behest of the insurance company,

19  aren't you?

20  A    Yes.

21  Q    And have they paid you anything to testify today?

22  A    They have not.

23  Q    How much time have you spent with the attorneys for the

24  insurance company?

25  A    None.

Conte - Cross / By Mr. Bennett                                    206

1  Q    So, you -- first time that you've come in today and talked

2  to Neel Lane was today?

3  A    That's correct.

4  Q    Okay.  You didn't talk to him before your deposition?

5  A    No, I did not.

6  Q    Didn't talk to him after your deposition?

7  A    No, I did not.

8  Q    He didn't go over it with you any of the questions he was

9  going to ask you?

10 A    He did not.

11 Q    Now, you moved some of your investments around within the

12 Stanford portfolio; isn't that correct?

13 A    Yes, I moved them to different stocks that I had an

14 interest in.

15 Q    Did anyone at Stanford tell you not to do that or you

16 couldn't move it around or did they give you complete freedom

17 to invest any way you wanted to?

18 A    No, they offered me advice and gave me -- when I had told

19 them I'd like to look at certain things, they gave me

20 information on them.

21 Q    Now, being an intelligent and experienced investor, you

22 kept up with the stock market in 2008, didn't you?

23 A    Yeah, I kept up with it to a certain extent, but you're

24 saying as an investor.  I don't do investments for a living.  I

25 do it to try to protect some assets going down the line.

1    Q    How did your stocks do in the fall of 2008?

2             MR. LANE:  Objection, relevance.

3             THE COURT:  Sustained.

4    BY MR. BENNETT:

5    Q    Now, you're not here to say any of these figures that are

6    in any of the publications we've gone through are in any way

7    inaccurate, are you?

8    A    No, I'm not.

9    Q    Now, turn with me -- I'm now at page -- under Exhibit 33 -

10   -

11            Your Honor, could I get that on the screen, please?

12            THE COURT:  Sure.  Oh, you want me -- you're going to

13   do it?

14            MS. UNIDENTIFIED:  Yes, ma'am.  Thank you.

15            THE COURT:  Okay.  No problem.  Are you in the front?

16            MS. UNIDENTIFIED:  Yes, ma'am.

17            THE COURT:  Okay.  I've got three front --

18   BY MR. BENNETT:

19   Q    It's on page 55 of Exhibit 33.  It's been received in

20   evidence.  Doctor, do you have that in front of you?

21   A    I have Exhibit 33.  What page are you on?

22   Q    On the bottom -- on the top, it says page 55.  On the

23   bottom, it's number 0251.

24   A    I have it.

25   Q    You see in the last paragraph, which starts with "the

 1  board of directors discharge"; do you see that?

 2  A    I do.

 3  Q    Do you see where it makes reference to the audit

 4  committee?

 5  A    It does.

 6  Q    Knowing that there was an audit committee, did that give

 7  you some reassurance and comfort and feeling good that there

 8  was an audit committee?

 9  A    That's correct.

10  Q    Okay.  And did you also know that was headed by Mr. Davis,

11  who we've talked about already?  Did you know that?

12  A    I didn't know who headed it.  It says independent

13  accountants in the management -- it says Mr. Davis is the CFO,

14  so I would assume he on it, whether he headed it, I don't know.

15  Q    Do you have reason to doubt that he was head of it?

16  A    No.

17        **MR. BENNETT:**  Just a moment, your Honor?

18        **THE COURT:**  Sure.

19     **(Attorney conferring with client)**

20  **BY MR. BENNETT:**

21  Q    Before the SEC came in, prior to that time, you were in no

22  way going to withdraw all your money or change your investment

23  standard; isn't that correct?

24  A    No.  As I previously stated, my intention was is that the

25  CDs and the amount that was in them, when you look at

1   calculated interest it all, it was much more of the portfolio

2   than I wanted the CDs to be in, so that was what I was going to

3   change.

4   Q    But you were going to keep it with Stanford?

5   A    Yes.  Yes.

6   Q    Okay.

7          No further questions, your Honor.  Thank you.

8          **MR. LANE:**  I have no redirect, your Honor.

9          **THE COURT:**  All right.  You're excused.  Thank you.

10  You may step down.

11         I do have one question, actually.  You said you

12  intended to diversify?  The other investments that you had

13  through the Stanford advisor, were those investments in

14  publicly traded companies and other --

15         **THE WITNESS:**  Yes.  It was all publicly traded -- the

16  companies -- such as I said General Motors, Coca Cola.

17         **THE COURT:**  Right.

18         **THE WITNESS:**  I put substantial amounts of the money

19  into things like Coca Cola.  Most everything I had was dividend

20  producing and, like I said, that one CD I did cash in and I put

21  it into an annuity.

22         **THE COURT:**  Right.  Okay.  So, when you wanted to

23  diversify at the end, you did not intend to invest in more

24  Stanford owned assets?

25         **THE WITNESS:**  Oh, no.  No.

1          **THE COURT:**  Oh, okay.  I just needed to clarify --

2          **THE WITNESS:**  No, that was -- you know, it was in

3    publicly traded (indiscernible).

4          **THE COURT:**  That was your goal?

5          **THE WITNESS:**  Yes, ma'am.

6          **THE COURT:**  Gotcha.  Thank you.  You're excused.

7          **THE WITNESS:**  Thank you.

8       **(Witness excused at 3:45 p.m.)**

9          **THE COURT:**  Next witness?

10         **MR. LANE:**  Your Honor, the underwriters call Kelly

11   DeHay.

12         **THE COURT:**  How late did I tell you we were going

13   tonight?

14         **MR. LANE:**  You said --

15         **THE COURT:**  Six?

16         **MR. LANE:**  Six, I believe, your Honor.

17         **THE COURT:**  I'm willing to go later if you want,

18   because I know we took a long time --

19         You can step up here, please.  Would you raise your

20   right hand, please?

21       **WALLACE LEE DEHAY, JR., DEFENDANTS' WITNESS, SWORN**

22         Please be seated.  Pull yourself up close to the mic.

23         **THE WITNESS:**  Okay.  This close enough?

24         **THE COURT:**  So that you can be heard.  And then,

25   state and spell your whole name for the record -- your given

DeHay - Direct / By Mr. Lane                211

1    name, please.

2            **THE WITNESS:**  Wallace, W-A-L-L-A-C-E, Lee, L-E-E,

3    DeHay, D-E-H-A-Y, Junior, J-R.

4            **THE COURT:**  Thank you.

5                        **DIRECT EXAMINATION**

6    BY MR. LANE:

7    Q    Mr. DeHay, do you go by Kelly?

8    A    Yes.

9    Q    And what business are you in?

10   A    I'm a realtor.

11   Q    And where do you reside?

12   A    I reside at 1501 Marshall in Houston, Texas.

13   Q    Could you tell the judge how you first came to hear of a

14   company called Stanford Financial?

15   A    My financial advisor had been with Wachovia for many years

16   and he went to Stanford Financial.

17   Q    After going to Stanford Financial, did he contact you?

18   A    Yes.

19   Q    Did he ask to meet with you?

20   A    Yes.

21   Q    And could you tell the judge about that meeting?

22   A    Well, he asked us to come with him.  We had a nice working

23   relationship and we had immense trust in him.  And so, we did

24   go with him.

25   Q    Who was your financial advisor, by the way?

1    A    Doug Shaw.

2    Q    Did Mr. Shaw tell you anything about Stanford

3    International Bank, Limited when you met with him?

4    A    Probably not the first time.  That's something that came

5    up later on.

6    Q    The first he met with you, what did you discuss with him?

7    A    I really can't remember everything that we would have

8    discussed in the very first meeting.  We weren't -- we didn't

9    change our portfolio all the time, so therefore we usually just

10   had meetings, quarterly meetings or, you know, semi-annual

11   meetings that -- and we would discuss maybe what the present

12   portfolio was doing.

13   Q    Did there ever come a time when Mr. Shaw suggested or

14   recommended, rather, that you invest in Stanford International

15   Bank, Limited CDs?

16   A    Yes.

17   Q    Could you tell the judge about what you were told on that

18   occasion?

19   A    I was told that it wasn't like a typical bank.  It was

20   much more highly capitalized than an American bank; that they

21   didn't pay taxes the way an American bank paid taxes.  So, I

22   was given material that showed, I think, for instance, on the

23   third page of the brochure I was given, there the words were

24   security, stability, well diversified.

25            The bank didn't work like a typical American bank,

DeHay - Direct / By Mr. Lane                                213

1    where they made money really making loans.  They would loan

2    money to a customer, but they would never loan more than what

3    the customer had in the bank.  So, to me, I didn't see how they

4    could really lose some money to that particular customer.

5              But their instruments were supposed to be from multi-

6    national companies.  They were very well diversified.  They

7    weren't limited to any particular geographic region, but just

8    it sounded like large, secure businesses.

9    Q    Was this CD -- did it charge a fixed rate?

10   A    It would have paid me a fixed rate.

11   Q    Was it -- did it seem a competitive rate with other CDs?

12   A    It was higher than an American bank was paying.

13   Q    Did you question Mr. Shaw about that?

14   A    Well, I think when he went over the material about the

15   reason why they could pay a higher rate and then it was

16   basically, I thought, outlined in the material, because I

17   thought, "If you're not paying taxes the way an American

18   business would pay, et cetera," then they probably should be

19   able to do this.

20   Q    Did you share with Mr. Shaw your investment goal?

21   A    Yes.  No, Doug knew that we were very conservative

22   investors, that preservation of capital was everything.

23   Q    And did you convey that to him?

24   A    Yes.

25   Q    Did he provide the information about Stanford

1    International Bank, Limited that led you to believe that it was

2    a conservative investment?

3    A    Yes.

4    Q    And what, if you recall, anything else than you already

5    described to the judge -- could you let the judge --?

6    A    I think one of the -- maybe one statement that he made to

7    us.  He had $2 million of his own money there.

8    Q    Let me show you.  There's a book in front of you, Exhibit

9    36.  This is the Stanford International Bank 2006 annual report

10   released in 2007.  Do you recall receiving this annual report?

11   A    I don't know that I did.  I have a report, but I don't

12   know that it was this one.

13   Q    Do you need to look at it to familiarize yourself with it?

14   A    I know that we asked for an additional report after I

15   became an investor, but I don't know the date of that report.

16          MR. BENNETT:  Objection, non responsive.  Motion to

17   strike, your Honor.

18          THE COURT:  Overruled.

19   BY MR. LANE:

20   Q    When did you become an investor?  Which calendar year?

21   A    2007.

22   Q    And was there -- with respect to the annual report

23   materials, did you go over any materials with the financial

24   advisor?

25   A    We went over -- as far as materials that was printed in

DeHay - Direct / By Mr. Lane                    215

1   the book that this company was very profitable.  And it had

2   continued to become more profitable, it appeared, each year.

3   Q    Was that important to you?

4   A    Yes.

5   Q    And why is that?

6   A    Well, I didn't want to make an investment in an

7   unprofitable company.

8   Q    And what did you invest in at Stanford International Bank

9   CDs?  What amount did you invest?

10  A    I personally invested $120,000.

11  Q    And what was the purpose of that investment?  What were

12  you --?

13  A    It's part of my retirement account.

14  Q    And how long did you intend to remain invested?

15  A    I signed up for five years.

16  Q    Did there come a time when you -- well, let me ask you.

17  How did you -- did you have further communications with your

18  broker after that?

19  A    Yes.

20  Q    Did you continue to have quarterly meetings?

21  A    I think initially, but then they all seemed to stop.

22  Q    About what time frame was that?

23  A    I think sometime in -- either end of 2007 or 2008.

24  Q    Was there a point at which you became worried about

25  Stanford International Bank?

DeHay - Direct / By Mr. Lane                          216

1   A    We were.  We were very concerned.  There was many changes

2   in the stock market and we e-mailed Doug and asked him to

3   please reassure us that everything was fine with the bank and

4   he did.

5   Q    He did.  And what were those reassurances about Stanford

6   International Bank?

7   A    He just reassured us there was no problems with the bank.

8   Q    Did you ever -- despite his assurances -- become more

9   concerned about Stanford?

10  A    I think one thing that concerned me was he wasn't

11  communicating with me the way he once did and I just felt

12  almost like he was hiding, but I couldn't -- you know -- I just

13  couldn't get my arms around it.

14  Q    Did there ever come a time when you called Doug Shaw about

15  your investments and didn't receive a response?

16  A    I think that's possible, yeah, I think it is.  I think

17  they said he was out of town or something.

18  Q    Did there come a time when you learned that Stanford had

19  been seized by regulators?

20  A    February 13th.

21  Q    Tell me -- February 13th, 2009?

22  A    Yes.

23  Q    Can you tell me about what you learned on February 13th

24  and what occurred that day?

25  A    I was handed the Houston Chronicle when I woke up that

1    morning and I saw the article in the paper.

2    Q    And as a result of seeing the article on Stanford, what

3    did you do?

4    A    I immediately called Doug.

5    Q    Did you receive a response?

6    A    I got -- I knew he always went to work early and so I

7    called -- got his assistant.  And she said she would -- I told

8    her I merely wanted to take my money out of the bank.  And she

9    said she would start preparing the documentation for me to do

10   that.  And then, I just went to the bank -- then I just went to

11   Stanford's office on Westheimer.

12   Q    Across from the Galleria?

13   A    Yes.

14   Q    And what did you find there?

15   A    I went upstairs.  I was starting to sign some papers and

16   then he came in.

17   Q    He being Mr. Shaw?

18   A    Doug Shaw.

19   Q    And what did Mr. Shaw tell you?

20   A    He told me I couldn't have the money.  He told me I could

21   have -- he thought I could have the interest.

22   Q    And did you take steps to try and get the interest --?

23   A    I signed the paperwork to get anything that I could.

24   Q    Did you -- after that, did you have any further dealings

25   with Doug Shaw?

1   A    No.

2   Q    Did you receive back the interest or the principal or

3   anything?

4   A    No.

5   Q    Okay.

6   A    For some reason, there was $71.35 that was never invested

7   or not invested.  I got a check for that.

8   Q    That was in a cash account of some kind?

9   A    I guess so.

10  Q    After that February 3rd encounter with Mr. Shaw, did you -

11  -

12  A    February 13th.

13  Q    February 13th, I'm sorry.  Did you ever go back to

14  Stanford?

15  A    Yes.

16  Q    Okay.  Tell me about -- tell the judge about that.

17  A    The day that it was announced on television that they had

18  posted a website, I believe it was for the receiver, I went to

19  see it, see what it was, hoping I could write it down and gain

20  some information about what was going on.

21  Q    And what was the scene at Stanford Financial when you got

22  there?

23         **MR. ZIMMERMANN:**  Excuse me.  What's the relevancy to

24  any contested issue in this case?

25         **THE COURT:**  Sustained.

**BY MR. LANE:**

1

2  Q    Had it been disclosed to you at the time that you met with

3  Mr. Shaw with respect to a potential investment in Stanford

4  that Mr. Stanford himself -- Allen Stanford -- had substantial

5  unsecured loans from Stanford International Bank in the amount

6  of more than a billion dollars, would that have concerned you?

7  A    Yes.

8  Q    If you'd been told that a large portion of the portfolio

9  was in a liquid real estate venture, would that have concerned

10 you?

11 A    Yes, because that wouldn't have been what the documents I

12 was given to read -- what it said it was supposed to be in.

13 Q    To date, have you received any portion of the amount that

14 was invested actually in the CDs?

15 A    No.

16        **MR. LANE:**  Your Honor, I pass the witness.

17                    **CROSS EXAMINATION**

18 **BY MR. KUNIANSKY:**

19 Q    Good afternoon.

20 A    Good afternoon.

21 Q    My name is Richard Kuniansky and I represent Mark Kuhrt.

22        Mark, would you stand up, please?  Be seated.

23        Have you ever seen that gentleman before?

24 A    No, sir.

25 Q    He's not made any representations to you of any type

1   whatsoever, correct?

2   A    No, sir.

3   Q    Your financial advisor, Doug Shaw, how did you come to be

4   involved with him?

5   A    One of my customers I had done about approximately five

6   real estate transactions with, he was a very conservative

7   businessman.  And he recommended Doug Shaw.  He had done

8   business with him at Wachovia.

9   Q    And at that time, Doug Shaw had moved over to Stanford?

10  A    This was before.

11  Q    Oh, before.  So, you started with him at Wachovia.

12  A    Yes.

13  Q    And when he transferred over, you stayed with him?

14  A    That's correct.

15  Q    And to your knowledge, did Doug Shaw knowingly make any

16  misrepresentations to you?

17        THE COURT:  He's asking to your knowledge.

18        THE WITNESS:  No, I guess not.

19  BY MR. KUNIANSKY:

20  Q    You probably had a pretty good relationship with him up

21  until everything soured at the end.  Is that right?

22  A    Yes.

23  Q    Happens to be a nice guy.

24  A    He's all right.

25        MR. KUNIANSKY:  That's all the questions I have.

1                          **CROSS EXAMINATION**

2    **BY MR. ZIMMERMANN:**

3    Q    Mr. DeHay, you and I never met; I'm Jack Zimmermann.  I

4    represent a fellow named Gil Lopez.  Do you know Gil Lopez?

5    A    No, sir.

6    Q    You don't know Gil Lopez?

7    A    No.

8    Q    You never met him?

9    A    No, sir.

10   Q    Ever talked to him on the phone?

11   A    Not to my knowledge, no.

12   Q    Did he ever make any presentation to sell you any

13   financial instruments associated with Stanford company?

14   A    No, sir.

15   Q    Do you see him in the courtroom?

16   A    I don't know him.

17   Q    Okay.  Thank you very much.

18   A    You're welcome.

19        **THE COURT:**  Anything?

20        **MR. KENNEDY:**  Yes, your Honor, some brief questions.

21                          **CROSS EXAMINATION**

22   **BY MR. KENNEDY:**

23   Q    Mr. DeHay, my name is Kirk Kennedy.  I'm counsel for Allen

24   Stanford.  I have a few questions for you.  Isn't it true that

25   the information that you relied upon came from Mr. Shaw

1    regarding Stanford Financial?

2    A    I assume it came to Doug Shaw through the corporation.

3    Q    But your only personal contact to Stanford Financial was

4    with Mr. Shaw.  Isn't that correct?

5    A    Yes.

6    Q    And you've never met Allen Stanford before, have you?

7    A    No.

8    Q    You see him sitting here, right?

9    A    Yes.

10   Q    Okay.  And you testified about personal loans or you were

11   asked by Mr. Lane about some personal loans of Mr. Stanford.

12   You have no personal knowledge of any personal loans made by

13   Stanford International Bank to Allen Stanford, do you?

14   A    No.

15   Q    In fact, you don't have any personal knowledge of any of

16   the underlying financial transactions or financial data that

17   went into the annual shareholder report, do you?

18   A    No.  All I would know is what was printed.

19   Q    All you know, really, is what Mr. Shaw told you.  Isn't

20   that true?

21   A    I'm sure Mr. Shaw furnished me and every other investor

22   the information that his corporation had printed.  I don't

23   think he dreamed it up.

24   Q    How long have you been an investor with Stanford Financial

25   prior to February the 13th?

DeHay - Cross / By Mr. Kennedy                    223

1   A    I guess Doug went there maybe in 2006.

2   Q    2006.  And the reason that you couldn't get your

3   investment back on February the 13th, or your interest or your

4   principal, is because the SEC had, in fact, seized the company

5   and obtained appointment of a receiver.  Isn't that true?

6   A    Yes.

7   Q    And so, when you state that the preservation of capital

8   was everything to you, right?

9   A    It meant a lot to me.  I worked hard for my money.

10  Q    And isn't it true, though, that the reason that this

11  capital wasn't preserved was because the SEC had captured it

12  and wouldn't release it to you?

13          **MR. LANE:**  Objection, your Honor.

14          **THE COURT:**  Sustained.

15          **MR. KENNEDY:**  No further questions.

16          **THE COURT:**  Anything further?

17          **MR. LANE:**  I've nothing further, your Honor.  Thank

18  you for your patience.

19          **THE COURT:**  You're excused.  Thank you.

20      **(Witness excused at 4:03 p.m.)**

21          Should we take a little break?

22          **MR. LANE:**  Be delighted to.

23          **THE COURT:**  We've only been going an hour and a half,

24  but -- okay.  Here's the deal.  I'm not leaving the bench.  So,

25  you have to be back here in ten minutes.  Ten minutes.

224

1      **(A recess was taken from 4:03 p.m. to 4:20 p.m.)**

2              **MR. BENNETT:**  Do you want to do this matter now?

3              **THE COURT:**  Do you want to?  I was going to ask you.

4      **(Court confers with ERO)**

5              **MR. UNIDENTIFIED:**  We're not needed.

6      **(Begin sidebar conference at 4:03 p.m.)**

7              **THE COURT:**  Is Mr. Stanford ready?

8              Remember (indiscernible)?

9              **MR. UNIDENTIFIED:**  Yes, your Honor.

10             **THE COURT:**  Even the funny part.

11             **MR. UNIDENTIFIED:**  Yes, your Honor.

12             **THE COURT:**  If you have to talk to somebody, you talk

13     to me.

14             **MR. UNIDENTIFIED:**  Yes, ma'am.

15             **THE COURT:**  Okay.

16             **MR. STANFORD:**  Yes, ma'am?

17             **THE COURT:**  I wanted to just do what I told you I was

18     going to do, which is put on the record the summary of our

19     conversation.  For the record, I agreed to meet with

20     Mr. Stanford, Mr. Bennett, Mr. Kennedy and Mr. Wallis in the

21     presence of a United States Marshal, Mr. Olivares, and my law

22     clerk, Mr. Hallmark (phonetic), to discuss what --

23             **COURT REPORTER**  Excuse me, Judge?  Excuse me?  I

24     can't hear anything because people --

25             **THE COURT:**  Could you keep it down, please?

1          I have to start over.  Sorry.  You okay?

2          **MR. STANFORD:**  No.  I have on these dadgum -- I have

3  these little old skinny socks they don't give you and it's just

4  like eating (indiscernible) flesh.  They twist in a certain

5  way.

6          **THE COURT:**  Can you loosen them?

7          **MR. STANFORD:**  That'd be great.  That would be

8  wonderful.

9          **THE COURT:**  Okay.  He'll try and loosen them a little

10  bit.

11          **MR. STANFORD:**  Thank you.

12          **THE COURT:**  Anyway.  I'll repeat, since it wasn't

13  clear I could be heard.  At counsel's request at the sidebar

14  this morning, in response to my urging parties to negotiate --

15  I was focused on the Kuhrt and Lopez people -- and one of

16  Mr. Stanford's lawyers, Mr. Kennedy, asked if I would discuss

17  that kind of thing on behalf of Mr. Stanford with the

18  underwriters and I explained that I couldn't push the

19  underwriters at that point in time for a variety of reasons,

20  but one of them was the concern I had about Mr. Stanford's

21  letter to Chief Judge Hinojosa complaining about Mr. Bennett.

22          And so, we agreed -- that is, the Stanford team --

23  and Mr. Stanford and I agreed we would meet over the lunch hour

24  and did so in the jury room off the record.  I discussed with

25  Mr. Stanford the practical issues posed by his letter;

1    specifically, that the letter was sent to Chief Judge Hinojosa

2    and that Judge Hinojosa is a judge just like all of us on the

3    district bench and while he has the dignity and the honor of

4    being Chief Judge, it's largely an administrative role by

5    virtue of his seniority and he has no power over the other

6    judges in that any concerns Mr. Stanford might have with

7    respect to counsel in this case needed to be taken up with me.

8         And so, we were attempting to do that.  I explained

9    to Mr. Stanford that the letter had been sent on by hand -- a

10   copy of his letter had been sent to Judge Hittner and had been

11   given to Mr. Bennett, but no one else.

12        The rest of the discussion was largely about my

13   concerns and my warnings to Mr. Stanford that the continuity of

14   counsel is important and that I was concerned that he not be

15   too quick to terminate the relationship with Mr. Bennett, which

16   he has the right to do -- but as he, Mr. Stanford, has the

17   right to do -- because continuity of counsel -- we're in the

18   middle or we have started the civil trial here on the coverage

19   issue and that I had seen Mr. Bennett had filed many documents,

20   including extensive proposed findings of fact and other

21   materials, witnesses, et cetera, et cetera; and that it seemed

22   to me that work was being done.

23        And while it might not be to Mr. Stanford's full

24   liking and there might be other gripes which Mr. Stanford may

25   want to pursue, this was not something that I could pursue in

1    my capacity as a federal judge here or in charge of this case;

2    that those gripes would need to be taken up with other

3    authorities, such as State Bar or the like and that Judge

4    Hinojosa could initiate proceedings to wind up precluding a

5    lawyer from appearing in federal court here in this district,

6    but not sanction in any other way.

7            And so, the issue is posed what did Mr. Stanford want

8    to do and I expressed concern that Mr. Stanford not represent

9    himself, although he has the right to do so.  And I did say

10   that parties are usually too close to the situation and did

11   some explanation about it's important to have the back and

12   forth, this debate and discussions with lawyers, but that

13   lawyers are trained and they're looking out for both this case

14   and other cases that Mr. Stanford may face and does face; and

15   that it was his choice about continuing with Mr. Bennett.

16           It was a private retention arrangement and I had no

17   authority over it.  I did remind or tell Mr. Stanford that I

18   had refused and denied Mr. Bennett's request to be relieved

19   because he thought that the relationship had -- it was a motion

20   that he made recently, because he thought the relationship had

21   deteriorated.  I denied that motion because I felt he was in

22   this case and that continuity of counsel was so important.

23           But I reminded Mr. Stanford that many times during

24   this debate that -- or discussion, rather -- I reminded him

25   that he had the right to pick his own lawyer or lawyers.

1         I did explain that I appreciate that Mr. Stanford's -

2    - some of his papers had been sent in late, but that I had

3    permitted that and had not stricken them, so that the delay --

4         **(Voices in the courtroom)**

5         Please watch out.  I need it quiet.  If you want to

6    talk, you're welcome to do so in the hallway.

7         I made it known to Mr. Stanford that although things

8    had been filed late, I had allowed them to be included in the

9    record and was relying on them and considering them and the

10   only things that I'd actually stricken were, I think, two

11   documents that were filed -- that seemed duplicative and were

12   incomplete and not -- but there may have been other things I've

13   stricken, but nothing of substance.

14        So -- I'm trying to remember what else I said.  But

15   the real point is that I expressed numerous times to

16   Mr. Stanford that he had the right to go with the lawyers he

17   had.  Mr. Bennett and Mr. Wallis and Mr. Kennedy were all here

18   in this proceeding and allowed to question as is evident from

19   the recent cross examinations after noon; but that at the time

20   of lunch I said that he could proceed with these lawyers and

21   that I cautioned him and warned Mr. Stanford not to in a fit of

22   frustration or whatever go pro se if he -- unless he really

23   wanted to.

24        But he has the right to do it and if I might recall,

25   Mr. Stanford said something to the effect at the end of the

1   discussion that he "would take my advice" and I corrected him

2   to say it's not my advice.  "It's warnings.  It's genuine,

3   heartfelt warnings, but you have the power, Mr. Stanford."

4           I'll direct my comment now to you directly.  You have

5   the power to do what you choose.  I felt like we had an

6   informative discussion.  You told me a little bit -- not a lot

7   -- but a little bit about what was on your mind regarding the

8   frustrations you have in the prison and the difficulties, many

9   of the points, of course, I'm aware of.  But you didn't tell me

10  too much.  I did more of the talking.

11          And that, for what it's worth, is intentional in that

12  I don't want you to divulge attorney/client matters to me any

13  more than absolutely necessary, because it's none of my

14  business and it could possibly prejudice you and I wouldn't

15  ever want that to happen.

16          I'm sure there are other things I may have said, but

17  I think this really does cover it.  There was a little

18  discussion about withdrawing the letter, but I said if it's

19  under seal and perhaps something that you and Mr. Stanford

20  needed to decide after discussing matters with your lawyers,

21  both Mr. Bennett and the others you have; who, by the way, are

22  completely independent of one another as I understand it.  Is

23  that correct?

24          **MR. STANFORD**:  It is correct, yes.

25          **THE COURT**:  Okay.  There was also the discussion of

1    the possibility of settlement negotiations of the civil

2    coverage suit.  We did not get into that in any detail, because

3    twofold:  One, we need to settle up on the representation side;

4    and number two, I was waiting for what I deemed to be an

5    opportune moment to raise the subject with the carriers.  And I

6    feel that waiting for some evidence to come in is a better

7    time.

8            I have not been involved in any details of any

9    settlements with any parties.  Every conversation I've had with

10   the exception of this one at lunch and this now is

11   conversations I've had with opposing parties present.

12           So, the settlement comments that I may or may not

13   make as this trial goes on are an exercise of my judgment that

14   I do, from time to time, but not that often, when I perceive

15   there's an opportune time.  It's like anything else, timing is

16   everything.

17           So, is there anything else that anyone wants to

18   mention that I discussed before you give me your response?

19   Yes, sir?

20           **MR. BENNETT:**  Your Honor, I think it'd just be in the

21   record that you discussed this with the underwriters before we

22   had meeting and they approved of us having this.

23           **THE COURT:**  Yes.  That's a good point.

24           **MR. BENNETT:**  I wanted to be sure that's clear.

25           **THE COURT:**  I did ask, actually, all other counsel in

1    this case if there was any objection to me meeting with

2    Mr. Stanford and his team and everyone else noted that there

3    was no objection from their side.

4           Go ahead.

5           **MR. BENNETT:**  Second, your Honor, my motion to

6    withdraw was based on (indiscernible) --

7           **THE COURT:**  Yeah.

8           **MR. BENNETT:**  And that was not -- it didn't have

9    anything to do with any type of conflict.  At that time when --

10          **THE COURT:**  Okay.  I mis-remembered.  Thank you.

11          **MR. BENNETT:**  That's the only issue with that, not

12   being paid.

13          **THE COURT:**  Yes, that's true.  And in fact, you

14   reminded me he did discuss during the lunch session some

15   frustration you have on that score and you did tell me what you

16   understood payment to be to the other lawyers, which I did not

17   know.

18          And Mr. Stanford did tell me that Mr. Bennett and

19   Mr. DeGuerin, who was short-lived in this case were the only

20   two lawyers that Mr. Stanford actually picked for himself.

21          **MR. STANFORD:**  Yes, ma'am.

22          **MR. BENNETT:**  And I was the only attorney that has

23   facilitated discovery.

24          **THE COURT:**  I'm sorry?

25          **MR. BENNETT:**  I was the only one who facilitated

1    discovery for him, brought things to me.

2           THE COURT:  Right.  And there were many things

3    Mr. Stanford said that were favorable, actually, during the

4    meeting about Mr. Bennett that countered to some extent the

5    allegations in the letter.  But I wasn't planning to get into

6    any of that here on this record.  I'm letting that be handled

7    separately.

8           MR. BENNETT:  Yes, ma'am.

9           THE COURT:  Okay.  Have I fairly characterized our

10   discussion?

11          MR. BENNETT:  Yes, ma'am.

12          THE COURT:  Is there anything else you can think of

13   that I covered with you that may have impacted you or that you

14   care about?  What do you remember I said?

15          MR. STANFORD:  I remember everything you said, Judge.

16          THE COURT:  But anything I've missed here in my

17   summary?

18          MR. STANFORD:  No, ma'am.

19          THE COURT:  Okay.  Would you like to comment back to

20   me about where we stand for these lawyers?  Don't give me any

21   detail.  I'm just really interested in the punch line.

22          MR. STANFORD:  Yes, your Honor.  I'd like to continue

23   with Mr. Bennett and with Olney and Kirk and --

24          THE COURT:  That's Wallis and Kennedy.

25          MR. STANFORD:  Kennedy, yes.  Wallis and Kennedy.  I

1   guess it'd be kind of silly to fire the only lawyer that never

2   got paid.

3       **(Laughter)**

4           **THE COURT:**  (Indiscernible).  I will say, also, that

5   you did say that Mr. Bennett had been a loyal soldier to you in

6   many ways.

7           **MR. STANFORD:**  We've had our disagreements, but I

8   think more important than that is just the conditions of trying

9   to work under.  But anyway, I won't go into that.

10          **THE COURT:**  But you did tell me some of that, that

11  you were frustrated in the anxiety of the start of the trial

12  and some of that you felt had possibly impacted you.

13          **MR. STANFORD:**  I think it impacted all of us, your

14  Honor.

15          **THE COURT:**  Yes.

16          **MR. STANFORD:**  All of us.  And then, of course, Bob

17  -- Mr. Bennett -- not having any money to pay anybody and his

18  personal situation.  Just a combination of things.  And then,

19  I'm in prison --

20          **THE COURT:**  Yeah.

21          **MR. STANFORD:**  It's just hard.  It really is.  But I

22  would like to send you a letter, your Honor, and send it to the

23  Chief Justice.

24          **THE COURT:**  Judge -- Chief Judge.

25          **MR. STANFORD:**  Chief Judge.

1    **THE COURT:**  No, you definitely don't want to send it

2   to Washington.

3    **MR. STANFORD:**  Sorry.

4    **THE COURT:**  It would get lost in about a million

5   pieces of paper.

6    **MR. STANFORD:**  To the Chief Judge also; send it by

7   copy.  Send it to you, copy him, and then that I explain the

8   situation very briefly that I would like to withdraw my

9   letter --

10    **THE COURT:**  Okay.

11    **MR. STANFORD:**  -- and go forward from where I am.

12    **THE COURT:**  You can write anything you want.  Do you

13   have a copy of the original letter you sent?  Do you want me to

14   give you a copy so you can have it for reference?

15    **MR. STANFORD:**  Yes.  I do not have a copy.

16    **THE COURT:**  I do not have -- well, this is what I

17   have, including the cover sheet of the Chief Judge sending it

18   to me.  Let me be sure it's only one copy.  Yeah, okay.  You

19   can have this.  We can print another one.  No problem.

20    **MR. STANFORD:**  Thank you.

21    **THE COURT:**  All right.  Anything further?

22    **MR. STANFORD:**  No, your Honor.  Thank you, your

23   Honor.

24    **THE COURT:**  You're welcome.

25    **MR. BENNETT:**  Do you know how long we're going to go

1    this afternoon?

2           **THE COURT:**  We're going to go until at least 6:00.

3    I'm hoping to go a little longer, because we've had longer

4    breaks than I'd planned.

5           **MR. BENNETT:**  Thank you, your Honor.

6           **THE COURT:**  You're welcome.

7        **(End sidebar conference at 4:20 p.m.)**

8           **THE COURT:**  Okay.  Mr. Lane, are you ready with

9    another witness?

10          **MR. LANE:**  Yes, your Honor.

11          **THE COURT:**  Okay.  Is Mr. Shidlofsky here?  Or may we

12   proceed without him?

13          **MR. UNIDENTIFIED:**  He's out in the hallway.  I'll get

14   him, Judge.

15          **THE COURT:**  If somebody will -- thank you.  I see you

16   got a tie.

17          **MR. UNIDENTIFIED:**  I did get a tie and it matches

18   almost perfectly.

19          **MR. UNIDENTIFIED:**  It matches the coat he had on

20   yesterday.

21          **THE COURT:**  Okay.  Another notebook.  Thank you very

22   much.

23          **MR. UNIDENTIFIED:**  Judge, I'm going to return these

24   to you.

25          **THE COURT:**  Oh.  I'm going to be rich with notebooks.

1      **MR. UNIDENTIFIED:**  It's the same one.

2      **THE COURT:**  That's all right.  I actually would try

3  to get some of them back.

4          In the future, for what it's worth, at the end -- I'm

5  going to do this, but we need the numbers on the spine.  I'm

6  just telling you it's handy.

7      **MS. UNIDENTIFIED:**  Okay.

8    **(Pause)**

9      **THE COURT:**  Do we have another witness?  You want to

10  check the witness?

11      **MR. LANE:**  Yes, your Honor.

12      **THE COURT:**  I mean, you can chat while we're getting

13  it, but -- him or her.

14      **MR. LANE:**  Underwriters call Mark Tidwell.

15      **MR. BENNETT:**  Your Honor, before this witness is

16  called, there may have been a violation of the rule and I'd

17  like to go into that real briefly with Mr. Tidwell.

18      **THE COURT:**  Okay.  What violation?

19      **MR. BENNETT:**  I think he's been talking to some of

20  the other witnesses in violation of the rule.

21      **THE COURT:**  Okay.  Well, I'll let you cross on it.

22      **MR. BENNETT:**  Okay.  Thank you, your Honor.

23      **THE COURT:**  Underwriters -- Mr. Tidwell?  Are you

24  Mr. Tidwell?

25      **THE WITNESS:**  Yes, I am.

1          **THE COURT:**  Step up here, please.  Will you be sure

2    to have your staff tell the witnesses not to talk to each

3    other?

4          **MR. CHASNOFF:**  Yes, your Honor.

5          **THE COURT:**  Okay.  Would you raise your right hand,

6    please?

7          **DWAYNE MARK TIDWELL, DEFENDANTS' WITNESS, SWORN**

8          Please be seated.  Would you please state and spell

9    your whole name for the record and speak into the mic?  If you

10   want to move the chair up closer, it does move.

11         **THE WITNESS:**  Dwayne Mark Tidwell.

12         **THE COURT:**  Oh, you know -- sorry.  Try it again.

13         **THE WITNESS:**  Dwayne Mark Tidwell, D-W-A-Y-N-E, Mark,

14   M-A-R-K, Tidwell, T-I-D-W-E-L-L.

15         **THE COURT:**  Thank you.  You may proceed.

16                         **DIRECT EXAMINATION**

17   **BY MR. LANE:**

18   Q    Mr. Tidwell, where do you reside?

19   A    Spring, Texas.

20   Q    And by who are you employed?

21   A    Zenith Wealth Management.

22   Q    What is the nature of your business?

23   A    Financial services.

24   Q    And do you have any licenses through FINRA?

25   A    Yes, I do.  My licenses are held with Sunbelt Securities.

Tidwell - Direct / By Mr. Lane                    238

1   Q    Which licenses do you have?

2   A    63, 7, 66, 31.

3   A    Can you tell me a little bit about your background -- your

4   educational and work background -- before you joined Stanford

5   Financial?

6   A    I have a BBA in finance from Texas A and M University.  I

7   went to work out of college in '91 for what is now Wells Fargo;

8   worked there for a few years, from '91 to '95.  Went to work

9   for Merrill Lynch here in Houston from '95 to January 2004.

10  From January 2004 I worked for Stanford Group Company in

11  Houston and my employment terminated December of 2007.

12  Q    Could you tell the judge what the nature of your various

13  positions were in the securities industry prior to your joining

14  Stanford?

15  A    Basically as a financial advisor or financial consultant,

16  as sometimes we're called.  We're also financial planners.  I

17  have a certified financial planning designation.

18       We consult with investors and do financial plans for

19  them; help them plan for college, retirement, you know, various

20  things like that, which encompasses making investment

21  recommendations; you know, monitoring their investment

22  portfolio and making sure they can get to those stated

23  objectives.

24  Q    How did you come to join Stanford?

25  A    Actually I was recruited by a gentleman that his name

Tidwell - Direct / By Mr. Lane                               239

1   escapes me, but a lot of times in this industry you get calls

2   from recruiters, you know, over many years and I was approached

3   to hear about an opportunity to go to a small private firm and

4   so he introduced me to Stanford.

5   Q    And at the time, you were at Merrill?

6   A    That is correct.

7   Q    And who did you meet with at Stanford before joining to

8   learn about Stanford?

9   A    That was several individuals; primarily, though, there a

10  Jay Comeaux, who was a managing director for the Houston office

11  and I think at the time I was recruited, he was still president

12  of Stanford Group Company and then there was various other

13  individuals, HR, different directors of different departments

14  that would possibly be of use of me with assisting my clients.

15  Q    Were you given any information about the company?

16  A    I was given various brochures on their mutual fund

17  program, Stanford International Bank, Limited; also, their

18  fixed income product that they also solicited.

19  Q    Did they give you information about the certificate of

20  deposits?

21  A    Yeah, that was issued through Stanford International Bank,

22  Limited.

23  Q    And what made you decide to go over to Stanford?

24  A    Well, that was not an easy decision, having been at

25  Merrill Lynch for about nine years.  Part of it was that they

1  were private with perceived financial strength.  They offered a

2  unique array of products, but they were, you know, they were

3  independent.  They weren't a -- as they call in our industry --

4  they weren't part of the wire house.

5          So, that was what the attraction was for me to come

6  over.  Merrill Lynch had just gone through a series of

7  situations and instances, Enron being probably the most notable

8  one, and it was causing my clients concern with who my employer

9  was.

10 Q    Now, when you moved over to Stanford, did your securities

11 licenses move with you?

12 A    Yes, they did.

13 Q    And were you licensed by a broker dealer?

14 A    Yes, I was.

15 Q    What entity was your broker dealer?

16 A    The broker dealer at Stanford was Stanford Group Company.

17 Q    And you were a registered representative of Stanford Group

18 Company?

19 A    That's correct.

20 Q    When you first joined Stanford as a registered rep of

21 Stanford Group Company, what were your initial duties?

22 A    Initially, I was brought over as a financial advisor, and

23 so, when you go through a transition process, it takes a long

24 time to move all your clients.  It's a very lengthy -- lot of

25 paperwork involved, and so it requires, you know, virtually

Tidwell - Direct / By Mr. Lane                          241

1    meeting every one of your clients and sitting down and

2    explaining that process.  So, primarily the first I would say

3    year to year and a half that's all I did.

4    Q    Did SGC -- could we call it SGC?

5    A    Yes, that's fine.

6    Q    Did it have a custodial element to it?

7    A    Yeah, because of the independent nature, SGC at the time

8    that I was brought on, their clearing firm, if you will -- I

9    think that's what you're referring to -- their clearing

10   arrangement was actually with Bear Stearns, which later, during

11   my tenure, that transitioned over to Persian.

12   Q    Now, when you moved over, if your clients moved over with

13   you, did their investments that were invested with you at

14   Merrill come over to Stanford?

15   A    Yes, they came over and obviously were custodianed at Bear

16   Stearns, you know, initially.

17   Q    Now, you were originally registered rep, did you later

18   take on any management duties?

19   A    Yeah, later on, I became the sales manager in the Stanford

20   Houston office.

21   Q    And what did that involve?

22   A    Primarily the role of the sales manager, at least the way

23   it was done in Houston, was to communicate with the other

24   advisors, make sure that they had the information from

25   management to make sure that if there was any initiatives or

1   any kind of product updates or information that they had that

2   information.

3          Most of Stanford's advisors were what we'd call well-

4   seasoned.  They didn't need a whole lot of training and so,

5   there was a tendency for them to kind of, you know, not

6   interact.  And so, the concern was things would be going on at

7   Stanford, primarily because of the growth and all of the

8   changes, and they would not be aware of it.  So, my role was

9   just kind of communicate and make sure they had that

10  information.

11  Q    Now, with respect to your being a registered rep, were you

12  regulated or were you subject to regulatory requirements of

13  some kind?

14  A    Absolutely.

15  Q    And what were the -- did you have a -- was there a so-

16  called office of simpler advisory jurisdiction?  Did someone --

17  ?

18  A    I think in our industry they call that the compliance

19  arena or compliance department.

20  Q    And who was your compliance person?  Who oversaw your

21  activities as a registered rep?

22  A    There was quite a few, so I don't think I could name all

23  of them.  Jane Bates was one of the initial ones when I first

24  joined.  She later left.  Jack Pernod was in that

25  (indiscernible).  I can't recall any others, but there was --

Tidwell - Direct / By Mr. Lane                    243

1   it was a fairly large department.

2   Q    As a manager, how many reps did you manage?

3   A    That was a moving target, but if I remember correctly, by

4   the time I left there was 25 to 30 advisors that were in the

5   Houston office.

6   Q    Did you receive or give what's called sales training as a

7   registered rep?

8   A    Yes, I did.

9   Q    Okay.  Could you explain to the Court what sales training

10  is for a registered rep?

11  A    Yes.  Sales training is simply the process in which a

12  financial advisor learns about the products or a product, if

13  it's in particular; learns about, you know, if there's a

14  certain strategy or theory.  They learn about that.  They learn

15  about if there's oversight; how long the product has been

16  around.

17       So, it's really kind of a deeper understanding for a

18  financial advisor to really know what's going on so they can,

19  in turn, take that knowledge -- that information -- and convey

20  it to a client.  So, we were kind of a conduit for that

21  information.

22  Q    Did you have annual compliance meetings?

23  A    Yes, we did.

24  Q    And what did the annual compliance meetings consist of?

25  A    Compliance meetings were very involved discussions about

Tidwell - Direct / By Mr. Lane                    244

1    things that are taking place in the industry, regulatory

2    changes that were taking place, different practices that were

3    not appropriate that the regulators had found out about and so,

4    you know, they'd want us to know about what's kind of going on

5    out there.

6            It involved, you know, just making sure that we were

7    doing things properly, ethically; that we were adhering to all

8    the rules and the guidelines and so it was really kind of a

9    50,000 foot view of the industry as a whole.  And then, they

10   would, as you went through the meeting, they would kind of

11   bring it down to what was specifically going on in your

12   particular office.

13   Q    Let me ask you, did issuers or representatives of issuers

14   of products ever meet with the registered reps at Stanford?

15   A    Yes, they did.

16   Q    And did they provide product training?

17   A    Yes, they did.

18   Q    And how was the product training distinct from the sales

19   training?

20   A    Well, I mean, the product training and sales training can

21   kind of go -- work together.  You know, everybody adopts their

22   own kind of, you know, sales practices and approaches within,

23   obviously, appropriate guidelines.

24           The product personnel over there would simply make

25   sure you had, you know, the right materials; you had updated

1    materials.  If you had any questions specific to the particular

2    product, they would answer those questions.  A lot of times

3    they would offer the opportunity to sponsor events to bring in

4    clients so they can further explain and, you know, solicit the

5    products.

6    Q    The Court has heard about Stanford International Bank

7    certificates of deposit.  When you came over to Stanford, SGC,

8    were you required -- was it a requirement -- that you sell

9    Stanford bank CDs?

10   A    No, it was not a requirement, but that's one of the things

11   that made Stanford very unique.  It was a bank CD that paid an

12   attractive yield, you know, certainly higher than what you

13   could get in the United States.  And so, it made for a

14   compelling product to be able to offer your clients, but it was

15   not a requirement.

16   Q    How did you -- well let me ask you -- was it important for

17   you to learn about the CDs, the Stanford bank CDs?

18   A    Absolutely.  That was pretty much required that you needed

19   to learn about it, yes.

20   Q    And how did you learn about the Stanford International

21   Bank and the CDs it offered?

22   A    There was various opportunities and things that Stanford

23   had sponsored to learn about the product, you know.  It started

24   initially, as I mentioned, with Jay Comeaux with my

25   introduction to the firm.  Later, once you were there and

1   transitioned your broker business, Jason Green would come over

2   and he would go in detail about the product -- the history of

3   the product.

4   Q    Let me stop you for a second.  Who is Jason Green?

5   A    Jason Green --

6         THE COURT:  Your voice is quite loud, so you don't

7   have to be quite as close to the mic.

8         THE WITNESS:  Okay.  Sorry.

9         Jason Green was the -- he ran the Baton Rouge

10  Stanford office.  He was also --

11  BY MR. LANE:

12  Q    Actually, you know, if I could just suggest.  You don't

13  have to worry about the mic, because she's picking up what you

14  say.

15  A    Okay.

16  Q    And you can just look at the judge and not worry about the

17  mic.

18  A    Okay.

19  Q    Okay.  So, could you tell the judge who Jason Green --

20        THE COURT:  Well, yeah, we do care.  I want the

21  lawyers to hear.  See, that's not quite loud enough.  I do want

22  the lawyers to hear.

23        THE WITNESS:  Okay.  Jason Green ran the Baton Rouge

24  office -- Stanford Baton Rouge office.  He also was on the

25  Stanford Trust Company board.  But as it relates to the CD, he

1   was the person that was in charge of that training.  He was the

2   gentleman that had quite a bit of experience, you know, with

3   the bank and with personnel at the bank and so, he was the

4   first person that would come over and kind of do a more formal

5   training as it relates to the CD and the whole program.

6           **THE COURT:**  He was on the board of what?

7           **THE WITNESS:**  He was on the board of Stanford --

8           **THE COURT:**  You know, it is hard to hear -- sorry.

9           **THE WITNESS:**  Pull it -- okay.

10          **THE COURT:**  I'm sorry.

11          **THE WITNESS:**  He was on the board of the Stanford

12  Trust Company, as well as he was a financial advisor and he was

13  also the managing director of the Baton Rouge office.

14  **BY MR. LANE:**

15  Q    In your initial product training on Stanford International

16  Bank and its products, what were you told by the Stanford

17  International Bank representatives about the product?

18  A    Well --

19  Q    And about the bank, I should say.

20  A    That's a long answer.  Essentially, if you boil it down

21  based on the training materials, you know, the bank was -- the

22  CD was like any other CD.  It's a promise to pay and so it

23  offered a more attractive rate than what you could get in a

24  typical U.S. bank.  They had groups of people in Memphis,

25  Tennessee that oversaw -- managers that they hired all

Tidwell - Direct / By Mr. Lane                          248

1   throughout the globe that managed various pieces of this

2   portfolio.  And so, it had very many --

3             THE COURT:  Where were those people?

4             THE WITNESS:  Well, there's several groups of people.

5   The first -- the underlying managers of the portfolio were

6   typically the ones that I was aware of were people like Credit

7   Suisse.

8             THE COURT:  But where?  Where were these people?  In

9   Baton Rouge?

10             THE WITNESS:  No.  I said Memphis.

11             THE COURT:  Memphis.

12             THE WITNESS:  Yeah.  Yeah.  That was another group.

13   And if I can explain, the underlying portfolio was divvied up

14   and there was various different groups, you know, throughout

15   Europe that managed a certain piece based on, I guess, the

16   board's direction.

17             And then, in Memphis, there was a group of analysts

18   that kind of oversaw those portfolio managers.  So, they were

19   kind of keeping tabs on the managers, if you will.

20   BY MR. LANE:

21   Q    Let me just ask you.  Is this what you were told by

22   Stanford International Bank representatives?

23   A    This is what I was told when I went to Memphis to do

24   further due diligence.  This is what I was told again and this

25   is what analysts that were there had told us.

1          **THE COURT:**  Just to clarify?

2          **THE WITNESS:**  Yes, ma'am.

3          **THE COURT:**  The portfolio managers you're referring

4   to are people who invested the money that was brought in

5   through the CD sales.  Is that what you mean?

6          **THE WITNESS:**  What I mean is the bank.

7          **THE COURT:**  And what were they managing?  What

8   assets?

9          **THE WITNESS:**  They were managing the assets of the

10  bank.  So, i.e., the depositors' assets.

11         **THE COURT:**  Which are CDs?

12         **THE WITNESS:**  Which were -- and then -- CDs were sold

13  to the investor.  So, you get a piece of paper that is a CD.

14  In turn, you give the bank your money.  That money ultimately

15  went to those portfolio managers.

16         **THE COURT:**  Okay.  That's my point.  And the bank did

17  not have deposits as a typical commercial bank would have,

18  correct?

19         **THE WITNESS:**  That is correct.

20         **THE COURT:**  Okay.  So, these portfolio managers

21  around the world -- but headed up in Memphis?

22         **THE WITNESS:**  Well, Memphis, as I understood it, was

23  kind of the oversight analysts making sure that the respective

24  portfolio managers were doing their job and sticking to their

25  marching orders, whatever that may have been.  So, they added

1   another layer of oversight and protection as I understood it.

2   **BY MR. LANE:**

3   Q    You said you received some materials in connection with

4   your training on at the bank.  Can I ask you to turn to the

5   document that's marked 52 in your binder there?  Can you --

6              And your Honor, I don't believe there's an objection

7   to 52.

8              **THE COURT:**  Are you offering 52?

9              **MR. LANE:**  Yes.

10             **THE COURT:**  Okay.  Hearing no objection, I'll receive

11  it.

12      **(Defendants' Exhibit Number 52 was received in evidence)**

13             It would be great if it could be rotated 90 degrees -

14  - clockwise.

15             **MR. LANE:**  Here we go.

16             **THE COURT:**  Thank you.

17  **BY MR. LANE:**

18  Q    Could you please tell the Court what this document is?

19  A    This looks like a document or a sales spread sheet showing

20  the International Bank's ten-year investment portfolio of

21  performance.

22  Q    Did you receive this document in connection with your

23  training?

24  A    Yeah, this was part of a training package that we would

25  have received on the bank, along with some other documents that

1    were in the package.

2    Q    And this reflected its returns year to year -- investment

3    return?

4    A    Yes.  But to be clear, this was the portfolio's

5    performance at the bank.  It wasn't what the client received.

6              **THE COURT:**  I understand.

7              **THE WITNESS:**  But yes, that's correct.

8    **BY MR. LANE:**

9    Q    Would this be the performances that would be reflected in

10   the annual reports for the bank that you saw from time to time?

11   A    I don't recall seeing these numbers in this fashion in the

12   annual report.

13             **THE COURT:**  Well, there's a predicate.  Did you see

14   the annual reports?

15             **THE WITNESS:**  Yes.

16             **THE COURT:**  Okay.

17   **BY MR. LANE:**

18   Q    Let me ask you to turn to Exhibit 224 and that's the next

19   one.  And take a moment if you need to.  But please, if you

20   could, tell the Court what generally that document is and then

21   we'll go through it.

22   A    Yes.  This looks like the training manual that financial

23   advisors received, I think, from Jason Green.  Yes, I did

24   receive one of these.

25   Q    Okay.

Tidwell - Direct / By Mr. Lane                    252

1          Your Honor, I offer 224.

2          **THE COURT**:  Received.

3          **(Defendants' Exhibit Number 224 was received in evidence)**

4          If you're going to object, gentlemen, you need to

5    speak up quickly, right?  Okay.

6    **BY MR. LANE:**

7    Q    Let's walk through this, if we could.  Page 1, is that

8    just the Caribbean Islands, where Antigua is located?

9    A    Yes.

10   Q    I'm going to skip over -- there's a little history of

11   Antigua and Barbuda.  And then the fourth page, it states

12   "regulators."  And it says "the financial services regulatory

13   commission, government of Antigua and Barbuda."  Were you told

14   anything about the FSRC and its role?

15   A    Yeah.  We were told that the FSRC was the regulatory body

16   that oversaw the banking activity in Antigua.

17   Q    And the next page, next couple of pages, entitled at the

18   top "licensing and supervision," and then the FSRC is

19   referenced in those.  Do those contain some of the things you

20   were trained about the FSRC's role?

21   A    Yes.

22   Q    Let me ask you to go to "management support."  Early did

23   you receive this Exhibit 224 when you were in Houston, when you

24   were in Memphis, or when you were in Antigua?

25   A    I received this when I was in Houston.

1    Q    Okay.  Did you receive this before you went to Antigua or

2    visited Memphis or Antigua?

3    A    I believe I received this before I went to Antigua and

4    Memphis.

5    Q    Okay.  I want you to turn to the page called "management

6    support," and it has two hands shaking.  I don't have page

7    numbers and I apologize for that, so I'm going to have to

8    describe --

9    A    I'm there.

10   Q    Do you see that page?  It says, "Management Support:

11   Support from Stanford affiliates."  And did you understand

12   there were affiliated companies of Stanford?

13   A    Yes.

14   Q    And then, it says, "Portfolio Management:  CFO's office in

15   Memphis, Tennessee."  Who was the CFO?

16   A    Jim Davis.

17   Q    And was he located in Memphis?

18   A    Yes, he was.

19   Q    Who was the chief investment officer?

20   A    Laura Pendergest at that time -- now Laura Pendergest-

21   Holt.

22   Q    And where was she located?

23   A    In Memphis.

24   Q    Let me ask you to turn to the next page.  And this is a

25   quote, do you see?

1   A     Yeah.

2   Q     Who's this quote from?

3   A     From Mr. Stanford.

4   Q     Could you read the quote?

5   A         "We offer clients quality products and excellent

6             return on investment and a high degree of safety, but

7             we only start there.  Ultimately, we're successful

8             because we're not content to settle for anything less

9             than the best from ourselves and for the client.  R.

10            Allen Stanford."

11  Q     Did you on occasion hear Mr. Stanford speak at events

12  where financial advisors were present?

13  A     Yes, I did.

14  Q     I'm going to ask you a little bit more about that in a

15  moment, but I want to continue to go through your training

16  materials here.  Do you see the next page, "factors mitigating

17  SIV credit risks"?

18  A     Yes.

19  Q     And "quantitative and qualitative."  And what did you

20  understand this to be teaching you about -- these pages of this

21  document?

22  A     Well, basically, they were comparing, you know, the CD to

23  other more known investments and going through a comparison

24  ultimately leading you to, you know, what are the risks of the

25  bank.  And that's my understanding.

1   Q    The next page, "structure, manager of managers' team," on

2   the second line.  You referred earlier in your testimony to

3   managers at Credit Suisse and different places like that.  Were

4   those the managers you were referring to?

5   A    Yes.

6   Q    And what was the manager of managers' team that you were

7   told?  What were you told that the manager of managers' team

8   was?

9   A    The manager of managers' team was effectively the role

10  that Memphis played on overseeing the underlying portfolio

11  managers like Credit Suisse.

12       THE COURT:  Who was doing that or who was in charge

13  of doing that?  I don't know.

14       THE WITNESS:  Yeah, my --

15  BY MR. LANE:

16  Q    Or who were you told was doing that?

17  A    Yeah.  My understanding that the oversight people were Jim

18  Davis and Mrs. Holt, as well as the analysts that worked

19  underneath them.

20  Q    A couple of lines down there -- and this is again at the

21  bottom it's Stanford International Bank, Limited.  Is that

22  correct?

23  A    That's correct.

24  Q    And then, it says, "Affiliation:  Part of a global family

25  of companies."  Do you recall what the bank representatives

1    told you about the global family of companies?

2    A    Well, in Stanford there was many different entities and so

3    it's my understanding that, you know, the Stanford

4    International Bank was one of those entities in the network of

5    companies.

6    Q    And it says, "Access to arguably the world's best money

7    managers."  Are those the money managers you were referring to

8    earlier?

9    A    Yes.

10   Q    And you were told some of them were in Europe?

11   A    Yeah.  Primarily Switzerland, but there was others in the

12   UK and, I think, Canada.

13   Q    It says, "Diversification:  Globally diversified

14   portfolio."  What was that a reference to?

15   A    That was a reference to the underlying investments in the

16   portfolio were assets that were in and around the globe and not

17   only diversified by country, but certainly by asset class.

18   Q    Now, at the bottom it says, "Capital:  Regulatory required

19   minimum capital 5 percent."  What did they explain that meant?

20   A    That was explained to us and my understanding, the amount

21   of capital that a private entity -- private bank -- had to

22   maintain in order to be, you know, in compliance with the

23   rules.

24   Q    The next page there, a list of factors -- now, let me ask

25   you.  There's a lot of information here about the bank and

Tidwell - Direct / By Mr. Lane                               257

1   about the CDs.  What was your understanding that the purpose

2   that the bank was sharing this information with you about

3   itself and about its products?

4   A    Well, like I mentioned before, I mean, this was an

5   educational process so financial advisors would have a better

6   understanding of what this product was all about and so, in

7   turn, they could convey that to the clients or potential

8   prospects.

9   Q    Was a CD a so-called sold product?

10  A    Yes.

11  Q    What does that mean?  Could you tell the Court?

12  A    A sold product basically because this was a Reg D private

13  placement offering.  You couldn't put a billboard up and just

14  solicit the general public, so we had to, one, pre-qualify a

15  prospect based on Reg D requirements, net worth or income, or

16  both; and then once you've done the pre-qualification, you

17  could get the marketing material and then sit down and talk to

18  a prospective client about the product.

19  Q    Was it your understanding that the purpose of educating

20  you on the product was so that you could communicate it to

21  potential customers?

22  A    Yes.

23  Q    Now, you see where it says, "Retained earnings:  No

24  shareholder dividends ever taken."  Do you see that reference?

25  A    Yes, I see it.

1   Q    Now, did you understand that Allen Stanford was the only

2   shareholder?

3   A    Yes.

4   Q    And what does it mean that they told you that he never

5   took dividends, ever.

6   A    My understanding is that he never took anything out of the

7   capital account and so, therefore, everything that the bank

8   earned stayed in retained earnings unless it dividend out to

9   him.

10  Q    It states, "Liquidity," well, it says, "Earnings from

11  capital enhanced SIDs returned."  Was that a connected concept

12  of the no shareholder dividends concept?

13  A    Yes.

14  Q    And the "Liquidity:  Policy establishes liquidity

15  requirements."  What were you told by the bank about that

16  policy and liquidity?

17  A    The number -- various of the materials it's changed, but

18  bottom line is we were told that the bank's portfolio could be

19  liquidated in T plus 3, T plus 4 and that number would be

20  somewhere in the 85 to 95 percent range.  So, in four days, you

21  know, the bank could be pretty much all in cash.

22  Q    So -- just so we understand.  T plus 4 means?

23  A    T stands for trade date and then you tack on three or four

24  days, so three to five days in total, the bank virtually could

25  be converted into cash.

Tidwell - Direct / By Mr. Lane                     259

1   Q    Under "marketability," it says, "Predominantly marketable

2   securities and portfolio."  Did the bank also represent that to

3   you?

4   A    Yeah.  That supports the T plus 3 or T plus 4.

5   Q    Let's go to the next page.  It says -- the third line down

6   -- "Working assets:  Minimal fixed assets."  What were you told

7   about that policy or that approach?

8   A    Well, basically, the bank wasn't investing in, you know,

9   land in buildings and that sort of thing.

10  Q    So, no land no buildings?

11  A    Very nominal.  I mean, it was not part of the investment

12  philosophy or the strategy.

13  Q    Where it says, "Lending policy:  Very conservative; 80

14  percent loan to deposits."  Would you explain what you were

15  told about that lending policy?

16  A    Basically --

17       MR. KENNEDY:  Objection, your Honor.  Objection, your

18  Honor.  Lack of foundation and personal knowledge.  I don't

19  think that counsel has laid the predicate for these

20  conversations and these facts about the investment strategies

21  of the company.  I'd like some more detail about it.

22       THE COURT:  The question was what he was told.  So,

23  tell us what you were told.  Overruled.  The question was

24  proper.

25       THE WITNESS:  What I was told was essentially that

1   loans were made to depositors, so therefore, they reasoned the

2   certificate of deposit as collateral and they would loan up to

3   80 percent of the value of the CD.

4   **BY MR. LANE:**

5   Q    Let me ask you.  There's a section called "Products and as

6   fixed CDs, flex CDs and index to length CDs.  You see that?

7   A    Yes.

8   Q    And those were all the bank products?

9   A    Yes.

10  Q    And it goes on to describe a number of products.  I won't

11  go into detail on each one.  And then you see there's a page

12  that says "Investment risk and return charts."

13  A    Okay.

14  Q    And it states:

15          "The charts outline the risk return characteristics

16          of a number of different investments.  The goal is to

17          properly frame the risk return aspects of SIV CDs

18          within the context of other popular investments."

19          Did I read that correctly?

20  A    Yes.

21  Q    Okay, now, is that what the charts follow -- compare

22  various different investments?

23  A    Yes.

24  Q    And the first page is cash and equivalents, high quality

25  bonds and funds, high yield bonds and funds, fixed annuities,

Tidwell - Direct / By Mr. Lane                    261

1   insurance policy; it goes on.  The next page, variable

2   annuities, common stock and stock funds, real estate REITs, RE

3   funds, precious metals, hedge funds; and then, it lists a

4   number of the three different products, the bank products.  Do

5   you see that?

6   A    Yes.

7           THE COURT:  Were the CDs insured by the FDIC?

8           THE WITNESS:  No, they were not.

9           THE COURT:  So, what did they explain to you was the

10  purpose of excess FDIC insurance on the page that's right

11  before "products"?  It's the very last line on that page.  Are

12  you on that -- did you have --?

13          THE WITNESS:  Yeah, I just found it, yes.

14          THE COURT:  Okay.

15          THE WITNESS:  Yeah, it was my understanding the

16  excess FDIC insurance was, you know, FDIC only exists in the

17  United States, so when you have cash, you know, outside the

18  jurisdiction of the United States, they purchased insurance to

19  protect that cash while it sat in those banks waiting to be

20  invested.  So, it was outside the realm of the United States to

21  protect the cash.  That's my understanding of what excess FDIC

22  was.

23          THE COURT:  Did they have any money in the banks in

24  the United States?

25          THE WITNESS:  I wouldn't have that knowledge.  I

1    didn't know.

2         THE COURT:  You don't -- okay.  But I didn't mean did

3    they.  That was a bad question.  Were you told, as part of the

4    training, that there was ever any FDIC insurance?

5         THE WITNESS:  No.  I was never told or had the belief

6    that there was FDIC insurance associated with this CD at all.

7         THE COURT:  Okay.  Sorry.

8    BY MR. LANE:

9    Q    Now, in the last page, it has "SIV fixed CDs, SIV flex

10   CDs, SIV index length CDs."  And I think it said on the first -

11   - prior to these tables -- it was intended to compare it to

12   other popular investments.  You see where it states --

13   describes a number of different characteristics of these

14   investments?

15   A    Yes.

16   Q    And it states, "SIV fixed CDs:  Best suited for investors

17   seeking predictable high income returns with principal and

18   purchasing power protection in exchange for accepting some

19   credit risk."  Let me ask you briefly.  What is credit risk?

20   A    Credit risk in the form of a bank is the, you know, credit

21   worthiness of the institution issuing the CD.  So, in this

22   case, it was Stanford International Bank.

23   Q    So, the credit risk to a Stanford CD would be the risk

24   that the bank wouldn't be good for it?

25   A    Right.  The risk to the CD or depositor is the financial

1   stability of the institution issuing the CDs.

2   Q    And you see in each category it states, "For the SIV fixed

3   CDs" -- and by the way, were any of these three products more

4   popular than the others?

5   A    Yes.  The fixed CD was I believe to be the most popular

6   product.

7   Q    And it states, "Annual income:  High."  Then the next,

8   "Potential for loss of principal."  You see "potential

9   volatility"?  What does it say there for this product?

10  A    For the flex CD?

11  Q    Yes.

12  A    It has a plus and says "none."

13  Q    For the interest rate risk?

14  A    It has a plus and says "none."

15  Q    Now, as these, I guess, other products -- various aspects

16  will either have a plus or a minus or a neutral zero?

17  A    Yes.

18  Q    So, you can kind of understand the characteristics?

19  A    Right.  There is a comparative chart.

20  Q    It says "Liquidity risk."  What does it say there?

21  A    Under the fixed portion?

22  Q    Under the SIV fixed.

23  A    Yes.  Fixed.  It has a plus and says "low."  It says

24  "modest surrender charges."

25  Q    So, that was a positive for this investment?

1    A    That was a positive attribute to this, yes.

2    Q    "Transaction costs"?

3    A    It has a plus and says "low" and "only on surrender."

4    Q    And then, "Credit risk," that is a risk that Stanford

5    might not be good for paying off the CDs.  What does it say

6    there?

7    A    It has a plus and says "low to zero, moderate" and then

8    says "C notes."

9    Q    Did you travel to Antigua as part of your training?

10   A    Yes, I did, on two occasions.

11   Q    And tell me about that.  Or tell the Court about that.

12   A    The first occasion was August of '04.  It was with another

13   group of financial advisors.  It was part of a due diligence

14   trip.  We were escorted by Jane Bates and we went down to meet

15   the various personnel at the bank and I got to see what, you

16   know, how the operations ran down in Antigua; met certain

17   personnel that myself and my assistant may have an occasion to

18   talk to.

19   Q    Did you ask questions about the bank or its operations?

20   A    Yes.  There was a formal presentation given by Juan

21   Rodriguez on, you know, everything that you just saw here, the

22   jurisdiction and how the bank operates.

23   Q    Did you also make a trip to Memphis in connection with

24   your training?

25   A    Yes, I did.

1   Q    Did you meet the chief investment officer at that time?

2   A    Yes, I did.

3   Q    Were you trained on the product by the chief investment

4   officer?

5   A    Yeah.  That was again another trip for due diligence with

6   some other advisors to kind of learn the role that the Memphis

7   group played with the bank.

8   Q    What were you told the chief investment officer Holt's

9   role was?

10  A    Well, she told us that, you know, it was her job to, along

11  with Mr. Davis, was to oversee, you know, the portfolio; the

12  managers; to monitor the bank; to monitor investments, you

13  know, to make investment decisions; to help create policy; you

14  know, it was all encompassing to deal with the underlying

15  investments of the portfolio.

16  Q    When you were in Memphis, were you actually trained about

17  Stanford International Bank based in Antigua and its portfolio

18  of assets?

19  A    Well, I mean, the role of Memphis was -- it was overseeing

20  the International Bank's, you know, portfolio.  So, you know,

21  the training there was just more specific on the role that they

22  played and how they oversaw the underlying managers and what

23  they did and how they interacted with those managers.

24  Q    During your training, whether in Houston, Memphis or

25  Antigua, were you ever told that the assets of the bank were

1   divided up into three so-called tiers?

2   A     Never.

3   Q     Did you hear of a so-called tier 3?

4   A     Never.

5   Q     Did anyone in Memphis or anyone involved in the management

6   -- purportedly involved in the management of the bank's

7   investments -- ever indicate that only a small portion of the

8   investments were managed out of Memphis?

9   A     Never.

10  Q     Or that only a small portion of the assets were subject to

11  the investment philosophies that they announced?

12  A     No, never said that or made that representation.

13  Q     Based on the information that was given to you about the

14  bank -- well, did you transmit that information you received

15  about the product and about the bank to potential customers?

16  A     Yes, I did.

17  Q     And did you provide them materials, as well, in connection

18  with sales of Stanford International Bank CDs?

19  A     Yes, I did.

20  Q     I want you to look at what's Exhibit Number 36 in your

21  binder there.  And this is an exhibit that's already in

22  evidence.  It is the annual report for 2006, which was released

23  in 2007.  And let me ask you that in 2007 you were still at

24  Stanford at that time; is that correct?

25  A     Yeah.  The June annual reports came out April, May, June-

1    ish time frame.

2    Q    Let me ask you before we move on to the annual report and

3    the representations in it, when you were in Memphis and you met

4    with Ms. Holt, did you ever propose an investment that you

5    should consider offering at the bank?

6    A    Yeah, I did propose an investment that I thought would be

7    appropriate for the bank's portfolio.

8    Q    What kind of investment was that?

9    A    Essentially, it was a limited partnership investment of a

10   20 year old limited service hotel operator that paid a monthly

11   return.

12            **MR. ZIMMERMANN:**  Excuse me.  This is very

13   interesting, but I object to relevancy, certainly to Mr. Lopez.

14   It's not relative to any contested issue in this case.

15            **THE COURT:**  Okay.  What is the relevance?

16            **MR. LANE:**  I'll connect it up, your Honor.  I believe

17   what I understand the testimony will be is that he was told

18   that the bank does not make investments in real estate.

19            **THE COURT:**  Oh, okay.  Go ahead, then.

20   **BY MR. LANE:**

21   Q    Okay.  What did she tell you?

22   A    Eventually, the bank --

23            **THE COURT:**  First, we cut you off.  Tell us what the

24   investment proposal was.

25            **THE WITNESS:**  Again, it was a portfolio of limited

Tidwell - Direct / By Mr. Lane                            268

1  service hotels throughout the United States.  It had been

2  around for, you know, close to 20 years.  It was a monthly

3  paying investment which I thought would make sense with the

4  bank's obligation to pay interest out monthly.  It was a

5  publicly reporting company although it was private.  It was big

6  enough because they had to adhere to Sarbanes-Oxley, so it had

7  all the transparencies.  So, that's essentially what the

8  investment was.

9            **THE COURT:**  Okay.

10 **BY MR. LANE:**

11 Q    What did the chief investment officer tell you with

12 respect to --?

13           **THE COURT:**  Who did you talk to about this?

14           **THE WITNESS:**  I made that proposal to initially Jay

15 Comeaux and then I think it got moved up the food chain and

16 then I brought it up to Laura Holt.

17 **BY MR. LANE:**

18 Q    And what was the response of Laura Holt?

19 A    Laura said that, you know, that's not an appropriate

20 investment, you know, for the bank because it's real estate and

21 it's not liquid.

22 Q    And was that consistent with the representations that you

23 had -- that you discussed earlier that had been made to you --

24 minimal fixed assets, high liquidity investments?

25 A    Yes.  That was consistent.

Tidwell - Direct / By Mr. Lane                    269

1    Q    Let me ask you to look, if you would at the annual report,

2    36, that we were starting to look at.  When you received these

3    annual reports each year, did you look through them closely?

4    A    Yes, I did.

5    Q    And why would you do that?

6    A    Well, I mean, as the training material points out, it you

7    take it to its end conclusion, the risk that you're taking is a

8    credit risk.  So, the natural step was then you want to look at

9    any and all financials as it relates to that entity.

10   Q    Did you rely on this annual report when you brought it to

11   your clients?

12   A    Yes, I did.

13          **THE COURT:**  When you say it's a credit risk, are you

14   saying that it's -- when your customer invests in a CD, he or

15   she's taking a credit risk in the bank?

16          **THE WITNESS:**  Yeah, the promise to pay.

17   **BY MR. LANE:**

18   Q    So, let me ask you to walk through this a little bit with

19   me.  I'm not going to read into sections of it, but I'm just

20   going to ask you to take a look.  There's an actual letter from

21   the chairman describing the results.  That's it.  I'm going to

22   give the Bates number at the very bottom -- 16.  Do you see

23   that?

24   A    Yes, I do.

25   Q    And did you read this letter in connection with your

1  familiarizing yourself with the product and so forth?

2  A    Yes, I did.

3  Q    Now, tell me about -- what you understood, or rather --

4  let me step back.  Let me withdraw that.

5         Did you hear Mr. Stanford speak at events where FAs

6  were present?

7  A    Yes, I did.

8  Q    On how many occasions?

9         **THE COURT:**  Where financial advisors were present.

10 **BY MR. LANE:**

11 Q    Yes.

12 A    I would say probably four to five times.

13 Q    Could you describe with as much specificity the first time

14 you heard Mr. Stanford at the first event?

15 A    The first event was their employee of the year, which was

16 the Jean A. Gilstrap awards.  And I was very new to the

17 company.  Generally it's done early in the year and I started

18 in January, so I'd only been there a short period of time.  And

19 it was kind of an overview of the success and how the company

20 was doing and then the introduction of the different finalists

21 for that award.

22 Q    Did you also -- were there also sales gatherings of some

23 kind that he would appear at occasionally?

24 A    He was never at any sales type meetings.

25 Q    What were the other three occasions that you heard him

Tidwell - Direct / By Mr. Lane                     271

1    speak?

2    A    They were what they called the TPC, which is the Top

3    Producer's Club, those people that had done a certain amount of

4    CD sales were invited to these events and, generally, he was

5    the initial speaker and gave overviews -- he and Mr. Davis

6    would give an overview of the company and the success and what

7    was going on.  And then there was kind of a recognition of the

8    top producers.

9    Q    Did he speak at the '07 Top Producer Club gathering, if

10   you recall?

11   A    I don't believe I was in attendance at the '07.

12   Q    What about the '06?

13   A    Yes, he did.

14   Q    Where did that take place?

15   A    I don't recall.  They all kind of run together.  I mean, I

16   can tell you the ones I was at, but I don't know specifically.

17   Q    Where were the located, the ones that you were at?

18   A    Yeah.  I went to -- there was one in Houston, New York

19   City and then Zurich, Switzerland.

20   Q    Tell me with as much specificity as you can what

21   Mr. Stanford said at the Top Producer Club with respect to the

22   health of the bank, its investments, its growth and so forth.

23   A    I mean, the whole time I was there, any and all

24   discussions as it relates to the bank was always positive.

25   "It's doing well.  It's in good shape."  There was never any

1    negative news or anything that was derogatory or anything of

2    that nature.  Everything was things were going well.  The bank

3    was going well.  Deposits were being added and they were

4    weathering, you know, doing well in the investment community.

5    So, it was always positive.

6    Q    Did Mr. Stanford encourage sales of the bank product?

7    A    Well, Mr. Stanford was a very charismatic, you know,

8    speaker and so, you know, just as his way of speaking was

9    encouraging people, so yes, he did.

10   Q    There are a number of financial statements in this annual

11   report reflecting cash flows and amounts under deposit and so

12   forth, or total assets.  Would you review those when you

13   received the annual report each year?

14   A    Yes.

15   Q    And would you convey that information -- the information

16   about those figures -- to your clients in connection with the

17   sales process?

18   A    Well, as I mentioned, you know, because of there being a

19   credit risk, you know, I made a point to give an annual report

20   to every depositor that I had so they would have that same

21   information and could look it over just like I did.  So, yeah,

22   I conveyed it.

23   Q    Was this annual report used as a sales piece?

24   A    I would say yes, it was used as a sales piece.

25   Q    Did you have an understanding as to Mr. Stanford's role --

Tidwell - Direct / By Mr. Lane                    273

1    I guess you saw the letter -- did you have an understanding of

2    his role in the creation of the document?

3    A    It was my understanding he was very particular about, you

4    know, anything written about the company and the bank and so I

5    understood him to be very actively involved in the creating of

6    this document.

7    Q    While you were still at Stanford -- let me ask you.  After

8    you left Stanford, after the collapse of Stanford, did you

9    learn second hand about various allegations concerning actual

10   assets?

11   A    Yes.  There was a time frame between when I left and that,

12   though.

13   Q    But while you were still there, while you were still

14   meeting with the clients, were you ever -- did you ever come to

15   learn that a large portion of the assets were in the form of

16   promissory notes from Allen Stanford to the bank?

17   A    No.

18   Q    Did you ever learn that there was a large portion devoted

19   to a so-called real estate investment of the assets?

20   A    No.

21   Q    Would that have concerned you?

22   A    Absolutely.

23   Q    What ultimately led you to leave Stanford?

24   A    That's been pretty well documented.  There was a series of

25   things that, you know, as I recall them, data points that

Tidwell - Direct / By Mr. Lane                274

1  concerned me as it relates to the bank, the big issue being the

2  Treasury Department filing a disclosure form that every U.S.

3  citizen that has money offshore in excess of $10,000 must

4  report that to the Treasury.  And I had concerns about --

5           **THE COURT:**  You mean the United States Treasury

6  Department.

7           **THE WITNESS:**  United States Treasury Department.

8           **THE COURT:**  Having this reg.

9           **THE WITNESS:**  Yes.  So, you know, my concern was I

10 was being told I could not remind clients either in writing or

11 e-mail, in any written form, that they possibly had this

12 requirement and they need to check with their CPA.  And that

13 concerned me, because I'm the person who got them in there.  I

14 didn't want to be liable if I left them a phone message and

15 they didn't receive it and they wouldn't file this form.

16          Also, as it relates to IRA monies, they went through

17 Stanford Trust Company, which that's a whole other matter.  It

18 was my understanding and belief that the trust company had that

19 obligation to file by disclosure form on behalf of IRA clients.

20          Stanford's response -- Stanford's management's

21 response to me was, you know, they are just a custodian.

22 They're not a trustee; therefore, they don't have that

23 requirement.  I sought outside counsel that had a specialty in

24 that arena and they completely disagreed.

25 Q    While you were at Stanford, while you were a financial

Tidwell - Direct / By Mr. Lane                    275

1    advisor, did you sell -- what was the volume, if you can

2    estimate it, of CDs that you sold to Stanford customers relying

3    on the information and materials that they provided -- the bank

4    had provided you?

5    A    Me personally as a financial advisor?  I think at the peak

6    of my total sales was $30 million.

7    Q    And when did you leave -- when actually did you tender

8    your resignation and leave Stanford?

9    A    I resigned on December 12, 2007, although Stanford's

10   position was they fired me on December 17th.

11   Q    And did you have actually an exit interview?

12   A    I'm not sure I could quite characterize it as an exit

13   interview.  It was more of a surprise attack and I was

14   questioned if I was happy and I wanted to stay and I told them

15   I wasn't happy and so I made a decision that I didn't want to

16   stay.

17            **THE COURT:**  You did not want to --?

18            **THE WITNESS:**  Did not want to stay and so --

19            **THE COURT:**  So, when was that conversation versus

20   when they say they fired you?

21            **THE WITNESS:**  Right.  That's where it gets confusing.

22   December 12th I told Jay Comeaux in management I did not want

23   to stay.  I don't think he knew what to do and so we had a

24   gentlemen's agreement that we would work through it and we

25   would, you know, work out a transition, which is what everybody

1    that I was ever involved with on the recruiting side, they had

2    told everybody that had ever come to that company, you know, if

3    it's not for you, then you will figure out how to transition

4    out of here.  Well, that's not what I was promised.

5            So, December 17th, I got a phone call in the car and

6    said, "Don't come back."

7    **BY MR. LANE:**

8    Q    After you left Stanford, did you ever meet with

9    representatives of any government agency?

10   A    Yeah, in that so-called exit interview on December 12th,

11   I'd asked a series of questions regarding the SEC investigation

12   that had been initiated in May of 2005.  I asked what the

13   status of that was.  I asked is there any other issues going on

14   that I was unaware of and basically in that interview process

15   Jay Comeaux said there were no issues or outstanding items

16   whatsoever.

17           So, in January of 2008, I decided to call the SEC and

18   to ask if that was true; was there still an investigation going

19   on.  And they told me absolutely, which that was a shocker.

20   And so, at that point I pretty much figured that everything

21   that was told to me I probably need to go verify and check.

22   And so, that's when we began to do that.

23           **THE COURT:**  And to do that, what did you do?

24           **THE WITNESS:**  Well, the SEC was curious why I was

25   calling, but we started to do some digging to see if there was

1    any issues with the IRS, state securities --

2            **THE COURT**:  When you say we?

3            **THE WITNESS**:  I had a partner that basically exited

4    at about the same time that I did.

5            **THE COURT**:  Oh, you began your own informal

6    investigation?

7            **THE WITNESS**:  Correct.

8    **BY MR. LANE**:

9    Q    Did you ultimately meet with the SEC?

10   A    Yes.  We met with SEC.

11   Q    There was a reference in a document that was between

12   executives that was read earlier and it said -- the quote was,

13   "Tidwell has thrown down the gauntlet."  Do you know if there

14   were any other Tidwells at Stanford to your knowledge?

15   A    To my knowledge, I think there was one early when I got

16   there, but I would have to imagine that was probably referring

17   to me.

18   Q    Okay.  I appreciate your patience.

19           I'll pass the witness at this time.

20           **THE COURT**:  Do you need water?  That's for you.

21           I'm sorry.  The air conditioning went off.  We're

22   trying to get it back on.  If it gets really, really bad, you

23   can be like, you know, one of those old time shows and take

24   your jackets off, but not yet.

25           **MR. UNIDENTIFIED**:  We'll suffer for the public fisc,

Tidwell - Cross / By Mr. Kuniansky                    278

1    your Honor.

2              THE COURT:  Yeah, there you go.

3              MR. KUNIANSKY:  Your Honor, could you switch the

4    computer over to --

5              THE COURT:  Sure.

6              MR. KUNIANSKY:  -- to Mr. Cramer?

7              THE COURT:  Oh, yes, okay.  They're in the back.

8                        CROSS EXAMINATION

9    BY MR. KUNIANSKY:

10   Q    Good afternoon, Mr. Tidwell.  My name is Richard Kuniansky

11   and I represent Mark Kuhrt.  You and I have never met or

12   talked, correct?

13   A    Correct.

14   Q    Do you know Mark Kuhrt ever so slightly?  Is that correct?

15   A    Yes.  I know his name.  I don't think we've ever met.  If

16   we did, it was --

17   Q    Mark, stand up.  Do you recognize him from hallways or

18   something?

19   A    Vaguely.

20   Q    Okay.  Vaguely.

21   A    Right.

22   Q    But you all have never really had any kind of substantive

23   discussions about any of the things you've testified about?

24   A    That is correct.

25   Q    Now, you've been a financial advisor for quite a period of

EXCEPTIONAL REPORTING SERVICES, INC

Tidwell - Cross / By Mr. Kuniansky                        279

1   time, correct?

2   A     Correct.

3   Q     And you have many different licenses in the financial

4   industry, correct?

5   A     Correct.

6   Q     And you would consider yourself, I assume, pretty

7   knowledgeable in financial instruments.  Is that right?

8   A     Correct.

9   Q     And what I want to do -- you also have some understanding

10  of the relationship of some of these Stanford Group of

11  entities; is that correct?

12  A     Yes.

13  Q     Could we put up that first slide?  And can you see that up

14  in front of you?  Is that on your computer screen?  It says

15  "relationship of relevant entities."

16  A     Yes.

17  Q     And what I want to show you, this SGC -- do you see on the

18  kind of right hand -- yes -- "SGC FA's market investments

19  including SIBL CDs."  Do you see that?

20  A     Yes.

21  Q     Okay.  There was something called a Stanford Group

22  Company.  Is that correct?

23  A     SGC, Stanford Group Company.

24  Q     And that's one of the entities or the entity that I

25  believe that you worked for.  Is that correct?

Tidwell - Cross / By Mr. Kuniansky                    280

1  A     Yes.

2  Q     And you were a financial advisor for them and then later a

3  manager of financial advisors for them, correct?

4  A     Correct.

5  Q     Now, the CDs are actually sold by or issued by a bank in

6  Antigua called Stanford International Bank, Limited.  Is that

7  correct?

8  A     Correct.

9  Q     And that's a completely different entity than SGC,

10 correct?

11 A     Correct.

12 Q     And the president of that entity was Juan Rodriguez-

13 Tolentino, correct?

14 A     Correct.

15 Q     And were you aware that the head accountant there was a

16 gentleman named Banu Persaud?

17 A     The name seems familiar, but I never met him.

18 Q     Okay.  Now, we also show -- I've got up here something

19 called correspondent banks.  But when somebody bought a CD

20 through SGC, issued by SIBL, the money didn't actually go into

21 SIBL's coffers, did it?

22 A     No.

23 Q     It went to correspondent banks of SIBL.  Is that correct?

24 A     Correct.

25 Q     So, unlike a normal bank, they actually didn't even have

Tidwell - Cross / By Mr. Kuniansky                    281

1   the cash sitting there, correct?

2   A    Correct.

3   Q    And you've actually been to that bank in Antigua, correct?

4   A    Correct.

5   Q    Were you at the new beautiful one that was built?

6   A    Yes.

7   Q    Sitting up on a hill with 80,000 square feet or whatever.

8   A    Yeah, whatever.

9        **THE COURT:**  Have you been there?

10       **MR. KUNIANSKY:**  Yes.

11  Q    Have you been there?

12  A    Yeah, I've been there.

13  Q    It's quite impressive looking building, isn't it?

14  A    Yes, it is.

15  Q    It seems to -- just from looking at it, exudes success,

16  doesn't it?

17  A    It does.

18  Q    Matter of fact, there are all kinds of Stanford related

19  entities all around the airport in Antigua, aren't there?

20  A    The Stanfordland as it was called in the hallways, yes.

21  Q    So, as soon as you get off an airplane, everything around

22  there is these beautiful Stanford buildings, correct?

23  A    Yes.

24  Q    And every one of them, it all appears to exude wealth and

25  success, correct?

Tidwell - Cross / By Mr. Kuniansky                    282

1   A    Yes.

2   Q    Matter of fact, you were aware, were you not, that he was

3   listed as the 205th wealthiest person in America.  Is that

4   right?

5   A    By Forbes.

6   B    By Forbes magazine, I believe.

7   A    Yes.

8   Q    And being in the investment industry, you read Forbes

9   magazine, don't you?

10  A    Yes.

11  Q    And you were aware of that, correct?

12  A    Correct.

13  Q    And you didn't know any reason to disbelieve that at the

14  time, did you?

15  A    No.

16  Q    Now, I don't know if you're -- let me point to this.

17  There's something called 50-plus Stanford affiliated entities.

18  Do you see that box?

19  A    I do.

20  Q    Are you aware that there were all kinds of different

21  Stanford affiliated companies all over the globe?

22  A    Yes.

23  Q    And would you agree that the number is at least 50, if not

24  well above 50?

25  A    My understanding the number was north of 50.

1   Q    Was what now?

2   A    North of 50.

3   Q    North of 50.  Maybe even -- I've heard 150.  Have you

4   heard that?

5   A    Yes.

6   Q    Okay.  Now, were you also familiar with an entity called

7   SFGC, Stanford Financial Group Company, down on the bottom left

8   hand corner?

9   A    Yes.

10  Q    Okay.  And were you aware whether or not they provided

11  certain administrative services to some of these other Stanford

12  affiliated entities?

13  A    It was my understanding it was just that -- administrative

14  services.

15  Q    Administrative services, okay.  They didn't sell CDs.

16  They didn't issue CDs.  They didn't market the CDs.  They

17  provided administrative services, correct?

18  A    Yes.

19  Q    And were you aware -- and you may have left somewhere

20  around then -- but that subsequently there was a -- let me ask

21  you this.  Were you aware of some global initiative in 2007 to

22  transfer operations over to the U.S. Virgin Islands and St.

23  Croix for tax reasons?

24  A    Yes.

25  Q    And had you heard of something called Economic Development

Tidwell - Cross / By Mr. Kuniansky                          284

1   Corporation and ways that the Stanford Group of companies could

2   save money by locating in St. Croix?

3   A    Yes, I have.

4   Q    And were you aware that there was another entity created

5   to replace SFGC, which is Stanford Financial Group Global

6   Management, which is on there as SFGGM?

7   A    That one is new to me.

8   Q    Okay.  Now, were you aware that Mark Kuhrt worked for

9   Stanford Financial Group Services, one of the companies that

10  provided administrative services?

11  A    I didn't know exactly what entity he worked for.

12  Q    Okay.  You didn't really know what he did?

13  A    No.

14  Q    Now --

15          THE COURT:  Do you know -- and I don't want you to

16  speculate -- but do you know one way or another how the annual

17  reports were distributed?  That's part one.  Were they sent in

18  hard copy or some other way?  And number two, were they

19  distributed to employees of the Stanford companies?

20          THE WITNESS:  As far as distribution, they were

21  brought in hard copy into the building.

22          THE COURT:  Okay.  Okay.  And were they distributed

23  to employees?

24          THE WITNESS:  Yes.

25          THE COURT:  In your world?

Tidwell - Cross / By Mr. Kuniansky                    285

1              **THE WITNESS:**  Yes.  You mean financial advisors,

2     their assistants?  Yes, they were.

3              **THE COURT:**  Okay.  Were they widely distributed in

4     your experience or not?

5              **THE WITNESS:**  As far as I know, anybody who asked

6     could get one.

7              **THE COURT:**  Okay.  But they didn't give out one to

8     every employee in your financial --?

9              **THE WITNESS:**  Mostly financial advisors, you know, it

10    was my knowledge, unless the financial advisors requested them.

11    So, any employee -- I mean, they were all over the building in

12    plain sight.

13             **THE COURT:**  Okay.  Did you see them in other places

14    within the company -- companies?  Not just your own company,

15    but any related companies?  When you visited Antigua or Memphis

16    or any of that, did you see annual reports lying around?

17             **THE WITNESS:**  Yeah, I mean, I recall seeing them in

18    other buildings, other entities, yes.

19             **THE COURT:**  I see.  Okay.

20    **BY MR. KUNIANSKY:**

21    Q    Now, when you first came over to Stanford Financial Group

22    -- or Stanford Group Company -- and became a financial advisor

23    there, at some point pretty early on somebody acquainted you

24    with this CD product, correct?

25    A    I was acquainted with it prior to me joining.

1   Q    Because what?  There was word out in the financial

2   industry of this product that's available through Stanford?

3   A    No, it was Jay Comeaux offered the opportunity for me to

4   go listen to a presentation being done for prospective clients

5   at the building in Houston.  So, I took him up and went to that

6   presentation.

7   Q    And when you went to this presentation, it sounded like a

8   pretty darn good product, didn't it?

9   A    Absolutely.

10  Q    And a couple of reasons it sounded like a good product,

11  one, they were able to offer a higher rate of return on the CDs

12  than traditional banks in the United States were able to offer,

13  correct?

14  A    That and I would say because the presenters were two

15  former Lehman bond people and they were fixed income, you know,

16  specialists and they were the ones giving the presentation.

17  Q    Okay.  So, people that were highly respected in the field

18  were giving a presentation on these instruments, correct?

19  A    Yes.

20  Q    And you relied and trusted those people, didn't you?

21  A    Yes.

22  Q    Matter of fact, you trusted them to the tune of -- I think

23  you said you sold $30 million worth of these things at some

24  point, correct?

25  A    That's the number, yes.

1  Q    And I assume, like most financial advisors, you were

2  meeting with friends and family and friends of friends and

3  friends of family and people that you're close with, correct?

4  A    That's correct.

5  Q    That's how you get your business, isn't it?

6  A    Yes.

7  Q    And you're not going to put somebody that's a family

8  member or one of your best friends or a friend of your best

9  friend into a product unless you believe in that product,

10  correct?

11  A    Correct.

12  Q    And you believed in these products, correct?

13  A    For a time, yes.

14  Q    Okay.  And you felt pretty terrible when it turned out

15  that you had sold $30 million worth of this stuff to some of

16  your best friends and family members and all of that, didn't

17  you?

18  A    Yes.

19  Q    Felt like you had been duped, didn't you?

20  A    Yes.

21  Q    And you're pretty smart in the financial industry.  You're

22  not the easiest person to dupe on this kind of stuff, are you?

23  A    I would think I wouldn't be easily duped.

24  Q    Now, I want to talk about, if you know -- to the extent

25  you know -- what happens after the -- you sell a CD, okay?

Tidwell - Cross / By Mr. Kuniansky                    288

1    Let's take it one step at a time.  You sell a CD.  Somebody,

2    you know, is writing a check out to buy a CD for $100,000,

3    let's say.  Okay?

4    A    Okay.

5    Q    Now, that $100,000 is going to end up in a correspondent

6    bank of Stanford International Bank, Limited, correct?

7    A    Yes.

8    Q    Okay.  And Stanford International Bank, Limited is going

9    to issue a CD or a promise to pay to this person who purchased

10   the CD, correct?

11   A    Yes.

12   Q    According to whatever the terms of that CD are.

13   A    Right.

14   Q    And then, this money is somehow going to leave this

15   correspondent bank and it's going to get out to portfolio

16   managers who are investing that money to be able to earn a

17   higher rate of return than what they're paying the people on

18   the CDs, correct?

19   A    Yes.

20   Q    And that's the whole theory behind it is you've got to

21   make more money than you're paying out or it isn't going to

22   work, correct?

23   A    Correct.

24   Q    And with respect to these portfolios, the management and

25   the money and all that -- strike that.

Tidwell - Cross / By Mr. Kuniansky                    289

1              With respect to this portfolio of investments that's

2    managed by these people all over the world and apparently are

3    allegedly overseen by people out of Memphis, you don't get to

4    see that portfolio of investments, do you?

5    A    Absolutely not.

6    Q    Okay.  And are there ever times when you asked to see that

7    portfolio of investments?

8    A    Yes.

9    Q    And you were told that that was a secret proprietary type

10   thing that couldn't be disclosed to you, correct?

11   A    Verbatim.

12   Q    Verbatim, okay.  Well, matter of fact, did you ever hear

13   of the term "secret family recipe"?

14   A    I never heard it put that way, but certainly proprietary.

15   Q    Okay.  And this is -- by the way, in order to be an

16   effective financial advisor, this is the type of information

17   that you would want to have to be able to really appropriately

18   advise your clients, isn't it?

19   A    Yes.

20   Q    But even though you didn't get that information, that

21   didn't lead you to believe that this was a great big Ponzi

22   scheme, did it?

23   A    Absolutely not.

24   Q    You trusted and believed that money was being invested as

25   had been represented, correct?

Tidwell - Cross / By Mr. Kuniansky                   290

1   A    Yes.

2   Q    Did you think it unusual that they would not provide this

3   information to you?

4   A    Well, the example that was given to us as we walk into

5   Bank of America or Chase, you can ask them what they're

6   investing in, you're not going to be told what that bank is

7   doing with, you know, your dollars and how they're investing

8   it.  You wouldn't know who they're making loans to.  So, that

9   was the analogy that they gave us.

10  Q    Well, I want to follow that analogy a little bit with

11  respect to a traditional bank, you would know by reading their

12  financial statement that whatever percentage of real estate

13  loans they're making, correct?  For example?

14  A    Uh-huh.

15  Q    Now they may not break it down to the 30,000 different

16  people that got a home mortgage, but it would lump it all

17  together into that loan category, correct?

18  A    Right.

19  Q    And you would know that, correct?

20  A    Right.

21  Q    Did you know that with respect to SIBL's portfolio of

22  investments?

23  A    Well, according to the annual report they had high level

24  information on fixed income equities.

25  Q    So, whatever information you had was just what the annual

Tidwell - Cross / By Mr. Kuniansky                    291

1   report said, right?

2   A    Yes.

3   Q    But that only broke it down into like four or five

4   categories of assets, didn't it?

5   A    Correct.

6   Q    And it wouldn't tell you anything, really, about how that

7   money was really invested, would it?

8   A    Correct.

9   Q    You don't know what stocks, bonds, private equities,

10  different currencies, et cetera, et cetera that money was

11  invested in, did you?

12  A    I did not know.

13  Q    But that's information that you would want to know in

14  order to be able to appropriately advise your clients on their

15  investments, correct?

16  A    Yes.

17  Q    And as a result, that's the kind of information that you

18  repeatedly sought to get, isn't it?

19  A    Yes.

20  Q    But you weren't given it.

21  A    No.

22  Q    And that didn't cause you to think that there was some

23  kind of fraud or crime or Ponzi scheme or anything else, did

24  it?

25  A    Well, I mean, the information that we kept requesting

Tidwell - Cross / By Mr. Kuniansky                    292

1  along with the Treasury Department information and, you know,

2  eventually over time, yeah, I got concerned.

3  Q    Okay.  But even when you got concerned, you didn't know

4  there was any kind of Ponzi scheme, correct?

5  A    No, I did not.

6  Q    Matter of fact, really, to this day, other than what you

7  read in the newspapers and pleadings and all that, you don't

8  know for a fact it was a Ponzi scheme, do you?

9  A    That is correct.

10 Q    And I think Mr. Lane asked you a question about them

11 investing great big amounts in real estate.  Do you know

12 whether or not they invested some large amount in real estate?

13 A    No, I do not.  Only what I've read in the paper.

14 Q    Did you read in the paper that the transaction never

15 occurred, it never got booked, it never happened?

16 A    No.

17 Q    Do you know whether that's the case one way or the other?

18 A    It's my understanding that the majority of the assets are

19 missing and they're not where they allege them to be.

20 Q    Okay.

21 A    Where they are, I do not know.

22 Q    You don't know and you don't know who does know, do you?

23 A    That's correct.

24 Q    Do you have any idea whether Mark Kuhrt knows where those

25 assets are?

Tidwell - Cross / By Mr. Kuniansky                    293

1   A     I don't know what Mark Kuhrt knows.

2   Q     Do you know whether he knows any more than what you know

3   about where those assets are?

4   A     I wouldn't have that knowledge, no.

5   Q     By the way, this Top Producer's Club that you're talking

6   about, I assume you got invited as a top producer; is that

7   right?

8   A     On a few occasions, yes.

9   Q     And at the Top --

10            **THE COURT:**  How long were you at the company?

11            **THE WITNESS:**  I started in January 2004 and left in

12   December of 2007.

13            **THE COURT:**  So you were there a full three years,

14   really -- four years.

15            **THE WITNESS:**  Yeah.

16   **BY MR. KUNIANSKY:**

17   Q     Was Doug Shaw also a top producer?

18   A     Yes.

19   Q     And for lack of a better word -- you can correct me if I'm

20   wrong -- but these top producer meetings were kind of like a

21   pep rally, weren't they?

22   A     Yes.

23   Q     And all the big dogs met at some nice place -- a resort or

24   whatever, correct?

25   A     Correct.

Tidwell - Cross / By Mr. Kuniansky                    294

1   Q    And probably at some nice hotel and planned events and all

2   that, correct?

3   A    Correct.

4   Q    All that picked up by the company, correct?

5   A    Correct.

6   Q    And generally Mr. Stanford would speak at these, correct?

7   A    Correct.

8   Q    And he'd be very charismatic, wouldn't he?

9   A    Yes.

10  Q    And the company was great, the CDs were great, the world

11  was great, correct?

12  A    That's the basic message, yes.

13  Q    Okay.  And you believed that message, didn't you?

14  A    Yes.

15  Q    And those other people in attendance believed that

16  message, didn't they?

17  A    Yes.

18  Q    During these meetings, did anyone ever get together and

19  go, "That's just a bunch of BS.  This is a great big Ponzi

20  scheme"?

21  A    No.

22  Q    Did anyone get together and say, "How can we possibly

23  offer these high rates of return on this completely safe

24  investment?

25  A    I mean, I was not party to it -- those meetings -- if they

 1  took place.  I don't know.

 2  Q    The ones that you were a party to, "This is great.  We're

 3  making lots of money.  Our clients are making lots of money.

 4  The world is great."  Correct?

 5  A    For a period of time there, yes.

 6  Q    And as a matter of fact, there was an incentive given to

 7  folks like you to put people onto these CDs versus other types

 8  of investments such as stocks and bonds, correct?

 9  A    The compensation was different for the CDs than other

10  financial instruments.

11  Q    And by that, you mean you could make more money if you

12  steered your clients into CDs than if you put them in other

13  type of financial instruments by the way this was set up at the

14  Stanford Company, correct?

15  A    Yes.

16  Q    And that didn't cause you to believe this was a fraud or a

17  Ponzi scheme either, did it?

18  A    No.

19          **MR. KUNIANSKY:**  Pass the witness.

20          **MR. ZIMMERMANN:**  I don't have any questions of this

21  witness, Judge.

22                    **CROSS EXAMINATION**

23  **BY MR. KENNEDY:**

24  Q    How are you doing, Mr. Tidwell?

25  A    Fine, thanks.

1  Q     My name is Kirk Kennedy and I'm counsel for Allen

2  Stanford.  You know Allen Stanford, right?

3  A     Yes.

4  Q     But you've never spoken to Allen Stanford directly, have

5  you?

6  A     I have, yes.

7  Q     You have?  When have you spoken to him?

8  A     The first meeting I spoke to him.  I was introduced to him

9  by Jay Comeaux.  And a couple of other occasions when he was in

10 the building in Houston, we chatted briefly.

11 Q     And that's when you were first hired, right?

12 A     The first meeting was when I was first hired.  He came in

13 and out of Houston, so there was an occasion where I ran into

14 him and we said hi.

15 Q     But in any event, it was a very brief meeting?

16 A     Yes.

17 Q     And before I get into my questions, I wanted to know, were

18 you out in the hallway speaking to Dr. Conte?

19 A     No.  I'm not even sure who he is.

20 Q     Did you have any conversations with any people out in the

21 hallway before you were getting ready to testify?

22 A     I chatted with Kelly.

23 Q     And who's Kelly?

24 A     The gentlemen that testified before me -- DeHay.

25 Q     What did you talk to Kelly DeHay about?

1  A    We just chatted on, you know, real estate.  He's a

2  realtor.  We talked about, you know, the economy.  And we were

3  out there for quite a while, so we just chitchatted.

4  Q    So, let me understand this.  You were talking to another

5  witness before you came in to testify?

6  A    Yes.

7            THE COURT:  Did you talk about the case?

8            THE WITNESS:  I'm sure we touched on parts of it,

9  yes.

10           THE COURT:  Did you talk about the case before he had

11  testified or after?

12           THE WITNESS:  Before.  It would have been before he

13  testified.

14           THE COURT:  Did you work with him or know him before

15  today?

16           THE WITNESS:  No.  I've seen him on TV and in various

17  meetings, but I don't know him.  He was not my client.

18           THE COURT:  Okay.

19  BY MR. KENNEDY:

20  Q    Now, in total I think you did testify and tell us that the

21  Stanford group of companies was a large group of companies,

22  right?

23  A    Yes.

24  Q    And it could be over 100?

25  A    I don't know if the Stanford group of companies is over

1   100.  I think the number of entities -- I guess, yeah, in total

2   I guess there could be over 100 all together.

3   A    And isn't it reasonable that the chairman of the board of

4   a group of companies that large is not going to be immersed in

5   the details, the intimate details of every particular entity.

6   Isn't that fair?

7   A    Yes, it's fair.

8   Q    Okay.  And it wouldn't -- you didn't have any personal

9   expectations after you met Allen Stanford that he would be

10  involved in the intricate financial planning of all the

11  subsidiaries and related affiliate companies in the Stanford

12  Group?

13  A    That's correct.

14  Q    In fact, I would imagine that -- and wouldn't you agree

15  with me -- that it would be difficult for the CEO of a large,

16  multi-national company to be intricately involved in the

17  details of a company of that size?

18  A    Yes.

19  Q    And micro management isn't one of the expectations that

20  investors would have of their CEO.  Wouldn't you agree with

21  that?

22  A    I would agree.

23  Q    It's more like strategic planning, isn't it?

24  A    Yes.

25  Q    And a lot of delegation is required, isn't it?

1   A     Yes.

2   Q     And a company the size of Stanford Financial -- in fact,

3   you can testify to this personally -- it had a lot of lawyers

4   and accountants and financial professionals involved in the

5   company, didn't it?

6   A     Yes.

7   Q     So, the company was surrounded by professional advisors in

8   the field of accounting, finance and securities regulation.

9   Isn't that true?

10  A     Yes.

11  Q     And you testified a little bit about the fact that

12  Stanford Financial had a robust compliance program, didn't you?

13  A     Yes.

14  Q     Are you familiar with what -- you're familiar with FINRA,

15  right?

16  A     Yes.

17  Q     And you have the series 7 securities license?

18  A     Yes.

19  Q     Tell the Court what FINRA is.

20  A     FINRA is the new regulatory body that I guess replaced the

21  NASD.  I don't remember exactly what the acronym stands for.  I

22  apologize.  But it's essentially the regulatory body that

23  oversees broker dealers, clearing firms.

24  Q     And FINRA is the regulatory body for want of a better

25  description that regulated the brokerage arm of the Stanford

1   Financial group of companies, right?

2   A    Yes.

3   Q    And do you know what the Central Registry of CDRs are?

4   Have you ever heard that acronym?

5   A    Yes.

6   Q    Okay.  Tell the Court what CDRs are.

7             **THE COURT:**  CDRs?

8             **MR. KENNEDY:**  Yes.

9             **THE WITNESS:**  CDR is the registry where brokers have

10  their license and their employment history; any customer

11  complaints are logged into the CDR.

12  **BY MR. KENNEDY:**

13  Q    In fact, the CDR is a central repository for all types of

14  complaints against brokers, against investment advisors,

15  against the company, against all aspects of an organization

16  like Stanford Financial that deals in publicly traded

17  securities.  Isn't that true?

18  A    Yes.

19  Q    Now, did you ever have any occasion when you were with the

20  Stanford Group Company to perform a broker check or what they

21  call a FINRA broker check with them?

22  A    On who?

23  Q    Just generally, with respect to any complaints or

24  violations of the company.

25  A    Oh, of Stanford?

1   Q    Right.

2   A    Yeah, it was my way, normal or common, for me to do a

3   broker check on your own employer.

4   Q    Would it surprise you if I told you that prior to the SEC

5   appointment of a receiver, ex parte appointment of a receiver

6   in 2009, that according to FINRA, Stanford Financial Group only

7   had three -- three -- compliance issues that were reported to

8   FINRA through the CDR?

9            MR. LANE:  Objection, relevance.

10           MR. KENNEDY:  Your Honor, the relevance is --

11           THE COURT:  Sustained -- I mean, overruled.  Let's

12   just move on.  It's really not very relevant.

13           MR. KENNEDY:  Your Honor, I would submit that the

14   relevance --

15           THE COURT:  Is he aware?  Yes or no?

16           THE WITNESS:  Yes, I'm aware.

17           THE COURT:  All right.  Move on.

18   BY MR. KENNEDY:

19   Q    Could you tell the Court a little bit about the compliance

20   program at the Stanford group of companies with respect to

21   securities --?

22           THE COURT:  What does this compliance program cover?

23   Let's get down to the more basic level.

24           THE WITNESS:  Well, compliance in a broker dealer is,

25   you know, they are kind of -- because it's a self-regulatory

1   industry -- they make sure that the financial advisors are

2   adhering to, you know, all the rules and regulations, be it,

3   you know, communication with the public, sales practices,

4   suitability for products.  I mean, that's their role is to make

5   sure that the advisors, the brokers, are adhering to those

6   rules and regs.

7   **BY MR. KENNEDY:**

8   Q    And there were very few customer arbitration cases and

9   complaints reported to FINRA with respect to Stanford.  Isn't

10  that true?

11  A    As far as I'm aware that's true.

12  Q    Prior to the SEC raid in 2000 --

13       I wanted to ask you a little bit.  You testified

14  about the 2007 annual report.  I think your testimony -- and

15  you can correct me if I'm wrong -- is that Allen Stanford

16  "actively participated in the drafting of 2000 annual report."

17  Did you testify to that?

18  A    I believe that's what I said, yes.

19  Q    Now, did Allen Stanford ever tell you that he drafted the

20  2000 annual report or actively participated in it?

21  A    No, he did not.

22  Q    Did you ever see Allen Stanford working on the 2000 annual

23  report?

24  A    I didn't witness it, no.

25  Q    So, really, you have no personal knowledge that Allen

1  Stanford drafted or participated in any information with

2  respect to that report.

3  A    My personal knowledge is based on the people in Stanford

4  Communication who were putting that report together.  When we

5  needed them and it was during that time, that's what they would

6  tell us.  They didn't have time for us, they were working on

7  the annual report.

8  Q    So, the statement you made regarding Allen Stanford's

9  involvement was coming second hand from somebody that told you

10 something.

11 A    That is correct.

12 Q    So, my question again is, you have no personal knowledge

13 that he participated actively, as you testified, in the

14 contents of that report?

15 A    That's correct.

16       THE COURT:  Is Stanford Communications -- what is

17 that?

18       THE WITNESS:  That was the internal division that

19 dealt with the annual report, marketing material, brochures.

20       THE COURT:  Okay.  Well, what company was it in, if

21 you know?

22       THE WITNESS:  I don't know exactly who they rolled up

23 to.  They may have been their own entity.

24       THE COURT:  Okay.  So, they produced the report?

25       THE WITNESS:  They -- I mean, it was their -- they

Tidwell - Cross / By Mr. Kennedy                    304

1   had writers.  They produced -- if Stanford did a commercial, if

2   they had anything written that was going out to the public,

3   they would produce it.

4            THE COURT:  Oh, advertising.

5            THE WITNESS:  Advertising and PR.

6            THE COURT:  I see.  Okay.  So, you'd call them and

7   say, "I need something," or what?

8            THE WITNESS:  Well, I mean, in my management role, I

9   was working with Jay Comeaux on the branding initiative in the

10  Houston office, so there was various different things going out

11  to Houston Business Journal; we met with the Chronicle; and so,

12  there was marketing pieces that were being produced for every

13  advisor in the office that was being run in the Houston

14  Business Journal.  And so, I had reasons to be talking to them

15  and during that time when the annual report was being drafted

16  and then done, that was, you know, nothing else would be worked

17  on.

18  BY MR. KENNEDY:

19  Q    And that communication division, where was that

20  headquartered?

21  A    It was in -- I think initially 5050 Westheimer, then they

22  moved over to 5051.

23  Q    And that's in Houston?

24  A    That was in Houston.  I think maybe later they may have

25  rolled up to Memphis.

1  Q    Now, you attended a meeting with Laura Pendergest-Holt and

2  James Davis in Memphis, didn't you?

3  A    Yeah, Mr. Davis was not there for the majority of the

4  meeting.  I think he said hi.  It was mainly Laura's meeting.

5  Q    What was your understanding of what role Laura Pendergest-

6  Holt performed?

7  A    It was -- she was chief investment officer, so it was my

8  understanding that she had oversight of the investment

9  portfolio.

10 Q    Did you learn that at the meeting in Memphis?

11 A    I mean, that was kind of common knowledge.  I learned that

12 initially from Jay Comeaux and then Jason Green and then from

13 her, as well.

14 Q    On up the chain of command?

15 A    Right.

16 Q    And what role did you understand Allen Stanford to have?

17 A    In what matter?

18 Q    With respect to investment decisions -- investment

19 strategy decisions.

20 A    He was on the board of the bank and so I think he was

21 privy to the direction the board was going, the underlying

22 portfolio.  I mean, he was on the board so I assumed that he

23 had knowledge of what was going on at the bank.

24 Q    Right.  So, you assumed that he had knowledge of the

25 specific investment decisions, but again you have no personal

1    knowledge as to Allen Stanford's exact role and the function

2    that he played in the investment strategy with respect to the

3    tier 3 investments or any of the investments for that matter.

4    Isn't that true?

5    A    That is true.

6    Q    Do you know what an accredited investor is, right?

7    A    Correct, yes.

8    Q    And did you sell your -- when you were promoting and

9    selling the CDs, were you selling the CDs primarily to

10   accredited investors?

11   A    Exclusively.

12   Q    So, there were no CDs that were sold to what we call non-

13   accredited investors?

14   A    I can't say there was no CDs sold to non-accredited

15   investors, but I can tell you I didn't sell to non-accredited

16   investors.  I don't know if there was people that were non-

17   accredited that owned the CD.  I wouldn't have that knowledge.

18   Q    And what is an accredited investor?

19   A    The rules have just recently changed, but at the time that

20   I was there it's essentially a person who has a net worth of a

21   million dollars, which back then was inclusive of your primary

22   residents.  That's been since changed.  You had to have income

23   -- if you were single, it'd be $200,000; if you were married

24   and filed jointly, it'd be $300,000, with the expectation of

25   the same income going forward.

Tidwell - Cross / By Mr. Kennedy                    307

1    Q    And to paraphrase, isn't it fair to say that accredited

2    investors are -- these are experienced investors, sophisticated

3    people that have, you know, not novices to the securities

4    market?

5    A    Unfortunately, I don't think that's what it says.  I think

6    if you just meet those hurdles then you are accredited.  So, I

7    don't necessarily think that everybody who meets those hurdles

8    fits that definition.

9         **THE COURT:**  So, to be accredited, what years are you

10   talking about here with the one million including your house?

11        **THE WITNESS:**  That was the whole time I was there, so

12   it was January 2004 through December 2007.

13        **THE COURT:**  So, to be accredited, all you needed was

14   -- that's not nothing or anything -- but it's not considered a

15   super high net worth person or anything.

16        **THE WITNESS:**  No, right.  No, that's why I think they

17   -- I think they've excluded now the primary residents in the

18   new regs.

19        **THE COURT:**  And that was equity, of course, in the

20   home based on whatever the appraised value was?

21        **THE WITNESS:**  Right.  The net, right, just the value.

22   **BY MR. KENNEDY:**

23   Q    Isn't it true that SEC regs there's also a criteria for

24   accredited investors that also includes a person check the box

25   if they have a level of sophistication with respect to

Tidwell - Cross / By Mr. Kennedy                    308

1    investment -- investing and securities issues?

2    A    I don't think they can get around the income or the net

3    worth requirement based on sophistication; not to my knowledge.

4    You can't just check a box and say you're sophisticated and be

5    accredited.

6             **THE COURT:**  In your books they couldn't, anyway.

7             **THE WITNESS:**  Right.

8    **BY MR. KENNEDY:**

9    Q    But you're not sure that the SEC regulations -- that

10   that's what they are?

11   A    The rules that I've read on accredited investors don't

12   have that requirement or option, I should say.

13   Q    Now, when you were selling the CDs you were working with

14   the broker dealer side of the house, so to speak, right?

15   A    SGC, yes.

16   Q    Right, SGC.  And do you know what the total amount in

17   billions of dollars that SGC had managed or advised when you

18   were working at the company?

19   A    Well, SGC, I think the way it was stated was under

20   management or advisement.  I believe that number was, you know,

21   $30 billion.  It was a large number.

22   Q    It was a very large number.  In fact, SGC managed a

23   significant amount of investments and in capital, did it not?

24   A    Yes.

25   Q    And it would be the equivalent of its counterpart would be

1   something like a Charles Schwab or a Merrill Lynch or something

2   to that --?

3   A    I don't think it was quite the Merrill Lynch level, but

4   possibly Schwab.  I haven't seen their numbers in a while.

5   Q    But in terms of the types of investment and the services

6   they performed for their investors?

7   A    Yes.  Yes.  Same services.

8   Q    And the broker dealer side of the house, in managing those

9   investments, the purpose of that entity was to return a profit

10  to the Stanford group of companies, was it not?

11  A    Yes.

12  Q    And did anyone ever speak to you about the value of the

13  brokerage firm, the going concern value to the overall Stanford

14  enterprise?

15  A    I had, you know, a few conversations with Jay Comeaux as

16  to, you know, the financial strength of the broker dealer and

17  it was my understanding the broker dealer was not in the black.

18  They were not making money.

19  Q    But it did have going concern value, did it not?

20  A    I mean, as far as enterprise value, I would say yes, it

21  did have a value.

22        **THE COURT:**  In other words, they had cash flow

23  problems or they spent more than they -- their revenues?

24        **THE WITNESS:**  Right.  And based on the growth model

25  and the acquisitions that they were undertaking with new

1    advisors, they were not -- the SGC was not making money, but

2    did they have value?  Yes, I'm sure they had value.

3    **BY MR. KENNEDY:**

4    Q    As part of the SGC function, did it also engage in private

5    wealth management?

6    A    Yes.

7    Q    Provide those services?

8    A    Yes.

9    Q    Do you know what percentage of cash reserves an FDIC

10   regulated bank would have it its reserves?

11           **MR. LANE:**  Objection, relevance, your Honor.

12           **MR. KENNEDY:**  Your Honor, this goes to the --

13           **THE COURT:**  I think it's beyond his competence.  I'll

14   let you ask that question, but --

15   **BY MR. KENNEDY:**

16   Q    If he knows.

17   A    I don't know that answer.

18   Q    Would it surprise you --?

19           **THE COURT:**  No, no.  Not if it's on that same line.

20           **MR. KENNEDY:**  I'm moving on.

21           **THE COURT:**  I've been on the bench long enough to

22   know, at least suspect, what might be coming.

23           **MR. KENNEDY:**  You know that trick?

24           **THE COURT:**  Yeah.  So, anyway, just change topics.

25   You're fine.

Tidwell - Cross / By Mr. Kennedy                              311

1   **BY MR. KENNEDY:**

2   Q    How many offices did Stanford on the broker dealer side

3   have across the globe?

4   A    Well, obviously, I was not there when they shut down,

5   but --

6   Q    When you left.

7   A    I'm going to say 12 to 14 offices.  I think it was in that

8   neighborhood.

9   Q    In several countries, right?

10  A    Well, not -- I'm only talking about SGC, which is the

11  United States.

12  Q    But I'm talking about in the Stanford group of companies,

13  Stanford had a presence, an international presence, in many

14  countries, did it not?

15  A    That's correct.

16          THE COURT:  But not selling the securities?

17          THE WITNESS:  Well, SGC was the broker dealer arm,

18  which was in the United States, so maybe I'm unclear what he's

19  asking.

20          THE COURT:  But you've answered 12 to 14 is the

21  United States --?

22          THE WITNESS:  Broker dealer --

23          THE COURT:  -- number of offices.

24          THE WITNESS:  Yeah, number of broker dealer offices,

25  yes.

Tidwell - Cross / By Mr. Kennedy                     312

1    **BY MR. KENNEDY:**

2    Q    Now, you left Stanford Financial Group in December of

3    2007, right?

4    A    Yes.

5    Q    And did you take your clients with you when you started

6    your new firm?

7    A    Well, I mean, you ask clients to come with you and they

8    make that decision.

9    Q    And they went with you?

10   A    Yes, most of my clients, but not all.

11   Q    And you started a new firm called Zenith Wealth Management

12   in October of 2007, did you not?

13   A    We registered the name in October 2007, yes.

14   Q    All right.

15            **THE COURT:**  Did you -- well, did your clients wind up

16   selling the CDs that they had?

17            **THE WITNESS:**  Yes.  I unsold the CD as I would like

18   to say it.  I presented the information that I had.  I

19   presented my concerns and, you know, it was their decision to

20   stay in or to get out, but at least I told them what I knew and

21   what my concerns were and then they made that decision.

22            **THE COURT:**  And did most of them, in fact, sell?

23            **THE WITNESS:**  They did.

24   //

25   //

1  **BY MR. KENNEDY:**

2  Q    Did all of your clients receive their investments back

3  from Stanford?

4            **THE COURT:**  Sell might be wrong.  It's really

5  redeemed, right.

6            **THE WITNESS:**  Redeemed is the better way of putting

7  it, yes.

8            **THE COURT:**  Okay.  My mistake.  Go ahead.

9  **BY MR. KENNEDY:**

10  Q    You had some clients that were in the CDs, but you also

11  had other clients that were in market and securities, did you

12  not?

13  A    Some in both.

14  Q    Okay.  And did all of your clients in the CDs that

15  redeemed their CDs, were they all paid?

16  A    Not all, but most, because some stayed.  Some didn't

17  redeem.

18  Q    Right.  But I'm talking about before the SEC raid in 2009,

19  all of your clients who redeemed their CDs were paid, were they

20  not?

21  A    Yes.

22  Q    Now, you're experienced in the securities field, right?

23  You hold those series 7 securities license?

24  A    Yes.

25  Q    And you're familiar about the investment -- at some level

1   about the investment portfolio of Stanford Financial Group, and

2   my question to you is, did Stanford Financial have any

3   investments, to your knowledge, in sub-prime debt?

4           **THE COURT:**  Can I ask a question?  Would you lay a

5   foundation here, because I think you're assuming something that

6   I don't recall and I'd like to get a little bit of foundation

7   before he answers the ultimate question.

8   **BY MR. KENNEDY:**

9   Q    Sure.

10          You marketed different products to your clients, did

11  you not?

12  A    Yes.

13  Q    And in the securities markets there's different industry

14  sectors:  telecommunications, aircraft, real estate,

15  securitizations for mortgages, things like that.  You're

16  familiar with the different industry sectors that you can put

17  your clients into, right?

18  A    Yes.

19  Q    Okay.  So, my question to you is, do you know if Stanford

20  Financial Group had any investments in what we'll call the sub

21  prime real estate market?

22  A    Can I just be clear.  You're saying Stanford Financial

23  Group.  Is that -- you mean --?

24  Q    I'm talking about the bank.

25  A    Okay.

1          **THE COURT:**  What was the trade name?  You want

2    Stanford --?

3    **BY MR. KENNEDY:**

4    Q    Stanford International Bank.  Forgive me, I'll rephrase

5    the question.

6    A    Okay.  I just wasn't sure.

7    Q    Do you know if Stanford International Bank had any of its

8    investments -- if anyone told you or if you have any personal

9    knowledge -- had any of its investments in the sub prime

10   market?

11   A    Was it my understanding that they did not.

12   Q    Did you know that the sub prime market was a causal factor

13   in the collapse of some major financial institutions?  Isn't

14   that true?

15          **MR. LANE:**  Objection, your Honor, relevance and

16   argumentative.

17          **THE COURT:**  I'll let him answer this, given his scope

18   of investment advice.

19          **THE WITNESS:**  I'm sorry.  Repeat the question?

20   **BY MR. KENNEDY:**

21   Q    Is it fair to say that the sub prime real estate market

22   was a causal factor in the collapse of some major financial

23   institutions -- Bear Stearns, Lehman -- we can go down the

24   list?

25   A    Yeah, it's very fair to say that.

1          **THE COURT:**  I couldn't hear the answer.

2          **THE WITNESS:**  It's yes.  I'm sorry.

3   **BY MR. KENNEDY:**

4   Q    Now, you were with Merrill Lynch before you came over to

5   Stanford, right?

6   A    Yes.

7   Q    And how long were you with Merrill Lynch?

8   A    I started with Merrill in March of '95 and left in, you

9   know, January 2004.

10  Q    One of the questions that I've got for you was, you went

11  to this meeting in Memphis and were told by Laura Pendergest-

12  Holt and some others that the investment strategy and the

13  investment profile of the Stanford assets was a secret, right?

14  A    The underlying holdings, their positions, were not known.

15  Q    So, is it fair to say then that you really had no personal

16  knowledge in terms of viewing underlying transactional

17  documents as to the investment positions of Stanford Financial?

18  A    I've no personal knowledge of specific positions.

19  Q    And I'm talking about the bank -- Stanford International

20  Bank.

21  A    No personal knowledge as to specific positions of Stanford

22  International Bank.

23  Q    And I think you testified when Mr. Kuniansky was asking

24  some questions about your personal knowledge that the only

25  thing you really know is what you've heard in the media or in

1    the public sphere.  Is that fair?  And people that you've

2    spoken to since the SEC --

3    A    In relation to the bank's portfolio?

4    Q    Yes.

5    A    Okay.  Yeah, that's -- the only thing I really know

6    specifically is what I've read in the media.

7    Q    Now, you came on to Stanford Financial and you signed a

8    contract, did you not?

9    A    Yes.

10   Q    And it's common, is it not, that when broker dealer firms

11   or brokerage firms, they want to recruit high producers, people

12   that have the potential to bring in clients and generate

13   revenue for the company, right?

14   A    Yes.

15   Q    And you, obviously, were one of those and they brought you

16   on, right?

17   A    Yes.

18   Q    And part of your compensation arrangement was that the

19   company -- you signed some promissory notes and the company

20   advanced you some money, right?

21   A    Yes.

22   Q    How much money did the company advance you in 2004 in

23   January when you came on?

24   A    I believe the number was around $200,000.  Can I clarify

25   what that $200,000 was for?

Tidwell - Cross / By Mr. Kennedy                318

1          THE COURT:  Yes.

2          THE WITNESS:  The $200,000 was essentially my

3    deferred compensation that I gave up when I left Merrill Lynch.

4          THE COURT:  Was it a loan?  He's asked if it was a

5    note.

6          THE WITNESS:  Yeah, there was a note, but it was a

7    note based on what I'd given up.  It wasn't just a note based

8    on me promising to do something.  It was a note based on a

9    verifiable, you know, income and assets that I was leaving

10   behind at Merrill because it wasn't transferable.

11         THE COURT:  Okay, fine.  But were you going to owe

12   the $200,000 back?

13         THE WITNESS:  Yes.  To Stanford, yes.  When I signed

14   that note, they advanced me the money.  Then, yes, I would owe

15   Stanford that money.

16         THE COURT:  So, what's the big deal?  What was the

17   benefit to you?

18         THE WITNESS:  Well, I mean, yeah, exactly.

19   Economically, it was basically a wash.

20         THE COURT:  Did you pay interest?

21         THE WITNESS:  It's federal nominal interest that you

22   have to pay.  It's really you do that because when I left, I

23   mean, the industry changed.  When I left, it was basically I

24   was just being, you know, made whole.  It was the opportunity

25   possibly to earn more money at Stanford because of the unique

Tidwell - Cross / By Mr. Kennedy                    319

1    capability that they had.

2         **THE COURT**:  Okay.

3    **BY MR. KENNEDY:**

4    Q    It was my understanding that there were several promissory

5    notes.  There was a $40,000 note and then a $200,000 note.

6    A    Yeah.  There was -- so, the $200,000 makes me whole from

7    what I'm giving up.  The other notes were based on certain, you

8    know, performance hurdles that they put into the contract.

9    Q    It was a sign-on bonus.  A portion of it was a sign-on

10   bonus.

11   A    Yes.  Yes.

12        **THE COURT**:  So, you got a $40,000 sign-on bonus,

13   which was again a loan to you?

14        **THE WITNESS**:  The $40,000 didn't come at the same

15   time as the 200.  There was some time -- I don't know exactly

16   what the time frame lapse was, but there was a hurdle.  I had

17   to meet a certain performance and I got that money.

18        **THE COURT**:  And then you got it forgiven?

19        **THE WITNESS**:  Yeah, and it's forgiven over a period

20   of time.  It amortizes away.  It's not a very good system in

21   the industry, but it is what it is.

22        **THE COURT**:  Okay.  But the point is that you owe them

23   a certain amount of money.  Did they give you the cash?

24        **THE WITNESS**:  Yeah, they give you the cash and then

25   if you're there it amortizes, so the longer you're there

1   eventually at some point it goes away.

2           THE COURT:  Okay.  Sorry for the interruption.

3   **BY MR. KENNEDY:**

4   Q    So, over a period of time, the loans are eventually

5   forgiven.  The longer you stay there under the idea that

6   eventually you'll be productive and generate money for the

7   company and, therefore, it's a win win scenario for both you

8   and the company, right?

9   A    Right.  Right.

10  Q    But we do know that in October of 2007, while you were

11  still at the company, you formed and started a new company

12  called Zenith Wealth Management, right?

13  A    I registered the name, correct.

14  Q    Did you tell anyone at Stanford Financial in October of

15  2007 that you were registering a name and starting a new

16  company?

17  A    Under legal advice, I was told I didn't need to.

18          THE COURT:  Had you opened your doors?

19          THE WITNESS:  Absolutely not.

20          THE COURT:  Doing any business under that name?

21          THE WITNESS:  No.

22          THE COURT:  Just registered it?

23          THE WITNESS:  Yes.  No capital, no -- didn't use the

24  name.

25  //

Tidwell - Cross / By Mr. Kennedy                    321

1    **BY MR. KENNEDY:**

2    Q    Did you talk to any clients and tell them you were opening

3    up a new business?

4    A    Well, part of the conversation with talking with your

5    clients about the problems I had with the CD and some other

6    issues, I did tell them, yes, I was contemplating, you know,

7    opening up my own company.  I didn't give them any details and

8    I didn't have any details.

9    Q    And then, in December of 2007 -- December 12th, in fact --

10   you had a conversation with Jay Comeaux, the person that

11   brought you in, right?

12   A    That's correct.

13   Q    And that's when you had this conversation about you

14   wanting to leave, right?

15   A    Yes.

16   Q    And did you tell him at the time that you'd opened up the

17   new business?

18   A    No.  He didn't ask.  He asked me where I thought I was

19   going.  I gave him the name of the entity that I'd talked to,

20   but I had no contract, in other words, no details worked out.

21   Essentially I was not prepared to go anywhere.

22   Q    At that time, in October and December, when you met with

23   Comeaux, when you opened up the new business, at that time you

24   owed some money.  It was residual debt that you owed to

25   Stanford Financial.

1    A    That is correct.

2    Q    How much did you owe?

3    A    I believe the number was $150,000; somewhere in that

4    neighborhood.

5    Q    Did you ever tell anyone at Stanford Financial Group that

6    you expected the company to forgive that loan?

7    A    I may have mentioned that.  I don't know.  I can't recall

8    if I had that conversation with anybody.

9         **THE COURT:**  We need to move along, please.

10   Q    Isn't it true that on December 17th, Stanford Financial

11   sent you a demand letter asking you to repay the loan?

12   A    I believe it was on or about that date, yes.

13   Q    And you ended up in litigation with Stanford Financial in

14   a federal proceeding, right?

15   A    Yes.

16   Q    In fact, they sued you to recover that money, right?

17   A    We sued them and they sued us.

18   Q    And what was the result, as you know, with FINRA, the

19   successor to the NASD, there's an arbitration process, right?

20   A    There's an arbitration process pending.

21   Q    What was the outcome of the arbitration process?

22   A    It's been stayed.

23        **THE COURT:**  What did you sue them over?

24        **THE WITNESS:**  Well, we sued Stanford over the fact

25   that they were committing, you know, which is not anything

1   relevant to this proceeding, there was a lot of issues that we

2   had with the company that I didn't want to be a part of.  I

3   mean, the disclosure form, if you read it, there is no statute

4   of limitations and there can be a fine up to 50 percent of the

5   value of the account.  And I brought that up on numerous

6   occasions and I was very concerned that my clients would be in

7   trouble and then, of course, I would be, too.  And every time

8   we asked Stanford about this matter, we were told it was a non

9   event, don't worry about it and move on.

10           **THE COURT:**  You mean -- what matter were you

11   referring to there?

12           **THE WITNESS:**  The disclosure form.

13           **THE COURT:**  The --

14           **THE WITNESS:**  The disclosure form that you must file

15   if you have assets outside of the jurisdiction --

16           **THE COURT:**  Oh, the $10,000 business.

17           **THE WITNESS:**  It wasn't $10,000.  If you have a half

18   million dollar account and you haven't disclosed that, the fine

19   could be $250,000.

20           **THE COURT:**  Oh, okay.  I understand then.  Okay.  And

21   then, Stanford counter claimed for the unpaid $200,000 or

22   whatever number it was.

23           **THE WITNESS:**  Right.  I didn't want to be a part of

24   illegal activity or any of that.  There was a lot of other

25   issues that we brought up to management that we did not get

1  satisfactory answers on and so, that's when I told Mr. Comeaux

2  I didn't want to be there anymore.

3  **BY MR. KENNEDY:**

4  Q    Who initiated the FINRA proceeding?

5  A    Stanford -- yeah, against me.

6  Q    They issued a demand letter and then they filed suit

7  against you and then you counter claimed and raised all these

8  issues about regulatory problems that you had?

9  A    Well, we tried to settle with them --

10        **THE COURT:**  You know what?  We don't want to drag

11  this out.  It's not that important, frankly.

12        **THE WITNESS:**  Okay.  We tried to settle.

13        **THE COURT:**  He's just trying to establish that

14  Stanford sued you first.  So, fine.  Let's go.  Next?

15        **MR. KENNEDY:**  No further questions.

16        **THE COURT:**  Okay.

17        **MR. LANE:**  Your Honor, I just have a couple of

18  follow-ups.

19                    **REDIRECT EXAMINATION**

20  **BY MR. LANE:**

21  Q    You were asked about, if you recall, whether you knew

22  about the proprietary assets held by Stanford Financial, the

23  bank -- Stanford International Bank, Limited.  Do you recall

24  those questions?

25  A    Uh-huh.  Yes.

1  Q    I think both attorneys questioned on that.  I think you

2  were asked one time about the secret recipe, whether it was

3  called the secret recipe or something like that.

4  A    And I'd never had it been told to me in those terms.

5  Q    Well, you had looked -- we discussed the Stanford

6  Financial or the Stanford International Bank report for 2006,

7  which came out in 2007.  Do you recall that?  That's number 36?

8  A    Yes.

9  Q    Let's say you didn't know the entire ingredients, or the

10 entire secret recipe, but you knew one ingredient of the $5.3

11 billion stated amount of assets for Stanford bank was a $1.5

12 billion debt owed -- unsecured debt -- owed by Allen Stanford

13 to Stanford International Bank, Limited; would just that one --

14 just knowing that one investment you would know that this

15 entire annual report was false, wouldn't you?

16         MR. KENNEDY:  Objection, your Honor, calls for

17 speculation.

18         THE COURT:  Well -- no.  Overruled.  My problem with

19 the question is it's too long and it's leading.

20         MR. LANE:  Okay.

21         THE COURT:  So, you may ask something shorter.

22 BY MR. LANE:

23 Q    Okay.

24         You were asked if you knew all of the proprietary

25 assets of Stanford International Bank.  Do you recall that?

Tidwell - Redirect / By Mr. Lane                    326

1   A    Yes.

2   Q    And I think your testimony was you were told it was

3   proprietary.

4   A    Yes.

5   Q    Had you known that $1.5 billion of Stanford bank's assets

6   consisted of an unsecured personal loan from Allen Stanford,

7   what would that lead you to believe as to the truth or falsity

8   of the annual report that's been marked as Exhibit 36?

9            MR. KENNEDY:  Objection, your Honor.  Assumes facts

10  not in evidence.

11           THE COURT:  Overruled.  It's hypothetical.

12           THE WITNESS:  My response to that is I would have

13  concern.  I don't know if I would -- that it would lead me to

14  believe that the document was false or not, but if I saw that

15  as an asset of the bank, I would have concern.

16           MR. LANE:  Your Honor, I have no further questions of

17  this witness.

18           THE COURT:  Anybody else?  Mr. Kuniansky?

19           MR. KUNIANSKY:  No, your Honor.

20           THE COURT:  Mr. Zimmermann?

21           MR. ZIMMERMANN:  No, your Honor.

22           THE COURT:  Mr. Kennedy?

23           MR. KENNEDY:  No, your Honor.

24           THE COURT:  Okay.  Thank you, sir.  You are excused.

25       **(Witness excused at 6:11 p.m.)**

1          Okay.  I told you we could get out of here at 6:00

2     o'clock.  We're a few minutes late.  I'm happy to go a little

3     longer or I'm happy to quit.  It's up to you.

4          **MR. LANE:**  Your Honor, I would start with a new

5     witness, so I would ask that we quit now.

6          I would ask one question.

7          **THE COURT:**  Okay.

8          **MR. LANE:**  Assuming that we go through our witnesses

9     tomorrow and we get done by mid afternoon, given the length of

10    the openings, I would ask that if we're completely done with

11    testimony and all the discussions of exhibits and everything,

12    can we do the closing Thursday morning rather than start it in

13    the middle of the afternoon?

14         **THE COURT:**  Yes, that's no problem.  But you're not

15    the only ones with witnesses.

16         **MR. LANE:**  Oh, we're not, your Honor.  I do believe

17    there are a couple more witnesses after us.

18         **THE COURT:**  Okay.  How many more witnesses are you

19    planning to offer?

20         **MR. LANE:**  Three, your Honor.

21         **THE COURT:**  Okay.

22         Are you going to have witnesses?  Do you know?

23         **MR. KUNIANSKY:**  I do not believe so, your Honor.  I'm

24    going to be playing a ten-minute tape.  I do have a question,

25    though, about Mr. Westheimer that probably needs to be

1    addressed and that's the --

2              THE COURT:  And he's your witness?

3              MR. KUNIANSKY:  Well, I understand he's going to be

4    called as their fact witness first.

5              THE COURT:  Right.

6              MR. KUNIANSKY:  And I'm assuming that's just limited

7    to what was said.  And then, later we call him as an expert.

8              THE COURT:  You may recall --

9              MR. KUNIANSKY:  But he's not going to be an expert in

10   the first part of it.

11             THE COURT:  Right.  He can put factual matters on and

12   then you can recall him, yes.  You don't think you're going to

13   have any other witnesses besides Westheimer, though?  I don't

14   know whose witness he is.

15             MR. KUNIANSKY:  Correct, your Honor.  I'm not sure

16   we've even decided between us who, but yes.

17             THE COURT:  Okay.  Do you have any fact witnesses

18   you're planning to call?

19             MR. ZIMMERMANN:  Well, we didn't think he was a fact

20   witness, but apparently he's been turned into one.

21             THE COURT:  Well, Westheimer we've already discussed.

22             MR. ZIMMERMANN:  That's it.

23             THE COURT:  Okay.

24             MR. BENNETT:  Your Honor, we have probably two

25   witnesses, one fact, one expert and maybe one rebuttal.  Could

1    we find out who they're going to call tomorrow, though, just to

2    find out for our timing, how long we're going to take?

3              **THE COURT:**  Okay.  What do you mean by rebuttal?

4              **MR. BENNETT:**  Well, we talked about Dr. Lare

5    (phonetic).

6              **THE COURT:**  Yeah, but I don't consider him a

7    rebuttal.  I consider him part of your case.  Okay.  Because

8    rebuttal would mean you do it after any rebuttal that the

9    plaintiff -- well, the underwriters, have.  So, I'm figuring if

10   we do anything with Lare, it will be while you're calling your

11   witnesses, generally, okay?

12             **MR. BENNETT:**  Fine, your Honor.

13             **THE COURT:**  Just terminology.  I want to be sure

14   we're on the same page.

15             **MR. LANE:**  Your Honor, I hope my colleagues will

16   correct me if I'm wrong, but I believe we're down to the last

17   three, which would be Mr. Westheimer --

18             **THE COURT:**  Karen Booth (phonetic).

19             **MR. LANE:**  Karen Booth and Paul Sewell, briefly

20   unless we can come to an agreement on some kind of stipulation.

21             **THE COURT:**  Oh, okay.

22             **MR. LANE:**  So, it may be two.

23             **THE COURT:**  Time limits are going to be a problem,

24   after all.

25             **MR. LANE:**  I don't believe so, your Honor.  That's

**EXCEPTIONAL REPORTING SERVICES, INC**

1    why I wondered if we get everything done within the time frame

2    --

3    **THE COURT:**  It's no problem to do closings tomorrow -

4    - I mean, Thursday.  But I'm -- you know, I'll be curious to

5    know if we finish as you expect.  I had planned to sit late

6    tomorrow if we need to.

7    **MR. ZIMMERMANN:**  Just to clarify.  The witness list

8    that you provided had a Charles Rawl (phonetic) on it.  You can

9    take him off?

10    **MR. LANE:**  No, we're not going to call Mr. Rawl.

11    **MR. ZIMMERMANN:**  Thank you.

12    **THE COURT:**  Okay.  I think that the plaintiffs have

13    indicated that they wanted the right to call witnesses that the

14    underwriters had listed if the underwriters don't call them.

15    And you may do that, but you need to plan ahead.  That's one of

16    the reasons I'm asking Mr. Lane to educate us.

17    **MR. LANE:**  I think Mr. Rawl may be the only one who

18    we were going to call, but I --

19    **THE COURT:**  Who had Mr. Compton?  Who's Mr. Compton?

20    **MR. LANE:**  He was an expert who was designated by

21    Ms. Holt.

22    **THE COURT:**  Okay.

23    **MR. LANE:**  He will not be testifying, as far as I can

24    tell.

25    **THE COURT:**  He will not.  Okay.  Anything else?

1      **MR. BENNETT:**  Just one minor thing, your Honor.

2  Would it be all right for Mr. Stanford to bring a sweatshirt

3  over because of the coldness in --?

4      **THE COURT:**  Yes.

5      **MR. BENNETT:**  Is that through you, not the U.S.

6  Marshals --

7      **THE COURT:**  You can bring him one.

8      **MR. BENNETT:**  Okay.

9      **THE COURT:**  Or he can bring one if he has one.

10     **MR. STANFORD:**  Well, they won't -- I had to get your

11  permission.

12     **THE COURT:**  Oh, the answer is yes.  Yes, of course.

13  No problem.

14     Okay.  Thank you all very much.  I'll see you

15  tomorrow.  We're starting at 9:00.

16     **(Proceeding was adjourned at 6:16 p.m.)**

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    <u>September 22, 2010</u>

            Signed                                                                Dated

*TONI HUDSON, TRANSCRIBER*