## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| LAURA PENDERGEST-HOLT, *et al.*, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-3712 |
| | § | |
| CERTAIN UNDERWRITERS AT | § | |
| LLOYD'S OF LONDON and ARCH | § | |
| SPECIALTY INSURANCE CO., | § | |
| Defendants. | § | |

## OPINION

The Court held a preliminary injunction hearing in this insurance coverage case from August 24 through August 27, 2010, to address issues raised by the Motion to Vacate Preliminary Injunction [Doc. # 260] filed by Defendants Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Co. (collectively, "Underwriters"). Plaintiffs Mark Kuhrt, Gilbert Lopez, and R. Allen Stanford[1] seek coverage under Directors and Officers insurance policies issued by Underwriters for defense costs incurred as a result of criminal charges and civil litigation filed against them based on their conduct while involved with certain Stanford Financial Group ("SFG") entities. Each party presented evidence through live witnesses, trial exhibits, matters of which the Court took judicial notice, and deposition testimony and exhibits.[2]

---

[1]     Plaintiff Laura Pendergest-Holt ("Holt") settled her dispute with Defendants prior to the hearing.

[2]     The parties and the Court have faced unusual hurdles in preparing for and presenting

(continued...)

The parties agree that the preliminary injunction standard applies[3] and that only the first prong of the standard is in issue.  The question presented therefore is whether Underwriters have shown a substantial likelihood that one or more Plaintiffs engaged in money laundering as defined in the applicable insurance policies.  Having observed the live witnesses and carefully considered all exhibits and all matters of record in this case, the arguments of counsel, and the governing legal principles, the Court makes

---

[2]     (...continued)
evidence at the preliminary injunction hearing. For instance, preparation time has not been what the parties desired.  The hearing precedes Plaintiffs' criminal trials.  As explained hereafter, certain SFG documents and other materials were seized by a Receiver appointed by United States District Judge David Godbey, Northern District of Texas, upon application of the Securities and Exchange Commission ("SEC"). The United States also seized many documents pursuant to search warrants.  Most of the seized documents were made available to the parties on Internet-accessible databases that are keyword searchable, but apparently the databases have posed issues for all concerned to varying degrees.  The Antiguan government seized the original records of SIBL, making them unavailable to all litigants.  Significantly, many people employed by SFG, third parties associated with SIBL, and those knowledgeable about its finances elected to assert their Fifth Amendment right against self-incrimination. Karyl Van Tassel, the Receiver's forensic accountant, was precluded by court order of Judge Godbey from giving testimony on all subjects, except to authenticate her declarations, unless the Receiver was paid unspecified millions of dollars to reimburse him for FTI and Van Tassel's expenses.  This requirement made Van Tassel unavailable as a practical matter.

[3]     "A district court should issue a preliminary injunction only if the plaintiff establishes: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury caused by the denial of the injunction outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest." *Sonnier v. Crain*, 613 F.3d 436, 440-41 (5th Cir. 2010) (citing *Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009)); *see Pendergest-Holt v.  Certain Underwriters at Lloyd's of London,* 600 F.3d 562, 568-69 (5th Cir. 2010) (citing *Winter v.  Nat'l Res. Defense Council*, __ U.S. __, 129 S. Ct. 365, 374 (2008)).

the following findings of fact and conclusions of law.[4]  For the reasons stated, the Court **grants** Underwriters' Motion to Vacate the Preliminary Injunction.

## I.   FACTUAL BACKGROUND

R.  Allen Stanford is, and at all times pertinent to this case was, the sole owner, directly or indirectly, of more than 100 separate Stanford-related entities, including Stanford International Bank Limited ("SIBL" or the "Bank").   These entities constituted a financial services network publicized and referred to internally as "Stanford Financial Group" ("SFG") or "Stanford Financial."   SFG and certain relevant financial affiliates were headquartered in Houston, Texas.   SIBL, which Stanford owned personally, directly or indirectly, was a private offshore bank with its principal place of business in Antigua.   SIBL was not a normal commercial bank; it did not offer checking accounts or engage in general lending.   The Bank's principal product offering, and principal source of funds, was its certificate of deposit ("CD") program.   SIBL's "purported business model was to invest proceeds of the CD sales in order to provide investment returns sufficient to cover *inter alia* the required interest payments on the CDs, redemptions of CDs, and overhead."[5]

The CDs primarily were marketed through "financial advisors" who worked for Stanford Group Company ("SGC"), a United States broker-dealer based in Houston, Texas, and an SFG affiliate.  Plaintiffs Kuhrt and Lopez worked for Stanford Financial

---

[4]   The Court explains the evidence and uses various forms of the word "find" to indicate a finding of fact, and sets forth legal principles and uses forms of the words "hold" and "conclude" to indicate a conclusion of law.  To the extent a finding of fact is more properly a conclusion of law, and to the extent a conclusion of law is more properly a finding of fact, it should be so construed.

[5]   Report of Mark Berenblut, Underwriters' Exh. 1 ("Berenblut Report"), at 6.  SIBL did offer loans to purchasers of its certificates of deposit (CDs) in amounts up to 80% of the certificate of deposit balance.  *Id.*, ¶ 11.

Group Company ("SFGC"), an SIBL and SFC affiliate, or its successor, Stanford Financial Group Global Management ("SFGGM").   SFGC and SFGGM provided administrative services, including accounting services, to other Stanford-related entities.

Plaintiffs are defendants in a criminal action pending in this Court before Senior United States District Judge David Hittner captioned *United States v.   R.   Allen Stanford, et al.*, No. 4:09-CR-0342 (S.D. Tex. filed Jun. 18, 2009) ("Criminal Action").   Plaintiffs also are defendants in an action commenced by the Securities and Exchange Commission (the "SEC") and pending before United States District Judge David Godbey in the United States District Court for the Northern District of Texas, Dallas Division, in the matter of *Sec. & Exch. Comm'n v. Stanford Int'l Bank, Ltd., et al.,* No. 3:09-CV-298 (N.D. Tex. filed Feb. 17, 2009) ("SEC Action").

The day before the SEC Action was filed in February 2007, the District Court for the Northern District of Texas, acting at the request of the SEC, froze the assets of several Stanford entities as well the assets of Stanford, Davis and Pendergest-Holt personally, and placed these entities and individuals into a Receivership.   Ralph Janvey was appointed Receiver.   That same day, the Receiver retained Karyl Van Tassel of FTI Consulting Services, Inc. ("FTI") to assist him in investigating the alleged Stanford fraud.   According to Van Tassel, FTI "perform[ed] a variety of services, including assisting in the capture and safeguarding of electronic accounting and other records of the Stanford Entities, and forensic accounting analyses of those records, including cash tracing."[6]   Van Tassel and FTI engaged in 18 months of detailed forensic investigation. While original SIBL documents have not been

---

[6]     *See, e.g.*, Declaration of Karyl Van Tassel of May 24, 2010, Underwriters' Exh. 198D ("May 24, 2010 Van Tassel Declaration"), at 1-3.

available, Van Tassel has had access to many other entities' tangible and electronic materials and has interviewed dozens of people who were formerly employed by or who worked with Stanford entities.[7]  Significantly, Van Tassel and her FTI staff examined many thousands of documents, such as available accounting and other records (including email files of certain former Stanford employees) relating to numerous Stanford entities located in and/or gathered from Texas, Mississippi, Tennessee, Florida, St. Croix, United States Virgin Islands, Antigua, Barbuda, and other Stanford locations within and outside the United States.  Van Tassel and her staff also examined extensive "SIBL customer records, including but not limited to paper and electronic records documenting SIBL CD purchases, interest payments and redemptions."[8]  FTI also obtained and analyzed paper and electronic files from third-party financial institutions where bank accounts of various Stanford entities are or were located, and electronic and other data from institutions that currently hold SGC customer accounts and former employee accounts, as well as SGC accounts.[9]  The Court receives in evidence and credits Van Tassel's conclusions based on detailed analysis of documentary evidence, augmented by interviews of persons with firsthand knowledge, concerning the source and use of SIBL funds, SIBL's financial condition at various points in time, the timing and cost of assets acquired by various Stanford

---

[7]   Declaration of Karyl Van Tassel of June 18, 2010, Underwriters' Exh. 198A ("June 18, 2010 Van Tassel Declaration"), ¶ 5, Attachment 2.  Indeed, Van Tassel reports that she interviewed Holt and Lopez.

[8]   *Id.*

[9]   These institutions apparently include Pershing, LLC and JP Morgan Clearing Corp. *Id.*, ¶ 6.

entities (*e.g.*, real estate and private equity investments), and the compensation of financial advisors who sold SIBL CDs.[10]

Following initiation of the SEC and Criminal Actions, Plaintiffs sought coverage for their defense costs under several related directors' and officers' insurance

---

[10]    Over Plaintiffs' objections, the Court receives to the extent described in the text five declarations and associated exhibits of Karyl Van Tassel, Underwriters' Exhs. 198A 198B, 109C, 198D and 198E (collectively, the "Van Tassel Declarations") under Federal Rule of Evidence 807, the residual hearsay exception.  The Court does not admit or rely on Van Tassel Declarations to prove ultimate facts in issue in this litigation, such as whether there was a "Ponzi scheme" or what any particular Plaintiff knew at any point in time.

The Court finds the Van Tassel Declarations, to the extent received in evidence, have strong "circumstantial guarantees" of their trustworthiness.  Van Tassel and FTI performed extraordinarily detailed analysis, as described in the Declarations and summarized above.  *See, e.g.,* Declaration of Karyl Van Tassel dated June 18, 2010, Underwriters' Exh. 198A ("June 18, 2010 Van Tassel Declaration"), ¶ 4.  Van Tassel has "25 years of experience providing a variety of audit, accounting, tax, litigation, valuation and other financial advisory services," is a Certified Public Accountant and the Senior Managing Director of FTI.  *Id.*, ¶ 1 and Exh. 1 thereto.  The information the Court considers is evidence of highly material facts.  *See* Fed. R. Evid. 807(A).  Van Tassel's Declarations, to the extent received, contain statements more probative on the points considered than any other evidence Underwriters can procure through reasonable efforts.  *See* Fed. R. Evid. 807(B).  Through no fault of their own, Underwriters have not had access to much of the information that Van Tassel has reviewed.  The time for discovery has been short for a case of this complexity.  Many witnesses are now unavailable.  Finally, the Court finds that the general purposes of the Federal Rules of Evidence and the interests of justice are best served by admission into evidence of the limited findings described in this opinion.  *See* Fed. R. Evid. 807(C).  There is no dispute that Plaintiffs received proper notice of Underwriters' intention to rely on the Van Tassel Declarations.  *See* Fed. R. Evid. 807.  Plaintiffs' objections to admission of the Van Tassel Declarations are overruled.  *See generally United States v. Mathis*, 559 F.2d 294 (5th Cir. 1977).

The Court also has considered Federal Rule of Evidence 403.  The Van Tassel Declarations are extremely relevant.  Their probative value is not outweighed by the danger of unfair prejudice, confusion of the issues, or any other Rule 403 concerns.

policies (collectively, the "Policy")[11] issued by Underwriters for the benefit of dozens of officers and directors of numerous Stanford-owned entities and affiliates.[12] Underwriters originally agreed to and did pay Plaintiffs' litigation defense costs, subject to a reservation of rights. In November 2009, however, Underwriters retroactively denied coverage back to August 27, 2009, and seeks reimbursement from Plaintiffs of all monies paid on Plaintiffs' behalf under the Policy.

The date of Underwriters' retroactive denial of coverage was not arbitrarily selected. August 27, 2009 was the date the Chief Financial Officer of SIBL, James M. Davis, entered into a plea agreement with the United States in the matter of *U.S. v. James M. Davis*, No. 4:09-cr-0335-01 (S.D. Tex., filed June 18, 2009). Davis entered a plea of guilty to conspiracy to commit wire, mail and securities fraud; mail fraud; and conspiracy to obstruct a proceeding before the SEC. Davis admitted that while employed with Stanford Financial Group he knowingly participated in a scheme

---

[11] Specifically, Underwriters issued a Directors' and Officers' and Company Indemnity Policy, bearing policy number 576/MNK558900 and effective August 15, 2008 to August 15, 2009 (the "D&O Policy"), to Stanford Financial Group Company, Stanford Group Company, and other Stanford-related entities more fully identified in the Policy. *See* Policy, Underwriters' Exh. 8. Underwriters also issued an Excess Blended "Wrap" Policy bearing policy number 576/MNA831400 and effective August 15, 2008 to August 15, 2009 (the "Excess Policy"). *See* Excess Blended "Wrap" Policy, Underwriters' Exh. 104. The Excess Policy is a "follow form" policy, meaning that it adopts the terms, conditions and provisions of the policies over which it sits, here, the D&O Policy. The parties agree that for present purposes these insurance policies are identical and will be referred to as one "Policy."

[12] The Policy form was presented to Underwriters by Stanford Financial Group's insurance agent. Underwriters argue that the Policy is therefore not a contract of adhesion and, if ambiguous, should not be construed against the carriers, as would be common under Texas law. There is insufficient evidence about how the form was originally prepared. The Court need not reach the issue of whether the Policy is ambiguous.

to defraud purchasers of SIBL CDs by, among other things, misrepresenting to actual and potential CD purchasers the nature of SIBL's investment portfolio, creating fictitious financial statements, and concealing large unsecured loans to Stanford. These material misrepresentations were intended to, and in fact did, induce sales of billions of dollars of SIBL CDs.  There is no dispute that Davis and others made use of interstate wire facilities and the mails in carrying out the scheme.[13]

In denying coverage, Underwriters relied on a "Money Laundering Exclusion" in the Policy.  That exclusion "bars coverage for loss (including defense costs) resulting from any claim arising directly or indirectly as a result of or in connection with any act or acts (or alleged act or acts)" of money laundering, as that term is defined in the Policy.[14]

After Underwriters denied coverage, Plaintiffs instituted this proceeding to obtain a judgment declaring that Underwriters are obligated to pay for Plaintiffs' defense costs and expenses in the SEC and Criminal Actions, among other relief.  On January 26, 2010, Judge Hittner granted Plaintiffs a preliminary injunction prohibiting Underwriters from "withholding payment" for defense costs "already incurred" by Plaintiffs and to be "incurred by them in the future . . . until a trial on the merits in this case or such other time as this Court orders."  *Pendergest-Holt v. Certain*

---

[13]   The SEC contends that the CDs were "securities" under the federal securities laws. Stanford and the other Plaintiffs contest this characterization.  The Court does not decide the issue.

[14]   This exclusion is completely different, in substance and procedure, from the fraud exclusion in the Policy.  The fraud exclusion does not apply until a final judgment of fraud has been entered against a beneficiary.  *See Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, 600 F.3d 562, 566-67 (5th Cir. 2010).  That exclusion is not at issue here.

*Underwriters at Lloyd's of London*, 681 F. Supp. 2d 816, 836 (S.D. Tex. 2010), *aff'd in part, rev'd in part, and modified by* 600 F.3d 562 (5th Cir. 2010).

On appeal, the Fifth Circuit  disagreed with the District Court's reasoning, but affirmed the preliminary injunction in part and remanded the case for further expedited proceedings on the coverage question.  *See Pendergest-Holt*, 600 F.3d at 576.  Specifically, the Fifth Circuit disagreed with Judge Hittner's conclusion that there must be a traditional "duty to defend" determination under the Texas doctrine known as the "eight corners rule" separate from a decision on indemnity obligations under the Policy with regard to the Money Laundering Exclusion.  The Court of Appeals held instead that the Policy created a contractual obligation for the carriers to reimburse the insureds for their respective corporate-related litigation defense costs from inception of the covered litigation unless there was an "in fact" "determination" by a court that money laundering (as defined in the Policy) had occurred.[15]  This determination, according to the Court of Appeals, permits the use of extrinsic evidence.  The Court of Appeals concluded its opinion by stating:  "Given the effect the determination in this case may have on the [Plaintiffs'] ability to secure criminal

---

[15]    The Court of Appeals stated:

> The underwriters are entitled to a decision in a separate coverage action, for their bargain sought to mitigate the risk of advancing substantial fees on behalf of policyholders should it be found that the insureds did in fact commit Money Laundering as defined in the policy. By the bargain, they are not compelled to remain aboard an aircraft that has lost its wings.

*Id.* at 574-75.  The Court of Appeals stated also that "[t]he underwriters are enjoined from refusing to advance defense costs as provided for in the D&O Policy unless and until a court determine[s] that the alleged act or alleged acts [of Money Laundering] did in fact occur."  *Id.* at 576 (internal quotation marks omitted, brackets in the original).

and civil counsel of their choosing, we are confident that the district court assigned this action on remand will be one able to proceed as expeditiously as is feasible under the circumstances." *Id.* at 576.

The case was remanded to this Court, which concluded that the "in fact" determination must be made in a preliminary injunction context and scheduled an evidentiary hearing.  The Court held that Underwriters had the burden to prove the application of the Money Laundering Exclusion by a preponderance of the evidence. For purposes of the preliminary injunction analysis, the Court requires Underwriters to show a substantial likelihood of success that the Money Laundering Exclusion in the Policy applies to each Plaintiff.  More specifically, Underwriters must demonstrate a substantial likelihood that it could demonstrate by a preponderance of the evidence that each Plaintiff "in fact" committed Money Laundering as defined by the Policy.

For the reasons explained below, the Court holds that Underwriters have satisfied that burden, and concludes as to each Plaintiff that the Policy's Money Laundering Exclusion applies to justify Underwriters' denial of insurance coverage at this time.  These findings and conclusions are neither final findings of fact nor conclusions of law for use in the criminal or SEC cases pending against each Plaintiff.

## II.   THE POLICY'S MONEY LAUNDERING EXCLUSION

The Policy's Money Laundering exclusion precludes coverage for "Loss" resulting from any "Claim" --

> arising directly or indirectly as a result of or in connection with any act
> or acts (or alleged act or acts) of Money Laundering or any act or acts (or
> alleged act or acts) which are in breach of and/or constitute an offence
> or offences under any money laundering legislation (or any provisions

and/or rules or regulations made by any Regulatory Body or Authority thereunder).[16]

Underwriters assert that Plaintiffs each engaged in Money Laundering as defined by the Policy and that coverage for their respective defense costs is therefore excluded.  Underwriters have the burden of proving the applicability of the Money Laundering Exclusion in the D&O Policy as to each Plaintiff by a preponderance of the evidence.[17]  Under the Policy, "Money Laundering" is defined as:

(i)     the concealment, or disguise, or conversion, or transfer, or removal of Criminal Property (including concealing or disguising its nature, source, location, disposition, movement or ownership or any rights relating thereto); or

(ii)    the entering into or becoming in any way concerned in an arrangement which is known or suspected to facilitate (by whatever means) the acquisition, retention, use or control of Criminal Property by or on behalf of another person; or

(iii)   the acquisition, use or possession of Criminal Property; or

(iv)    any act which constitutes an attempt, conspiracy or incitement to commit any act or acts mentioned in the foregoing paragraphs (i), (ii) or (iii); or

(v)     any act which constitutes aiding, abetting, counseling or procuring the commission of any act or acts mentioned in the foregoing paragraphs (i), (ii) or (iii).[18]

"Criminal Property" is defined to include:

---

[16]    Policy, Underwriters Exh.  8, Art. IV, cl. T.  The Court does not rely on the "alleged act or acts" phrase in this exclusion.

[17]    *See* Memorandum and Order [Doc. # 93].

[18]    Policy, Art. III, cl. I.

[P]roperty which constitutes a benefit obtained from or as a result of or in connection with criminal conduct or represents such a benefit (in whole or part and whether directly or indirectly) which the Directors or Officers or the Company (or any person or entity acting on their behalf) knows or suspects or reasonably should have known or suspected that it constitutes or represents such a benefit.[19]

The Policy defines "Criminal Conduct" as "conduct which constitutes (or would constitute) an offence in any part of the world."[20]

Thus, to demonstrate the applicability of the Money Laundering Exclusion, Underwriters must first establish the existence of Criminal Property, which for purposes of this opinion is defined as a benefit that a Plaintiff knew or suspected, or reasonably should have known or suspected, was obtained from or as a result of, or in connection with, Criminal Conduct.[21]  Underwriters must further establish that a Plaintiff knowingly took an action described in one of the five prongs of the exclusion in connection with that Criminal Property.[22]

---

[19]    *Id.*, Art. III, cl. J.

[20]    *Id.*, Art. III, cl. K.

[21]    The definition of Criminal Property includes as an alternative "property that represents such a benefit."  The meaning of this phrase is unclear and the parties have not argued the point.  The Court therefore does not rely on this language.

[22]    The Court does not rely on the conspiracy theory permitted in subparagraph (iv) of the Money Laundering exclusion.
Stanford argues that Underwriters' proof does not satisfy the standard articulated in footnote 17 of the Fifth Circuit's decision.  The footnote provides in its entirety:

> The executives also argue that the underwriters' reading of the money laundering exclusion "swallows up" the fraud exclusion.  It is true that only one of twenty-one criminal counts brought against the executives alleges "money laundering" as defined *by law*.  But the Money Laundering exclusion's language is sufficiently broad to capture the
>
> (continued...)

Underwriters assert that the funds from purchasers of SIBL CDs are Criminal Property because such funds were derived from Criminal Conduct. The Court agrees, as explained below. The Court also addresses hereafter the conduct of each Plaintiff that satisfies the other elements of the Money Laundering Exclusion.

## III.   FINDINGS OF FACT AND CONCLUSIONS OF LAW [23]

### A.   SIBL and the CD Program

Stanford was the sole owner, directly or indirectly, of SIBL, a private offshore bank with its principal place of business in Antigua. The Bank's principal product,

---

[22]     (...continued)

> other twenty counts without rendering the fraud exclusion itself a nullity (each arises directly or indirectly as a result of or in connection with acts or alleged acts of Money Laundering, as defined by the policy). One example of a fraud claim safe from the Money Laundering exclusion would be an alleged reckless failure to disclose material information– e.g., where the company operates an otherwise legitimate business but is alleged to have overstated earnings in public filings.

600 F.3d at 570 n.17 (emphasis in original). To the extent the last sentence in footnote 17 is an admonition that acts of Money Laundering must be undertaken knowingly, and not merely recklessly, to satisfy the Money Laundering Exclusion, this Court agrees and applies the Money Laundering Exclusion where a Plaintiff knowingly took an action enumerated in that exclusion in connection with Criminal Property as defined in the Policy. The Court of Appeals, however, does not purport to limit the Policy's definition of "Criminal Property." Criminal Property may be created when a Plaintiff knows, suspects, or should have known or suspected, that a benefit was derived from someone's criminal conduct (*i.e.*, conduct that itself is an act that violates criminal law somewhere in the world).

[23]     The Court cites to exhibits and testimony for illustrative purposes; the citations are not intended to be exhaustive. For instance, many of the Kuhrt and Lopez exhibits are duplicates of others' exhibits that were received in evidence first, and are cited instead. The Court also occasionally refers to testimony of live witnesses but, in the interest of time, does not cite to transcripts, as they are not all available.

and principal source of funds, was its CD program.[24]  SIBL advertised that it provided an opportunity for high net worth individuals to invest in the CDs for periods ranging from 30 days to 5 years.  Most varieties of the CDs were advertised to earn a fixed high rate of return and purportedly were available for redemption on a few days' or weeks' notice.[25]

SIBL and the financial advisors promoted the CDs as liquid, conservative investments.[26]  More specifically, SIBL's marketing materials and disclosure statements included prominent representations that SIBL's assets were invested in secure liquid assets such as equities in strong multinational companies, securities issued by stable governments and major international banks, and cash equivalents.[27]

---

[24]     *E.g.,* Disclosure Statement as amended Nov. 15, 2007, Underwriters' Exh. 39, at 10.

[25]     *See* 2006 SIBL Brochure, Exh. 3 to June 18, 2010 Van Tassel Declaration, Underwriters' Exh. 198A ("2006 SIBL Brochure"), at 11; 2003 Brochure and Disclosure Statement, Underwriters' Exh.  41, at 12; June 9, 2009 Van Tassel Declaration, Underwriters' Exh. 198B, ¶ 19.

[26]     *E.g.*, Testimony of Mark Tidwell, former financial advisor with SGC; Testimony of Robert Conte and Wallace "Kelly" Dehay, CD purchasers.

[27]     *E.g.*, Disclosure Statement, as amended Nov. 15, 2007, Underwriters' Exh. 39, at 10 ("The funds deposited with us are primarily invested in foreign and U.S. investment grade bonds and securities, and Eurodollar and foreign currency deposits."); SFG Training Manual, at 15th unnumbered page ("Marketability: Predominantly marketable securities in portfolio"); *Id.* at 16th unnumbered page ("Working Assets: Minimal fixed assets"); *Id.* at 12th unnumbered page ("We offer clients quality products, an excellent return on investment and a high degree of safety – but we only start there." Quote of R. Allen Stanford, Chairman of the Board of SIBL).  *See also* Underwriters' Exhibit 142, *passim* at 4-6 ("Investment Strategies" are to invest the Bank's assets in a "well balanced global portfolio of financial instruments and commercial securities in international markets"; the Bank's investment strategy is established annually by the Board of Directors; the goal is to minimize risk and maintain liquidity).

SIBL's assurances in annual reports to existing and potential CD purchasers about the safety of its CDs described the Bank's investment strategy as "designed to minimize systematic and unsystematic risk while maintaining liquidity, portfolio efficiency (highest yield/minimum risk), operational flexibility and absolute yield."[28] Each SIBL annual report opened with Stanford's personal address to SIBL CD purchasers (and potential purchasers). Stanford's report assured purchasers that their deposits were safe, highlighting SIBL's financial health and stability through specific discussion of the Bank's total assets, customer deposits, operating profit, and shareholder equity.[29] Stanford also reported on various aspects of SIBL's operations, including touting the Bank's adoption of stringent international financial reporting standards.[30] Annual reports also regularly trumpeted the Bank's "global diversification" and "realistic performance criteria."[31]

In addition to giving the impression that SIBL was a financially strong institution where CD holders' money would be secure, largely invested in diversified, marketable securities, SIBL's annual reports from 2002 through 2007 created a perception of astounding financial success in sales of CDs and in SIBL's investment of CD holders' monies.  According to SIBL's annual reports, both customer CD

---

[28]    2007 SIBL Annual Report, Underwriters' Exh. 30 ("2007 Annual Report"), at 2.

[29]    *See, e.g.*, 2005 SIBL Annual Report, Underwriters' Exh. 33, at 26-27.  *See id.* at 19, 37 ("assets primarily consisting of securities . . ..  The Bank's assets are invested in a well-balanced global portfolio of marketable financial instruments, namely, U.S. and foreign securities and fiduciary placements").

[30]    *See, e.g., id.* at 23.

[31]    *See, e.g., id.* at 37; 2003 Annual Report, Underwriters' Exh. 34, at 20.

deposits and SIBL's assets grew by more than $5 billion during this period.[32]  In its 2007 Annual Report, SIBL reported total assets of approximately $7.6 billion, of which $6.3 billion (almost 83%) was categorized as "Financial Assets at Fair Value." At year end 2007, the "financial assets" were reportedly allocated to 58.6% equity, 18.6% fixed income, 7.2% precious metals and 15.6% alternative investments.[33]  SIBL reported total liabilities of approximately $6.7 billion, $6.69 billion of which was listed as "Deposits from Clients."[34]

SFG also aggressively marketed the SIBL CDs through financial advisors employed by Stanford Group Company ("SGC").  SGC financial advisors, such as Mark Tidwell, the former sales manager of the Houston SGC office and a credible witness, were trained by executives of their employer, SGC, and by others within SFG, to market CDs to clients as safe and secure investments.   Tidwell credibly testified that he was trained that the funds from the CDs were placed in a highly liquid investment portfolio consisting mainly of marketable securities.   The financial advisors were told that Laura Holt and James Davis, SIBL's Chief Investment Officer and Chief Financial Officer, respectively, oversaw a global team of money managers who managed SIBL's investment portfolio.  When Tidwell asked about the details of the portfolio, he was told that the information was proprietary and confidential, and was given no information.  He was assured, however, that substantially all of the Bank's investments could be liquidated within three or four days and that the portfolio

---

[32]     *Compare* 2002 SIBL Annual Report, Underwriters' Exhibit 32, at 3, *with* 2007 SIBL Annual Report, at 19.

[33]     2007 SIBL Annual Report, note 12, at 24; *See* Berenblut Report, ¶ 46 and n. 53.  The situation was similar at year end 2005.  *See* Underwriters' Exh. 33, at 46.

[34]     2007 SIBL Annual Report, at 9.

contained very few real estate investments.  Indeed, Tidwell testified that he once suggested a lucrative, cash-generating real estate investment to Holt, but she rejected it because it was "not liquid" and SIBL did not invest in real estate.  Tidwell was also told that loans by SIBL were rare and were secured by depositors' CDs.  He was told that Stanford, SIBL's owner, did not take shareholder dividends, and that earnings from capital were used to enhance SIBL's returns.

SIBL, SGC financial advisors, Stanford, and SFG top executives, such as Holt and Davis, emphasized that the SIBL CDs earned unusually high rates of return.  SIBL's CD interest rates often substantially exceeded rates generally available in the United States.[35]   As part of their training, financial advisors were provided with a "Ten Year Investment Portfolio Performance" worksheet that showed double-digit investment returns ranging from 15.71% to 11.72% for the years 1994-2004, which was used to explain to CD purchasers how SIBL was capable of offering such high interest rates.[36]   Tidwell testified that, based upon the training and representations about the Bank's investment portfolio about the high rate of return, he sold over $30 million in SIBL CDs during his several years with SFC.  Finally, to incentivize the

---

[35]   For example, a 2005 SIBL marketing brochure advertised that "[o]ver the past decade, Stanford International Bank CDs have outperformed U.S. bank CDs by an average of 4.2%."  *See* 2005 SIBL Brochure, Underwriters' Exh. 31, at 8 (also bearing the page number 817).  The 2005 brochure contains a chart comparing the historic yield of SIBL CDs to average United States CD yields for the years 1997 to 2005.  Similar charts in other SIBL marketing brochures show the SIBL yield outpacing the average U.S. yield for each listed year.

[36]   *See*, *e.g.*, May 24, 2010 Van Tassel Declaration, ¶¶ 31-33.

financial advisors, SGC paid substantially "above-market" commissions to sell this SIBL product.[37]

As the economic crisis of 2007 and 2008 unfolded, SIBL CD holders and financial advisors began to question the security of the Bank's CDs and investment portfolio. During the same time, press reports challenging the legitimacy of SIBL's operations also began to surface.[38] SIBL, Stanford, Holt, Davis, and others attempted to calm CD holders and encouraged new CD sales. An example was the publication in December 2008 of SIBL's first and only "Monthly Report."[39] In that Monthly Report, SIBL informed CD purchasers that the Antiguan Financial Services Regulatory Commission had recently conducted its annual inspection and found the Bank to be in good standing. SIBL claimed that its only lending was to existing clients on a cash-secured basis. The Monthly Report acknowledged that SIBL's 2008 earnings would not meet expectations, but stated that SIBL is "strong, safe, and fiscally sound." The report cited total assets of approximately $8.6 billion as of November 28, 2008.[40] On February 11, 2009, the Bank distributed a "Dear Client"

---

[37]     For instance, the financial advisors received 1% on each CD sold, with a 1% trailing commission for each year the customer held the CD. A 5-year CD could generate, therefore, a 5% commission, which is far above industry standard. May 24, 2010 Van Tassel Declaration, ¶¶ 34-36.

[38]     For instance, in July 2008, Bloomberg News published a story noting that the SEC had subpoenaed two former SGC financial advisors, including Tidwell, who claimed that the company forced them to resign after they refused to participate in illegal activities. *See* Email from Yolanda Suarez to Lula Rodriguez, Underwriters' Exh. 69 (forwarding content of Bloomberg article). *See* May 24, 2010 Van Tassel Declaration, ¶ 24; *see also* Berenblut Report, at 8-9, and cited materials at nn. 30-34.

[39]     Monthly Report, Underwriters' Exh. 53.

[40]     *Id.* at 2. Stanford also tried to assuage CD holders' liquidity concerns by announcing
(continued...)

letter signed by Stanford in which he addressed media reports of the SEC's on-site investigation of the Stanford-related entities. He assured "Clients" that the regulators' inspections were part of "routine examinations."[41]   Others within SFG also assured clients about SIBL's health and financial safety.[42]

Five days later, however, SIBL was placed in Receivership. The SEC sued certain Plaintiffs the following day.

At the inception of the Receivership, SIBL's obligations to CD holders totaled $7.2 billion according to SIBL records.[43] Only six weeks earlier, December 31, 2008, the Bank had recorded investments valued at $8.3 billion.[44]   Van Tassel found, however, that the market value of the assets of *all* Stanford-related entities at the time

---

[40]   (...continued)
that SIBL had received a $541 million capital infusion, described to have been made on November 28, 2008, that reportedly brought total shareholder equity to $1.02 billion "with a capital to assets ratio of 11.87% and a capital to deposits ratio of 13.48%." *Id.*

[41]   Stanford also claimed in the "Dear Client" letter that "we have already added two capital infusions into the bank and are considering additional actions." "Dear Client" Letter, Underwriters' Exh. 54. Stanford claimed then and apparently still claims to have made one capital infusion in September 2008 for $200 million and one in November 2008 for $541 million. The record does not support his assertion, but the Court does not rule on its veracity.

[42]   *See* Berenblut Report, ¶¶ 29(a)-(g) and materials cited at nn.35-43.

[43]   Declaration of Karyl Van Tassel of July 15, 2010 ("July 15, 2010 Van Tassel Declaration"), Underwriters' Exh 198E ("July 15, 2010 Van Tassel Declaration"), ¶ 18.

[44]   *Id.*, ¶ 15(a). SIBL reported to the Antiguan Financial Services regulatory Commission ("FSRC") in excess of $8.1 billion in assets as of June 30, 2008. *See* Berenblut Report, ¶ 35 and n.46 (citing FSRC Quarterly Statement, Sept. 2008); Kuhrt Exh. 318, SIBL letter to FSRC dated July 21, 2008 (enclosing the June 30, 2008 SIBL financial report).

the Receivership commenced was overstated by billions of dollars.[45]   Van Tassel reports that of $8.3 billion in assets SIBL claimed at year end 2008, $3.174 billion was improperly attributed to two Antiguan real estate acquisitions in companies for which SIBL had paid a total of $63.5 million only six and three months earlier, respectively.[46]   Another $1.8 billion of the total assets consisted of notes receivable from Stanford,[47] which notes Van Tassel convincingly concludes were essentially without value because Stanford had no significant assets apart from the Stanford-related entities that were materially over-valued.[48]   Underwriters' expert witness, Mark Berenblut, also found that SIBL grossly overstated the value of its investments in certain public and private companies.   For example, Berenblut found that SIBL's investment in a company called "eLandia" was assigned a value of $372 million in internal SIBL documents, but that this value was more than three times the company's entire market capitalization.[49]

---

[45]   *Id.*, ¶¶ 15(a), 18.   Van Tassel concludes that the assets of SIBL at the time of commencement of the Receivership on February 16, 2010, was less than $1 billion. At the time the Receivership was imposed, SIBL was insolvent by more than $6 billion.   *Id.*

[46]   *Id.,* ¶ 15(b); Berenblut Report, ¶ 62.   *See* discussions *infra* concerning Kuhrt and Lopez's conduct.

[47]   There is a dispute about whether the loans were to Stanford personally or to his companies, or a combination, and whether there were $1.8 billion in loans to Stanford affiliated companies as well as $1.7 billion in loans to Stanford individually.   The Court does not make a conclusive determination in this regard.   The Court finds for present purposes merely that there were approximately $1.8 billion in loans to Stanford or his affiliates.

[48]   *See* July 15, 2010 Van Tassel Declaration, ¶ 15(c).   For example, Van Tassel stated that the Receivership might realize only $25 million from private equity investments that SIBL had recorded as worth $1.2 billion on June 30, 2008.   *See id.*, ¶ 15(d).

[49]   *See* Berenblut Report, ¶ 68(a).   Berenblut also reported that this was true for other
(continued...)

Significantly, and independent of any particular asset valuations, it is clear that, to the extent that internal SFG documents listing SIBL assets reflect assets actually owned by SIBL, the composition of the reported assets was grossly inconsistent with SIBL's widespread representations that it invested in liquid, highly marketable securities, and that it only engaged in cash-secured lending to CD holders.[50] If, on the other hand, the list of assets was a mere fabrication then the representation by SIBL of its investment of CD proceeds in secure liquid assets, strong multinational companies, and securities issued by stable governments and major international banks, are similarly misleading.

Van Tassel's findings dovetail with statements given by Davis in his plea agreement about his conduct in falsifying SIBL financial statements and the resulting deception of CD purchasers, all of which was designed initially to induce purchases of CDs and later to enable SIBL to retain purchasers' money as the Bank was failing. Davis pleaded guilty to engaging in mail fraud in violation of 18 U.S.C. § 1341,

---

[49]    (...continued)
publicly traded companies on the list purporting to comprise the assets of SIBL. *See* Berenblut Report, ¶¶ 69(b)(c) & nn. 76, 77, 78 (referring to DGSE Companies, Inc. (SIBL's reported investment was more than twice DGSE's market capitalization as of June 30, 2008) and Health Systems Solutions, Inc. (SIBL's reported investment value was more than what the company was estimated to earn in three years and more than almost six times the company's total market capitalization as of June 30, 2008). Plaintiffs have demonstrated that the document containing the SIBL list of assets on which Berenblut relied (which appears to be the list of Tier 3 assets) actually was created by Davis in early February 2009. Plaintiffs argue this list of assets either was fictitious or contains information of which Kuhrt and Lopez were unaware. The Court does not impute knowledge to Kuhrt or Lopez about the contents of this list. The relevance is that SIBL claimed in public materials that it had assets totaling $8.1 billion as of June 30, 2008, and Van Tassel and Berenblut concluded that this total necessarily comprised the false valuations of numerous assets of the sort listed here.

[50]    Van Tassel found that SIBL had been insolvent since at least 2004, if not before. The Court does not reach this issue.

conspiracy to violate the mail, wire and securities fraud laws in violation of 18 U.S.C. § 371, as well as conspiracy to obstruct a proceeding before the SEC in violation of 18 U.S.C. § 371.

Davis in his guilty plea admitted that he intentionally and knowingly participated in a scheme to defraud purchasers of SIBL CDs by, among other things, misrepresenting the nature of SIBL's investment portfolio to CD holders and potential CD purchasers, by creating fictitious financial statements, and by concealing the composition of the SIBL investments and financial condition from regulators and SFGC financial advisors. Misrepresentations also include non-disclosure of large unsecured loans to Stanford personally and to companies he owned and controlled. As explained by Davis and SFGC financial advisor Mark Tidwell, as well as three CD purchasers,[51] whose testimony the Court fully credits, these material misrepresentations were intended to, and in fact did, induce purchasers to buy billions of dollars of SIBL CDs.

There is no dispute that Davis and others used mail facilities and wire facilities, such as email to communicate with the CD purchasers and prospects, as well as for CD purchases, interest and redemption payments, to carry out the scheme.

The Court credits Davis's statements about his own conduct but does not reach the question of whether Plaintiffs were conspirators in the crimes Davis admits.[52]

---

[51]    Robert Conte, Wallace Lee Dehay, and Robert Hollier.

[52]    There is no dispute that Davis, despite his plea of guilty to three criminal charges, is unavailable to testify in this civil proceeding. Through his attorney, Davis has informed the parties that he would invoke his Fifth Amendment right against self-incrimination to any and all questions posed in this case. *See* Doc. # 265, at 16-17. The parties appear to concede that there is no need to call him to assert his privilege in open court, either to specific questions or globally. *See United States v. Young Bros., Inc.*, 728 F.2d 682, 690 (5th Cir. 1984). Underwriters seek admission in
(continued...)

Davis admitted that, contrary to the representations and strong inferences made during training and sales meetings to the financial advisors and CD holders that Holt was largely responsible for overseeing SIBL's entire portfolio of non-cash assets, SIBL's investment portfolio was actually organized into three tiers: cash and cash equivalents ("Tier 1"); investments with outside portfolio managers ("Tier 2"); and other assets ("Tier 3").   It is undisputed that Holt and her team of portfolio managers only managed Tier 2 investments, which by 2008 comprised only approximately ten percent of SIBL's portfolio.[53]   Moreover, contrary to the Bank's representations that its assets were in secure, highly marketable, liquid investments, Davis acknowledged

---

[52]   (...continued)

evidence of Davis's entire plea agreement as well as the rearraignment transcript, relying on Federal Rules of Evidence 804(b)(3) and 807.  The Court concludes that Rule 804(b)(3) warrants admission of certain portions of Davis's plea agreement and plea transcript for limited purposes.  To the extent the factual information in Davis's plea agreement and the rearraignment transcript contain matters against Davis's penal and other interests, they are admissible under Federal Rule of Evidence 804(b)(3). *See United States v. Westmoreland*, 240 F.3d 618, 627 (7th Cir. 2001); *United States v. Scopo*, 861 F.2d 339, 348 (2d Cir. 1988).  Davis has pleaded guilty under oath to charges carrying imprisonment sentences of variously five and 20 years.  The factual material in his plea agreement and transcript describing Davis's personal criminal conduct are strong evidence of those matters.  *See, e.g., RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 403 (8th Cir. 1995); *In re Slatkin*, 525 F.3d 805, 812 (9th Cir. 2008).  On the other hand, to the extent Davis describes others' conduct, particularly that which is incriminating, the statements are not received in evidence.  These statements, whether true or not, are efforts to cooperate with the Government and thus reduce Davis's exposure to prison.

The Court does not reach the applicability of Federal Rule of Evidence 807, although at first blush that rule would appear to permit receipt of the limited information the Court receives in evidence in this case.  Underwriters' reliance on Federal Rule of Evidence 803(8) is unavailing.  Davis's admissions are not statements of the United States Government.

[53]   Plea Agreement of James Davis, Underwriters' Exh. 7, ¶ 13(g).

that, "by 2008, approximately 80% of SIBL's investment portfolio was made up of illiquid investments, including grossly overvalued real and personal property that SIBL had acquired from Stanford-controlled entities at falsely inflated prices."[54] These admissions corroborate Van Tassel's findings.

Davis also admitted that he falsified revenue and asset figures on SIBL's financial statements.[55]  Davis confessed that he would determine the amount of revenue SIBL needed to report from its investment portfolio in order to cover CD obligations, satisfy regulators, and make the CDs attractive to purchasers.[56]  Davis would then "reverse-engineer" or "back in" to the desired returns by assigning fictitious revenue amounts to the various categories of SIBL's purported investment allocation in order to generate the desired return on investment ("ROI").[57]

The Court finds that Davis engaged in Criminal Conduct as defined under the Policy in connection with CD purchasers' funds.[58]  The Court further concludes that the funds obtained by SIBL from CD sales were Criminal Property.  These funds were

---

[54]     *Id.*  Davis further admitted that he was aware that "[a]t least $2 billion dollars of undisclosed, unsecured personal loans from SIBL to Stanford were disguised in SIBL's financial statements as 'investments.'"  *Id.*

[55]     *Id.*, ¶¶ 13(j), (k).

[56]     *Id.*, ¶ 13(l)  Davis refers to conspirators in this regard, but the Court does **not** rely on his accusations against Kuhrt and Lopez.

[57]     *See id.*

[58]     The Court does not reach the question of whether Plaintiffs themselves engaged in Criminal Conduct as defined by the Policy.

"property which constitutes a benefit obtained from or as a result of . . . criminal conduct" which Davis knew was "such a benefit."[59]

The Court now turns to whether any Plaintiff knew or suspected, or reasonably should have known or suspected, that the CD purchasers' funds were Criminal Property in that the funds were "a benefit obtained from or as a result of or in connection with [C]riminal [C]onduct" and whether such Plaintiff engaged in an act included in the Policy's definition of Money Laundering.

## B.     Kuhrt and Lopez

To prove a Plaintiff engaged in Money Laundering under the Policy, Underwriters must show that the Plaintiff knew, suspected, or should have known or suspected, that the CD funds were Criminal Property as defined in the Policy and that he knowingly engaged in an act of Money Laundering with regard to those funds. Underwriters principally advance three theories. They contend that Kuhrt and Lopez (i) "reverse-engineered" SIBL's revenue numbers each month, (ii) designed a plan to inflate $63.5 million in real estate investments into a $3.174 billion asset, and (iii) failed to require SIBL to disclose in its financial reports that SIBL had extended $1.7 or $1.8 billion in personal loans to Stanford. The Court focuses primarily on the reverse-engineering theory.

Kuhrt and Lopez did not testify at the hearing. On advice of counsel, they each elected to invoke their Fifth Amendment right against self-incrimination.[60] Kuhrt and Lopez, however, took the unusual step of jointly briefing Alan Westheimer, a certified public accountant and retained expert witness for these Plaintiffs. Kuhrt and Lopez

---

[59]     *See* Policy, Art. III, cl. J.

[60]     Stanford did the same. All Plaintiffs also declined to respond to Underwriters' written and deposition discovery.

orally explained to Westheimer their work histories, job duties within SFG, their knowledge and intentions regarding matters for which they were responsible, and their claimed understanding of the workings of various SFG entities.  Kuhrt and Lopez were permitted to introduce this information at the hearing vicariously through Westheimer's testimony.[61]   The Court has carefully considered Westheimer's oral testimony and assumes that he accurately reported what he was told.[62]  However, the Court finds the testimony unpersuasive on many points regarding Kuhrt and Lopez's knowledge and putative belief of the legitimacy of their conduct.

Notably, Westheimer testified that at no time during the interview, which lasted several hours, did Kuhrt and Lopez disagree with one another's rendition of events, procedures, or anything else.  The Court therefore attributes to both Kuhrt and Lopez

---

[61]    In fact, Underwriters offered much of Westheimer's descriptions of Kuhrt and Lopez's comments as admissions by a party opponent.  *See* Fed. R. Evid. 801(d)(A), (B) and (D).  Other comments were received under the rule of optional completeness. *See* Fed. R. Evid. 106;  *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 171-72 (1988); *United States v. Li*, 55 F.3d 325, 329 (7th Cir. 1995).  The Court ultimately also received in evidence Westheimer's written "expert report," albeit reluctantly, because all parties repeatedly referred to it during the direct testimony, cross-examination, and at other points in the hearing.  The Court gives no weight to Westheimer's opinions in his report concerning the propriety or reasonableness of Kuhrt or Lopez's conduct.  These opinions are based on methodologies that lack the rigor expected of a Certified Public Accountant, do not represent opinions properly offered by an accounting expert (*e.g.*, they are legal opinions and invade the province of the Court), are conclusory or speculative, and/or are not based on reliable information or data.

[62]    Westheimer, to his credit, segregated in his testimony what Kuhrt or Lopez actually said from what he inferred from the information.  Much of the latter type of testimony is rejected by the Court as unpersuasive.

all aspects of Westheimer's explanations of these men's duties, knowledge and beliefs.[63]

Kuhrt and Lopez played meaningful roles in connection with the Stanford-related entities' financial reporting.  Lopez was the Chief Accounting Officer of Stanford Financial Group Company ("SFGC"), an entity that provided administrative services, including accounting services, to other Stanford-related entities.  Lopez's job duties included "overall supervision of the accounting reports and budgetary process" and "supervisory and managerial duties for the accounting process."[64]  Lopez was Kuhrt's supervisor.[65]

During 2000 to 2007, Kuhrt worked initially as Account Manager, then Assistant Controller, and later Controller at SFGC.  Kuhrt supervised an accounting staff.  In 2007, as part of a corporate restructuring, allegedly for "tax reasons," Kuhrt moved to St. Croix, and became Global Controller for a new entity called Stanford Financial Group Global Management ("SFGGM").   He apparently performed substantially the same tasks as in his prior position as Controller for SFGC in Houston.

Kuhrt told Westheimer that his responsibilities included creating budget parameters for the global budgeting process and budget templates, compiling budgets

---

[63]     The emails in evidence support this finding, as many emails were sent to both Kuhrt and Lopez or were communications between them.

[64]     Expert Report of Alan Westheimer, Underwriters' Exh. 3 ("Westheimer Report"), at 5; *see* Underwriters' Exh. 123.

[65]     *See, e.g.*, SFGC Scorecards of Mark Kuhrt by Gil Lopez, Underwriters' Exh. 4. These are performance reviews by Lopez about Kuhrt's responsibilities, accomplishments, and areas needing improvement for various quarters in 2000 through 2006.

for Davis's approval,[66] compiling data for monthly financial reports from the various Stanford-related entities into "red books" sent to Davis, and preparing monthly projected investment revenue numbers for Davis.  The budgets apparently contained projected figures for the amount of SIBL's funds to be invested, the expenses of SIBL, the rates of investment returns expected, and the allocation of SIBL funds to be invested in each category or type of investment,[67] Kuhrt and Lopez also had responsibilities for finalizing SIBL's annual reports.[68]  The Court finds that each of these Plaintiffs knew the contents of the annual reports.

Westheimer, Kuhrt and Lopez claimed they believed the figures Davis gave them were accurate reports of investment revenues for a multi-billion dollar banking institution.[69]  That Kuhrt and Lopez reached this conclusion based on the monthly procedure they used with Davis to create the reports strains credulity.  Kuhrt (with

---

[66]   *See id.*  Kuhrt's performance reviews contain numerous references to working on budgets and SIBL annual reports.  Other evidence indicating that he was actively involved are Underwriters' Exhs. 105, 107 and 110.

[67]   *See, e.g.,* Berenblut Report, Exh. 7 at 00000135-00000136 (Workpapers showing 2006 and 2007 Budget v. Actual by month).  The workpapers listed the categories as "Fixed Income," "Equity," "Fiduciary," "Futures & Options," "Foreign Exchange," "Metals," and "Interest."

[68]   Kuhrt and Lopez did more than merely plug Davis's numbers into templates.  *See, e.g.*, Stanford Exhs. 18, 30, 31, 32, 43, 45, 51, 52, 53, 58, 88, 118, 123.

[69]   The Court is unpersuaded by Kuhrt and Lopez's contention that they relied on Davis's representations that the investment revenue figures were approved by auditors.  It would be highly unusual for an auditor contemporaneously to check revenue figures of a company it audited. Plaintiffs provide no evidence that the auditors were actually engaging in any work.  In addition, the decision by SFG and SIBL, a financial institution with billions in assets, to use a tiny Antiguan auditing firm is suspicious in and of itself.  Van Tassel explains that at least two of the big four multinational accounting firms had locations in the Caribbean.  *See* May 24, 2010 Van Tassel Declaration, ¶ 49.

approval from and under the supervision of Lopez) sent to Davis what amounted to fictitious revenue entries for SIBL's investment portfolio for the previous month.[70] Davis then approved, or adjusted and approved (a process Plaintiffs called "truing up"), the numbers and sent them to Kuhrt.[71]  Kuhrt then forwarded those numbers to Bhanoo Persaud, SIBL's Antiguan Accounting Manager, for formal entry into the books of SIBL.  All were aware that the figures Persaud used were the ones that were included in SIBL's annual reports, disclosures statements, and promotional materials. This process was referred to by Davis as "reverse engineering" of investment revenue results.

This procedure was illogical and without accounting or business justification. The revenue an investment portfolio generates in a given month is a matter of historical fact based on the performance of investments held by third parties. Plaintiffs provide no explanation how any budget or projected performance figures could possibly be helpful to ascertain the actual performance of SIBL's investments. The "budget" figures Kuhrt and Lopez used apparently were derived from earlier projections of revenue numbers for SIBL.  While unclear when and exactly how these projections were created or adjusted by Kuhrt, it appears they were aspirational goals set for planning purposes.  To the extent they were budgets prepared before the beginning of the fiscal year, the numbers were at best educated guesses of the amount of revenue that SIBL hoped to bring in from CD sales, the amount of CD redemptions, and the size of expenditures, as well as predictions about what investments of the

---

[70]   *See, e.g.*, Underwriters' Exh. 141; Berenblut Report, ¶¶ 32, 33 and emails and worksheets in Exh. 7 thereto.  *See also* Stanford Exhs. 45, 51, 52, 53, 55, 58, 123.

[71]   *See* Kuhrt Exhs. 127, 129, 133, 134, 135, 136, 141, 305, 306, 307, 308, 309; Westheimer Testimony; Davis Plea Agreement.

SIBL funds would be made and the associated anticipated revenues.[72]   Thus, the budget figures could not have been any meaningful indicia of actual performance of investments made with actual CD proceeds.   Indeed, the budget figures themselves were strained.   Workpapers reveal that Kuhrt and Lopez assumed that all categories of investments would earn the same return on investment.[73]   There is no basis in this record to find that SIBL's actual investment revenues would be close or logically related to pre-existing budget figures.

Most significantly, Kuhrt and Lopez were denied all actual investment performance information and reports from the institutions in which the investments allegedly had been made.   The absence of *any* documentary backup from Davis was a red-flag that something was seriously amiss.   Nevertheless, Kuhrt and Lopez deliberately and knowingly–month after month for years–engaged in this peculiar process for preparing the investment revenue reports.

The lack of demonstrable factual foundation of the SIBL investment revenue entirely undermines the reliability of SIBL's financial reports.   The SIBL assets were derived substantially from CD sales.   Kuhrt and Lopez knew from their work on the annual reports that those assets were to be invested in conservative, multi-national

---

[72]   The use of budgets as a starting point for booking investment revenues is even more far fetched because in the 2004-2008 time frame, the markets for equities, fixed income, currencies and other investments were volatile, and suffered heavy losses in 2008.   *See, e.g.*, May 24, 2010 Van Tassel Declaration, ¶¶ 37-47; Berenblut Report, ¶ 39 and Exh. 9 thereto.

[73]   *See* Berenblut Report, Exh. 7.6, at 00000135-00000136.   The categories were "Fixed Income," "Equity," "Fiduciary," "Futures & Options," "Foreign Exchange," and "Metals."   *See also* Stanford Exh. 123 at 5th unnumbered page.

institutions, government securities, fixed-income investments, or other liquid assets.[74]
Income from such investments typically would be easily ascertainable.

Kuhrt and Lopez offer no explanation for why they accepted the proposition
that Davis and his staff could "work off of" projected or budgeted numbers rather than
simply pulling the actual figures from the statements of account for each investment
and compiling the figures. When, over several years, Davis could not timely provide
any investment revenue figures for any month, Kuhrt and Lopez should have known
or at least suspected, contrary to SIBL's promotional material and annual reports, that
the funds were not invested as advertised. In addition, the extraordinarily high returns
SIBL's investments purportedly earned were not credible. Kuhrt and Lopez, as
trained accountants, knew or suspected that these high returns could not be achieved
with the claimed low-risk investments advertised.[75]

The Court thus finds that Underwriters have met their burden to demonstrate
a substantial likelihood that a preponderance of the evidence would establish that the
Money Laundering Exclusion applies to Kuhrt and Lopez. The Court finds that Kuhrt
and Lopez knew, suspected, or reasonably should have known or suspected that the
investment revenue figures Davis sent back to them for posting in the SIBL books
were fictitious or, at the very least, were not accurate reflections of SIBL's
investments' performance. Kuhrt and Lopez clearly knew that the figures Davis gave
them were being used in annual reports and marketing materials given to regulators
and to existing and prospective CD holders. They therefore knew, suspected, should
have known or should have suspected that the CDs were being sold under false

---

[74]    This investment approach was promised and necessary because most CDs were
redeemable on a few days to a few weeks' notice.

[75]    *See* Berenblut Report, ¶¶ 38, 39, 42, 43.

pretenses, and that funds from SIBL CD sales constituted a benefit obtained from or as a result of (or in connection with) criminal conduct, *i.e.*, Criminal Property.[76]

The Court further concludes Underwriters have shown a substantial likelihood of success that they can prove that Kuhrt and Lopez, by providing these SIBL budget projections to Davis each month and by unquestioningly accepting his unsupported revenue figures for reporting purposes, engaged in Money Laundering under the Policy. Specifically, their conduct "concerned [them] in an arrangement" which– at a minimum–was "suspected to facilitate" "the acquisition, retention, use or control of Criminal Property" by SIBL, Stanford, Davis, and others. Kuhrt and Lopez also aided and abetted the acquisition, use and possession by SIBL, Stanford personally and through entities he owned and controlled, and others, of Criminal Property by assisting in the reverse engineering of reporting of SIBL's investment revenues each month. Kuhrt and Lopez's actions also aided and abetted the transfer and removal of Criminal Property by others.

While these findings and conclusions warrant application of the Money Laundering Exclusion to Kuhrt and Lopez, the Court, for the sake of completeness, addresses Underwriters' other theories. First, both Kuhrt and Lopez admitted to Westheimer that they were aware of, and were in fact tracking, substantial increasing SIBL loans to Stanford personally and his related entities. Kuhrt and Lopez also were

---

[76]    Another strong indication that Kuhrt and Lopez were aware that the investment revenue figures provided by Davis must have been false was debate among Kuhrt and others, and Davis's direction, to increase belatedly SIBL's investment revenue total to offset a comparable unexpected increase in SIBL's expenses, so SIBL could meet a regulatory 5% capital requirement. *See* Underwriters' Exhs. 7.1 at 00000118, 7.3 at 00000127, 7.4 at 00000129, and 7.6 at 00000133-134 (ties to 00000127); Email exchange between R. Roca and Kuhrt, dated Aug. 8, 2007, Stanford Exh. 123 (setting the July 2007 ROI, and agreeing to keep the May ROI figure, so the monthly income is in line with the budget); *see also* Underwriters' Exhs. 106, 132, 148, 210, 211, 223.

aware that SIBL had adopted international accounting standards in 2005, and that those standards required the disclosure of the Stanford loans.[77]  Nevertheless, these loans, which were apparently not being serviced and had grown by the end of 2008 to at least  $1.7  billion (in excess of 20% of SIBL's purported assets),[78] were not disclosed in SIBL's annual reports, and Kuhrt and Lopez knew it.[79]  Loans to Stanford and/or his affiliated companies were utterly inconsistent with the representations made to CD purchasers regarding SIBL's investment portfolio.[80]  The evidence is clear that Kuhrt and Lopez were aware of the figures in those reports and the inconsistency with SIBL's marketing to CD holders.[81]   Kuhrt and Lopez's awareness of the non-disclosure of the Stanford loans supports the conclusion that they knew or suspected the funds earned through CD sales were obtained through material omission.

---

[77]   Westheimer Report, at 14.  In fact, Westheimer testified that Kuhrt stated that he sent Davis a draft footnote to be included in the 2005 Annual Report, but that Davis took it out.  Similarly, Lopez told Westheimer that every time Lopez updated Davis regarding the loans he informed him that the overall balance was increasing and needed to be serviced, and that the loans should be disclosed.

[78]   *See* May 24, 2010 Van Tassel Declaration, ¶ 15(c); Plea Agreement of James Davis, ¶ 17(g); Berenblut Report, ¶¶ 49, 53, and Testimony; Westheimer Testimony.

[79]   *See* SFGC Scorecards of Mark Kuhrt by Gil Lopez, Underwriters' Exh. 4.

[80]   *See* SFGC Scorecards of Mark Kuhrt by Gil Lopez, Underwriters' Exh. 4.  Kuhrt and Lopez argue that they discharged their duties by informing Davis that the loans should be disclosed.  The Court is unpersuaded.  Kuhrt and Lopez's knowledge of the loans and the reporting obligation should have raised strong suspicions that SIBL (at Davis's or others' direction) was not complying with the SIBL mantra that the investments were conservative with a high proportion of liquid assets.  *See also* Berenblut Report ¶ 53 n.63.

[81]   The Court is unpersuaded that Kuhrt and Lopez's role with regard to the SIBL annual reports was limited to putting the numbers given them by others into a "visually appealing format."  *See, e.g.,* exhibits cited in note 68 *supra*.

The evidence also is clear that, by summer 2008, Kuhrt and Lopez were taken even more closely into Stanford and Davis's confidence.[82] At that time, Stanford and SIBL were in the process of purchasing 1,587 acres of land on several islands in Antigua for a total of $63.5 million.[83]  At Davis's and implicitly Stanford's request, Kuhrt and Lopez devised a plan to attempt to bolster SIBL's balance sheet in late 2008/early 2009, after SIBL developed serious cash flow problems from unanticipated CD redemptions and insufficient new CD sales.  SIBL also then was under close scrutiny by the SEC.[84]  Specifically, Kuhrt and Lopez proposed a way to inflate the value of the 1,587 acres 50-fold to a total of $3.174 billion as of December 31, 2008, merely three and six months after the properties' acquisitions.  The transactions Kuhrt proposed, with Lopez's approval, lacked economic substance and were not supported

---

[82]   *See* Underwriters' Exhs. 154, 175.

[83]   *See* Underwriters' Exh. 159.  The purchases technically were made through SIBL's acquisition of holding companies that owned the real estate parcels and closed in June and September 2008, respectively.  Kuhrt and Lopez became involved in this scheme when they, as part of a small group, met with Stanford and Davis in St. Croix. Stanford told them confidentially that he, through SIBL, was purchasing (or had purchased) acreage to be used as a resort development known as the "Islands Club." Interestingly, this plan is somewhat inconsistent with evidence from Stanford's witness, Giselle James, and Stanford's exhibits demonstrating that Stanford had conceived of, hired architects to design, and already begun to build aspects of the club starting four years earlier.

[84]   *See, e.g.,* May 24, 2010 Van Tassel Declaration, ¶ 24; Emails among SIBL and other staff, Underwriters' Exhs. 93, 160, 161, 165, 170, 173, 174, 175, 177, 186; Stanford Exhs. 29, 89, 90, 126, 175, 176, 350, 351, 358.  Also highly suspicious was the fact that Davis and Stanford wanted this project kept secret.  Kuhrt and Lopez presented the plan to Davis in a password protected spreadsheet.  *See* Email from Mark Kuhrt to James Davis of December 23, 2008, Underwriters' Exh. 61; Email from Gilbert Lopez to James Davis of December 23, 2008, Underwriters' Exh. 62.  *See also* Underwriters' Exh. 168. `

by meaningful real estate valuation principles or appraisals.[85]   Lopez and Kuhrt counter that their efforts were merely preliminary planning and that the transactions did not occur.  They add that they relied on Davis's directive to value each of the 1,587 acres at $2 million based on a recent sale by SIBL of six acres of land on a different Antiguan island.[86]  However, there is no evidence that in fact (or that Kuhrt or Lopez believed) the six acre parcel was similar to any part, let alone every acre, of the 1,587 acres,[87] particularly in the midst of a deepening global recession.  The very fact that Kuhrt and Lopez were willing to design a series of transactions without economic substance corroborates the Court's finding above that they were aware that Davis and Stanford were misleadingly reporting SIBL's assets and investment revenues in order to encourage new CD purchases or avoid CD redemptions.

Accordingly, the Court concludes that the Underwriters have met their burden to show a substantial likelihood of success that the Money Laundering Exclusion in the Policy applies to Kuhrt and Lopez.[88]  The Court makes these findings and conclusions without inferences from Kuhrt and Lopez's invocation of their Fifth Amendment privilege against self-incrimination.  Finally, the Court's ruling here is

---

[85]   *See, e.g.*, Email from Mark Kuhrt to Gilbert Lopez of January 6, 2009, Underwriters' Exh. 63; Berenblut Report, ¶¶ 62-64, 66 and Exh. 14 thereto.  *See also* Underwriters' Exhs. 66, 67.

[86]   *See* Underwriters' Exhs. 149, 155.

[87]   The newly purchased parcels were on Pelican Island and various Guiana Islands.  *See* Underwriters' Exh. 159.

[88]   If necessary, the Court would hold that the evidence of record supports a conclusion that Underwriters have shown by a preponderance of the evidence that the Money Laundering Exclusion in fact applies, not merely that there is a substantial likelihood that it has done so.  Moreover, in the Court's view, the evidence would suffice under a clear and convincing standard, were that the applicable standard of proof.

narrow. It is limited to analysis of conduct found by a preponderance of the evidence in a preliminary injunction context and on a necessarily restricted record. These findings and conclusions are not intended for use in the Criminal or SEC Actions.

### C.   R.  Allen Stanford

Underwriters assert that Stanford personally engaged in numerous acts of Criminal Conduct and was at the epicenter of a massive Ponzi scheme. The Court limits its focus in deciding the application of the Money Laundering Exclusion to the elements Underwriters must show, namely, whether there is a substantial likelihood that Underwriters can prove by a preponderance of the evidence that Stanford knew or suspected, or reasonably should have known or suspected, that CD holders' funds were Criminal Property under the Policy definition and that Stanford knowingly engaged in acts constituting Money Laundering under the Policy with regard to those funds.

Based on the testimony presented at the hearing and the parties' exhibits of record,[89] the Court finds that Stanford personally was aware that SIBL CDs were being marketed on the basis of important misrepresentations about the Bank's investment portfolio and investment performance. The Court bases this finding on the many communications Stanford sent and received,[90] the personal interest he took in the CD program of SIBL, the direct financial interests he had in many of the projects involved in this case, his personal ownership of the Stanford entities in issue, his personal involvement in promoting SFG's projects and affiliates, and oral

---

[89]   The Court notes again that it has not attempted to cite to all exhibits that support the findings and conclusions in this opinion, but rather cites illustrations.

[90]   *See, e.g.,* Underwriters' Exhs. 25, 54, 66, 73, 80, 82, 83, 85, 90, 93, 129, 130, 133, 141, 145, 147, 149, 151, 154, 155, 165, 175, 182, 183, 186, 187, 188, 189, 191, 192. 283.

communications to financial advisors and large CD prospects, as well as the letters he signed that appeared in SIBL annual reports, disclosure statements, marketing brochures, and financial advisors' training materials.  For instance, each annual report contained an opening letter to CD holders signed by Stanford as well as a "Report of Management" letter signed by both Stanford and Davis.[91]  Stanford–regardless of his official corporate title–took a personal interest in his companies[92] and authorized highly visible promotional pieces touting the security, liquidity and conservative nature of the CDs as investments.  While Stanford was not engaged in the day-to-day bookkeeping or management of any of the companies, the exhibits and testimony demonstrate that he was actively involved in SFG's businesses' largest investments which relied on funds from the sale of CDs through SIBL.  Stanford's strategic and financial role was necessary for him to protect and enlarge his personal investment in the many SFG companies, and to promote environmental and other social goals he endorsed.[93]

---

[91]     *See, e.g.*, 2007 Annual Report, Underwriters' Exh. 30, at 6-7, 34.

[92]     *See, e.g.*, Email chain from Linda Wingfield to James Davis, Kuhrt and Lopez, with a copy to Stanford, dated July 5, 2007, Stanford Exh. 283 (an assistant wrote that "each of you be aware that if and when the business expense polices of [Stanford's] companies are modified, it will be only under his direction," and Stanford confirmed this instruction minutes thereafter)

[93]     The Court finds entirely unpersuasive Stanford's contention–asserted through counsel–that  Stanford was uninvolved in the business of SIBL and did not know about the uses of the Bank's funds.  He and his wholly owned companies were by far the largest beneficiaries of the investments made with the funds.  *See* Internal Revenue Service ("IRS") Notices of Deficiency and Explanations of Items, Stanford Exhs. 15, 16, 281; *Robert A. Stanford v. Commissioner*, Case # 97-60531, Opinion dated Sept. 3, 1998, Stanford Exh. 370 (pertaining to tax year 1990).  *See also* Strategic Investment Policy Committee Meeting, July 6, 2004 ("welcome" remarks
(continued...)

Further, it is clear that Stanford knew, from *at least* 2006, that the annual reports and other promotional material through which financial advisors sold SIBL CDs, contained certain important false information about SIBL's asset and investment allocations and the performance of those investments.   The annual reports and marketing materials emphasized the Bank's purported strategy of investing its assets largely in secure, marketable financial instruments, liquid assets, major multi-national corporations, and government securities.[94]   The annual reports also stated, in

---

93   (...continued)
     by Stanford), Stanford Exh. 249, at 2 (page cites are to the control numbers in the upper right corner of the document);   *id.* at 7 ("Specific Objective – Capital preservation and a steady annual flow of income and/or consistent yields," "minimization of risk," "liquidity," and "marketability"); *id.* at 8 (real estate and private equity investments each were to be between 0 - 10% of the total portfolio, with a "high proportion of fixed-income and cash investments"; *see id.* at 9 *et seq. (*various investment allocations for accredited and non-accredited investors); *id.* at 17 (real estate was to be in "hard assets, REIT, managed assets with income streams").

94   For example, the 2006 Annual Report stated that

     [t]he Bank's assets are invested in a well-balanced global portfolio of marketable financial instruments, namely U.S. and international securities and fiduciary placements . . .. The Bank's investment portfolio maintains a stable and well-balanced structure due to a high proportion of fixed-income investments and a diversified investment advisory network resulting in an optimum diversification process. There is a policy of maintaining sufficient liquidity, thus protecting longer-term investments with significant returns."

2006 Annual Report, Underwriters' Exh. 36, at 27.  *See* May 24, 2010 Van Tassel Declaration, ¶ 12 and Exh. 3, at 3, 6; SFG Brochure, Underwriters' Exh. 10, at 3 (touting liquidity of SIBL's investments, including "highly marketable securities, issued by stable governments, strong multinational companies and major international banks," "matching investment time horizons against terms of deposits . . . to ensure adequate liquidity to meet all customers' needs"); *see* comparable language in Underwriters' Exhs. 11, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 124, 126,
(continued...)

---

emphasizing the security of CD holders' funds, that SIBL "does not expose its clients to the risks associated with commercial loans.  The Bank's *only form of lending* is done on a cash-secured basis solely to existing clients."[95]  Stanford personally made similar representations, touting the strength of SIBL's investments, at presentations to groups of financial advisors.[96]  Stanford knew these representations were untrue, because he and the entities he controlled received hundreds of millions of dollars (and eventually over a billion dollars) in undisclosed loans and other SIBL funds transfers.[97]  Indeed, the loan total was approximately $1.8 billion by the end of 2008.[98]  There is no evidence that these loans were repaid or the interest serviced; indeed, all evidence of record, as well as Van Tassel's analysis, strongly suggests that they were not.[99]  Nowhere do the SIBL promotional materials or annual reports disclose that investments in Stanford-related entities would be part of the portfolio.[100]

---

[94]     (...continued)
137.

[95]     *See, e.g.*, 2007 SIBL Brochure, Underwriters' Exh. 42, at 7; 2005 Annual Report, at 31.

[96]     Testimony of financial advisor Tidwell, sales manager of the Houston SGC office.

[97]     *See* Underwriters' Exhs. 55 (Promissory Notes signed by R. Allen Stanford), 109 (wire transfer confirmations), 128, 131.  The promissory notes signed by Stanford totalled more than $1.056 billion in loans by year end 2003.

[98]     *See, e.g.*, Berenblut Report, Exh. 12.

[99]     June 15, 2010 Van Tassel Declaration, ¶ 15(c).

[100]    Stanford's argument that the funds transfers were "investments" and not debt is unavailing.  It appears that Stanford was personally involved in these ventures, thus making the investments less than arms' length.  The expensive real estate projects and private equity investments also likely had long term horizons before profits could be
(continued...)

Stanford also was closely involved in the purchase and development of real estate using SIBL funds, in particular, the grandiose "Islands Club" project. As Stanford's own witness, Giselle James, explained in detail at the hearing, from 2004 onward, Stanford took great pride and gave significant attention to this project.[101] Even if, as Stanford argues, the Islands Club project was an actual real estate development on one or more Antiguan islands, and not just a balance sheet scheme to increase SIBL's reported assets (as others contend), this substantial, long term, illiquid real estate project, was patently inconsistent with the investment goals of CD holders seeking conservative, liquid investments.

Stanford had additional incentive to hide SIBL's weak balance sheet and inadequate investment performance as 2008 progressed. SIBL experienced an unexpectedly high volume of CD redemptions and severe liquidity issues, apparently due to adverse reports about SIBL in the financial press, reports of regulatory

---

[100]   (...continued)
realized and thus were inconsistent with SIBL's, the financial advisors', and Stanford's own marketing of SIBL CDs.

Stanford's reliance on investigations and reports of the IRS to establish the transfers were not "loans" to him or his entities is also unavailing. After-the-fact characterizations by the IRS of related-party transactions is not probative for present purposes. Moreover, neither loans to nor investments in related parties were consistent with the investment guidelines presented to CD holders.

[101]   *See, e.g.*, Stanford Exhs. 80, 139, 140, 141, 143, 144, 145, 154, 155, 157, 160. The project apparently was conceived in 2004. The club was a very ambitious endeavor not likely to succeed in 2008 or the near term. Each individual who joined the club was expected to pay a $50 million initiation fee for the right to have access to one of the extravagant homes Stanford planned to build on the club properties. The member additionally was to pay annual dues of $15 million. This project stands in stark contrast to Tidwell's testimony about Holt declining the opportunity on behalf of SIBL to invest in a real estate project that was generating consistent revenue.

investigations and the global recession, resulting in SIBL having difficulty honoring its commitments to CD holders and others.[102]   When matters reached crisis proportions, Stanford sent a "Dear Client" Letter in mid-February 2009 in an attempt to calm CD holders.[103]  He had no demonstrable basis for his statements in the letter that SIBL was in good financial health or that the SEC review was merely routine. Moreover, the SEC was seeking testimony from SIBL and SFG.  It appears that Davis and Stanford sought to defend the mid-2008 and end of year claims that SIBL assets were in the $8 billion range.  Thus, they secretly undertook in late 2008 and the first months of 2009, with Kuhrt and Lopez's help, to devise a way to convert the $63.5 million worth of Antiguan real estate (purchases that had closed only several months earlier) into a $3.174 billion investment as of year end.[104]

The Court concludes that Underwriters have proven a substantial likelihood that a preponderance of the evidence would show that Stanford knew or suspected the SIBL revenues from CD sales were "property which constitutes a benefit obtained

---

[102]   *See* May 24, 2010 Van Tassel Declaration, ¶ 24; *see, e.g.*, Emails among SIBL and other staff, Underwriters' Exhs. 93, 160, 161, 165, 170, 173, 174, 175, 177, 186; Stanford Exhs. 29, 50, 89, 90, 126, 175, 176, 350, 351, 358.

[103]   *See* "Dear Client" Letter, Underwriters' Exh. 54.

[104]   The Court credits the testimony and analysis of Underwriters' expert Berenblut, which was consistent with Van Tassel's conclusions, that SIBL's year end asset values totaling more than $8 billion were not possible without the artificially inflated $3.174 billion value of the real estate in issue.

The Court does not address Stanford's problematic representations that he made two capital contributions to SIBL totaling $741 million.  *See* Email Chain among Holt, Kuhrt, Lopez and Davis, dated Dec. 17, 2008, Stanford Exh. 175 (discussing the need to convert holdings to cash, and including an inquiry about whether the Sept. 30, 2008 and Nov. 30, 2008 "injected capital" was "a cash contribution").

from . . . or in connection with criminal conduct," namely, mail and wire fraud by Davis, and thus satisfies the Policy's definition of Criminal Property.

The Court concludes further that Underwriters have proven a substantial likelihood that a preponderance of the evidence would establish that Stanford knowingly committed acts of Money Laundering involving the Criminal Property. For instance, when Stanford approved financial reports that did not disclose loans or transfers of hundreds of millions of dollars to him and his entities, thus making SIBL's financial condition appear far stronger than it was, he entered into or became "concerned in an arrangement" which he knew would facilitate the "acquisition, use or possession" of Criminal Property.   Underwriters also have shown that Stanford knowingly committed acts of Money Laundering under the Policy in that he assisted in the concealing and transfer of SIBL funds by using the funds for related companies' purposes, for at least one enormous real estate development that would not have cash flow for many years, all without disclosing the uses to SIBL CD holders or regulators. Underwriters therefore have shown that they have no obligation to pay Stanford's defense costs in the Criminal and SEC Actions.[105]

The Court's ruling here is narrow.  The Court does not reach the issue of whether the evidence supports a finding that Stanford personally engaged in criminal conduct.  The ruling is limited to analysis of conduct found by a preponderance of the evidence on a necessarily restricted record and without reliance on inferences that could be drawn from Stanford's invocation of his Fifth Amendment privilege against

---

[105]   To the extent necessary, the Court would hold that the evidence of record supports a conclusion that the Underwriters have shown by a preponderance of the evidence that the Money Laundering Exclusion in fact applies, not merely that there is a substantial likelihood this burden has been met.  Moreover, in the Court's view, the evidence would suffice under a clear and convincing standard, were that the applicable standard of proof.

self-incrimination.  These findings and conclusions are not intended for use in the Criminal or SEC Actions.

## IV.  STAY PENDING APPEAL

A stay pending appeal is extraordinary relief and should be entered only when four conditions are met: (1) the movant establishes a likelihood of success on the merits; (2) the movant would suffer irreparable injury if a stay is not granted; (3) a showing that the stay would not substantially harm the other party; and (4) a demonstration that the stay would serve the public interest.  *See Reading & Bates Petroleum Co. v. Musslewhite*, 14 F.3d 271, 275 (5th Cir. 1994) (citing *United States v. Baylor Univ. Medical Center*, 711 F.2d 38, 39 (5th Cir. 1983)).  "While each part must be met, the appellant need not always show a probability of success on the merits; instead, the movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the stay."  *Arnold v. Garlock, Inc.*, 278 F.3d 426, 438-39 (5th Cir. 2001), *reh'g en banc denied*, 288 F.3d 234 (5th Cir. 2002).

The Court finds that there is little likelihood of success on the merits of the issues expected to be appealed in this matter.  Moreover, given the Court's interpretation of the proof requirements under the Policy, there is no serious legal question regarding the Policy's Money Laundering Exclusion.

As to irreparable injury if the stay is not granted, the Court acknowledges that Plaintiffs' criminal defense counsel will no longer be paid by Underwriters under the Policy.  Nevertheless, Plaintiffs may apply for payment of counsel's future fees and expenses under the Criminal Justice Act, 18 U.S.C. §3006A.  The Court is therefore unpersuaded at this time that Plaintiffs would suffer irreparable injury if a stay pending appeal is denied.

The Court finds, on the other hand, that the grant of a stay would harm Underwriters, who would have to continue to pay Plaintiffs' attorneys' fees and expenses and have little chance for recoupment of those funds. While, under the Policy, Plaintiffs technically have a reimbursement obligation to Underwriters for attorneys' fees and expenses paid on their behalf prior to the Money Laundering Exclusion being found to apply, all indications are that Plaintiffs' have very limited personal assets, and they will be unable to repay the hundreds of thousands, if not millions, of dollars that Underwriters already have spent for each Plaintiff.[106] Indeed, Underwriters already have spent well more than $11.2 million to fund Plaintiffs' defense costs, most of which has been paid during the pendency of this coverage case. The litigation resulting from the SIBL CDs and other SFG businesses is already enormous and promises to expand. There is a dwindling insurance pot intended for the benefit of at least 30 SFG officers and directors, some of whom apparently are not subject to the Money Laundering Exclusion. It is unfair to continue defense costs for Plaintiffs at the potential expense of others who are in need and have not yet benefitted.[107]

Finally, the Court is unpersuaded that a stay of this ruling would serve the public interest. Underwriters and the Stanford entities negotiated a contract that must be enforced by its terms. To do otherwise would disserve the public interest.

## V. CONCLUSION AND ORDER

---

[106]   It is noted that after completion of the criminal and civil cases, under the Fifth Circuit's ruling, Plaintiffs may seek from this Court a final determination on the merits of the Money Laundering Exclusion if they (Plaintiffs) prevail in the other cases.

[107]   It is noted that the Receiver also asserts a claim on the proceeds from the Policy.

On the bases detailed above, the Court concludes that Underwriters have met their burden to show a substantial likelihood that the preponderance of the evidence would demonstrate that the Money Laundering Exclusion applies to each Plaintiff and that coverage of defense costs in the Criminal or SEC Action, or related litigation, for Plaintiffs is not required by the Policy.[108]  The Court therefore grants Underwriters' Motion to Vacate the Preliminary Injunction [Doc. # 260].

The Court carefully has considered the evidence of record, the parties' arguments, and applicable law.  The Court concludes that there is no basis for a stay of this ruling pending the inevitable appeal.  It is therefore

**ORDERED** that Underwriters' Motion to Vacate [Doc. # 260] is **GRANTED**. It is further

**ORDERED** that a stay pending appeal is **DENIED**.

Signed at Houston, Texas, this <u>13</u>th day of **October, 2010**.

Nancy F. Atlas
United States District Judge

---

[108]    Finally, if necessary, the Court would hold that the proof of record establishes by clear and convincing evidence that the Money Laundering Exclusion applies to each Plaintiff.